# United States Bankruptcy Court
## for the Southern District of Texas
## Houston Division

|  |  |
|---|---|
| *In re*<br>**Wesco Aircraft Holdings, Inc.**,<br>*et al.*,[1]<br><br>Debtors. | Case No. 23-90611 (DRJ)<br><br>Chapter 11<br><br>(Joint Administration Requested) |

# Declaration of Raymond Carney in Support of Chapter 11 Petitions and First Day Motions

---

[1] The Debtors operate under the trade name Incora and have previously used the trade names Wesco, Pattonair, Haas, and Adams Aviation. A complete list of the Debtors in these chapter 11 cases, with each one's federal tax identification number and the address of its principal office, is available on the website of the Debtors' noticing agent a thttp://www.kccllc.net/incora/. The service address for each of the Debtors in these cases is 2601 Meacham Blvd., Ste. 400, Fort Worth, TX 76137.

I, Raymond Carney, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer ("**CFO**") of Wesco Aircraft Holdings, Inc. ("**Wesco Holdings**"), a Delaware corporation (together with the other above-captioned debtors, the "**Debtors**" and, together with their non-Debtor subsidiaries, "**Incora**"). I have served as CFO of Wesco Holdings since September 2021 on an interim basis and since October 2021 on a permanent basis. Before accepting the CFO position, I served as Incora's Chief Accounting Officer and Global Controller beginning in November 2020.

2.      As CFO, I am responsible for the overall accuracy, reliability, efficiency, and business partnering capabilities of Incora's finance function, and I am generally familiar with Incora's day-to-day operations, business affairs, and books and records. In addition, as part of Incora's executive leadership team, I work with other senior leaders to make decisions on key business and strategic matters. I participate in certain meetings with the board of directors of Wesco Holdings' indirect parent company, Wolverine Intermediate Holding Corp. ("**Wolverine Intermediate**").

3.      Before my employment with Incora, I spent most of my career in financial leadership roles in publicly traded, multinational companies across various industries, including positions as Chief Accounting Officer for KBR, Inc., Exterran Corporation, and Dresser-Rand Group Inc. Before working at Dresser-Rand, I spent six years in finance and accounting positions at Alcoa and thirteen years as an auditor with Ernst & Young. I hold a B.S. in accounting from the Pennsylvania State University.

4.      On June 1, 2023 (the "**Petition Date**"), the Debtors commenced their respective bankruptcy cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") in the U.S. Bankruptcy Court for the Southern District of Texas (the "**Court**"). I understand that the Debtors intend to request certain types of relief in "first-day" motions and applications (collectively, the "**First Day Motions**"). I am familiar with the contents of each First Day Motion, including their exhibits, and I believe that the relief sought in those motions is critically important for maintaining the Debtors'

operational stability, preserving commercial relationships and jobs, and maximizing the value of the Debtors' estates. Furthermore, I believe that the relief sought in the First Day Motions is narrowly tailored to achieving those goals and, accordingly, serves the interests of all of the Debtors' stakeholders.

5.      I submit this declaration (this "***Declaration***") to provide an overview of the Debtors, their history, and the reasons for their filing the chapter 11 petitions, as well as in support of the relief sought in the First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of Incora's senior management and personnel, my review of the records maintained by Incora in the regular course of business, and my opinions based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify regarding any of the foregoing, I would testify competently to the facts set forth in this Declaration.

## OVERVIEW

6.      Incora is a provider of supply chain management services in several industries and the largest independent distribution and supply chain services provider in the global civilian and military aerospace industry. In its distribution business, Incora offers aerospace hardware and parts, electronic products, chemicals, and tooling products, which it procures, tracks and provides to customers from service centers around the world. In its service business, Incora manages all aspects of its customers' supply chains, including procurement, warehouse management, and on-site customer services, offering both customized supply-chain management plans and ad hoc direct sales. In both lines, timely delivery of necessary hardware and chemicals is critical to the business operations of Incora and its civilian and military customers.

7.      Fundamentally, Incora creates value for manufacturers and aftermarket maintenance providers by ensuring that critical supplies are available when needed. In the ordinary course, airplanes, helicopters, and other technologies both in and out of the aerospace industry require numerous supplies—chemicals, hardware, electronics, tooling products—often unpredictably and on a moment's notice. But it is inefficient for many manufacturers and

maintenance providers to source and store all the supplies that are regularly needed in what are often global operations. Incora solves this problem by managing all aspects of those customers' supply chains—from procurement to warehouse management to on-site services—which Incora achieves through its global footprint, large integrated workforce, and proprietary logistics capabilities.

8.     The COVID-19 pandemic in early 2020 devastated the aerospace industry. Incora's business was no exception. Travel restrictions were implemented early in the pandemic and grounded most of the global commercial airline fleet, causing customer demand for parts and services to decrease rapidly. Notably, COVID-19 occurred just as Incora was formed through the consolidation of Wesco and Pattonair, as discussed below. The ensuing economic and commercial aerospace slowdown made it difficult to implement some of the synergy initiatives that motivated the transaction.

9.     In late 2021 and early 2022, Incora retained advisors and began searching for liquidity-enhancing transactions that would enable it to survive the pandemic-driven downturn and return to normal operations. After considering options under its debt documents and in light of the prevailing market conditions, Incora pursued two parallel paths: (1) an amendment to its asset-based credit facility to provide incremental liquidity (which was consummated in February 2022), and (2) a comprehensive out-of-court recapitalization.

10.     Throughout the process, Incora was committed to identifying the best possible financing solution. Incora appointed Patrick Bartels as an independent director to the board and engaged in good faith negotiations with all its stakeholder groups. Incora also provided diligence to, and assessed a proposal from, a minority noteholder group. In the end, Incora's board of directors determined that the minority group's proposal—which provided significantly less liquidity, did not address upcoming maturities, and carried material litigation risk—was inadequate.

11.     In March 2022, after careful consideration of numerous term sheets and input from all stakeholder groups, Incora's board determined to engage in a recapitalization transaction (the

"*2022 Transaction*") that was sponsored by a majority of its secured noteholders and supported by strong majorities across the capital structure. The 2022 Transaction provided Incora with $224 million of much-needed cash (after accounting for transaction costs), extended maturities on large portions of its existing debt, substantially decreased cash interest obligations, and allowed for the suspension of payment of management fees to Incora's principal equity owner. These benefits generated significant liquidity for Incora, which it sought to leverage in what appeared to be an improving commercial environment. Subsequently, Incora secured new business, grew revenue by over $120 million, and improved adjusted EBITDA performance by nearly 40% in 2022.

12.     The 2022 Transaction positioned Incora to recover from the effects of the pandemic and to turn its business around. But while Incora's financial performance has improved considerably, it has not been enough to overcome a confluence of unforeseeable events, all beyond Incora's control. Incora was beset by significant disruption in the global supply chain, critical labor shortages, and the extended closure of the Chinese markets following COVID-19, which further delayed the expected rebound in the aerospace industry. High inflation also put increased pressure on gross margins.

13.     More specifically, these unforeseeable challenges can be broken down into several major categories:

- **Supply Chain Disruption Impact on Inventory Procurement**: Supply chain disruptions have been one of the most significant drags on Incora's financial performance over the past year. As in many markets, the supply of aerospace parts has undergone significant disruption that has increased the lead times for Incora to procure critical supplies for its customers and resulted in insufficient inventory levels of certain parts. Over the past year, Incora's shipments in arrears from suppliers, measured by the value of the shipments, has increased nearly nine-fold; on-time delivery rates are currently only around 50%. And, over the past year, the average lead time has gone from an average of 9 months to 18 months, with some parts having lead times of 12 or more months.

  These supply chain challenges have been especially problematic for Incora because its role in the aerospace industry (and some of its contracts) require it to maintain substantial inventory that manufacturers and maintenance service providers can call upon at any time. Because any failure to meet its obligations could result in contract penalties and a substantial loss of business, Incora has incurred additional costs to overcome these supply chain challenges, including from "gap" purchases at higher

prices from other distributors, expedited freight, and increased labor costs to turn inventory faster when it arrives late. These costs are in addition to the increased time and effort Incora's personnel must dedicate to managing supplier relationships.

- **Inflated Inventory Pricing**: Global price inflation, particularly for raw materials that are critical inputs to aerospace parts, has caused Incora's inventory costs to increase substantially. Incora's customer contracts were largely negotiated in an environment of low inflation and industry growth and, as a result, many include long-term, fixed-price terms without inflation protection provisions. At the same time, while Incora purchases inventory to fulfill its customer contracts in a variety of ways, it often must purchase inventory at the current market price or otherwise at prices that do not reflect the pricing expectations at the time its customer contracts were negotiated. As such, Incora is subject to increased inventory costs that it is unable to pass along to many of its customers. Additionally, many suppliers of proprietary parts have exploited their position to raise prices in excess of general inflation rates. Since inflationary pressure began developing in 2019, prices for aluminum, steel, and nickel alloy—all key materials used to manufacture aerospace parts—have increased 15–105% and Incora's gross margins (measured as of 2022) have decreased by approximately 4.5%. Until Incora can modify unprofitable contracts, inflation and supply chain challenges will continue to prevent Incora from sufficiently enjoying the benefits of the commercial aerospace industry recovery and operating its business sustainably.

- **Lower Than Expected Industry Production Rates**: Following the 2022 Transaction, Incora was prepared to capitalize on increased demand in the aerospace manufacturing industry. Based on optimistic production forecasts from key customers and industry consultants, Incora invested heavily in inventory in anticipation of a strong industry recovery. But several unforeseeable factors contributed to significantly lighter-than-expected aerospace production on the part of Incora's customers. First, like Incora, Incora's customers have been subject to supply chain disruption and, as a result, have faced difficulties procuring manufacturing components outside Incora's purview. Without all necessary componentry, Incora's customers struggled to meet production forecasts. Second, customers faced labor shortages, which also caused production delays in many key aerospace platforms. Finally, the Chinese markets, which support significant global aviation activity and accounted for nearly half of all Asia-Pacific pre-pandemic air traffic, remained closed due to COVID-19 much longer than anticipated due to China's strict travel policies. And finally, Boeing, one of Incora's largest sources of customer activity, experienced a shutdown in deliveries of its 787 platform for a significant part of 2022. The combined effect of these issues was that actual aerospace production rates for 2022 were significantly below the consensus industry forecasts set at the beginning of the year. Accordingly, Incora's revenue grew only approximately 7% in 2022, well below the expected 13%. Furthermore, the long lead time of many of the parts that Incora purchases necessitated placing orders in anticipation of the recovery. This, coupled with the above-described slowdown, resulted in Incora being left with an oversupply of inventory that was not converting to cash as quickly as expected.

- **Limited Ability to Manage Working Capital**: Incora was poised to capitalize on several working capital initiatives to provide additional liquidity for its continued recovery. Three such key initiatives were: (a) improving the collections of accounts receivable, (b) negotiating more favorable payment terms with suppliers, and (c) selling down inventory as industry demand increased. Collections were expected to improve in line with a general industry recovery; supplier payment terms were expected to improve as a result of Incora's rehabilitated financial position following the 2022 Transaction, reversing the contraction of terms that occurred during a period of financial distress; and, as discussed above, inventory balances were expected to reduce as sales increased from a general industry recovery. However, as discussed, Incora's customers and suppliers were affected by many of the same economic impediments as Incora, which limited the effectiveness of these initiatives. Resulting changes in in the statuses of accounts receivable, accounts payable, and inventory were all drains on liquidity in 2022, subverting expectations.

- **Disruption in Katsumi Factoring Facility**: On April 10, 2023, the provider of Incora's main receivable factoring facility informed Incora that it would not accept Incora's then-outstanding nominations (i.e., offers to sell specific receivables) and would not accept future nominations. The loss of this facility has caused a total liquidity reduction of approximately $43 million.

14.     As Incora devoted itself to addressing and mitigating these operational challenges, certain unsecured noteholders filed suit in the Supreme Court of the State of New York against Incora and certain of its noteholders to, among other things, unwind the 2022 Transaction. This action was followed by a similar action naming only Incora's noteholders and affiliates, also in the New York Supreme Court. These cases have caused yet another drain on Incora's financial resources (including on account of Incora's indemnification of the parties that participated in the 2022 Transaction) and distraction for its management team and key employees at a time when focus on operations and reorganization could not be more critical.

15.     All of the foregoing issues severely strained Incora's resources. Incora has managed to keep its business sound and continues to be a reliable source of inventory for its customers, but it cannot generate sufficient cash to meet its existing obligations. Despite Incora's efforts, its liquidity has been insufficient due to continuing cashflow issues and its leveraged capital structure. As a result, Incora is unable to meet its near-term obligations, including interest payments on its notes that became due on May 15, 2023.

16.     In January 2023, Incora engaged with its senior stakeholders to negotiate a consensual restructuring. As described further in the *Declaration of Peter Laurinaitis in Support of Debtors' Emergency Motion For Entry of Interim and Final Orders (i) Authorizing Them to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (ii) Granting Liens and Providing Superpriority Administrative Expense Claims, (iii) Granting Adequate Protection to Prepetition Secured Parties, (iv) Modifying the Automatic Stay, and (v) Granting Related Relief* (the "***Laurinaitis Declaration***"), filed along with this Declaration, Incora and its senior secured noteholders reached an agreement on the terms of a debtor-in-possession financing (the "***DIP Financing***").

17.     Incora intends to use these Chapter 11 Cases to repair its capital structure and address targeted operational issues. Incora's management team has already made significant progress toward determining how to use the tools of chapter 11 to address Incora's operational challenges, including by bringing its unprofitable customer contracts and other burdensome contractual arrangements in line with current economic and commercial reality.

18.     Demand for Incora's services remains strong, and Incora is poised for growth as the commercial aerospace industry continues its recovery from the COVID-19 pandemic. Incora has already been able to win new business and boost operating income in the last year despite its various challenges and intends to continue this positive trajectory during and after its Chapter 11 Cases. It is my every expectation that Incora will emerge from the Chapter 11 Cases a healthier and more nimble company that can execute on its strategic initiatives, retain a talented workforce, and continue to provide its global customer base with the reliable and innovative supply chain solutions that have made Incora a trusted partner and market leader.

19.     This Declaration is organized into four sections that describe: (a) Incora and its business, history, and corporate structure, (b) Incora's prepetition capital structure, (c) the circumstances and events that led to the commencement of the Chapter 11 Cases, and (d) the First Day Motions.

# INCORA'S BUSINESS, HISTORY AND CORPORATE STRUCTURE

## I.   INCORA'S BUSINESS

20.     Incora provides customizable and often on-demand supply chain management services to manufacturers and maintenance providers across several industries, with a focus on the commercial and defense aerospace industry. Incora enables manufacturers and maintenance providers to off-load the resource-intensive management of their critical supply inventories and instead focus on their core manufacturing or repair businesses.

21.     These manufacturers and maintenance providers depend on Incora to provide critical components and other supplies reliably and quickly. Without Incora's services, these manufacturers and maintenance providers would need to source and keep on hand at all times various supplies needed to, for example, overhaul a jet engine—fasteners, bearings, lubricants, sealants, and so on—which would require them to devote substantial resources to processes outside their core capabilities. If a manufacturer or maintenance provider has a contract with Incora, it can rapidly obtain the parts or chemicals from an Incora warehouse. The manufacturer or maintenance provider could also contract with Incora for tailored, holistic supply chain management, allowing Incora to track and forecast its needs and provide supplies before it knows they are needed. Because Incora's services are so closely integrated into its customer's operations, its customers could experience delays or even shutdowns in their production lines if Incora does not provide them with necessary supplies. In short, Incora's services are critical to the day-to-day operations of its customers and the entire aerospace industry.

### A.     Global Presence, Customers and Suppliers

22.     Incora's business depends on its ability to maintain a global physical presence and an equally broad network of employees to coordinate with its numerous vendors and customers. From its global headquarters in Fort Worth, Texas, its European headquarters in Derby, England, and its Asian headquarters in Singapore, Incora operates more than 60 stocking locations, warehouses, and offices in 17 countries across the globe.



23.     To serve its over 8,400 customers – many of which are major well-known organizations within their respective industries and which range from aircraft manufacturers to the U.S. military[2] to automotive manufacturers to pharmaceutical companies – Incora employs approximately 3,750 people worldwide. More than 1,200 of them work at approximately 200 customer sites and provide a range of critical on-site services, creating a bespoke and comprehensive service experience. These employees are essential to sourcing hardware and chemicals from over 7,000 suppliers.

24.     Incora's services allow both suppliers and customers to improve performance and increase value. Suppliers benefit from improved machine utilization, reduced finished goods inventory, access to Incora's customers, improved working capital and cash flow, price discipline, lower administrative and selling costs, and improved on-time performance, among other things. Customers benefit from lower overhead costs, reduced inventory and working capital, improved

---

[2]     Over 40% of Incora's revenues derive from business with the U.S. military and several large defense contractors and subcontractors that manufacture aircraft and armaments, many of which have been customers for decades. The defense industry remained relatively stable during COVID-19 and continues to grow steadily.

productivity, better on-time delivery, consistent and predictable quality, fewer stock shortages, and a single point of contact for orders and deliveries.

25.    Incora can provide this value because it is deeply rooted among the industries it serves. The average length of time that Incora has served its ten largest customers (who collectively represent 57% of its revenue in fiscal year 2022) is greater than 20 years. Likewise, its relationships with its ten largest suppliers span, on average, over 25 years. Incora attributes its industry-leading status in significant part to its history of focusing on establishing these long-term relationships with customers and suppliers.

