# EXHIBIT 1 TO DISCLOSURE STATEMENT

## REDLINE OF DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF WESCO AIRCRAFT HOLDINGS, INC. *ET AL.* AGAINST THE FIRST AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF WESCO AIRCRAFT HOLDINGS, INC. *ET AL.*[1]

---

[1] Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| *In re*<br><br>**WESCO AIRCRAFT HOLDINGS, INC.**, *et al.*,[1]<br><br>Debtors. | Case No. 23-90611 (MI)<br><br>Chapter 11<br><br>(Jointly Administered) |

## FIRST AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF WESCO AIRCRAFT HOLDINGS, INC. *ET AL.*[2]

Charles A. Beckham, Jr. (02016600)
Patrick L. Hughes (10227300)
Kelli S. Norfleet (24070678)
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone: 1 (713) 745-2000
Charles.Beckham@HaynesBoone.com
Patrick.Hughes@HaynesBoone.com
Kelli.Norfleet@HaynesBoone.com

Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
Benjamin M. Schak (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: 1 (212) 530-5000
DDunne@Milbank.com
SKhalil@Milbank.com
BSchak@Milbank.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors operate under the trade name Incora and have previously used the trade names Wesco, Pattonair, Haas, and Adams Aviation. A complete list of the Debtors in these chapter 11 cases, with each one's federal tax identification number and the address of its principal office, is available on the website of the Debtors' noticing agent at http://www.kccllc.net/incora/. The service address for each of the Debtors in these cases is 2601 Meacham Blvd., Ste. 400, Fort Worth, TX 76137.

[2] Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

This disclosure statement is being submitted for, but has not yet gained, approval of the United States Bankruptcy Court for the Southern District of Texas. The filing of this proposed disclosure statement is not a solicitation of acceptance or rejection of any chapter 11 plan. Such a solicitation may not occur until a disclosure statement has been approved by the Bankruptcy Court. The information presented in this proposed disclosure statement is subject to material change. This proposed disclosure statement is not an offer to sell any securities and is a solicitation of any offer to buy securities.

# DISCLOSURE STATEMENT
## DATED ~~NOVEMBER 17~~DECEMBER 27, 2023

# SOLICITATION OF VOTES
## ON THE JOINT CHAPTER 11 PLAN OF
## WESCO AIRCRAFT HOLDINGS, INC. *ET AL.*



## IMPORTANT NOTICES AND DISCLAIMERS

### DEADLINE FOR VOTING

If you are entitled to vote, your Ballot must be submitted to and **actually received** by Kurtzman Carson Consultants, LLC (the "*Solicitation Agent*") at or before **5:00 p.m. (CST) on February [•], 2024** (the "*Voting Deadline*"), unless the Voting Deadline is extended. If the Solicitation Agent does not actually receive your Ballot by the Voting Deadline, your vote will be counted only at the discretion of the Debtors unless the Voting Deadline is extended.

### HEARING ON CONFIRMATION

Any objections to confirmation of the Plan must be filed and served on the Debtors, the Committee, the First Lien Noteholder Group, and the U.S. Trustee no later than 5:00 p.m. (CST) on February [•], 2024.

A hearing to consider confirmation of the Plan (the "*Confirmation Hearing*") will be held before the Honorable Marvin Isgur, United States Bankruptcy Judge, on February [•], 2024, at [•] (CST), in Courtroom 404 at 515 Rusk Street, Houston, TX 77002.

You may participate in the hearing either in person or by an audio and video connection. Audio communication will be through the Court's dial-in facility, at 1 (832) 917-1510. Once connected, the audio conference room number is 954554. Video communication will be through the GoToMeeting platform. You may connect via the free GoToMeeting application or by clicking the link on Judge Isgur's homepage at https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-marvin-isgur. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting. Appearances must be made electronically in advance of both remote and in-person hearing attendance. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's homepage at ~~https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-marvin-isgur~~https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-marvin-isgur. Select the case name, complete the required fields, and click "Submit" to complete your appearance.

### RECOMMENDATION: VOTE TO ACCEPT THE PLAN

**The Debtors recommend that all eligible holders of Claims vote to accept the Plan.** The proposed restructuring will eliminate approximately $[~~•~~]2 billion in debt from the Debtors' balance sheet and thereby improve the Debtors' financial condition and overall creditworthiness and help ensure their continued operations.

The Official Committee of Unsecured Creditors (the "*Committee*") also recommends that all unsecured creditors vote to **accept** the Plan.

### THIRD-PARTY RELEASE

> **The Plan provides that certain Entities and Persons will be deemed to have granted the Third-Party Release contained in Article VIII.E of the Plan. You will be bound by the Third-Party Release if you do not validly and timely opt out of the Third-Party Release. For more information about the Third-Party Release, please refer to Section IV.H.4.f of this Disclosure Statement.**

### DISCLAIMERS

Each holder of a Claim who is entitled to vote on the Plan should read this Disclosure Statement (including the Plan and other exhibits) in its entirety before voting. The description of the Plan provided throughout this Disclosure Statement is only a summary of the Plan. If this Disclosure Statement is incomplete or inconsistent with the Plan in any respect, the Plan will govern. A copy of the Plan is attached as **Exhibit A** to this Disclosure Statement.

The contents of this Disclosure Statement should not be construed as providing any legal, business, financial, or tax advice, and the Debtors urge any holder of a Claim who is entitled to vote on the Plan to consult with its own advisors for any legal, business, financial, or tax advice in reviewing this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan. This Disclosure Statement shall not be understood to be advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against the Debtors or the Reorganized Debtors. The Debtors have not authorized any entity to provide any information about, or concerning, the Plan, other than the information contained in this Disclosure Statement. In addition, the Debtors have not authorized any entity to make any representations concerning the Debtors or the value of their property, other than as set forth in this Disclosure Statement. Any other representations or inducements made to secure your vote for acceptance or rejection of the Plan should not be relied upon.

Except where specifically noted, the statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement. There can be no assurance that those statements will remain correct or accurate at any time after that date.

Statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete; in each instance, reference is made to the complete text of such document. Certain documents described in or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing complete copies of those documents to all recipients of this Disclosure Statement.

Except where specifically noted, the financial information contained in this Disclosure Statement (including its exhibits) has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles.

The Debtors' management and advisors have prepared the projections attached to this Disclosure Statement. While those projections have been presented with numerical specificity, the projections are necessarily based on a variety of estimates and assumptions which, though considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtors' control. The Debtors caution that they cannot make any representations as to the accuracy of these projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions will inevitably differ from actual conditions. Furthermore, events and circumstances occurring after the date on which these projections were prepared may differ from any assumed facts and circumstances and may affect financial results in a materially adverse or materially beneficial manner. The projections, therefore, should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Descriptions of actual or threatened litigation in this Disclosure Statement shall not constitute, and should not be construed as, an admission, stipulation, or waiver.

~~The Plan does not constitute an "Acceptable Plan" and this Disclosure Statement does not constitute an "Acceptable Disclosure Statement" under the DIP Note Purchase Agreement, and none~~None of the Debtors' creditors (including the Note Purchasers, ~~(~~as defined in the DIP Note Purchase Agreement~~)~~, or any of their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained in this Disclosure Statement, takes any responsibility for that information, ~~or~~ should have any liability with respect to that information, ~~and none of the foregoing entities~~ or ~~persons~~ makes any representations or warranties whatsoever concerning the information contained in this Disclosure Statement.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "*SEC*") or any comparable state authority. The securities issued pursuant to the Plan have not been approved or disapproved by the SEC or any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any state securities commission or authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The securities to be issued pursuant to the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act, or any securities regulatory authority of any state under the applicable state securities law or similar public, governmental, or regulatory authority. The Debtors intend to rely on, to the extent each is available, (a) section 1145(a) of the Bankruptcy Code, (b) section 4(a)(2) of the Securities Act, or (c) Regulation D promulgated thereunder (and in each case,

equivalent state law registration exemptions) to exempt from registration under the Securities Act the new securities of the Reorganized Debtors in connection with the Plan.

This Disclosure Statement contains "forward-looking statements". Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology, such as "may," "expect," "anticipate," "estimate," "continue," or the negatives of those words, as well as any similar language. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained in and attached to this Disclosure Statement are only estimates, and the timing and amount of actual distributions to holders of Allowed Claims, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

*[Remainder of page intentionally blank]*

# TABLE OF CONTENTS

IMPORTANT NOTICES AND DISCLAIMERS ......................................................... II

Deadline for Voting ................................................................................. ii
Hearing on Confirmation ......................................................................... ii
Recommendation: Vote to Accept the Plan ............................................... ii
Third-Party Release ................................................................................. iii
Disclaimers ............................................................................................. iii
Special Notice Regarding Federal and State Securities Laws ..................... iv

TABLE OF CONTENTS ................................................................................. VI

SECTION I. INTRODUCTION .......................................................................... 1

    A.    The Disclosure Statement and Voting ............................................ 1
    B.    Overview of the Proposed Restructuring ......................................... 2
    C.    Summary of Classification, Treatment, and Estimated Recoveries .... 3
    D.    Further Inquiries ............................................................................ 4

SECTION II. HISTORICAL INFORMATION ...................................................... 5

    A.    Incora's Business .......................................................................... 5
    B.    Incora's Corporate History ............................................................ 11
    C.    Incora's Corporate Structure ......................................................... 12
    D.    Incora's Prepetition Capital Structure ............................................ 13
    E.    Events Leading to the Chapter 11 Filings ...................................... 18

SECTION III. EVENTS DURING THE CHAPTER 11 CASES ................................. 29

    A.    Overview of Chapter 11 ................................................................ 29
    B.    First-Day Relief ............................................................................ 29
    C.    Postpetition Financing ................................................................... 30
    D.    Other Procedural and Administrative Motions ................................ ~~32~~31
    E.    Appointment of Creditors' Committee ........................................... ~~33~~32
    F.    Claims Processing and Reconciliation ........................................... ~~33~~32
    G.    Contract Re-Negotiation ............................................................... 33
    H.    Continuation of the ~~2022~~ Financing Litigation ............................. 33
    I.    Standing Motions .......................................................................... 34
    J.    Restructuring Support Agreement ................................................... 35

SECTION IV. SUMMARY OF PLAN OF REORGANIZATION .............................. ~~35~~37

    A.    New Debt Instruments and Securities ............................................ ~~35~~37
    B.    Classification and Treatment of Claims and Interests ..................... ~~35~~37
    C.    Voting Classes .............................................................................. ~~48~~50
    D.    Means for Implementation of the Plan ........................................... ~~48~~50
    E.    Treatment of Executory Contracts and/or Unexpired Leases .......... ~~57~~59
    F.    Claims Resolution ........................................................................ ~~62~~65
    G.    Distributions ................................................................................. ~~65~~68
    H.    Provisions Relating to Releases, Exculpations, and Injunctions ...... ~~72~~74
    I.    Conditions to Effective Date ......................................................... ~~84~~87

J.    Modification, Revocation or Withdrawal of Plan ................................... ~~86~~90

K.    Retention of Jurisdiction ...................................................................... ~~87~~91

L.    Miscellaneous Provisions ..................................................................... ~~89~~93

**SECTION V. VOTING PROCEDURES AND REQUIREMENTS** ................................... ~~94~~97

A.    Who May Vote ....................................................................................... ~~94~~97

B.    Voting Deadline ..................................................................................... ~~94~~97

C.    Establishing Claim Amounts for Voting Purposes ................................ ~~95~~98

D.    Voting Procedures ................................................................................. ~~96~~99

E.    Agreements upon Furnishing Ballots ................................................... ~~100~~103

F.    Further Information and Additional Copies .......................................... ~~100~~103

**SECTION VI. CONFIRMATION OF PLAN** ............................................................ ~~101~~104

A.    Confirmation Hearing ........................................................................... ~~101~~104

B.    Objections to Confirmation ................................................................... ~~101~~104

C.    Requirements for Confirmation ............................................................ ~~103~~106

D.    Additional Requirements for Non-Consensual Confirmation ................ ~~105~~108

**SECTION VII. FEDERAL INCOME TAX CONSIDERATIONS** ................................... ~~108~~111

A.    Importance of Obtaining Independent Professional Tax Advice ........... ~~108~~111

B.    Tax Consequences of the Restructuring ............................................... ~~108~~111

C.    Certain U.S. Federal Income Tax Consequences to the Debtors ~~110~~ and
the Reorganized Debtors ...................................................................... 112

D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders ~~of
Allowed Claims in Voting Classes~~ ...................................................... ~~113~~ 116

E.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders ~~of
Allowed Claims in Voting Classes~~ ...................................................... ~~113~~ 125

F.    Information Reporting and Back-Up Withholding ................................ 131

**SECTION VIII. SECURITIES LAW CONSIDERATIONS** .......................................... ~~114~~132

A.    Importance of Obtaining Independent Professional Advice .................. ~~114~~132

B.    Issuance and Resale of Securities Under the Plan ................................ ~~114~~132

**SECTION IX. RISK FACTORS** .......................................................................... ~~119~~137

A.    Bankruptcy Process Risks ..................................................................... ~~119~~137

B.    Business Risks ....................................................................................... ~~122~~140

C.    Risks Relating to the New Common Equity ........................................... ~~135~~153

D.    Risks Relating to the Financing Facilities ............................................ ~~137~~156

E.    Other Risks ........................................................................................... ~~138~~157

**SECTION X. ALTERNATIVES TO THE PLAN** ...................................................... ~~140~~159

A.    Liquidation Under the Bankruptcy Code ............................................... ~~140~~159

B.    Alternative Plans of Reorganization ..................................................... ~~141~~159

C.    Sale Under Section 363 of the Bankruptcy Code .................................. ~~141~~160

D.    Non-Bankruptcy Liquidation or Foreclosure ........................................ ~~141~~160

**SECTION XI.** CONCLUSION AND RECOMMENDATION ................................................... ~~142~~161


EXHIBIT A                    JOINT CHAPTER 11 PLAN OF WESCO AIRCRAFT
                             HOLDINGS, INC. *ET AL.*

EXHIBIT B                    FINANCIAL PROJECTIONS

EXHIBIT C                    LIQUIDATION ANALYSIS

EXHIBIT D                    VALUATION ANALYSIS

EXHIBIT ~~D~~E                  ORGANIZATIONAL CHART

# SECTION I.
## INTRODUCTION

### A.    THE DISCLOSURE STATEMENT AND VOTING

Wesco Aircraft Holdings, Inc. ("*Wesco Holdings*") and its ~~debtor affiliates~~<u>affiliated debtors</u> (each, a "*Debtor*" and, collectively, the "*Debtors*" or "*Incora*" or the "*Company*") submit this disclosure statement (as amended from time to time, the "*Disclosure Statement*") in connection with the Solicitation of votes on the *Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.*, attached as **Exhibit A** (the "*Plan*") to this Disclosure Statement.

The purpose of this Disclosure Statement is to enable those creditors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain documents related to the Plan, descriptions of relevant statutory provisions, and a description of key events in the Debtors' chapter 11 cases (the "*Chapter 11 Cases*"). This Disclosure Statement is part of the "*Solicitation Package*" distributed to all holders of Claims in the Voting Classes, which contains the following:

- this Disclosure Statement;

- the Plan, as **Exhibit A** to this Disclosure Statement;

- the Financial Projections, as **Exhibit B** to this Disclosure Statement;

- the Liquidation Analysis, as **Exhibit C** to this Disclosure Statement;

- ~~an organizational chart~~<u>the Valuation Analysis</u>, as **Exhibit D** to this Disclosure Statement;

- <u>an organizational chart, as</u> **Exhibit E** <u>to this Disclosure Statement;</u>

- one or more ballots (the "*Ballots*"), which include instructions describing the acceptable methods to submit a Ballot (either physically, via email, or through the Solicitation Agent's online portal, as applicable).

Questions regarding the Ballots or voting procedures may be directed to the Debtors' Solicitation Agent, as follows:

| **Solicitation Agent:** |
| :---: |
| Kurtzman Carson Consultants LLC |
| www.kccllc.net/incora/inquiry |
| (888) 251-2937 (toll-free) |
| +1 (310) 751-2613 (international) |

If you are a holder of a Claim who is entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent at the website or telephone numbers shown above.

For your vote to count, your Ballot must be ***actually received*** by the Solicitation Agent no later than the Voting Deadline of ***5:00 p.m. (CST) on February [•], 2024***. Each Ballot must be completed, properly executed, and delivered to the Solicitation Agent in accordance with the instructions set forth on the Ballot, so that the Ballot is actually received by the Solicitation Agent before the Voting Deadline. Copies, faxes, and emails will not be accepted or counted; *provided that* Master Ballots may be submitted by email in accordance with the Master Ballot's instructions.

## B.   OVERVIEW OF THE PROPOSED RESTRUCTURING

The Debtors are pleased to announce that the Plan provides for a comprehensive financial restructuring (the "*Restructuring*") that will eliminate approximately $[•]2 billion of net debt (plus unpaid interest) from their balance sheet. As a result, Incora will emerge from chapter 11 (as the "*Reorganized Debtors*") a stronger company, with a sustainable capital structure that is better aligned with its expectations for growth.

The Plan is described in further detail at Section IV, below. Both this summary and that further description are qualified in their entirety by reference to the Plan itself. As a result of the Restructuring:

- ABL Facility Claims will receive Cash in an amount equal to the Allowed amount of such ABL Facility Claim.

- The outstanding principal and exit fee payable under the DIP Notes will be converted into an equivalent ~~principal~~ amount of New Exit Notes (approximately $324 million in principal), while other DIP Financing Claims will be paid in full in Cash. ~~The New Exit Notes will be [•] year notes, bearing interest at a rate of [•] per annum.~~

- The holders of Allowed 1L Notes Claims will receive ~~their Pro Rata shares of $[•]~~$420,000,000 in principal amount of New Takeback Notes ~~as well as all~~and 96.5% of the New Common Equity, subject to dilution by any New Common Equity issued ~~on account of distributions to holders in other Classes or~~ in respect of the Management Incentive Plan.

- The holders of 1L Notes Claims will also ~~have an Allowed General Unsecured Claim (a "deficiency" Claim) in the aggregate amount of $[•]. The New Takeback Notes will be [•]-year notes, bearing interest at a rate of [•] per annum.~~

- ~~The holders of Allowed 1.25L Notes Claims will receive their Pro Rata shares of the 1.25L Notes Settlement Consideration.~~

- ~~The holders of Allowed 2026 Unsecured Notes Claims will receive their Pro Rata shares of the 2026 Unsecured Notes Settlement Equity, and the holders of Allowed 2024 Unsecured Notes Claims will receive their Pro Rata shares of the 2024 Unsecured Notes Settlement Equity.~~

- ~~The~~receive indemnification as set forth under Article V.D.2.b of the Plan.

- The Settlement Equity Pool (i.e., 3.5% of the New Common Equity, subject to dilution by the Management Incentive Plan) will be distributed to holders of Allowed General Unsecured Claims (including 2027 Unsecured Notes Claims and 1L Notes Deficiency Claims) will receive their Pro Rata shares of the GUC Settlement Distribution.

- The holders of Allowed General Unsecured Convenience Claims (i.e., general unsecured Claims claims in amounts up to $[•]1,500,000) will receive their Pro Rata share of Cash in an the amount equal to [•]of $7,500,000, except that no such holder will receive more than 10.00% of the Allowed amount of their Claims its General Unsecured Convenience Claim.

- The holders of 1.25L Notes Claims, PIK Notes Claims, and Existing Equity Interests will receive no distributions.

- The holders of certain other Allowed Claims, including Priority Non-Tax Claims and Other Secured Claims, will be Unimpaired by the Plan, meaning that they will be paid in full in cash, paid in the ordinary course of business, or receive other treatment as permitted by the Bankruptcy Code.

The Debtors believe that the proposed Restructuring will provide the Debtors with the capital structure and liquidity that they need to flourish. Entering bankruptcy, the Debtors were overleveraged and faced severe liquidity constraints. The Restructuring will address those problems by eliminating approximately $[•]2 billion in principal amount ofnet funded debt obligations, thereby reducing debt service and eliminating near-term maturities. Furthermore, the rejection or renegotiation of certain burdensome contracts during the Chapter 11 Cases will improve Incora's long-term profit margins.

In developing the Plan, the Debtors, with the assistance of their advisors, conducted a careful review of their existing business operations and compared their projected value as an ongoing business enterprise with their projected value in a liquidation scenario, as well as the estimated recoveries to holders of Allowed Claims in each of these scenarios. The Debtors concluded that the potential recoveries to holders of Allowed Claims would be maximized by continuing operations as a going concern through implementation of the Restructuring. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation or piecemeal sale. Moreover, the Debtors believe that any alternative to the Plan could result in significant delay, litigation, execution risk, and additional costs, ultimately lowering the recoveries to holders of Claims that can be achieved through the Restructuring. Accordingly, it is the Debtors' opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' estates, creditors, and equity interest holders. Therefore, the Debtors recommend that all eligible holders of Claims vote to *accept* the Plan.

C.    SUMMARY OF CLASSIFICATION, TREATMENT, AND ESTIMATED
      RECOVERIES

The following table summarizes the classification of Allowed Claims and Interests and the estimated recoveries of their holders under the Plan. Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates. Actual recoveries realized under the Plan may vary from these estimates. In addition, the ability of holders to receive distributions under the Plan depends upon, among other things, the ability of the Debtors to obtain Confirmation of the Plan and to meet the conditions to effectiveness of the Plan. For additional explanation regarding the terms of the Plan and its treatment of Allowed Claims and Interests, please refer to the discussion in Section IV, entitled "Summary of Plan of Reorganization," as well as the Plan itself, which is attached to this Disclosure Statement as **Exhibit A**. This chart assumes that the value of New Common Equity will be within the range disclosed in the Valuation Analysis attached as **Exhibit D**, that all post-Effective Date debt will be valued at par, that the Settlement Equity Pool will be shared by holders of approximately $650 million to $690 million of General Unsecured Claims, and that the consideration allocated to Class 7b will be shared by holders of approximately $70 million to $75 million of General Unsecured Convenience Claims. Actual ranges and recoveries may differ materially from these assumptions. The following table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claims or Interests | Impairment | Voting Rights | Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Presumed to accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Presumed to accept | 100% |
| 3 | ABL Facility Claims | Unimpaired | Presumed to accept | 100% |
| 4 | 1L Notes Claims | Impaired | **Entitled to vote** | 58–92% |
| 5 | 1.25L Notes Claims | Impaired | ~~Entitled to vote~~Deemed to reject | 0% |
| 6a | [Reserved] | N/A | N/A | N/A |
| 6b | [Reserved] | N/A | N/A | N/A |
| ~~6a~~ | ~~2026 Unsecured Notes Claims~~ | ~~Impaired~~ | ~~Entitled to vote~~ | |
| ~~6b~~ | ~~2024 Unsecured Notes Claims~~ | ~~Impaired~~ | ~~Entitled to vote~~ | |
| 7a | General Unsecured Claims | Impaired | **Entitled to vote** | 2–5% |
| 7b | General Unsecured Convenience Claims | Impaired | **Entitled to vote** | 10% |
| ~~7c~~ | ~~General Unsecured Canada/Mexico Claims~~ | ~~[•]~~ | ~~[•]~~ | |

| Class | Claims or Interests | Impairment | Voting Rights | Recovery |
|-------|---------------------|------------|---------------|----------|
| 8 | PIK Notes Claims | Impaired | Deemed to reject | 0% |
| 9 | Intercompany Claims | Impaired/ Unimpaired | Deemed to reject or presumed to accept | 0% or 100% |
| 10 | Existing Equity Interests | Impaired | Deemed to reject | N/A |
| 11 | Intercompany Interests | Unimpaired | Presumed to accept | N/A |

**D.    FURTHER INQUIRIES**

If you have questions about the Solicitation Package you have received, please contact the Solicitation Agent at (888) 251-2937 (toll-free in the U.S. and Canada) or +1 (310) 751-2613 (international). Additional copies of this Disclosure Statement, the Plan, and the Plan Supplement (when filed) are available on the Solicitation Agent's website, https://www.kccllc.net/Incora, or upon written request made to the Solicitation Agent at the following address:

| |
|---|
| **Incora Ballot Processing** |
| c/o KCC LLC |
| 222 N. Pacific Coast Hwy., Ste. 300 |
| El Segundo, CA  90245 |
| United States |

Please do not direct inquiries to the Bankruptcy Court.

*[Remainder of page intentionally blank]*

# SECTION II.
## HISTORICAL INFORMATION

### A. INCORA'S BUSINESS

Incora provides customizable and often on-demand supply chain management services to manufacturers and maintenance providers across several industries, with a focus on the commercial and defense aerospace industry. Incora enables manufacturers and maintenance providers to off-load the resource-intensive management of their critical supply inventories and instead focus on their core manufacturing or repair businesses.

These manufacturers and maintenance providers depend on Incora to provide critical components and other supplies reliably and quickly. Without Incora's services, these manufacturers and maintenance providers would need to source and keep on hand at all times various supplies needed to, for example, overhaul a jet engine—fasteners, bearings, lubricants, sealants, and so on—which would require them to devote substantial resources to processes outside their core capabilities. If a manufacturer or maintenance provider has a contract with Incora, it can rapidly obtain the parts or chemicals from an Incora warehouse. The manufacturer or maintenance provider could also contract with Incora for tailored, holistic supply chain management, allowing Incora to track and forecast its needs and provide supplies before it knows they are needed. Because Incora's services are so closely integrated into its customer's operations, its customers could experience delays or even shutdowns in their production lines if Incora does not provide them with necessary supplies. In short, Incora's services are critical to the day-to-day operations of its customers and the entire aerospace industry.

### 1. Global Presence, Customers and Suppliers

Incora's business depends on its ability to maintain a global physical presence and an equally broad network of employees to coordinate with its numerous vendors and customers. From its global headquarters in Fort Worth, Texas, its European headquarters in Derby, England, and its Asian headquarters in Singapore, Incora operates more than 60 stocking locations, warehouses, and offices in 17 countries across the globe.



To serve its over 8,400 customers – many of which are major, well-known, organizations within their respective industries and which range from aircraft manufacturers to the U.S. military[3] to automotive manufacturers to pharmaceutical companies – Incora employs approximately 3,750 people worldwide. More than 1,200 of them work at approximately 200 customer sites and provide a range of critical on-site services, creating a bespoke and comprehensive service experience. These employees are essential to sourcing hardware and chemicals from over 7,000 suppliers.

Incora's services allow both suppliers and customers to improve performance and increase value. Suppliers benefit from improved machine utilization, reduced finished goods inventory, access to Incora's customers, improved working capital and cash flow, price discipline, lower administrative and selling costs, and improved on-time performance, among other things. Customers benefit from lower overhead costs, reduced inventory and working capital, improved productivity, better on-time delivery, consistent and predictable quality, fewer stock shortages, and a single point of contact for orders and deliveries.

Incora can provide this value because it is deeply rooted among the industries it serves. The average length of time that Incora has served its ten largest customers (who collectively represent 57% of its revenue in fiscal year 2022) is greater than 20 years. Likewise, its relationships with its ten largest suppliers span, on average, over 25 years. Incora attributes its

---

[3]    Over 40% of Incora's revenues derive from business with the U.S. military and several large defense contractors and subcontractors that manufacture aircraft and armaments, many of which have been customers for decades. The defense industry remained relatively stable during COVID-19 and continues to grow steadily.

industry-leading status in significant part to its history of focusing on establishing these long-term relationships with customers and suppliers.

### 2.    Business Lines

Incora has two primary lines of business: the Hardware business and the Chemicals business (each as defined below). The Hardware business focuses on the distribution and supply chain management of fasteners, bearings, machined parts, tooling, and other hardware supplies, while the Chemicals business focuses on the distribution and supply chain management of solvents, paints, coatings, oils, greases, lubricants, adhesives, tapes, sealants, industrial gases, and other chemical supplies.



Incora's hardware business is further organized by its Contract and ONdemand models. Under the Contract model, Incora provides customized services to source, hold, and deliver inventory directly to Incora's customers' manufacturing sites. Incora enters into long-term contracts with its customers and earns a margin on product sales and a management fee on services provided. Contracts typically have three- to five-year terms.

The ONdemand model creates value through the maintenance of a distribution system that provides hardware parts to customers at a variable market-driven price without the need for long-term contracts. The ONdemand model generally suits customers with immediate delivery needs or limited purchasing scale.

The Hardware business consists of a mix of Contract and ONdemand model revenue, while the Chemicals business largely consists of Contract model revenue.



FY 2022E Segment Breakdown ($)

a.     *The Contract Business*

The long-term nature of customer contracts allows Incora to customize product sourcing and compliance processes, as well as integrate IT systems. Incora stations employees on-site at major customers' facilities to receive, inspect, organize, and deliver parts directly to their production lines.

Incora offers its Contract customers several services:

- *Supply Chain Management:* Comprehensive supply chain management that provides a single point of contact for a customer's supply chain needs. Incora tailors its services to each customer, managing the customer's unique inventory procurement needs and ensuring regulatory compliance.

- *Inventory Management Services:* Technology- and data-based solutions for monitoring inventory and forecasting procurement needs. This includes the provision of stocking and planning tools designed to track consumption, manage expirations, and automatically replenish orders through Incora's global network of distribution centers, as well as to identify and avoid potential acquisitions of unnecessary inventory.

- *Chemical Services:* Software solutions and on-site services to support chemical inventory management and regulatory compliance. Chemical management is essential to a variety of industries, including aerospace, industrial and heavy machinery, and pharmaceuticals. Incora's proprietary "tcmIS" software allows customers to control purchasing, track chemical location and usage, and streamline environmental and other regulatory compliance. Additionally, Incora's hazard communication ("*HAZCOM*") program, which complies with the Occupational Safety and Health Administration ("*OSHA*") Hazard Communication Standard, presents OSHA's hazard communications guidance in an easy-to-understand

format that enables employees to respond quickly and safely in the event of a chemical emergency.

- *Composite Management:* Management of inventories of composite materials – *i.e.*, special-purpose materials used in both simple and complex aircraft part manufacturing. Composite materials are essential to continuing innovation in aircraft design, including improvements in fuel efficiency. Incora offers fully customizable composite materials kits.

- *Kitting Services:* Delivery services for customized kits containing exact quantities of inventories needed for specific jobs. Kitting services allow customers to avoid sourcing and storing miscellaneous inventory.

- *Distribution Services:* Global delivery of hardware, chemicals, electronics, and other supplies. Incora meets its customers' distribution needs through its global locations and over $1 billion of inventory, employing certified quality assurance and documentation experts.

- *Vending Services:* Sale and installation of "warehouse-in-a-box" vending cabinets for customer facilities. Vending cabinets, which can hold over 300 unique part numbers and over 20,000 individual parts, make parts available on-site at any time. The cabinets are transportable and possess inbuilt features for rough service deployment, including a payload lift system.



Incora also distributes to its Contract customers a variety of products used in their manufacturing and maintenance operations, including the following:

- *Fasteners:* Highly engineered aerospace parts that affix two or more components, such as rivets, bolts, screws, nuts, and washers.

- *Electrical Products:* Reliable interconnect and electro-mechanical products, including connectors, relays, switches, circuit breakers, lighted

products, wires, and cables, as well as assembled products such as panel connectors and illuminated push-button switches. Incora offers electronic components from over 40 top manufacturers. Additionally, Incora operates a Center of Excellence for Electronics in Wichita, Kansas, offering to customers worldwide instruction on warehousing, quality management, administration, connector and lighted switch assemblies, and wire cutting and respooling.

- *Tooling:* Premium tools, specialized tooling solutions, and toolkits known for their quality and design. Incora's tooling center provides comprehensive tool management by supporting customers through the life cycle of their tools. Incora is manufacturer-authorized for sales, distribution, maintenance, and repair, and Incora employs certified technicians who carry out in-house or on-site manufacturer warranty services.

- *Bearings:* Anti-friction products, such as airframe control bearings, rod ends, spherical bearings, ball bearings, needle roller bearings, bushings, and precision bearings.

- *Machined Parts:* Customized parts designed for a specific customer, such as laser-cut or stamped brackets, milled parts, shims, stampings, turned parts, and welded assemblies. Incora partners with over 100 vetted manufacturers and machine shops to provide best practices for sourcing new materials and in-house quality testing.

- *Chemicals:* Adhesives, sealants and tapes, lubricants, oil and grease, paints and coatings, industrial gases, coolants, metalworking fluids, and cleaners and cleaning solvents. Incora's global network of chemical warehouses features temperature-controlled storage, shelf-life management, custom labeling, and barcode tracking for traceability.

**Representative Products**

Incora is an authorized distributor with contracts with most major aviation hardware manufacturers and service providers. In total, Incora offers over 600,000 stock-keeping units ("*SKUs*") of chemicals and "B-Class" and "C-class" hardware components that are used in aircraft engines, airframes, hydraulic units, actuation systems, wheels, brakes, landing gears, and exteriors. C-class components are parts that typically constitute a significant majority of the number of component SKUs used in aircraft.

### b.    *The ONdemand Business*

Some customers buy products directly from Incora without a contract. For ONdemand customers, Incora's in-stock inventory availability, ability to procure variable products as needed, and turnaround time are critical. Because Incora incurs significant costs to ensure that its SKUs are kept in stock to provide to ONdemand customers, its profit margins for ONdemand customers are typically higher than for Contract customers who look to Incora for broader supply chain management.

## B.    INCORA'S CORPORATE HISTORY

Incora was formed through a consolidation of two industry leaders, Wesco and Pattonair. Wesco was an aerospace hardware and service provider founded in

1953 in Gardena, California. A major private equity firm purchased a majority of Wesco's stock from the company's founding family in 2006 and then sold Wesco's stock through an initial public offering in 2011. At that time, Wesco's business relied heavily on sales of C-class hardware and was attempting to transition customers toward the comprehensive supply chain management agreements that now provide most of Incora's revenue. Three years later, Wesco significantly expanded the chemical side of its business with the purchase of Haas Group, a leading provider of chemical supply chain management services, for $550 million in cash. By 2019, Wesco's business was roughly balanced between hardware and chemicals.

Pattonair was founded in 1970 in England, not far from London Heathrow Airport. Pattonair's business concentrated on providing C-class parts for civilian aircraft engines, with an especially close relationship with Rolls-Royce, a leading manufacturer in the aerospace industry. Platinum Equity (the "*Sponsor*"), an American private equity investment firm, purchased Pattonair from another private owner in 2017.

In August 2019, Wesco and the Sponsor announced that Wesco would be sold to the Sponsor. The Sponsor intended to combine Wesco with Pattonair to create a business that would benefit from complementary commercial strengths, an expanded global reach, and reduced overhead. The sale of Wesco closed in January 2020, the combined company announced its new brand name—Incora—in March 2020, and the firm opened a new global headquarters in Fort Worth, Texas, in May 2021.



## C.   INCORA'S CORPORATE STRUCTURE

As shown in the organizational chart attached to this Disclosure Statement as **Exhibit ~~D~~E**, Incora's operations are divided across numerous operating entities, due to the global nature of those operations and due to its history of business combinations. The operating entities include Wesco Aircraft Hardware Corp. (formerly the principal operating company of Wesco) and Pattonair Ltd. (formerly the principal operating company of Pattonair). All operating companies are directly or indirectly owned by Wesco Holdings, which is the issuer of most of Incora's funded debt. Wesco Holdings is in turn owned by a chain of three holding companies: Wolverine Intermediate Holding II Corporation (a Debtor and a guarantor of most of Incora's funded debt), Wolverine Intermediate Holding Corporation ("Wolverine Intermediate Holding," a Debtor and the issuer of the PIK Notes described below), and Wolverine Top Holding Corporation (a non-Debtor).

Independent director Patrick Bartels serves on the board of directors of Wolverine Intermediate Holding.

## D.   INCORA'S PREPETITION CAPITAL STRUCTURE

Incora's prepetition capital structure was initially established in late 2019 and early 2020 in connection with the consolidation of Wesco and Pattonair and was later modified by the 2022 Transaction and related subsequent exchanges. A chart summarizing approximate principal amounts and accrued interest under Incora's funded debt is set forth below:

| Facility | Principal and Interest Outstanding[4] | Interest Rate | Maturity Date | Collateral |
|---|---|---|---|---|
| ABL Facility | $ ~~419,762,370~~419,762,370 | LIBOR + 1.75% | January 9, 2025 | 1st priority on current assets; 3rd priority on fixed assets; includes assets of Canadian and Mexican Debtors |
| 1L Notes | $ ~~1,387,960,298~~1,394,468,210 | 10.50% | November 15, 2026 | 2nd priority on current assets; 1st priority on fixed assets |
| 1.25L Notes | $ ~~532,737,211~~535,859,414 | 13.125% | November 15, 2027 | 3rd priority on current assets; 2nd priority on fixed assets |

---

[4]   Amounts ~~do not~~ reflect ~~any interest (including payment in kind interest)~~interest accrued ~~since May 15, 2023~~through the Petition Date, except that the amount shown for ABL Facility reflects a month-end principal balance as of May 31, 2023.

| Facility | Principal and Interest Outstanding[4] | Interest Rate | Maturity Date | Collateral |
|---|---|---|---|---|
| *Total Secured Debt* | $ ~~2,341,798,717~~ *2,350,089,994* | | | |
| 2024 Unsecured Notes | $ ~~184,284,810~~ 184,984,336 | 8.50% | November 15, 2024 | None |
| 2026 Unsecured Notes | $ ~~352,142,660~~ 353,557,970 | 9.00% | November 15, 2026 | None |
| 2027 Unsecured Notes | $ ~~110,958,203~~ 111,608,496 | 13.125% | November 15, 2027 | None |
| *Total Opco Debt* | $ ~~2,989,184,390~~ *3,000,240,796* | | | |
| PIK Notes | $ ~~156,195,977~~ 157,154,969 | 13.75% | April 15, 2028 | None; structurally subordinated |
| *Total Debt* | $ ~~3,145,380,367~~ *3,157,395,765* | | | |

## 1.    Secured Debt

### a.    *The Asset-Based Loan Facility*

Wesco Holdings is the borrower under an asset-based credit facility (the "*ABL Facility*") governed by a Revolving Credit Agreement, dated as of January 9, 2020, among Wolverine Intermediate Holding II Corporation as Holdings, Wesco Holdings as Ultimate Lead Borrower, Bank of America, N.A., as Administrative Agent and Collateral Agent and Swingline Lender, certain subsidiaries of Wesco Holdings, as Borrowers and Guarantors, and the Lenders and Issuing Banks party thereto (as amended to date, the "*ABL Credit Agreement*"). The ABL Facility originally provided for total loan commitments of $375 million, consisting of a $300 million U.S.-based sub-facility and a $75 million UK-based sub-facility. The ABL Facility also offered Incora the ability to obtain up to $75 million of letters of credit within the $375 million facility. On February 20, 2020, Amendment No. 1 to the ABL Credit Agreement enlarged the commitments to $475 million, consisting of $380 million under the U.S. sub-facility and $95 million under the UK sub-facility.

The maturity date for loans under the ABL Credit Agreement was originally January 9, 2025, with a springing maturity of August 16, 2024 if certain secured notes outstanding on January 9, 2020 remained outstanding as of such date.

