# In the United States Bankruptcy Court
## for the Southern District of Texas
## Houston Division

|  |  |
|---|---|
| *In re*<br><br>**Wesco Aircraft Holdings, Inc.,**<br>*et al.*,[1]<br><br>Debtors. | Case No. 23-90611 (MI)<br><br>Chapter 11<br><br>(Jointly Administered) |

# Debtors' Reply to the Limited Objection and Reservation of Rights of Gulfstream Aerospace Corporation to the Debtors' Motion for an Order Authorizing Rejection of the Gulfstream Contract

## (Related to Docket Nos. 1057, 1147)

---

[1] The Debtors operate under the trade name Incora and have previously used the trade names Wesco, Pattonair, Haas, and Adams Aviation. A complete list of the Debtors in these chapter 11 cases, with each one's federal tax identification number and the address of its principal office, is available on the website of the Debtors' noticing agent at http://www.kccllc.net/incora/. The service address for each of the Debtors in these cases is 2601 Meacham Blvd., Ste. 400, Fort Worth, TX 76137.

The above-captioned debtors and debtors in possession (the "***Debtors***" or "***Incora***")[2] respectfully state as follows in support of their *Motion for Entry of an Order Authorizing Rejection of the Gulfstream Contract* [Docket No. 1057] (the "***Motion***")[3] and in response to the *Limited Objection and Reservation of Rights of Gulfstream Aerospace Corporation* [Docket No. 1147] (the "***Gulfstream Response***"). Attached to this Reply as **Exhibit A** is the *Declaration of Kevin Matthies* in support of the Motion.

## PRELIMINARY STATEMENT

1.        Until recently, Gulfstream Aerospace Corporation ("***Gulfstream***") was a significant customer of Incora's, with a long-term, multi-million-dollar contract for Incora to manage Gulfstream's hardware needs at several of its North American locations. Like many of Incora's long-term customer contracts, the Gulfstream Contract suffered from declining margins in the face of inflationary pressures, rising supply costs, and several unfavorable commercial terms. For instance, the Gulfstream Contract required Incora to maintain several months' worth of parts in stock for Gulfstream's benefit, without requiring Gulfstream to purchase those parts exclusively from Incora. Gulfstream has been unwilling to accept the modifications to its contract that Incora has requested. For this reason, the Gulfstream Contract is, to date, the only material customer contract that the Debtors have proposed to reject.[4]

2.        Tellingly, *none* of the Debtors' economic stakeholders dispute that the Gulfstream Contract is burdensome, or that rejection of the Gulfstream Contract is anything other than a sound

---

[2]    For the sake of simplicity, the Debtors use "Incora" to refer to both the enterprise as a whole and to the specific entity that is a party to the contract that is the subject of this brief.

[3]    Capitalized terms not otherwise defined in this reply bear the meanings ascribed to them in the Motion.

[4]    Gulfstream states incorrectly that the Debtors have rejected some unspecified contract with Rolls-Royce. *See* Gulfstream Resp. ¶ 31. In fact, the Debtors have *assumed* each of their contracts with Rolls-Royce. *See Order Authorizing and Approving the Assumption and Amendment of Certain Executory Contracts with Rolls-Royce*, Docket No. 1084; Sched. 1, *Debtors' Motion for Entry of an Order Authorizing and Approving the Assumption and Amendment of Certain Executory Contracts with Rolls-Royce*, Docket No. 956 (listing five assumed contracts). Incora views the continuation of its relationship with Rolls-Royce as one of the greatest operational successes of these Chapter 11 Cases.

exercise of the Debtors' business judgment. Even Gulfstream recognizes that the business judgment rule is a "low bar" (Gulfstream Resp. ¶ 27) and that rejection of the Gulfstream Contract in its current form is appropriate. *See Proposed Order Authorizing Rejection of Gulfstream Contract* ¶ 1, *attached to* Gulfstream Response. Instead, Gulfstream argues that Incora should be permitted to reject the Gulfstream Contract only if Incora complies with the rejected contract's onerous requirement to sell tens of millions of dollars of parts to Gulfstream.[5] *See* Gulfstream Resp. ¶¶ 11, 26–31.