**B.     Business Lines**

26.    Incora has two primary lines of business: the Hardware business and the Chemicals business (each as defined below). The Hardware business focuses on the distribution and supply chain management of fasteners, bearings, machined parts, tooling, and other hardware supplies, while the Chemicals business focuses on the distribution and supply chain management of solvents, paints, coatings, oils, greases, lubricants, adhesives, tapes, sealants, industrial gases, and other chemical supplies.



27.     Incora's hardware business is further organized by its Contract and ONdemand models. Under the Contract model, Incora provides customized services to source, hold, and deliver inventory directly to Incora's customers' manufacturing sites. Incora enters into long-term contracts with its customers and earns a margin on product sales and a management fee on services provided. Contracts typically have three- to five-year terms.

28.     The ONdemand model creates value through the maintenance of a distribution system that provides hardware parts to customers at a variable market-driven price without the need for long-term contracts. The ONdemand model generally suits customers with immediate delivery needs or limited purchasing scale.

29.     The Hardware business consists of a mix of Contract and ONdemand model revenue, while the Chemicals business largely consists of Contract model revenue.



### 1.     *The Contract Business*

30.     The long-term nature of customer contracts allows Incora to customize product sourcing and compliance processes, as well as integrate IT systems. Incora stations employees on-site at major customers' facilities to receive, inspect, organize, and deliver parts directly to their production lines.

31.     Incora offers its Contract customers several services:

- *Supply Chain Management*: Comprehensive supply chain management that provides a single point of contact for a customer's supply chain needs. Incora tailors its services to each customer, managing the customer's unique inventory procurement needs and ensuring regulatory compliance.

- *Inventory Management Services*: Technology- and data-based solutions for monitoring inventory and forecasting procurement needs. This includes the provision of stocking and planning tools designed to track consumption, manage expirations, and automatically replenish orders through Incora's global network of distribution centers, as well as to identify and avoid potential acquisitions of unnecessary inventory.

- *Chemical Services*: Software solutions and on-site services to support chemical inventory management and regulatory compliance. Chemical management is essential to a variety of industries, including aerospace, industrial and heavy machinery, and pharmaceuticals. Incora's proprietary software, "tcmis," allows customers to control purchasing, track chemical location and usage, and streamline environmental and other regulatory compliance. Additionally, Incora's hazard communication (HAZCOM) program, which complies with the Occupational Safety and Health Administration ("**OSHA**") Hazard Communication Standard, presents OSHA's hazard communications guidance in an easy-to-understand format that enables employees to respond quickly and safely in the event of a chemical emergency.

- *Composite Management*: Management of inventories of composite materials – *i.e.*, special-purpose materials used in both simple and complex aircraft part manufacturing. Composite materials are essential to continuing innovation in aircraft design, including improvements in fuel efficiency. Incora offers fully customizable composite materials kits.

- *Kitting Services*: Delivery services for customized kits containing exact quantities of inventories needed for specific jobs. Kitting services allow customers to avoid sourcing and storing miscellaneous inventory.

- *Distribution Services*: Global delivery of hardware, chemicals, electronics, and other supplies. Incora meets its customers' distribution needs through its global locations and over $1 billion of inventory, employing certified quality assurance and documentation experts.

- *Vending Services*: Sale and installation of "warehouse-in-a-box" vending cabinets for customer facilities. Vending cabinets, which can hold over 300 unique part numbers and over 20,000 individual parts, make parts available on-site at any time. The cabinets are transportable and possess inbuilt features for rough service deployment, including a payload lift system.



32.     Incora also distributes to its Contract customers a variety of products used in their

manufacturing and maintenance operations, including the following:

- *Fasteners:* Highly engineered aerospace parts that affix two or more components, such as rivets, bolts, screws, nuts, and washers.

- *Electrical Products:* Reliable interconnect and electro-mechanical products, including connectors, relays, switches, circuit breakers, lighted products, wires, and cables, as well as assembled products such as panel connectors and illuminated push-button switches. Incora offers electronic components from over 40 top manufacturers. Additionally, Incora operates a Center of Excellence for Electronics in Wichita, Kansas, offering to customers worldwide instruction on warehousing, quality management, administration, connector and lighted switch assemblies, and wire cutting and respooling.

- *Tooling:* Premium tools, specialized tooling solutions, and toolkits known for their quality and design. Incora's tooling center provides comprehensive tool management by supporting customers through the life cycle of their tools. Incora is manufacturer-authorized for sales, distribution, maintenance, and repair, and Incora employs certified technicians who carry out in-house or on-site manufacturer warranty services.

- *Bearings:* Anti-friction products, such as airframe control bearings, rod ends, spherical bearings, ball bearings, needle roller bearings, bushings, and precision bearings.

- *Machined Parts:* Customized parts designed for a specific customer, such as laser-cut or stamped brackets, milled parts, shims, stampings, turned parts, and welded assemblies. Incora partners with over 100 vetted manufacturers and machine shops to provide best practices for sourcing new materials and in-house quality testing.

- *Chemicals:* Adhesives, sealants and tapes, lubricants, oil and grease, paints and coatings, industrial gases, coolants, metalworking fluids, and cleaners and cleaning solvents. Incora's global network of chemical warehouses features temperature-controlled storage, shelf-life management, custom labeling, and barcode tracking for traceability.



33.     Incora is an authorized distributor with contracts with most major aviation hardware manufacturers and service providers. In total, Incora offers over 600,000 stock-keeping units ("*SKUs*") of chemicals and "B-Class" and "C-class" hardware components that are used in aircraft engines, airframes, hydraulic units, actuation systems, wheels, brakes, landing gears, and exteriors. C-class components are parts that typically constitute a significant majority of the number of component SKUs used in aircraft.

### 2.     *The ONdemand Business*

34.     Some customers buy products directly from Incora without a contract. For ONdemand customers, Incora's in-stock inventory availability, ability to procure variable products as needed, and turnaround time are critical. Because Incora incurs significant costs to ensure that its SKUs are kept in stock to provide to ONdemand customers, its profit margins for ONdemand customers are typically higher than for Contract customers who look to Incora for broader supply chain management.

35.     While ONdemand profit margins are higher than the Contract business, ONdemand revenue volume has been steadily declining in recent years as customers migrate to the Contract business, among other reasons. In 2019, ONdemand represented 18% of Incora's total revenue, whereas in 2022 it was down to only 11%. As the highest margin piece of Incora's business, the decline in ONdemand revenue has contributed to an overall decline in Incora's gross profit margins.

## II.   Corporate History

36.     Incora was formed through a consolidation of two industry leaders, Wesco and Pattonair. Wesco was an aerospace hardware and service provider founded in 1953 in Gardena, California. A major private equity firm purchased a majority of Wesco's stock from the company's founding family in 2006 and then sold Wesco's stock through an initial public offering in 2011. At that time, Wesco's business relied heavily on sales of C-class hardware and was attempting to transition customers toward the comprehensive supply chain management agreements that now provide most of Incora's revenue. Three years later, Wesco significantly expanded the chemical side of its business with the purchase of Haas Group, a leading provider of chemical supply chain management services, for $550 million in cash. By 2019, Wesco's business was roughly balanced between hardware and chemicals.

37.     Pattonair was founded in 1970 in England, not far from London Heathrow Airport. Pattonair's business concentrated on providing C-class parts for civilian aircraft engines, with an especially close relationship with Rolls-Royce, a leading manufacturer in the aerospace industry.

Platinum Equity, an American private equity investment firm, purchased Pattonair from another private owner in 2017.

38.     In August 2019, Wesco and Platinum Equity announced that Wesco would be sold to Platinum Equity. Platinum Equity intended to combine Wesco with Pattonair to create a business that would benefit from complementary commercial strengths, an expanded global reach, and reduced overhead. The sale of Wesco closed in January 2020, the combined company announced its new brand name—Incora—in March 2020, and the firm opened a new global headquarters in Fort Worth, Texas, in May 2021.



## III.   CORPORATE STRUCTURE

39.     As shown in the chart attached to this Declaration as **Exhibit A**, Incora's operations are divided across numerous operating entities, due to the global nature of those operations and due to its history of business combinations. The operating entities include Wesco Aircraft Hardware Corp. (formerly the principal operating company of Wesco) and Pattonair Ltd. (formerly the principal operating company of Pattonair). All operating companies are directly or indirectly owned by Wesco Holdings, which is the issuer of most of Incora's funded debt. Wesco Holdings

is in turn owned by a chain of three holding companies: Wolverine Intermediate Holding II Corporation (a Debtor and a guarantor of most of Incora's funded debt), Wolverine Intermediate (a Debtor and the issuer of the PIK Notes described below), and Wolverine Top Holding Corporation (a non-Debtor).

40.     Independent director Patrick Bartels serves on the board of directors of Wolverine Intermediate.

## INCORA'S PREPETITION CAPITAL STRUCTURE

41.     Incora's prepetition capital structure was initially established in late 2019 and early 2020 in connection with the consolidation of Wesco and Pattonair and was later modified by the 2022 Transaction and related subsequent exchanges. A chart summarizing approximate principal amounts and accrued interest under Incora's funded debt is set forth below:

| Debt Facility | Security and Priority | Principal and Accrued Interest Outstanding (mm)[3] |
|---|---|---|
| ABL Facility | First lien on current assets; third lien on fixed assets | $421 |
| 2026 Secured 1L Notes | Second lien on current assets; first lien on fixed assets | $1,388 |
| 2027 Secured 1.25L Notes | Third lien on current assets; second lien on fixed assets | $533 |
| *Total Secured* | | *$2,341* |
| 2024 Unsecured Notes | None | $184 |
| 2026 Unsecured Notes | None | $352 |
| 2027 Unsecured Notes | None | $111 |
| PIK Notes | None; structurally subordinated | $156 |
| *Total* | | *$3,144* |

---

[3]     Amounts do not reflect any interest (including payment-in-kind interest) accrued since May 15, 2023.

## I.    SECURED DEBT

### A.    The Asset-Based Loan Facility

42.    Wesco Holdings is the borrower under an asset-based credit facility (the "***ABL Facility***") governed by a Revolving Credit Agreement, dated as of January 9, 2020, among Wolverine Intermediate Holding II Corporation as Holdings, Wesco Holdings as Ultimate Lead Borrower, Bank of America, N.A., as Administrative Agent and Collateral Agent and Swingline Lender, certain subsidiaries of Wesco Holdings, as Borrowers and Guarantors, and the Lenders and Issuing Banks party thereto (as amended to date, the "***ABL Credit Agreement***"). The ABL Facility originally provided for total loan commitments of $375 million, consisting of a $300 million U.S.-based sub-facility and a $75 million UK-based sub-facility. The ABL Facility also offered Incora the ability to obtain up to $75 million of letters of credit within the $375 million facility. On February 20, 2020, Amendment No. 1 to the ABL Credit Agreement enlarged the commitments to $475 million, consisting of $380 million under the U.S. sub-facility and $95 million under the UK sub-facility.

43.    The maturity date for loans under the ABL Credit Agreement was originally January 9, 2025, with a springing maturity of August 16, 2024 if certain secured notes outstanding on January 9, 2020 remained outstanding as of such date.

44.    On February 17, 2022, Amendment No. 6 modified the ABL Credit Agreement to provide for, among other things, a new tranche of loans. The new tranche consisted of commitments of $40 million, including a $27 million U.S.-based first-in last-out facility and a $13 million UK-based first-in last-out facility (collectively, the "***ABL FILO Facility***"). Other commitments were reduced by the same amount, so that the total amount of commitments under the ABL Credit Agreement remained $475 million. The maturity date for the new tranche was February 17, 2024 (*i.e.*, two years after the amendment date), and the original loans have the first right to the proceeds of collateral.

45.    In connection with Amendment No. 6, certain of Wesco Holdings' Debtor Canadian subsidiaries, Wesco Aircraft Canada Inc. and Haas Group Canada Inc. (the "***Canadian Debtors***")

and a Debtor Mexican subsidiary, Haas TCM de Mexico, S. de R.L. de C.V. (the "***Mexican Debtor***") provided secured guarantees of the obligations under the ABL Credit Agreement. Amendment No. 6 also removed the "fixed charge coverage ratio" financial covenant in the ABL Credit Agreement and replaced it with a condition that "Global Availability" be, at all times, at least $47.5 million.

46.     Amendment No. 7 provided certain consents in connection with the 2022 Transactions described below.

47.     As of May 15, 2023, approximately $421 million in principal amount of loans was outstanding under the ABL Facility, including approximately $13 million under the ABL FILO Facility. Additionally, approximately $1.6 million in letters of credit had been issued under the ABL Facility and remained outstanding.

48.     The ABL Facility is guaranteed by each of the Debtors other than Wolverine Intermediate and Wesco Holdings, and the borrowers' and guarantors' obligations under the ABL Facility are secured by substantially all of their respective assets. Other than equity pledges from the Canadian Debtors and the Mexican Debtor, this collateral (the "***Shared Collateral***") also secures the obligations under the Secured Indentures in accordance with the terms of the Intercreditor Agreement, as described below.

### B.     The Secured Notes

49.     Wesco Holdings is the issuer of (a) $1.273 billion principal amount of 10.50% Senior Secured First Lien PIK Notes due November 2026 (the "***2026 Secured 1L Notes***"; the holders of these notes, the "***2026 Secured 1L Noteholders***") under the Indenture, dated March 28, 2022 (the "***2026 1L Indenture***"), among Wesco Holdings, the guarantors party thereto, and Wilmington Savings Fund Society, FSB as indenture trustee and collateral agent, and (b) approximately $473 million principal amount of 13.125% Senior Secured 1.25 Lien PIK Notes due November 2027 (the "***2027 Secured 1.25L Notes***" and, together with the 2026 Secured 1L Notes the "***Secured Notes***;" the holders of the 2027 Secured 1.25L Notes, the "***2027 Secured 1.25L Noteholders***" and, together with the 2026 Secured 1L Noteholders, and "***Secured Noteholders***")

under the Indenture, dated March 28, 2022 (the "***2027 1.25L Indenture***"), among Wesco Holdings, the guarantors party thereto, and Wilmington Savings Fund Society, FSB as indenture trustee and collateral agent.

50.     The 2026 Secured 1L Notes and 2027 Secured 1.25L Notes are guaranteed by all Debtors other than Wolverine Intermediate, Wesco Holdings, the Canadian Debtors, and the Mexican Debtor and are secured by the Shared Collateral.

51.     The Secured Notes were issued as part of the 2022 Transaction: the 2026 Secured 1L Notes in exchange for then-outstanding secured notes due 2024 and 2026 (and related accrued interest) and the 2027 Secured 1.25L Notes in exchange for then-outstanding unsecured notes due 2027 (and related accrued interest) and a $25 million unsecured promissory note issued by Wesco Holdings to Platinum Equity (the "***2023 Promissory Note***") (and related accrued interest).

52.     Several follow-on exchanges were also completed as required by and in accordance with the 2022 Transaction: On April 8, 2022, Wesco Holdings issued approximately $12.3 million of additional 2026 Secured 1L Notes in exchange for $11.8 million in principal amount of now-unsecured notes due 2026 (and related accrued interest). Also on April 8, 2022, Wesco Holdings issued $3.1 million in principal amount of additional 2026 Secured 1L Notes pursuant to the terms and conditions set forth in that certain notes purchase agreement. On October 27, 2022, Wesco Holdings issued approximately $5.8 million of additional 2026 Secured 1L Notes in exchange for $5.5 million in principal amount of now-unsecured notes due 2024 and 2026 (and related accrued interest). Finally, on April 12, 2023, Wesco Holdings issued $311,000 of additional 2026 Secured 1L Notes in exchange for $297,840 in principal amount of now-unsecured notes due 2026 (and related accrued interest).

53.     As of May 15, 2023, approximately $1.388 billion in of 2026 Secured 1L Notes and $533 million of 2027 Secured 1.25L Notes are outstanding (inclusive of accrued and unpaid interest).

### C.     The Intercreditor Agreements

54.     Two intercreditor agreements define the relative rights of creditors under the foregoing facilities to the Shared Collateral.

55.     The collateral agents under the ABL Credit Agreement and the 2026 1L Indenture and the 2027 1.25L Indenture are party to an Amended and Restated ABL Intercreditor Agreement dated as of March 28, 2022 (the "***ABL Intercreditor Agreement***"). Under the ABL Intercreditor Agreement, the lenders under the ABL Facility have superior rights to the portion of the Shared Collateral consisting of cash, accounts receivable, inventory, and certain other current assets, while the Secured Noteholders have superior rights to the portion of the Shared Collateral that primarily consists of real estate, equipment, intellectual property, and other fixed assets.

56.     The indenture trustees and the collateral agents under the 2026 1L Indenture and the 2027 1.25L Indenture are party to a Junior Lien Intercreditor Agreement dated as of March 28, 2022, pursuant to which the 2026 Secured 1L Noteholders have superior rights to the Shared Collateral vis-à-vis the 2027 Secured 1.25L Noteholders.