On February 17, 2022, Amendment No. 6 modified the ABL Credit Agreement to provide for, among other things, a new tranche of loans. The new tranche consisted of commitments of $40 million, including a $27 million U.S.-based first-in last-out facility and a $13 million UK-based first-in last-out facility (collectively, the "*ABL FILO Facility*"). Other commitments were reduced by the same amount, so that the total amount of commitments under the ABL Credit Agreement remained $475 million. The maturity date for the new tranche was February 17, 2024 (*i.e.*, two years after the amendment date), and the original loans have the first right to the proceeds of collateral.

In connection with Amendment No. 6, certain of Wesco Holdings' Canadian Debtor subsidiaries, Wesco Aircraft Canada Inc. ("*Wesco Aircraft Canada"*), and Haas Group Canada Inc. (the "*Haas Group Canada*"), and a Mexican Debtor subsidiary, Haas TCM de Mexico, S. de R.L. de C.V. (together with Wesco Aircraft Canada and the Haas Group Canada, the "*Canada/Mexico Debtors*") provided secured guarantees of the obligations under the ABL Credit Agreement. Amendment No. 6 also removed the "fixed charge coverage ratio" financial covenant in the ABL Credit Agreement and replaced it with a condition that "Global Availability" be, at all times, at least $47.5 million.

Amendment No. 7 provided certain consents in connection with the 2022 Financing Transactions described below.

As of the Petition Date, approximately $419 million in principal amount of loans was outstanding under the ABL Facility, including approximately $13 million under the ABL FILO Facility. The amounts owed under the ABL FILO Facility were subsequently "amortized" into equivalent amounts that currently remain outstanding under the primary tranche of the ABL Facility. Additionally, approximately $1.6 million in letters of credit had been issued under the ABL Facility and remained outstanding.

The ABL Facility is guaranteed by each of the Debtors other than Wolverine Intermediate and Wesco Holdings, and the borrowers' and guarantors' obligations under the ABL Facility are secured by substantially all of their respective assets. Other than equity pledges from the Canada/Mexico Debtors, this collateral (the "*Shared Collateral*") also secures the obligations under the 1L Indenture and the 1.25L Indenture in accordance with the terms of the Intercreditor Agreement, as described below.

### b.   *The Secured Notes*

Wesco Holdings is the issuer of (a) $1.273 billion principal amount of 10.50% Senior Secured First Lien PIK Notes due November 2026 (the "*1L Notes*;" and the holders of the 1L Notes, the "*1L Noteholders*") under the indenture, dated March 28, 2022 (the "*1L Indenture*"), among Wesco Holdings, the guarantors party thereto, and Wilmington Savings Fund Society, FSB as indenture trustee and collateral agent, and (b) approximately $473 million principal amount of 13.125% Senior Secured 1.25 Lien PIK Notes due November 2027 (the "*1.25L Notes*" and, together with the 1L Notes the "*Secured Notes*"; the holders of the 1.25L Notes, the "*1.25L Noteholders*" and, together with the 1L Noteholders, the "*Secured Noteholders*") under the indenture, dated March 28, 2022 (the "*1.25L Indenture*"), among Wesco Holdings, the

guarantors party thereto, and Wilmington Savings Fund Society, FSB as indenture trustee and collateral agent.

The 1L Notes and 1.25L Notes are guaranteed by all Debtors other than Wolverine Intermediate Holding, Wesco Holdings, and the Canada/Mexico Debtors  and are secured by the Shared Collateral.

The Secured Notes were issued as part of the 2022 Financing Transactions: the 1L Notes in exchange for then-outstanding formerly secured notes due 2024 and 2026 (and related accrued interest) and the 1.25L Notes in exchange for then-outstanding unsecured notes due 2027 (and related accrued interest) and a $25 million unsecured promissory note issued by Wesco Holdings to the Sponsor (the "*2023 Promissory Note*") (and related accrued interest).

Several follow-on exchanges were also completed as required by and in accordance with the 2022 Transaction: On April 8, 2022, Wesco Holdings issued approximately $12.3 million of additional 1L Notes in exchange for $11.8 million in principal amount of now-unsecured notes due 2026 (and related accrued interest). Also on April 8, 2022, Wesco Holdings issued $3.1 million in principal amount of additional 1L Notes pursuant to the terms and conditions set forth in that certain notes purchase agreement. On October 27, 2022, Wesco Holdings issued approximately $5.8 million of additional 1L Notes in exchange for $5.5 million in principal amount of now-unsecured notes due 2024 and 2026 (and related accrued interest). Finally, on April 12, 2023, Wesco Holdings issued $311,000 of additional 1L Notes in exchange for $297,840 in principal amount of now-unsecured notes due 2026 (and related accrued interest).

As of the Petition Date, approximately $1.388 billion of 1L Notes and $533 million of 1.25L Notes are outstanding (inclusive of accrued and unpaid interest).

### c.    *The Intercreditor Agreements*

Two intercreditor agreements define the relative rights of creditors under the foregoing facilities to the Shared Collateral.

The collateral agents under the ABL Credit Agreement and the 1L Indenture and the 1.25L Indenture are party to an Amended and Restated ABL Intercreditor Agreement dated as of March 28, 2022 (the "*ABL Intercreditor Agreement*"). Under the ABL Intercreditor Agreement, the lenders under the ABL Facility have superior rights to the portion of the Shared Collateral consisting of cash, accounts receivable, inventory, and certain other current assets (the "*ABL Priority Collateral*"), while the Secured Noteholders have superior rights to the portion of the Shared Collateral that primarily consists of real estate, equipment, intellectual property, and other fixed assets (the "*Secured Notes Priority Collateral*").

The indenture trustees and the collateral agents under the 1L Indenture and the 1.25L Indenture are party to a Junior Lien Intercreditor Agreement dated as of March 28, 2022, pursuant to which the 1L Noteholders have superior rights to the Shared Collateral vis-à-vis the 1.25L Noteholders.

2.     **Unsecured Debt**

a.     *The Unsecured Notes*

Wesco Holdings is also the issuer of (a) $900 million of now-unsecured notes due November 15, 2026 (the "*2026 Unsecured Notes*" and the holders thereof, the "*2026 Unsecured Noteholders*") under the indenture among Wesco Holdings, the guarantors party thereto, and UMB Bank, n.a. as indenture trustee (the "*2026 Unsecured Indenture Trustee*")[5] dated November 27, 2019 (as amended on January 9, 2020, January 28, 2020, and March 28, 2022, the "*2026 Unsecured Indenture*"), (b) $650 million of now-unsecured notes due November 15, 2024 (the "*2024 Unsecured Notes*" and the holders thereof, the "*2024 Unsecured Noteholders*") under the indenture among Wesco Holdings, the guarantors party thereto, and UMB Bank, n.a. as indenture trustee (the "*2024 Unsecured Indenture Trustee*") dated November 27, 2019 (as amended on January 9, 2020, January 28, 2020, and March 28, 2022, the "*2024 Unsecured Indenture*"), and (c) $525 million of unsecured notes due November 15, 2027 (the "*2027 Unsecured Notes*", together with the 2026 Unsecured Notes, and the 2024 Unsecured Notes, the "*Unsecured Notes;*" and the holders thereof, the "*2027 Unsecured Noteholders*", together with the 2026 Unsecured Noteholders and the 2024 Unsecured Noteholders, the "*Unsecured Noteholders*") under the indenture among Wesco Holdings, the guarantors party thereto, and BOKF, NA as indenture trustee (the "*2027 Unsecured Indenture Trustee*")[6] dated November 27, 2019 (as amended, the "*2027 Unsecured Indenture*"). Like the Secured Notes, the Unsecured Notes are guaranteed by each of the Debtors other than Wolverine Intermediate Holding, Wesco Holdings, and the Canada/Mexico Debtors, except that the 2027 Unsecured Notes are also not guaranteed by Wolverine Intermediate Holding II Corporation. As of the Petition Date, $184 million of the 2024 Unsecured Notes, $352 million of the 2026 Unsecured Notes, and $111 million of the 2027 Unsecured Notes are outstanding (inclusive of accrued and unpaid interest).

The 2024 Unsecured Notes and the 2026 Unsecured Notes were originally secured but that security was released in connection with the 2022 Financing Transactions.

b.     *The PIK Notes*

Wolverine Intermediate Holding is the issuer of $100 million of notes due April 15, 2028 (the "*PIK Notes*") under the indenture between Wolverine Intermediate Holding and Wilmington Savings Fund Society, FSB, as indenture trustee,[7] dated as of January 9, 2020 (as amended on March 28, 2022 and April 25, 2022, the "*PIK Notes Indenture*"). As of the Petition Date, approximately $156 million in the face amount of the PIK Notes (including capitalized interest) was outstanding. Because the PIK Notes are not guaranteed by any subsidiary of Wolverine

---

[5]     UMB Bank, n.a. is the successor to The Bank of New York Mellon Trust Company, N.A., the Wilmington Savings Fund Society, FSB, and BOKF, NA, which each previously served as indenture trustee for both the 2026 Unsecured Notes and the 2024 Unsecured Notes.

[6]     BOKF, NA is the successor to The Bank of New York Mellon Trust Company, N.A. and the Wilmington Savings Fund Society, FSB, which both previously served as indenture trustee for the 2027 Unsecured Notes.

[7]     Wilmington Savings Fund Society, FSB is the successor to The Bank of New York Mellon Trust Company, N.A., which previously services as indenture trustee for the PIK Notes.

Intermediate Holding, they are structurally subordinated to the ABL Facility, the Secured Notes, the Unsecured Notes, and all other debt of Wolverine Intermediate Holding's subsidiaries.

### c. *Lease Obligations*

In the ordinary course of business, the Debtors lease certain warehouses, office space, equipment, and other personal and real property. The Debtors' leases have initial terms ranging from one to twenty-five years. As of October 31, 2023, the Debtors had approximately $84 million in operating lease liabilities and less than $1 million in finance lease liabilities.

### d. *Accounts Payable and Other Accrued Liabilities*

As of the Petition Date, the Debtors had approximately $325 million in outstanding accounts payable and other accrued liabilities to various parties, such as vendors, suppliers, service providers, utility providers, and taxing authorities.

### 3. Accounts Receivable Financing

Wesco Holdings and three of its U.S.-based operating subsidiaries, Wesco Aircraft Hardware Corp., Pattonair USA, Inc., and Haas Group International, LLC, are also party to a receivable factoring facility provided by KARS Funding, LLC as Buyer and Katsumi Servicing, LLC as Buyer Representative dated April 9, 2021 (the "*Katsumi Factoring Facility*"). Under the Katsumi Factoring Facility, Incora may sell outstanding U.S. dollar-denominated receivables to KARS Funding, LLC in exchange for a total purchase price of up to $62 million. The Katsumi Factoring Facility is supported by cash collateral posted by Wolverine Top Holding Corp., which is the non-Debtor parent of Wolverine Intermediate Holding. Wolverine Top Holding Corp. has historically purchased certain receivables from KARS Funding.

On April 10, 2023, Katsumi Servicing informed Incora that it would not fulfill Incora's then-outstanding nominations and would cease fulfilling future nominations under the Katsumi Factoring Facility. Since then, the amount of receivables outstanding under the Katsumi Factoring Facility has steadily declined as collections have been turned over to Katsumi. Since the Petition Date, no receivables have been sold pursuant to the Katsumi Factoring Facility. The Debtors currently owe Wolverine Top Holding Corp. approximately $2.25 million on account of collections on receivables owned by Wolverine Top Holding Corp., and the Debtors believe that the amount of remaining uncollected receivables purchased under the Katsumi Factoring Facility (including receivables owned by KARS Funding and those owned by Wolverine Top Holding Corp.) is approximately $500,000.

### 4. Equity

Wolverine Intermediate Holding wholly owns each of the other Debtors either directly or indirectly. Wolverine Intermediate Holding is directly fully owned by the non-Debtor Wolverine Top Holding Corporation. The vast majority of the common and the preferred stock of Wolverine Top Holding Corporation is owned by certain funds controlled by the Sponsor; substantially all of the remaining stock is owned by current or former members of Incora's management team.

E.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

Incora's financial challenges began with the COVID-19 pandemic. The pandemic caused a significant decrease in revenue, gross margin and cash flow, and a corresponding liquidity shortfall, which Incora sought to manage through an out-of-court recapitalization. Yet, despite its success in reaching a deal that should have positioned it for growth, several unprecedented market headwinds combined in 2022 and into 2023 to make a turnaround all but impossible. Due to significant operational burdens outside its control—including supply chain dysfunction and global inflation—Incora found itself with an unsustainable capital structure. Thus, in light of the sizeable financial obligations coming due, the board of directors of Wolverine Intermediate determined that filing the Chapter 11 Cases would be in the best interests of Incora and its stakeholders.

1.    **COVID-19 Causes a Significant Drop in Revenue and Gross Margin.**

The COVID-19 pandemic devastated the global passenger aviation industry in 2020. Approximately two-thirds of the world's passenger fleet was grounded for most of the year as governments closed their borders and passengers worried that flying was unsafe.

Demand for Incora's products and services is tied directly to aircraft "cycles" (typically measured by one take-off and landing) and aircraft manufacturing activity. Due to decreased flying, aircraft did not require routine maintenance as frequently as they normally would have. Incora's customers had far less work to do—especially on the wide-body planes that are most often used for international travel and contribute significantly to Incora's revenue—and therefore needed far fewer parts and chemicals from Incora. Additionally, strapped for cash, many airlines sought to economize by delaying optional maintenance and eliminating or postponing deliveries and orders of new aircraft. Passenger travel represents such a significant proportion of overall air travel that, even with strong revenue from military and cargo customers, Incora's overall revenue decreased sharply, from $2.24 billion in 2019[8] to $1.83 billion in 2021.

---

[8]    Revenue for 2019 is presented as combined pro forma revenue for Wesco and Pattonair given the respective businesses were not combined at the time.



Hardware revenue, which is largely driven by activity in the commercial aviation industry, was impacted most significantly, with a decline from $1.51 billion in 2019[9] to $1.04 billion in 2021.



---

[9]   Revenue for 2019 is presented as combined pro forma revenue for Wesco and Pattonair given the respective businesses were not combined at the time.

Even though both the Hardware and Chemicals businesses began to stabilize in 2022[10] and overall revenue grew approximately 7% from $1.83 billion in 2021 to $1.96 billion in 2022, the growth was much lower than anticipated. Specifically, following the 2022 Transaction, Incora's business plan projected $2.09 billion revenue in 2022, which would have amounted to 14% revenue growth. Incora's revenue underperformance as compared with the business plan is directly related to lower actual aircraft production rates than projected by a variety of industry sources.

The COVID-19 pandemic also had a significant negative impact on Incora's gross margins. As discussed above, supply chain disruptions and high inflation (including inflation of inventory and internal operating costs), by creating new costs that cannot be passed on to Incora's customers, have caused Incora's gross margins to decline from 24.0% in 2019[11] to 19.6% in 2022. Moreover, while ONdemand profit margins were historically higher than the Contract business, ONdemand revenue volume has been steadily declining in recent years as customers migrate to the Contract business, among other reasons. This shift overlapped with the COVID-19 pandemic to further strain Incora's gross margins. In 2019, ONdemand represented 18% of Incora's total revenue, whereas in 2022 it was down to only 11%. As the highest margin piece of Incora's business, the decline in ONdemand revenue has contributed to an overall decline in Incora's gross profit margins.



---

[10]    Overall, Chemical revenue has been strong during recent years due to a higher concentration of such revenue coming from the defense industry, which continues to remain active. From 2020 to 2022, Chemical revenue increased over $160 million.

[11]    Gross margins for 2019 are presented as combined pro forma gross margins for Wesco and Pattonair given the respective businesses were not combined at the time.

The combined impact of decreased revenue and lower gross margins resulted in a substantial decline in Incora's overall profitability, with adjusted EBITDA declining from $204 million in 2019[12] to $65 million in 2021.



While Incora's business began to stabilize in 2022 and adjusted EBITDA began to increase, the recent improvements have not been sufficient to support Incora's approximately $225 million in go-forward annual cash interest expense.

### 2. Incora Makes Efforts to Manage Liquidity and Engagement with Stakeholders.

Faced with diminishing revenues, shrinking margins, declining profitability, and other operational challenges, starting in March 2020, Incora took numerous steps to preserve or generate liquidity. For example:

- One of Incora's largest customers is Rolls-Royce, the famous British manufacturer of, among other things, aircraft engines. Historically, Rolls-Royce provided 60% of Pattonair's revenue and approximately 16% of Incora's combined revenue in 2020. In October 2021, Rolls-Royce agreed to shorten its terms of trade to 15 days. (This term increased to 30 days at the beginning of 2022, reverted to 75 days in October 2022, and in March 2023 settled at 60 days with no set expiration.)

---

[12]   Adjusted EBITDA for 2019 is presented as combined pro forma adjusted EBITDA for Wesco and Pattonair given the respective businesses were not combined at the time.

- In November 2020, the Sponsor provided $25 million in exchange for the unsecured 2023 Promissory Note.

- Throughout 2021, Incora sold approximately $120 million worth of inventory, with the total value of its inventory decreasing from $1.26 billion at the end of 2020 to $1.14 billion at the end of 2021. This reduction of inventory contributed to Incora's ability to make interest payments through the end of 2021.

- In the fourth quarter of 2021, Incora hired financial advisors to assist in, among other things, improving Incora's cash flow forecasting and working capital management.

Despite these attempts to manage liquidity, at the outset of its strategic review process in 2021, Incora found itself over-levered and suffering from a significant pandemic-driven liquidity shortfall. By the beginning of 2022, the situation was worsening as key suppliers had begun to accelerate their payment terms and even cut off supply in response to late payments by Incora. In response, Incora hired legal counsel and an investment bank to advise it with respect to its options.

With advisors in place, Incora entered discussions with its major financial creditors. Discussions with lenders under the ABL Credit Agreement resulted in Amendment No. 6, which, while not increasing the lenders' total commitments under the ABL Facility, increased the borrowing base (through the addition of new guarantors) and modified a financial covenant that allowed the debtors to avoid mandatory repayments in early 2022.

Incora also received outreach from an *ad hoc* group whose members it understood held over two-thirds of the then-secured notes due 2024 and over one-half of the then-secured notes due 2026 (the "*Majority Noteholders*"). In December 2021, the Majority Noteholders proposed a financing transaction designed to provide Incora a lifeline—a potential out-of-court restructuring that was intended to provide sufficient liquidity until the aerospace industry recovered.

In receipt of a proposal that, after further negotiation, could provide a workable liquidity solution, Incora worked diligently to advance toward a transaction. It prepared a counterproposal to the Majority Noteholders and engaged with the major holders of the 2027 Unsecured Notes and the PIK Notes, whose consents would be needed. Incora also began executing non-disclosure agreements with key parties in January 2022 and provided substantial requested diligence. In fact, committed to achieving the best outcome, over the following months Incora engaged in good-faith discussions with all of its creditor groups: (a) the Majority Noteholders, (b) the minority holders of the then-secured notes due 2024 and the then-secured notes due 2026 (the "*Minority Noteholders*"), (c) the holders of the majority of the 2027 Unsecured Notes, (d) the holder of a controlling position in the PIK Notes, (e) the majority of lenders under the ABL Credit Agreement, and (f) the provider of its receivables factoring facility. Moreover, as discussions advanced toward a transaction, Mr. Bartels was appointed to the board of directors of Wolverine Intermediate Holding to serve as an independent director. Incora sought to conclude a financing transaction quickly to address its deteriorating liquidity position.

Progress on Incora's negotiations was disrupted when the Minority Noteholders started buying notes that the Majority Noteholders had lent out to brokers through customary securities lending arrangements. Incora understood that the goal of the Minority Noteholders was to purchase sufficient notes to block a potential transaction with the Majority Noteholders. Despite this tactic, Incora entertained proposals from both the Majority Noteholders and the Minority Noteholders. It executed non-disclosure agreements with the advisors to the Minority Noteholders and provided diligence.

The board of directors, including Mr. Bartels as an independent director, carefully considered each proposal Incora received in light of all circumstances. Ultimately, the board determined that the best financing terms came from the Majority Noteholders. The Minority Noteholders' proposal was materially inferior to the Majority Noteholders' proposal in several respects, including that it did not provide nearly as much liquidity, did not provide a solution for an upcoming maturity of certain of Incora's secured notes, and carried material litigation risks given the Minority Noteholders' proposal likely would have required moving material assets out of the existing collateral package.

Accordingly, the 2022 Financing Transactions, supported by every stakeholder group referenced above other than the Minority Noteholders, closed on March 28, 2022. It involved exchanges of debt held by, among others, the Majority Noteholders, the Carlyle Group as the major then-holder of the 2027 Unsecured Notes, and the Sponsor as then-holder of the 2027 Unsecured Notes and the 2023 Promissory Note. The 2022 Financing Transactions were effectuated in several distinct but related steps, all in compliance with the then-existing indenture agreements. First, on March 28, 2022, with the consent of a simple majority of noteholders under the then-operative versions of the 2026 Unsecured Indenture, the 2024 Unsecured Indenture, and the 2027 Unsecured Indenture, Incora amended those indentures pursuant to supplemental indentures (the "*Third Supplemental Indentures*"), which allowed for the issuance of $250 million of additional 1L Notes. Immediately following the execution of the Third Supplemental Indentures, Incora and the Majority Noteholders executed a note purchase agreement, dated March 28, 2022 (the "*Note Purchase Agreement*"), effectuating the issuance of those additional 1L Notes for $250 million in cash, providing Incora with much needed liquidity.

Then, pursuant to additional supplemental indentures (the "*Fourth Supplemental Indentures*"), Incora amended the 2026 Unsecured Indenture, the 2024 Unsecured Indenture, and the 2027 Unsecured Indenture, and the relevant security documents with the requisite consent of the noteholders under each such indenture. The amendments allowed for the exchange (the "*Exchange*") of (a) the Majority Noteholders' previously secured notes for the 1L Notes and (b) the majority unsecured noteholders' unsecured notes (including those held by the Sponsor) for the 1.25L Notes. The amendments also released the liens held by the collateral agent on behalf of the previously secured noteholders under the 2026 Unsecured Indenture and the 2024 Unsecured Indenture, allowed for the issuance of senior secured debt, and removed certain covenants. Immediately after execution of the Fourth Supplemental Indentures, Incora and the participating noteholders consummated the Exchange.

The pre- and post-2022 Financing Transactions capital structure is depicted in the diagram attached to the *Declaration of Raymond Carney in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 13] as Exhibit B.

The 2022 Financing Transactions provided Incora with much-needed liquidity that preserved jobs and critical relationships with key customers. Those transactions also provided several other important benefits: they extended the maturities on $455 million of Incora's secured debt by two years and the maturity of the $25 million 2023 Promissory Note held by the Sponsor by four years; they significantly reduced Incora's cash interest obligations; and they allowed Incora to accrue management fees owing to the Sponsor without payment for three years (and potentially longer subject to performance thresholds). At the time of the 2022 Financing Transactions, based on the then-current market conditions, Incora projected that the recapitalization would right its business and position it for growth.

### 3. Incora Experiences Global Disruptions to Its Post-Transaction Business Plan.

The 2022 Financing Transactions positioned Incora to recover from the effects of the COVID-19 pandemic and to turn its business around. But while Incora's financial performance has improved considerably, it has not been enough to overcome a confluence of unforeseeable events, all beyond Incora's control. Incora's management team devoted substantial time to developing a business plan to put the new liquidity to use in what appeared to be a rapidly improving commercial environment. However, Incora was beset by unpredictable and uncontrollable global market forces. Incora was beset by significant disruption in the global supply chain, critical labor shortages, and the extended closure of the Chinese markets following the COVID-19 pandemic, which further delayed the expected rebound in the aerospace industry. High inflation also put increased pressure on gross margins.

More specifically, these unforeseeable challenges can be broken down into several major categories:

- *Supply Chain Disruption Impact on Inventory Procurement:* Supply chain disruptions were one of the most significant drags on Incora's financial performance following the 2022 Financing Transactions. As in many markets, the supply of aerospace parts underwent significant disruption that increased the lead times for Incora to procure critical supplies for its customers and resulted in insufficient inventory levels of certain parts. Over the past year, Incora's shipments in arrears from suppliers, measured by the value of the shipments, increased nearly nine-fold; on-time delivery rates hovered around 50%. And, over the year preceding bankruptcy, the average lead time went from an average of 9 months to 18 months.

  These supply chain challenges were especially problematic for Incora because its role in the aerospace industry (and some of its contracts) require it to maintain substantial inventory that manufacturers and maintenance service providers can call upon at any time. Because any failure to meet its obligations could result in contract penalties and a substantial loss of business, Incora incurred additional costs to overcome

these supply chain challenges, including from "gap" purchases at higher prices from other distributors, expedited freight, and increased labor costs to turn inventory faster when it arrived late. These costs were in addition to the increased time and effort Incora's personnel needed to dedicate to managing supplier relationships.

- *Inflated Inventory Pricing:* Global price inflation, particularly for raw materials that are critical inputs to aerospace parts, caused Incora's inventory costs to increase substantially following the 2022 Financing Transactions. Incora's customer contracts were largely negotiated in an environment of low inflation and industry growth and, as a result, many include long-term, fixed-price terms without inflation protection provisions. At the same time, while Incora purchases inventory to fulfill its customer contracts in a variety of ways, it often must purchase inventory at the current market price or otherwise at prices that do not reflect the pricing expectations at the time its customer contracts were negotiated. As such, Incora has been subject to increased inventory costs that it was unable to pass along to many of its customers. Additionally, many suppliers of proprietary parts exploited their position to raise prices in excess of general inflation rates. Since inflationary pressure began developing in 2019, prices for aluminum, steel, and nickel alloy—all key materials used to manufacture aerospace parts—increased 15–105% and Incora's gross margins (measured as of 2022) decreased by approximately 4.5%.

- *Lower-Than-Expected Industry Production Rates:* Following the 2022 Financing Transactions, Incora was prepared to capitalize on increased demand in the aerospace manufacturing industry. Based on optimistic production forecasts from key customers and industry consultants, Incora invested heavily in inventory in anticipation of a strong industry recovery. But several unforeseeable factors contributed to significantly lighter-than-expected aerospace production on the part of Incora's customers. First, like Incora, Incora's customers were subject to supply chain disruption and, as a result, faced difficulties procuring manufacturing components outside Incora's purview. Without all necessary componentry, Incora's customers struggled to meet production forecasts. Second, customers faced labor shortages, which also caused production delays in many key aerospace platforms. Finally, the Chinese markets, which support significant global aviation activity and accounted for nearly half of all Asia-Pacific pre-pandemic air traffic, remained closed due to the COVID-19 pandemic much longer than anticipated due to China's strict travel policies. And finally, Boeing, one of Incora's largest sources of customer activity, experienced a shutdown in deliveries of its 787 platform for a significant part of 2022. The combined effect of these issues was that actual aerospace production rates for 2022 were significantly below the consensus industry forecasts set at the beginning of the year. Accordingly, Incora's revenue grew only approximately 7% in

2022, well below the expected 13%. Furthermore, the long lead time of many of the parts that Incora purchases necessitated placing orders in anticipation of the recovery. This, coupled with the above-described slowdown, resulted in Incora being left with an oversupply of inventory that was not converting to cash as quickly as expected.

- *Limited Ability to Manage Working Capital:* Incora was poised to capitalize on several working capital initiatives to provide additional liquidity for its continued recovery. Three such key initiatives were: (a) improving the collections of accounts receivable, (b) negotiating more favorable payment terms with suppliers, and (c) selling down inventory as industry demand increased. Collections were expected to improve in line with a general industry recovery; supplier payment terms were expected to improve as a result of Incora's rehabilitated financial position following the 2022 Financing Transactions, reversing the contraction of terms that occurred during a period of financial distress; and, as discussed above, inventory balances were expected to reduce as sales increased from a general industry recovery. However, as discussed, Incora's customers and suppliers were affected by many of the same economic impediments as Incora, which limited the effectiveness of these initiatives. Resulting changes in the statuses of accounts receivable, accounts payable, and inventory were all drains on liquidity in 2022, subverting expectations.

- *Disruption to Katsumi Factoring Facility:* On April 10, 2023, the provider of Incora's main receivable factoring facility informed Incora that it would not accept Incora's then-outstanding nominations (i.e., offers to sell specific receivables) and would not accept future nominations. The loss of this facility caused a total liquidity reduction of approximately $43 million.

All of the foregoing issues severely strained Incora's resources. Incora managed to keep its business sound and continued to be a reliable source of inventory for its customers, but it did not generate sufficient cash to meet its existing obligations. Despite Incora's efforts, its liquidity was insufficient due to continuing cashflow issues and its leveraged capital structure. As a result, Incora would have been unable to meet its near-term obligations, including interest payments on its notes that were scheduled to become due on May 15, 2023.

### 4. Disgruntled Bondholders File Litigation over the 2022 Financing Transactions.

Making matters worse, as Incora devoted itself to addressing and mitigating its operational challenges, certain unsecured noteholders filed suit in the Supreme Court of the State of New York against Incora and certain of its noteholders to, among other things, unwind the 2022 Financing Transactions. This action was followed by a similar action naming only Incora's noteholders and affiliates, also in the New York Supreme Court. These cases caused yet another drain on Incora's financial resources (including on account of Incora's indemnification of the parties that participated in the 2022 Transaction) and distracted its management team and key

employees at a time when focus on operations and reorganization could not have been more critical.

Specifically, on October 28, 2022, a group of 2026 Unsecured Noteholders and 2024 Unsecured Noteholders initiated an action (the "*2026/2024 Noteholders Action*") by filing a complaint in New York Supreme Court against certain of the Debtors, certain of the Debtors' non-Debtor affiliates, and certain third parties, including certain participating noteholders and the Sponsor. The complaint alleges that the 2022 Financing Transactions violated Incora's original indentures and constituted an insider transaction that transferred value away from non-participating noteholders. The complaint seeks declarations that the 2022 Financing Transactions were not permitted under the original indentures, and asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, fraudulent transfer, preferential transfer, and conversion. The complaint seeks to unwind the 2022 Financing Transactions.

In January 2023, Incora and other defendants in the 2026/2024 Noteholders Action filed motions to dismiss the complaint. The plaintiffs served limited interrogatories on the defendants, and the defendants responded and served their own interrogatory demands. However, the 2026/2024 Noteholders Action is presently stayed.

On March 27, 2023, a single holder of the 2027 Unsecured Notes initiated a separate action (the "*2027 Noteholder Action*") in New York Supreme Court in connection with the 2022 Financing Transactions against certain of the Debtors' non-Debtor affiliates and the participating noteholders that previously held 2027 Unsecured Notes, including the Sponsor and the Carlyle Group. The complaint in the 2027 Noteholder Action—which was commenced nearly one year after the 2022 Financing Transactions closed—similarly seeks to unwind the 2022 Financing Transactions, alleging that the participating noteholders sought to transfer value to themselves and asserting that the 2022 Financing Transactions constituted preferential transfers and violated the applicable indenture and the implied covenant of good faith and fair dealing. Motions to dismiss the complaint were filed in the 2027 Noteholder Action on May 26, 2023, and discovery had commenced. One Debtor entity was served with a non-party subpoena in the proceeding. Incora Responded to the subpoena on May 22, 2023 and received multiple follow-up communications from the plaintiffs in that case to meet and confer regarding discovery. The 2027 Noteholder Action is presently stayed.

The 2026/2024 Noteholders Action and the 2027 Noteholder Action (together, the "*State Court Actions*") placed considerable strain on the Debtors. In connection with the 2026/2024 Noteholders Action, the Debtors and their key employees expended funds and time to preparing substantial briefing and responding to burdensome discovery. And while the Debtors were not formally named in the 2027 Noteholder Action, the Debtors were nonetheless compelled to expend considerable resources to defend their interests in that litigation as well, given that all the relevant facts in the 2027 Noteholder Action arise from the 2022 Financing Transactions and any legal conclusions reached in the 2027 Noteholder Action would directly impact the Debtors. As such, the State Court Actions diverted the Debtors' attention from working efficiently and productively toward a successful reorganization.

### 5.       Incora Obtains DIP Financing and Files the Chapter 11 Petitions.

In January 2023, facing an unfavorable economic environment and the State Court Actions, and with sizeable financial obligations looming, Incora initiated discussions about its options with certain of its stakeholders.

Incora was unable to obtain out-of-court financing sufficient to meet its immediate liquidity needs on terms consistent with its existing debt covenants. As such, Incora engaged with stakeholders across its capital structure on the terms of potential debtor-in-possession financing. Incora also solicited interest from a number of parties outside the existing capital structure to provide debtor-in-possession financing. On May 31, 2023, Incora reached an agreement on the terms of the DIP Financing with its 1L Noteholders, who committed to provide $300 million in superpriority debtor-in-possession financing.

On June 1, 2023, all 44 Debtor entities filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Houston Division).

*[Remainder of page intentionally blank]*

## SECTION III.
### EVENTS DURING THE CHAPTER 11 CASES

### A.   OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The principal goal of chapter 11 is to allow a business to reorganize its financial and operational position for the collective benefit of its creditors and other stakeholders. Another goal of chapter 11 is to promote the equality of treatment of similarly-situated creditors and equity interest holders. To advance these goals, section 362 of the Bankruptcy operates as an automatic stay of substantially all acts and proceedings against the debtor or its property, including all attempts to collect claims or to enforce liens that arose prior to the chapter 11 case. The commencement of a case also automatically creates a single "estate" comprising all of the debtor's legal and equitable interests in property, which the chapter 11 debtor is normally permitted to manage as a "debtor in possession."

Together, these provisions give a chapter 11 debtor the time and authority necessary to develop a plan of reorganization, whose consummation is the ultimate objective of a chapter 11 case. A debtor's chapter 11 plan sets forth comprehensively the terms of the debtor's reorganization, including the manner in which creditors and equity interest holders will receive assets of the debtor, new interests in the reorganized debtor, or both. Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor, any entity that issues securities under the plan, any entity that acquires property under the plan, and any creditor or equity security holder of the debtor. Subject to certain limited exceptions (and the terms of the plan), the order confirming the plan substitutes the obligations specified under the plan for any debts that arose prior to the date of confirmation and discharges the debtor from any such debts.

Certain holders of claims against, or interests in, a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require a plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. When the disclosure statement is disseminated after a chapter 11 case has commenced, it must first be approved by the bankruptcy court as containing adequate information.

### B.   FIRST-DAY RELIEF

On the Petition Date, the Debtors filed several "first day" motions seeking relief that would facilitate a smooth transition into operating their businesses in the ordinary course throughout the chapter 11 process. The Bankruptcy Court granted substantially all the relief sought by the Debtors, including, among other relief, the following:

- orders authorizing the Debtors to maintain their existing cash management system [Dkt. Nos. 122, 374];

31

- an order prohibiting utility companies from discontinuing service, and approving steps proposed by the Debtors to adequately assure payments for post-petition service [Dkt. No. 118];

- an order authorizing the Debtors to maintain their existing insurance and surety programs [Dkt. No. 127];

- an order authorizing the Debtors to pay certain taxes and fees [Dkt. No. 116];

- an order authorizing the Debtors to pay certain prepetition compensation and benefit obligations to employees [Dkt. No. 117];

- orders authorizing the Debtors to pay prepetition claims held by certain trade creditors, including critical vendors [Dkt. No. 128];

- an order authorizing the Debtors to maintain certain customer programs [Dkt. No. 120];

- orders authorizing the Debtors to obtain postpetition financing (further described in the next section) and to use cash collateral [Dkt. Nos. 139, 396];

- an order authorizing the Debtors to retain and compensate certain professionals utilized in the ordinary course of business [Dkt. No. 607];

Pursuant to these orders, the Debtors have paid over $150 million in ordinary course prepetition claims to certain critical and non-U.S. vendors, as well as over $45 million on account of vendor claims that are subject to possessory liens or subject to priority under section 503(b)(9) of the Bankruptcy Code.

## C.   POSTPETITION FINANCING

On July 10, 2023, the Bankruptcy Court entered an order (the "*Final DIP Order*") approving the Debtors' $300 million post-petition financing (the "*DIP Financing*") on a final basis. As approved, the DIP Financing has ensured that the Debtors can bring critical vendors current, pay their ongoing operating expenses, and finance the administration of the Chapter 11 Cases.

The DIP Financing is structured as 9-month secured notes (the "*DIP Notes*"). The DIP Notes bear interest at a rate of SOFR plus 8.50% *per annum* (with a 4.0% SOFR floor) and may be prepaid at any time subject to a 3.00% exit fee on the amount prepaid or redeemed. The DIP Financing is secured by substantially all assets of the Debtors, including the Shared Collateral. As to the Shared Collateral that constitutes ABL Priority Collateral, the DIP Notes are junior in lien priority to the ABL Facility but senior to the Secured Notes.

As a condition to obtaining the DIP Financing, the Debtors agreed to comply with certain milestones, of which the following remained outstanding as of the date on which this Disclosure Statement was approved:

- [By no later than ~~November 28, 2023, the Debtors shall have filed~~30 calendar days after filing an Acceptable Plan of Reorganization ~~and Acceptable Disclosure Statement~~,[13] ~~with the Bankruptcy Court.~~]

- ~~[By no later than 30 calendar days after filing~~ an Acceptable Plan of ~~Reorganization,~~ subject to court availability, the Bankruptcy Court shall have entered an order approving the Disclosure Statement for an Acceptable Plan of Reorganization.~~]~~

- By no later than 10 calendar days after entry of the order approving a disclosure statement, the Debtors shall have commenced solicitation of an Acceptable Plan of Reorganization.

- By no later than 180 calendar days after the Petition Date (a milestone that has been extended through January 26, 2024), the Bankruptcy Court shall have entered an order confirming an Acceptable Plan of Reorganization.

- By no later than 15 calendar days after entry of such a confirmation order, the effective date for an Acceptable Plan of Reorganization shall have occurred.

The Final DIP Order also reflects an agreement between the Debtors and their prepetition secured creditors regarding the consensual use of cash collateral and the terms of adequate protection to be provided to them. Among other things, such prepetition secured creditors have received (a) replacement liens; (b) an administrative expense claim for diminution in the value of their security interests; (c) payment of reasonable and documented fees and expenses, and (d) with respect to the lenders under the ABL Facility, continuing compliance with a financial covenant relating to the ABL Facility's borrowing base.