3.        But that is not how rejection works. As the Fifth Circuit recently explained, "[t]he hornbook law of rejection" is that "[r]ejection . . . excus[es] the debtor's future performance" and "transforms [that] future performance into an unsecured claim for damages." *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 683–684 (5th Cir. 2022); *see also Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 377 (7th Cir. 2012) (Easterbrook, C.J.) ("After rejecting a contract, a debtor is not subject to an order of specific performance."), *quoted with approval by Gulfport Energy*, 41 F.4th at 683 n.33; *Ebert v. Devries Family Farm, LLC* (*In re Devries*), Adv. No. 12-04015-DML, 2014 Bankr. LEXIS 3621, at *45, 2014 WL 4294540, at *13 (Bankr. N.D. Tex. Aug. 27, 2014) ("By rejecting the Operating Agreement, the Trustee is freed relieved from any future obligations under it . . . ." (citing *Sunbeam Prods.*)); *Route 21 Assocs. of Belleville v. MHC, Inc.*, 486 B.R. 75, 89 (S.D.N.Y. 2012) ("[T]he remedy of specific performance is typically converted into a damages claim, to be considered alongside the monetary claim of other creditors as against the bankruptcy estate."); *In re Lowe*, Case No. 09-37600-H3-7, 2010 Bankr. LEXIS 737, at *5, 2010 WL 817169, at *2 (Bankr. S.D. Tex. Mar. 4, 2010) ("[Rejection] deprives the non-debtor party of a specific performance remedy . . . ."); *In re Waldron*, 36 B.R. 633, 642 n.4 (Bankr. S.D. Fla. 1984) ("The Code does not permit specific performance as a remedy resulting from the

---

[5]        Gulfstream also urges the Court to require Incora to deliver "part certifications" for parts that have already been delivered. *See* Gulfstream Resp. ¶¶ 32–33. This issue is moot. The day *before* Gulfstream filed its Response, Incora offered to provide certifications for such parts to Gulfstream. Although the Debtors disagree that the Bankruptcy Code requires Incora to provide these certifications, Incora nevertheless has agreed to do so, in part because of the minimal effort involved and in part to spare Incora's suppliers the burden of dealing with Gulfstream's requests for replacement certifications.

rejection of an executory contract . . . .”). Even when specific performance is clearly available as an equitable remedy under the contract, the concept of a bankruptcy “claim” transforms that right into an unsecured claim against the estate. *See Mech. & Elec. Concepts, Inc. v. CalTex Holdings LP* (*In re CalTex Holdings LP*), Adv. No. 09-3145, 2010 Bankr. LEXIS 950, at *7–8 (Bankr. S.D. Tex. Mar. 22, 2010).

4.    Gulfstream also asks the Court to order Incora to surrender certain Gulfstream-owned parts that are currently stored at Incora’s warehouse in Savannah, Georgia (the “***Consigned Inventory***”). Gulfstream omits to add that it currently owes Incora over $22 million in unpaid invoices, including over $13 million for goods and services that Incora provided post-petition. Crucially, Gulfstream has no colorable justification for refusing to pay post-petition invoices, which cannot be set off or recouped against Gulfstream’s rejection damages or other pre-petition claims. *See Braniff Airways v. Exxon Corp.*, 814 F.2d 1030, 1036 (5th Cir. 1987) (“The mutuality element is lacking if a party attempts to setoff [sic] a pre-petition debt against a post-petition claim.”); *Sacramento Mun. Util. Dist. v. Mirant Americas Energy Mktg., LP* (*In re Mirant Corp.*), 318 B.R. 377, 382–384 (Bankr. N.D. Tex. 2004) (holding that a post-petition payable cannot be used to recoup rejection damages because doing so would “‘frustrate both the specific commands of § 365(g)(1) and § 502(g)’ and the basic purpose of chapter 11” (quoting *United States v. Dewey Freight Sys., Inc.* (*In re Dewey Freight Sys., Inc.*), 31 F.3d 620 (8th Cir. 1994))), *aff’d*, 331 B.R. 693, 696–697 (N.D. Tex. 2005). Under these circumstances, Incora is within its rights to withhold Gulfstream’s property as security for payment. The situation is no different from any warehouse whose customer refuses to pay.

5.    In any event, the question of whether Incora may maintain possession of Gulfstream-owned parts is unrelated to the question of whether Incora may reject Gulfstream’s contract to buy Incora-owned parts. If Gulfstream wishes to argue that it should be able to replevy its property while refusing to pay its invoices, it can do so—after the Gulfstream Contract has been rejected—by filing an adversary proceeding. *See* Fed. R. Bankr. P. 7001(1) (listing “a proceeding to recover money or property” as example of matters to be resolved by adversary proceeding).

## BACKGROUND

### I.   THE GULFSTREAM CONTRACT

6.      Gulfstream's summary of the Gulfstream Contract is largely accurate and will not be repeated at length here. *See* Gulfstream Resp. ¶¶ 8–11. Under the Gulfstream Contract, Incora sells certain hardware to support Gulfstream's manufacture and maintenance of aircraft at facilities throughout North America. The Gulfstream Contract requires Incora to buy and store at least six months' worth of parts for Gulfstream's Savannah plant based on Gulfstream's forecasts. To keep an adequate supply of parts, Incora often places orders far in advance of their delivery; in some cases, Incora is bound by purchase orders for delivery as far out as 2026. Incora normally retains title and bears the risk of loss for these parts until, upon Gulfstream's request, Incora pulls specific parts from its stockpile and delivers them to Gulfstream's facility. At that point, Gulfstream takes title to those parts, and Incora is entitled to invoice Gulfstream for them. Although Incora is required to maintain a deep supply of parts for Gulfstream (many of which are only useful in Gulfstream's aircraft), Gulfstream is allowed to purchase the same parts from other vendors if it finds better terms elsewhere and store those parts at Incora's warehouse. Additionally, the Gulfstream Contract requires Incora personnel to manage hardware inventory, organize the parts into "kits" for Gulfstream's use, and provide documentation for the parts. The Gulfstream Contract is scheduled to terminate at the end of 2027.