## II.     UNSECURED DEBT

### A.     The Unsecured Notes

57.     Wesco Holdings is also the issuer of (a) $900 million of now-unsecured notes due November 15, 2026 (the "***2026 Unsecured Notes***" and the holders thereof, the "***2026 Noteholders***") under the Indenture among Wesco Holdings, the guarantors party thereto, and BOKF, NA as indenture trustee (the "***Unsecured Notes Trustee***")[4] dated November 27, 2019 (as amended on January 9, 2020, January 28, 2020, and March 28, 2022, the "***2026 Unsecured Indenture***"), (b) $650 million of now-unsecured notes due November 15, 2024 (the "***2024 Unsecured Notes***" and the holders thereof, the "***2024 Unsecured Noteholders***") under the

---

[4]     On May 26, 2023, the Wilmington Savings Fund Society, FSB (previously The Bank of New York Mellon Trust Company, N.A.) resigned as trustee under the Unsecured Notes. On that date, Wesco Holdings appointed the Unsecured Notes Trustee in Wilmington Savings Fund Society, FSB's stead, with all of the rights, powers, and duties thereof.

Indenture among Wesco Holdings, the guarantors party thereto, and the Unsecured Notes Trustee dated November 27, 2019 (as amended on January 9, 2020, January 28, 2020, and March 28, 2022, the "***2024 Unsecured Indenture***"), and (c) $525 million of unsecured notes due November 15, 2027 (the "***2027 Unsecured Notes***" (together with the 2026 Unsecured Notes, and the 2024 Unsecured Notes, the "***Unsecured Notes***" and the holders thereof the "***Unsecured Noteholders***") and the holders thereof, the "***2027 Unsecured Noteholders***") under the Indenture among Wesco Holdings, the guarantors party thereto, and the Unsecured Notes Trustee dated November 27, 2019 (as amended, the "***2027 Unsecured Indenture***"). Like the Secured Notes, the Unsecured Notes are guaranteed by each of the Debtors other than Wolverine Intermediate, Wesco Holdings, the Canadian Debtors, and the Mexican Debtors, except that the 2027 Unsecured Notes are also not guaranteed by Wolverine Intermediate Holding II Corporation. As of May 15, 2023, as the result of mandatory repurchases and the 2022 Transaction (and its related subsequent exchanges), $184 million of the 2024 Unsecured Notes, $352 million of the 2026 Unsecured Notes, and $111 million of the 2027 Unsecured Notes are outstanding (inclusive of accrued and unpaid interest).

58.     The 2024 Unsecured Notes and the 2026 Unsecured Notes were originally secured but that security was released in connection with the 2022 Transactions.

**B.      The PIK Notes**

59.     Wolverine Intermediate is the issuer of $100 million of notes due April 15, 2028 (the "***PIK Notes***") under the Indenture between Wolverine Intermediate and Wilmington Savings Fund Society, FSB (previously The Bank of New York Mellon Trust Company, N.A.), as indenture trustee, dated as of January 9, 2020 (as amended on March 28, 2022 and April 25, 2022, the "***PIK Note Indenture***"). As of May 15, 2023, approximately $156 million in the face amount of the PIK Notes (including capitalized interest) was outstanding. Because the PIK Notes are not guaranteed by any subsidiary of Wolverine Intermediate, they are structurally subordinated to the ABL Facility, the Secured Notes, the Unsecured Notes, and all other debt of Wolverine Intermediate's subsidiaries.

### C.      Lease Obligations

60.      In the ordinary course of business, the Debtors lease certain warehouses, office space, equipment, and other personal and real property. The Debtors' leases have initial terms ranging from one to twenty-five years. As of the Petition Date, the Debtors have approximately $80 million in operating lease liabilities and $1 million in finance lease liabilities.

### D.      Accounts Payable and Other Accrued Liabilities

61.      As of the Petition Date, the Debtors have approximately $325 million in outstanding accounts payable and other accrued liabilities to various parties, such as vendors, suppliers, service providers, utility providers, and taxing authorities.

### III.    ACCOUNTS RECEIVABLE FINANCING

62.      Wesco Holdings and three of its U.S.-based operating subsidiaries, Wesco Aircraft Hardware Corp., Pattonair USA, Inc., and Haas Group International, LLC, are also party to a receivable factoring facility provided by KARS Funding, LLC as Buyer and Katsumi Servicing, LLC as Buyer Representative dated April 9, 2021 (the "***Katsumi Factoring Facility***"). Under the Katsumi Factoring Facility, the Incora entities may sell outstanding U.S. dollar-denominated receivables to KARS Funding, LLC in exchange for a total purchase price of up to $62 million. As of the Petition Date, the amount of outstanding receivables purchased under the Katsumi Factoring Facility was approximately $1.2 million. The Katsumi Factoring Facility is supported by cash collateral posted by the non-Debtor parent of Wolverine Intermediate.

63.      On April 10, 2023, Katsumi Servicing informed Incora that it would not fulfill Incora's then-outstanding nominations and would cease fulfilling future nominations under the Katsumi Factoring Facility. Since then, the amount of receivables outstanding under the Katsumi Factoring Facility has steadily declined as collections have been turned over to Katsumi.

### IV.    EQUITY

64.      Wolverine Intermediate wholly owns each of the other Debtors either directly or indirectly. Wolverine Intermediate is directly fully owned by the non-Debtor Wolverine Top Holding Corporation. The vast majority of the common and the preferred stock of Wolverine Top

Holding Corporation is owned by certain funds controlled by Platinum Equity; I understand that substantially all of the remaining stock is owned by current or former members of Incora's management team.

## EVENTS LEADING TO THE CHAPTER 11 FILING

65.    Incora's financial challenges began with the COVID-19 pandemic. The pandemic caused a significant decrease in revenue, gross margin and cash flow, and a corresponding liquidity shortfall, which Incora sought to manage through an out-of-court recapitalization. Yet, despite its success in reaching a deal that should have positioned it for growth, several unprecedented market headwinds combined in 2022 and into 2023 to make a turnaround all but impossible. Due to significant operational burdens outside its control—including supply chain dysfunction and global inflation—Incora found itself with an unsustainable capital structure. Thus, in light of the sizeable financial obligations coming due, the board of directors of Wolverine Intermediate determined that filing the Chapter 11 Cases would be in the best interests of Incora and its stakeholders.

## I.    COVID-19 CAUSES A SIGNIFICANT DROP IN REVENUE AND GROSS MARGINS.

66.    The COVID-19 pandemic devastated the global passenger aviation industry in 2020. Approximately two-thirds of the world's passenger fleet was grounded for most of the year as governments closed their borders and passengers worried that flying was unsafe.

67.    Demand for Incora's products and services is tied directly to aircraft "cycles" (typically measured by one take-off and landing) and aircraft manufacturing activity. Due to decreased flying, aircraft did not require routine maintenance as frequently as they normally would have. Incora's customers had far less work to do—especially on the wide-body planes that are most often used for international travel and contribute significantly to Incora's revenue—and therefore needed far fewer parts and chemicals from Incora. Additionally, strapped for cash, many airlines sought to economize by delaying optional maintenance and eliminating or postponing deliveries and orders of new aircraft. Passenger travel represents such a significant proportion of

overall air travel that, even with strong revenue from military and cargo customers, Incora's overall revenue decreased sharply, from $2.24 billion in 2019[5] to $1.83 billion in 2021.



68.     Hardware revenue, which is largely driven by activity in the commercial aviation industry, was impacted most significantly, with a decline from $1.51 billion in 2019[6] to $1.04 billion in 2021.

---

[5]   Revenue for 2019 is presented as combined pro forma revenue for Wesco and Pattonair given the respective businesses were not combined at the time.

[6]   Revenue for 2019 is presented as combined pro forma revenue for Wesco and Pattonair given the respective businesses were not combined at the time.



69.     Even though both the Hardware and Chemicals businesses began to stabilize in 2022[7] and overall revenue grew approximately 7% from $1.83 billion in 2021 to $1.96 billion in 2022, the growth was much lower than anticipated. Specifically, following the 2022 Transaction, the Incora's business plan projected $2.09 billion revenue in 2022, which would have amounted to 14% revenue growth. Incora's revenue underperformance as compared with the business plan is directly related to lower actual aircraft production rates than projected by a variety of industry sources.

70.     The COVID-19 pandemic also had a significant negative impact on Incora's gross margins. As discussed above, supply chain disruptions and high inflation (including inflation of inventory and internal operating costs), by creating new costs that cannot be passed on to Incora's customers, have caused Incora's gross margins to decline from 24.0% in 2019[8]  to 19.6% in 2022.

---

7   Overall, Chemical revenue has been strong during recent years due to a higher concentration of such revenue coming from the defense industry, which continues to remain active. From 2020 to 2022, Chemical revenue increased over $160 million.

8   Gross margins for 2019 are presented as combined pro forma gross margins for Wesco and Pattonair given the respective businesses were not combined at the time.



71.    The combined impact of decreased revenue and lower gross margins resulted in a substantial decline in Incora's overall profitability, with adjusted EBITDA declining from $204 million in 2019[9] to $65 million in 2021.



---

[9]    Adjusted EBITDA for 2019 is presented as combined pro forma adjusted EBITDA for Wesco and Pattonair given the respective businesses were not combined at the time.

72.     While Incora's business began to stabilize in 2022 and adjusted EBITDA began to increase, the recent improvements have not been sufficient to support Incora's approximately $225 million in go-forward annual cash interest expense.

## II.    Efforts to Manage Liquidity & Engagement with Stakeholders

73.     Faced with diminishing revenues, shrinking margins, declining profitability, and other operational challenges, starting in March 2020, Incora took numerous steps to preserve or generate liquidity. For example:

- One of Incora's largest customers is Rolls-Royce, the famous British manufacturer of, among other things, aircraft engines. Historically, Rolls-Royce provided 60% of Pattonair's revenue and approximately 16% of Incora's combined revenue in 2020. In October 2021, Rolls-Royce agreed to shorten its terms of trade to 15 days. (This term increased to 30 days at the beginning of 2022, reverted to 75 days in October 2022, and in March 2023 settled at 60 days with no set date of expiry.)

- In November 2020, Platinum Equity provided $25 million in exchange for the unsecured 2023 Promissory Note.

- Throughout 2021, Incora sold approximately $120 million worth of inventory, with the total value of its inventory decreasing from $1.26 billion at the end of 2020 to $1.14 billion at the end of 2021. This reduction of inventory contributed to Incora's ability to make interest payments through the end of 2021.

- In the fourth quarter of 2021, Incora hired financial advisors to assist in, among other things, improving Incora's cash flow forecasting and working capital management.

74.     Despite these attempts to manage liquidity, at the outset of its strategic review process in 2021, Incora found itself over-levered and suffering from a significant pandemic-driven liquidity shortfall. By the beginning of 2022, the situation was worsening as key suppliers had begun to accelerate their payment terms and even cut off supply in response to late payments by Incora. In response, Incora hired legal counsel and an investment bank to advise it with respect to its options.

75.     With advisors in place, Incora entered discussions with its major financial creditors. Discussions with lenders under the ABL Credit Agreement resulted in Amendment No. 6, which, while not increasing the lenders' total commitments under the ABL Facility, increased the

borrowing base (through the addition of new guarantors) and modified a financial covenant that allowed the debtors to avoid mandatory repayments in early 2022.

76.     Incora also received outreach from an *ad hoc* group whose members it understood held over two-thirds of the then-secured notes due 2024 and over one-half of the then-secured notes due 2026 (the "***Majority Noteholders***"). In December 2022, the Majority Noteholders proposed a financing transaction designed to provide Incora a lifeline—a potential out-of-court restructuring that would ensure sufficient liquidity until the aerospace industry recovered.

77.     In receipt of a proposal that, after further negotiation, could provide a workable liquidity solution, Incora worked diligently to advance toward a transaction. It prepared a counterproposal to the Majority Noteholders and engaged with the major holders of the 2027 Unsecured Notes and the PIK Notes, whose consents would be needed. Incora also began executing non-disclosure agreements with key parties in January 2022 and provided substantial requested diligence. In fact, committed to achieving the best outcome, over the following months Incora engaged in good-faith discussions with all of its creditor groups: (a) the Majority Noteholders, (b) the minority holders of the then-secured notes due 2024 and the then-secured notes due 2026 (the "***Minority Noteholders***"), (c) the holders of the majority of the 2027 Unsecured Notes, (d) the holder of a controlling position in the PIK Notes, (e) the majority of lenders under the ABL Credit Agreement, and (f) the provider of its receivables factoring facility. Moreover, as discussions advanced toward a transaction, Mr. Bartels was appointed to the board of directors of Wolverine Intermediate to serve as an independent director. Incora sought to conclude a financing transaction quickly to address its deteriorating liquidity position.

78.     Progress on Incora's negotiations was disrupted when the Minority Noteholders started buying notes that the Majority Noteholders had lent out to brokers through customary securities lending arrangements. Incora understood that the goal of the Minority Noteholders was to purchase sufficient notes to block a potential transaction with the Majority Noteholders. Despite this tactic, Incora entertained proposals from both the Majority Noteholders and the Minority

Noteholders. It executed non-disclosure agreements with the advisors to the Minority Noteholders and provided diligence.

79.     The board of directors, including Mr. Bartels as an independent director, carefully considered each proposal Incora received in light of all circumstances. Ultimately, the board determined that the best financing terms came from the Majority Noteholders. The Minority Noteholders' proposal was materially inferior to the Majority Noteholders' proposal in several respects, including that it did not provide nearly as much liquidity, did not provide a solution for an upcoming maturity of certain of Incora's secured notes, and carried material litigation risks given the Minority Noteholders' proposal likely would have required moving material assets out of the existing collateral package.

80.     Accordingly, the 2022 Transaction, supported by every stakeholder group referenced above other than the Minority Noteholders, closed on March 28, 2022. It involved exchanges of debt held by, among others, the Majority Noteholders, the Carlyle Group as the major then-holder of the 2027 Unsecured Notes, and Platinum Equity as then-holder of the 2027 Unsecured Notes and the 2023 Promissory Note. The 2022 Transaction was effectuated in several distinct but related steps, all in compliance with the then-existing indenture agreements. First, on March 28, 2022, with the consent of a simple majority of noteholders under the originally secured indentures (the "*Original Secured Indentures*") and the originally unsecured indenture (the "*Original Unsecured Indenture*"), Incora amended the Original Secured Indentures and the Original Unsecured Indenture pursuant to supplemental indentures (the "*Third Supplemental Indentures*"), which allowed for the issuance of $250 million of additional 2026 Secured 1L Notes. Immediately following the execution of the Third Supplemental Indentures, Incora and the Majority Noteholders executed a note purchase agreement, dated March 28, 2022 (the "*Note Purchase Agreement*"), effectuating the issuance of those additional 2026 Secured 1L Notes for $250 million in cash, providing Incora with much needed liquidity.

81.     Then, pursuant to additional supplemental indentures (the "*Fourth Supplemental Indentures*"), Incora amended the Original Secured Indentures, the Original Unsecured Indenture,

and the relevant security documents with the requisite consent of at least two-thirds of noteholders under the Original Secured Indentures and a majority of noteholders under the Original Unsecured Indenture. The amendments allowed for the exchange (the "***Exchange***") of (a) the Majority Noteholders' previously-secured notes for the 2026 Secured 1L Notes and (b) the majority unsecured noteholders' unsecured notes (including those held by Platinum Equity) for the 2027 Secured 1.25L Notes. The amendments also released the liens held by the collateral agent on behalf of the previously-secured noteholders under the Original Secured Indentures, allowed for the issuance of senior secured debt, and removed certain covenants. Immediately after execution of the Fourth Supplemental Indentures, Incora and the participating noteholders consummated the Exchange.

82.     The pre- and post-2022 Transaction capital structure is depicted in the diagram attached hereto as **Exhibit B**.

83.     The 2022 Transaction provided Incora with much-needed liquidity that preserved jobs and critical relationships with key customers. It also provided several other important benefits: it extended the maturities on $455 million of Incora's secured debt by two years and the maturity of the $25 million 2023 Promissory Note held by Platinum Equity by four years; it significantly reduced Incora's cash interest obligations; and it allowed Incora to accrue management fees owing to Platinum Equity without payment for three years (and potentially longer subject to performance thresholds). At the time of the 2022 Transaction, based on the then-current market conditions, Incora projected that the recapitalization would right its business and position it for growth.

### III.   GLOBAL DISRUPTIONS TO THE POST-TRANSACTION BUSINESS PLAN

84.     Incora's management team devoted substantial time to developing a business plan to put the new liquidity to use in what appeared to be a rapidly improving commercial environment.

85.     However, Incora was beset by unpredictable and uncontrollable global market forces. As described more fully above, the supply-chain dysfunction, inflationary pressure, rising costs of capital, economic slow-down, an interrupted rebound of the aerospace industry, market

breakdowns resulting from the COVID-19 pandemic, and other events all combined to significantly impact Incora's profitability.

## IV. LITIGATION OVER THE 2022 TRANSACTION

86.     Making matters worse, on October 31, 2022, a group of 2024 Unsecured Noteholders and 2026 Unsecured Noteholders initiated an action (the "***SSD Investments Action***") by filing a complaint in New York Supreme Court against certain of the Debtors, certain of the Debtors' non-Debtor affiliates, and certain third parties, including certain participating noteholders and Platinum Equity. The complaint alleges that the 2022 Transaction violated Incora's original indentures and constituted an insider transaction that transferred value away from non-participating noteholders. The complaint seeks declarations that the 2022 Transaction was not permitted under the original indentures, and asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, fraudulent transfer, preferential transfer, and conversion. The complaint seeks to unwind the 2022 Transaction.