---

[13]   As set forth in the Final DIP Order, an "*Acceptable Plan of Reorganization*" means "a Chapter 11 Plan for each of the Debtors that, upon the consummation thereof, provides for (a) the termination of all unused Commitments and the indefeasible payment in full of all Obligations in Cash and (b) the indefeasible payment in full of all allowed Prepetition 1L Notes Obligations in Cash (other than contingent indemnity obligations, which shall, to the extent allowed, survive implementation of such Chapter 11 Plan) or such other treatment of the Prepetition 1L Notes Obligations as is agreed to by the holders of at least 66⅔% of the aggregate principal amount of Prepetition 1L Notes." ~~For the avoidance of doubt, the Plan does not constitute an Acceptable Plan of Reorganization. An "*Acceptable Disclosure Statement*" means "the disclosure statement in respect of the Acceptable Plan of Reorganization and any exhibits and schedules thereto, in each case in form and substance reasonably acceptable in all respects to the Required Purchasers (and to the Notes Agent, with respect to those provisions thereof that affect the rights, obligations, liabilities, duties or treatment of the Notes Agent)." For the avoidance of doubt, this Disclosure Statement does not constitute an Acceptable Disclosure Statement.~~

**D.      OTHER PROCEDURAL AND ADMINISTRATIVE MOTIONS**

The Debtors also filed various motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including the following:

- a motion, which the Bankruptcy Court granted, seeking authority to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operations of their businesses [Dkt. Nos. 422, 607], of which over 56 have subsequently filed declarations regarding their retention by the Debtors;

- a motion, which the Bankruptcy Court granted, seeking authority to enter into and implement key employee performance programs [Dkt. Nos. 502, 713];

- a motion, which the Bankruptcy Court granted, seeking authority to establish procedures for interim compensation and reimbursement of expenses for professionals [Dkt. Nos. 421, 606];

- a motion, which the Bankruptcy Court granted, seeking authority to sell certain inventory to Rolls Royce plc [Dkt. Nos. 614, 787];

- a motion, which the Bankruptcy Court granted, seeking an extension of time for the Debtors to assume or reject unexpired leases of nonresidential real property [Dkt. Nos. 769, 776];

- a motion, which the Bankruptcy Court granted, seeking to establish the bar dates for filing proofs of claim, the form of proofs of claim, the manner of filing, and the bar date notice [Dkt. Nos. 605, 750];

- a motion, [which remains pending,] seeking entry of an order establishing claims objection and settlement procedures [Dkt. No. 918]; and

- several retention applications, which the Bankruptcy Court granted, seeking authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include (i) Alvarez & Marsal North America, LLC, as financial advisor; (ii) PJT Partners LP, as investment banker; (iii) Milbank LLP, as counsel to the Debtors; (iv) PwC US Tax LLP, as tax advisor; and (v) Quinn Emanuel Urquhart & Sullivan, LLP ("*Quinn Emanuel*") as special litigation and conflicts counsel. The Bankruptcy Court has entered orders authorizing the retention of certain of these professionals [Dkt. Nos. 481 (A&M), 482 (PJT), 484 (Milbank), 790 (PwC), 664 (Quinn Emanuel)]. In connection with such retention, the Debtors filed a motion to establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals, which the Bankruptcy Court granted on August 8, 2023 [Dkt. Nos. 421,

606]. The Debtors reserve the right to seek to retain additional professionals.

## E.  APPOINTMENT OF CREDITORS' COMMITTEE

On June 16, 2023, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "*Committee*"), pursuant to section 1102 of the Bankruptcy Code, to represent the interests of unsecured creditors. The members of the Committee are BOKF, NA, in its capacity as 2027 Unsecured Indenture Trustee, Parker Hannifin Corporation, and Insight2Profit. The Committee subsequently retained Morrison & Foerster LLP and McDermott Will & Emery LLP as its legal counsel, Province, LLC as its financial advisor, and Piper Sandler & Co. as its investment banker.

## F.  CLAIMS PROCESSING AND RECONCILIATION

On August 7, 2023, the Debtors each filed their schedules of assets and liabilities and statements of financial affairs (the "*Schedules and Statements*"). Among other things, these filings detail all known claims against the Debtors.

Subsequently, the Bankruptcy Court entered an order [Dkt. No. 750] (the "*Bar Date Order*") approving (a) October 11, 2023, at 5:00 p.m. (CDT) as the deadline for all ostensible creditors other than governmental units to file proofs of claim and (b) November 28, 2023, at 5:00 p.m. (CST) as the deadline for all governmental units to file proofs of claim. (Later deadlines may apply to parties in interest in specific, exceptional circumstances. Consult the Bar Date Order for further information.)

As of October 11, 2023, at 5:00 p.m. (CDT), approximately 1,800 proofs of claim had been filed. The Debtors and their advisors are reviewing all such claims, and expect to file objections to many of them.

## G.  CONTRACT RE-NEGOTIATION

As outlined in the *Declaration of Raymond Carney in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 13], one of the objectives of the Debtors' Chapter 11 process was to bring unprofitable customer contracts in line with current economic and commercial reality. The Debtors began the process of renegotiating customer contracts prior to the Chapter 11 filing; however, the progress was limited since the Debtors lacked leverage to renegotiate unprofitable contracts in the middle of their terms. The Chapter 11 process has provided the Debtors the opportunity to accelerate customer contract renegotiations through the threat of contract rejection.

In 2023, the Debtors have completed 60 customer contract renegotiations, which are expected to generate more than $80 million in annualized profitability for the Debtors to offset the impact of inflation on fixed price contracts.[14] The Debtors expect to complete at least 53

---

[14]  The revenue improvements from contract renegotiations is not expected to correspond dollar for dollar to "bottom line" improvements to EBITDA, as a portion of the benefit is applied as an offset to inflation. *Cf.* Ex.

more such renegotiations through emergence from Chapter 11 which are expected to generate an additional $60 million in annualized profitability for the Debtors.

The threat of contract rejection has proven a valuable tool for engaging customers in productive negotiations and to date, only 2 unprofitable four burdensome customer contracts have been rejected through the court.

## H.    CONTINUATION OF THE 2022 FINANCING LITIGATION[15]

Prior to the Petition Date, the Debtors were aware of the State Court Actions challenging aspects of the 2022 Financing Transactions. On the Petition Date, the Debtors initiated an adversary proceeding (captioned as *Wesco Aircraft Holdings, Inc. et al. v. SSD Investments Ltd. et al.*, Adv. Pro. No. 23-03091 (MI) (Bankr. S.D. Tex. June 1, 2023) (the "*2022 Financing Adversary Proceeding*") seeking an order declaring that the automatic stay applied to the State Court Actions during the pendency of the Chapter 11 Cases. Thereafter, the Debtors filed an amended complaint in the 2022 Financing Adversary Proceeding seeking the Bankruptcy Court's determinations concerning certain of the legal issues raised in the State Court Actions, including the validity of the 2022 Financing

---

"bottom line" improvements to EBITDA, as a portion of the benefit is applied as an offset to inflation. *Cf.* Ex. B, Financial Projections.

[15]  "*Financing Litigation*" means any Cause of Action arising out of or related to (a) the facts and circumstances alleged in any complaint filed in the 2022 Financing State Court Litigation, including all Causes of Action alleged therein; (b) the facts and circumstances alleged in any complaint, counterclaim, or crossclaim filed in the 2022 Financing Adversary Proceeding, including all Causes of Action alleged therein; (c) the Standing Motions, including all Causes of Action alleged therein; (d) the 2022 Financing Transactions, including: (i) the facts and circumstances related to the negotiation of and entry into the 1L Indenture or the 1.25L Indenture and any related transactions or agreements, including any related amendments to the Unsecured Notes Indentures or the security or collateral documents related thereto; (ii) any consents provided in connection with any amendments, supplements or waivers with respect to the 2024 Notes, the 2026 Notes, the 2027 Notes, the Unsecured Notes Indentures or related documents; (iii) the issuance of additional notes under the 2026 Unsecured Indenture; or (iv) the purchase or exchange of any "Obligations" under, and as defined in, the Unsecured Notes Indentures through the 2022 Financing Transactions; and/or (e) any associated documentation or transactions related to the foregoing.

"*2022 Financing State Court Litigation*" means the proceedings in New York Supreme Court (New York County) captioned (a) *SSD Investments Ltd. et al. v. Wilmington Savings Fund Society, FSB et al.*, Index No. 654068/2022, and (b) *Langur Maize, L.L.C. v. Platinum Equity Advisors, LLC, et al.*, Index No. 651548/2023.

"*Standing Motions*" means (a) the *Motion for Entry of An Order Granting Langur Maize, L.L.C. Standing to Pursue Fraudulent Transfer and Preference Claims* [Dkt. No. 650]; (b) the *Amended and Supplemental Motion of the 2024/2026 Holders (I) Confirming Direct Standing to Pursue Certain Claims and Remedies Or, In the Alternative, (II) for Derivative Standing to Pursue Such Claims and Remedies and for Exclusive Settlement Authority* [Dkt. No. 652]; (c) the *Omnibus (I) Motion of the Official Committee of Unsecured Creditors for Exclusive Leave, Standing, and Authority to Prosecute and Settle Certain Claims, Causes of Action, and Claim Objections on Behalf of the Debtors' Estates and (II) Claim Objection* [Dkt. No. 994]; and (d) any other motion filed at any time in the Chapter 11 Cases (including in any adversary proceeding) seeking standing to pursue claims or remedies on behalf of the Debtors' Estates.

Transactions. The defendants in the 2022 Financing Adversary Proceeding each filed counterclaims naming the Debtors and various non-Debtor defendants. The parties to the 2022 Financing Adversary Proceeding agreed to stipulate that each of the State Court Actions is stayed pending the Bankruptcy Court's determinations concerning the merits of the 2022 Financing Transactions. The parties' agreed stipulation to stay the State Court Actions will consolidate in the Bankruptcy Court all determinations of liability with respect to the 2022 Financing Transactions.

The Debtors, certain 2026 Unsecured Noteholders and 2024 Unsecured Noteholders, Langur Maize, and certain non-Debtor counterclaim defendants are engaged in continuing litigation in the 2022 Financing Adversary Proceeding concerning the merits of the 2022 Financing Transactions. The causes of action alleged against the Debtors include declaratory judgment for breach of contract, declaratory judgment for breach of the implied covenant of good faith and fair dealing, declaratory judgment for direct standing to prosecute certain claims against the Debtors, and equitable lien. A hearing on the parties' motions for summary judgment or judgment on the pleadings was conducted on October 11, 2023, and [remains under advisement]. Absent a summary judgmentdispositive order on all issues, a trial on any remaining issues is tentatively scheduled for mid-Januaryanticipated in early 2024. Discovery is underway and continuing.

# I. STANDING MOTIONS

On November 27, 2023, after several months of discovery, the Committee filed the *Omnibus (I) Motion of the Official Committee of Unsecured Creditors for Exclusive Leave, Standing, and Authority to Prosecute and Settle Certain Claims, Causes of Action, and Claim Objections on Behalf of the Debtors' Estates and (II) Claim Objection* and accompanying *Proposed Complaint* [as corrected on December 4, 2023, Dkt. No. 1020 (sealed)] (the "*Standing Motion*"). Through the Standing Motion, the Committee sought exclusive standing and authority to commence, prosecute, and settle certain, which primarily relate debt transactions completed by the Debtors in January 2020 and March 2022.

The Committee's proposed causes of action generally fall into the following five categories: (a) causes of action, including constructive fraudulent transfer, breach of fiduciary duties, and equitable subordination, seeking to challenge certain transactions and decisions relating to the merger of Wesco and Pattonair into one combined company—Incora—pursuant to a leveraged buyout closed in January 2020; (b) a constructive fraudulent transfer claim seeking to challenge payments of advisory fees to Sponsor in exchange for advisory services; (c) causes of action, including actual and constructive fraudulent transfer, insider preferential transfer, breach of fiduciary duties, aiding and abetting and knowingly participating in breach of fiduciary duties, and equitable subordination, seeking to challenge the 2022 Financing Transactions; (d) causes of action, including breach of fiduciary duties and constructive fraudulent transfer, seeking to challenge a 2022 amendment to the Debtors' ABL Facility; and (e) a claim seeking to avoid allegedly unperfected security interests on the Debtors' bank accounts, director and officer insurance policies, and commercial tort claims. The Standing Motion also seeks the disallowance

of claims for applicable premium or make-whole amounts as unmatured interest and argues that any claims asserted by Carlyle or Sponsor should be disallowed unless and until they have returned certain transaction fees.

As a component of the Global Settlement, the Committee has agreed to support the Plan, including Debtor Releases that will release all claims held by the Debtors' estates. As described below, the Committee has also agreed to hold its Standing Motion in abeyance, pending a hearing on Confirmation of the Plan.

## J.   RESTRUCTURING SUPPORT AGREEMENT

Throughout the Chapter 11 Cases, the Debtors have engaged in negotiations with key creditor groups over the terms of a plan of reorganization. As of the filing of this Disclosure Statement, the Debtors anticipate that they will enter into a Restructuring Support Agreement with, among others, the members of the First Lien Noteholder Group and the holders of more than two-thirds in principal amount of the 1.25L Notes Claims. Pursuant to the Restructuring Support Agreement, those supporting creditors are expected to agree to, among other things, accept the proposed treatment of their Claims and Interests under the Plan, vote in favor of the Plan, and not opt out of the Third-Party Releases. The Restructuring Support Agreement is also expected to provide for the payment of a limited amount of professional fees and expenses for certain of the supporting creditors.

The Debtors also anticipate that they will enter into a stipulation with the Committee, under which the Committee will agree to, among other things, (a) hold its Standing Motion in abeyance pending Confirmation and (b) support Confirmation of the Plan, including the Debtor Release, which would release all the claims that are now subject to the Committee's Standing Motion.

*[Remainder of page intentionally blank]*

# SECTION IV.
## SUMMARY OF PLAN OF REORGANIZATION

### A.   NEW DEBT INSTRUMENTS AND SECURITIES

Reorganized Incora or affiliated entities will be obligated on the following debt and will issue the following equity interests upon consummation of the Plan:

- *The New Revolver Facility:* the new revolving facility with aggregate commitments of up to $[•]600,000,000, in the form of an asset-based revolver, to be made available to the Reorganized Debtors by one or more lenders pursuant to and subject to the terms and conditions of the New Revolver Facility Documents, and which shall be in an amount and on terms acceptable to the Debtors and reasonably acceptable to the Required Consenting 1L Noteholders.

- *The New Exit Notes:* the new notes in the aggregate principal amount of $[•]approximately $324 million, to be issued in respect of DIP Financing Claims in accordance with the Plan pursuant to the terms and conditions of the New Exit Notes Documents, which notes shall. The New Exit Notes will have terms acceptable to the Debtors and the Required Consenting 1L Noteholders.

- *The New Takeback Notes:* the new notes in the aggregate principal amount of $[•]420,000,000 to be issued in respect of 1L Notes Claims in accordance with the Plan pursuant to the terms and conditions of the New Takeback Notes Documents, which notes shall. The New Takeback Notes will have terms acceptable to the Debtors and the Required Consenting 1L Noteholders.

- *The New Common Equity:* the new shares of common stock, limited liability company units or similar equity interests in Reorganized Incora to be issued on or after the Effective Date.

Certain obligations that constitute Priority Non-Tax Claims or Other Secured Claims may be reinstated as obligations of the applicable Reorganized Debtors and paid in the ordinary course of business.

### B.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

#### 1.   Classification of Claims and Interests

##### a.   *General Terms*

All Claims and Interests, except for those described in Article II of the Plan, are classified as set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the

description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be eliminated from the Plan for purposes of voting to accept or reject the Plan and shall not be considered in evaluating the Plan's compliance with section 1129(a)(8) of the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine that controversy on or before the Confirmation Date.

### b.     Standards for Acceptance of a Plan

The Bankruptcy Code defines "acceptance" of a plan by a Class of (a) Impaired Claims as acceptance by creditors that hold at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class held by creditors that cast ballots for acceptance or rejection of the Plan and (b) Impaired Interests as acceptance by Interest holders that hold at least two-thirds (⅔) in amount of the Allowed Interests in such Class held by holders that cast ballots for acceptance or rejection of the Plan. However, any Class of Claims or Interests that is Unimpaired under the Plan is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan. Likewise, any Class of Claims or Interests that does not entitle the holders of such Claims or Interests to receive or retain any property under the Plan on account of such Claims or Interests is deemed to have rejected the Plan and is therefore not entitled to vote to accept or reject the Plan.

If a Class contains Claims or Interests eligible to vote, but no holder of Claims or Interests in that Class delivers a valid and timely vote, the Plan shall be presumed accepted by that Class.

Pursuant to sections 1129(b) and 1129(a)(10) of the Bankruptcy Code, a plan may be confirmed despite its rejection by a Class, so long as (among other things) at least one Impaired Class of Claims accepts the plan, determined without including any acceptance of such plan by an insider. This requirement will be satisfied by acceptance of the Plan by one or more of the Voting Classes of Claims. Certain of the Debtors may not have holders of Claims or Interests in particular Classes. The Debtors intend to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each rejecting Class.

### c.     Classes Under the Plan and Their Voting Rights

Under the Plan, holders of Claims or Interests in Classes 4, 5, 6a, 6b, 7a, and 7b [and 7c] are the Voting Classes that are entitled to vote to accept or reject the Plan.

In light of the treatment set forth below and in Article III.B of the Plan, Classes 1, 2, 3, [7c,] and 11 are Unimpaired and deemed to accept the Plan; they are therefore not entitled to vote to accept or reject the Plan. Holders of Claims in ClassClasses 5 and 8 and holders of Interests in Class 10 are due to receive or retain no property under the Plan on account of their Claims or Interests (as applicable); such holders are therefore not entitled to vote to accept or reject the Plan. Depending on their treatment, Class 9 either is Unimpaired or is due to receive or

retain no property under the Plan; in either case, it is not entitled to vote to accept or reject the Plan. Holders of Claims or Interests in the remaining Classes (Classes 4, ~~5, 6a, 6b,~~ 7a, and 7b ~~[and 7c]~~) are Impaired and are entitled to vote to accept or reject the Plan.

Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is summarized as follows:

| Class | Claims or Interests | Impairment | Voting Rights |
|---|---|---|---|
| 1 | *Priority Non-Tax Claims:* Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than Administrative Expenses (including DIP Financing Claims), and Priority Tax Claims. | Unimpaired | Presumed to accept |
| 2 | *Other Secured Claims:* Secured Claims, other than a Priority Tax Claim (except as set forth in Article II.F of the Plan), a DIP Financing Claim, an ABL Facility Claim, or a 1L Notes Claim. For the avoidance of doubt, no 1.25L Notes Claim, 2026 Unsecured Notes Claim, 2024 Unsecured Notes Claim, 2027 Unsecured Notes Claim, or PIK Notes Claim is an "Other Secured Claim." | Unimpaired | Presumed to accept |
| 3 | *ABL Facility Claims:* Claims arising on account of the "Obligations," as defined in the ABL Credit Agreement. | Unimpaired | Presumed to accept |
| 4 | *1L Notes Claims:* Claims ~~(other than 1L Notes Deficiency Claims)~~ arising on account of the "Obligations" under the "Note Documents," each as defined in the 1L Indenture. | Impaired | **Entitled to vote** |
| 5 | *1.25L Notes Claims:* Claims arising on account of the "Obligations" under the "Note Documents," each as defined in the 1.25L Indenture. | Impaired | ~~Entitled to vote~~Deemed to reject |
| 6a | [Reserved] | N/A | N/A |
| 6b | [Reserved] | N/A | N/A |
| ~~6a~~ | *~~2026 Unsecured Notes Claims:~~* ~~Claims arising on account of, derived from, based upon or arising under the 2026 Unsecured Indenture or related documents.~~ | ~~Impaired~~ | ~~**Entitled to vote**~~ |
| ~~6b~~ | *~~2024 Unsecured Notes Claims:~~* ~~Claims arising on account of, derived from, based upon or arising under the 2024 Unsecured Indenture or related documents.~~ | ~~Impaired~~ | ~~**Entitled to vote**~~ |

41

| Class | Claims or Interests | Impairment | Voting Rights |
|---|---|---|---|
| 7a | *General Unsecured Claims:* Claims, other than Administrative Expenses, Other Secured Claims, Priority Tax Claims, Priority Non-Tax Claims, ABL Facility Claims, 1L Notes Claims ~~(other than 1L Notes Deficiency Claims)~~, 1.25L Notes Claims, General Unsecured Convenience Claims, ~~2026 Unsecured Notes Claims, 2024 Unsecured~~PIK Notes Claims,and Intercompany ~~Claims, or General Unsecured Canada/Mexico~~ Claims. For the avoidance of doubt, ~~all 1L~~every 2024 Unsecured Notes ~~Deficiency Claims~~Claim, 2026 Unsecured Notes Claim and 2027 Unsecured Notes ~~Claims are~~Claim is a General Unsecured ~~Claims~~Claim.[15] | Impaired | **Entitled to vote** |
| 7b | *General Unsecured Convenience Claims:* Claims that are Allowed in an amount of $[•]1,500,000 or less, ~~that are not:~~other than Administrative Expenses, Other Secured Claims, Priority Tax Claims, Priority Non-Tax Claims, ABL Facility Claims, 1L Notes Claims, ~~1L Notes Deficiency Claims,~~ 1.25L Notes Claims, ~~2026 Unsecured Notes Claims, 2024 Unsecured Notes Claims,~~ 2024 Unsecured Notes Claims, 2026 Unsecured Notes Claims, 2027 Unsecured Notes Claims, PIK Notes Claims, and Intercompany Claims ~~or General Unsecured Canada/Mexico Claims~~. The Allowed amount of all Claims held by a holder and its Affiliates shall be aggregated for purposes of the foregoing calculation. Holders of Claims that are Allowed in an amount in excess of $1,500,000 that otherwise meet the foregoing criteria may opt into treatment as a General Unsecured Convenience Claim by making a ballot election to waive any Allowed amounts that are in excess of the $1,500,000 threshold. | Impaired | **Entitled to vote** |
| ~~7c~~ | *~~General Unsecured Canada/Mexico Claims:~~* ~~Claims against Canada/Mexico Debtors that are not Secured Claims, Intercompany Claims, the unsecured portions of Secured Claims, or Claims entitled to priority under the Bankruptcy Code.~~ | ~~[•]~~ | ~~[•]~~ |
| 8 | *PIK Notes Claims:* Claims against Wolverine Intermediate Holding Corporation arising on account of the PIK Notes or the PIK Notes Indenture or other related documents. | Impaired | Deemed to reject |
| 9 | *Intercompany Claims:* Claims against a Debtor held by any other Debtor. | Impaired/ Unimpaired | Deemed to reject/ presumed to accept |
| 10 | *Existing Equity Interests:* Interests other than Intercompany Interests. | Impaired | Deemed to reject |

~~[15]   Notwithstanding anything to the contrary in the Plan or this Disclosure Statement, the Debtors reserve the right to amend the Plan, including to reclassify 1.25L Note Claims, 2026 Unsecured Notes Claims and 2024 Unsecured Notes Claims as General Unsecured Claims.~~

| Class | Claims or Interests | Impairment | Voting Rights |
|-------|---------------------|------------|---------------|
| 11 | *Intercompany Interests:*<br>Interests in any Debtor held by another Debtor. | Unimpaired | Presumed to accept |

### 2.    Treatment of Impaired Claims

#### a.    *1L Notes Claims (Class 4)*

The Claims in Class 4 will consist of all 1L Notes Claims other than 1L Notes Deficiency Claims. The 1L Notes Claims (including the 1L Notes Deficiency Claims), which shall be Allowed in the amount of not less than $1,394,468,209.68 (the aggregate principal amount of not less than $1,318,739,792, plusand accrued andbut unpaid interest (including, for the avoidance of doubt, interest that was scheduled to be paid in kind on May 15, 2023) andthereon through the Petition Date), plus fees through the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

On the Effective Date, each holder of an Allowed 1L Notes Claim shall receive (i) its Pro Rata share of (A) $[•]420,000,000 in principal amount of New Takeback Notes and (B) 10096.5% of the New Common Equity, subject to dilution by (x) any New Common Equity issued in respect of the Management Incentive Plan and (yii) any other New Common Equity issued in respect of distributions on account of Allowed Claimsthe indemnification set forth under thisArticle V.D.2.b of the Plan (if any).[16]

The receipt of the foregoing consideration, along with the consideration on account of the 1L Notes Deficiency Claims in Class 7a, shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each 1L Notes Claim against each Debtor. As a component of the Global Settlement, each holder of a Claim in Class 4 shall waive any distribution from Class 7a on account of any deficiency claim.

Holders of 1L Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

#### b.    *1.25L Notes Claims (Class 5)*

The 1.25L Notes Claims shall be Allowed in the amount of $535,859,414.03 (the aggregate principal amount of $519,016,212 plusand accrued andbut unpaid interest andthereon through the Petition Date), plus fees through the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

OnAs a component of the Effective DateGlobal Settlement, each holder of an Allowed 1.25L Notesa Claim in Class 5 shall receive such holder's Pro Rata sharewaive any distribution on account of [theits 1.25L Notes Settlement Consideration]Claims.

---

[16]   Treatment of prepetition indemnity claims and any post emergence indemnification of holders of 1L Notes Claims remains to be determined.

The receipt of the foregoing consideration shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the 1.25L Notes Claims against each Debtor.

c.        *2026 Unsecured Notes Claims (Class 6a)*

The 2026 Unsecured Notes Claims shall be Allowed in the aggregate principal amount of $336,978,622, plus accrued and unpaid interest and fees thereon through the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

On the Effective Date, each holder of an Allowed 2026 Unsecured Notes Claim shall receive such holder's Pro Rata share of the [2026 Unsecured Notes Settlement Equity].

The receipt of the foregoing consideration shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each 2026 Unsecured Notes Claim against each Debtor.

Therefore, no property will be distributed to holders of 1.25L Notes Claims. Each 1.25L Notes Claim shall be released and cancelled on the Effective Date.

Holders of 1.25L Notes Claims are not entitled to vote to accept or reject the Plan.

c.      *[Reserved]*

d.      *2024 Unsecured Notes Claims (Class 6b)[Reserved]*

The 2024 Unsecured Notes Claims shall be Allowed in the aggregate principal amount of $176,772,000, plus accrued and unpaid interest and fees thereon through the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

On the Effective Date, each holder of an Allowed 2024 Unsecured Notes Claim shall receive such holder's Pro Rata share of the [2024 Unsecured Notes Settlement Equity].

The receipt of the foregoing consideration shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each 2024 Unsecured Notes Claim against each Debtor.

e.      *General Unsecured Claims (Class 7a)*

i.      *Allowance*

The 1L2024 Unsecured Notes Deficiency Claims shall be Allowed in the amount of $184,984,336.09 (the aggregate principal amount of [•] (which shall be deemed equal to the Allowed 1Land accrued but unpaid interest thereon through the Petition Date), plus fees through

44

the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

The 2026 Unsecured Notes Claims ~~minus~~ shall be Allowed in the amount of $353,557,970.20 (the aggregate ~~value distributed on account of such 1L Notes Claims under Article III.B.4 of the Plan)~~principal amount and accrued but unpaid interest thereon through the Petition Date), plus fees through the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

The 2027 Unsecured Notes Claims shall be Allowed in the amount of $111,608,496.29 (the aggregate principal amount ~~of $104,125,000, plus~~and accrued ~~and~~but unpaid interest ~~and~~thereon through the Petition Date), plus fees through the Petition Date, and shall not include any amount on account of "Applicable Premium," make-whole premium, call protection, or other similar amounts or premiums.

Other General Unsecured Claims shall be Allowed or Disallowed in accordance with Article VI of the Plan.

ii.    *Treatment and Voting*

On the Effective Date (or as soon thereafter as reasonably practicable in accordance with the resolution and distribution provisions set forth herein), each holder of an Allowed General Unsecured Claim shall receive ~~such holder's~~its Pro Rata share ~~[(calculated as if all 2026 Unsecured Notes Claims and 2024 Unsecured Notes Claims were General Unsecured Claims)]~~ of the ~~[GUC~~ Settlement ~~Distribution]~~Equity Pool.

The receipt of the foregoing consideration shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each General Unsecured Claim against each Debtor.

Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

**f.    *General Unsecured Convenience Claims (Class 7b)***

Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment (with the consent of the Required Consenting 1L Noteholders, not to be unreasonably withheld), each holder of an Allowed General Unsecured Convenience Claim shall receive such holder's Pro Rata share of Cash in ~~an~~the amount ~~equal to [•]~~of $7,500,000; *provided* that in no event shall any holder of General Unsecured Convenience Claims recover more than 10.00% of the Allowed amount of its General Unsecured Convenience Claim.

The receipt of the foregoing consideration shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each General Unsecured Convenience Claim against each Debtor.

g.    [Holders of General Unsecured *Canada/Mexico*Convenience Claims *(Class 7c)]*are entitled to vote to accept or reject the Plan.

[•]

g.    h.  *PIK Notes Claims (Class 8)*

No property will be distributed to holders of PIK Notes Claims. Each PIK Notes Claim shall be released and cancelled on the Effective Date.

Holders of PIK Notes Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.    **Treatment of Unimpaired Claims and Interests**

a.    *Unimpaired Claims and Interests, Generally*

With the exception of Claims in Classes 4, 5, 6a, 6b, 7a, 7b, [7c,] and 8 (described above), Intercompany Claims (described below) and Existing Equity Interests (described below), all other Claims and Interests will be given such treatment as to render them Unimpaired. In particular:

- *Priority Non-Tax Claims (Class 1):* Except to the extent previously paid during the Chapter 11 Cases or the holder of an Allowed Priority Non-Tax Claim and the Debtors (with the consent of the Required Consenting 1L Noteholders, not to be unreasonably withheld) agree to less favorable treatment for such holder, each holder of an Allowed Priority Non-Tax Claim shall (a) receive from the applicable Reorganized Debtor, in full and final satisfaction of its Priority Non-Tax Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its Priority Non-Tax Claim becomes due and payable in the ordinary course or (b) be otherwise rendered Unimpaired.

- *Other Secured Claims (Class 2):* Except to the extent previously paid during the Chapter 11 Cases or the holder of an Allowed Other Secured Claim and the Debtors (with the consent of the Required Consenting 1L Noteholders, not to be unreasonably withheld) agree to less favorable treatment for such holder, each holder of an Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Required Consenting 1L Noteholders, not to be unreasonably withheld), in full and final satisfaction of its Other Secured Claim, (a) shall receive Cash in an amount equal to the Allowed amount of its Other Secured Claim on the later of the Effective Date and the date that is 10 Business Days after the date such Other Secured Claim becomes an Allowed Claim; (b) shall receive, on the Effective Date or as soon as reasonably practicable thereafter, delivery of, or shall retain, the applicable collateral securing its Allowed Other Secured Claim up to the secured amount of such Claim

46

pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) shall have its Other Secured Claim Reinstated as of the Effective Date; or (d) shall receive such other treatment sufficient to render its Allowed Other Secured Claim Unimpaired.

- *ABL Facility Claims (Class 3):* Except to the extent previously paid during the Chapter 11 Cases or the holder of an ABL Facility Claim, the Debtors and the ~~Debtors~~Required Consenting 1L Noteholders agree to less favorable treatment for such holder, on the Effective Date, each holder of an ABL Facility Claim shall receive, in full and final satisfaction of its ABL Facility Claim, Cash in an amount equal to the Allowed amount of its ABL Facility Claim.[16]

- ~~[General Unsecured Canada/Mexico Claims (Class 7c): [•]]~~

- *Intercompany Claims (Class 9):* No property will be distributed to holders of Intercompany Claims. Each Intercompany Claim shall be either Reinstated or released and cancelled, as ~~determined appropriate by the Debtors~~described in the Description of Restructuring Transactions, on or after the Effective Date.[17]

- *Existing Equity Interests (Class 10):* Holders of Existing Equity Interests shall not receive any distribution or retain any property on account of their Existing Equity Interests. On the Effective Date, all Existing Equity Interests will be cancelled, released and extinguished, and will be of no further force or effect. Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

- *Intercompany Interests (Class 11):* Unless otherwise provided for in the Description of Restructuring Transactions, each Intercompany Interest shall be Reinstated solely to the extent necessary to maintain the Reorganized Debtors' organizational structure.

---

[16] The Plan proposes to Allow post-petition interest on ABL Facility Claims at the contractual non-default rate. The ABL Agent and the ABL Lenders have asserted that unimpaired treatment of the ABL Facility Claims requires payment of post-petition interest at the contractual default rate and have informed the Debtors that they intend to object to confirmation of the Plan on those grounds. If such an objection is successful, then the Debtors reserve all rights to pay default-rate interest as part of the treatment of the Allowed ABL Facility Claims or to provide such other treatment, which the Bankruptcy Court determines by Final Order, renders the ABL Facility Claims unimpaired.

[17] Depending on the treatment accorded, Intercompany Claims are either Unimpaired or Impaired under the Plan. Holders of Intercompany Claims are conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code and, in either case, are not entitled to vote to accept or reject the Plan.

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Financing Claims, other Administrative Expenses and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

- *General Administrative Expenses:* General Administrative Expenses are Administrative Expenses other than Retained Professional Fees, Restructuring Expenses, DIP Financing Claims, and Statutory Fees. Each holder of an Allowed General Administrative Expense, to the extent its Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases, shall receive, in full and final satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense in accordance with the following: (1) if such General Administrative Expense is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed General Administrative Expense is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense is not Allowed as of the Effective Date, no later than the first Business Day after the date that is thirty (30) calendar days after the date on which an order Allowing such General Administrative Expense becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed General Administrative Expense is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Expense without any further action by the holders of such Allowed General Administrative Expense; or (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors (with the consent of the Required Consenting 1L Noteholders) or the Reorganized Debtors, as applicable.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Allowed General Administrative Expenses must be filed with the Bankruptcy Court and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the General Administrative Expenses Bar Date. **Holders of General Administrative Expenses that are required to, but do not, file and serve a request for payment of such General Administrative Expenses by the General Administrative Expenses Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Expenses against the Debtors or their property and such General Administrative Expenses shall be deemed discharged as of the Effective Date.** Notwithstanding the foregoing, no request for payment of a General Administrative Expense need be filed with respect to a General Administrative Expense previously Allowed by Final Order of the Bankruptcy Court.

The Reorganized Debtors may settle General Administrative Expenses in the ordinary course of business without further notice and without further

approval or an order of the Bankruptcy Court. The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any General Administrative Expense no later than the General Administrative Expenses Objection Deadline, subject to extensions by the Bankruptcy Court or agreement in writing of the applicable parties. Unless the Debtors or the Reorganized Debtors (or other party with standing) objects to a timely filed and properly served General Administrative Expense, such General Administrative Expense will be deemed Allowed in the amount requested. In the event that the Debtor or the Reorganized Debtor objects to a General Administrative Expense, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such General Administrative Expense should be Allowed and, if so, in what amount.

Notwithstanding anything to the contrary in the Plan or the DIP Orders, no General Administrative Expense shall be Allowed pursuant to section 507(b) of the Bankruptcy Code.

- *Retained Professional Fees:* Retained Professional Fees are the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Retained Professionals, that: (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Retained Professional. To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, that amount shall no longer constitute Retained Professional Fees. The treatment of Retained Professional Fees is described below at Section IV.B.3.d, entitled "Retained Professional Fees".

- *Restructuring Expenses:* Restructuring Expenses are the reasonable and documented fees and expenses, incurred in connection with the Chapter 11 Cases (including the 2022 Financing Litigation and the Restructuring) of (a) the professionals retained by, or on behalf of, the First Lien Noteholder Group or any member thereof, including Davis Polk & Wardwell LLP, Evercore Group, L.L.C., Porter Hedges LLP, Holwell Shuster & Goldberg LLP, and each other local or special counsel or other advisor to the First Lien Noteholder Group or any member thereof, (b) the DIP Agent and the professionals retained by, or on behalf of, the DIP Agent, including Pryor Cashman LLP and one local counsel to the DIP Agent in each applicable jurisdiction, (c) the 1L Indenture Trustee and the professionals retained by, or on behalf of, the 1L Indenture Trustee, including Pryor Cashman and one local counsel to the 1L Indenture Trustee in each applicable

jurisdiction, and (d) the ABL Agent and the professionals retained by, or on behalf of, the ABL Agent, including Cahill Gordon & Reindel LLP, FTI Consulting, Inc., and Norton Rose Fulbright US LLP, (e) the 1.25L Indenture Trustee and the professionals retained by, or on behalf of, the 1.25L Indenture Trustee, including Pryor Cashman and one local counsel to the 1.25L Indenture Trustee in each applicable jurisdiction. All Restructuring Expenses and (f) all other creditor professionals who are entitled to reimbursement pursuant to the Restructuring Support Agreement (excluding, for the avoidance of doubt, any Retained Professionals); *provided* that the fees and expenses payable to the Restructuring Professionals listed in the foregoing clauses (e) and (f) shall be paid in full in Cash, subject to the procedures described below at Section IV.B.3.e , entitled "conditions and limitations set forth in the Restructuring Expenses"Support Agreement.

- *Statutory Fees:* Statutory Fees are all fees payable pursuant to section 1930 of title 28 of the U.S. Code. All Statutory Fees due and payable prior to, and that remain unpaid as of, the Effective Date shall be paid by the applicable Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall be jointly and severally liable to pay all Statutory Fees when due and payable. The Debtors shall file all reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the applicable Reorganized Debtors shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. Each one of the Debtors and the Reorganized Debtors shall remain obligated to pay its own Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. Nothing in the Plan shall prohibit the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors) from paying any Statutory Fees that become due and payable.

- *DIP Financing Claims:* DIP Financing Claims are all Claims on account of DIP Obligations. The DIP Financing Claims shall be Allowed in the full amount due and owing under the DIP Documents, including (a) the principal amounts outstanding on the Effective Date, (b) all interest accrued and unpaid thereon through and including the date of payment, and (c) all premiums, fees (including back-end fees and exit fees), expenses, and indemnification obligations under the DIP Documents. For the avoidance of doubt, the DIP Financing Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

On the Effective Date, except to the extent that the Debtors (with the consent of the Required Consenting 1L Noteholders) and the holder of

a DIP Financing Claim agree to different treatment of such holder's Claim, each holder of an Allowed DIP Financing Claim shall receive [(a) with respect to any portion thereof on account of outstanding principal and the Exit Premium (as defined in the DIP Note Purchase Agreement) due on the DIP Notes, an equivalent principal amount of New Exit Notes and (b) with respect to all other amounts (including accrued and unpaid interest on the DIP Notes), payment in full in Cash].

From and after entry of the Confirmation Order, the Debtors or Reorganized Debtors, as applicable, shall, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, pay in Cash all DIP Fees and Expenses (as defined in the Final DIP Order) (to the extent not previously disputed or paid during the Chapter 11 Cases) in accordance with the procedures for payment of Restructuring Expenses described in Article II.B. of the Plan.

- *Priority Tax Claims:* Priority Tax Claims are Claims of a Governmental Unit that are entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code. Except to the extent that an Allowed Priority Tax Claim has not been previously paid in full or its holder and the Debtor against which it is asserted (with the consent of the Required Consenting 1L Noteholders) agree to less favorable treatment for such holder, in full and final satisfaction of each Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is Allowed as a Secured Claim, it shall be classified and treated as an Allowed Other Secured Claim.

### b.   *Reservations of Rights Regarding Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing in the Plan shall affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims. Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

       c.      *Restructuring Expenses*

The Debtors shall be obligated, jointly and severally, to pay all Restructuring Expenses in full in Cash, in accordance with the following procedures. No Restructuring Professional shall be required to comply with the U.S. Trustee fee guidelines or file an application seeking compensation for services or reimbursement of expenses with the Bankruptcy Court.

Any time that a Restructuring Professional seeks payment of Restructuring Expenses from the Debtors prior to Confirmation, such Restructuring Professional shall comply with the review procedures set forth in paragraph 17 of the Final DIP Order.

From and after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, shall, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, pay in Cash all Restructuring Expenses within ten (10) Business Days (or earlier, as provided below) after submission of an invoice to the Debtors or the Reorganized Debtors, as applicable, which may be in the same summary form permitted under the Final DIP Order but without any requirement that any Restructuring Professional comply with such review procedures.

All Restructuring Expenses incurred, or estimated in good faith to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases). The Debtors shall inform each of the Restructuring Professionals of the anticipated Effective Date at least five (5) Business Days in advance. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Expenses.