7.      If Gulfstream terminates the Gulfstream Contract on account of Incora's breach, the Gulfstream Contract provides that:

> Gulfstream may purchase or manufacture similar Product(s) and/or require [Incora] to transfer title and deliver to Gulfstream any or all property, other than Intellectual Property, produced or procured by [Incora] under this Agreement and/or Order, or otherwise necessary for Gulfstream to produce and support Product(s), to include all applicable tooling.

Gulfstream Contract, § 16.1.2. More generally, the Gulfstream Contract requires Incora to "use commercially reasonable best efforts to effect an orderly and efficient transition to enable Gulfstream to resource replacement Product(s) from a third party in a manner that allows the Aircraft program to continue without interruption or adverse effect" for up to twelve months. *Id*. § 16.1.4.

8.     From the perspective of the Debtors' estates, the Gulfstream Contract is unduly burdensome for several reasons. *First*, Incora is required to sell to Gulfstream at prices that are projected to become unprofitable in 2024 and to remain unprofitable through the remaining contract term. Even in 2023, Incora was required to place over $10 million of "gap buys" and expedited orders—*i.e.*, purchases of inventory on shorter lead times than typical purchase orders, which enables Incora to meet specific customer need dates—which caused the Gulfstream Contract to underperform economic expectations. *Second*, Incora is required to buy and hold a large stock of inventory for Gulfstream, while Gulfstream is free to buy the same products from other suppliers. *Third*, Gulfstream may remove parts from the contractual list at any time. If the part is classified as "unique" to Gulfstream, Incora may compel Gulfstream to buy the part at the contract price; otherwise, Incora has no remedy. *Fourth*, unlike most customer contracts, the Gulfstream Contract does not place a fixed cap on Incora's liability for breach.

9.     Incora has invested approximately $77 million in Incora-owned parts and $104 million in outstanding purchase orders for parts that were intended for Gulfstream's ultimate use. (These figures do not include costs associated with services to procure, manage, and distribute these parts.) Gulfstream currently owes Incora $8,961,325 for pre-petition goods and services provided under the Gulfstream Contract, $12,507,192 for post-petition goods and services provided under the Gulfstream Contract, and $820,662 for ad hoc post-petition goods and services. Gulfstream has filed a proof of claim (no. 1269) for $9,344,544.90 in "rebates, credits, and other contractual amounts that have accrued pre-petition" (although Incora believes that only approximately $3.3 million in pre-petition rebates and penalties are outstanding) and has accrued approximately $4.8 million in post-petition rebates.

## II.   INCORA'S EFFORTS TO RE-NEGOTIATE CUSTOMER CONTRACTS

10.     From the start of these Chapter 11 Cases, the Debtors have had four major goals: (i) to stabilize vendor relationships, (ii) to re-negotiate burdensome long-term contracts with customers, (iii) to resolve the litigation over the 2022 financing transactions, and (iv) to de-lever their balance sheet. For several months, the Debtors' senior management team has focused on contract re-negotiations and has enjoyed overwhelming success in those efforts. Time after time, Incora has presented commercially reasonable requests to customers. Time after time, those customers have understood the reality that Incora has both the right and the duty as a debtor-in-possession to reject burdensome contracts and have understood that they themselves will be better off with a revised contract than with no contract at all. Only three small customer contracts have been rejected to date, while ***139 contracts with 77 customers*** have been successfully re-negotiated. Thanks to the high degree of sophistication and support of Incora's customer base, Incora is now on a path to propose a confirmable plan of reorganization and emerge from chapter 11 as a stronger business.

11.     On November 21, 2023, Incora's contract re-negotiation team approached Gulfstream to propose adjustments to certain terms of the Gulfstream Contract, including the burdensome, off-market terms described above. The approach was consistent with Incora's approaches to similarly situated customers. Despite a face-to-face meeting in the first week of December, the discussions with Gulfstream soon reached an impasse. The Debtors therefore filed the Motion to reject the Gulfstream Contract, even while hoping that the parties could still turn this important business relationship into one that will be profitable for Incora as well as Gulfstream.