87.     In January 2023, Incora and other defendants in the SSD Investments Action filed motions to dismiss the complaint. Oral argument is scheduled for June 29, 2023. Furthermore, the discovery process is in an early stage. The plaintiffs have served limited interrogatories on the defendants, and the defendants have responded and served their own interrogatory demands. Discovery is moving forward pursuant to an agreed-upon discovery schedule, with document production underway and scheduled to be substantially completed by September 2023 and all discovery scheduled to be completed in March 2024.

88.     On March 27, 2023, a single holder of the 2027 Unsecured Notes initiated a separate action (the "***Langur Maize Action***") in New York Supreme Court in connection with the 2022 Transaction against certain of the Debtors' non-Debtor affiliates and the participating noteholders that previously held 2027 Unsecured Notes, including Platinum Equity and the Carlyle Group. The complaint in the Langur Maize Action—which was commenced nearly one year after the 2022 Transaction closed—similarly seeks to unwind the 2022 Transaction, alleging that the participating noteholders sought to transfer value to themselves and asserting that the 2022

Transaction constituted a preferential transfer and violated the applicable indenture and the implied covenant of good faith and fair dealing. Motions to dismiss the complaint were filed in the Langur Maize Action on May 26, 2023, and discovery is underway. Indeed, one Debtor entity has been served with a non-party subpoena in the proceeding. Incora Responded to the subpoena on May 22, 2023 and has already received multiple follow-up communications from the plaintiffs in that case to meet and confer regarding discovery.

89.     The SSD Investments Action and the Langur Maize Action (together, the "***State Court Actions***") have placed considerable strain on the Debtors. In connection with the SSD Investments Action, the Debtors and their key employees have expended funds and time to preparing substantial briefing and responding to burdensome discovery. And while the Debtors are not formally named in the Langur Maize Action, the Debtors are nonetheless compelled to expend considerable resources to defend their interests in this litigation as well, given that all the relevant facts in the Langur Maize Action arise from the 2022 Transaction and any legal conclusions reached in the Langur Maize Action will directly impact the Debtors. The Debtors are also likely to be drawn into discovery in the Langur Maize Action. As such, the State Court Actions will continue to divert the Debtors' attention from working efficiently and productively toward a successful reorganization.

## V.     INCORA OBTAINS DIP FINANCING AND FILES THE CHAPTER 11 PETITIONS.

90.     In January 2023, facing an unfavorable economic environment and the State Court Actions, and with sizeable financial obligations looming, Incora initiated discussions about its options with certain of its stakeholders.

91.     As further explained in the Laurinaitis Declaration, Incora was unable to obtain out-of-court financing sufficient to meet its immediate liquidity needs on terms consistent with its existing debt covenants. As such, Incora engaged with stakeholders across its capital structure on the terms of potential debtor-in-possession financing. Incora also solicited interest from a number of parties outside the existing capital structure to provide debtor-in-possession financing. On May 31, 2023, Incora reached an agreement on the terms of the DIP Financing with its 2026 1L

Noteholders, who committed to provide $300 million in superpriority debtor-in-possession financing.

92.    The first-filed Debtor (Pattonair USA, Inc.) is incorporated in the State of Texas. No Debtor altered its jurisdiction of organization or its principal place of business in contemplation of these Chapter 11 Cases.

## THE FIRST DAY MOTIONS

93.    Contemporaneously herewith, the Debtors have filed the following First Day Motions seeking orders granting various forms of relief intended to stabilize their business operations, minimize disruptions caused by the commencement of these Chapter 11 Cases, and facilitate the smooth administration of these Chapter 11 Cases:

- Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")

- Debtors' <u>Emergency</u> Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims, Noticing and Solicitation Agent (the "**Claims and Noticing Agent Application**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order Extending Time to File (i) Schedules, (ii) Statements of Financial Affairs and (iii) Rule 2015.3 Statements (the "**Schedules and Statements Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing Wesco Aircraft Holdings, Inc. to Act as the Debtors' Foreign Representative (the "**Foreign Representative Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order (i) Authorizing Them to Redact Certain Personally Identifiable Information and (ii) Granting Related Relief (the "**Motion to Redact Personally Identifiable Information**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (ii) Approving Adequate Assurance of Payment to Utilities and (iii) Establishing Procedures to Resolve Requests for Additional Assurance (the "**Utilities Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (i) Authorizing Them to (A) Maintain and Use Their Existing Cash Management System, (B) Pay Bank Fees, (C) Utilize Existing Business Forms, (D) Utilize Credit Cards, and (E) Engage in Intercompany Transactions and (ii) Waiving Compliance with Section 345(b) (the "**Cash Management Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of an Interim Order and a Final Order (i) Authorizing the Debtors to Maintain Their Insurance Policies and Programs and Honor Related Obligations, (ii) Authorizing the Debtors to Renew, Supplement, Modify, Extend, Reduce or Purchase Insurance Policies, and (iii) Modifying the Automatic Stay with Respect to Workers' Compensation (the "**Insurance Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order (i) Authorizing Them to Pay Certain Prepetition Taxes and Fees and (ii) Granting Related Relief (the "**Taxes Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order (i) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Related Prepetition Obligations and (ii) Granting Related Relief (the "**Customer Programs Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of an Order (i) Authorizing Them to (A) Pay Prepetition Wages, Salaries, Benefits and Other Compensation and (B) Maintain Employee Benefit Programs and (ii) Granting Related Relief (the "**Wages Motion**")

- Debtors' <u>Emergency</u> Motion for Entry an Order (i) Authorizing the Payment of Lien Claims and Claims Under 11 U.S.C. § 503(b)(9) and (ii) Granting Related Relief (the "**Section 503(b)(9) and Lien Claimant Motion**")

- Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (i) Authorizing the Payment of Prepetition Claims of Critical Vendors and Foreign Claimants, (ii) Authorizing the Payment of Outstanding Orders, and (iii) Granting Related Relief (the "**Critical and Foreign Vendor Motion**")

- Debtors' <u>Emergency</u> Motion for an Order (i) Declaring That the Automatic Stay Applies to the Non-Debtor Parties and (ii) Preliminarily Enjoining the New York State Actions (the "**Stay Motion**")

94.     The First Day Motions also include the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "**DIP Motion**"). Although not discussed below, I concur with the separate declarations filed in support of the DIP Motion that the relief requested in it is essential to the Debtors' Chapter 11 Cases.

95.     I have reviewed each of the First Day Motions or have had their contents explained to me, and I believe that the Debtors would suffer severe, immediate, and irreparable harm if they cannot continue their business operations as proposed in the First Day Motions. In my opinion, approval of the relief sought in each First Day Motion will be critical to maintaining the stability of the Debtors' business operations, preserving value, and allowing the Debtors' managers and advisors to focus on the efforts to develop a chapter 11 plan.

96.     Several of the First Day Motions request authority to pay certain prepetition claims. I am told by the Debtors' counsel that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where, in the Debtors' judgment, the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

97.     Below is a brief discussion of each First Day Motion and an explanation of why, in my belief, the relief sought in each such motion is critical to the successful prosecution of these Chapter 11 Cases. More detailed descriptions of the relevant facts and the bases for the relief requested can be found in each First Day Motion.[10]

## I.     JOINT ADMINISTRATION MOTION

98.     In the Joint Administration Motion, the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only. All Debtors are affiliates as they are under the common ownership of Wesco Holdings. I believe joint administration of the Chapter 11 Cases will save the Debtors' estates substantial time and expense by removing the need to prepare, file, and serve duplicative notices, applications, and orders.

---

[10]    Capitalized terms used but not defined in the following sections have the meanings ascribed to them in the applicable First Day Motion.

Furthermore, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The Debtors, the parties in interest in these cases, and the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*") will similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings.

99.    I believe that joint administration would not adversely affect any creditor's rights because the Debtors request the joint administration of these cases for procedural purposes only. The Debtors do not seek substantive consolidation of their estates. Instead, all parties in interest will benefit from the cost reductions associated with joint administration. Accordingly, I believe that joint administration of these Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted.

## II.    CLAIMS AND NOTICING AGENT APPLICATION

100.    In the Claims and Noticing Agent Application, the Debtors request entry of an order appointing Kurtzman Carson Consultants, LLC ("*KCC*") as the claims, noticing, and solicitation agent (the "*Claims and Noticing Agent*") in these Chapter 11 Cases, effective as of the Petition Date.

101.    As more fully described in the Claims and Noticing Agent Motion, KCC will, among other tasks, (a) serve as the noticing agent to mail notices to creditors, equity security holders, and other parties in interest, (b) provide computerized claims, objection, solicitation, and balloting database services, (c) provide expertise, consultation, and assistance in the claim and ballot processing, and (d) provide other administrative services with respect to these Chapter 11 Cases, all pursuant to the terms of the Engagement.

102.    The Debtors' counsel has informed me that the Debtors will be required to provide notices to numerous persons and entities during the pendency of these Chapter 11 Cases. The appointment of KCC as the Claims and Noticing Agent will provide the most effective and efficient means of providing those notices, as well as soliciting and tabulating votes on the Debtors' future chapter 11 plan, thereby relieving the Debtors of the administrative burden associated with all of

these necessary administrative tasks. In addition, by KCC's appointment as Claims and Noticing Agent, the staff of this Court will be relieved from many of the duties that KCC will assume. Accordingly, I believe the Claims Agent Motion should be granted.

## III.  SCHEDULES AND STATEMENTS MOTION

103.    In the Schedules and Statements Motion, the Debtors seek entry of an order extending the deadline by which they must file their (a) schedules of assets and liabilities, (b) schedules of current income and current expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs (collectively, the "***Schedules and Statements***") through and including the date that is 60 days after the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown.

104.    I believe that the requisite cause exists for granting the extensions requested in the Schedules and Statements Motion because collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to address the immediate needs of the Debtors' business operations in chapter 11.

105.    Based on the foregoing, I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted.

## IV.  FOREIGN REPRESENTATIVE MOTION

106.    In the Foreign Representative Motion, the Debtors seek entry of an order authorizing Wesco Aircraft Holdings, Inc. to act as the foreign representative of the Debtors in any judicial or other proceeding in any foreign country. During the course of these chapter 11 cases, the Debtors may well find it advisable to file petitions in the United Kingdom or elsewhere to obtain recognition of these chapter 11 cases and to obtain relief from non-U.S. courts or agencies in support of the Debtors' reorganization under the Bankruptcy Code. Non-U.S. courts may, for instance, assist the Debtors' reorganization by enforcing the automatic stay under section 362 of

the Bankruptcy Code in their respective jurisdictions or by binding local creditors and other parties in interest to a plan of reorganization confirmed by this Court.

107.    I believe that Wesco Holdings is an appropriate choice because it is the issuer or borrower of most of the Debtors' funded debt and because it is the entity that employs many members of Incora's senior management. Authorizing Wesco Holdings to act as the foreign representative on behalf of the Debtors' estates will allow coordination of these chapter 11 cases with any non-U.S. proceedings and provide an effective mechanism to protect and maximize the value of the Debtors' estates.

## V.    MOTION TO REDACT PERSONALLY IDENTIFIABLE INFORMATION AND APPROVE FORM OF NOTICE

108.    In the Motion to Redact Personally Identifiable Information, the Debtors seek entry of an order authorizing them and their noticing agent to redact certain personally identifiable information of individual persons, including current and former employees, from these lists and from other public filings (such as the Debtors' schedules of assets and liabilities, statements of financial affairs, affidavits of service and claim objections). The Debtors propose to provide an unredacted version of all filings with redactions to the U.S. Trustee, counsel to any official committee appointed in these cases, the Court, and any other party as the Court may direct.

109.    I believe that permitting the Debtors to redact certain personally identifiable information of individual persons is warranted because the risk of identity theft, harassment, stalking, phishing scams, or injury to innocent individual creditors (most of which are likely to be employees or contractors) outweighs the presumption in favor of public access to judicial records and papers. I believe that granting the Motion to Redact is in the best interests of the Debtors, their estates, and creditors.

## VI.    UTILITIES MOTION

110.    In the ordinary course of business, the Debtors obtain telephone, Internet, gas, electric, water, waste, and other Utility Services from several Utility Companies. These Utility Services are critical to the continued operation of the Debtors' facilities as the Debtors cannot

operate their businesses without the services that the Utility Companies provide.  As of the Petition Date, approximately 110 Utility Companies, including those on the Utility List, provide services to the Debtors.  Since the Debtors' business depends on their ability to provide rapid and reliable service to their clients, it is critical that the Debtors have uninterrupted service throughout these cases.  Even a brief interruption in those services may cause grave disruption to the Debtors' day-to-day operations, and impact time sensitive deliveries and services, which would interfere with customer relationships, adversely impact revenue, and hinder the Debtors' ability to conduct their business. I believe the continued and uninterrupted provision of Utility Services during the postpetition period is necessary to allow a smooth operation of the Debtors' business and ensure stability in the production of the Debtors' products.

111.    Accordingly, in the Utilities Motion, the Debtors seek entry of an order: (a) determining adequate assurance of payment for future Utility Services that certain of the Debtors regularly obtain from a number of Utility Companies, (b) establishing procedures for determining adequate assurance of payment, and (c) prohibiting Utility Companies from altering, refusing, or discontinuing utility services.  Specifically, the Debtors request authority to deposit an amount of money equivalent to approximately two weeks of payments to Utility Companies in a segregated bank account for the benefit of the Utility Companies.

112.    In general, the Debtors have a consistent history of paying their Utility Companies on time. Over the past year, the Debtors have paid, on average, approximately $531,000 per month to Utility Companies for their services. To the best of my knowledge, there are generally no material defaults or arrearages with respect to undisputed invoices for the services that the Utility Companies provide to the Debtors.

113.    I am informed and believe that the proposed adequate assurance procedures are consistent with procedures that are typically approved in chapter 11 cases in this district and are sufficient to assure the Utility Companies that they will be paid for post-Petition Date services.

## VII.  CASH MANAGEMENT MOTION

114.    In the Cash Management Motion, the Debtors seek entry of an order: (a) authorizing them to (i) continue utilizing their existing Cash Management System, (ii) pay bank fees, (iii) continue utilizing existing business forms and checks, (iv) continue utilizing credit cards, and (v) continue to engage in intercompany transactions in the ordinary course of business and to provide administrative expense priority for such postpetition intercompany claims; and (b) waiving compliance with section 345(b) of the Bankruptcy Code.

115.    As a complex global enterprise, Incora depends on the efficient collection, transfer, and disbursement of funds. The Cash Management System is tailored to meet Incora's operating needs, enabling it to control and monitor company funds, ensure cash availability and liquidity, comply with requirements in its financing arrangements, and reduce administrative expenses incurred in connection with the movement of funds and the reporting of accurate account balances. I estimate that, on a monthly basis, approximately $165 million in cash collected from the Debtors' operations flows through the Cash Management System. The cash receipts mainly come from Incora's customers. Customer receipts (consisting of wires, automated clearing house transfers and checks) are deposited into Bank Accounts controlled by both the Debtors and by certain of their non-Debtor subsidiaries.

116.    As more fully described in the Cash Management Motion, in the ordinary course of business, Incora has historically used a complex global Cash Management System to collect receipts, pay invoices, make payroll, and fund its global operations. The Cash Management System is similar in scope, structure, and complexity to centralized cash management systems used by comparable companies to manage cash flow: it allows Incora to efficiently collect and transfer cash generated by its businesses and pay its obligations. It also enables Incora to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, allocate working capital across its global operations, and maintain control over its bank accounts. The Cash Management System spans several countries and holds funds in at least 10 different currencies. Cash then moves through the Cash Management System as described below. In all respects, under the Cash

Management System the accounting for each Debtor is separately maintained and tracked in accordance with generally accepted accounting procedures and requirements.

117.    The Cash Management System is divided into four geographic segments: (a) the U.S. system (the "***U.S. Cash Management System***"), which primarily serves the U.S. Debtors, (b) the Canadian system (the "***Canada Cash Management System***"), which primarily serves the Canadian Debtors; (c) the UK system (the "***UK Cash Management System***"), which primarily serves the UK Debtors, and (d) the rest-of-world system (the "***ROW Cash Management System***"), which includes other overseas accounts controlled by certain Debtors. Segments of each system are also used to support the operations of the Debtors' non-Debtor subsidiaries across the globe.

118.    At a high level, the U.S. Cash Management System and the Canadian Cash Management System automatically sweep the proceeds of customer receipts—deposited into zero balance accounts—into master accounts denominated in U.S. dollars and Canadian dollars. Funds from the Master Accounts are then distributed to the various disbursement accounts to satisfy Incora's U.S. and Canadian financial obligations, including payroll and ordinary course operations.

119.    The UK Cash Management System includes both depository accounts and disbursement accounts in a variety of currency denominations. The UK Cash Management System does not include a master account, but certain UK depository accounts may be manually swept into the Master Accounts. The ROW Cash Management System includes a number of standalone (primarily operating) accounts in several countries.

120.    The Cash Management System includes a total of 62 bank accounts in the name of one of the Debtors, 20 of which are maintained in the United States (18 on behalf of U.S. entities and 2 on behalf of international entities), 17 of which are maintained in the United Kingdom (13 on behalf of UK entities and 4 on behalf of non-UK entities), 7 of which are maintained in Canada (4 on behalf of Canadian entities and 3 on behalf of non-Canadian entities), and 18 that are maintained in other countries (6 in Israel, 5 in Poland, 4 in Mexico, 2 in Argentina, 1 in Germany). A list of the current Bank Accounts is attached to the Cash Management Motion.

121.     The Debtors' treasury department maintains daily oversight over the Cash Management System and implements controls for depositing, processing and releasing funds. Additionally, the Debtors' corporate accounting and treasury departments regularly reconcile their books and records to ensure that all transfers are properly accounted for.