After the Effective Date, the Reorganized Debtors shall continue to pay, when due, pre- and post-Effective Date Restructuring Expenses, whether incurred before, on or after the Effective Date when due and payable in the ordinary course of business.

The payment of Restructuring Expenses to Restructuring Professionals described in clauses (e) and (f) of the definition of "Restructuring Expenses" shall be subject in all respects to the conditions and limitations set forth in the Restructuring Support Agreement.

       d.      *Retained Professional Fees*

        i.     *Final Fee Applications*

All final requests for payment of Retained Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the U.S. Trustee, counsel to the Committee, and all other parties that have requested notice in these Chapter 11 Cases by no later than 60 days after the Effective Date, unless the Reorganized Debtors agree otherwise in writing. Objections to Retained Professional Fees must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the applicable Retained Professional within 21 days after the filing of the applicable final fee application. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any

prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of all Retained Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be paid in full in Cash from the Professional Fee Escrow Account as promptly as practicable; *provided*, *however*, that if the funds in the Professional Fee Escrow Account are insufficient to pay the full Allowed amounts of the Retained Professional Fees, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from their Cash on hand.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional that the Debtors are permitted to pay in the ordinary course of business without specific authority from the Bankruptcy Court (or in accordance with any prior order of the Bankruptcy Court). The Debtors and Reorganized Debtors may continue to make such payments after Confirmation and the Effective Date.

### ii. *Professional Fee Escrow Account*

Each Retained Professional shall estimate its unpaid Retained Professional Fees, as of the Effective Date and shall deliver its estimate to the Debtors' counsel no later than three (3) Business Days before the anticipated Effective Date. A Retained Professional's estimate shall not be deemed to limit the Allowed amount of its Retained Professional Fees. If a Retained Professional does not provide an estimate, the Debtors may themselves estimate the unpaid and unbilled fees and expenses of such Retained Professional for purposes of funding the Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account in an amount equal to all asserted Claims for Retained Professional Fees incurred but unpaid as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts provided prior to the Effective Date). The Professional Fee Escrow Account may be an interest-bearing account. Amounts held in the Professional Fee Escrow Account shall not constitute property of the Reorganized Debtors. However, if a balance remains in the Professional Fee Escrow Account after all Retained Professionals have been paid their Allowed Retained Professional Fees, any such balance shall be promptly returned to, and shall then constitute property of, the Reorganized Debtors. No liens, claims, interests, or encumbrances shall encumber the Professional Fee Escrow Account or the funds held in the Professional Fee Escrow Account.

### iii. *Fees and Expenses After Confirmation*

Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Debtors, as applicable, shall pay, within ten (10) Business Days after submission of a detailed invoice to the Debtors or the Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement incurred by Retained Professionals of the Debtors from and after the Confirmation Date and prior to the Effective Date. If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the

Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

The Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors on and after the Confirmation Date. Following the Confirmation Date, no professional employed or retained by the Debtors shall be required to comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Confirmation Date, and the Reorganized Debtors may employ and pay any professional without further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and all payments made by the Debtors (including in respect of any payments described in Article II.C.3 of the Plan) prior to the Effective Date shall remain subject to the Final DIP Order in all respects.

### 4. Subordination of Claims

Except as expressly provided in the Plan, the Allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination that may apply.

## C. VOTING CLASSES

Any Class that does not have a Claim or an Interest, as applicable, as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for all purposes. If a Class is eligible to vote and no holder of Claims or Interests, as applicable, eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

## D. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. Global Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (a) all Claims and Interests and controversies related to the 2022 Financing Transactions and the 2022 Financing Litigation, (b) Claims arising from diminution of value from collateral, (c) valuation of collateral supporting the ABL Facility, the 1L Notes and the

1.25L Notes, (cd) the amount of secured and unsecured Claims arising from the 1L Notes and 1.25L Notes pursuant to section 506(a)(1) of the Bankruptcy Code, (e) rights to cash payments on account of DIP Financing Claims under section 1129(a)(9)(A) of the Bankruptcy Code, and (df) all Claims on account of make-whole premiums, call protection, and similar amounts and premiums, and (g) the applicability of turnover of proceeds arising under any intercreditor agreement. All distributions made to holders of Allowed Claims and Interests in any Class in accordance with the Plan are intended to be, and shall be, final. Among other things, the Plan provides for a global settlement among the Debtors and various creditors of the Debtors (the "*Global Settlement*"), which provides substantial value to the Debtors' Estates.

## 2. Sources of Consideration for Distributions

### a. *Cash*

The Reorganized Debtors shall fund distributions under the Plan required to be paid in Cash, if any, with Cash on hand (including Cash from operations and Cash received under the DIP Financing in accordance with the DIP Documents and Cash received on the Effective Date).

### b. *New Financing*

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the New Debt Documents, subject to the requisite approvals, without further (a) notice to or order of the Bankruptcy Court; (b) vote, consent, authorization, or approval of any Person; or (c) action by the holders of Claims or Interests. Confirmation of the Plan shall be deemed approval of the New Financing and the New Debt Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into, execute, and deliver the New Debt Documents and such other documents as may be required to effectuate the treatment afforded by the New Financing.

The New Debt Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. The financial accommodations to be extended pursuant to the New Debt Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, all of the Liens to be granted in accordance with the New Debt Documents (a) shall be deemed to be approved; (b) shall be legal, binding, and enforceable Liens on the collateral granted under the respective New Debt Documents in accordance with the terms thereof; (c) shall (i) be deemed automatically perfected on the Effective Date without the need for the taking of any further filing, recordation, approval, consent, or other action, and (ii) have the priorities as set forth in the respective New Debt Documents, and be subject only to such Liens as may be permitted under the New Debt Documents; and (d) shall not be enjoined or

subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the secured parties (and their designees and agents) under such New Debt Documents shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents, and to take any other actions necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of the Liens granted under the New Debt Documents shall occur automatically on the Effective Date by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be necessary or required), and the Reorganized Debtors and the secured parties (and their designees and agents) under such New Debt Documents will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

To the extent that any holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such holder, has filed or recorded any Liens to secure such holder's Secured Claim, then on or as soon as practicable after the Effective Date, such holder (or the agent for such holder) shall, at the Debtors' or Reorganized Debtors' sole cost and expense, take any and all steps reasonably requested by the Debtors, Reorganized Debtors, the New Notes Indenture Trustees, or the New Revolver Facility Agent that are necessary to cancel and/or extinguish such Liens (it being understood that such Liens held by holders of Secured Claims that are satisfied on the Effective Date pursuant to the Plan shall be automatically canceled or extinguished on the Effective Date by virtue of the entry of the Confirmation Order). To the extent any direction under any of the Prepetition Debt Documents is required to effectuate the cancellation or extinguishment of Liens described above, the Confirmation Order shall be deemed to have provided such direction and shall include language effectuating the foregoing.

All of the New Notes issued and/or distributed pursuant to the Plan shall be exempt from the registration requirements of Section 5 of the Securities Act and any "blue sky" laws of any U.S. jurisdiction pursuant to section 1145(a) of the Bankruptcy Code, except to the extent that the recipient is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.

     c.     *New Common Equity*

On the Effective Date, Reorganized Incora is authorized to issue or cause to be issued, and shall issue, the New Common Equity pursuant to and in accordance with the Plan, without further notice to or order of the Bankruptcy Court; act or action under applicable law, regulation, order, or rule; or the vote, consent, authorization, or approval of any Person.

The New Common Equity shall be distributed in accordance with the treatment set forth in~~in~~at Article III.B of the Plan.

All of the New Common Equity issued and/or distributed pursuant to the Plan shall be exempt from the registration requirements of Section 5 of the Securities Act and any "blue sky" laws of any U.S. jurisdiction pursuant to section 1145(a) of the Bankruptcy Code, except to the

extent that the recipient is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.

### 3. Effects of the Plan

#### a. *Organizational Existence*

Except as otherwise provided in the Plan, each Debtor and each of its direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended, amended and restated, replaced or otherwise modified pursuant to the New Organizational Documents. To the extent such documents are amended, amended and restated, replaced or otherwise modified pursuant to the New Organizational Documents, such documents are deemed to be amended, amended and restated, replaced or otherwise modified pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

#### b. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, all property in any Debtor's Estate, including any property acquired by any Debtor pursuant to the Plan, shall vest in the applicable Reorganized Debtor and, if applicable, any Entity or Entities formed pursuant to the Restructuring Transactions to hold the assets of the Debtors, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without notice and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Notice of the Plan or of the Confirmation Order shall be conclusively deemed to be adequate notice that Liens, Claims, charges, or other encumbrances are being extinguished. Any Person having a Lien, Claim, charge, or other encumbrance against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

#### c. *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan, on the Effective Date: (a) the Prepetition Debt Documents, the Existing Equity Documents, and any other credit agreement, collateral agreement, indenture, certificate, equity security, share, note, purchase right, option, warrant, or

other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors or giving rise to any Claim or Interest (except such agreements, certificates, notes, or other instruments or documents evidencing any indebtedness or obligation of, or ownership interest in, the Debtors that are Reinstated, amended and restated, entered into or issued pursuant to the Plan) shall be deemed cancelled, released, surrendered, extinguished and discharged and of no force or effect, without any need for further action or approval of the Bankruptcy Court, the Debtors, any holder of any Claim or Interest or any other Person or Entity, and no party (including the Debtors, the Reorganized Debtors and any non-Debtor affiliates) shall have any continuing obligations or duties thereunder or in any way related thereto, which shall be deemed satisfied in full, canceled, released, discharged, and of no further force or effect; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes, or other instruments or documents evidencing any indebtedness or obligation of, or ownership interest in, the Debtors that are specifically Reinstated, amended and restated, entered into or issued pursuant to the Plan) shall be deemed satisfied in full, released, and discharged, without any need for further action or approval of the Bankruptcy Court, the Debtors, any holder of any Claim or Interest or any other Person or Entity. To the extent any direction under the Prepetition Debt Documents is required to effectuate the foregoing, the Confirmation Order shall be deemed to have provided such direction and shall include language providing therefor.

Notwithstanding such cancellation and discharge, the Prepetition Debt Documents shall continue in effect solely to the extent necessary (a) to allow the holders of Claims to receive distributions under the Plan; (b) to allow the Debtors, the Reorganized Debtors, and the Prepetition Agents to make or receive distributions under and in accordance with the terms of the Plan and to take other actions pursuant to the terms of the Plan on account of Claims; (c) to allow the 2026 Unsecured Indenture Trustee, the 2024 Unsecured Indenture Trustee, the 2027 Unsecured Indenture Trustee, the PIK Notes Indenture Trustee, the 1L Indenture Trustee, and the 1.25L Indenture Trustee to exercise their rights, claims, causes of action, and interests (including their rights, if any, to compensation and indemnification as against any money or property distributable) under the 2026 Unsecured Indenture, the 2024 Unsecured Indenture, the 2027 Unsecured Indenture, the PIK Notes Indenture, the 1L Indenture, and the 1.25L Indenture, respectively, against any holder of 2024 Unsecured Notes Claims, 2026 Unsecured Notes Claims, 2027 Unsecured Notes Claims, PIK Notes Claims, 1L Notes Claims, and 1.25L Notes Claims, respectively, to the extent consistent with the Plan, including to exercise charging liens; (d) to allow the Prepetition Agents to enforce any obligations owed to them under the Plan; and (e the Prepetition Debt Documents; (e) to preserve all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the 1L Indenture Trustee, the 1.25L Indenture Trustee, and the PIK Notes Indenture Trustee, as applicable, against any person other than a Released Party; and (f) to allow the Prepetition Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to such documents in furtherance of the foregoing; *provided* that any provisions regarding turnover of proceeds arising under any intercreditor agreement that constitute Prepetition Debt Documents shall be cancelled and discharged and of no force or effect; and *provided, further* that nothing in Article IV.C.3 of

the Plan shall affect the discharge of Claims or Interests pursuant to the Plan or the effectiveness of the Third-Party Release.

Except for the foregoing, upon Consummation of the Plan, the Prepetition Agents ~~shall~~and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be discharged and shall have no further obligation or liability, and shall otherwise be relieved of all further duties and responsibilities related to the foregoing documents; *provided* that any provisions of such documents that by their terms survive their termination shall survive in accordance with their terms.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, lis pendens, or similar interests or documents and take all other steps reasonably requested by the Debtors, the Reorganized Debtors, the New Notes Indenture Trustees, or the New Revolver Facility Agent that are necessary to cancel or extinguish Liens securing such holder's Other Secured Claim.

### d.    *Binding Effect of New Organizational Documents*

Each holder of the New Common Equity (whether issued and distributed hereunder or otherwise, and in each case, whether such New Common Equity is held directly or indirectly through the facilities of DTC) shall be deemed to be a party to, and shall be bound to the terms of, the applicable New Organizational Documents, in accordance with their terms, from and after the Effective Date, even if not a signatory thereto.

### 4.    Authorization to Implement the Plan

### a.    *Restructuring Transactions*

In consummating the Plan, the Debtors and the Reorganized Debtors shall be authorized, to the extent consistent with the Plan, to enter into such transactions and take such other actions (in ~~consultation~~each case, with the ~~First Lien Noteholder Group in material respects~~consent of the Required Consenting 1L Noteholders) as may be necessary or appropriate to effect a corporate and other organizational restructuring of their businesses, to otherwise simplify the overall corporate and other organizational structure of the Debtors, to reincorporate or reorganize certain of the Debtors under the laws of jurisdictions other than the laws under which such Debtors currently are incorporated or formed, and to alter the tax status of the Debtors (collectively, "*Restructuring Transactions*"). The Restructuring Transactions may include one or more mergers, consolidations, dispositions, transfers, assignments, contributions, liquidations or dissolutions, as may be determined by the Debtors (in ~~consultation~~each case, with the ~~First Lien Noteholder Group in material respects~~consent of the Required Consenting 1L Noteholders) to be necessary or appropriate, including any such transaction necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of

certain of the Debtors vesting in one or more surviving, resulting, or acquiring entities. Subject to the terms of the Plan, in each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, that surviving, resulting, or acquiring Entity shall perform the obligations of the corresponding Debtor or Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against and Interests in that Debtor, except that any contract, instrument or other agreement or document effecting a disposition to the surviving, resulting or acquiring Entity, which may provide that another Entity (including another Reorganized Debtor) will perform such obligations. The Restructuring Transactions may occur prior to, on, or after the Effective Date.

In effecting the Restructuring Transactions, the Debtors and the Reorganized Debtors shall be permitted to (a) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable non-bankruptcy law and such other terms to which the applicable Entities may agree; (b) form new Entities, execute and deliver appropriate documents in connection therewith containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable non-bankruptcy law, and issue equity in such newly formed Entities; (c) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree and effectuate such transfers, assignments, assumptions, or delegations in accordance with such instruments, including to any Entities formed in accordance with the Restructuring Transactions and the Plan; (d) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable non-bankruptcy law; and (e) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings, or vacating previously filed filings or recordings, that may be required by applicable non-bankruptcy law in connection with such transactions. Each agent of the Debtors and other Persons authorized to make filings with respect to the Debtors is directed to cooperate with and to take direction from the Debtors and the Reorganized Debtors as to the foregoing.

To the extent known, any Restructuring Transactions will be summarized in the Description of Restructuring Transactions, and shall be subject to the terms and conditions of the Plan and, in material respects, the reasonable consent of the Required Consenting 1L Noteholders.

**b.**      ***Actions to Effectuate the Plan***

All actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including, with respect to the applicable Reorganized Debtors: (a) appointment of the New Boards pursuant to Article IV.E of the Plan and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (b) the issuance and distribution of the New Common Equity by Reorganized Incora; (c) entry into the New Organizational Documents; (d) entry into the New Debt Documents; and (e) implementation of the Restructuring Transactions.

All matters provided for in the Plan involving the corporate or other organizational structure of the Debtors or the Reorganized Debtors, and any corporate or other entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Debtors or the Reorganized Debtors.

On and after the Effective Date, the Debtors, the Reorganized Debtors and their respective officers, directors or managers shall each be authorized and (as applicable) directed to issue, execute, deliver, file, or record the contracts, securities, instruments, releases, and other agreements and documents contemplated under the Plan (or necessary or desirable to effectuate, implement, or further evidence the transactions contemplated under the Plan) in the name, and on behalf, of the Debtors or the Reorganized Debtors, including any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals set forth in Article IV.D.2 of the Plan shall be effective notwithstanding any approvals, authorization or requirements under applicable non-bankruptcy law, except for those expressly required pursuant to the Plan or the New Organizational Documents.

### c.   *Authorization and Issuance of the New Common Equity*

All of the New Common Equity issued or distributed pursuant to the Plan shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Common Equity issued or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid and non-assessable. Each distribution and issuance of the New Common Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 5.   **Directors and Officers**

### a.   *Resignation of Incumbent Directors*

As of the Effective Date, the terms of the current directors and managers of each Debtor shall expire, and each such director and manager will be deemed to have resigned and shall have no continuing obligation in their capacity as such to the Reorganized Debtors after the Effective Date.

### b.   *New Boards of Directors*

~~On the Effective Date, the~~The Reorganized Incora Board shall ~~consist of [•] Directors, which shall~~ be determined and selected by the Required Consenting 1L Noteholders, and the identities of such Directors will be disclosed, to the extent known, in the Plan Supplement. As of the Effective Date, the applicable New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents, and the identities of the members thereof will be disclosed, to the extent known, in the Plan Supplement. From the Effective Date, each of the directors or managers, as applicable, of the Reorganized Debtors shall serve pursuant to the

terms of the applicable New Organizational Documents and may be replaced or removed in accordance with the New Organizational Documents.

### c.      *Officers*

Except as otherwise provided in the Plan Supplement, the officers of the Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date, except that those officers who are employed by or partners of the Sponsor shall be deemed to have resigned and shall bear no further duties to any of the Debtors or the Reorganized Debtors. From and after the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

### 6.      **Tax and Regulatory Matters**

### a.      *Filing of New Organizational Documents*

On or prior to the Effective Date or as soon thereafter as is practicable, the applicable Reorganized Debtors shall, if so required under applicable local law, file their New Organizational Documents with the applicable Secretaries of State or other applicable authorities in their respective jurisdictions of organization in accordance with the laws of the respective jurisdictions. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective jurisdictions of organization, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

### b.      *Section 1146 Exemption*

In accordance with section 1146 of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any securities, instruments or documents, including the New Common Equity; (b) the creation of any lien, mortgage, deed of trust, or other security interest; (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise); (d) the grant of collateral under the New Debt Documents; (e) the Restructuring Transactions; and (f) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed, bill of sale, assignment or other instrument of transfer under, in furtherance of, contemplated by, arising out of or in any way related to, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing

or recording fee, or other similar tax or governmental assessment (except, in each case, to the extent required under applicable foreign law), and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing, other than in respect of any tax imposed under applicable foreign law), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 7. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII.D of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action (and all Privilege Rights with respect thereto), whether arising before or after the Petition Date, in any court or other tribunal including, in an adversary proceeding filed in the Chapter 11 Cases, and including any actions specifically enumerated in the Schedule of Retained Causes of Action.

The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their discretion.

**No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action against them.** Unless any Cause of Action against a Person is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action as Retained Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation of the Plan.

The Reorganized Debtors, through their authorized agents or representatives, shall retain and shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 8. Management Incentive Plan

The Reorganized Debtors will reserve a pool of [•]% of the New Common Equity to be agreed by the Debtors and the Required Consenting 1L Noteholders for a post-emergence Management Incentive Plan for management employees of the Reorganized Debtors, which will

contain terms and conditions (including with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined by the Reorganized Incora Board after the Effective Date.

### E.   TREATMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES

#### 1.   Assumption and Rejection

Except as otherwise provided in the Plan, each Executory Contract and/or Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract and/or Unexpired Lease (a) was previously assumed or rejected; (b) previously expired or was terminated pursuant to its own terms; (c) is the subject of a motion to reject, assume, or assume and assign filed on or before the Effective Date; or (d) is designated specifically as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases; *provided* the Debtors or the Reorganized Debtors, as applicable, retain the right to alter, amend, modify or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including by way of adding or removing a particular Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including (60) Business Days after the Effective Date.

Unless previously approved by the Bankruptcy Court, the Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described rejections, assumptions, and assignments, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective upon Consummation of the Plan.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each Executory Contract and/or Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, the applicable Reorganized Debtor in accordance with its terms (including any amendments to any Executory Contracts and/or Unexpired Leases that were entered into after the Petition Date), except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the maximum extent permitted by law, to the extent that any provision in any Executory Contract and/or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract and/or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified or stricken such that the transactions contemplated by the Plan shall not entitle the non-Debtor that is party thereto to terminate such Executory Contract and/or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Nothing contained in the Plan shall constitute an admission by the Debtors that any Executory Contract and/or Unexpired Lease is, in fact, an Executory Contract and/or Unexpired Lease or that the Debtors or the Reorganized Debtors have any liability thereunder.

2.      **Assumed Contracts and Leases**

a.      *Cure of Defaults and Objections to Cure and Assumption*

The Allowed Cure Claim for each Executory Contract and/or Unexpired Lease shall be $0.00, unless (a) the Debtors (with the consent of the Required Consenting 1L Noteholders, not to be unreasonably withheld) affirmatively propose to Allow a Cure Claim for an Executory Contract and/or Unexpired Lease in a different amount by listing it on the Schedule of Assumed Executory Contracts and Unexpired Leases, (b) a Final Order is entered Allowing a Cure Claim in a different amount, or (c) the Debtors (subject towith the Claim Objection and Settlement Procedures Orderconsent of the Required Consenting 1L Noteholders) or Reorganized Debtors, as applicable, otherwise agree with the applicable party or parties to an Executory Contract and/or Unexpired Lease to Allow a Cure Claim in a different amount. The Debtors (subject towith the Claim Objection and Settlement Procedures Orderconsent of the Required Consenting 1L Noteholders) and the Reorganized Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract and/or Unexpired Lease (with the consent of the Required Consenting 1L Noteholders, not to be unreasonably withheld, as to material Executory Contracts and/or Unexpired Leases), all objections to the assumption of any Executory Contract and/or Unexpired Lease pursuant to the Plan, including to any Cure Claim set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases, must be filed with the Bankruptcy Court on or before the Confirmation Objection Deadline or such other deadline that may be set by the Bankruptcy Court. Any such request that is not timely filed shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, the Debtors or the Reorganized Debtors shall satisfy all Allowed Cure Claims in respect of assumed Executory Contracts and Unexpired Leases by payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, of the Allowed amount. Each Cure Claim shall be deemed fully satisfied, released, and discharged upon such payment; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The consummation of the Plan on the Effective Date shall be conclusively deemed to provide "adequate assurance of future performance" as to all Executory Contracts and/or Unexpired Leases that are assumed.

Assumption of any Executory Contract and/or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract and/or Unexpired Lease at any time before the date that it is assumed. Subject to the

resolution of any timely objections in accordance with Article V.B.2 of the Plan, any Proofs of Claim filed with respect to an Executory Contract and/or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**b.** *Dispute Resolution*

If a counterparty to an Executory Contract and/or Unexpired Lease files a timely objection regarding the amount of any Cure Claim or any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code (each, an "*Assumption Dispute*"), the Assumption Dispute shall be resolved by the Bankruptcy Court or otherwise as may be agreed upon by the Debtors (~~subject to~~with the ~~Claim Objection and Settlement Procedures Order~~consent of the Required Consenting 1L Noteholders) or the Reorganized Debtors and the counterparty.

The Debtors (with the consent of the Required Consenting 1L Noteholders~~, not to be unreasonably withheld, as to material Executory Contracts and/or Unexpired Leases~~) or the Reorganized Debtors may assume, assume and assign, or reject an Executory Contract and/or Unexpired Lease that is subject to an Assumption Dispute at any time prior to the resolution of the Assumption Dispute relating to the Executory Contract and/or Unexpired Lease. During the Assumption Dispute, the counterparty shall continue to perform under the applicable Executory Contract and/or Unexpired Lease. If the Assumption Dispute is resolved or determined unfavorably to the Debtors or Reorganized Debtors, the Debtors or Reorganized Debtor may either affirm the assumption or reject the applicable Executory Contract and/or Unexpired Lease after such determination, in which case the counterparty may file a Proof of Claim within 30 days after notice of rejection.

Any Assumption Dispute, including one styled as an objection to Confirmation, may be scheduled to be heard by the Bankruptcy Court at or after the Confirmation Hearing and may be adjourned from time to time by the Debtors upon notice to the Bankruptcy Court.

**c.** *Modifications, Amendments, Supplements, Restatements, and Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and/or Unexpired Lease that is assumed and, if applicable, assigned to the Reorganized Debtors, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract and/or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and/or Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract and/or

Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 3.     Rejected Contracts and Leases: Claims for Damages

If the rejection of an Executory Contract and/or Unexpired Lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 7ba (General Unsecured Claims), and may be objected to in accordance with the provisions of Article VI of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules. Such Claims shall be asserted within 30 days following entry of the order (including the Confirmation Order) approving the Debtors' rejection of the applicable executory contract or unexpired lease. The Allowance of all such Claims shall be subject to all applicable limitations, including the caps set forth in section 502(b)(6) of the Bankruptcy Code. All such Claims not filed within such time will be Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, their Estates or the Reorganized Debtors, or the property thereof, without the need for any objection by the Debtors or Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.

### 4.     Particular Contracts and Leases

#### a.     *Insurance Policies*

Unless listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, each of the insurance contracts, including all D&O Policies, are deemed to be and treated as Executory Contracts and/or Unexpired Leases under the Plan, and on and after the Effective Date, the Debtors shall be deemed to have assumed all insurance contracts, including all D&O Policies in place as of the Petition Date.

In addition, after the Effective Date, all current and former officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, solely to the extent set forth in such D&O Policies and subject to any terms and conditions thereof. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date; *provided* that, for the avoidance of doubt, any insurance contract, including tail insurance policies, for directors', members', trustees', and officers' liability to be purchased or maintained by the Reorganized Debtors after the Effective Date shall be subject to ordinary-course corporate governance of the Reorganized Debtors.

b.     *Indemnification Obligations*

i.      ~~b.~~ *Indemnification of Directors, Officers, and Others*

Except as set forth on the Schedule of Rejected Contracts and Unexpired Leases, any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (a) remain in full force and effect; (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (c) not be limited, reduced, or terminated after the Effective Date; and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date; *provided* that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that (x) are not indemnified by such Indemnification Obligation; or (y) arise out of or relate to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct; *provided*, *further*, that the obligations in this section shall not apply to any Excluded Party or any other Person that is employed by or a partner of <u>(or indemnified by)</u> the Sponsor, and any obligations to indemnify any such Person shall be terminated upon the occurrence of the Effective Date regardless of whether such obligations are captured on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Contracts and Unexpired Leases. Except as provided in the foregoing sentence, all such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors, and, if necessary to effectuate such assumption under local law, one or more of the Reorganized Debtors shall contractually assume such obligations.

No Entity or Person may assert any Cause of Action against any independent director of a Debtor (including Patrick Bartels as independent director of Wolverine Intermediate Holding) arising out of or related to a Covered Exculpation Matter without first seeking authority from the Bankruptcy Court. Any request for such authority shall: (i) be made in writing with notice to all affected parties and shall include a proposed complaint setting forth any alleged Causes of Action and the detailed factual basis in support of such Causes of Action; (ii) indemnify each independent director against whom any such Causes of Action are asserted against costs associated with the successful defense of any such Causes of Action that are allowed to proceed; and (iii) propose a reasonable attorney fee reserve amount, which amount shall be subject to modification by the Bankruptcy Court and shall be deposited by the Entity or Person asserting such Causes of Action in the Bankruptcy Court's registry to secure the payment of such indemnity.

Any Claim filed on account of an indemnification obligation to a director, manager, officer, or employee of the Debtors as of the Effective Date shall be deemed satisfied and may be expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed by the Reorganized Debtors, or honored or reaffirmed, as the case may be pursuant to the Plan, without an objection having to be filed and without any further notice or action, order or approval of the Bankruptcy Court. For the avoidance of doubt, ~~this~~<u>the</u> Plan is

without prejudice to any indemnification of the holders of 1L Notes Claims that may be provided by the Reorganized Debtors from and after the Effective Date on account of 1L Notes Claims.

ii.    *Indemnification of 1L Indenture Trustee and Holders of 1L Notes Claims*

Following the Effective Date, holders of 1L Notes Claims as of the Effective Date (including the 1L Indenture Trustee) and their respective Related Parties shall be indemnified by the Reorganized Debtors with respect to all present and future actions, suits, and proceedings against holders of 1L Notes Claims or their respective Related Parties in connection with or related to the 2022 Financing Transactions, the Financing Litigation, and/or any other Causes of Action in connection with or related to the 1L Indenture (including, with respect to the 1L Indenture Trustee, for its reasonable and documented fees and expenses and for the reasonable and documented fees and expenses of its counsel), or the other Note Documents (as defined in the 1L Indenture), on the same terms as afforded under the 1L Indenture or the other Note Documents (as defined in the 1L Indenture); *provided that* the Reorganized Debtors shall not so indemnify any Excluded Party or its Related Parties.

c.    ***Compensation and Benefit Plans***

Unless otherwise provided in the Plan (including on the Schedule of Rejected Executory Contracts and Unexpired Leases) and except as applicable to any Excluded Party or any other Person that is employed by or a partner of the Sponsor, all [employment, restrictive covenant, confidentiality, and non-competition agreements, collective bargaining agreements, offer letters (including any severance set forth therein), bonus, gainshare and cash-based incentive programs, vacation, holiday pay, severance, retirement, supplemental retirement, employee or director or officer indemnity, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs, agreements and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations (collectively, the "*Compensation and Benefit Plans*")] are deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, subject to the following provisos, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code (in each case, as amended prior to or on the Effective Date); *provided* that Consummation shall not constitute a change in control or term of similar meaning pursuant to any such plans; *provided*, *further*, that no employee equity or equity-based plans, or any provisions set forth in any Compensation and Benefits Plans that provide for rights to acquire equity interests in any of the Debtors, including Existing Equity Interests, shall be assumed, or deemed assumed, by the Reorganized Debtors, or assumed and assigned, or deemed to be assumed and assigned, to Reorganized Incora.

For the avoidance of doubt, the foregoing shall not (1) limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to the Compensation and Benefit Plans, or (2) impair the ability of the Reorganized Debtors, to implement the Management Incentive Plan and to determine the Compensation and Benefit Plans of the Reorganized Debtors on or after the Effective Date, in each case consistent with the Plan.

5. **Postpetition Contracts and Leases**

Subject to Article V.B.3 of the Plan, new contracts and leases entered into after the Petition Date by any Debtor, will be performed by the applicable Debtor or Reorganized Debtor, as the case may be, liable thereunder in the ordinary course of its business or as authorized by the Bankruptcy Court. Accordingly, such contracts and leases (including any assumed Executory Contracts and/or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

F. **CLAIMS RESOLUTION**

1. **Allowance of Claims and Interests, Generally**

Except as otherwise expressly provided in the Plan and without regard to any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Confirmation Date, the Debtors (with the consent of the Required Consenting 1L Noteholders unless otherwise permitted under the Claim Objection and Settlement Procedures Order), and Reorganized Debtors shall have the sole authority, without any further notice to or action, order, or approval by the Bankruptcy Court, to (a) agree to Allow any Disputed Claim pursuant to clause (c)(iii) of the definition of "Allowed," which has not been made subject to an objection or request for estimation prior to the Confirmation Date, (b) file, withdraw, or litigate to judgment objections to Disputed Claims, (c) settle or compromise any Disputed Claim that has not been made subject to an objection or request for estimation prior to the Confirmation Date, and (d) direct the Claims Agent to adjust the Claims Register to reflect all resolutions of Disputed Claims.

The Reorganized Debtors shall file any objections to Claims (including any omnibus objections) no later than the Claim Objection Deadline (as it may be extended).

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been Allowed, Disallowed or estimated by order of the Bankruptcy Court be entitled to seek reconsideration of such an order unless it filed a motion requesting reconsideration on or before 21 days after the date of the order.

2. **Contingent and Unliquidated Claims**

Except with respect to a Claim that is Allowed pursuant to clause (a) or (c) of the definition of "Allowed," under the Plan, any Claim that is listed in the Schedules as contingent, unliquidated or disputed, and for which no superseding Proof of Claim has been filed, shall be considered Disallowed and shall be expunged by the Debtors and the Claims Agent without further notice to any party or action, approval or order of the Bankruptcy Court.

At any time prior to the Claim Objection Deadline, the Debtors and Reorganized Debtors or the applicable claimant may request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Claim that is presented in a Proof of Claim as contingent or unliquidated, regardless of whether any party previously has objected to such

Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. If neither the Reorganized Debtors nor the applicable claimant has filed a motion to estimate a contingent or unliquidated Claim (or portion of the Claim) on or before the Claim Objection Deadline, then the Claim (or portion of the Claim) shall be Disallowed without need for further notice or order of the Court.

### 3. Amendments

On or after the Confirmation Date, a Claim may not be amended without the prior authorization of (a) the Bankruptcy Court or (b) the Debtors or Reorganized Debtors, as applicable.

The Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, may amend the Schedules with respect to any Claim (other than any Claim that otherwise is or becomes an Allowed Claim or is released hereunder or otherwise by a Final Order) and to make distributions pursuant to the Plan based on such amended Schedules (if no Proof of Claim is timely filed in response to such amendment) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or adversely changes the nature or priority of a Claim that was previously scheduled as undisputed, liquidated and not contingent, the Debtors or the Reorganized Debtors, as applicable, shall provide the holder of such Claim with notice of such amendment and the opportunity to file a Proof of Claim pursuant to the Claims Bar Date Order. For the avoidance of doubt, the Reorganized Debtors shall have the authority to Dispute any Claim that has been listed on the Schedules (other than any Claim that is otherwise an Allowed Claim), even if not listed as disputed, unliquidated and/or contingent.

### 4. Claims Subject to Avoidance Actions

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim held by an Entity against which a Debtor or a Reorganized Debtor pursues an Avoidance Action or an action to recover property under sections 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, in each case other than a Released Claim, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and the holder of such Claim shall not receive any distribution under the Plan on account of such Claim until such time as such action has been resolved and, to the extent applicable, all sums due from such holder have been turned over to the Debtors or the Reorganized Debtors, as applicable. For the avoidance of doubt, the Claims Objection Deadline shall not apply to the filing of an Avoidance Action, including an Avoidance Action that seeks disallowance of a Claim as relief.

### 5. Claims Paid or Payable by Third Parties

#### a. *Claims Paid by Third Parties*

The Debtors or Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such

Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the party that is not a Debtor or Reorganized Debtor, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim. To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or the Reorganized Debtor on account of such Claim, such holder shall, within 10 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

### b.    *Claims Payable by Third Parties*

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any Debtor's insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; *provided* that if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor's insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim. The insurers reserve all rights to defend and contest applicable causes of action or demands to the extent that they are brought against the insurers, or to the extent that such causes of action or demands seek recovery from the insurers. To the extent that one or more of the Debtors' insurers, in its role as an insurer (but not in any role as the issuer of surety bonds or similar instruments or as a guarantor of payment), agree to satisfy a Claim in full or in part (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' payment thereof, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### c.    *Applicability of Insurance Contracts*

Except as otherwise provided in the Plan, distributions to holders of Claims covered by insurance contracts shall be in accordance with the provisions of any applicable insurance contract. Except as otherwise expressly set forth in the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including any holders of Claims, may hold against any other Entity under any insurance contract, including against insurers or any insured, nor shall anything contained in the Plan constitute or be deemed

a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

**6.    [Reserved]**

**7.    6. Claim Resolution Procedures Cumulative**

All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**G.    DISTRIBUTIONS**

**1.    The Disbursing Agent and Servicers**

**a.    *Powers and Roles***

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the next Interim Distribution Date) or as soon as reasonably practicable thereafter. Where Allowed Claims that are governed by a separate agreement and administered by a Servicer, the Disbursing Agent and the Reorganized Debtors, together with the applicable Servicer, shall use commercially reasonable efforts to implement distributions in accordance with the Plan and with the applicable agreements.

Without further order of the Bankruptcy Court, the Disbursing Agent and, where applicable, the Servicers, shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to such responsibilities; and (d) exercise such other powers as may be vested in them by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the Plan.

If the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The Servicers shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

**b.    *Expenses***

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent or the Servicers on or after the Effective Date (including the reasonable and documented fees and expenses of counsel) in connection with making distributions shall be paid by the Reorganized Debtors, without duplication of payments of Restructuring Expenses or Retained Professional Fees. Additionally,

in the event that the Disbursing Agent is ordered or required to give a bond or surety, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

**2.      Delivery Procedures**

**a.      *Record Date***

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated in the Debtors' records as of the date of any such distribution.

The manner of such distributions shall be determined at the discretion of the Reorganized Debtors. In addition, with respect to payment of any Cure Claim or disputes over any Cure Claim, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

**b.      *Interim Distribution Date***

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make additional interim distributions to holders of Allowed Claims that were not considered Allowed as of Distribution Record Date.

The Reorganized Debtors shall have sole discretion to determine the timing of these Interim Distribution Dates based on among other things, resolutions of Disputed Claims and the administrative costs of such a distribution. The manner of such distributions shall be determined at the reasonable discretion of the Reorganized Debtors.

**c.      *Publicly Held Securities***

The Distribution Record Date and subsequent Interim Distribution Record Dates shall not apply to publicly held securities deposited with DTC and, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors or the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

**d.      *Undeliverable Distributions and Unclaimed Property***

In the event that any distribution to any holder is undeliverable for any reason (including an undeliverable address or the recipient's failure to provide necessary information), no distribution to such holder shall be made unless and until the holder has cured the reason that its distribution was undeliverable, after which its distribution shall be made on the next Interim Distribution Date without interest; *provided*, *however*, that any undeliverable distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of

180 calendar days after the date on which such distribution was first attempted to be made, as determined in good faith by Reorganized Incora; *provided*, *further*, that the Debtors or Reorganized Debtors, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, state or other jurisdiction escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 180 calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the holder of the relevant Allowed Claim within the 180-calendar-day period. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors (notwithstanding any applicable federal, state, other U.S. or non-U.S. jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary).

A distribution shall be deemed unclaimed if a holder has not: (w) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (x) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (y) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (z) taken any other action necessary to facilitate such distribution.

The Debtors, the Reorganized Debtors, and the Disbursing Agents, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of actual fraud, gross negligence, or willful misconduct, as determined by a Final Order of a court of competent jurisdiction.

### e.   *Manner of Payment*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.

### 3.   **Calculation**

### a.   *Full Amount Payable*

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, then on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class. Distributions on account of any Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in Article VII of the Plan. If any payment or act under the Plan is required to be made or performed on or by a date

that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day. Distributions on account of Claims in unimpaired Classes that are asserted in non-U.S. currency may, at the Debtors' discretion, be paid in the applicable non-U.S. currency. Distributions on account of Claims in all other Classes shall be converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

### b.    *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, each Claim that has been asserted against multiple Debtors will be treated as a single Claim and shall result in a single distribution under the Plan. ~~[For the avoidance of doubt, each Claim Allowed against one or more Canada/Mexico Debtors and asserted against one or more other Debtors shall be treated as a Claim against the applicable Canada/Mexico Debtor.]~~

### c.    *Minimum Distributions*

No fractional New Common Equity shall be distributed to a holder of an Allowed Claim on account of its Allowed Claim. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares (or LLC interests or other such units) of New Common Equity that is not a whole number, the actual distribution of such New Common Equity shall be rounded as follows: (a) fractions of greater than one-half (½) shares of New Common Equity shall be rounded to the next higher whole number and (b) fractions of one-half (½) or less of New Common Equity shall be rounded to the next lower whole number with no further payment on their account. The total number of authorized shares of New Common Equity to be distributed to holders of Allowed Claims may be adjusted as necessary to account for the foregoing rounding.