12.     Soon after the Motion was filed, Incora initiated a call with Gulfstream to resume discussions. On that call, Gulfstream rejected Incora's request to settle and refused to pay its over-due post-petition invoices. On that basis, Incora advised Gulfstream that it would stop providing goods and services to Gulfstream, effective that evening. Since then, the Debtors have maintained their stockpile of hardware that had been intended for Gulfstream's operations and have continued

to accept additional deliveries and to place orders in support of Gulfstream.[6] Incora has continued to offer employment to its entire workforce at its Savannah warehouse and will continue to do so. Through these efforts, Incora has preserved its ability, even now, to resume performance if Gulfstream is willing to enter into a revised long-term contract.

## ARGUMENT

### I. INCORA SHOULD NOT BE REQUIRED TO SELL HARDWARE UNDER A REJECTED CONTRACT.

#### A. Rejected Contracts Are Not Entitled to Specific Performance.

13.     The Gulfstream Contract is a contract for the sale of goods. During the term of the Gulfstream Contract, Incora buys parts, stores them, and then sells them to Gulfstream. If the Gulfstream Contract terminates on account of Incora's breach, then section 16.1.2 of the Gulfstream Contract provides that Gulfstream may either purchase or manufacture the parts it requires and/or require Incora to specifically perform by selling to Gulfstream any parts in Incora's possession that Gulfstream requests. Based on this provision, Gulfstream asserts that Incora must comply with the specific performance prong of section 16.1.2 even after the Gulfstream Contract has been rejected under section 365 of the Bankruptcy Code.

14.     Gulfstream's argument turns rejection law on its head. Rejection does constitute a breach of the contract, which "subjects the estate to a claim for money damages." *Highland Cap. Mgmt., L.P. v. Dondero* (*In re Highland Cap. Mgmt., L.P.*), Adv. Pro. No. 21-03003-sgj, 2021

---

[6]    Gulfstream has wrongly accused the Debtors of advising manufacturers not to sell to Gulfstream. *See* Gulfstream Resp. ¶ 16. Instead, the Debtors have told suppliers that the Debtors expect them to perform the outstanding purchase orders as agreed, and that the Debtors are ready, willing and able to pay for those orders. If a supplier wishes to sell to Gulfstream while honoring its existing commitments to Incora, the supplier is free to do so. In fact, Incora believes that ***Gulfstream*** has been telling suppliers, incorrectly, that Incora is scaling down its overall procurement program.

Gulfstream is also incorrect that Incora's purchase orders identify Gulfstream as the intended end user. *See* Gulfstream Resp. ¶ 12. Incora's purchase orders typically do not. While the Debtors do place purchase orders on behalf of certain customers who purchase "third-party logistics" services, Gulfstream is not that type of customer. Incora is responsible for purchasing and stockpiling parts in Incora's own name, which then become the property of Gulfstream only "at [Gulfstream's] designated facility upon receipt" by Incora's personnel or "upon signature of the waybill" by Gulfstream's personnel. Gulfstream Contract § 6.1.

Bankr. LEXIS 3314, at *36, 2021 WL 5769320, at *7 (Bankr. N.D. Tex. Dec. 3, 2021); *see also* 11 U.S.C. §§ 365(g), 502(g) (treating resulting claim as a pre-petition claim). "Significantly, however, ***the injured party cannot insist on specific performance by the [debtor]*.*" Highland Cap.*, 2021 Bankr. LEXIS 3314, at *36, 2021 WL 5769320, at *7 (emphasis in original). When creditors have attempted to impose the remedy of specific performance on a debtor in possession, they have met refusal and even exasperation on the part of courts. *See, e.g., Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 681 (5th Cir. 2022) ("[B]ecause the [defendant's regulatory] orders [requiring performance of a rejected contract] rested on an ***inexplicable misunderstanding*** of rejection, we vacate them all.") (emphasis added); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43 (Bankr. S.D.N.Y. 2004) (explaining, in a situation where a landlord tried to enforce cleanup costs on a debtor pursuant to the terms of a rejected lease, that "[i]t would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition to doing so, to comply with one of the very aspects of the agreement that is burdensome").

15.     The Fifth Circuit recently applied this "hornbook law" in *Gulfport Energy*, 41 F.4th at 667. In that case, the Federal Energy Regulatory Commission (FERC), had entered regulatory orders that purported to require the debtor (a natural gas supplier) to comply with its pre-petition energy contracts even after the debtor had rejected those contracts in bankruptcy. FERC argued that its exclusive jurisdiction under the Natural Gas Act, 15 U.S.C. §§ 717–717z, permitted it to enforce any so-called "filed rate" despite the debtor's rejection of the contract. The Fifth Circuit explained that rejection "excus[es] the debtor's future performance" and "transforms [that] future performance into an unsecured claim for damages." *Id.* at 683–684.[7] Similarly, Gulfstream is