122.     In the United States, deposits—primarily derived from the Debtors' operations in the United States and Canada—are made into one of two zero balance collection accounts, which are swept daily into a U.S. Master Account. These deposits are denominated in USD. The U.S. Master Account is maintained at JPMC Bank by Wesco Aircraft Hardware Corp. When funds are needed to fund the Debtors' U.S. operating expenses, they are transferred from the U.S. Master Account automatically into payroll, disbursement, and operating ZBAs. The U.S. Cash Management System includes two payroll ZBAs, two disbursement ZBAs, and one operating ZBA.

123.     Additionally, the Debtors maintain 12 U.S. Standalone Accounts, which are generally used to collect and disburse funds in foreign currencies, including Euros, Great British Pounds, CAD, and Mexican Pesos. To the extent that funds from the U.S. Standalone Accounts are swept into and out of the U.S. Master Account, it is done manually.

124.     Similar to the U.S. Cash Management System, the Canada Cash Management System concentrates funds in a USD-denominated Master Account and a CAD-denominated Master Account. Deposits are made either directly into one of the Canada Master Accounts or into one of the two operating ZBAs (one USD-denominated ZBA and one CAD-denominated ZBA). The Canadian ZBAs are swept daily into the corresponding Canada Master Account. Funds held in the Canada Master Accounts are periodically swept into the U.S. Master Account. The Canada Master Accounts are maintained at JPMC Bank by Wesco Aircraft Canada, Inc. When funds are needed to fund the Debtors' operating expenses in Canada, they are transferred either directly from the Canada Master Accounts or through the operating ZBAs.

125.    Additionally, the Debtors maintain 3 standalone accounts in Canada. Two of the Canada Standalone Accounts are generally utilized to collect and disburse funds in foreign currencies. One Canada Standalone Account is maintained for tax purposes.

126.    The UK Cash Management System does not use a separate concentration account. Instead, the UK Cash Management System consists of 16 standalone operating accounts and one standalone collection account. The UK Cash Management System also includes an internally maintained petty cash account that is used to fund employee-related travel expenses and per diem in lieu of travel and expense cards. UK Standalone Operating Accounts are denominated in a variety of foreign currencies. Collections and disbursements, including payroll, are made into and out of the relevant currency denominated UK Standalone Operating Account. Funds within the UK Cash Management System are manually transferred as needed both between or among accounts controlled by the same Debtor and between or among accounts of a Debtor to accounts of other Debtors or their non-Debtor affiliates. Some Bank Accounts in the UK Cash Management System may be manually swept into the U.S. Master Account. Funds processed through the UK Cash Management System are generally on account of Incora's European business segments.

127.    Additionally, the UK Cash Management System is used to fund payroll for two of the Debtors' non-Debtor subsidiaries domiciled in Poland. Debtor Pattonair Limited—through a UK Standalone Operating Account (JPMC Bank (x3869))—funds an account with Santander Bank (x2462) owned by non-Debtor Pattonair Poland Sp. z. o. o. which remits approximately $700,000 a month to fund the payroll of Pattonair Poland and Haas Group International SP z.o.o. In the ordinary course, Pattonair Poland and Haas Group International SP, provide shared services for the benefit of Incora's European operations, which particularly benefit the UK Debtor entities.

128.    The ROW Cash Management System includes 18 Debtor-controlled Bank Accounts in Argentina, Israel, Mexico, and Poland. Of these Bank Accounts, 13 are currency denominated operating accounts, 3 are value added tax accounts, one is a standalone pay-card account, and one is a standalone collections account.

129.     Given the economic and operational scale of the Debtors' businesses, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders. Authority to continue utilizing the existing Cash Management System, subject to the terms described in the Cash Management Motion, is essential for minimizing the disruption caused by the filing of these chapter 11 cases and to maximizing the value of the Debtors' estates.

130.     In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts, service fees and other charges and costs charged by the Banks on account of the Bank Accounts (collectively, the "***Bank Fees***"). The Debtors estimate that $100,000 in Bank Fees were due and owing as of the Petition Date.

131.     In the ordinary course of business, the Debtors use numerous Business Forms, including, without limitation, checks, correspondence forms, business cards, letterhead, purchase orders and invoices. To minimize expense to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors need to continue to use all Business Forms as they existed immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.  The Debtors will ensure that, to the extent reasonably practicable, any checks that are generated electronically are clearly labeled "debtor-in-possession." Moreover, to the extent the Debtors purchase or print any new paper checks once the current stock has been depleted, such new checks will also include the designation "debtor-in-possession" to the extent reasonably practicable.

132.     Essential to the operation of the Debtors' businesses, is the ability of their employees to use corporate credit cards. As of the Petition Date, approximately 25 purchasing cards and approximately 321 travel and expense cards had been issued by American Express and six other banks.  P-Cards are used to pay for the procurement of office supplies, inventory, utilities, and other goods and services which are used in the ordinary course of the Debtors' business. T&E Cards are used by employees to procure travel and related expenses in the ordinary course of business. Credit Cards are paid by the Debtors as part of their accounts payable. Use of the Credit

Cards is an integral part of the Debtors' cash management and account functions, and continuation of the ability of the Debtors' employees to use Credit Cards is essential to the continued operation of the Debtors' business.

133.    The combined average monthly spending on the Credit Cards is approximately $3,000,000, which is repaid in at least monthly installments. The aggregate credit limit on the Credit Cards is $4,500,000, of which $3,000,000 is attributable to fifteen active P-Cards, each issued by JPMC Bank.

134.    Furthermore, as part of a global enterprise operated under common management, the Debtors routinely engage in business transactions with one another and with their non-Debtor subsidiaries for the benefit of the collective enterprise that result in intercompany receivables and payables. Intercompany Transactions include, among other things, inventory purchases, payroll funding, furniture and equipment purchasing, and payments to maintain insurance policies. Intercompany Transactions are an essential component of Incora's complex global operations, and they are integral to Incora's ability to provide enterprise-wide management and support services, and otherwise to conduct its global operations. Because Incora's overseas operations are often reliant on currency denominated standalone operating accounts, Intercompany Transactions between foreign entities are often facilitated by transferring funds through the U.S. Master Account. Such transfers are manually entered and completed as necessary, with proper accounting made as between each Incora entity.

135.    Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' (and their non-Debtor subsidiaries') accounting systems. The Debtors' accounting reconciliation software, OneStream, is used to report and consolidate the Intercompany Claims. In certain instances, Intercompany Claims are documented through intercompany notes and/or loan agreements. The Debtors generally account for the Intercompany Transactions as they occur and reconcile the resulting Intercompany Claims monthly.

136.    The Debtors' global finance team meets weekly to discuss the Debtors' cash position. The Debtors track all fund transfers in their respective accounting systems and can

ascertain, trace, and account for all Intercompany Transactions. The Debtors will continue to track postpetition Intercompany Transactions consistent with historical practice.

137.    The Debtors accounting, financial, and senior management teams would be unduly burdened, both financially and logistically, if they were required to halt Intercompany Transactions or otherwise make material changes to the Cash Management System. Such disruption would be detrimental to the Debtors' business operations, would destroy creditor value, and would ultimately harm the Debtors' stakeholders. The Debtors need authority to continue the Intercompany Transactions in the ordinary course of business consistent with past practice and ask the Court to grant administrative expense priority status to all postpetition Intercompany Claims. The Debtors are able to continue to closely monitor and record the Intercompany Transactions.

138.    I believe that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' businesses. Therefore, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

## VIII. INSURANCE MOTION

139.    In the Insurance Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto in the ordinary course of business, (b) authorizing the Debtors to renew, supplement, modify, extend, reduce, or purchase insurance coverage in the Debtors' discretion on a postpetition basis, and (c) modifying the automatic stay with respect to workers' compensation claims.

140.    In connection with the operation of the Debtors' businesses and the management of their properties, the Debtors maintain a comprehensive insurance program. The Debtors maintain approximately twenty Insurance Policies that are administered by approximately sixteen third-party Insurance Carriers. The Insurance Policies provide coverage for, among other things,

property liability, cargo transport liability, products & premises liability, general liability, umbrella liability, cyber liability, automobile liability, workers' compensation, special risk, aviation products and airport premises, and directors' and officers' liability. A list of the Insurance Policies in effect as of the Petition Date is attached to the Insurance Motion.

141.    Continuation and renewal of the Insurance Policies and potentially entry into new insurance policies is essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Bankruptcy Code. Accordingly, the Debtors need to maintain the existing Insurance Policies, pay any related prepetition obligations, and to renew, supplement, modify, or enter into new Insurance Policies in the ordinary course of business on a postpetition basis.

142.    The Debtors are required to pay premiums and associated taxes and fees under the Insurance Programs based on rates that are established and billed by each Insurance Carrier. Each of the Insurance Policies are one year in length and, except for the Workers' Compensation Insurance and the Debtors' D&O Insurance, each renews in December. The Debtors pay their general liability, umbrella liability, and U.S. workers' compensation premiums directly. As discussed below, the Debtors' remaining Insurance Policies are financed.

143.    During the period from December 1, 2022 to November 30, 2023, the Debtors expect to pay approximately $995,021.28 in Direct Insurance Obligations. No Direct Insurance Obligations were past due as of the Petition Date, however, the Debtors expect Direct Insurance Obligations totaling approximately $95,804.47 to come due prior to determination of the Insurance Motion on a final basis. Failure to pay Direct Insurance Obligations when due may harm the Debtors' estates in several ways, including the loss of insurance coverage and the subsequent need to obtain replacement insurance on an emergency basis, likely at a higher price.

144.    The seventeen remaining Insurance Policies are or were financed through premium financing agreements with IPFS Corporation and Premium Credit Limited. The IPFS Agreement was executed by Wesco Aircraft Holdings, Inc., Arthur J. Gallagher Brokerage & Risk

Management Services, LLC and IPFS Corporation on December 15, 2022. The PCL Agreement was executed by Wolverine UK Holdco Ltd., Gallagher, and Premium Credit Limited. Pursuant to the Premium Financing Agreements, the Debtors pay the financing premiums on an installment basis. If the Debtors default in paying the Insurance Financing Obligations, the related policies could be canceled.

145.     The aggregate annual amount of Insurance Financing Obligations, including taxes, fees, surcharges, and finance charges, is approximately $2,079,013. The Debtors pay approximately $39,340 in annual finance charges on account of the Premium Financing Agreements. As of the Petition Date, the Debtors did not owe any amounts on account of Financed Insurance Obligations. However, regular monthly premium payments become due on the first of each month in the aggregate amount of approximately $161,895.

146.     Certain of the Insurance Policies require the Debtors to pay deductibles in the maximum amount of $25,000 per incident. Generally, if a claim is made against the Insurance Policies, the Debtors' applicable Insurance Carrier will administer the claim and make payments in connection therewith. The Debtors then pay the Deductible directly to their Insurance Carriers. The Debtors need authority to continue honoring any payment obligations under the Deductibles, in the ordinary course of business to ensure uninterrupted coverage.

147.     The Debtors' professional liability errors and omissions policy uses a self-insured retention (the "*SIR*"). Under such SIR, the Debtors make payments to Chubb Custom Ins. Co. up to the $1,000,000 per claim limit of the SIR, and once the claim value is above the SIR amount, the Insurance Carrier will cover remaining costs up to an excess liability limit of $10 million. If a claim is made against such combined policies, the Insurance Carrier will administer the claim and make payments in connection therewith. The Debtors need authority to continue the SIR, including honoring any payment obligations under the SIR, in the ordinary course of business on a postpetition basis to ensure uninterrupted coverage thereunder.

148.     The Debtors employ Gallagher and Marsh to give advice on insurance coverage and to assist with arranging their Insurance Programs. Gallagher assists the Debtors in obtaining

insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, providing data analytics and actuarial services, and providing ongoing support throughout the applicable policy periods. Likewise, Marsh provides similar services related to the Debtors' D&O insurance. I believe that Gallagher's and Marsh's services are necessary to assure the Debtors' ability to secure Insurance Programs on advantageous terms at competitive rates, to maintain the Debtors' Insurance Policies in good order postpetition, and to ensure adequate protection of the Debtors' property for the benefit of all parties in interest.

149.     The Debtors pay Gallagher an aggregate amount of approximately $275,000 per year in fees and pay Marsh an aggregate amount of $151,009 per year in fees. Gallagher's Agent Fees are payable on September 30th of each calendar year. Marsh's Agent Fees are payable on April 21st of each calendar year. To the best of my knowledge, the Debtors do not currently owe any accrued Agent Fees.

150.     The Debtors' Workers' Compensation Insurance deserves special mention. In many (if not all) of the jurisdictions where the Debtors operate, employers are required to maintain workers' compensation coverage for their employees for claims arising from their employment. If the Debtors fail to maintain the Workers' Compensation Insurance, they may be prohibited from operating in those jurisdictions.

151.     The Debtors purchase their Workers' Compensation Insurance for U.S. employees from Starr Specialty Insurance Company and ACE American Insurance Company (as part of the Debtors' foreign liability package) for all foreign employees. The Debtors pay the Workers' Compensation Insurance premiums owed to Starr directly. I believe they are current as of the Petition Date.

152.     The Workers' Compensation Insurance policy with Starr renewed on March 1, 2023. The Debtors pay Starr for Workers' Compensation Insurance pursuant to a monthly installment schedule. The Debtors may receive dividends based on prioritizing workplace safety and successfully controlling their losses. Dividends are not guaranteed, and generally payable to

qualifying policies after such policy has expired and the prescribed period has lapsed. As of the Petition Date, there are approximately $10,000 in known, unresolved workers' compensation claims.  Although the Debtors expect that all workers' compensation claims will be covered by insurance, they must be able to participate in the process of assessing, adjudicating and paying those claims without regard to whether the liabilities accrued before the Petition Date, in accordance with applicable laws and requirements.

153.    I believe that continuation and renewal of the Insurance Programs and potentially entry into new insurance policies is essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Programs is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, I respectfully submit that the Court should approve the Insurance Motion.

## IX.    TAXES MOTION

154.    In the Taxes Motion, the Debtors seek entry of an order: (a) authorizing them to satisfy certain prepetition taxes, assessments, fees, and other charges in the ordinary course of business on a final basis and (b) granting certain related relief.

155.    In the ordinary course of business, the Debtors collect, withhold and incur an assortment of Taxes and Fees, which they remit periodically to various federal, state, local and non-U.S. tax authorities, regulators, licensing agencies and other governmental authorities, as well as taxing authorities in the countries where they operate.

156.    A major part of the Debtors' business consists in the sale of hardware and chemical products. As such, the Debtors are required to collect and remit various sales taxes, use taxes, and similar taxes in the ordinary course of business. In some countries, the Debtors are also required to collect "value added tax," which is effectively a sales tax on both goods and services. The Debtors may also owe use tax when they purchase goods and services from vendors that are not

required to collect sales tax in the jurisdiction where those goods are delivered, whether to one of the Debtors or by drop shipment to a Debtor's own customer, or those services rendered. Some of these comprise taxes arising under non-United States law, which implicates myriad complex issues of reporting, and consequences for not making the payments on schedule.

157.    The Debtors pay property taxes to approximately 45 Taxing Authorities on real estate, inventory, and other tangible assets. Some of these comprise taxes arising under non-United States law, which implicates myriad complex issues of reporting, and consequences for not making the payments on schedule.

158.    The Debtors also pay corporate income taxes to approximately 19 Taxing Authorities, mostly in the United States, the United Kingdom, Canada, and Mexico. These taxes are generally calculated as a percentage of net income, although some jurisdictions may tax income based on gross receipts. In most jurisdictions, the Debtors remit income tax on a quarterly basis.

159.    The Debtors pay various franchise taxes, annual report fees, business privilege fees, regulatory and environmental fees, and similar charges to conduct their businesses within specific jurisdictions, mostly on an annual basis. Some of these comprise taxes arising under non-United States law, which implicates myriad complex issues of reporting, and consequences for not making the payments on schedule. Failure to pay these charges could put the good standing of certain Debtor entities at risk or could prevent the Debtors from doing business in particular jurisdictions.

160.    In the twelve months before the Petition Date, the Debtors paid in the ordinary course of business approximately $30 million in Taxes and Fees. The Debtors estimate that approximately $15.6 million in unpaid Taxes and Fees had accrued as of the Petition Date.

161.    I believe that any failure to pay the Taxes and Fees, including the Prepetition Taxes and Fees, could materially disrupt the Debtors' business operations in several ways, including the following: (a) the Tax Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Tax Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; (c) foreign Taxing Authorities may disregard the automatic stay and

seek to collect or use self-help to seize control of the Debtors' assets; and (d) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both. In addition, counsel informs me that (i) nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code and (ii) the Debtors collect and hold certain taxes in trust for the benefit of the applicable Tax Authorities, and such funds may not constitute property of the Debtors' estates.

162. For these reasons, and for reasons described more fully in the Taxes Motion, I believe that the relief requested in the Taxes Motion is necessary and appropriate to avoid serious consequences for the Debtors' operations and ability to reorganize.

## X. CUSTOMER PROGRAMS MOTION

163. To solicit and retain customer business, the Debtors provide various rebates, promotional discounts, service credits and adjustments, and refunds to certain of their customers in the ordinary course of business. In addition, the Debtors generate business by participating in a number of programs related to customer convenience, whereby the Debtors provide third-party logistics services to certain customers and/or provide customers with flexible payment options by participating in various customer-led factoring facilities. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. I believe that maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders. The Customer Programs are described below.