Notwithstanding any other provision of the Plan, no Cash payment valued at less than $100.00, in the reasonable discretion of the Disbursing Agent and the Debtors or the Reorganized Debtors (as applicable), shall be made to a holder of an Allowed Claim on account of such Allowed Claim. Such Allowed Claims to which this limitation applies shall be discharged and its holder forever barred from asserting that Claim against the Reorganized Debtors or their property.

### d.    *Setoff and Recoupment*

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest that have not been otherwise released, compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise); *provided* that neither the failure to do so nor the Allowance of any Claim or Interest under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest.

### e.   *No Postpetition Interest*

Except as to the DIP Financing Claims and as required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

### f.   *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

### g.   *Single Satisfaction of Claims*

Notwithstanding anything else contained in the Plan or Confirmation Order, in no case shall a distribution be made under the Plan on account of an Allowed Claim to the extent that the aggregate value of all property received or retained on account of such Allowed Claim (from whatever source) would exceed 100 percent of the underlying Allowed Claim.

### 4.   **Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of the Plan, (a) no distributions will be made under the Plan on account of a Disputed Claim until such Claim becomes an Allowed Claim pursuant to a Final Order, if ever, and (b) except as otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, no partial distributions with respect to a Disputed Claim will be made under the Plan until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any distributions under the Plan shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Interim Distribution Date, without any interest to be paid on account of such Claim.

### 5.   **Exemption from Securities Laws**

### a.   *Exemption for Distributions Under Plan*

The offer, issuance, and distribution under the Plan of the New Common Equity and New Notes shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code, except with respect to an Entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the New Organizational Documents, the New Exit Notes Documents or the New Takeback Notes Documents, as applicable, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section

4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, if the holder is not an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, but such holder is an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the issuer, such holder may resell such securities without registration pursuant to and in accordance with the applicable provisions of Rule 144 (the manner of sale provisions of Rule 144(f) apply to New Common Equity but do not apply to New Notes) under the Securities Act (other than the holding period requirement in Rule 144(d) applicable to "restricted securities") or another available exemption under the Securities Act. In addition, such persons will also be entitled to resell such securities in transactions registered under the Securities Act following the effectiveness of an applicable registration statement, if one is filed with the SEC and becomes effective. Further, subject to the transfer provisions, if any, and other applicable provisions set forth in the New Organizational Documents, the New Exit Notes Documents or the New Takeback Notes Documents, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

### b.    *Exemption for Issuances to Underwriters*

The offer, sale, issuance, and distribution under the Plan of any New Common Equity or any New Notes issued to an Entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, shall be exempt from registration under the Securities Act and any other applicable securities laws in reliance on the exemption from registration set forth in Section 4(a)(2) under the Securities Act (and on applicable state law registration exemptions) and/or Regulation D promulgated thereunder (and on the preemption of state law registration requirements afforded thereby) or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 under the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the New Organizational Documents, the New Exit Notes Documents, or the New Takeback Notes Documents.

### 6.    DTC

Should the Debtors (with the consent of the Required Consenting 1L Noteholders) or the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Equity and/or the New Notes through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of New Common Equity and/or New Notes under applicable U.S. federal, state or local securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity and/or the New Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services. Each Entity that becomes a holder of New Common Equity and/or New

Notes indirectly through the facilities of DTC will be deemed bound by the terms and conditions of the applicable New Organizational Documents, New Exit Notes Documents or New Takeback Notes Documents and shall be deemed to be a beneficial owner of New Common Equity and/or New Notes subject to the terms and conditions of the applicable New Organizational Documents, New Exit Notes Documents or New Takeback Notes Documents.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity and/or the New Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

### 7. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. Notwithstanding the above, each holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Debtors have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations. The Debtors may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9 or similar form, as applicable to each such holder.

### H.   PROVISIONS RELATING TO RELEASES, EXCULPATIONS, AND INJUNCTIONS

### 1.   Compromise and Settlement

The Confirmation Order will constitute the Bankruptcy Court's approval of the settlements reflected in the Plan, including the Debtor Release and the Third-Party Release, and further, shall constitute the Bankruptcy Court's finding and determination that such settlements, including the Debtor Release and the Third-Party Release are (a) by conferring substantial benefits on the Debtors' Estates, an exercise of the Debtors' business judgment and in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (b) fair, equitable, and reasonable; (c) made in good faith; (d) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (e) an integral and non-severable

element of the Plan and the transactions incorporated therein, and essential to the Confirmation and Consummation of the Plan; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity asserting any Released Claim. In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Released Claim that may exist between the Debtors and any Released Party and, as of the Effective Date, any and all such Released Claims are settled, compromised, and released as set forth in the Plan. The Confirmation Order shall authorize and approve the releases of the Released Parties by all Entities and Persons of all the Released Claims that are satisfied, compromised, and settled pursuant to the Plan. Except as expressly set forth in the Plan, nothing in the Plan shall compromise or settle, in any way whatsoever, (x) any Causes of Action against any Excluded Party or any other Entity that is not a Released Party; (y) any Causes of Action that are preserved pursuant to Article IV.G of the Plan; or (z) any Causes of Action included on the Schedule of Retained Cause of Action.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, after the Effective Date, the applicable Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Debtors not previously Allowed (if any) and (2) claims (including Causes of Action) held by the Reorganized Debtors against other Entities.

## 2. Discharge of Claims and Termination of Interests

> **The discharge provisions set forth in Article VIII.B of the Plan are~~will be~~ binding on all Persons and Entities, and~~ are~~ enforceable through the injunction provisions set in Article VIII.G of the Plan.**

The complete text of Article VIII.B of the Plan is as follows:

Except as otherwise provided in the Plan, effective as of the Effective Date of each applicable Debtor: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the applicable Debtors or any of their assets, property, or estates; (b) the Plan shall bind all holders of Claims against Interests in the Debtors, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the applicable Reorganized Debtors, their successors and assigns and their assets and properties any other

Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

3.    **Release of Liens**

> **The lien release provisions set forth in Article VIII.C of the Plan ~~are~~will be binding on all Persons and Entities, and ~~are~~ enforceable through the injunction provisions set forth in Article VIII.G of the Plan.**

The complete text of Article VIII.C of the Plan is as follows:

Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document that is created, amended, ratified, entered into, or Reinstated pursuant to the Plan (including the New Debt Documents), on the Effective Date, concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New Debt Documents, and without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors:

1.    all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and each of their successors and assigns,

2.    the DIP Agent and the Prepetition Agents shall be directed (as if directed by the applicable percentage of lenders and/or noteholders required under the DIP Documents and the Prepetition Debt Documents) to release any such mortgages, deeds of trust, Liens, pledges, or other security interests held by such holder and to take such actions as may be requested by the Reorganized Debtors~~,~~ the New Revolver Facility Agent or the New Notes Indenture Trustees~~]~~ to evidence the release of such mortgages, deeds of trust, Liens, pledges, or other security interests, including the execution, delivery, and filing or recording of any related releases or discharges as may be requested by the Reorganized Debtors, the New Revolver Facility Agent or the New Notes Indenture Trustees, or as may be required in order to effectuate the foregoing, in each case, at the Reorganized Debtors' cost and expense, and

3.      the Reorganized Debtors (and any of their respective agents, attorneys, or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases, or such other forms or release documents in any jurisdiction as may be necessary or appropriate to evidence such releases and implement the provisions of this Article VIII.C, including, for the avoidance of doubt, with respect to the DIP Notes.

The presentation or filing of the Confirmation Order to or with any federal, state, local or non-U.S. agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, or other security interests.

### 4.      Releases

As set forth more fully in the definitions and articles of the Plan that are copied below, the Plan provides for the release of all Released Claims against all Released Parties. These releases apply to Released Claims held by the Debtors themselves, by the Reorganized Debtors, by the Debtors' Estates, and by the Releasing Parties.

### a.      *Released Claims*

As set forth below, the "Released Claims" include a wide range of claims and other rights that relate to the Debtors, the Debtors' debt financing agreements, and other aspects of the Restructuring. The "Released Claims" expressly include derivative claims assertable by or on behalf of a Debtor or its estate; known and unknown claims; foreseen and unforeseen claims; fixed and contingent claims; matured and unmatured claims; disputed and undisputed claims; liquidated and unliquidated claims; existing claims and claims that arise later; and claims that may be asserted in law, equity, or otherwise.

The complete definition of "Released Claims" is as follows:

the Causes of Action released under Article VIII.D and Article VIII.E [of the Plan].

The full text of Article VIII.D and Article VIII.E of the Plan is set forth below.

### b.      *Released Parties*

As set forth below, the "Released Parties" include the Debtors, the Reorganized Debtors, and many of the key stakeholders of the Debtors who have participated in the Debtors' Restructuring or the Chapter 11 Cases.

The complete definition of "Released Parties" is as follows:

collectively, the Releasing Parties; *provided* that no Excluded Party shall be a Released Party.

The complete definition of "Excluded Party" is as follows:

> any Entity that (a) elects to opt out of the Third-Party Release, if permitted to opt out; (b) files with the Bankruptcy Court an objection to the Plan, including the Third-Party Release or the Debtor Release, that is not consensually resolved before Confirmation, or supports any such objection or objector; or (c) is designated as an Excluded Party pursuant to the Plan Supplement; *provided* that (i) no Initial Consenting Party and (ii) none of the Committee, its members or any advisor thereto or related party shall be an Excluded Party pursuant to the foregoing clause (c).

"Initial Consenting Party" means each Consenting 1L Noteholder, Consenting 1.25L Noteholder and Consenting Equity Holder that is party to the Restructuring Support Agreement as of the date of its execution, [•], 2023.

### c.   *Entities Bound by Releases*

The releases set forth in Article VIII.D of the Plan are binding on the Debtors, their Estates, and the Reorganized Debtors.

**The Third-Party Release set forth in Article VIII.E of the Plan is binding on all Releasing Parties.** You will be a Releasing Party if you vote to accept the Plan. You will also be a Releasing Party if you do not affirmatively opt out of granting the Third-Party Release by following the procedures set forth on your Ballot or Non-Voting Status Notice and submitting your Ballot or Non-Voting Status Notice by the Voting Deadline.

The complete definition of "Releasing Parties" is as follows:

> collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each non-Debtor affiliate; (d) [reserved]each of the Consenting 1L Noteholders, the Consenting 1.25L Noteholders and the Consenting Equity Holders; (e) the Committee and its members; (f) the DIP Purchasers; (fg) Wilmington Savings Fund Society, FSB, in its capacity as current and/or former indenture trustee, notes agent and collateral agent, as applicable, under the DIP Notes Purchase Agreement, the 1L Indenture, the 1.25L Indenture, the Unsecured Notes Indentures and the PIK Notes Indenture; (g) the ABL Agent; (h) the ABL Agent and the ABL Lenders; (i) the New Revolver Facility Agent and the New Revolver Facility Lenders; (ij) the New Notes Indenture Trustees; (jk) each holder of Claims or Interests that is entitled to vote on the Plan and either (i) votes to accept the Plan, (ii) abstains from voting on the Plan and does not elect to opt out of the Third-Party Release, or (iii) votes to reject the Plan and does not elect to opt out of the Third-Party Release; (kl) each holder of Claims or Interests that is deemed to reject or presumed to accept the Plan but does not elect to opt out of the Third-Party Release;

(*l*m) with respect to each of the Entities in the foregoing clauses (a) through (k*l*), each such Entity's current and former Related Parties; *provided* that no holder that votes to accept the Plan shall be entitled to opt out of the Third-Party Release; *provided*, *further*, that, if any holder of a Claim or Interest does not elect to opt out of the Third-Party Release in any of its capacities, such holder and each of its Related Parties that is also a holder of a Claim or Interest shall be deemed to have not opted out of the Third-Party Release in all capacities.

### d.  *How to Opt Out*

You may opt out of granting the Third-Party Release by (a) voting to **reject** the Plan or declining to vote on the Plan **and** (b) checking the opt-out box on your Ballot or Non-Voting Status Notice. You must then submit your Ballot or Non-Voting Status Notice to the Solicitation Agent so that it is **actually received** on or before the Voting Deadline. If you opt out of consenting to the Third-Party Release as a "Releasing Party," you will also not be a "Released Party" and will not ~~benefit as a releasee~~be released from claims under the Debtor Release or the Third-Party Release.

If you vote to accept the Plan, you may not opt out of granting the Third-Party Release, and any attempt to do so (including by checking the opt-out box on your Ballot) will be disregarded.

### e.  *Releases by the Debtors: Full Text*

The complete text of Article VIII.D of the Plan is as follows:

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each of the Released Parties shall be expressly, absolutely, unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and each of their Estates from any and all Causes of Action, including any derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, any Causes of Action that any Debtor, Reorganized Debtor, or any of their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually or collectively) ever had, now have, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (i) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (except to the

extent the Debtors or Reorganized Debtors retain Intercompany Claims for accounting or tax purposes), the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the Global Settlement, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Definitive Documents, the DIP Financing, the New Exit Notes, the New Takeback Notes, the New Revolver Facility, the New Common Equity, the Disclosure Statement, or the Plan, including the Plan Supplement; (ii) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the DIP Financing, the use of cash collateral authorized under the DIP Orders and the adequate protection granted in connection therewith, the New Exit Notes, the New Takeback Notes, the New Revolver Facility, the New Common Equity, the Disclosure Statement, or the Plan, including the Plan Supplement; (iii) the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (iv) the assumption, rejection, or amendment of any Executory Contract and/or Unexpired Lease; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected through the Restructuring (including pursuant to the Plan) or classified in the Plan; (vi) the filing or administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; (vii) the 2022 Financing Transactions, the 2022 Financing Litigation or the settlement thereof, including pursuant to the Global Settlement; or (viii) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing, including the 1L Indenture, 1.25L Indenture, 2024 Unsecured Indenture, 2026 Unsecured Notes Indenture, 2027 Unsecured Notes Indenture, the PIK Notes Indenture, or the ABL Credit Agreement and including any amendments to the foregoing and all matters relating thereto.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release, and the Reorganized Debtors shall retain, (a) to the extent that any Causes of Action

against the Debtors are not released or discharged pursuant to the Plan, any rights of the Debtors to assert any and all counterclaims, crossclaims, offsets, indemnities, claims for contribution, defenses, and similar claims in response to such Causes of Action, (b) any Cause of Action set forth in the Schedule of Retained Causes of Action, (c) any Cause of Action unknown to the Debtors as of the Effective Date that arises out of actual fraud, or gross negligence of an Entity other than a Debtor, (d) any Cause of Action against any Excluded Party, (e) any post-Effective Date obligations of any Entity under the Plan, any Restructuring Transaction, any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument or agreement executed to implement the Plan, (f) any Cause of Action that is of a commercial nature and arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed, (g) any Cause of Action arising from any obligations owed to the Debtors pursuant to an Executory Contract and/or Unexpired Lease that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date, or (h) any Cause of Action against a holder of a Disputed Claim to the extent necessary to administer and resolve such Disputed Claim solely in accordance with this Plan.

**f.**    *Releases by Holders of Claims (Third-Party Release): Full Text*

> **The release provisions set forth in Article VIII.E of the Plan will be binding on all Releasing Parties, as defined herein, and enforceable through the injunction provisions set forth at Article VIII.G of the Plan.**
>
> **Holders of Claims or Interests in the Voting Classes should refer to 4Section IVV.HD.43 of this Disclosure Statement for further information regarding these release provisions, including instructions to opt out from being a Releasing Party.**

The complete text of Article VIII.E of the Plan is as follows:

> **As of the Effective Date, each of the Releasing Parties (other than the Debtors) shall be deemed to have expressly, absolutely, unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged each of the Released Parties from any and all Causes of Action, including any derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, and any Causes of Action asserted or assertable by or on behalf of the holder of any**

Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties (whether individually or collectively) ever had, now have, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (i) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the Global Settlement, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Definitive Documents, the DIP Financing, the New Exit Notes, the New Takeback Notes, the New Revolver Facility, the New Common Equity, the Disclosure Statement, or the Plan, including the Plan Supplement; (ii) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the DIP Financing, the use of cash collateral authorized under the DIP Orders and the adequate protection granted in connection therewith, the New Exit Notes, the New Takeback Notes, the New Revolver Facility, the New Common Equity, the Disclosure Statement, or the Plan, including the Plan Supplement; (iii) the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (iv) the assumption, rejection, or amendment of any Executory Contract and/or Unexpired Lease; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected through the Restructuring (including pursuant to the Plan) or classified in the Plan; (vi) the filing or administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; (vii) the 2022 Financing Transactions, the ~~2022~~ Financing Litigation or the settlement thereof, including pursuant to the Global Settlement; or (viii)

any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing, including the 1L Indenture, 1.25L Indenture, 2024 Unsecured Indenture, 2026 Unsecured Notes Indenture, 2027 Unsecured Notes Indenture, the PIK Notes Indenture, or the ABL Credit Agreement and including any amendments to the foregoing and all matters relating thereto (collectively, the "*Covered Released Matters*").

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release (a) to the extent that any Causes of Action against any Releasing Party are not released or discharged pursuant to the Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, offsets, indemnities, claims for contribution, defenses, and similar claims in response to such Causes of Action (*provided* that, except as set forth in Article V.D.2, no such counterclaims, crossclaims, offsets, indemnities, claims for contribution, defenses, or similar claims may be asserted against the Debtors, or the Reorganized Debtors or any Related Party of the Reorganized Debtors to the extent such claims have been released or discharged pursuant to the Plan), (b) any Cause of Action (other than any Cause of Action against the Debtors, the Reorganized Debtors, or any Related Party of the Reorganized Debtors) unknown to such Releasing Party as of the Effective Date that arises out of actual fraud, or gross negligence of an Entity other than such Releasing Party, (c) any Cause of Action against any Excluded Party, or (d) any post-Effective Date obligations of any Entity under the Plan, any Restructuring Transaction, any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument or agreement executed to implement the Plan.

5. **Exculpation**

> The exculpation provisions set forth in Article VIII.F of the Plan will be binding on all Persons and Entities, and enforceable through the injunction provisions set forth at Article VIII.G of the Plan.

a. *Summary of Exculpation*

As set forth more fully in the text of Article VIII.F of the Plan (copied below), the Plan exculpates the Debtors and certain other fiduciaries from liability in connection with the administration of the Chapter 11 Cases and certain other aspects of the Restructuring, unless

such a Person is found by a court of competent jurisdiction to have committed an act or omission that constitutes gross negligence, willful misconduct, or actual fraud. This article also permits any Exculpated Party to rely reasonably on the advice of counsel with respect to the Exculpated Party's duties and responsibilities and incorporates a finding that the Solicitation has been conducted in good faith.

### b.   *Exculpated Parties*

The complete definition of "Exculpated Parties" is as follows:

> collectively, and in each case in their capacities as such and, in each case, to the maximum extent permitted by law: (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Committee and its members, ~~and~~ (iv) any independent director of a Debtor (including Patrick Bartels as independent director of Wolverine Intermediate Holding) and (v) in each case, the Retained Professionals of the foregoing.

### c.   *Entities Bound by Exculpation Provisions*

All Persons and Entities are bound by the exculpation provisions set forth in Article VIII.F of the Plan.

### d.   *Exculpation: Full Text*

The complete text of Article VIII.F of the Plan is as follows:

> Without affecting or limiting the releases set forth in Article VIII.D and Article VIII.E of the Plan, and notwithstanding anything in the Plan to the contrary, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Financing; the Restructuring Support Agreement; the New Exit Notes, the New Takeback Notes; the New Revolver Facility; the Plan (including the Plan Supplement); the Disclosure Statement; the ~~2022~~ Financing Litigation; the Restructuring Transactions; the solicitation of votes for, or confirmation of the Plan; any settlement or other acts approved by the Bankruptcy Court; the funding of the Plan; Consummation of the Plan; the administration and implementation of the Plan or the property to be distributed under the Plan; the issuance or distribution of securities under or in connection with the Plan; the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors under or in connection with the Plan; or the transactions in furtherance of any of the foregoing (collectively, the "*Covered Exculpation Matters*"); *provided* that

the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan (including the Plan Supplement), the New Financing, any Restructuring Transaction, or any Definitive Document, or other document, instrument, or agreement executed to implement the Plan.

Each Exculpated Party shall be entitled in all respects to rely reasonably (and to have relied reasonably) on the advice of counsel with respect to the Exculpated Party's duties and responsibilities. The Exculpated Parties have, and upon implementation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

The exculpations set forth in this Article VIII.F do not apply to any Causes of Action arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted gross negligence, willful misconduct, or actual fraud on the part of the Exculpated Party.

**6.** ~~Injunction~~Injunctions

> **The injunctions set forth in Article VIII.G of the Plan will be binding on all Persons and Entities, and will enjoin certain conduct not otherwise enjoined under the Bankruptcy Code.**

### a.    *Summary*

As set forth more fully in the text of Article VIII.G of the Plan (copied below), the Plan enjoins (i.e., forbids) all Persons and Entities from interfering with the implementation or consummation of the Plan. The Plan also enjoins (i.e., forbids) all Persons and Entities from taking a wide range of actions in defiance of the release and exculpation provisions set forth above. These injunctions extend to protect the Debtors, the Reorganized Debtors, the Released Parties, the Exculpated Parties, and all of their successors. Each of these injunctions will be incorporated into the Confirmation Order and will be effective upon entry of the Confirmation Order. Any Person or Entity that subsequently violates the injunctions as set forth in the Confirmation Order may be held in contempt by the Bankruptcy Court and may be subject to

(among other things) monetary damages (including legal fees, legal costs, other compensatory damages and punitive damages) and disallowance of Claims.

     **b.**    *Full Text*

The complete text of Article VIII.G of the Plan is as follows:

> **Upon entry of the Confirmation Order, all Persons and Entities shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan, or the vesting of the Estates' assets in, and the enjoyment of such assets by, the Reorganized Debtors pursuant to this Plan.**
>
> **Except as otherwise expressly provided in this Plan or in the Confirmation Order, upon entry of the Confirmation Order, all Persons and Entities are permanently enjoined, from and after the Effective Date, from commencing or continuing any action, the employment of process, or any other act, to pursue, collect, recover or offset any Claim, Interest, debt, obligation or Cause of Action (including, for the avoidance of doubt, the ~~2022~~ Financing Litigation) that has been extinguished, discharged, released or made subject to exculpation under this Plan (the "*Covered Matters*"), whether against the Debtors, the Reorganized Debtors, (solely with respect to the Releasing Parties) the Released Parties, or the Exculpated Parties (the "*Covered Entities*"). The acts enjoined by the foregoing injunction include any act to:**
>
> > **1.    enforce, attach, collect, or recover by any manner or means any judgment, award, decree, or order against a Covered Entity or any of the property or interests in property of a Covered Entity on account of or in connection with or with respect to any Covered Matter;**
> >
> > **2.    create, renew, perfect, or enforce any lien or encumbrance of any kind against a Covered Entity or any of the property or interests in property of a Covered Entity on account of or in connection with or with respect to any Covered Matter; or**
> >
> > **3.    assert any right of setoff, subrogation, or recoupment of any kind against any obligation due from a Covered Entity or from any of the property or interests in property of a Covered Entity on account of or in connection with or with respect to any Covered Matter, unless the Person or Entity holding such setoff, subrogation or recoupment right has asserted such a right and has expressly stated its intent to preserve its right in a document filed with the Bankruptcy Court**

and served on the Debtors and the applicable Covered Entity no later than the earlier of (x) 28 days after entry of the Confirmation Order and (y) the Effective Date.

Without limiting the generality of the foregoing, no Entity shall treat, or cause any other Entity to treat, any stock (within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended) of any Debtor held by any 50-Percent Shareholder as "becoming worthless" (within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended), with respect to any taxable year ending prior to the Effective Date.

With respect to any Covered Entity, no Entity or Person may commence or continue any action, employ any process, or take any other act to pursue, collect, recover or offset any Claim, Interest, debt, obligation, or Cause of Action relating or reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Covered Released Matter, Covered Matter, or Covered Exculpation Matter (including one that alleges the actual fraud, gross negligence, or willful misconduct of a Covered Entity), unless expressly authorized by the Bankruptcy Court after (1) it determines that, after notice and a hearing, such Claim, Interest, debt, obligation, or Cause of Action is colorable and (2) it specifically authorizes such Entity or Person to bring such Claim or Cause of Action. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether any such Claim, Interest, debt, obligation, or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate such underlying colorable Claim, Interest, debt, obligation, or Cause of Action.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any Entity from bringing an action to enforce the terms of this Plan, the Confirmation Order, the Restructuring Support Agreement, any other Definitive Document, or other document, instrument, or agreement executed to implement this Plan, the Confirmation Order, the Restructuring Support Agreement or any other Definitive Document. The injunctions set forth in this Article VIII.G shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, the Exculpated Parties and all of their respective property and interests in property.

7.      **Subordination Rights**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

I.      CONDITIONS TO EFFECTIVE DATE

1.      **The Conditions**

These are the conditions to each Debtor's Effective Date, which must be satisfied or waived in accordance with Article IX.B of the Plan) at or before Consummation of the Plan:

1.      the Final DIP Order shall be in full force and effect, and there shall be no default or event of default existing under the DIP Notes;

2.      the Bankruptcy Court shall have entered the Confirmation Order and any other order required to approve any Definitive Document, which shall be Final Orders and in form and substance acceptable to the Debtors and ~~reasonably acceptable in all material respects to~~ the Required Consenting 1L Noteholders and consistent with the Specified Creditor Consent Rights (solely to the extent applicable);

3.      all governmental and regulatory approvals, consents, authorizations, rulings, or other documents that are necessary to implement and effectuate the Plan, including those that are legally required for the consummation of the Restructuring (including, for the avoidance of doubt, any approvals required in connection with the transfer, change of control, or assignment of permits and licenses held by the applicable Debtor, unless such permits or licenses are abandoned), shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended) or applicable review periods under non-U.S. antitrust law shall have expired;

4.      the final version of the Plan, including all schedules, supplements, and exhibits thereto, including in the Plan Supplement (including all documents contained therein), shall be (a) except as otherwise provided in the Restructuring Support Agreement, in form and substance ~~reasonably~~ acceptable ~~in all material respects~~to the Debtors and to the Required Consenting 1L Noteholders and (b) consistent with the Specified Creditor Consent Rights (solely to the extent applicable);

5.      all Definitive Documents (including all documents in the Plan Supplement) to be executed, delivered, assumed, or performed upon or in

connection with Consummation shall have been (or shall, contemporaneously with the occurrence of the Effective Date, be) (a) executed and in full force and effect, delivered, assumed, or performed, as the case may be, and in form and substance consistent with the Restructuring Support Agreement (including consistent with the Specified Creditor Consent Rights (solely to the extent applicable)), and the Required Consenting 1L Noteholders shall have consented in writing to the form thereof in accordance with their consent rights set forth in the Restructuring Support Agreement; (b) to the extent required, filed with the applicable Governmental Units in accordance with applicable law; and (c) any conditions precedent contained in such documents shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially contemporaneously with or after Consummation of the Plan;

6.   there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

7.   all financing necessary for the Plan shall have been obtained, and any documents related thereto, including the New Debt Documents, shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto having been satisfied or waived, except with respect to such conditions that by their terms shall be satisfied contemporaneously with or after Consummation of the Plan);

8.   all conditions to the transfer and/or issuance of the New Common Equity shall have occurred;

9.   the Restructuring Transactions shall have been (or shall, contemporaneously with the occurrence of the Effective Date, be) implemented in a manner consistent in all material respects with the Plan and in all respects with the Restructuring Support Agreement;

10.  the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or estimated in good faith to be incurred, through the Effective Date, in accordance with and subject to Article II.B of the Plan;

11.  the Professional Fee Escrow Account shall have been established and funded in full, in Cash, in accordance with, and subject to Article II.C of the Plan;

12.  the 2022 Financing Litigation shall have been resolved, pursuant to one or more Final Orders (which may include the Confirmation Order), in a form and manner satisfactory to the Debtors and the Required Consenting 1L Noteholders, each in their sole and absolute discretion (and in a manner consistent with the 1.25L Noteholder Consent Rights (solely to the extent applicable)); and

13. no notice of termination or breach shall have been delivered by the Required Consenting 1L Noteholders under the Restructuring Support Agreement or any Definitive Document in accordance with the terms thereof, and noneither the Restructuring Support Agreement nor any Definitive Document shall have otherwise been terminated.

## 2. Waiver of Conditions

The conditions to the Effective Date set forth in Article IX of the Plan may be waived, without notice, leave, or order of the Bankruptcy Court, only by the Debtors with the consent of the Required Consenting 1L Noteholders (not to be unreasonably withheld)and in a manner consistent with the Specified Creditor Consent Rights (solely to the extent applicable); *provided* that (a) condition 10 may be waived by the Debtors with the consent of the applicable Restructuring Professional(s) and (b) condition 11 may be waived by the Debtors and the Committee. If any such condition precedent is waived pursuant to this section and the Effective Date occurs, the Debtors shall be estopped from withdrawing such waiver after the Effective Date, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur with respect to such Debtors.

## J. MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

### 1. Modification and Amendments

The Debtors reserve the right to (a) modify the Plan, with the consent of the Required 1L Noteholders in material respects (not to be unreasonably withheld), whether such modification is material or immaterial, andwith the consent of the Required Consenting 1L Noteholders and in a manner consistent with the Specified Creditor Consent Rights (solely to the extent applicable) and (b) seek Confirmation consistent with the Bankruptcy Code. Subject to those restrictions on modifications set forth in the Plan, the Restructuring Support Agreement, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each Debtor expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, in material respects with the consent of the Required Consenting 1L Noteholders (not to be unreasonably withheldand in a manner consistent with the Specified Creditor Consent Rights (solely to the extent applicable).

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court, provided that such technical

adjustments and modifications do not adversely affect the treatment of holders of Allowed Claims or Allowed Interests under the Plan.

### 2. Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since its solicitation are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal

The Debtors reserve the right to revoke or withdraw the Plan, in consultation with the Committee, with respect to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan or Confirmation does not occur, then (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts and/or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity; or (iv) be used by the Debtor or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims. For the avoidance of doubt, the foregoing sentence shall not be construed to limit or modify any rights under the Restructuring Support Agreement.

## K. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and Consummation of the Plan, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2. adjudicate all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Retained Professionals pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract and/or Unexpired Lease to which the Debtors are party or with respect to which the Debtors

may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract and/or Unexpired Lease that is assumed, or assumed and assigned; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, the Executory Contracts and Unexpired Leases to the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.　　ensure that distributions are accomplished pursuant to the provisions of the Plan;

5.　　adjudicate any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.　　adjudicate any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.　　enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement;

8.　　enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.　　resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.　　issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.　　hear and determine any cases, controversies, suits, disputes, or Causes of Action involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.　　resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of

additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.E of the Plan;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter any order or final decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    adjudicate matters concerning state, local, federal, and foreign taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.    adjudicate whether and in what amount a Claim or Interest is Allowed;

21.    adjudicate matters related to the DIP Financing and the DIP Orders;

22.    recover all assets of the Debtors and property of the Estates, wherever located;

23.    adjudicate any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a Cure, in each case, for the purpose of determining whether a Claim or Interest is discharged under the Plan or for any other purpose;

24.    adjudicate any rights, claims, or Causes of Action held by, or accruing to, the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, but not limited to, those set forth on the Schedule of Retained Causes of Action;

25.    enforce all orders previously entered by the Bankruptcy Court;

26.    adjudicate any Cause of Action against any independent director of a Debtor (including Patrick Bartels as independent director of Wolverine Intermediate Holding) arising out of or related to a Covered Exculpation Matter to the maximum extent permitted by law;

27.     adjudicate the ~~2022~~ Financing Litigation; and

28.     adjudicate any other matter as to which the Bankruptcy Court has jurisdiction.

Notwithstanding the foregoing, the New Organizational Documents, the New Debt Documents and any other documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection, and dispute resolution clauses that may be set forth in those documents.

## L.   MISCELLANEOUS PROVISIONS

### 1.   Effect of Plan

#### a.   *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect as to a Debtor if the Effective Date does not occur as to such Debtor. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before Consummation.

#### b.   *Immediate Binding Effect*

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and enforceable and binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject to, the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to Executory Contracts and/or Unexpired Leases and any other prepetition agreements.

#### c.   *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan; provided that the Restructuring Support Agreement shall remain in full force and effect in accordance with its respective terms.

#### d.   *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or

assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### e.    *Termination of Injunctions and Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. For the avoidance of doubt, (a) upon the Effective Date, the automatic stay pursuant to Bankruptcy Code section 362 of any litigation proceedings against or involving the applicable Debtors shall terminate and (b) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### f.    *Votes Solicited in Good Faith*

Upon Confirmation, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

### g.    *Dissolution of the Committee*

On the Effective Date with respect to the Plan, the Committee shall be deemed to have been dissolved, and its members, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to any continuing confidentiality obligations and for the limited purposes of, if applicable, prosecuting requests for allowance of compensation of and reimbursement of expenses incurred by the Committee or its Retained Professionals prior to the Effective Date.

### h.    *Closing of Chapter 11 Cases*

On and after the Effective Date, all of the Chapter 11 Cases of the Debtors shall be deemed closed except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters and adversary proceedings relating to any of the Debtors (including Claim objections) shall be administered and heard in such Chapter 11 Case, irrespective of whether the contested matter or adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed. Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to change the name of the remaining Debtor and case

caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

The Reorganized Debtors may at any time seek to close any remaining Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 2.    Contents of Plan

#### a.    *Exhibits*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with Consummation of the Plan) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

#### b.    *Non-Severability*

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Required Consenting 1L Noteholders and in a manner consistent with the Specified Creditor Consent Rights (solely to the extent applicable)), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. Confirmation shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent of the Debtors or the Reorganized Debtors, consistent with the terms set forth herein; and (c) non-severable and mutually dependent.

#### c.    *Conflicts*

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of a conflict between the Plan (excluding the Plan Supplement) and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

### 3.     Notices

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, or the Reorganized Debtors, shall be served on:

Wesco Aircraft Holdings, Inc.
2601 Meacham Blvd., Suite 400
Fort Worth, TX  76137
Attn: Dawn Landry

with a copy to:

Milbank LLP
55 Hudson Yards
New York, NY  10001
Attention:     Dennis F. Dunne
               Samuel A. Khalil
               Benjamin M. Schak
Email:         DDunne@Milbank.com
               SKhalil@Milbank.com
               BSchak@Milbank.com

~~And~~and with ~~a copy~~copies to the First Lien Noteholder Group, Carlyle and Sponsor, each delivered to~~:~~

~~Davis Polk & Wardwell LLP~~
~~450 Lexington Avenue~~
~~New York, New York 10017~~
~~Attention:~~     ~~Damian S~~ the addresses specified in the Plan.~~chaible~~
               ~~Angela M. Libby~~
               ~~Stephanie Massman~~
~~Email:~~        ~~damian.schaible@davispolk.com~~
               ~~angela.libby@davispolk.com~~
               ~~stephanie.massman@davispolk.com~~

After entry of the Confirmation Order, the Debtors shall notify all Persons entitled to notice of filings in the Chapter 11 Cases that each such Person (other than the U.S. Trustee) must file a renewed request pursuant to Bankruptcy Rule 2002 in order to continue to receive documents that are filed after the Effective Date. After service of that notice and Consummation of the Plan, the Reorganized Debtors shall be authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the Reorganized Debtors, the U.S. Trustee and those Persons that have filed renewed requests.

*[Remainder of page intentionally blank]*

## SECTION V.
### VOTING PROCEDURES AND REQUIREMENTS

**A.   WHO MAY VOTE**

**1.   Voting Classes**

As explained above at Section IV.B.1.b (entitled "Standards for Acceptance of a Plan"), the Bankruptcy Code does not provide all holders of claims and interests the right to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not Impaired by a plan are conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "Impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof, or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. Creditors and equity interest holders whose claims or interests are Impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.

**2.   Voting Record Date**

Consistent with the provisions of Bankruptcy Rule 3018(b), the Debtors have fixed January 29, 2024 as the "*Voting Record Date*" for the determination of holders of Claims entitled to vote to accept or reject the Plan.

**3.   Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Entity acting in a fiduciary or representative capacity, that Entity must indicate such capacity when signing. If requested by the Debtors, the signing Entity will be required to submit evidence satisfactory to the Debtors of its authority to so act. Each authorized signatory must submit a separate Ballot for each holder on whose behalf the authorized signatory is voting.

**B.   VOTING DEADLINE**

Each Ballot must be submitted to and ***actually received by*** the Solicitation Agent at or before the Voting Deadline (***5:00 p.m. (Central Standard Time) on February [•], 2024***), unless the Debtors extend the Voting Deadline. Except to the extent requested by the Debtors, in their sole discretion, or as ordered by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, no Ballot received by the Solicitation Agent after the Voting Deadline will be counted or otherwise used in connection with the Debtors' request for confirmation of the Plan.

The Debtors expressly reserve the right to extend the Voting Deadline by oral or written notice to the Solicitation Agent. The Debtors may extend the Voting Deadline an unlimited number of times, may extend the Voting Deadline by any increment, and may extend the Voting Deadline retroactively. The Debtors will have no obligation to publish, advertise, or otherwise communicate any such extension, other than by notifying each of the Prepetition Indenture Trustees in their respective facilities, posting a notice on the Solicitation Agent's website at ~~https://www.KCCLLC.net/Incora~~https://www.kccllc.net/Incora, and filing a notice of the extension with the Bankruptcy Court.

The Debtors offer no assurance that they will exercise their right to extend the Voting Deadline, and votes may not be transmitted orally, by fax, by email (except for Master Ballots submitted via email), or by any other means not approved by the Court. Accordingly, each eligible holder of a Claim or Interest is urged to return its completed and signed Ballot promptly.

## C.  ESTABLISHING CLAIM AMOUNTS FOR VOTING PURPOSES

The Claim amount established by the Solicitation and Voting Procedures shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on any Ballot by the Debtors through the Solicitation Agent or the holder of the Claim, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the following hierarchy will be used to determine the amount of the Claim associated with each claimant's vote:

a. the Claim amount: (i) specified in the Solicitation and Voting Procedures; (ii) settled and/or agreed by the Debtors, as reflected in a document filed with the Court; (iii) set forth in an order of the Court; or (iv) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b. the Claim amount Allowed pursuant to a Resolution Event under the procedures set forth in the Solicitation and Voting Procedures;

c. the Claim amount contained in a Proof of Claim that has been timely filed (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that Ballots cast by holders of Claims who timely file a Proof of Claim in respect of a contingent Claim (for example, a claim based on pending litigation) or in a wholly-unliquidated or unknown amount based on a reasonable review of the Proof of Claim and supporting documentation by the Debtors or their advisors that is not the subject of an objection will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 for the purposes of satisfying the amount requirement of section 1126(c) of the Bankruptcy Code, and, if a Proof of Claim is filed as partially liquidated and partially unliquidated, such Claim will be counted for voting purposes only in the liquidated amount; *provided, further*, that, to the extent the Claim amount contained in the Proof of

Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the Proof of Claim;

d.   the Claim amount listed in the Schedules, so long as the Claim (i) is not scheduled as contingent, disputed, or unliquidated and/or has not been paid (in which case, such contingent, disputed, or unliquidated scheduled Claim shall be disallowed for voting purposes) and (ii) has not been superseded by a timely Proof of Claim; and

e.   if none of the foregoing applies to a Claim, the Claim will be disallowed for voting purposes.