---

[7]     *See also In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) ("A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection."). Indeed, the Fifth Circuit reached this conclusion even though many courts, including the Fifth Circuit itself, have concluded in other contexts that a regulator's acceptance of a filed rate constitutes public law, independent of the contract in which the rate is embedded. *See, e.g., Carter v. Am. Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir. 1966) ("[A] tariff, required by law to be filed, is not a mere contract. It is the law."); *cf. In re First Energy Sols. Corp.*, 945 F.3d 431, 455 (6th Cir. 2019) (Griffin, J., dissenting

wrong to argue that its rights can only be vindicated through specific performance. The Bankruptcy Code gives the Gulfstream Contract's specific performance provision "full effect," in the words of the *Mirant* court by allowing Gulfstream an unsecured claim on account of Incora's non-performance of that provision.

16.     Courts have even disfavored specific performance in situations where, unlike here, the breach of a contract did not naturally give rise to money damages. In *Highland Capital*, the bankruptcy court held that an arbitration agreement constituted an executory contract that could be rejected and that would not thereafter be given any effect through the remedy of specific performance—even though nothing in the opinion suggests that the counterparty would have been able to prove up monetary damages on account of being forced to litigate in bankruptcy court. *See Highland Cap.*, 2021 Bankr. LEXIS 3314, at *26–38, 2021 WL 5769320, at *3-7; *see also Janvey v. Alguire*, Civ. Action No. 3:09-CV-0724-N, 2014 U.S. LEXIS *119, 2014 WL 12654910, at *11 (N.D. Tex. July 30, 2014) (holding that an equity receiver's rejection of an arbitration agreement "is dispositive on the question of compelling arbitration"). Likewise, courts have even refused to award specific performance under a rejected contract for the purchase of real property, a context in which the common law typically favors specific performance. *See In re Lowe*, Case No. 09-37600-H3-7, 2010 Bankr. LEXIS 737, at *5, 2010 WL 817169, at *2 (Bankr. S.D. Tex. Mar. 4, 2010). Here, by contrast, Gulfstream's damages from Incora's breach are wholly economic, easily measured by the difference between the cost of a hypothetical sale under the contract and Gulfstream's actual cost of buying replacement parts on the open market. *See* Ga. Code § 11-2-713(1).[8]

17.     Gulfstream's reliance on *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) is misplaced. In that case, the Supreme Court held that a rejection of a trademark

---

in part) (accepting FERC's argument that a filed rate constitutes federal regulation which survives contract rejection). The Gulfstream Contract obviously does not implicate any of the public policy concerns that courts have grappled with in the FERC cases. If a federal agency cannot even rely on an act of Congress to bypass the consequences of rejection under the Bankruptcy Code, Gulfstream's arguments certainly must fail.

[8]     The Gulfstream Contract is governed by Georgia law, including its version of the Uniform Commercial Code. *See* Gulfstream Contract, § 17.1.

license agreement does not terminate the licensee's right to continue to use the licensed trademark. *Id.*, at 1666. But the Court has made a clear distinction between the debtor's ***future*** obligations, which are "converted . . . to a pre-petition damages claims" (*id.,* at 1659), and the rights that have already "vested" in the counterparty and require no continued performance from the debtor, which are left "intact" (e.g., the right to continue using a licensed trademark). *Id.* at 1661. The *Mission Product* decision repeatedly states that the debtor ***does not have to*** "perform its remaining obligations under the [rejected] agreement." *Id.* at 1662. Thus, this Supreme Court decision only confirms that Incora has no obligation to continue performing under the Gulfstream Contract.

18.     Gulfstream is served no better by *Pirtek USA, LLC v. Lager* (*In re Lager*), Adv. Pro. No. 22-03042-MVL, 2022 Bankr. LEXIS 2224, 2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022). The bankruptcy court in *Pirtek*, while requiring a debtor to comply with non-disparagement and non-disclosure provisions under a rejected contract, emphasized that "neither the Non-Disparagement Clause nor the NDA requires affirmative action on the part of [the debtor], which this Court finds to be a ***critical*** distinction." *Id.*, 2022 Bankr. LEXIS 2224, at *29, 2022 WL 3330421, at *10 (emphasis in original). The *Pirtek* court cites other cases that have held that negative covenants, which require a debtor to ***refrain*** from a certain action, rather than continue performing, "survive rejection." *Id.*[9] Gulfstream tries to transform the requirement that would force Incora to continue selling its inventory to Gulfstream into a negative covenant of "not preventing Gulfstream from paying for and taking possession of the parts." Gulfstream Resp. ¶ 26. The phrase is linguistically awkward and logically absurd. It attempts to fit a square rivet in a round hole. A grocer sells apples; it does not "not prevent[] [customers] from paying for and taking possession of [apples]." Likewise, Gulfstream sells aircraft; it does not "not prevent[] [its customers] from paying for and taking possession of [aircraft]."