164. In the ordinary course of business, the Debtors often provide their customers with discounts dispensed in the form of percentage-based Rebates, which are generally based on contract-specific, annual purchase volumes. Subject to a negotiation process, the terms of the Rebates vary by customer and are memorialized in contractual agreements. Rebate payments materially impact total costs for qualifying customers, so continuing to make such payments is necessary and crucial to maintaining good relationships with their existing customers and

attracting new customers. I believe that there is a possible risk that customers who are entitled to or justifiably expecting Rebate payments may take their business to competitors if such payments are not made.  Accordingly, the Debtors need authority to continue to honor all of their Rebates-related obligations, including satisfying any prepetition Rebate payments, consistent with past practice.  The Debtors estimate that, as of the Petition Date, approximately $14 million is outstanding on account of the Rebates.[11]

165.    In the ordinary course of business, the Debtors also offer various Discounts to customers based on purchase order volume for certain products and/or based on when the Debtors receive payment from said customers. Subject to a negotiation process, the terms of the Discounts vary by customer and are memorialized in contracts. Importantly, the Discounts involve no cash outlay. I believe that continuing to offer Discounts consistent with pre-petition terms will aid in maintaining favorable payment timelines and securing bulk orders. Furthermore, I believe that offering Discounts is necessary and crucial to maintaining good relationships with the Debtors' existing customers and attracting new customers. I also believe that there is a possible risk that customers who are justifiably expecting Discounts on future orders may take their business to competitors if such Discounts are no longer offered.

166.    Additionally, in the ordinary course of business, the Debtors offer certain Credits and Adjustments to compensate customers for delay, unavailability, or other forms of non-compliance. Specifically, the Debtors provide (a) adjustments to compensate customers for deliveries that arrive after contractual deadlines; (b) adjustments to compensate customers for manufacturing delays resulting from delayed delivery of products; (c) reimbursement of costs incurred to source delayed or unavailable products from an alternative supplier; (d) replacement of non-compliant or otherwise defective products within contractually set timeframes, including the payment of acquisition costs in the event that the Debtors fail to meet contractually agreed-on amounts; and (e) reductions to service fees in the event that key performance indicators are not

---

[11]    As of the Petition Date, Rebates account for over 75% of customer-related liabilities. The largest Rebate as of the Petition Date is approximately $8.3 million and accounts for approximately 61% of all estimated Rebates.

met. Subject to a negotiation process, these Credits and Adjustments vary by customer and are memorialized in contracts. I believe that there is a possible risk that customers who are entitled to or justifiably expecting Credits and Adjustments may take their business to competitors if such payments are not made. Furthermore, customers that are entitled to prepetition Credits and Adjustments may seek legal recourse to collect on or otherwise enforce amounts owed, including in foreign jurisdictions.

167.   The Debtors estimate that, as of the Petition Date, approximately $5 million is outstanding on account of the Credits and Adjustments. The Debtors need authority to continue to honor all of their obligations related to the Credits and Adjustments, including satisfying any prepetition Credits and Adjustments, consistent with past practice.

168.   The Debtors participate in two key programs that provide customers with greater purchasing power, added flexibility in the timing of their payments, and potentially enable them to place orders that they could not have otherwise: (a) third-party logistics services and (b) factoring agreements with certain banking institutions. These programs benefit the Debtors and their estates by allowing them to offer additional services and/or provide more competitive terms to their customers, which in turn enhance client relationships and generate additional business.

169.   When deemed to be in the best interests of their business and to enhance revenues, the Debtors occasionally opt to serve as a third-party logistics provider to certain customers. In practice, the Debtors will themselves purchase inventory from third parties and then be reimbursed by an interested customer, transfer title to that inventory to the relevant customer. In many such cases, the Debtors will retain physical possession of the purchased inventory, storing and maintaining it thin their warehouses while collecting maintenance fees from the applicable customer. As of the Petition Date, the Debtors hold approximately $69 million of customer-owned inventory in their warehouses.  Subject to a negotiation process, the terms of these Logistics Services vary by customer and are memorialized in contracts.

170.   I believe that the provision of these Logistics Services is a valuable revenue generating activity and is also necessary to guarantee the competitiveness of the Debtors' products

and to ensure that they are available on demand for use by their current and potential customer base. I also believe that there is a possible risk that both existing and new customers may be unable, or unwilling, to purchase goods and related services from the Debtors absent the flexibility provided by these Logistics Services.  Accordingly, the Debtors need authority to continue the Logistics Services and to honor all related obligations post-petition.

171.    The Debtors are currently party to six customer-specific agreements to factor receivables, through which select Debtors sell certain outstanding U.S. dollar-denominated Receivables to participating banks in exchange for an expedited, contractually agreed percentage of the sold Receivables. The transactions under the Factoring Agreements are structured as true sales: the relevant Debtor assigns the sold Receivables to the purchasing counterparty absolutely and with full right, title, and interest, concurrently with receiving the discounted payment.

172.    The Factoring Agreements are arranged by individual customers for their own convenience. The Debtors' participation in the Factoring Agreements enables them to provide customers with longer contractual periods between the delivery of an invoice and the customer's payment thereof than would otherwise be practicable or desirable in the operation of the Debtors' businesses, which promotes the accessibility of their products and creates value for their customers. Furthermore, the Factoring Agreements provide the Debtors with certainty in the timing of payment (which factors positively into their price tolerance and consideration of other trade terms) and with greater operational flexibility and greater flexibility in their near-term liquidity needs.

173.    I believe that the Factoring Agreements are necessary to guarantee the competitiveness of the Debtors' products and related services and to ensure that they are maximally accessible to their existing customers. I also believe that there is a possible risk that participating customers may be unable, or unwilling, to purchase goods and related services from the Debtors absent the favorable trade terms that are currently enabled by these Factoring Agreements.

174.    Maintaining market confidence in the Debtors' ability to provide critical supplies on a timely basis is crucial to their reorganization efforts. Because of the filing of these chapter 11

cases, the Debtors must take immediate, active steps to preserve their relationships with over 8,400 loyal customers world-wide, including various essential business relationships across the aerospace, automotive, military, and pharmaceutical industries.[12] If the Debtors do not honor their Customer Programs, counterparties to these business relationships (whether or not governed by written contracts) may exercise their discretion to refrain from directing future business to the Debtors. The loss of such future business or a delay in placing further business would vastly outweigh the amounts the Debtors are seeking authority to pay by the Customer Programs Motion.

175.    Accordingly, in the Customer Programs Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to maintain and administer their customer-related programs, policies, and practices and honor certain prepetition obligations related thereto and (b) granting certain related relief.

176.    The Debtors estimate that, as of the Petition Date, the amount of outstanding purchased Receivables is approximately $24 million.

177.    I believe that continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserving the value of the Debtors' estates. Customers expect and rely on the Customer Programs and may not continue supporting the Debtors' businesses if the Customer Programs are discontinued. Continued support from the Debtors' customers is essential for go-forward operations and value maximization. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

## XI.    WAGES MOTION

178.    In the Wages Motion, the Debtors seek entry of an order: (a) authorizing them to pay prepetition wages, salaries, benefits, and other compensation and (b) authorizing them to continue employee benefits programs in the ordinary course, including payment of certain

---

[12]    Notably, the Debtors' relationships with their ten largest customers span, on average, over 25 years and collectively represented approximately 57% of their revenue in fiscal year 2022. These high-value, long-term relationships exemplify those that the Debtors seek to preserve.

prepetition obligations related thereto. Without the continued, uninterrupted services of the Debtors' workforce, I believe the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' ongoing business could be severely and adversely affected.

179.    Incora employs approximately 3,750 individuals around the world, mostly on a full-time, permanent basis. Approximately 1,600 of the Employees earn hourly wages, and approximately 2,150 earn a salary. The Debtors also rely on the services of Staffing Agencies that currently provide finance and accounting contractors, as well as short-term employees. The largest of the Staffing Agencies is Grupo American Industries, S.A. de C.V., who provides approximately 300 contractors for finance and accounting support roles at Haas TCM de Mexico, S. de R.L. de C.V.'s shared service center in Chihuahua, Mexico (as discussed below). The remaining Staffing Agencies currently provide approximately 100 individuals who fill short-term positions that are economically infeasible to fill through direct hires.[13]

180.    Approximately 1,500 Employees are employed by the Debtors domiciled in the United States, approximately 800 Employees are employed by the Debtors domiciled in the United Kingdom, and approximately 800 Employees are employed by the Debtors domiciled in Argentina, Canada, Israel, and Mexico. The Debtors' non-Debtor subsidiaries employ the remaining approximately 650 Employees in various countries, including China, France, Germany, India, Italy, Malaysia, Poland, and Singapore.

181.    Employees perform a wide variety of functions, including warehouse operations, customer operations, quality, supply chain services, safety, sales and marketing, accounting and treasury, billing operations, legal and compliance, financial planning and analysis, human resources and payroll, information technology, procurement, and administrative support. Their skills and knowledge of the Debtors' supply chain solutions, infrastructure, inventory, customers,

---

[13]    The remaining Staffing Agencies include, but are not limited to, Adecco, Aerotek, Astrix, Gigworld, KForce, Jim Kyle, Quantum, Randstad, Regal Staffing, REMX, Robert Half, Ternio Solutions Group, and Sky Recruitment.

and business operations are essential to the Debtors' continued operations. Without the continued, uninterrupted services of the Employees and Staffing Agencies, the Debtors' reorganization efforts will be jeopardized.

182.     The Debtors incur a number of obligations to, or on account of, their Employees, including those related to compensation and benefits. Separately, the Debtors incur obligations to their payroll servicers.

183.     The Debtors estimate that, as of the Petition Date, they owe approximately $25,553,000 on account of Employee Obligations. To the best of my knowledge, no individual Employee is owed Wages and earned but unpaid Employee Bonuses in excess of the $15,150 as of the Petition Date.[14] The Debtors estimate that, as of the Petition Date, they owe approximately $70,000 on account of Employee Payroll Servicer Obligations. Employee Compensation Obligations.

184.     The Debtors incur payment obligations for wages, salaries, overtime, and other obligations to their Employees. The Debtors pay the U.S. Wages every other week, the UK Wages monthly, and the ROW Wages a combination of weekly, bi-weekly, and monthly. The Debtors encourage their Employees to take their pay through direct deposit, and nearly all of them have elected that option. On average, the Debtors pay approximately the following amounts in Wages monthly:

| Category | Est. Monthly Wages |
|----------|--------------------|
| U.S. Wages | $9,000,000 |
| UK Wages | $3,700,00 |
| ROW Wages | $1,300,000 |
| **Total** | **$14,000,000** |

185.     As of the Petition Date, the Debtors estimate that they owe approximately $9,000,000 on account of unpaid Wages.

---

[14]    For the avoidance of doubt, such calculations do not include the value of accrued and unused paid time off.

186.    The Debtors also process and fund payroll for Pattonair Poland and Haas Group International SP, non-Debtor entities whose operations are based in Poland. Pattonair Poland and Haas Group International SP collectively employ approximately 330 individuals and their average combined monthly payroll is approximately $700,000. Such payroll amounts are funded by Pattonair Limited and settled via intercompany accounting. Additional information regarding the Pattonair Poland and Haas Group International SP intercompany payroll transfers can be found in the Cash Management Motion. Segregating Pattonair Poland's and Hass Group International SP's payroll processing would be time consuming, burdensome, and inefficient. Further, Pattonair Poland and Haas Group International SP support the Debtors' operations by providing shared services for the benefit of the Debtor entities domiciled in Europe, including the UK-based Debtors.

187.    As a part of their Employee Compensation Obligations, the Debtors maintain, in the ordinary course, a variety of Employee Bonus Programs that are linked to a participating Employee's continued employment and/or the results of corporate financial and business line goals established annually by the Debtors. The Employee Bonus Programs are developed by management.

188.    With the exception of certain Employees' accrued PTO, to the best of my knowledge, the Debtors do not owe prepetition Wages and Employee Bonuses to any individual Employee in excess of the priority cap set forth in section 507(a)(4) of the Bankruptcy Code. In any event, the Debtors will pay accrued PTO only in the ordinary course of business, consistent with existing policies, as individual Employees take vacations or leave the Debtors' employ. I believe that such payments are appropriate under the circumstances.

189.    Certain commercial team Employees are entitled to payments, in addition to Wages, under the Debtors' Sales Incentive Plan.  The Sales Incentive Plan entitles eligible Employees to a percentage payout based upon certain financial metrics including margin growth, contract average annual EBITDA, gross profit and net bookings. The Sales Incentive Plan rewards Employees for obtaining sales and growth based on the type of sales role and individual goals. The Sales Incentive

Plan motivates eligible Employees to meet defined targets, and the Commissions constitute part of such Employees' ordinary course compensation on which they depend.

190.    As of the Petition Date, Employees have accrued approximately $55,000 on account of unpaid Commissions. In the twelve months before the Petition Date, the Debtors paid approximately $2,200,000 in Commissions. The Debtors need authority to pay accrued but unpaid Commissions and to continue to pay Commissions in the ordinary course of business and consistent with past practices.

191.    The Debtors have historically maintained a management incentive plan to motivate, reward, and retain certain non-insider managerial Employees as an additional component of overall compensation. I believe that the Management Incentive Program drives Employee performance, aligns Employees' interests with the Debtors' business interests, and promotes the overall efficiency of the Debtors' operations. Under the Management Incentive Program, the Debtors have provided annual discretionary bonuses based on certain target metrics. Payments to Employees vary based on an Employee's base salary and require executive approval. Approximately 560 Employees were paid approximately $1,300,000 pursuant to the 2022 Management Incentive Program, with the average payment to Employees being approximately $2,300.

192.    To the best of my knowledge, the Debtors do not owe any prepetition amounts on account of the Management Incentive Program as of the Petition Date. The next payment date under the Management Incentive Program will not occur until fiscal year 2024.

193.    The Debtors have also historically maintained an employee incentive plan to motivate, reward, and retain non-insider individual contributor Employees. The Employee Incentive Program offers certain Employees individualized awards as an additional component of their overall compensation. I believe that the Employee Incentive Program drives Employee performance, aligns Employees' interests with the Debtors' business interests, and promotes the overall efficiency of the Debtors' operations. Under the Employee Incentive Program, the Debtors have provided annual discretionary bonuses based on certain target metrics. Payments to Employees vary based on an Employee's base salary. Payments require executive approval.

Approximately 2,200 Employees were paid approximately $740,000 pursuant to the 2022 Employee Incentive Program, with the average payment to Employees being approximately $350.

194.     To the best of my knowledge, the Debtors do not owe any prepetition amounts on account of the Employee Incentive Program as of the Petition Date. Further, the next payment date under the Employee Incentive Program will not occur until fiscal year 2024.

195.     The Debtors have also historically maintained a legislative incentive plan for certain non-Insider ROW Employees as required by local law. For example, in Mexico, ROW Employees are entitled to receive 10% of pre-tax profits pursuant to Section A.IX of Article 123 in the Mexican Constitution.

196.     To the best of my knowledge, the Debtors do not owe any prepetition amounts on account of the Legislative Incentive Program as of the Petition Date.

197.     The Debtors provide certain eligible former Employees with severance obligations. Certain U.S. Employees may receive (a) one week of their annual base salary for each year of service (up to a maximum of 26 weeks) and (b) for Employees at or above the level of director, also up to $2,000 of outplacement services through RiseSmart.  UK Employees may receive one to 30 weeks of their annual base salary depending on their level.   Certain ROW Employees may also receive severance obligations. For example, ROW Employees in Canada are entitled to similar severance benefits as U.S. Employees.

198.     In the twelve months before the Petition Date, the Debtors paid approximately $60,000 per month in Severance Obligations.  To the best of my knowledge, the Debtors do not owe any amounts on account of the Severance Obligations as of the Petition Date.

199.     Incora's board of directors includes Patrick Bartels, a non-Employee director (the "***Director***"). The Debtors pay the Director an average annual cash retainer of $360,000. The Director is generally entitled to reimbursement for reasonable out-of-pocket expenses in connection with travel related to his duties (together with annual retainer payments, the "***Director Compensation***"). The Director is a critical component of the Debtors' governance structure and

vital to ensuring that the Debtors continue to adhere to governance best practices. The Debtors do not presently owe any prepetition amounts on account of the Director Compensation.

200.    The Debtors reimburse their Employees for certain reasonable and necessary Expenses incurred and paid by an Employee on the Debtors' behalf in the scope of the Employee's employment. Most of the Expenses are travel related, such as airfare, lodging, meals and incidentals such as gas and mileage.  As of the Petition Date, the Debtors estimate that Employees are owed approximately $1,000,000 on account of Expenses incurred prepetition. However, there may be Expenses incurred prior to the Petition Date that have not yet been submitted by current or former Employees.

201.    For each applicable pay period, the Debtors deduct certain amounts from each Employee's gross pay including garnishments, such as tax levies, child support, spousal support, 401(k) contributions, tax efficient childcare costs, and transit ticket (commuter) costs as well as other pre- and post-tax deductions payable under certain employee benefit plans discussed below. The Debtors deduct approximately $1,750,000 in the aggregate from Employees' pay per month, which they remit to the appropriate third-party recipients. As of the Petition Date, the Debtors estimate that they hold approximately $1,070,000 in unremitted amounts on account of the Deductions.