If a Proof of Claim is amended, the last timely Proof of Claim shall be subject to these rules and will supersede any earlier Claim, which will then be disallowed for voting purposes.

The voting amounts for the 1~~L Notes Claims, 1.25~~L Notes Claims, 2026 Unsecured Notes Claims, 2024 Unsecured Notes Claims, and the 2027 Unsecured Notes ~~Claims, and the 1L Notes Deficiency~~ Claims (collectively, the "*Notes Claims*") will be the principal amount of the respective Notes held by each corresponding, directly registered holder as of the Voting Record Date, as evidenced on the books and records of the respective indenture trustees or, as the case may be, in the amount of Notes Claims held by each Beneficial Holder through its Nominee (as defined below) as of the Voting Record Date, as evidenced by the securities position report(s) from the Depository Trust Company ("*DTC*").

## D.   VOTING PROCEDURES

### 1.   Ballot Submission

Each Ballot enclosed with this Disclosure Statement is marked with the Class in which the corresponding Claim has been placed under the Plan. All votes to accept or reject the Plan must be cast by properly submitting the duly completed and executed Ballot in accordance with the instructions set forth on the applicable Ballot. If you wish to vote on the Plan, you must complete and sign your Ballot in accordance with the instructions printed on the Ballot, being sure to check one (and only one) of the boxes labeled "**Accept** (vote **for**) the Plan as to each Debtor" or "**Reject** (vote **against**) the Plan as to each Debtor." Any executed Ballot that does not indicate either acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted.

Each holder of multiple Claims within a single Class must vote each of its Claims within that Class either to accept or to reject the Plan and may not split its vote. If a holder of Claims holds multiple Claims within a particular Class, the Debtors may, in their discretion, instruct the Solicitation Agent to aggregate that holder's Claims within the applicable Class for the purpose of counting votes.

As set forth in greater detail on each Ballot's instructions, each Ballot may be submitted in paper form or electronically through the Solicitation Agent's e-ballot portal (an "*E-Ballot*").

Each non-Notes Claims Ballot and Record Holder Ballot may alternatively be submitted electronically as an E-Ballot; *provided that* each voting holder of a Claim submitting such a Ballot may choose either method at its own risk and should allow sufficient time for timely delivery by the Voting Deadline. For holders who choose to submit their Ballots in paper form, the Debtors recommend using an air courier with guaranteed next-day delivery. Ballots will ***not*** be accepted by fax, email, or other means; *provided that* Master Ballots may be submitted by email in accordance with the Master Ballot's instructions.

If you are entitled to vote and you did not receive a correct Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent through its website at www.kccllc.net/incora/inquiry or by phone at (888) 251-2937 (U.S./Canada) or +1 (310) 751-2613 (International).

### 2. Ballot Submission by Beneficial Noteholders and Their Nominees

#### a. *Record Holders*

A beneficial holder of a Notes Claim that holds a Claim as a record holder in its own name should vote on the Plan by completing and signing a Ballot (a "*Record Holder Ballot*") and returning it directly to the Solicitation Agent on or before the Voting Deadline. The voting amounts of any record holder of a Claim will be the amounts set forth on the books and records of the applicable indenture trustee as of the Voting Record Date.

#### b. *Beneficial Holders Holding Through DTC Nominees*

##### i. *Beneficial Holders*

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to Beneficial Holders of Notes Claims who hold their position through a broker, bank, or other nominee or an agent of a broker, bank, or other nominee (each of the foregoing, a "*Nominee*"). A beneficial holder that holds its claim in "street name" through a Nominee (a "*Beneficial Holder*") may vote on the Plan through one of the following two methods, as selected by the Beneficial Holder's Nominee:

- Each Beneficial Holder that holds its Claim through a particular Nominee will complete and sign a Ballot (a "*Beneficial Holder Ballot*") and return it to its Nominee, in the manner directed by the Nominee and according to any deadline prescribed by the Nominee to ensure that the Nominee can collect and review Beneficial Holder Ballots and return a completed "master" ballot (a "*Master Ballot*") to the Solicitation Agent by the Voting Deadline.

  *or*

- Each Beneficial Holder that holds its Claim through a particular Nominee will receive a pre-validated Beneficial Holder Ballot from its Nominee, which the Beneficial Holder must return directly to the Solicitation Agent by the Voting Deadline.

If it is a Nominee's customary practice to forward solicitation information to Beneficial Holders and to collect votes from them by voter information form ("*VIF*"), email, telephone or other means of communication, the Nominee may employ that method instead of sending a paper Beneficial Holder Ballot and Solicitation Package.

No Beneficial Holder Ballot delivered to a Nominee will be counted unless the Nominee properly delivers to the Solicitation Agent, by the Voting Deadline, either (a) that Beneficial Holder Ballot with proper validation or (b) a Master Ballot that incorporates the Beneficial Holder's vote and (if applicable) other elections.

If a Beneficial Holder holds Claims through more than one Nominee or through multiple accounts, it may receive more than one Beneficial Holder Ballot. It should then execute a separate Beneficial Holder Ballot for each block of Claims that it holds through a Nominee and return each such Beneficial Holder Ballot to the appropriate Nominee.

Votes cast by Beneficial Holders through Nominees will be applied to the positions held by those Nominees, as of the Voting Record Date, as evidenced by securities position reports obtained from the Depository Trust Company. Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of recorded Claims held by the Nominee as of the Voting Record Date.

      ii.   *Nominees*

A Nominee that is the DTC account holder of Claims on behalf of one or more Beneficial Holders shall obtain votes and other elections from those Beneficial Holders consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

- *Pre-Validated Ballots.* The Nominee may "pre-validate" a Beneficial Holder Ballot by (a) signing the Beneficial Holder Ballot; (b) indicating on the Beneficial Holder Ballot the amount and the account number of the Claims held by the Nominee for the particular Beneficial Holder; and (c) forwarding the Beneficial Ballot, together with the Disclosure Statement, a postage-paid return envelope pre-addressed to the Solicitation Agent, and other materials requested to be forwarded, to the Beneficial Holder for voting. The Beneficial Holder must then complete the information requested in the Beneficial Ballot and return the Beneficial Ballot directly to the Solicitation Agent in the pre-addressed, postage-paid return envelope so that it is received by the Solicitation Agent on or before the Voting Deadline. A list of the Beneficial Holders to whom "pre-validated" Beneficial Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

- *Master Ballots.* The Nominee may obtain the votes of Beneficial Holders by forwarding to each Beneficial Holder an unsigned Beneficial Holder Ballot through mail, VIF, email, or any other reliable and customary method of collecting votes from a Beneficial Holder, together with the Disclosure Statement, a postage-paid return envelope addressed to the

Nominee (in the case of a physical mailing), and other materials requested to be forwarded. Each such Beneficial Holder must then indicate its vote and other elections on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee. If it is accepted practice for a Nominee to collect votes through a VIF, email, or other method, the Beneficial Holder shall follow the Nominee's instruction for completing and submitting its votes to the Nominee. After collecting the Beneficial Holders' votes, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holders, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is received by the Solicitation Agent at or before the Voting Deadline. All Beneficial Ballots returned by Beneficial Holders should either be forwarded to the Solicitation Agent along with the Master Ballot or retained by the Nominee for inspection for at least one year from the Voting Deadline. **Each Nominee should advise its Beneficial Holders to return their Beneficial Ballots to the Nominee by a date and time calculated by the Nominee to allow it to prepare and return the Master Ballot to the Solicitation Agent so that the Master Ballot is received by the Solicitation Agent on or before the Voting Deadline.**

### 3. Notices of Non-Voting Status for Holders of PIK Notes

The Debtors may apply similar procedures as the foregoing to distribute Notices of Non-Voting Status to holders of 1.25L Notes and PIK Notes and to allow such holders to opt out of the Third-Party Releases.

### 4. Opt-Out from Releases

The Plan contains the Third-Party Release described above at Section IV.H.4.f. If you vote to reject the Plan or do not vote on the Plan, you may opt out of the Third-Party Release by checking the box labeled "**Opt out** of the Third-Party Release" that follows the Third-Party Release provisions on the applicable Ballot or Non-Voting Status Notice. If you vote to accept the Plan, you will be deemed to have consented to the Third-Party Release regardless of whether you check the opt-out box. If you opt out of consenting to the Third-Party Release, then you will not be a Released Party, even if you would otherwise be entitled to be a Released Party.

> **Regardless of whether you vote on acceptance or rejection of the Plan, you must return your Ballot or Non-Voting Status Notice at or before the Voting Deadline in compliance with the instructions in order to opt out of the Third-Party Release.**

5.      **Withdrawal or Change of Votes**

Any holder of a Claim that has submitted a Ballot may revoke its Ballot and change its vote by submitting to the Solicitation Agent a subsequent, properly completed, and signed Ballot before the Voting Deadline, subject to Bankruptcy Rule 3018(a); provided that a holder may not change its vote in a previously cast Ballot from acceptance to rejection or from rejection to acceptance without first obtaining authority from the Court pursuant to the requirements of and in compliance with Bankruptcy Rule 3018(a). Accordingly, a Ballot changing a vote in a previously submitted Ballot without authority from the Court will not be counted. If more than one timely, properly completed Ballot is received with respect to the same Claim, the Solicitation Agent will count only the Ballot that the Solicitation Agent determines, in its sole discretion, was the last to be received. However, if a holder timely submits both a paper Ballot and E-Ballot on account of the same Claim, the E-Ballot will be counted, even if the paper Ballot is received later; *provided*, *that*, the foregoing shall be without prejudice to Section III of the Solicitation and Voting Procedures.

6.      **Waivers of Defects and Irregularities**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. As indicated above, effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any purported withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form or the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The Debtors' interpretation of the Ballot and its instructions will be final and binding on all parties, unless otherwise ordered by the Bankruptcy Court. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

E.      **AGREEMENTS UPON FURNISHING BALLOTS**

The delivery of a Ballot that votes to accept the Plan will constitute the agreement of the corresponding creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, the Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in the Plan.

**F.**     **FURTHER INFORMATION AND ADDITIONAL COPIES**

If you have any questions about the Solicitation, your Ballot or the procedures for voting, or to request additional copies of the Solicitation Materials, please call the Solicitation Agent's hotline at (888) 251-2937 (toll-free in the U.S. and Canada) or +1 (310) 751-2613 (international), or submit an electronic inquiry to the Solicitation Agent at www.kccllc.net/incora/inquiry.

The Solicitation Agent cannot answer legal questions regarding the Plan. For legal assistance (including regarding the Plan or the Third-Party Release), please consult your own legal counsel.

*[Remainder of page intentionally blank]*

# SECTION VI.
## CONFIRMATION OF PLAN

## A.   CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, upon appropriate notice to all required parties, to hold a hearing on confirmation of the Plan. Notice of the confirmation hearing will be provided to all known creditors and equity holders or their counsel. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the hearing itself or on the docket for the Chapter 11 Cases. Additionally, the Confirmation Hearing shall be adjourned in the event any notice of a breach or a 1L Noteholder Termination Event (as defined in the Restructuring Support Agreement) as to the Debtors has been delivered by the Required Consenting 1L Noteholders under the Restructuring Support Agreement until (a) such alleged breach is cured (if capable of cure), (b) such notice has been rescinded by the Required Consenting 1L Noteholders or (c) the Court determines that there is no breach or 1L Noteholder Termination Event under the Restructuring Support Agreement.

## B.   OBJECTIONS TO CONFIRMATION

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Rules, and any orders of the Bankruptcy Court, (c) set forth the name and address of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party, (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, and (e) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served so as to be received no later than the date and time designated in the notice of the confirmation hearing. No objection shall, without leave of the Bankruptcy Court, exceed forty pages (excluding any tables, exhibits, addenda, or other supporting material).

Any objection to confirmation must be served on the following parties:

**Debtors:**
Incora
2601 Meacham Blvd., Suite 400
Fort Worth, TX  76137
Attn:   Dawn Landry

**Counsel to Debtors:**

Milbank LLP
55 Hudson Yards
New York, NY  10001
Attn:   Dennis F. Dunne
       Samuel A. Khalil
       Benjamin M. Schak

*and*

Haynes and Boone, LLP
1221 McKinney Street, Suite 400
Houston, TX  77010
Attn:   Charles A. Beckham, Jr.
       Patrick L. Hughes
       Kelli S. Norfleet
       Re'Necia Sherald

**Counsel to the Committee:**

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Attn:   Lorenzo Marinuzzi
       Theresa A. Foudy
       Benjamin Butterfield

*and*

McDermott Will & Emery LLP
2501 North Harwood Street, Suite 1900
Dallas, TX 75201-1664
Attn:   Charles Gibbs
       Jack Haake

**Counsel to First Lien Noteholder Group:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017
Attn:   Damian S. Schaible
       Angela M. Libby
       Stephanie Massman

*and*

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002-6341
Attn:   John Higgins
       M. Shane Johnson
       Megan Young-John
       Bryan L. Rochelle

**United States Trustee:**
Kevin M. Epstein
United States Trustee Region 7
Southern and Western Districts of Texas
515 Rusk Avenue, Suite 3516
Houston, TX 77002
Attn:   Jayson Ruff

## C.   REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among other requirements, the Plan must be (a) feasible and (b) in the "best interests" of holders of Impaired Claims and Interests.

### 1.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed only if its confirmation "is not likely to be followed by liquidation or the need for further financial reorganization" of the debtor or any successor to the debtor. This requirement is often referred to as the "feasibility" test.

The Debtors believe that the Plan satisfies this requirement. For purposes of determining whether the Plan meets this requirement, the Debtors, in consultation with their financial advisors, have analyzed their ability to meet the obligations that they will incur or assume under the Plan. As part of that analysis, the Debtors have prepared consolidated projected financial results (the "*Financial Projections*") for each fiscal year following the Effective Date through [2026]2027. These Financial Projections, and the assumptions on which they are based, are attached to this Disclosure Statement as **Exhibit B**. All holders of Claims who are entitled to vote to accept or reject the Plan are urged to examine carefully, in consultation with professional financial advisors, all of the assumptions on which the Financial Projections are based.

The Financial Projections have not been audited by a certified public accountant and have not necessarily been prepared in accordance with generally accepted accounting principles. The Debtors' management and advisors have prepared the Financial Projections. While the Financial Projections have been presented with numerical specificity, the Financial Projections are necessarily based on a variety of estimates and assumptions which, though considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, and market and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtors' control. The Debtors caution that they cannot make any representations as to the accuracy of the Financial Projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions will inevitably differ from actual conditions. Furthermore, events and circumstances occurring after the date on which the Financial Projections were prepared may differ from any assumed facts and circumstances and may affect financial results in a materially adverse or materially

beneficial manner. The Financial Projections, therefore, should not be relied upon as a guarantee or other assurance of the actual results that will occur.

## 2.     Best Interests

Section 1129(a)(7) of the Bankruptcy Code permits a plan to be confirmed only if each holder of an impaired claim or interest that did not vote to accept the plan, will "receive or retain under the plan on account of such claim or interest property of a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code on the Effective Date of the plan. This requirement is often referred to as the "best interests" test.

Based on the Liquidation Analysis attached to this Disclosure Statement as **Exhibit C**, the Debtors believe that all holders of Impaired Claims and Interests will receive, under the Plan, property with a value greater than or equal to the value that they would have received in a chapter 7 liquidation.

To estimate the potential recoveries in a chapter 7 liquidation, the Debtors estimated the amount of liquidation proceeds that might be available for distribution (net of liquidation costs) and the allocation of those proceeds among the Classes of Claims and Interests based on their relative priorities under chapter 7 of the Bankruptcy Code.

The net amount of value available in a liquidation to the holders of unsecured Claims and all Interests would be reduced by, first, the Claims of secured creditors to the extent of the value of their respective collateral and, second, the administrative expenses and priority claims allowed in chapter 7. Those administrative expenses would include the compensation of a trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, applicable taxes, litigation costs, unpaid administrative expenses incurred by the Debtors and the Committee in the Chapter 11 Cases, DIP Financing Claims and Claims arising from the Debtors' operations during the Chapter 11 Cases. The liquidation itself may trigger certain priority Claims that would otherwise be due in the ordinary course of business. Those priority Claims would have to be paid in full from the liquidation proceeds before any balance would be made available to pay unsecured Claims. The liquidation would also prompt the rejection of executory contracts and unexpired leases, and thereby create a significantly greater aggregate amount of unsecured Claims.

In a chapter 7 liquidation, no junior Class of Claims or Interests may be paid unless all Classes of Claims or Interests senior to such junior Class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no Class of Claims or Interests that is contractually subordinated to another Class (such as the 1.25L Notes Claims vis-à-vis the 1L Notes Claims) would receive any payment on account of its Claims or Interests, unless and until such senior Class was paid in full. If the probable distribution to a Class through a chapter 7 liquidation has a value greater than the value of distributions to be received by the same Class under the Plan, the Plan is not in the best interests of the members of that Class and cannot be confirmed by the Bankruptcy Court.

The Liquidation Analysis demonstrates that each holder of Impaired Claims and Interests will receive at least as much, if not more, under the Plan as it would receive if the Debtors were liquidated under chapter 7. In particular, holders of 1.25L Notes Claims, 2026 Unsecured Notes Claims, 2024 Unsecured Notes Claims, General Unsecured Claims, General Unsecured Convenience Claims, PIK Notes Claims and Existing Equity Interests would receive no value whatsoever in a liquidation under chapter 7. Therefore, the Debtors believe that the Plan satisfies the requirements of the "best interests" test.

### 3.     Acceptance by Class

The Bankruptcy Code defines "acceptance" of a plan by a Class of (a) Impaired Claims as acceptance by creditors in that Class that hold at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class held by creditors that cast ballots for acceptance or rejection of the Plan and (b) Impaired Interests as acceptance by Interest holders that hold at least two-thirds (⅔) in amount of the Allowed Interests in such Class held by holders that cast ballots for acceptance or rejection of the Plan. However, any Class of Claims or Interests that is Unimpaired under the Plan is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan. Likewise, any Class of Claims or Interests that does not entitle the holders of Claims or Interests to receive or retain any property under the Plan on account of such Claims or Interests is deemed to have rejected the Plan and is therefore not entitled to vote to accept or reject the Plan.

A plan may be confirmed if it is accepted by each impaired class of claims or interests, or if additional requirements (described below at Section VI.D, entitled "Additional Requirements for Non-Consensual Confirmation") are satisfied as to all non-accepting impaired classes.

Under the Plan, Classes 1, 2, 3, [7c,] and 11 are Unimpaired and deemed to accept the Plan. Depending on its treatment, Class 9 is Unimpaired or is due to receive or retain no property under the Plan; in either case, it is not entitled to vote to accept or reject the Plan. Class 5, Class 8, Class 9 (in the event that a Claim in Class 9 receives or retains no property under the Plan) and Class 10 are deemed to reject the Plan.

### 4.     Deemed Acceptance of a Class in Which No Votes Are Cast

If no votes to accept or reject the Plan are received with respect to a particular Class of Claims for which holders of such Claims are entitled to vote on the Plan with respect to such Claims, such Class shall be deemed to have voted to accept the Plan.

## D.     ADDITIONAL REQUIREMENTS FOR NON-CONSENSUAL CONFIRMATION

### 1.     Cram-Down

If any impaired class of claims or interests votes to reject a plan or is deemed to reject a plan, the Bankruptcy Code nevertheless allows that plan to be confirmed over that class's rejection, so long as (a) at least one impaired class of claims accepts the plan, determined without including any acceptance of such plan by an insider (b) the plan satisfies each of the requirements of section 1129(a) other than the requirement for acceptance by each impaired

class, and (c) the plan satisfies certain additional requirements set forth in section 1129(b) discussed below. This power to confirm a plan over dissenting classes—often referred to as "cram-down"—assures that no single group of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The additional requirements referred to above are that the plan may not "discriminate unfairly" against an impaired dissenting class and must be "fair and equitable" toward an impaired dissenting class.

The Debtors intend to pursue confirmation through cram-down, if necessary, as to Class 5 (1.25L Notes Claims), ~~Class 6a (2026 Unsecured Notes Claims), Class 6b (2024 Unsecured Notes Claims),~~ Class 7a (General Unsecured Claims), Class 7b (General Unsecured Convenience Claims), Class 8 (PIK Notes Claims), and Class 10 (Existing Equity Interests), but not as to Class 4 (1L Notes Claims). (Additionally, the Debtors submit that the cram-down requirements should not be applied strictly to Class 9 (Intercompany Claims), which have no economic substance and will be impaired only to preserve, improve, or simplify the accounting or tax position of the Debtors' reorganized enterprise. In any event, each holder of an Intercompany Claim is a proponent of the Plan and has therefore waived any objection to its treatment under the Plan.)

### 2. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and legal character but are receiving different treatment under the Plan. The test does not require that the treatment be the same but that such treatment be "fair." Bankruptcy courts consider several factors in determining whether a plan discriminates "unfairly," and accordingly, a plan could treat two classes differently without unfairly discriminating against the class receiving inferior treatment. This test applies only to classes that reject or are deemed to reject the plan.

The Debtors believe that the Plan satisfies the "unfair discrimination" test as to all relevant Classes.

### 3. Fair and Equitable

A chapter 11 plan is fair and equitable with respect to a dissenting class only if no class senior to such dissenting class receives more than it is entitled to on account of such senior claims or interests. The "fair and equitable" test imposes certain statutory requirements that depend on the type of claims or interests in the dissenting class.

To be fair and equitable with respect to a dissenting class of impaired secured claims, a plan must provide that each holder of such a claim either (a) retains liens on its collateral (or, if the collateral is sold, on the proceeds) to the extent of the allowed amount of the secured claim and also receives deferred cash payments having a value, as of the plan's consummation, of at least the allowed amount of the secured claim, or (b) otherwise receives the "indubitable equivalent" of its secured claim.

To be fair and equitable with respect to a dissenting class of impaired unsecured claims, a plan must provide that either (a) each holder of such a claim receives or retains property having a value, as of consummation of the plan, equal to the allowed amount of its claim, or (b) no holders of claims or interests that are junior to the claims in the dissenting class will receive or retain any property under the plan on account of its junior claim or interest.

The Debtors believe that the 1.25L ~~Notes Claims, 2026 Unsecured Notes Claims, and 2024 Unsecured~~ Notes Claims are completely unsecured pursuant to section 506(a) of the Bankruptcy Code and that the 2024 Unsecured Notes Claims and the 2026 Unsecured Notes Claims are completely unsecured as a result of the 2022 Financing Transactions. Accordingly, the provisions of section 1129(b) addressing secured claims are not applicable.

The provisions of section 1129(b) addressing unsecured claims are satisfied as to the 1.25L Notes Claims, the ~~2026 Unsecured Notes Claims, the 2024 Unsecured Notes Claims, the other~~ General Unsecured Claims, and the General Unsecured Convenience Claims because no holders of Claims or Interests that are junior to those Classes will receive or retain any property on account of those Claims or Interests. The only junior Claims or Interests that exist against the Debtors are those that will be Reinstated for the purpose of preserving the Debtors' organizational structure. Unless otherwise provided for in the Description of Restructuring Transactions, Wolverine Intermediate Holding will be permitted to retain its Interests in the Debtors solely for the purpose of preserving the business's organizational structure and in consideration of its distribution of new securities and assumption of new debt pursuant to the Plan and the cancellation of the equity interests of its own members—not on account of its existing Interests in the Debtors. For these reasons, the Debtors believe that the "fair and equitable" test is satisfied as to Classes 5, ~~6a, 6b,~~ 7a, and 7b.

The provisions of section 1129(b) are likewise satisfied as to the PIK Notes Claims because the Existing Equity Interests in Wolverine Intermediate Holding will receive no distributions on account of the Plan.

To be fair and equitable with respect to a dissenting class of impaired equity interests, a plan must provide that either (a) each holder of such an interest receives or retains property having a value, as of consummation of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest, or (b) no holders of interests that are junior to the interests in the dissenting class will receive or retain any property under the plan on account of its junior claim or interest. No Claims or Interests are junior to the Existing Equity Interests, so no such Claims or Interests will receive or retain any property under the Plan. Accordingly, the Debtors believe that the "fair and equitable" test is satisfied as to Class 10.

*[Remainder of page intentionally blank]*

# SECTION VII.
## FEDERAL INCOME TAX CONSIDERATIONS

**A.**  **IMPORTANCE OF OBTAINING INDEPENDENT PROFESSIONAL TAX ADVICE**

> The tax consequences of the Plan are complex. The following summary does not discuss all aspects of U.S. federal income taxation or other taxation that may be relevant to the Debtors or to any particular holder of Claims in light of its particular circumstances and income tax situation. This summary is not a substitute for careful tax planning and advice based on individual circumstances that pertain to a particular holder of a Claim. Each holder of a Claim should consult with its tax advisors as to the consequences of the transactions contemplated by the Plan, including the application and effect of federal, state, local, or non-U.S. laws regarding income, estate and other taxation, and of any changes in those laws.

118

## B.  TAX CONSEQUENCES OF THE RESTRUCTURING

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and the Reorganized Debtors, and holders of Allowed 1L Notes Claims, Allowed ~~1.25L Notes Claims, Allowed 2026~~General Unsecured ~~Notes Claims, Allowed 2024 Unsecured notes Claims, Allowed 2027 Unsecured Notes~~ Claims and Allowed General Unsecured _Convenience_ Claims (~~the Allowed 1.25L Notes Claims, Allowed 2027 Unsecured Notes Claims and Allowed General Unsecured Claims together~~collectively, the "~~Other~~_Addressed_ Claims"). This summary is based on the Internal Revenue Code of 1986, as amended (the "_Tax Code_"), the U.S. Treasury Regulations promulgated under the Tax Code (the "_Treasury Regulations_"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "_IRS_"), all as in effect on the date of this Disclosure Statement (collectively, "_Applicable Tax Law_"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed in this Disclosure Statement, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated investment companies, passive foreign investment companies, controlled foreign corporations, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of tax accounting, holders of Claims who are themselves in bankruptcy, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates and accrual method taxpayers that report income on an "applicable financial statement"). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds such Claims as "capital assets" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other

119

than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to holders: (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan. Furthermore, this summary does not address the U.S. federal income tax consequences associated with the DIP Notes or DIP Financing Claims or the receipt of the New Exit Notes in exchange forsatisfaction of the DIP Financing ClaimsNotes.

For purposes of this discussion, a "*U.S. Holder*" is a beneficial owner of an Allowed 1L NotesAddressed Claim, an Allowed 2026 Unsecured Notes Claim, an Allowed 2024 Unsecured Notes Claim, or Allowed Other Claim, as applicable, that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

For purposes of this discussion, a "*Non-U.S. Holder*" is a beneficial owner of an Allowed 1L NotesAddressed Claim, an Allowed 2026 Unsecured Notes Claim, an Allowed 2024 Unsecured Notes Claim or Allowed Other Claim, as applicable, that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of an Allowed 1L Notes Claim, Allowed 2026 Unsecured Notes Claim, an Allowed 2024 Unsecured Notes Claim or Allowed OtherAddressed Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Allowed 1L Notes Claims, Allowed 2026 Unsecured Notes Claim, an Allowed 2024 Unsecured Notes Claim or Allowed OtherAddressed Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

## C.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND THE REORGANIZED DEBTORS

For U.S. federal income tax purposes, Wolverine Top Holding Corporation ("*Parent*"), a non-debtor, is the common parent of an affiliated group of corporations that files a single consolidated U.S. federal income tax return (the "*Tax Group*"), of which the Debtors are members or are either foreign corporations or flow-through entities, directly or indirectly, wholly-owned by a member of the Tax Group. The Debtors estimate that, as of the taxable year ending December 31, 2022, the Tax Group had federal net operating loss

("*NOL*") carryforwards ~~in excess~~ of ~~approximately~~almost $~~13~~22 million. In addition, the Debtors estimate that, as of the taxable year ending December 31, 2022, the Tax Group also had interest expense carryforwards of approximately $515 ~~million and foreign tax credit carryforwards of approximately $13~~ million. As discussed below, the Tax Group's NOLs and other tax attributes may be, in connection with the implementation of the Plan, significantly reduced, subject to limitation or entirely unavailable to the Reorganized Debtors, depending on the manner in which the Restructuring Transactions are consummated.

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as an actual or deemed taxable sale of the assets and/or stock of any Debtor or subsidiary of any Debtor (a "*Taxable Transaction*") or as a recapitalization or reorganization of the Debtors (a "*Reorganization Transaction*"). It has not yet been determined how the Restructuring Transactions will be structured. Such decision will depend on, among other things, whether assets being sold (or deemed to be sold) pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (i.e., a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (i.e., a "built-in loss"), the amount of any required reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("*COD Income*"), whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up (if any) in the tax basis of the assets sold pursuant to a Taxable Transaction, and the amount and character of any losses with respect to the stock of any applicable Debtor or subsidiary thereof, in each case for U.S. federal, state and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors plus certain liabilities treated as assumed (which aggregate amount generally should equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors, unless the amount of liabilities assumed exceeds the fair market value of the assets transferred or deemed to be transferred) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the Tax Code, ~~net operating loss~~NOL carryforwards from prior years, if any, and any worthless stock deduction claimed with respect to the equity of a Debtor that is available to offset all or a portion of such gains; provided that any such gain that is ordinary in nature may not be offset by capital losses. Any taxable gain remaining after such offsets would result in a cash tax obligation that would need to be satisfied by the Reorganized Debtors. If the Reorganized Debtors purchase (or are deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtors will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred (i) will retain its basis in its assets, unless the Debtors and/or Reorganized Debtors are eligible to make, and timely make, certain elections provided for under the Tax Code to treat such stock purchase as the purchase of such Debtor's assets, and (ii) may succeed to certain tax attributes of the Tax Group, subject to reduction for COD Income as discussed below. If the Restructuring Transactions are consummated as a Taxable Transaction treated as an asset

transfer, the Debtors' NOLs and other tax attributes will not carry over to the Reorganized Debtors. The tax consequences to the Debtors of the Restructuring Transactions, including the potential amount of cash tax liability (if any) resulting from a Taxable Transaction, remain subject to ongoing analysis.

### 1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of: (i) the amount of Cash paid; (ii) the issue price of any new indebtedness of the taxpayer issued; and (iii) the fair market value of any other consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes (such as current year losses, NOL carryforwards, capital loss carryforwards, tax credits and tax basis in assets) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

In connection with the implementation of the Plan, the Debtors are expected to realize significant COD Income. The exact amount of any COD Income that will be realized by the Debtors will depend, in part, on the value of ~~any property (including cash) other than debt~~the New Common Equity and the "issue price" of ~~any debt (as determined under applicable tax rules) distributed to the holders of Allowed Claims~~the New Takeback Notes (as described below) and, therefore, will not be determinable until the consummation of the Plan. The Debtors expect that the amount of COD Income will be sufficient to eliminate all of the Debtors' NOL carryforwards allocable to periods prior to the Effective Date. In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income. As noted above, whether or not the Reorganized Debtors succeed to the tax attributes of the Debtors will depend on whether the Restructuring Transactions are structured as a Taxable Transaction (and if a Taxable Transaction, whether it is treated as an asset sale or stock sale) or as a Reorganization Transaction.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any NOLs, interest expense carryforwards, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the corporation allocable to

periods prior to the ownership change (collectively, "*Pre-Change Losses*") that may be utilized to offset future taxable income generally are subject to an annual limitation. If the Reorganized Debtors succeed to any Pre-Change Losses, the implementation of the Plan is expected to result in an "ownership change" of the Reorganized Debtors and, as a result, the Reorganized Debtors' use of those Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the IRS amended the proposed effective date provision of those regulations to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. Thus, if the proposed regulations are finalized in their current form, the proposed regulations are not expected to apply to the Reorganized Debtors and the remainder of this discussion assumes they will not apply.

### a.   *General Section 382 Annual Limitation*

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (~~3.65~~3.81% for ownership changes occurring in ~~November~~December 2023). The section 382 limitation may be increased to the extent that the company recognizes certain built-in gains in its assets during the five-year period following the ownership change or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65 (in either case, up to the amount of the company's original net unrealized built-in gain). Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### b.   *Special Bankruptcy Exception*

An exception to the forgoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in a chapter 11 case receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation, if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "*382(l)(5) Exception*"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but instead, NOL carryforwards and/or interest expense carryforwards will be reduced by the amount of any interest deductions claimed during the

taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(*l*)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(*l*)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(*l*)(5) Exception), a second special rule will generally apply (the "*382(l)(6) Exception*"). Under the 382(*l*)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(*l*)(6) Exception also differs from the 382(*l*)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a subsequent change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation from ~~that~~the subsequent change of ownership would be determined under the regular rules for ownership changes.

If the Restructuring Transactions are structured as a Taxable Transaction that is treated as an asset transfer, the Reorganized Debtors are not expected to succeed to the Debtors' NOLs and other tax attributes, with the result that Section 382 should not be relevant to the Reorganized Debtors. If the Restructuring Transactions are structured as a Reorganization Transaction or a stock transfer where the Reorganized Debtors succeed to any of the Debtors' Pre-Change Losses, the application of section 382, including whether the 382(*l*)(5) Exception may apply, will need to be considered after taking into account any reduction of NOLs or other tax attributes for COD Income and the impact of any prior section 382 ownership changes to a portion of the Debtors' existing NOLs and other tax attributes.

D.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS ~~OF ALLOWED CLAIMS IN VOTING CLASSES~~

~~[Description of income tax consequences to follow.]~~

1.    Treatment of Claims as Securities

As discussed further below, the U.S. federal income tax consequences to holders of Allowed Addressed Claims may depend on whether the Allowed Addressed Claims constitute "securities" for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations promulgated under the Tax Code defines the term "security". Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is

evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the available collateral, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The 2024 Unsecured Notes, the 2026 Unsecured Notes and the 2027 Unsecured Notes, that constitute General Unsecured Claims were each issued in 2019 with an initial term of five years, seven and eight years, respectively. The 1L Notes and 1.25L Notes were issued in 2022 as part of a debt exchange transaction. While the 1L Notes and 1.25L Notes each had an initial term of just four and five years, respectively, they were each received in exchange for prior debt having an initial term of five and eight years, respectively. Based on certain IRS guidance, in certain circumstances, a loan issued in exchange for a debt instrument that would have been treated as a security may be considered a security notwithstanding that the new loan has a term of less than five years. Each holder of an Allowed Addressed Claim is urged to consult its own tax advisor regarding whether such Allowed Addressed Claim should be treated as a "security" for U.S. federal income tax purposes.

### 2. Consequences of Exchange for U.S. Holders of Allowed Addressed Claims

#### a. *Gain or Loss on Allowed 1L Notes Claims*

On the Plan Effective Date, the holders of Allowed 1L Notes Claims will exchange their 1L Notes Claims for (x) New Common Equity and (y) New Takeback Notes. Pursuant to the Plan, the Debtors may also pay certain Restructuring Expenses attributable to the 1L Indenture Trustee and the First Lien Noteholder Group. It is possible that all or a portion of these payments may be treated as payment of cash to certain holders of Allowed 1L Notes Claims. The remaining discussion does not address the tax treatment to a U.S. Holder of Allowed 1L Notes Claims if any such amounts paid by the Debtors is treated as cash consideration with respect to the U.S. Holder's Allowed 1L Notes Claims. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of any such payment.

As described above, the U.S. federal income tax consequences to a U.S. Holder of an Allowed 1L Notes Claim will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction, or (b) a Reorganization Transaction and, if a Reorganization Transaction, the steps for implementing the Plan. The U.S. federal income tax consequences to U.S. Holders of Allowed 1L Notes Claims may further depend on whether the Allowed 1L Notes Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Reorganization Transaction.If the Allowed 1L Notes Claims are treated as securities for U.S. federal income tax purposes and the Restructuring Transactions are structured as a Reorganization Transaction that otherwise qualifies for "reorganization" treatment (within the meaning of section 368(a)(1) of the Tax Code) or a transaction described in Section 351 of the

Tax Code, a U.S. Holder's exchange of Allowed 1L Notes Claims for New Common Equity and New Takeback Notes should be treated as a fully tax-free (or partially tax-free) transaction for a U.S. Holder of an Allowed 1L Notes Claim. In addition to a requirement for "reorganization" treatment that U.S. Holder's Allowed 1L Notes constitutes a security for U.S. federal income tax purposes, the determination of whether the transaction is a reorganization, and whether the exchange is partially or fully tax-free, will depend on the identities of the issuer of the New Common Equity and the New Takeback Notes and whether the New Takeback Notes themselves constitute "securities" for U.S. federal income tax purposes.

If the Allowed 1L Notes Claims constitute "securities" for U.S. federal income tax purposes and the transaction is treated as a "reorganization" or a transaction described in Section 351 of the Tax Code with respect to a U.S. Holder of Allowed 1L Notes Claims, subject to the discussion under "—*Accrued Interest and OID*" below, a U.S. Holder of Allowed 1L Notes Claims should (i) not recognize any gain or loss as a result of the receipt of New Common Equity and New Takeback Notes if the New Takeback Notes are "securities," and either the issuer of the New Common Equity and the New Takeback Notes is the issuer of the Allowed 1L Notes Claims or, if the issuer of the New Common Equity is not the issuer of the Allowed 1L Notes Claims, the New Common Equity is received in a transaction described in Section 351 of the Tax Code, or (ii) if the exchange is not described in (i), will not recognize any loss but should recognize gain, if any, but not in excess of an amount equal to (x) if the issuer of the New Common Equity is an entity other than the issuer of the Allowed 1L Notes Claims (and the New Common Equity is not received in a transaction described in Section 351 of the Tax Code) and the New Takeback Notes are "securities" and are issued by the issuer of the Allowed 1L Notes Claims, the fair market value of the New Common Equity received by the U.S. Holder, or (y) if the issuer of the New Common Equity is the issuer of the Allowed 1L Notes Claims (or the New Common Equity is received in a transaction described in Section 351 of the Tax Code) and either the issuer of the New Takeback Notes is not the issuer of the Allowed 1L Notes Claims or the New Takeback Notes are not "securities", the fair market value of New Takeback Notes received by the U.S. Holder. A U.S. Holder's tax basis in any New Common Equity and New Takeback Notes received in a transaction described in (i) above (apart from amounts allocable to accrued but unpaid interest or accrued original issue discount ("*OID*")) should generally equal the U.S. Holder's adjusted tax basis in its Allowed 1L Notes Claim exchanged therefor and should be allocated between New Common Equity and New Takeback Notes received in accordance with their fair market values. In a transaction described in (ii)(x) above, a U.S. Holder's tax basis in New Takeback Notes received by such holder will equal the holder's tax basis in its Allowed 1L Notes Claims exchanged therefor, increased by the amount of any gain recognized pursuant to such exchange and reduced by the fair market value of the New Common Equity received, and the U.S. Holder's tax basis in the New Common Equity received will equal the fair market value of such equity. In a transaction described in (ii)(y) above, a U.S. Holder's tax basis in the New Common Equity will equal the holder's tax basis in its Allowed 1L Notes Claims exchanged therefor, increased by the amount of any gain recognized pursuant to such exchange and reduced by the fair market value of New Takeback Notes received, and the U.S. Holder's tax basis in New Takeback Notes received by such holder will equal the fair market value thereof. Subject to the rules regarding accrued but unpaid interest and accrued OID, a U.S. Holder's holding period in (A) the New Common Equity received in a transaction described in (i) or (ii)(y) above should include the holding period for the Allowed 1L Notes Claims exchanged therefor, (B) New Takeback Notes received in a transaction described in (i) or (ii)(x) above should include the

holding period for the Allowed 1L Notes Claims exchanged therefor, and (C) New Common Equity received in a transaction described in (ii)(x) above or New Takeback Notes received in a transaction described in (ii)(y) above should begin the day after the Effective Date.