---

[9]     *JTH Tax Inc. v. Knight*, No. 2:13CV583 2014 WL 1050905 (E.D. Va. Mar. 17, 2014), another case cited by Gulfstream, is one such case. In that case, the plaintiff asserted that the debtor failed to comply with certain post-termination obligations in a rejected franchise agreement, which, in large part, constituted negative covenants. The district court's decision adopted a magistrate judge's recommendation to issue a permanent injunction, which was unopposed by the debtor.

19.     Just as the grocer and Gulfstream actively sell apples and aircraft, Incora must undertake substantial affirmative actions (in the words of *Pirtek*) to sell thousands of distinct parts to Gulfstream. Currently, the majority of Incora's Gulfstream-related inventory is divided among two sites: parts that are expected to be used in the next days or weeks are mostly located near Gulfstream's assembly plant at Incora's Savannah warehouse, while parts that are expected to be used farther in the future are mostly located at Incora's major warehouse in Northlake, Texas. In the first phase of a bulk sale, Incora's personnel would review the inventory in both locations for the more than 6,000 distinct part numbers associated with the Gulfstream Contract and where those parts are physically located. Incora's personnel would then separate "Gulfstream" parts from other inventory, package the Gulfstream parts, organize them onto pallets, and then verify the inventory the parts that have been palleted for delivery to Gulfstream. Because of space limitations at the Savannah warehouse, this would be a phased process, based on the urgency of Gulfstream's needs for particular parts. Incora employees would also need to confirm Gulfstream's acceptance of the pallets at the handoff point (either Incora's or Gulfstream's loading dock) and deliver the part certificates that Gulfstream's own pleading describes as essential to a complete delivery. A similar process would need to be followed for the parts at the Northlake warehouse, but with the additional step of transferring parts from Northlake to Savannah before delivering onward to Gulfstream. In addition to the human resources that an extraordinary bulk sale would require simply to move and track the parts, Incora's personnel would need to spend time and money to coordinate transportation, obtain containers for storing materials in preparation for shipment, and rent extra forklifts and trucks.

20.     Finally, "specific performance should not be permitted where the remedy would in effect do what § 365 of the Code can avoid, that is, the imposition of burdensome contracts on the debtor." *In re Baerg Real Prop. Trust*, 585 B.R. 373, 390 (Bankr. N.D. Tex. 2018). The Court should consider that commercial contracts frequently contain termination provisions that, in one way or another, allow one party to obtain an approximation of its full contractual benefits when the other party breaches. If bankruptcy courts were to adopt a practice of ordering specific performance of

post-termination obligations in rejected contracts, the right to rid themselves of burdensome contracts, one of the fundamental rights given to debtors by Congress, would be rendered largely meaningless. *See, e.g.*, *In re Avianca Holdings S.A.*, 618 B.R. 684, 697 (Bankr. S.D.N.Y. 2020) (quoting *Mission Prod.*, 139 S. Ct. 1658, 1665) (describing rejection as a "powerful tool" to "escape all of [a debtor's] future contract obligations"); *In re Trans World Airlines, Inc.*, Case No. 01-0056, 2001 Bankr. LEXIS 772, at *6, 2001 WL 1820019, at *2 (Bankr. D. Del. Mar. 16, 2001) (describing rejection as a "fundamental . . . right" "designed for the benefit of the bankruptcy estate"). Incora has enjoyed remarkable success in persuading customers to re-negotiate burdensome contracts in the shadow of rejection law, but the next Incora will not be able to do so. After all, why would any counterparty fear rejection when it can obtain specific performance of the core economic terms nevertheless? For the sake of future debtors, the Court should apply hornbook rejection law and limit Gulfstream to an unsecured claim for damages.

> **B.    The Debtors Have Exercised Sound Business Judgment in Refusing to Perform Under a Rejected Contract.**

21.    Separately, Gulfstream offers a peculiar argument that rejecting the Gulfstream Contract without complying with the transitional obligations "would be so unnecessarily harmful to the estate and to Gulfstream that it would fall below the admittedly low bar a debtor must meet under the business judgment standard." Gulfstream Resp. ¶ 27. Gulfstream is correct that the business judgment standard sets a "low bar," but is wrong to suggest that the rejection of the Contract would harm the Debtors' estates. To the contrary, the Debtors expect that, by declining to sell its inventory at the Gulfstream Contract's prices, the Debtors will ultimately be able to sell the same parts at higher, market-based, prices, either to other distributors, to other customers, to the original suppliers, or to Gulfstream itself.

22.    The correct statement of the business judgment standard is that, as long as a debtor's decision "'appears to enhance a debtor's estate,' a bankruptcy court should only withhold approval when 'the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *In re J. C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) (quoting *Richmond Leas. Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)).