202.    In addition to the Deductions, the Debtors are obligated by law to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, including Social Security and Medicare taxes (or the equivalent in each country) for remittance to the appropriate federal, state, or local taxing authority. The Debtors also must match, from their own funds, Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance.[15] In the aggregate, Payroll Taxes, including both the Employee and the Debtors' portions, total approximately $4,100,000 per month. As of the

---

[15]    For instance, United Kingdom law requires debtors to assess and withhold income tax and national insurance contributions from UK Employees' salary payments under the Pay As You Earn system.

Petition Date, the Debtors estimate that they hold approximately $2,730,000 in unremitted amounts on account of the Payroll Taxes.

203.    As noted above, the Debtors make payments to the Staffing Agencies on account of the compensation for the services of the independent contractors provided by such Staffing Agencies.   In the year prior to the Petition Date, the Debtors paid the Staffing Agencies approximately $19,000,000. As of the Petition Date, the Debtors estimate that the Staffing Agencies are owed approximately $3,100,000 for services rendered prior to the Petition Date. The Debtors need authority to continue paying the Staffing Agencies on account of compensation earned postpetition, consistent with past practices.

204.    In the ordinary course of business, the Debtors provide various benefits to their Employees. These benefits fall within the following categories: (a) paid time off, including personal time off, sick days, and holidays, (b) medical, dental, vision and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and flexible spending accounts, (c) retirement programs, and (d) certain other benefits. The Employee Benefit Plans vary by jurisdiction and most of the Employee Benefit Plans are administered through third parties.

205.    U.S. Employees receive a variety of Employee Leave Benefits. U.S. Employees are entitled to between 5 and 28 days of vacation as paid-time-off a year and may carry over up to 10 days of accrued but unused U.S. PTO from year to year. As of the Petition Date, the Debtors estimate that their liability for the accrued U.S. PTO is $4,750,000.

206.    In addition, the Debtors provide U.S. Employees with other U.S. Employee Leave Benefits that do not involve incremental cash outlays beyond the Debtors' standard payroll obligations and do not require payments upon termination of employment, including:

- paid holidays throughout the year, during which most U.S. Employees are not required to work and are paid at their base rate;

- leave under the Family and Medical Leave Act and similar state laws for birth, adoption, foster care, family care, medical emergencies, military exigencies and the like; and

- other leaves, such as sick leave, personal time off, disability leave, bereavement leave and leave for jury duty.

207.    UK Employees also receive various Employee Leave Benefits. In the United Kingdom, Employees are entitled to between 25 and 34 days of vacation as paid-time-off a year. UK Employees may not carry over accrued UK PTO from year to year. As of the Petition Date, the Debtors estimate that their liability in connection with accrued UK PTO is $1,500,000. UK Employees are entitled to receive their accrued but unused UK PTO in cash upon termination.

208.    In addition, the Debtors provide UK Employees with certain other UK Employee Leave Benefits, which do not involve incremental cash outlays beyond the Debtors' standard payroll obligations and do not require payments upon termination of employment, including:

- paid holidays throughout the year, during which most UK Employees are not required to work and are paid at their base rate;

- leave under certain provisions of UK law for birth, adoption, foster care, family care, medical emergencies, military exigencies and the like;

- 52 weeks of paid parental leave for the birth or adoption of a child; and

- other leaves, such as statutory sick leave, disability leave, bereavement leave and leave for jury duty.

209.    ROW Employees also receive a variety of Employee Leave Benefits. For Example, ROW Employees in Canada are entitled to similar leave benefits as U.S. Employees. As of the Petition Date, the Debtors estimate that their liability in connection with accrued ROW PTO is $400,000.

210.    In addition, depending upon the jurisdiction, the Debtors provide ROW Employees with certain other ROW Employee Leave Benefits, which do not involve incremental cash outlays beyond the Debtors' standard payroll obligations and do not require payments upon termination of employment, including:

- paid holidays throughout the year, during which certain ROW Employees are not required to work and are paid at their base rate;

- leave under certain provisions of applicable law for birth, adoption, foster care, family care, medical emergencies, military exigencies and the like;

- paid parental leave for the birth or adoption of a child; and

- other leaves, such as statutory sick leave, disability leave, bereavement leave and leave for jury duty.

211.   I believe that the continuation of the Employee Leave Benefits, on which Employees have come to depend, in accordance with past practice is essential to maintaining Employee morale throughout these cases. Although the Debtors estimate that Employees had accrued approximately $6,650,000 in unpaid Employee Leave Benefits prior to the Petition Date, I anticipate that the vast majority of the accrued leave time will be used in the ordinary course of business, which will not require any incremental cash outlays beyond the Debtors' normal payroll expense.

212.   The Debtors offer a comprehensive Health and Welfare Benefit plan for full-time Employees. As more fully described below, the offered benefits include (i) medical, vision, dental and prescription drug plans, (ii) life insurance and AD&D insurance, and (iii) short-term and long-term disability benefits.

213.   The Debtors and their U.S. Employees share the cost of the premiums and administrative fees under the U.S. Health Insurance Plans. The Debtors' share averages approximately $902,000 per month. As of the Petition Date, the Debtors owe approximately $902,000 in accrued and unpaid premiums and administrative fees on account of the U.S. Health Insurance Plans.

214.   The Debtors offer medical insurance and prescription medication coverage to all eligible U.S. Employees. The Medical Insurance also includes coverage under COBRA, post-termination. The Medical Insurance also provides U.S. Employees with access to mental health, legal, and financial assistance. The Medical Insurance and Prescription Drug Insurance are self-funded programs. The Debtors pay fixed costs to use the carrier's network and variable costs for

the members' claims. Each U.S. Employee contributes between zero and 20 percent of the cost of the Medical Insurance, depending on the type of coverage they select and the applicable laws of the jurisdictions in which the U.S. Employee is located. The applicable insurance providers adjudicate and pay claims to healthcare providers, pharmacies, or U.S. Employees, as applicable. As of the Petition Date, the Debtors estimate that they owe approximately $860,000 on account of Medical Insurance and Prescription Drug Insurance obligations, including claim reimbursement and administrative fees.

215.    The Debtors offer dental insurance to full-time U.S. Employees. The Dental Insurance is administered by MetLife Dental. In the twelve months before the Petition Date, the Debtors paid approximately $370,000 to MetLife Dental in premiums and administrative fees. As of the Petition Date, the Debtors owe approximately $40,000 on account of the Dental Insurance.

216.    The Debtors offer vision insurance to full-time U.S. Employees that they purchase from MetLife Vision. In the twelve months before the Petition Date, the Debtors paid approximately $10,000 to MetLife Vision in premiums and administrative fees. As of the Petition Date, the Debtors estimate that they owe approximately $2,000 on account of the Vision Insurance.

217.    The Debtors also offer life insurance, AD&D insurance, and short-term and long-term disability insurance to U.S. Employees.

218.    The Debtors premiums and fees for the U.S. Casualty Insurance Plans average approximately $80,000 per month. As of the Petition Date, the Debtors owe approximately $80,000 in accrued and unpaid premiums and administrative fees on account of the U.S. Casualty Insurance Plans.

219.    The Debtors provides full time U.S. Employees' basic life and AD&D insurance and the option to participate in supplemental voluntary life insurance and/or AD&D insurance. The U.S. Basic Life/AD&D Insurance pays the applicable U.S. Employee's annual Wages in the event of such Employee's death. The annual cost of the U.S. Basic Life/AD&D Insurance is approximately $200,000. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 on account of the U.S. Basic Life/AD&D Insurance premiums.

220.    The Debtors offer both basic short term disability insurance and voluntary short term disability. The U.S. Basic Short Term Disability Insurance is available to U.S. Employees at no cost and entitles them to sixty percent of their weekly wages for up to twenty-six weeks in the event the U.S. Employee is partially or fully disabled for a short time. The U.S. Voluntary Short Term Disability Insurance entitles U.S. Employees to seventy percent of their weekly wages for up to twenty-six weeks in the event the U.S. Employee is partially or fully disabled for a short time. The U.S. Basic and Voluntary Short-Term Disability Insurance begins on the eighth day after the event giving rise to disability. The Debtors' annual costs on account of these programs is approximately $380,000. As of the Petition Date, the Debtors estimate they owe approximately $40,000 on account of accrued short term disability benefit obligations.

221.    The Debtors also offer U.S. Employees long-term disability benefits at no cost. The U.S. Long-Term Disability Insurance provides eligible U.S. Employees with sixty percent of their normal wages after 180 days following the qualified event. The Debtors' annual costs on account of the U.S. Long-Term Disability Insurance is approximately $190,000. As of the Petition Date, the Debtors estimate they owe approximately $20,000 on account of accrued U.S. Long Term Disability Insurance obligations.

222.    Similar to the coverage provided to U.S. Employees, the Debtors provide various health and benefit plans to subscribing UK Employees and their families. The UK Insurance Plans include private medical insurance, life insurance, and various other plans. As of the Petition Date, the Debtors estimate they owe approximately $72,000 on account of accrued UK Insurance obligations.

223.    Likewise, the Debtors provide various health and benefit plans to subscribing ROW Employees and their families. For example, the ROW Insurance Plans for ROW Employees in Canada include medical and dental insurance, life insurance, AD&D insurance, long-term disability, and various other plans. As of the Petition Date, the Debtors estimate they owe approximately $204,000 on account of accrued ROW Insurance obligations.

224.    The Debtors maintain various retirement savings plan for their Employees. For U.S. Employees, the Debtors maintain a plan that satisfies the requirements of section 401(k) of the Internal Revenue Code. The 401(k) Plan is available to all U.S. Employees over the age of twenty who have been employed by the Debtors for at least one month. Eligible U.S. Employees may contribute up to sixty percent of their eligible Wages to the 401(k) Plan. The Debtors match (i) one hundred percent of the contributions of the participating U.S. Employee up to a maximum of one percent of the U.S. Employee's base salary and (ii) fifty percent of the contributions of the participating U.S. Employee for the next five percent of the U.S. Employee's base salary. The 401(k) Plan is administered by Fidelity Investments. As of the Petition Date, approximately 2,225 current and former U.S. Employees participate in the 401(k) Plan (U.S. Employees may maintain their 401(k) Plan account if they change jobs). UK Employees are entitled to participate in a government pension plan. The UK Pension Plan allows UK Employees to invest in master trusts established and supervised in accordance with the pension fund laws of the United Kingdom. The Debtors maintain Retirement Plans similar to the 401(k) Plan and UK Pension Plan for the benefit of ROW Employees.

225.    In the year before the Petition Date, the Debtors paid approximately $220,000 per month in the 401(k) Matching Contributions. As of the Petition Date, the Debtors estimate that they owe approximately $470,000 in accrued Retirement Plan obligations, including $130,000 in accrued 401(k) Matching Contributions, $310,000 in accrued obligations under the UK Pension Plan, and $30,000 related to Retirement Plans for the benefit of ROW Employees.

226.    The Debtors also provide full-time U.S. Employees with access to a flexible spending account administered by AmeriFlex, Inc. Each U.S. Employee may contribute pre-tax dollars to an FSA and use such funds to pay eligible expenses, such as healthcare costs not covered by insurance. The Debtors remit U.S. Employees' FSA contributions to AmeriFlex and do not make any contributions to the U.S. Employees' FSAs. U.S. Employees may submit claims to AmeriFlex for the reimbursement of qualified expenses. As of the Petition Date, the Debtors estimate that they

hold approximately $10,000 in unremitted amounts on account of the FSAs, and owe *de minimis* administrative fees to AmeriFlex on account of the FSAs.

227.    As an alternative to the FSA Program, the Debtors also provide full-time U.S. Employees with access to a health savings account administered by HSA Bank, a division of Webster Bank, N.A. Each U.S. Employee may contribute pre-tax dollars to their HSA and use such funds to pay qualified healthcare expenses. To participate in the HSA Program, U.S. Employees must be enrolled in a high deductible health plan. U.S. Employees own their HSAs, and each U.S. Employee may roll over their HSA funds year-to-year and maintain the HSA if they change jobs. The Debtors also make HSA contributions on behalf of a number of U.S. Employees of up to $500 per year for certain individuals and up to $1,000 per year for families. The Debtors remit HSA contributions to HSA Bank. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 in accrued but unremitted amounts owed on account of the HSAs. The Debtors also estimate that participating U.S. Employees owe a total of approximately $20,000 in accrued but unremitted amounts owed on account of the HSAs and owe *de minimis* administrative fees to HSA Bank on account of the FSAs.

228.    The Debtors, through Voya Financial, Inc., offer certain U.S. Employees several elective supplements to their medical insurance, including supplemental accident, critical illness, and hospital indemnity coverage. Accident coverage covers expenses related to accidental injuries that occur outside of work. Critical illness coverage pays a lump-sum benefit if an U.S. Employee is diagnosed with a covered disease or condition. Hospital indemnity coverage provides a cash payment if a U.S. Employee is admitted to a hospital or an intensive care unit for a covered stay. The Debtors remit U.S. Employees' Supplemental Health Program contributions to Voya and do not make any contributions to the Supplemental Health Programs. As of the Petition Date, the Debtors estimate that they hold approximately $10,000 in unremitted amounts on account of the Supplemental Health Programs.

229.    The Debtors, through ARAG Legal, offer low-cost access to attorneys for U.S. Employee's personal legal services. Payments are made through payroll deductions. The Prepaid

Legal Coverage includes such services as estate planning, identity-theft defense, divorce, real estate matters, and document review, among others.

230.    The Debtors, through International Medical Group, Inc., provide certain Employees with travel assistance services that include 24/7 medical and security management services, claims administration, and multilingual customer service professionals. To the extent there are any *de minimis* amounts outstanding on account of the Travel Assistance Program relating to the prepetition period, the Debtors need authority to pay such amounts.

231.    The Debtors also provide a variety of other, similar, benefit programs to UK Employees and ROW Employees (the "Miscellaneous Benefit Programs"). For example, the Debtors provide education allowances, childcare programs, and transportation benefits for UK and ROW Employees. As of the Petition Date, the Debtors estimate that they owe approximately $80,000 in accrued Miscellaneous Benefit Programs obligations.

232.    To efficiently manage the processing and payment of the various Employee Obligations, the Debtors rely on third-party service providers to facilitate payroll processing and administration (the "***Payroll Services***"). Such services are provided by ADP in the United States and by ADP, Out Helping, APSI, and BDO in other relevant jurisdictions.[16] These services are crucial to the Debtors' payroll system. With the Payroll Servicers' assistance, the Debtors can ensure that Employees are paid on time, appropriate deductions and withholding are made, payroll reporting is accurate, and appropriate amounts are remitted to the applicable taxing authorities and other recipients.

233.    The Debtors pay the Payroll Servicers approximately $700,000 per year for Payroll Services, consisting of $600,000 owed to the U.S. Payroll Servicer and $100,000 owed to the ROW Payroll Servicers. The Debtors estimate that, as of the Petition Date, they owe approximately $70,000 on account of Payroll Services.

---

[16]    Certain UK Employees provide Payroll Services for the Debtors in the UK.

234.     To minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid or remitted to such parties when due or expected, the Debtors need authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, Wages, Commissions, Severance, Expenses, Withholdings, Payroll Taxes, PTO, Health and Welfare Benefits, 401(k) Matching Contributions, Other Benefit Programs, and Payroll Servicer obligations that the Debtors historically have provided.

235.     I believe the relief requested in the Wages Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates. I believe that, without the relief requested in the Wages Motion, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors or customers, which would deplete the Debtors' workforce and hinder the Debtors' ability to operate their businesses.

## XII.   SECTION 503(B)(9) AND LIEN CLAIMANT MOTION

236.     In the Section 503(b)(9) and Lien Claimant Motion, the Debtors seek entry an order: (a) authorizing the Debtors to pay certain prepetition amounts owing on account of (i) 503(b)(9) Claims and (ii) Lien Claims and (b) granting certain related relief. The Debtors' business relies on continuing access to, and relationships with, its network of goods suppliers and distribution service providers. Any disruption in the Debtors' access to such services and the provision of critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' business.

237.     Incora's job is to ensure that it can make critical supplies available to its customers as scheduled and with minimal lead times. Any disruption to Incora's vendor relationships could have a catastrophic effect on its reputation among customers, its market share, and ultimately its ability to emerge from these chapter 11 cases as a going concern. Indeed, supply chain disruptions have been the most significant drag on Incora's financial performance in the past year and were a significant factor in the filing of these chapter 11 cases.

238.     Incora operates in a highly specialized and regulated industry. If a vendor increases its prices or refuses to do business, Incora may be unable to switch to a different vendor until the affected customer has obtained approval to use the alternative vendor's part. Moreover, some vital products are proprietary or acquired from limited-source vendors who cannot be replaced without extraordinary expense or delay.

239.     The Debtors have received inventory, goods, or materials from various vendors within the 20-day period preceding the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts and, instead, the Debtors obtain goods and materials from such claimants on an order-by-order basis. As a result, I believe that many of the 503(b)(9) Claimants may refuse to supply new merchandise to the Debtors unless their 503(b)(9) Claims are paid. The Debtors also believe that certain 503(b)(9) Claimants may reduce the Debtors' prepetition trade credit or impose stricter payment terms, such as demanding payment in cash on delivery.

240.     The Debtors therefore need authorization to pay certain outstanding prepetition 503(b)(9) Claims subject to the limitations set forth in the proposed Order. For the avoidance of doubt, the Debtors propose to pay 503(b)(9) Claims only to the extent necessary and on such terms and conditions as are appropriate, in the Debtors' business judgement, to avoid disruptions to their business.