Taxable Transaction.  If the Restructuring Transactions are not described in the preceding paragraphs, a U.S. Holder of an Allowed 1L Notes Claim is expected to recognize gain or loss with respect to such Claim equal to the difference between (i) the sum of (a) the fair market value of its pro rata share of the New Common Equity and (b) the "issue price" of its New Takeback Notes (other than amounts, if any, allocable to accrued but unpaid interest (including OID), discussed below under "—*Accrued Interest and OID*") and (ii) such U.S. Holder's tax basis in their Allowed 1L Notes Claims. The character of such gain or loss as capital or ordinary will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed 1L Notes Claim constitutes a capital asset in such U.S. Holder's hands, whether the Allowed 1L Notes Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction with respect to its Allowed 1L Notes Claim. If the recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder has held its Allowed 1L Notes Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations (as discussed below). To the extent that a portion of the consideration received in exchange for its Allowed 1L Notes Claim is allocable to accrued but unpaid interest or OID, the U.S. Holder may recognize ordinary income. *See* "—*Accrued Interest and OID*" and "—*Market Discount*", below. In the case of a transaction described in this paragraph, a U.S. Holder's tax basis in the New Common Equity and New Takeback Notes received in respect of its Allowed 1L Notes Claim should be equal to the fair market value of the New Common Equity and the issue price of the New Takeback Notes and the U.S. Holder's holding period for New Common Equity and New Takeback Notes received on the Effective Date should begin on the day following the Effective Date.

### b.   *Gain or Loss on Allowed General Unsecured Claims*

Pursuant to the Plan, in full and final satisfaction of Allowed General Unsecured Claims, each holder thereof will receive New Common Equity.

The U.S. federal income tax consequences to a U.S. Holder of Allowed General Unsecured Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction, or (b) a Reorganization Transaction and, if a Reorganization Transaction, the steps for implementing the Plan. The U.S. federal income tax consequences to U.S. Holders of Allowed General Unsecured Claims may further depend on whether the applicable Allowed General Unsecured Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Reorganization Transaction.If the applicable Allowed General Unsecured Claims are treated as securities for U.S. federal income tax purposes and the Restructuring Transactions are structured as a Reorganization Transaction that otherwise qualifies for "reorganization" treatment (within the meaning of section 368(a)(1) of the Tax Code) or a transaction described in Section 351 of the Tax Code (which may apply even if the applicable Allowed General Unsecured Claims are not treated as securities), a U.S. Holder's exchange of applicable Allowed General Unsecured Claims for New Common Equity should be treated as a fully tax-free

transaction for a U.S. Holder of an applicable Allowed General Unsecured Claim. In addition to a requirement for "reorganization" treatment that the U.S. Holder's applicable Allowed General Unsecured Claim constitutes a security for U.S. federal income tax purposes, the determination of whether the transaction is a reorganization, and whether the exchange is tax-free, will depend on the identity of the issuer of the New Common Equity.

If either (i) the applicable Allowed General Unsecured Claims constitute "securities" for U.S. federal income tax purposes and the transaction is treated as a "reorganization" with respect to a U.S. Holder of applicable Allowed General Unsecured Claims or (ii) the transaction is described in Section 351 of the Tax Code with respect to a U.S. Holder of applicable Allowed General Unsecured Claims, subject to the discussion under "—*Accrued Interest and OID*" below, a U.S. Holder of applicable Allowed General Unsecured Claims will not recognize any gain or loss. A U.S. Holder's tax basis in the New Common Equity received by such holder (apart from amounts allocable to accrued but unpaid interest or accrued OID) will equal the holder's tax basis in its applicable Allowed General Unsecured Claims exchanged therefor. Subject to the rules regarding accrued but unpaid interest and accrued OID, a U.S. Holder's holding period in the New Common Equity received should include the holding period for the applicable Allowed General Unsecured Claims exchanged therefor.

Taxable Transaction. If the Restructuring Transactions are not described in the preceding paragraphs with respect to a U.S. Holder of Allowed General Unsecured Claims, such U.S. Holder of Allowed General Unsecured Claims is expected to recognize gain or loss equal to the difference between (i) the fair market value of its share of the New Common Equity (other than amounts, if any, allocable to accrued by unpaid interest (including OID)) and (ii) such U.S. Holder's adjusted tax basis in their Allowed General Unsecured Claims. The character of such gain or loss as capital or ordinary will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed General Unsecured Claims constitute a capital asset in such U.S. Holder's hands, whether the Allowed General Unsecured Claims were purchased at a discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction with respect to its Allowed General Unsecured Claims. If the recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder has held its Allowed General Unsecured Claims for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations (as discussed below). To the extent that a portion of the consideration received in exchange for its Allowed General Unsecured Claims is allocable to accrued but unpaid interest or OID, the U.S. Holder may recognize ordinary income. *See* "—*Accrued Interest and OID*" and "—*Market Discount*", below. In the case of a Taxable Transaction described in this paragraph, a U.S. Holder's tax basis in the New Common Equity received in respect of its Allowed General Unsecured Claims should be equal to the fair market value of the New Common Equity and the U.S. Holder's holding period for New Common Equity received on the Effective Date should begin on the day following the Effective Date.

c.    *Gain or Loss on Allowed Other Claims*

Pursuant to the Plan, a U.S. Holder will receive Cash in full and final satisfaction of the U.S. Holder's Allowed Claims in Class 7b. A U.S. Holder of such Claims should recognize gain or loss on such Claim in an amount equal to the difference between the amount of Cash received

and the U.S. Holder's tax basis in such Claims. To the extent that a portion of the consideration received in exchange for such Claims is allocable to accrued but unpaid interest or OID, the U.S. Holder may recognize ordinary income. *See* "*—Accrued Interest and OID*" and "*—Market Discount*", below. If the recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder has held its Allowed Claims in the above-listed Classes for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations (as discussed below).

### d.    *Accrued Interest and OID*

In general, regardless of the manner in which the Restructuring Transactions are consummated, to the extent that any amount received by a U.S. Holder of an Allowed Claim is attributable to accrued but unpaid interest or OID on the debt instruments constituting the Allowed Claim, as applicable, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (if not previously included in such Holder's gross income). Conversely, a U.S. Holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest or OID previously was included in the U.S. Holder's gross income but was not paid in full. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal of and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments made under a debt instrument as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### e.    *Market Discount*

Under the "*market discount*" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim who receives consideration pursuant to the Plan in satisfaction of its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the Allowed Claim, as applicable. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than at original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim acquired with market discount should generally be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claim, as applicable, was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that Allowed Claims that were acquired with market discount are exchanged in a Reorganization that qualifies for partially tax-free or fully tax-free treatment for the exchanging U.S. Holder, any market discount that accrued on the Allowed Claims up to the time of the exchange, but was not recognized by the U.S. Holder is carried over to the New Common Equity or New Takeback Notes received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the New Common Equity or New Takeback Notes is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the Allowed Claims.

U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the exchange of Allowed Claims that were acquired with market discount pursuant to the Plan.

3. **Consequences to U.S. Holders of Claims of Owning and Disposing of Consideration Received Under the Plan**

a. *Ownership and Disposition of New Common Equity*

Distributions on New Common Equity. Any distributions made on account of the New Common Equity will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Incora, as determined under U.S. federal income tax principles. Dividends received by a non-corporate U.S. Holder may be eligible for the lower rate applicable to long-term capital gain if certain holding period requirements are satisfied. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain, which will be treated as long-term capital gain if such U.S. Holder's holding period in its New Common Equity exceeds one year as of the date of the distribution.

Amounts treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

Sale, Redemption or Repurchase of New Common Equity. Subject to the discussion below regarding redemption of the New Common Equity, unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale or other taxable

disposition of the New Common Equity. Such capital gain will be long-term capital gain if, at the time of the sale or other taxable disposition, the U.S. Holder's holding period in the New Common Equity is more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. In certain circumstances, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claims or recognized an ordinary loss on the exchange of its Allowed Claims pursuant to the Plan.

A full or partial redemption of the New Common Equity will be treated as a distribution taxable as a dividend to holders of the New Common Equity to the extent of Reorganized Incora's current or accumulated earnings and profits, unless it can be satisfactorily established that, for U.S. federal income tax purposes, (i) the redemption is "not essentially equivalent to a dividend," (ii) the redemption results in a "complete termination" of the holder's interest in stock of Reorganized Incora or (iii) the redemption is "substantially disproportionate" with respect to the holder, all within the meaning of section 302(b) of the Tax Code. In any such case where one of these requirements is met, the redemption will be subject to U.S. federal income tax in the manner described above with respect to sales and other taxable dispositions generally. A redemption of the New Common Equity that is treated as a distribution taxable as a dividend will be subject to U.S. federal income tax in the manner described above under "—*Distributions on New Common Equity*".

As discussed above under "—*Market Discount*", in the case of any debt instrument underlying an Allowed Claim that was acquired at a "market discount" and is subject to partially tax-free or fully tax-free treatment with respect to the exchange pursuant to the Plan as more fully discussed above, the Tax Code indicates that any accrued market discount in respect of such portion of the Allowed Claim, as applicable, that is not currently includible in income should carry over to any nonrecognition property received in exchange therefor (i.e., the New Common Equity). Accordingly, in that situation, any gain recognized by a holder upon a subsequent disposition of New Common Equity may be treated as ordinary income to the extent of the allocable portion of any accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

### b.    *Ownership and Disposition of New Takeback Notes*

Interest (including OID) on New Takeback Notes.Qualified stated interest (described below) paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Takeback Notes exceeds the "issue price" of the New Takeback Notes by an amount equal to or greater than a statutorily defined *de minimis* amount, the New Takeback Notes will be treated as issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the New Takeback Notes is the total of all payments due on the New Takeback Notes, other than payments of qualified stated interest. In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually

at a single fixed rate (or at certain qualified floating rates). The terms of the New Takeback Notes have not yet been established. As a result, it is unclear whether any portion of the stated interest on the New Takeback Notes will be treated as qualified stated interest.

Reorganized Incora will determine the issue price of the New Takeback Notes after the Effective Date. If Reorganized Incora determines that the issue price of the New Takeback Notes is an amount different from the face amount of those loans, Reorganized Incora will make that determination available to any U.S. Holders receiving a portion of the New Takeback Notes. U.S. Holders should consult their tax advisors concerning the treatment of owning New Takeback Notes.

If the New Takeback Notes are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield basis and regardless of the U.S. Holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Takeback Notes that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the First Lien Facility is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the New Takeback Notes, and a pro rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Takeback Notes.

If the U.S. Holder's Allowed Claims are exchanged for New Takeback Notes in a Reorganization that is a fully or partially tax-free transaction, and as a result the U.S. Holder's tax basis in the New Takeback Notes exceeds the issue price thereof, the amount of qualified stated interest and/or OID required to be recognized by the U.S. Holder may be reduced under the rules applicable to "acquisition premium" or "amortizable bond premium." U.S. Holders should consult their tax advisors about the application of these rules to their ownership of New Takeback Notes.

Sale, Redemption or Repurchase of New Takeback Notes. Upon the sale, exchange or other taxable disposition of New Takeback Notes, a U.S. Holder will generally recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but unpaid interest, which shall be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Takeback Notes. A U.S. Holder's initial tax basis in the New Takeback Notes will be increased by any previously accrued OID and decreased by any payments on the New Takeback Notes (other than payments of qualified stated interest, if any) and any bond premium previously amortized. Any such gain or loss generally will be long-term capital gain or loss if at the time of the sale, redemption or other taxable disposition, the U.S. Holder has held (or is treated as having held) the New Takeback Notes for more than one year. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential tax rates on long-term capital gains. The deductibility of capital losses is subject to significant limitations (as discussed below).

As discussed above under "—*Market Discount*", in the case of any debt instrument underlying an Allowed Addressed Claim that was acquired at a "market discount" and is subject to partially tax-free or fully tax-free treatment with respect to the exchange pursuant to the Plan, the Tax Code indicates that any accrued market discount in respect of such portion of the

Allowed Addressed Claim that is not currently includible in income should carry over to any nonrecognition property received in exchange therefor (i.e., the New Common Equity and/or New Takeback Notes). Accordingly, any gain recognized by a holder upon a subsequent disposition of such property would be treated as ordinary income to the extent of the allocable portion of any accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

### 4. Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses will be subject to limits on their use of capital losses. For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 (or $1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year. Non-corporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

## E. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS ~~OF ALLOWED CLAIMS IN VOTING CLASSES~~

~~[Description of income tax consequences to follow.]~~

### 1. Gain Recognition

Whether the satisfaction of an Allowed Claim is a taxable event or not will be determined as noted above under the discussion relevant to U.S. Holders. To the extent that the Restructuring Transactions are treated as a taxable exchange for a Non-U.S. Holder, or otherwise result in recognition of gain for U.S. federal income tax purposes for such Non-U.S. Holder, any gain recognized by such Non-U.S. Holder on the exchange of its Allowed Claims generally will not be subject to U.S. federal income taxation unless (a) such Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Effective Date occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain recognized

133

on the exchange in the same manner as a U.S. Holder. In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.     Accrued Interest and OID

Subject to the discussion below under "—*FATCA*" and "—*Information Reporting and Backup Withholding*", payments to a Non-U.S. Holder that are attributable to accrued but unpaid interest (including accrued OID) on the debt instruments constituting the surrendered Allowed Claims generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an IRS Form W-8BEN or W-8BEN-E (or applicable successor form)) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Wesco Holdings Inc. stock entitled to vote;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Wesco Holdings Inc. (each, within the meaning of the Tax Code);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

In the case of a Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but unpaid interest (including accrued OID) on the Allowed Claims described above, any payments attributable to accrued but unpaid interest (including OID) that is not effectively connected income (as described in the fourth bullet above) generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail, the Plan provides that the aggregate consideration to be distributed to holders of Allowed Addressed Claims in each Class will be allocated first to

the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Allowed Claims, if any. The IRS could take the position that the consideration received by a Non-U.S. Holder should be allocated in some way other than as provided in the Plan. Non-U.S. Holders of Allowed Addressed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

3. **Consequences to Non-U.S. Holders of Claims of Owning and Disposing Consideration Received Under the Plan**

a. *Ownership and Disposition of New Common Equity*

Distributions on New Common Equity.Any distributions made on account of the New Common Equity will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Incora, as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of the Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; see "—*Sale, Redemption or Repurchase of New Common Equity*" below).

Subject to the discussion below under "—*FATCA*" and "—*Information Reporting and Backup Withholding*" and except as described below, dividends paid with respect to the New Common Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a Non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

Sale, Redemption or Repurchase of New Common Equity.Subject to the discussion below regarding redemptions of the New Common Equity and under "—*Information Reporting*

*and Backup Withholding*", a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain recognized on the sale or other taxable disposition of New Common Equity unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- Reorganized Incora is or has been during a specified testing period a "U.S. real property holding corporation" (a "*USRPHC*") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Common Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Equity under the Foreign Investment in Real Property Tax Act ("*FIRPTA*"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Equity will generally be required to withhold a tax equal to 15% of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.

As discussed above under "—*Consequences to U.S. Holders of Addressed Claims*," a full or partial redemption of the New Common Equity will generally be treated as a distribution taxable as a dividend to the extent of Reorganized Incora's current or accumulated earnings and profits unless it can be satisfactorily established that, for U.S. federal income tax purposes, (i) the redemption is "not essentially equivalent to a dividend," (ii) the redemption results in a "complete termination" of the holder's interest in the stock (both preferred and common) of Reorganized Incora or (iii) the redemption is "substantially disproportionate" with respect to the holder, all within the meaning of section 302(b) of the Tax Code. In such event, any amount constituting a dividend for U.S. federal income tax purposes generally would be subject to U.S. federal withholding tax at a rate of 30%, or such lower rate as may be specified by an applicable income tax treaty, unless such dividend is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). A withholding agent (which may include Reorganized Incora) might not make a determination as to whether the cash received upon redemption is subject to such withholding, including because the application of Section 302 of the Tax Code will depend on a Non-U.S. Holder's particular circumstances. Accordingly, withholding agents may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the entire amount of the redemption amount made to such Non-U.S. Holder, unless (1) the withholding agent has established special procedures allowing Non-U.S. Holders to certify that they are exempt from such withholding tax and (2) such Non-U.S. Holders are able to certify that they meet the requirements of such exemption (e.g., because such Non-U.S. Holders are not treated as receiving a dividend under the Section 302 tests described above). However, there can be no assurance that a withholding agent will establish such special certification procedures. If a withholding agent withholds excess amounts from the cash consideration so payable to a Non-U.S. Holder, such Non-U.S. Holder may obtain a refund of any such excess amounts by timely filing an appropriate claim with the IRS. Non-U.S. Holders should consult their own tax advisors regarding the application of the foregoing rules in light of their particular facts and circumstances, the procedures for claiming treaty benefits or otherwise establishing an exemption from U.S. withholding tax with respect to payments received in redemption of their New Common Equity.

**b.**     ***Ownership and Disposition of New Takeback Notes***

Interest (including OID).Subject to the discussion below under "—*FATCA*" and "—*Information Reporting and Backup Withholding*", interest and OID on the New Takeback Notes paid to a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, a properly executed IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10% or more of the voting stock of the person that is treated as issuing the New Takeback Notes for U.S. federal income tax purposes;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Tax Code) with respect to the person

that is treated as issuing the New Takeback Notes for U.S. federal income tax purposes;

- the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Sale, Exchange and Retirement of New Takeback Notes.A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of its New Takeback Notes (other than any amount representing accrued but untaxed interest on the New Takeback Notes) unless:

- the gain is effectively connected with the conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of its interest in the New Takeback Notes under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "—Interest (including OID)". If an individual Non-U.S. Holder falls under the second of these exceptions, the holder generally will be subject to U.S. federal income tax at a rate of 30% (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of disposition.

### 4.    FATCA

Under the Foreign Account Tax Compliance Act ("*FATCA*"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments". For this purpose, "withholdable payments" are generally U.S. source

payments of fixed or determinable, annual or periodical income, including any dividends (including any deemed dividends) on the New Common Equity and New Takeback Notes. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of the FATCA withholding rules on such Non-U.S. Holder's ownership of the New Common Equity and First Lien Facility.

**F.     INFORMATION REPORTING AND BACK-UP WITHHOLDING**

The Debtors and Reorganized Debtors will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan or with respect to their New Common Equity or New Takeback Notes. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 (or otherwise establishes such U.S. Holder's eligibility for an exemption) or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (along with appropriate attachments) (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption from withholding). Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*[Remainder of page intentionally blank]*

# SECTION VIII.
## SECURITIES LAW CONSIDERATIONS

**A.   IMPORTANCE OF OBTAINING INDEPENDENT PROFESSIONAL ADVICE**

> **The Debtors do not make any representation concerning the ability of any Entity to dispose of the securities to be issued under or otherwise acquired pursuant to the Plan. The question of whether a particular Entity is an underwriter or an affiliate is complex, and the availability of exemptions from registration under the Securities Act (including those under section 1145 of the Bankruptcy Code and Rule 144 under the Securities Act) is highly fact-specific. Potential recipients of securities to be issued under or otherwise acquired pursuant to the Plan should consult their own counsel concerning their ability to trade or re-sell such securities freely.**

**B.   ISSUANCE AND RESALE OF SECURITIES UNDER THE PLAN**

**1.   Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Law**

No registration statement will be filed under the Securities Act or pursuant to any state securities laws with respect to the offer and distribution of securities under the Plan.

**2.   Section 1145 Securities**

The Plan provides for the offer, issuance, sale or distribution of shares of New Common Equity as well as the New Notes (the "*Section 1145 Securities*"). The offer, issuance, sale or distribution of the Section 1145 Securities is expected to be exempt from registration under section 5 of the Securities Act and under any state or local law requiring registration for offer or sale of a security pursuant to section 1145 of the Bankruptcy Code. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property.

Subject to the limitations in the applicable governance documents, the Section 1145 Securities may be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters:"

(i)       a person who purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)       a person who offers to sell securities offered or sold under a plan for the holders of such securities;

(iii)       a person who offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is:

(A)       with a view to distributing such securities; and

(B)       under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

(iv)       a person who is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

To the extent that persons who receive Section 1145 Securities pursuant to the Plan are deemed to be underwriters, resales by such persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be underwriters may, however, be permitted to resell such Section 1145 Securities without registration pursuant to and in accordance with the provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act. In addition, such persons will also be entitled to resell their Section 1145 Securities in transactions registered under the Securities Act following the effectiveness of a registration statement, if one is filed with the SEC and becomes effective.

As noted above, holders of Section 1145 Securities who are deemed underwriters may resell Section 1145 Securities pursuant to the limited safe harbor resale provision under Rule 144 of the Securities Act, which are more fully described below in the Section entitled "Private Placement Securities," or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an underwriter with respect to the Section 1145 Securities or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving Section 1145 Securities or other securities under the Plan would be an underwriter with respect to such Section 1145 Securities or other securities, whether such person may freely resell such securities, or the circumstances under which they may resell such securities.

### 3.    Private Placement Securities

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act.

The Debtors believe that the shares of New Common Equity and/or the New Notes to be issued in accordance with the Plan to underwriters (as defined for purposes of section 1145(b)) (collectively, the "*4(a)(2) Securities*"), are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act, including potentially pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act, and/or other applicable exemptions. Each of the holders of the Debtors' outstanding notes is required to represent that it is an "accredited investor" within the meaning of Rule 501(a) of Regulation D of the Securities Act, or a "qualified institutional buyer" (as defined under Rule 144A under the Securities Act).

The 4(a)(2) Securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

In addition to the limitations in the applicable governance documents, the 4(a)(2) Securities will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act); will bear customary legends and transfer restrictions; and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available and in each case subject to the limitations in the applicable governance documents.

Rule 144 provides a limited safe harbor for the resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer. It is currently anticipated that none of the

Debtors will be subject to the reporting requirements of the Exchange Act after the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the effective date of the Plan. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Each certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserves the right

to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

*[Remainder of page intentionally blank]*

# SECTION IX.
## RISK FACTORS

> **Before voting to accept or reject the Plan, holders of Claims who are entitled to vote should read and carefully consider the Plan and this Disclosure Statement, including the risk factors set forth in this Section IX. The risks described in this Section IX are not the only ones associated with the Plan or its implementation, as new risks may emerge from time to time, and it is impossible to predict all such risks.**
>
> **All holders of Claims should consult their own professional advisors regarding risks associated with the Plan, including those set forth in this Section IX.**

## A.   BANKRUPTCY PROCESS RISKS

### 1.   The Debtors Cannot Predict How Long Their Chapter 11 Cases Will Last.

Long chapter 11 cases could disrupt the Debtors' businesses, impair prospects for reorganization on terms contained in the Plan, and possibly lead to an opportunity for other plans to be proposed that may negatively impact the business and cause increased administrative costs.

The Debtors cannot be certain that the Chapter 11 Cases will not be materially disruptive to the Debtors' businesses. If the Debtors are unable to obtain confirmation of the Plan for any reason, the Debtors may be forced to operate in chapter 11 for an extended period while trying to develop a different chapter 11 plan that can be confirmed. The Debtors cannot assure parties in interest that the Plan will be confirmed; even after confirmation of the Plan, it is impossible to predict with certainty how long will be needed to implement the complex transactions that the Plan anticipates. Moreover, the Bankruptcy Code limits the time during which the Debtors will have the exclusive right to file a plan, before other parties in interest are permitted to propose and file alternative plans.

A long chapter 11 case may also involve additional expenses and divert the attention of management from operation of the business, as well as create concerns for personnel, vendors, suppliers, service providers, and customers. Even if the Plan is confirmed, the bankruptcy proceedings may adversely affect the Debtors' relationships with key vendors, customers, and employees.

### 2.   Parties in Interest May Object to the Plan.

Parties having proper standing may oppose and object to either the entirety of the Plan or specific provisions of the Plan, including on grounds related to arguments that have been presented in the ~~2022~~ Financing Litigation. Although the Debtors believe that the Plan complies

with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan presenting contrary views or that the Bankruptcy Court will not sustain such an objection.

### 3. The Bankruptcy Court May Not Confirm the Plan.

Although the Debtors believe that the Plan will satisfy all requirements for confirmation (including "cram-down" requirements as to Classes, if any, that vote against or are deemed to reject the Plan), there can be no assurance that the Bankruptcy Court will reach the same conclusion. Modifications to the Plan may be required to address objections or issues raised by the Bankruptcy Court to permit confirmation, and those modifications could be sufficiently material to require re-solicitation of votes on the Plan.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue; while the Debtors have confidence in the viability of the underlying business, the Chapter 11 Cases in the event confirmation is denied could be adversely impacted and in such event may instead be converted into liquidation cases under chapter 7 of the Bankruptcy Code. Likewise, there can be no assurance that any alternative chapter 11 plan or plans will be on terms as favorable to the holders of Claims and Interests as the terms of the Plan. If a liquidation or a protracted reorganization occurs, there is a substantial risk that the Debtors' going concern value will be substantially eroded to the detriment of all stakeholders. See below at Section X.A (entitled "Liquidation Under the Bankruptcy Code"), as well as the Liquidation Analysis, for a discussion of the effects that a chapter 7 liquidation may have on recoveries of holders of Claims and Interests.

### 4. The Bankruptcy Court May Not Approve the Required Releases, Injunctions and Exculpations Contained in the Plan.

As discussed above at Section IV.H (entitled "Provisions Relating to Releases, Exculpations, and Injunctions"), the Plan provides for certain releases, injunctions, and exculpations, with respect to certain Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, the Released Parties, or their respective assets. Parties in interest may object to these provisions, which may not be approved by the Bankruptcy Court. If these provisions are not approved, certain Released Parties or Exculpated Parties may withdraw their support for the Plan. This may affect the Debtors' ability to proceed to seek confirmation of the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to convert certain of their Claims against the Debtors' estates into equity in Reorganized Incora, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

**5.      The Effective Date May Not Occur.**

The Restructuring Transactions in the Plan are subject to governmental and regulatory consents and approvals (including review under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), which may not be obtained prior to the anticipated Effective Date. Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and that there is not a material risk that the Debtors will not be able to obtain the consents and approvals (including any antitrust approval) needed to implement the Restructuring Transactions and thus cause the Effective Date to occur, there can be no assurance that the Effective Date will occur on time or will occur at all. The Effective Date is also subject to certain conditions precedent, as described above at Section IV.I (entitled "Conditions to Effective Date"). Failure to meet any of these conditions (in the absence of a waiver in accordance with Article IX of the Plan) could prevent the Effective Date from occurring.

If the Effective Date does not occur, the Plan will be null and void, and the Confirmation Order may need to be vacated. In that case, no distributions will be made under the Plan, the Debtors and all holders of Claims and Interests will be restored to the status quo immediately prior to Confirmation, and the Debtors' obligations with respect to Claims and Interests will remain unchanged.

**6.      The DIP Financing May Be Terminated.**

The DIP Financing, along with the consensual use of cash collateral, is intended to provide liquidity to the Debtors during the Chapter 11 Cases. The DIP Financing has a maturity date that was intended to provide for the prompt emergence from Chapter 11. ~~In addition, the Plan does not constitute an "Acceptable Plan" and this Disclosure Statement does not constitute an "Acceptable Disclosure Statement" under the DIP Note Purchase Agreement.~~ If the Chapter 11 Cases take longer than expected to conclude or the Debtors do not comply with their covenants and obligations under the Final DIP Order or the DIP Note Purchase Agreement, the Debtors may exhaust or lose access to this financing. Unless the Debtors receive extensions, necessary waivers or are able to refinance the DIP Financing, the DIP Financing will mature on March 1, 2024. If the DIP Financing matures, the Debtors also would lose access to cash collateral to operate their business. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise, nor is there any assurance that the Debtors will receive consent from the DIP Note purchasers to continue to use their cash collateral if the DIP Financing matures. If the DIP Financing matures (or otherwise terminates), the Debtors may lose their ability to convert the principal amount of DIP Financing Claims into New Exit Notes and may therefore be required to pay the such amount in cash. In any such case, the Debtors may not have sufficient liquidity to maintain orderly functioning of their businesses.

**7.      The Restructuring Support Agreement May Be Terminated.**

The Restructuring Support Agreement is expected to contain provisions that give the respective Consenting Parties the right to terminate the Restructuring Support Agreement if certain conditions are not satisfied or waived. The Plan may not be confirmed if the Restructuring Support Agreement is terminated as to all Consenting Parties, which could result in protracted Chapter 11 Cases and detrimentally affect the Debtors' relationships with, among

others, vendors, suppliers, customers and employers. Termination of the Restructuring Support Agreement could also result in the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

Upon the occurrence of a Termination Date (as defined in the Restructuring Support Agreement) (other than a Termination Date as a result of the occurrence of the Effective Date), any and all votes (including any and all votes contained on a Master Ballot) submitted prior to such Termination Date by the Consenting Parties subject to such termination will automatically be deemed, for all purposes, to be null and void from the first instance and will not be counted in determining the acceptance or rejection of the Plan or for any other purpose. Such votes may be changed or resubmitted regardless of whether the Voting Deadline has passed (without the need to seek a court order or consent from the Debtors allowing such change or resubmission).

### 8. ~~7.~~ The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan.

The Debtors reserve the right, in accordance with the Bankruptcy Code ~~and~~, the Bankruptcy Rules and the Restructuring Support Agreement, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If the Debtors seek to modify the Plan after receiving sufficient acceptances but before the Bankruptcy Court's entry of an order confirming the Plan, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected holders accept the modification in writing or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims or Interests, or is otherwise permitted by the Bankruptcy Code.

The Debtors may also revoke or withdraw the Plan prior to the Confirmation Date.

### 9. Recoveries for Holders of General Unsecured Convenience Claims May Depend on Elections of Holders of General Unsecured Claims.

Under the Plan, certain holders of Claims in Class 7a (General Unsecured Claims) have the right to waive any Allowed portion of their Claims in excess of $1,500,000 and instead accept treatment as a holder of a General Unsecured Convenience Claim in an amount up to $1,500,000. Because no more than $7,500,000 will be distributed to holders of General Unsecured Convenience Claims, the percentage recoveries of each holder of a General Unsecured Convenience Claims may be diminished if holders of General Unsecured Claims elect treatment as holders of General Unsecured Convenience Claims.

B.    BUSINESS RISKS

    1.    **Results May Vary from the Projections and Other Forward-Looking Statements.**

The Debtors' management and advisors have prepared the projections attached to this Disclosure Statement. While those projections have been presented with numerical specificity, the projections are necessarily based on a variety of estimates and assumptions which, though considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtors' control. The Debtors caution that they cannot make any representations as to the accuracy of these projections (or other forward-looking statements set forth in this Disclosure Statement) or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions will inevitably differ from actual conditions. Furthermore, events and circumstances occurring after the date on which these projections were prepared may differ from any assumed facts and circumstances and may affect financial results in a materially adverse or materially beneficial manner. The projections and other forward-looking statements, therefore, should not be relied upon as a guarantee or other assurance of the actual results that will occur.

    2.    **The Aerospace Industry May Experience a Downturn or the Global Economy May Experience a Recession.**

Demand for the products and services the Debtors offer are directly tied to the delivery of new aircraft, aircraft utilization and repair of existing aircraft, which are in turn affected by global economic conditions. The airline and business jet industries are sensitive to changes in economic conditions. A recession in the U.S. or global economies would likely result in a decrease in capital spending in the aerospace industry and have a materially adverse effect on the Debtors' operating results. For example, revenue passenger miles on commercial aircraft plummeted in 2020 due to the COVID-19 pandemic, leading to decreased revenues on a *pro forma* basis compared to the Debtors' predecessor businesses in 2019. Conversely, during periods of economic expansion, when capital spending normally increases, and Debtors generally benefit from greater demand for our products and services.

The commercial airline and business jet industries could experience a difficult operating environment due to several factors beyond the Debtors' control. As an example, the operating environment would be negatively affected by increasing fuel prices, industry consolidation, changes in regulation, terrorism, a resurgence of COVID-19, labor disruptions, or environmental concerns. Many of these factors could have a negative effect on air travel, which could materially and adversely affect the Debtors' business, financial condition and operating results.

Fluctuations in the global supply of crude oil, refined products including jet fuel, and the possibility of changes in government policies on the production, transportation and marketing of jet fuel make it impossible to predict the future availability and price of jet fuel. If there is an outbreak or escalation of hostilities or other conflicts or significant disruptions in oil production or delivery in oil-producing areas or elsewhere, there could be reductions in the production or importation of crude oil and significant increases in the cost of jet fuel. If there were major

reductions in the availability of jet fuel or significant increases in its cost, commercial airlines would face increased operating costs. Due to the competitive nature of the airline industry, airlines are often unable to pass on increases in fuel prices to customers by increasing fares. As a result, an increase in jet fuel could result in a decrease in net income from either lower margins or, if airlines increase ticket fares, lower net sales from reduced airline travel. Decreases in airline profitability could decrease the demand for new commercial aircraft, resulting in delays of or reductions in deliveries of commercial aircraft that utilize the products we sell, and, as a result, the Debtors' business, financial condition and operating results could be materially adversely affected.

### 3. Global Military Spending May Decline.

During 2022, approximately 40% of our revenue was related to services and goods for military aircraft. The military market depends strongly on governmental budget trends, and especially on the budget of the U.S. Department of Defense. Future Department of Defense budgets could decline due to several factors, including changes to defense spending policy by current and future presidential administrations or Congresses, the U.S. government's budget deficits or government shutdowns, national spending priorities, the cost of sustaining the U.S. military presence in overseas operations, and political pressure to reduce military spending. A decline in U.S. military spending could result in a reduction in military aircraft production, which could materially and adversely affect the Debtors' business, financial condition and operating results.

In particular, military spending may be limited by the Fiscal Responsibility Act of 2023, which was passed in June 2023 (the "*Fiscal Responsibility Act*"). The Fiscal Responsibility Act established limits on federal defense spending during the government's fiscal years 2024 and 2025. The limits for fiscal years 2024 and 2025 may be enforced through sequestration—across-the-board spending cuts that arise if annual appropriations exceed the authorized amounts. The Debtors are unable to predict the effects that budget limits and sequestration provisions of the Fiscal Responsibility Act may have on funding for the military programs that the Debtors support. However, any cuts may result in reductions, delays or cancellations of those programs, which could have a material adverse effect on the Debtors' business, financial condition and operating results.

### 4. Changes in Trade Policies May Negatively Affect the Debtors' Business.

The U.S. has, from time to time, signaled support for, and in some instances has taken action with respect to, major changes to certain trade policies, such as the imposition of additional tariffs on imported products and the withdrawal from or renegotiation of certain trade agreements, including the North American Free Trade Agreement. Further changes could also result in retaliatory actions by the United States' trade partners. For example, the United States has increased tariffs on certain imports from China, as well as on steel and aluminum products imported from various countries. In response, China, the European Union, and several other countries have imposed or proposed additional tariffs on certain exports from the United States.

The Debtors procure certain of the products we sell directly or indirectly from outside of the United States, including from China. The imposition of tariffs and other potential changes in U.S. trade policy could increase the cost or limit the availability of such products, which could hurt our competitive position and adversely impact our business, financial condition and results of operations. In addition, the Debtors sell a significant proportion of our products to customers outside of the United States. Retaliatory actions by other countries could result in increases in the price of our products, which could limit demand for such products, hurt the Debtors' global competitive position and have a material adverse effect on their business, financial condition and operating results.

5.      **New Regulations May Be Adopted.**

If new and more stringent government regulations are adopted or if industry oversight increases, the Debtors' suppliers and customers may incur significant expenses to comply with the new regulations or heightened industry oversight. In the case of suppliers, these expenses may be passed on to the Debtors in the form of price increases, which the Debtors may be unable to pass along to our customers. In the case of customers, these expenses may limit their ability to purchase products. In each case, the Debtors' business, financial condition and operating results may be adversely affected. Additionally, the Debtors' own operations may be directly affected by new regulations, including new cyber-security regulations, accounting rules, and defense procurement rules.

6.      **The Debtors May Be Adversely Affected by Global Climate Change**
       **or by Regulatory or Market Responses to Climate Change.**

The Debtors' regulators and contractual counterparties may respond to global climate change by imposing new regulations, contractual requirements, and other policies, which may lead to additional operational restrictions. Our opportunities for growth may be limited by increased costs across the aerospace industry as a result of climate change, and our business may be unsuccessful in adapting to changes in product designs, carbon offset requirements, and limits on greenhouse gas emissions, among other things. Furthermore, increasing attention to environmental, social and governance (ESG) matters may lead to enhanced compliance and disclosure requirements and their attendant costs, especially if the Reorganized Debtors seek to offer securities on public markets.

7.      **The Debtors Are Subject to Special Business Risks as a Result of**
       **Supplying Equipment and Services to the U.S. Government.**

Companies engaged in supplying defense-related equipment and services to U.S. government agencies are subject to risks specific to the defense industry. The Debtors contract directly with the U.S. government and also as a subcontractor to customers that contract with the U.S. government. Accordingly, the U.S. government may unilaterally suspend or prohibit the Debtors from receiving new contracts pending resolution of alleged violations of procurement laws or regulations, may revoke required security clearances, may reduce the value of existing contracts, and may audit the Debtors' contract-related costs and fees. In addition, most of the Debtors' U.S. government contracts and subcontracts can be terminated by the U.S. government or the contracting party, as applicable, at its convenience. Termination-for-convenience

provisions typically provide only for the Debtors' recovery of costs incurred or committed, settlement expenses, and profit on the work completed prior to termination.

In addition, the Debtors are subject to U.S. government inquiries and investigations, including periodic audits of costs that we determine are reimbursable under government contracts. U.S. government agencies routinely audit their contracts to review performance, cost structure, and compliance with applicable laws, regulations and standards, as well as adequacy of a contractor's internal control systems and policies. Any costs found to be misclassified or inaccurately allocated to a specific contract are not reimbursable, and must be refunded to the extent already reimbursed. Also, any inadequacies in the Debtors' systems and policies could result in payment withholding, penalties, or loss of future business.