23.    Gulfstream describes why **Gulfstream** would be harmed by rejection of the Gulf-stream Contract. But "the question is not whether the debtor's decision reasonably protects the interests of **other parties**, but rather whether the decision 'appears to enhance a debtor's estate.'" *In re J. C. Penney*, 50 F.4th at 534 (quoting *Richmond Leas.*, 762 F.2d at 1309, with emphasis added). The more Gulfstream insists that rejection will harm Gulfstream, the more the Court should be convinced that the Gulfstream Contract is a lopsided, off-market arrangement whose rejection will benefit the estates.

24.    Gulfstream's two ostensible concerns about the lack of benefit to the Debtors' estates are easily dispensed with.

25.    *First*, Gulfstream implies that Incora's reputation will suffer if it does not perform under rejected contracts. Gulfstream Resp. ¶ 29, citing Docket No. 5. But most customers understand that two things can be true at once: the Debtors genuinely want to maintain their long-term relationships, yet are not afraid to reject contracts that are burdensome to the estates and cannot be re-negotiated. This is why almost all significant customers have already agreed to new terms. If Incora's reputation survived direct negotiations with those customers with the possibility of rejection looming in the background, Incora is confident that its commercial reputation will survive the actual rejection of the Gulfstream Contract.

26.    *Second*, Gulfstream speculates that the Debtors need the cash that would be provided by a sale of inventory to Gulfstream. In fact, the Debtors have marshaled their resources carefully throughout these Chapter 11 Cases, and do not currently need cash from a bulk sale.[10] (Indeed, the Debtors have long expected that the Gulfstream Contract would eventually be **assumed**, in which case there would not have been any kind of bulk sale to Gulfstream. So clearly, the Debtors can survive without a bulk sale to Gulfstream.) Gulfstream also suggests that it is the

---

[10]    Gulfstream's comparison to the Rolls-Royce bulk sale, *see* Docket No. 614, is off base. That proposed sale was an arrangement with a customer that had already agreed to new terms on its major long-term contracts. The motion to approve the Rolls-Royce sale sets forth additional reasons for the sale, which do not apply to Incora's remaining Gulfstream-related inventory.

only potential purchaser of much of the inventory, which is specially designed for use in Gulf-stream's aircraft. The Debtors disagree. At the very least, the Debtors could sell the parts back to the original suppliers, often at a better price. Furthermore, rejection of the Gulfstream Contract does not prevent the Debtors from selling to Gulfstream; the new sales will simply be at a renego-tiated, market, price instead of the under-market price under the Gulfstream Contract.

27.     There is simply no evidence in the record, and Gulfstream presents none, suggesting that Incora's decision to reject the Gulfstream Contract is the product of "bad faith, whim, or caprice"—as would be necessary to question Incora's business judgment and deny it access to one of the most critical tools in a debtor's toolbox. *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (internal citation omitted). Rejection may not sit well with Gulfstream, but that is not the inquiry the Court must undertake: Incora's decision to reject the Gulfstream Contract is, as detailed above, a sound exercise of Incora's business judgment and will enhance the value of the Debtors' estates. The Motion should be granted.

## II. INCORA SHOULD NOT BE REQUIRED TO SURRENDER THE CONSIGNED INVENTORY WHILE IT IS SUBJECT TO A WAREHOUSE LIEN.

28.     In its Objection, Gulfstream asks this Court to order Incora to return the Consigned Inventory—certain property owned by Gulfstream that is currently stored in Incora's warehouse in Savannah, Georgia. Gulfstream is correct that Incora has not been willing to turn over the Consigned Inventory to Gulfstream, as Incora holds an undischarged warehouse lien over those assets. But the relief that Gulfstream seeks is improperly brought before this Court.

29.     Bankruptcy Rule 7001 provides that "a proceeding to recover . . . property" and "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" are adversary proceedings. Fed. R. Bankr. P. 7001(1), (2); *see also In re Haber Oil Co.*, 12 F.3d 426, 437 (5th Cir. 1994) ("A proceeding to recover money or property is an adversary proceeding.") (internal citations omitted); *In re Vill. Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991) (stating that landlord's claim for conversion, resulting from destruction of certain buildings on the lot, "is an adversary proceeding" which "required the filing of a complaint" under Rules 7001 and

7003). Gulfstream's request that "[Incora] should be ordered to immediately return the Purchased Inventory to Gulfstream" within an objection to a rejection motion is therefore procedurally deficient. Indeed, the relief that Gulfstream seeks requires the commencement of an adversary proceeding and service of a complaint to provide the Court an opportunity to determine the validity, priority, or extent of the rights and interests of Incora, Gulfstream, and any other third party who may claim an interest in the Consigned Inventory. Such a factual determination may not be made in the context of a rejection motion.