241.     The Debtors estimate that, as of the Petition Date, approximately $92,000,000 is outstanding on account of the 503(b)(9) Claims.

242.     The Debtors also need authority to pay prepetition claims of certain domestic and foreign commercial common carriers, freight forwarders and consolidators, delivery services, and other third-party providers of shipping and transportation services, including those third parties that facilitate the movement of various Goods through customs and of those third-parties that store or otherwise aid in the transport of their Goods through established national and international distribution networks of third-party warehouses.

243.    As of the Petition Date, the Debtors have approximately 40 Carriers and Warehouses in both the United States and abroad service the Debtors' 30 domestic and international distribution centers and forward stocking locations. These distribution centers and forward stocking locations are primarily located in the United States, the United Kingdom, Canada, Mexico, and Israel.

244.    The services provided by the Carriers and Warehouses are critical to the Debtors' day-to-day operations. At any given time, there are countless shipments *en route* to various locations. Therefore, many Carriers and Warehouses currently have Goods in their possession that are important to the Debtors' operations. Because of the commencement of these chapter 11 cases, certain Carriers and Warehouses who hold Goods for delivery to or from the Debtors may refuse to release those Goods pending receipt of payment for their prepetition services, which would disrupt the Debtors' operations. Indeed, counsel informs me that under some state and non-U.S. laws, a Carrier or Warehouse may have a lien on the Goods in its possession to secure the charges and/or expenses incurred for the transportation or storage of such Goods.

245.    The Debtors rely on the Carriers and Warehouses to timely manage the large volume of Goods transported to various points in the Debtors' worldwide operations. Accordingly, because the Debtors are dependent on the third-party Carriers and Warehouses, it is essential that the commencement of these cases do not give any Carriers and Warehouses reason or excuse to cease performing or to retain the Debtors' Goods.

246.    In the ordinary course of their business, the Debtors purchase various goods and supplies overseas and import those goods and supplies into the United States and other jurisdictions. The Debtors' purchase of the Imported Goods is vital to their business operations. For example, without the uninterrupted purchase and delivery of the Imported Goods, such as aircraft parts, components, and raw materials, ongoing operations would suffer, and certain operations may be significantly impaired.

247.    If the Customs Duties on the Imported Goods are not timely paid, the U.S. Customs Service and non-U.S. customs authorities may demand liquidated damages, assess interest, or

impose other penalties and sanctions. Absent payment, (i) the Debtors' customs brokers may, in some instances, assert carrier's or warehouses' liens on the Imported Goods, (ii) the U.S. Customs Service may assert a lien against the Imported Goods under 19 C.F.R. § 141.1(d), and (iii) non-U.S. customs authorities may assert similar liens or take other action against the Debtors in their respective jurisdictions. Accordingly, it is in the best interest of the Debtors' estates and stakeholders that the Debtors be authorized to pay the Customs Duties to ensure continuous flow of the Imported Goods.

248.     Accordingly, the Debtors need authority for themselves and the customs brokers acting as their agents, to continue to make necessary payments of customs duties, import-related taxes, entry fees, and other incidental import and related expenses to the U.S. Customs Service and to non-U.S. customs authorities on account of obligations that arose or relate to the period before the Petition Date.

249.     Accordingly, the Debtors need authority to pay prepetition Lien Claims as they become due and payable in the ordinary course of business. For the avoidance of doubt, the Debtors seek authority to pay only those Lien Claims that the Debtors determine, in their sole discretion, to be necessary or appropriate to (a) obtain release of critical or valuable Goods, (b) maintain reliable, efficient, and smooth distribution systems, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' postpetition operations. and (b) pursuant to section 363(e) of the Bankruptcy Code, the Carriers and Warehouses, as holders of possessory liens, may be entitled to adequate protection

250.     For the twelve months before the Petition Date, on average, the Debtors paid the Lien Claimants approximately $7,000,000 per month. The Debtors estimate that, as of the Petition Date, approximately $5,000,000 is outstanding on account of the Lien Claims.

251.     In return for the payment of prepetition 503(b)(9) Claims and Lien Claims, the Debtors propose that the 503(b)(9) Claimants and Lien Claimants be required to continue providing Goods and/or services to the Debtors on the most favorable terms (including credit limits, pricing, timing of payments, availability, and other terms) in effect between such 503(b)(9)

Claimant or Lien Claimant and the Debtors in the 24-month period preceding the Petition Date or on such other terms as the Debtors and such claimant may otherwise agree. The Debtors propose that the Customary Trade Terms apply for the balance of the term of each 503(b)(9) Claimant or Lien Claimant's agreement with the Debtors, so long as the Debtors make payments in accordance with that agreement.

252.    I believe that the Debtors' ongoing ability to obtain Goods from their suppliers is critical to their survival, necessary to preserve the value of their estates, and justifies the Debtors' decision to pay the Section 503(b)(9) Claims early in the Debtors' chapter 11 cases. Absent payment of the Section 503(b)(9) Claims—which I am advised will likely only accelerate the timing of payment and not improve the ultimate treatment of such claims—the Debtors could be denied access to the crucial parts and components necessary to provide competent service to their customers. Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process or to accelerate or eliminate favorable trade terms. Needless to say, such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

253.    Similarly, payment of the Lien Claims is necessary to facilitate the uninterrupted operation of the Debtors' business. Absent payments of the Lien Claims, the Lien Claimants may stop providing essential services. The cessation of the services provided by the Lien Claimants and/or the assertion of Mechanic's Liens would materially disrupt the Debtors' business.

254.    I believe that the critical need for the continued receipt and distribution of Goods that Carriers, Warehouses or certain other third parties may hold on the Petition Date justifies the relief sought in the Lien and 503(b)(9) Claimant Motion. The prompt payment to Carriers, Warehouses, and other third parties, as applicable, which may be necessary to obtain delivery of the Goods in their possession, is crucial for the orderly and efficient operation of the Debtors' business. For these reasons, I believe the relief requested in the Lien and 503(b)(9) Claimant

Motion is vitally necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders in the chapter 11 cases.

## XIII. CRITICAL AND FOREIGN VENDOR MOTION

255.    In the Critical and Foreign Vendor Motion, the Debtors seek entry an order: (a) authorizing the Debtors to pay certain prepetition amounts owing on account of (i) prepetition claims held by certain critical vendors that are essential to the Debtors' ongoing business operations and (ii) prepetition claims held by certain Foreign Claimants, (b) authorizing, but not directing, the payment of Outstanding Orders in the ordinary course of business, and (c) granting certain related relief. I am familiar with the Debtors' various vendors and suppliers. Because the Debtors' business relies on continuing access to, and relationships with, its network of vendors and suppliers, payment of the prepetition claims held by certain essential vendors and suppliers is critical to maintain the integrity of the Debtors' supply chain and ensure uninterrupted operation of the Debtors' business operations. Any disruption in the Debtors' access to such services and the provision of critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' business.

256.    To achieve uninterrupted and timely service to its customers, the Debtors rely on continuing access to, and relationships with, certain highly specialized vendors, as well as certain vendors and service providers that operate in foreign jurisdictions all of whom comprise creditors of one or more of the Debtors. Without uninterrupted access to these goods and services, and the smooth transition into its restructuring particularly for its foreign operations, the Debtors' operations would be severely impaired, and its customers impacted to the detriment of all.

257.    For this reason, the Debtors need authorization to pay the Critical Vendor Claims and Foreign Claimants, subject to the limitations set forth in the proposed Orders. Given the size, number and global scale of the Debtors' operations, the Debtors intend to use their discretion to pay only those Critical Vendor Claims and Foreign Claims that are critical to maintaining the Debtors' supply chain and provide the Debtors with favorable postpetition terms.

258.    Manufacturers and maintenance providers for airplanes, helicopters, and other technologies both in and out of the aerospace and defense manufacturing industries require hundreds of thousands of specialized parts. The Debtors provide inventory management services for many of their customers. The Debtors forecast inventory needs and maintain safety stock in some instances, which requires constant replenishment as inventory is used. In other circumstances, the Debtors receive inventory that customers need to keep their manufacturing production lines operational. The Debtors fill a critical role in mitigating supply chain delays and managing long lead times to ensure customers receive the inventory they need when they need it. Thus, in the ordinary course of business, the Debtors deal with many providers of critical supplies that the Debtors depend upon to service their customers. Of particular importance are vendors irreplaceable due to geography, customer-mandated suppliers, proprietary or limited-source suppliers, and technical service providers with expertise specific to the Debtors' operations, its customers equipment, and the infrastructure in the numerous domestic and foreign locations in which the Debtors operate. The Debtors obtain such materials and related services from these Critical Vendors often on an order-by-order basis and without long-term contracts,[17] that would likely be impossible to replace or would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 cases. Consistent with industry norms, many of the Debtors' supplies are also acquired by means of purchase orders with lead times ranging from twelve to eighteen months, which would likely be cost-prohibitive or impossible to replace on short notice, particularly as to items that are specially designed, manufactured, or otherwise regulated.

259.    In addition to providing difficult-to-source, custom-manufactured, or proprietary goods pursuant to highly specific agreements, many of the Critical Vendors are irreplaceable

---

[17]   For example, the Debtors estimate that less than 15% of inventory purchases are tied to active long-term supplier contracts. Most inventory purchases are made at market prices through new purchase orders. Even the minority of purchases made through active supplier contracts often involve suppliers who supply other parts off-contract through separate purchase orders, thus providing these suppliers additional leverage to withhold critical parts if other prepetition liabilities are not satisfied.

simply due to the scale of the Debtors' operations. In the ordinary course of business, the Debtors maintain inventory valued in excess of $1 billion, which consists of a tremendous array of supplies, parts, equipment, and other assorted goods. Indeed, some of the aircraft for which the Debtors provide supplies may be comprised of as many as 6 million individual parts, and many of these parts are subject to substantial technical specifications and particular materials, with no room for manufacturing errors. It would be impossible for the Debtors, much less any logistics provider, to find alternative suppliers to provide bulk substitutes for the quantity of goods needed to operate the Debtors' enterprise—let alone alternative suppliers capable of delivering equivalent goods across the globe. It would be even more difficult to find such alternative suppliers on short notice during the pendency of these chapter 11 cases. These concerns apply with equal, if not greater force, to the approximately $500 million of outstanding orders with lead times ranging from several weeks to over a year and a half. In many cases, there is simply no way to find alternate suppliers in time to meet customer needs. I believe that difficulties associated with obtaining substitute supply sources pose a significant risk to their operations absent the relief requested herein.

260.    The Debtors have historically enjoyed favorable trade terms with certain of their Critical Vendors and believe that they would likely need to forego these favorable terms if they are forced to seek out new suppliers who may demand cash in advance or cash on delivery. Less favorable trade terms would negatively impact the value of the Debtors' estates.

261.    To identify Critical Vendors and estimate prepetition amounts outstanding, the Debtors, in conjunction with their advisors, closely reviewed their accounts payable and prepetition vendor lists. The criteria considered in evaluating critical vendor status included whether: (a) a particular vendor is a sole- or limited-source provider; (b) quality control or other contractual requirements preventing the Debtors from replacing the vendor; (c) the vendor supplies highly engineered component parts that require substantial lead time to develop and produce; (d) the Debtors receive advantageous pricing or other terms from the vendor; (e) the vendor might face its own liquidity crisis if the Debtors do not promptly pay its prepetition claim; and (f) the

Debtors lacked a long-term supply contract with the vendor, through which the Debtors could compel performance.

262.    The Debtors and their advisors also have considered historical spending trends, procurement volume, and lead times for key purchase orders. The Debtors then considered whether a vendor would follow through on its threat to stop shipping goods either to the Debtors or to their non-debtor affiliates (that would not be protected by the automatic stay) and whether an amount less than the full amount of a vendor's prepetition claim could induce such vendor to continue shipments.

263.    I believe that jeopardizing the Debtors' relationships with any of the entities identified as Critical Vendors would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of the Critical Vendors' goods and services would impede the Debtors' operations, and the cumulative impact of such interruptions could have a catastrophic adverse effect on the Debtors' businesses and their ability to restructure as a going concern. Such harm would likely far outweigh the aggregate amount of the Critical Vendor Claims, which is modest in comparison to the overall value of the Debtors' enterprise and the amount of their secured and unsecured institutional debt.

264.    For the avoidance of doubt, the Debtors and their advisors have not determined the complete list of individual Critical Vendors and will, in their sole discretion, make such determinations on a case-by-case basis. In the event that the amount of claims proposed to be paid must be amended, the Debtors will file a notice of the proposed overage and provide an opportunity for objections thereto. For the avoidance of doubt, the Debtors intend to pay only those Critical Vendor Claims where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

265.    For the twelve months before the Petition Date, on average, the Debtors paid the currently identified Critical Vendors approximately $87,000,000 per month. The Debtors estimate that, as of the Petition Date, the outstanding amount of Critical Vendor Claims (that are not addressed by the other First-Day Motions) may be as much as approximately $84,000,000. Of

these, approximately $65,000,000 may come due during the first 21 days of these chapter 11 cases. Notably, the Debtors were forced to preserve liquidity by delaying payments to many vendors during the weeks and months before the Petition Date. Without meaningful, prompt payments to rectify past-due balances to Critical Vendors, the Debtors may face significant disruptions to their operations.

266.    Given the global nature of their businesses, the Debtors must necessarily make payments in the ordinary course to Foreign Claimants. Indeed, with more than 30 stocking locations, warehouses, and offices around the world and multiple foreign hub warehouses, a critical component of the Debtors' business involves transacting with Foreign Claimants. The Foreign Claimants with which the Debtors regularly transact business are located in the United Kingdom, Canada, Mexico, South America, Southeast Asia, India, Japan, China, and continental Europe. Many of the Foreign Claimants are irreplaceable due to the specialized and customized nature of their products and services, specific to the Debtors' international operations. Moreover, it is often logistically impracticable—and significantly more cost prohibitive—for the Debtors to purchase goods and services from a U.S.-based entity than from a Foreign Claimant. Indeed, the same concerns discussed above with respect to the Critical Vendors apply with equal force to many of the Foreign Claimants. Accordingly, the loss of production or services from Foreign Claimants (even those that may not meet the high bar to be considered Critical Vendors) could have a deleterious effect on the Debtors' business operations outside of the United States, given the Debtors' global footprint and the extremely short timelines and exacting specifications on which the Debtors must provide supplies and related services. Thus, the Debtors' viability as a global enterprise is disproportionately dependent upon the maintenance of their relationships with the Foreign Claimants. Alternative suppliers or service providers in many situations may not exist in the necessary locations, and the amount of time and expense needed to locate and convert to alternative supply or service sources in foreign countries would be prohibitive.

267.    Many of the Foreign Claimants lack meaningful, if any, contacts with the United States and may consider themselves beyond the effective jurisdiction of the Court, and therefore,

may disregard the automatic stay, notwithstanding its extraterritorial application as a matter of U.S. law. Accordingly, many of the Foreign Claimants may withhold vital goods or services from the Debtors, thereby causing drastic consequences to the operation of the Debtors' businesses. Attempts to pursue relief outside of the United States' system of enforcement would present uncertain outcomes, may be more costly than the value of the benefits obtained, and in any event would complicate the fostering of commercial relationships. Moreover, failure to pay the Foreign Claims accrued in the ordinary course may result in lawsuits and other collection remedies outside the United States, including the assertion of liens and perhaps other relief by the Foreign Claimants. Those actions would have both an immediate impact on the Debtors' ability to operate and long-term effects on their ability to attract new business and would distract the Debtors' foreign-based employees from their focus on serving the business. In many instances, it would be unduly time-consuming, of uncertain result, and burdensome for the Debtors to seek to enforce an order of this Court in the Foreign Claimants' home countries.

268.    To maintain access to the critical goods and services provided by the Foreign Claimants, the Debtors need authority to pay Foreign Claims as they become due in the ordinary course of business. For the avoidance of doubt, the Debtors intend to pay prepetition Foreign Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

269.    For the twelve months before the Petition Date, on average, the Debtors paid the Foreign Claimants approximately $49,000,000 per month. The Debtors estimate that, as of the Petition Date, approximately $81,000,000 is outstanding on account of the Foreign Claims, approximately $51,000,000 of which is due or will become due within the first 21 days of these chapter 11 cases.

270.    As described in the Critical and Foreign Vendor Motion, payment of the obligations described in the Critical and Foreign Vendor Motion will be conditioned on agreements that the affected vendors continue to sell their goods or provide their services to the Debtors on the same prices and trade terms as those in effect before the Petition Date. Maintaining customary trade

terms will improve the Debtors' chances of successfully reorganizing as purchasing goods on credit preserves working capital and liquidity—enabling the Debtors to maintain their competitiveness and to maximize the value of their businesses.

271.    For these reasons, I believe the relief requested in the Critical and Foreign Vendor Motion is vitally necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders in the chapter 11 cases.

## Conclusion

272.    This Declaration describes the Debtors' business and capital structure, the factors that precipitated the commencement of these Chapter 11 Cases, and the critical need for certain relief critical to the Debtors' ability to restructure their financial affairs and operations.  The relief sought in the First Day Motions will stabilize the Debtors' operations—the first critical step toward achieving a successful financial reorganization for the benefit of the Debtors' investors and employees.

*[Remainder of page intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 1, 2023
Fort Worth, Texas                                    */s/ Raymond Carney*

                                                     Raymond Carney
                                                     Chief Financial Officer
                                                     Wesco Aircraft Holdings, Inc.