Government rules require contracting officers to impose contractual withholdings at no less than certain minimum levels if a contracting officer determines that at least one of a contractor's business systems has at least one significant deficiency. If a contracting officer were to impose a withholding on the Debtors or even on one of the Debtors' prime contractors, it would increase the risk that the Debtors would not be paid in full or paid timely. If future audit adjustments exceed the Debtors' estimates, the Debtors' profitability could be adverse affected.

If a government inquiry or investigation uncovers improper or illegal activities, the Debtors could be subject to civil or criminal penalties or administrative sanctions, including contract termination, fines, forfeiture of fees, suspension of payment, or suspension or debarment from doing business with U.S. government agencies, any of which could materially adversely affect the Debtors' reputation, business, financial condition and operating results.

The Debtors are also subject to the federal False Claims Act, which provides for substantial civil penalties and treble damages where a contractor presents a false or fraudulent claim to the government for payment. Actions under the False Claims Act may be brought by the government or by other persons on behalf of the government (who may then share in any recovery).

**8.    The Debtors May Lose Significant Customers or Significant Customers May Reduce Orders.**

The Debtors' top ten customers during 2022 accounted for approximately 58% of revenue. A reduction in purchasing by or loss of one of the Debtors' larger customers for any reason, including changes in manufacturing or procurement practices, in-sourcing, merger, loss of a customer as a result of the acquisition of that customer by a purchaser that does not hire the Debtors, a transfer of business to a competitor, an economic downturn, failure to adequately service our clients or to manage the implementation of new customer sites, decreased production or a strike, could have a material adverse effect on the Debtors' business, financial condition and operating results.

9. **Competitive Pricing Pressure and In-Sourcing May Decrease the Debtors' Revenue.**

The Debtors operate in a highly competitive global industry and compete against a number of companies, including divisions of larger companies and certain of the Debtors' suppliers, some of which may have significantly greater financial resources than do the Debtors and therefore may be able to adapt more quickly to changes in customer requirements. These competitors consist of both U.S. and foreign companies and range in size from divisions of large public corporations to small privately held entities. Competition can be focused in the local service area and is generally based on product line breadth, product availability, service capabilities and price. The Debtors believe that their ability to compete depends on superior customer service and support, on-time delivery, sufficient inventory availability, competitive pricing and effective quality assurance programs. To remain competitive, the Debtors may have to adjust the prices of some of the products and services and continue investing in procurement, supply-chain management and sales and marketing functions, the costs of which could negatively impact the results of operations. Also, to the extent that the Debtors do not meet changing customer preferences or demands or to the extent that one or more competitors becomes more successful with private label products or otherwise, the Debtors' ability to attract and retain customers could be materially adversely affected.

In addition, the Debtors face competition for long-term contract customers both from competitors in the aerospace industry (including OEMs that are increasing the services portion of their businesses) and the in-sourcing of supply-chain management by the Debtors' customers themselves. If any long-term customer decides to in-source the services the Debtors provide or to switch to a competitor, the Debtors' business may be adversely affected.

Existing or future competitors also may seek to compete for acquisitions, which could have the effect of increasing the price and reducing the number of suitable acquisitions. In addition, consolidation among competitors or customers may make it more difficult for the Debtors to compete. Some competitors' financial, technological and other resources may be greater than the Debtors' or they may have less debt and, as a result, may be better able to withstand changes to industry conditions. The occurrence of any of these circumstances or events could materially adversely affect the Debtors' growth and profit margins.

10. **The Debtors Do Not Have Guaranteed Future Sales.**

Certain of the Debtors' contracts are long-term, fixed-price agreements with no guarantee of future sales volumes, and may be terminated for convenience on short notice by our customers, often without meaningful penalties. Some of these contracts provide that the Debtors are reimbursed upon termination only for the cost of any inventory that has been specifically procured for the terminating customer and that is not commonly sold to the Debtors' other customers. In addition, the Debtors purchase inventory based on their forecasts of anticipated future customer demand. As a result, the Debtors may take the risk of having excess inventory if customers do not place orders consistent with forecasts. This risk is especially pronounced with respect to inventory that has a more limited shelf-life. Also, even though the Debtors often enter into long-term pricing agreements with suppliers, they run the risk of not being able to pass along or otherwise recover unexpected increases in product costs, including as a result of

commodity price increases and tariffs, which may increase above prices that are fixed under long-term customer contracts. When the Debtors are awarded new contracts, particularly just-in-time ("*JIT*") contracts, they may incur high costs, including salary and overtime costs, to hire and train on-site personnel, in the start-up phase of performance. In the event that the Debtors purchase more products than customers require, product costs increase unexpectedly, the Debtors experience high start-up costs on new contracts or the Debtors' contracts are terminated, the Debtors' business, financial condition, operating results and operating margins could be negatively affected.

### 11.    Customers May Reduce Investment in New Manufacturing.

If the Debtors' customers decide to reduce their investment in manufacturing of new aircraft and aerospace equipment, it is likely that those customers will reduce the amount of goods that they purchase from or through the Debtors. While customers may reduce manufacturing volume for many reasons, an increase in interest rates or cost of capital would present a particular risk to the Debtors' business if such an increase causes many customers to simultaneously reduce their demand for hardware and chemicals. Likewise, the Debtors' clients in the aerospace industry may face declining demand if airlines conduct fewer flight operations, whether due to shortages of qualified pilots, labor disputes, declining demand for business travel, or other causes.

### 12.    Customers May Become Financially Distressed or Insolvent.

If any of the Debtors' customers becomes insolvent or experiences substantial financial difficulties, the Debtors may be unable to timely collect amounts owed to them by those customers and may not be able to sell the inventory that they have purchased for those customers, which, if involving substantial sales, could have a material adverse effect on our business, financial condition and operating results.

### 13.    Customers or Suppliers May Lose Government Approvals.

The aerospace industry is highly regulated in the United States and in other countries. The Federal Aviation Administration ("*FAA*") prescribes standards and other requirements for aircraft components in the United States and comparable agencies, such as the European Aviation Safety Agency, the Civil Aviation Administration of China and the Japanese Civil Aviation Bureau, regulate these matters in other countries. The Debtors' suppliers and customers must generally be certified by the FAA, the U.S. Department of Defense and similar agencies in foreign countries. If any supplier's government certifications are revoked, the Debtors would be less likely to buy that supplier's products, and, as a result, would need to locate a suitable alternate supply of its products, which we be difficult to accomplish on commercially reasonable terms or at all. If any customer's government certifications are revoked, their demand for the Debtors' products would decline. In each case, the Debtors' business, financial condition and operating results may be adversely affected.

### 14. The Debtors May Be Unable to Effectively Manage Inventory.

Due to the lead times required by many of the Debtors' suppliers, they typically order products (particularly hardware products) in advance of expected sales, and the volume of those orders may be significant. Lead times generally range from several weeks up to two years, depending on industry conditions, which makes it difficult to manage inventory to match future demand. In addition, demand for the Debtors' products can fluctuate significantly, which can also negatively affect cash flows and inventory levels.

### 15. The Debtors May Not Be Able to Satisfy Customer Demands If Suppliers Cannot Supply Quality Products On Time, in Adequate Quantities, and at Reasonable Cost.

The Debtors' inventory is primarily sourced directly from producers and manufacturing firms. The Debtors depend on the availability of large supplies of their merchandise, which must also meet customers' quality standards. These suppliers may experience capacity constraints that result in their being unable to supply the Debtors with products in a timely manner, in adequate quantities and at a reasonable cost. Many such suppliers are experiencing inflationary pressures, as well as disruptions due to the lingering effects of COVID-19, global supply chain constraints and labor instability. Additionally, if one or more of the raw materials on which our suppliers depend becomes unavailable, or available only at very high prices, suppliers may be unable to deliver to the Debtors' and their customers at budgeted costs.

In particular, certain of the Debtors' products, such as wire and conduit, are commodity-price-based products and may be subject to significant price fluctuations that are beyond the Debtors' control. While increases in the cost of energy or products could have adverse effects, decreases in those costs, particularly if severe, could also adversely impact the Debtors by creating deflation in selling prices, which could cause our gross profit margin to deteriorate. Fluctuations in energy or raw materials costs can also adversely affect the Debtors' customers. Historically, declines in oil and gas prices have negatively impacted customers operating in those industries and, consequently, the Debtors' sales to those customers.

Beyond the foregoing considerations, procurement costs could rise due to changes in trade policies, such as additional tariffs on certain products imported into the United States or new sanctions against countries where such products are manufactured or where underlying raw materials are found. Any significant interruption in the supply of these products or termination of the Debtors' relationship with any suppliers could result in the Debtors being unable to meet the demands of customers, which would have a material adverse effect on the Debtors' business, financial condition and operating results.

The Debtors are also subject to the risk of supplier concentration. During 2022, PPG Industries, Precision Castparts, Howmet Aerospace, and Lisi Aerospace collectively supplied approximately 21.5% of the products the Debtors purchased. If any of these suppliers in particular were to experience the negative effects discussed above, this could have a material adverse effect on the Debtors' business, financial condition and operating results.

16.     **The Debtors May Face a Failure of Complex Information Systems.**

The provision and application of information technology is an increasingly important aspect of the Debtors' business. Among other things, the Debtors' IT systems must interact with those of our customers, suppliers and logistics providers. The Debtors' operations depend on their ability to maintain existing systems and implement new technology, which includes allocating sufficient resources to periodically upgrade their information technology systems. Conversions to new information technology systems may result in cost overruns, delays or business interruptions. If the Debtors' information technology systems are disrupted (including due to a cyber-security attack), become obsolete or do not adequately support their strategic, operational or compliance needs, it could result in competitive disadvantage and adversely affect financial results and business operations, including the Debtors' ability to process orders, receive and ship products, maintain inventories, collect accounts receivable and pay expenses.

17.     **The Debtors Depend on Key Personnel, Whose Departure May Adversely Affect the Debtors' Financial Results.**

The Debtors depend, and will continue to depend, on the services of key managerial, administrative, sales and field personnel, who possess the necessary experience and skills to operate the Debtors' businesses. The ability to attract and retain key employees is important to the Debtors' success and growth. Competition for these workers can be intense, and the Debtors may become unable to provide sufficient compensation to retain and motivate key employees, especially in an inflationary economic environment. For some positions, the Debtors may face additional challenges in integrating and retaining employees who primarily work from remote locations. The unexpected loss of key employees, whether to competitors, customer in-sourcing, retirement or other pursuits, could have a detrimental effect on the Debtors' financial condition or operational results.

18.     **Labor Disputes May Degrade Our Operations.**

Labor disputes involving the Debtors or their customers or suppliers could degrade the Debtors' operations. If customers or suppliers are unable to negotiate new labor agreements and their plants experience slowdowns or closures, the Debtors net sales and profitability could be negatively affected.

Collective agreements may be in place on either a local or a national level at certain of the Debtors' (or their subsidiaries') international sites, and the employees of the Debtors' customers, suppliers and other service providers may be, or may in the future be, unionized. The Debtors cannot guarantee that there will not be any strike, lockout, work stoppage or material labor dispute with respect to their own business or those of their customers or suppliers, which may materially affect the Debtors business, financial condition and operating results.

19.     **Legal Proceedings May Adversely Affect the Debtors' Businesses.**

From time to time, the Debtors may become involved in various legal proceedings incidental to their businesses, including patent, commercial, product liability, employment, or whistleblower litigation or claims, and regulatory investigations or proceedings. Even if each

individual matter is not material to the Debtors' business, and even if the claims are without merit, such matters can divert employees' attention and cause the Debtors to incur significant expenses. Furthermore, because such matters are inherently unpredictable, there can be no assurance that the results of litigation will not have an adverse effect on the Debtors' businesses, financial results, or financial condition.

**20.    The Debtors Are Subject to Health, Safety and Environmental Laws and Regulations.**

The Debtors are subject to extensive federal, state, local and foreign laws, regulations, rules and ordinances (collectively, "*EHS laws*") relating to pollution, protection of the environment and human health and safety, and the handling, transportation, storage, treatment, disposal and remediation of hazardous substances, including potentially with respect to historical chemical blending and other activities that pre-dated the purchase of the Haas business. Actual or alleged violations of EHS laws, or permit requirements could result in restrictions or prohibitions on operations and substantial civil or criminal sanctions, as well as, under some EHS laws, the assessment of strict liability and/or joint and several liability. Furthermore, the Debtors may be subject to future claims by employees who assisted in supplying chemicals or providing chemical management services at our customer's operations, or by other persons, including the Debtors' customers and their employees.

Governmental, regulatory and societal demands for increasing levels of product safety and environmental protection are resulting in increased pressure for more stringent regulatory control with respect to the chemical industry. The European Union's Registration, Evaluation, Authorization and Restriction of Chemicals ("*REACH*") regulations enacted in 2009 have been a continuing source of compliance obligations and restrictions on certain chemicals, and REACH-like regimes have now been adopted in several other countries. In the United States, the core provisions of the Toxic Substances Control Act (the "*TSCA*") were amended in June 2016 for the first time in nearly 40 years. Among the more significant changes are that these amendments mandate safety reviews of existing "high priority" chemicals and regulatory action to control any "unreasonable risks" identified as result of such reviews. The U.S. Environmental Protection Agency (the "*EPA*") also now must make a "no unreasonable risk" finding before a new chemical can be fully commercialized. These new mandates create uncertainty about whether existing chemicals of importance to our business may be designated for restriction and whether the new chemical approval process may become more difficult and costly.

Finally, certain of the Debtors have in the past sold products containing per- and polyfluoroalkyl substances ("*PFAS*"), including perfluorooctanoic acid ("*PFOA*"). Certain PFAS, including PFOA, have been targeted for risk assessment, restriction, and high priority remediation and have been the subject of ongoing and substantial litigation in the United States, the United Kingdom and the European Union. The Debtors have not received any claims or enforcement actions from governments or third parties relating to PFOA or any other PFAS.

In addition, these concerns could influence public perceptions regarding the Debtors' operations and their ability to attract and retain customers and employees. Moreover, changes in EHS laws could inhibit or interrupt the Debtors' operations, or require them to modify facilities or operations. Accordingly, environmental or regulatory matters may cause the Debtors to incur

significant unanticipated losses, costs, capital expenditures or liabilities, which could reduce their profitability. Such losses, costs, capital expenditures or liabilities will be subject to evolving regulatory requirements and will depend on the timing of the promulgation and enforcement of specific standards which impose requirements on our operations. As a result, these losses, costs, capital expenditures or liabilities may be more than currently anticipated.

### 21.    The Debtors' Insurance Coverage May Prove Inadequate.

The Debtors carry liability, property, directors' and officers', and other insurance policies that are designed to cover insurable risks. The Debtors select the types of insurance, the limits, and the deductibles based on the Debtors' specific risk profile, general industry standards, and the cost of the coverage versus its perceived benefit. The Debtors' insurance policies commonly contain standard exclusions for events such as war. Although the Debtors attempt to select reputable insurance carriers, the Debtors may be unable to access an insurance policy whose carrier does not have sufficient capital to meet the coverage. Even if carriers remain able to pay their policies, the Debtors' policies may prove to be inadequate.

### 22.    Failure of a Product Could Result in a Recall.

Most of the products that the Debtors supply go into critical aerospace manufacturing applications. A failure of such components could lead to a product recall. If a recall were to happen as a result of failure by a component supplied by the Debtors, the Debtors could bear a substantial part of the cost of correction. In addition to the cost of fixing the parts affected by the component, a recall could result in the loss of a portion of or all of the customer's business. The loss of a key customer or a successful legal claim by a customer arising from a product recall could have a material adverse effect on our business, financial condition, operating results and cash flows from operations. While the failure of a component is usually attributable to the original manufacture of the component, there can be no assurance that a successful product recall claim would not impact the Debtors as supplier, and could negatively affect their financial condition and results of operations.

### 23.    Failure of a Product Could Result in an Aircraft Crash.

The Debtors may be exposed to liabilities for personal injury, death or property damage due to the failure of a product that the Debtors have sold. The Debtors typically agree to indemnify their customers against certain liabilities resulting from such products, and any third-party indemnification from the Debtors' suppliers and liability insurance may not fully cover those indemnification obligations to customers. The Debtors also may not be able to maintain insurance coverage in the future at an acceptable cost. Any liability for which third-party indemnification is not available that is not covered by insurance could have a material adverse effect on the Debtors' business, financial condition and results of operations.

In addition, a crash caused by a product that a Debtor has sold could damage the Debtors' reputation for selling quality products. The Debtors believe that customers consider safety and reliability as key criteria in selecting a provider of aircraft products and believe that the Debtors' reputation for quality assurance is a significant competitive strength. If a crash were to be caused by a product that a Debtor has sold, or if the Debtors are to otherwise fail to maintain a

satisfactory record of safety and reliability, their ability to retain and attract customers may be materially adversely affected.

### 24. The Debtors May Experience a Catastrophic Event at a Warehouse.

A significant portion of the Debtors' inventory is concentrated in several large warehouses, and the Debtors may be exposed to a significant loss of inventory if a catastrophic event occurs at any of those locations, including by fire, tornado, flood, explosion, or shelving collapse. Even though the Debtors maintain customary and appropriate insurance coverage, it is possible that insurance proceeds will not adequately compensate the Debtors for losses, including indirect losses from interruption of business if a short-term loss of inventory renders the Debtors incapable of satisfying their customers' immediate needs. A catastrophic event may also expose the Debtors to environmental liabilities, including from a release of hazardous chemicals.

### 25. The Debtors Face Risks Inherent in International Operations.

The Debtors and their subsidiaries have significant international operations, with facilities in Argentina, Australia, Brazil, Canada, China, France, Germany, India, Ireland, Israel, Italy, Japan, Mexico, Philippines, Poland, Singapore, Turkey, the United Kingdom and the United States, and customers throughout North America, Latin America, Europe, Asia and the Middle East. In 2022, approximately 40% of sales were derived from outside the United States.

These international operations are subject to the following risks, among others:

- the burden of complying with multiple and possibly conflicting laws and any unexpected changes in regulatory requirements;

- political risks, including risks of loss due to civil disturbances, acts of terrorism, acts of war, guerilla activities and insurrection;

- unstable economic, financial and market conditions and increased expenses due to inflation, or higher interest rates;

- difficulties in enforcement of third-party contractual obligations and collecting receivables through foreign legal systems;

- changes in global trade policies;

- increasingly complex laws and regulations concerning privacy, data protection and data security, including the EU's General Data Protection Regulation and the United Kingdom's equivalent;

- difficulties in staffing and managing international operations and the application of foreign labor regulations;

- differing local product preferences and product requirements; and

- adverse tax consequences from changes in tax laws, requirements relating to withholding taxes on remittances and other payments by subsidiaries and restrictions on the Debtors' ability to repatriate dividends from subsidiaries.

### 26.    The Debtors Are Subject to Exchange Rate Fluctuations.

Given the international nature of their operations, the Debtors are exposed to currency exchange rate fluctuations as a portion of their revenues and expenses are denominated in currencies other than the U.S. dollar. The Debtors and their subsidiaries generate a significant proportion of profits in both British pounds sterling and euros, and hence their operating profits can be adversely affected when the U.S. dollar strengthens against these currencies. Operating results of certain of foreign subsidiaries are translated into U.S. dollars for purposes of statements of comprehensive income at average monthly exchange rates. Moreover, to the extent that net sales are not denominated in the same currency as expenses, net earnings could be materially adversely affected. For example, a portion of labor, material and overhead costs for the Debtors' facilities in the United Kingdom, Germany, France and Italy are incurred in British pounds sterling or euros, but in certain cases the related net sales are denominated in U.S. dollars. Changes in the value of the U.S. dollar or other currencies could result in material fluctuations in foreign currency translation amounts or the U.S. dollar value of transactions and net earnings could thereby be materially adversely affected. At times the Debtors have engaged in hedging transactions to manage or reduce foreign currency exchange risk, but these transactions may not be successful and, as a result, the Debtors' business, financial condition and operating results could be materially adversely affected. During 2022, fluctuations in foreign currency translation had a negative effect on cash of approximately $3.5 million.

### 27.    International Operations Require Compliance with Numerous Anti-Corruption and Trade Control Laws and Regulations.

Doing business on a worldwide basis requires the Debtors to comply with the laws and regulations of many governments, including the United States and the United Kingdom. The Debtors' failure to comply with these rules and regulations may expose us to liability. These laws and regulations can apply to companies, individual directors, officers, employees and agents, and may restrict the Debtors' operations, trade practices, investment decisions and partnering activities. The risk of violating anti-corruption laws is increased because some of the international locations in which the Debtors operate lack a highly developed legal system and have elevated levels of corruption, and because the Debtors' industry is highly regulated.

In particular, the Debtors' international operations are subject to U.S. and foreign anti-corruption laws and regulations, such as the Foreign Corrupt Practices Act ("*FCPA*"), the UK Bribery Act (the "*Bribery Act*") and other applicable anti-corruption regimes. These laws generally prohibit us from providing anything of value, directly or indirectly, to foreign government officials for the purposes of improperly influencing official decisions, improperly obtaining or retaining business, or otherwise obtaining favorable treatment. As part of the Debtors' business, they may deal with governments and state-owned business enterprises, the employees and representatives of which may be considered government officials for purposes of the FCPA, the Bribery Act or other applicable anti-corruption laws. Some anti-corruption laws, such as the Bribery Act, also prohibit commercial bribery and the acceptance of bribes. Failure to

comply with these laws could result in civil and criminal penalties and other sanctions, which could negatively impact the Debtors' financial condition and operating results. Even if the Debtors are not ultimately sanctioned by government authorities, the costs of investigation and review, distraction of personnel, legal defense costs, and harm to reputation could be substantial and could limit profitability.

As an exporter, The Debtors must comply with various laws and regulations relating to the export of products, services and technology from the United States and other countries having jurisdiction over our operations. In the United States, these laws include, among others, the Export Administration Regulations (the "*EAR*") administered by the Department of Commerce's Bureau of Industry and Security, the International Traffic in Arms Regulations ("*ITAR*") administered by the Department of State's Directorate of Defense Trade Controls, and trade sanctions, regulations and embargoes administered by the Department of the Treasury's Office of Foreign Assets Control ("*OFAC*"). OFAC enforces certain laws and regulations that impose restrictions upon U.S. nationals, U.S. permanent residents, persons located in the United States or entities organized under the laws of a U.S. jurisdiction (collectively, "*U.S. Persons*"), upon business conducted in whole or in part in the United States and, in some instances, upon foreign entities owned or controlled by U.S. Persons, with respect to activities or transactions with certain countries, governments, entities and individuals that are the subject of such U.S. economic sanctions. These laws and regulations may require the Debtors to obtain licenses from the relevant agency to export, re-export, or transfer commodities, software, technology, or services to certain jurisdictions, individuals, or entities. The Debtors cannot be certain that their applications for export licenses or other authorizations will be granted or approved. Furthermore, the export license and export authorization process is often time-consuming.

Violations of these legal requirements can be punishable by criminal fines and imprisonment, civil penalties, disgorgement of profits, injunctions, debarment from government contracts, seizure and forfeiture of unlawful attempted exports, and/or denial of export privileges, as well as other remedial measures. The Debtors have established policies and procedures designed to assist us, our personnel and our agents to comply with applicable U.S., UK and international laws and regulations. However, there can be no guarantee that these policies and procedures will effectively prevent the Debtors, their employees or their agents from violating these regulations in every transaction in which the Debtors may engage, and violations, allegations or investigations of such violations could materially adversely affect the Debtors' reputation, business, financial condition and results of operations.

### 28.   The Debtors May Be Subject to Changes in Tax Laws or Challenges to Their Tax Positions.

The Debtors are subject to taxes in jurisdictions in which they do business, including taxes imposed on income, receipts, stockholders' equity, property, sales, purchases and payroll. As a result, the Debtors' tax expense can be adversely affected by changes in tax law. The Debtors often cannot anticipate these changes in tax law, which can cause unexpected volatility in results of operations. Additionally, the tax laws to which the Debtors are subject are inherently complex and often ambiguous. Therefore, the Debtors must interpret the applicable laws and make subjective judgments about the expected outcome upon challenge by the applicable taxing authorities. As a result, the impact on results of operations from the application of enacted tax

laws to actual facts and circumstances is frequently uncertain. There can be no assurance that the Debtors can accurately predict the outcome of a tax authority's challenge to the Debtors' interpretation and application of tax laws, and the taxes ultimately owed upon effective settlement may differ from the tax expense recognized in consolidated statements of income and accrued on consolidated balance sheets. Additionally, if the Debtors cannot meet liquidity requirements in the United States, they may have to repatriate funds from overseas, which may result in a U.S. tax liability on the amount repatriated.

### 29.    Financial Results May Fluctuate from Period to Period.

Many factors, such as the cyclical nature of the aerospace industry, fluctuations in the Debtors' ONdemand sales, delays in major aircraft programs, planned production shutdowns, downward pressure on sales prices and changes in the volume of customers' orders could cause financial results to fluctuate from period to period. For example, during 2022, approximately $218 million of revenue was derived from ONdemand sales. The prices charged for ONdemand sales are typically higher than the prices under long-term contracts. However, customers may not continue to purchase the same amount of products on an ONdemand basic as they have in the past, so it cannot be assured that the Debtors will be able to generate similar levels of ONdemand net sales as they did in 2022. The Debtors are also actively working to transition customers from ONdemand purchases to long-term contracts, which may also result in a reduction in our ONdemand net sales. A significant reduction in ONdemand sales in any given period could result in fluctuations in financial results and operating margins. As a result of these factors, quarter-to-quarter comparisons of the Debtors' financial results are not necessarily meaningful and these comparisons cannot be relied upon as indicators of future performance.

### C.    RISKS RELATING TO THE NEW COMMON EQUITY

#### 1.    A Liquid Market for the New Common Equity May Not Develop.

There is currently no market for the New Common Equity, and there can be no assurance that any such market will develop. The New Common Equity may, therefore, be illiquid securities without an active trading market. The Reorganized Debtors will be under no obligation to list the New Common Equity on any securities exchange. There can be no assurance as to the prices at which the New Common Equity might be traded, even if an active trading market develops. Accordingly, holders of the New Common Equity may bear certain risks associated with holding securities for an indefinite period of time.

#### 2.    The New Common Equity May Be Subject to Restrictions on Transfers.

Any New Common Equity issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, the New Common Equity will not be freely tradable if, at the time of a transfer, the holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1)

under the Securities Act or had been such an "affiliate" within 90 days of the transfer. "Affiliate" holders will be permitted to sell New Common Equity without registration only if they comply with an exemption from registration, such as Rule 144 under the Securities Act.

The New Common Equity will not be registered under the Securities Act or any other securities laws, and the Debtors make no representation regarding the right of any holder to freely resell securities.

The terms of the New Organizational Documents are expected to contain prohibitions on the transfer of the New Common Equity, to the extent such transfer would subject the Reorganized Debtors to the registration and reporting requirements of the Securities Act and the Securities Exchange Act. Furthermore, the terms of the New Organizational Documents may contain additional transfer restrictions. These terms will be binding on all recipients of New Common Equity under the Plan, including any recipients who do not vote to accept the Plan or affirmatively consent to the New Organizational Documents.

### 3. The New Common Equity May Become Diluted.

The ownership percentage represented by the New Common Equity distributed on the Effective Date will be subject to dilution by any equity issued pursuant to any Management Incentive Plan. The New Common Equity may also be diluted by any other equity interests that may be issued in connection with the Plan or after consummation of the Plan in accordance with the terms of the New Organization Documents, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued after consummation of the Plan.

### 4. Ownership of the New Common Equity May Be Concentrated with a Limited Number of Holders.

Certain holders of Claims may acquire a significant ownership interest in the New Common Equity pursuant to the Plan. Such holders may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and may consequently affect the value of the New Common Equity. Further, the possibility that one or more holders of significant numbers of units of New Common Equity may sell all or a large portion of their New Common Equity in a short period of time may adversely affect the market price of the New Common Equity.

### 5. The New Common Equity Will Be Subordinated to the Reorganized Debtors' Indebtedness.

In any subsequent reorganization, liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity will rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Equity will not be entitled to receive any payment or other distribution upon the reorganization, liquidation, dissolution, or

winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their creditors have been satisfied.

6. **Any Valuation That May Be Implied by the Plan Does Not Represent Trading Value or Fundamental Value of the New Common Equity.**

The valuations implied by the terms of the Plan are not intended to represent the trading value of the New Common Equity in public or private markets or the fundamental value of the Reorganized Debtors, all of which are difficult to predict. Actual market prices of the Reorganized Debtors' securities will depend upon, among other things, (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated initial securities holdings of prepetition creditors and equity holders, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and (d) other factors that generally influence the prices of securities. The actual market prices of the New Common Equity, if any such market exists, are likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance, could cause the market prices of the New Common Equity to rise and fall. Accordingly, any values implied by the Plan do not necessarily reflect, and should not be construed as reflecting, values that will be attained for these securities in the public or private markets.

7. **Reorganized Incora May Not Pay Dividends.**

Reorganized Incora may not pay any dividends on the New Common Equity and may instead retain any future cash flows for debt reduction and to support the Reorganized Debtors' operations. As a result, the success of an investment in the New Common Equity may depend entirely on future appreciation in value. There is, however, no guarantee that the New Common Equity will appreciate in value or even maintain its initial value.

8. **Reorganized Incora Is Expected to Be a Private Company.**

The Debtors expect that Reorganized Incora will not be subject to the reporting requirements of Section 13 or Section 15(d) of the Securities Exchange Act. As a result, holders of the New Common Equity may receive less information with respect to the Reorganized Debtors' business than they would have received if Reorganized Incora were subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act.

9. **Recoveries on the New Common Equity May Be Diminished If Reorganized Incora Is Sold.**

If the Reorganized Incora Board determines to sell substantially all assets of the Reorganized Debtors, the proceeds of such a sale would be distributed in conformity with the New Organizational Documents. Accordingly, such a sale may crystallize New Common Equity holders' recoveries before the Reorganized Debtors have had an opportunity to capture their businesses' full potential for growth. Likewise, if holders of the New Common Equity exercise "drag" rights under the New Organizational Documents, other holders of New Common Equity

may be forced to sell their New Common Equity at a price that may not fully reflect the Debtors' potential for growth.

**D.    RISKS RELATING TO THE FINANCING FACILITIES**

**1.    The Exit Facilities May Not Become Available to the Debtors.**

Pursuant to the Plan, the Debtors intend to obtain commitments under the New Revolver Facility in order to ensure sufficient liquidity to operate their businesses upon emergence from the Chapter 11 Cases. As of the date of this Disclosure Statement, there can be no assurance that the Debtors will successfully obtain these commitments.

In addition, the New Revolver Facility Documents include (or will include) various conditions to closing. The Debtors cannot give assurances that they will meet these conditions. If any of the New Revolver Facility Documents are not consummated, and the Debtors are unable to promptly obtain replacement facilities, the ability of the Debtors to complete the Restructuring Transactions will be materially and adversely affected.

Even if the New Revolver Facility is entered into, the Reorganized Debtors may be unable to remain in compliance with covenants under that facility, in which case the Reorganized Debtors may be unable to access the full committed amount.

**2.    The Exit Facilities May Inhibit the Reorganized Debtors from Obtaining Additional Financing.**

Although the Plan will result in the elimination of debt, the Reorganized Debtors will continue to have a significant amount of indebtedness after the Effective Date, including the New Exit Notes, the New Takeback Notes, and the New Revolver Facility . That indebtedness may limit the ability of the Reorganized Debtors to obtain additional financing for working capital, capital expenditures, debt service requirements, and general corporate or other purposes. The Reorganized Debtors' indebtedness may also limit their ability to adjust to changing market conditions and to withstand competitive pressures, possibly leaving them vulnerable in a downturn in general economic conditions or in its business, or unable to carry out necessary maintenance or capital expenditures.

**3.    The Exit Facilities Are Subject to Ongoing Negotiation**

The Exit Facilities are subject to ongoing marketing and negotiation. Accordingly, the material economic terms of each of the Exit Facilities—including tenor, interest rate, cash interest rate, call protection, collateral package, guarantee package and structural subordination—are not yet known. The Debtors believe that the exhibits to this Disclosure Statement are predicated on reasonable assumptions regarding the Exit Facilities, including that the Reorganized Debtors will have discretion to pay interest on the New Takeback Notes in kind, but cannot give assurance that the Exit Facilities' final terms will correspond to the assumptions that have been incorporated into those exhibits. If the Debtors cannot obtain sufficiently

favorable terms for the Exit Facilities, the Debtors may be unable to obtain Confirmation of the Plan.

## E.    OTHER RISKS

### 1.    The Debtors Have No Duty to Update This Disclosure Statement.

Except where specifically noted, the statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement. There can be no assurance that those statements will remain correct or accurate at any time after that date. Absent an order from the Bankruptcy Court, the Debtors have no duty to update the Disclosure Statement.

### 2.    No Representations Outside This Disclosure Statement Are Authorized.

The Debtors have not authorized any Person or Entity to provide any information about, or concerning, the Plan, other than the information contained in this Disclosure Statement. In addition, the Debtors have not authorized any entity to make any representations concerning the Debtors or the value of their property, other than as set forth in this Disclosure Statement. Any other representations or inducements made to secure the vote of any holder of Claims for acceptance or rejection of the Plan should not be relied upon.

### 3.    The Restructuring Is Expected to Give Rise to Cancellation of Debt Income and Other Tax Risks.

The Restructuring is expected to give rise to cancellation of debt income (COD Income) for U.S. federal income tax purposes. See the tax disclosures set forth in Section VII (entitled Federal Income Tax Considerations) for further information regarding COD Income and other tax considerations.

The tax consequences of the Restructuring Transactions to the Reorganized Debtors may materially differ depending on how the Restructuring Transactions are structured. For example, the Debtors' tax attributes may be, in connection with the implementation of the Plan, significantly reduced, subject to limitation or entirely unavailable to the Reorganized Debtors, depending, in part, on whether the transaction is structured such that the Reorganized Debtors would be treated as purchasing certain of the assets of the Debtors for U.S. federal income tax purposes. The Debtors have not yet determined how to structure the Restructuring Transactions in light of the tax and non-tax considerations. For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan, see Section VII of this Disclosure Statement.

*[Remainder of page intentionally blank]*

# SECTION X.
## ALTERNATIVES TO THE PLAN

### A.   LIQUIDATION UNDER THE BANKRUPTCY CODE

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the Debtors' assets.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims, the Debtors believe that the value of their Estates would be substantially diminished in a chapter 7 liquidation, due to a loss of going concern value. The assets available for distribution to creditors would be reduced by the additional administrative expenses of a chapter 7 trustee and the trustee's professional advisors, as well as by Claims (some entitled to priority) that would arise from the rejection of leases and executory contracts once the Debtors cease operations.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a chapter 7 liquidation, resulting in greater recoveries than in a chapter 7 liquidation. However, the Estates would still lose their going concern value, and the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation. However, the drafting and solicitation of a liquidation plan would result in additional administrative costs.

The Debtors believe that any liquidation is a much less attractive alternative for creditors than the Plan because of the greater recoveries that the Debtors anticipate will be provided under the Plan. The Debtors believe that the Plan affords substantially greater benefits to holders of Claims than would liquidation under any chapter of the Bankruptcy Code.

The Liquidation Analysis, prepared by the Debtors with their financial advisors, premised upon a chapter 7 liquidation, is attached to this Disclosure Statement as **Exhibit C**. In the Liquidation Analysis, the Debtors have considered the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors and equity interest holders than that recoverable in each instance under the Plan. The Debtors believe it is highly unlikely that holders of Claims or Interests in Class 5 (1.25L Notes Claims), ~~Class 6a (2026 Unsecured Notes Claims), Class 6b (2024 Unsecured Notes Claims),~~ Class 7a (General Unsecured Claims), Class 7b (General Unsecured Convenience Claims), ~~[Class 7c (General Unsecured Canada/Mexico Claims),]~~ Class 8 (PIK Notes Claims), or Class 10 (Existing Equity Interests) would receive any distribution in a liquidation under either chapter 7 or chapter 11.

**B.    ALTERNATIVE PLANS OF REORGANIZATION**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization expires or is terminated, any other party in interest) could attempt to formulate a different plan. Such a plan might involve (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets. The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

The Debtors could continue to manage their businesses and maintain their properties as debtors-in-possession, subject to the restrictions imposed by the Bankruptcy Code. However, it is not clear that the Debtors could continue as a going concern in protracted Chapter 11 Cases if Confirmation of the Plan is denied. In such a circumstance, the Debtors may face higher costs of operating amid eroding confidence of customers and vendors. Furthermore, if the DIP Financing were terminated as a result of failure to achieve timely Confirmation of the Plan, it likely would be difficult for the Debtors to find alternative financing.

**C.    SALE UNDER SECTION 363 OF THE BANKRUPTCY CODE**

If the Plan is not confirmed, the Debtors could evaluate whether to seek authorization from the Bankruptcy Court to sell their assets under section 363 of the Bankruptcy Code or through an amended plan. In the event of any sales, the DIP Secured Parties and other secured creditors would be entitled to credit bid on any property to which their security interests are attached to the extent of the value of their security interests, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of Secured Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of the security interests in those assets. The Debtors do not believe a sale of assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

**D.    NON-BANKRUPTCY LIQUIDATION OR FORECLOSURE**

If the Plan is not confirmed, the Chapter 11 Cases could be dismissed, in which case separate liquidation or dissolution proceedings may be commenced in the various jurisdictions where the Debtors are organized, including (as to some) the United Kingdom. Such proceedings may be lengthy, are unlikely to be effectively coordinated across courts, and are unlikely to preserve the going concern value of the Debtors' enterprise. Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases in favor of non-bankruptcy proceedings is a much less attractive alternative for creditors as compared to the Plan.

*[Remainder of page intentionally blank]*

# SECTION XI.
## CONCLUSION AND RECOMMENDATION

The Debtors believe that acceptance and confirmation the Plan is in the best interests of their estates. The Debtors therefore urge all holders of Claims in the Voting Classes to submit timely votes to accept the Plan.



Dated: ~~November 17~~December 27, 2023
Fort Worth, Texas

WESCO AIRCRAFT HOLDINGS, INC,
on behalf of itself and each of its Debtor affiliates

By: */s/ David Coleal*

David Coleal
Chief Executive Officer

EXHIBIT A TO DISCLOSURE STATEMENT

FIRST AMENDED JOINT CHAPTER 11 PLAN OF
WESCO AIRCRAFT HOLDINGS, INC. *ET AL.*

Exhibit B to Disclosure Statement

Financial Projections

*[Exhibit to be filed prior to hearing on approval of Disclosure Statement]*

Exhibit C to Disclosure Statement

Liquidation Analysis

*[Exhibit to be filed prior to hearing on approval of Disclosure Statement]*

Exhibit D to Disclosure Statement


Valuation Analysis

Exhibit E to Disclosure Statement

Organizational Chart

Document comparison by Workshare Compare on Wednesday, December 27, 2023 11:35:40 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\sheraldr\OneDrive - Haynes and Boone, LLP\Desktop\As Filed - Disclosure Statement.docx |
| Description | As Filed - Disclosure Statement |
| Document 2 ID | netdocuments://4890-3838-7580/9 |
| Description | Wesco (Incora) - Disclosure Statement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 567 |
| Deletions | 383 |
| Moved from | 9 |
| Moved to | 9 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 968 |