30.     Irrespective of the proper procedure, Gulfstream is not entitled to recover the Consigned Inventory so long as Gulfstream has failed to make its outstanding payments owed to Incora under the Gulfstream Contract.

31.     As of today, Gulfstream owes over $22 million to Incora, subject to certain rebates. Importantly, over $13.3 million relates to *post*-petition goods and services, which cannot be offset against Gulfstream's rejection claim. *See In re Buttes Res. Co.*, 89 B.R. 613, 614 (S.D. Tex. 1988) ("[P]re-petition claims against the debtor cannot be set off against post-petition debts to the debtor." (citing *Lee v. Schweiker*, 73 F.2d 870, 875 (3d Cir. 1984))); *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 442 (5th Cir. 2019) ("[C]ontract rejection is treated as a breach of contract immediately before the date of the filing of the petition.") (internal quotation omitted). Gulfstream is currently past-due on $93,484.92, representing a credit that Gulfstream incorrectly deducted from its October bill.

32.     Under these circumstances, the Debtors are well within their rights to protect their warehouse lien over Gulfstream's property. Indeed, Georgia's[11] version of the Uniform Commercial Code provides that "[a] warehouse has a lien against the bailor on the goods covered by a . . . storage agreement . . . for charges for storage or transportation . . . and for expenses reasonably necessary for preservation of the goods . . . ." *See* Ga. Code Ann. § 11-7-209(a). A warehouse "loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver." *Id.* § 11-

---

[11]   The relevant property is located in Incora's warehouse near Savannah, Georgia.

7-209(e). Incora is a "warehouse" under section 11-7-102(a)(13), in that a central part of its business consists of "storing goods for hire." *See* First Day Decl. ¶ 31.

33.     Incora's refusal to turn over the Consigned Inventory can hardly be viewed as unjustified or unreasonable while Gulfstream continues to owe Incora millions of dollars. *See In re Am.-STREVELL, INC.*, Case No. 81M-03652, 1983 Bankr. LEXIS 5749, at *7 (Bankr. D. Utah July 22, 1983) (finding creditor's refusal to turn over debtor's property subject to a warehouse lien to be justified where the debtor had outstanding charges owed to the creditor and the debtor did not offer adequate protection). Accordingly, even if the Court finds Gulfstream's request to be procedurally proper, Gulfstream is nonetheless not entitled to recover the Consigned Property until Gulfstream satisfies its outstanding invoices.

34.     Furthermore, Incora derives no benefit from holding Gulfstream's property and ***will allow*** Gulfstream to take its owned property, either before or after rejection of the Gulfstream Contract, provided only that Gulfstream pay its outstanding invoices (net of any appropriate rebates). Because Incora's estates derive zero benefit from holding Gulfstream's property (and in fact, they likely bear marginal cost for storage and insurance), Incora believes that the imposition of an administrative claim, even if properly presented to the Court, would be inappropriate.[12]

35.     For these reasons, the Court should grant the relief requested in the Motion.

*[Remainder of page intentionally blank]*

---

[12] Gulfstream mis-states the result in the one case that it cites to support its threat of an administrative claim. In *In re Whistler Energy II, L.L.C.*, 931 F.3d 432 (5th Cir. 2019), the Fifth Circuit did ***not*** grant any administrative claim, much less an administrative claim for "retain[ing] counterparty's property." The *Whistler* court was faced with a situation in which a counterparty voluntarily left its equipment on the debtor's drilling rig to support the debtor's post-rejection de-mobilization of the rig, not a situation in which the debtor withheld the counterparty's property to preserve rights against the counterparty. On those facts, the Court of Appeals vacated the bankruptcy court's denial of an administrative claim and remanded for further fact-finding on the question of whether the debtor "explicitly requested" or "voluntarily accepted" the plaintiff's services.

Dated: January 9, 2024

Respectfully submitted,

*/s/ Charles A. Beckham, Jr.*

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Patrick L. Hughes (TX Bar No. 10227300)
Kelli S. Norfleet (TX Bar No. 24070678)
Martha Wyrick (TX Bar No. 24101606)
Re'Necia Sherald (TX Bar No. 24121543)
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone: 1 (713) 547-2000
Email:      Charles.Beckham@HaynesBoone.com
            Patrick.Hughes@HaynesBoone.com
            Kelli.Norfleet@HaynesBoone.com
            Martha.Wyrick@HaynesBoone.com
            ReNecia.Sherald@HaynesBoone.com

- and -

Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
Benjamin M. Schak (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: 1 (212) 530-5000
Email:      DDunne@Milbank.com
            SKhalil@Milbank.com
            BSchak@Milbank.com

*Counsel to the Debtors and*
*Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that, on January 9, 2024, a true and correct copy of the foregoing document was served through the Electronic Case Filing system of the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed noticing agent.

*/s/ Charles A. Beckham, Jr.*

Charles A. Beckham, Jr.