United States Bankruptcy Court
Southern District of Texas

**ENTERED**
January 14, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-90611 |
| WESCO AIRCRAFT | § | |
| HOLDINGS, INC., *et al.*, | § | CHAPTER 11 |
| | § | |
| Debtors. | § | |
| | § | |
| WESCO AIRCRAFT | § | |
| HOLDINGS, INC., *et al.*, | § | |
| | § | |
| | § | |
| VS. | § | ADVERSARY NO. 23-3091 |
| | § | |
| SSD INVESTMENTS LTD., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION

This adversary proceeding concerns the validity of a prepetition debt restructuring. In 2019, Wesco Aircraft Holdings, Inc. entered three indentures to finance a leveraged buyout. In 2022, Wesco entered into new agreements with some of the indenture counterparties to issue new debt and modify security interests created in those 2019 transactions. The Court must determine whether the 2022 Transaction impermissibly infringed on rights created in the 2019 indentures.

The parties have filed motions for summary judgment. For the reasons stated below, the summary judgment motions are granted in part and denied in part.

## BACKGROUND

Wesco Aircraft Holdings, Inc. is a multi-industry supply chain management services provider, with a significant market share in the global civilian and military aerospace industry.  ECF No. 201 at 3.  In 2019, Wesco's predecessor entity bought Pattonair, an aerospace parts supplier owned by Platinum Equity Advisors, LLC, in a leveraged buy-out.  ECF No. 201 at 3–4; ECF No. 204-1 at 17.  Wesco, operating as "Incora," was formed in 2020 upon closing of the leveraged buy-out. ECF No. 201 at 3.

Wesco entered three indentures to finance the 2019 buy-out: the 2024 Secured Indenture (ECF No. 204-3), the 2026 Secured Indenture (ECF No. 204-2), and the 2027 Unsecured Indenture (ECF No. 204-4). The 2024 Secured Indenture provided for $650,000,000 in senior secured notes, the 2026 Secured Indenture provided for $900,000,000 in senior secured notes, and the 2027 Unsecured Indenture provided for $525,000,000 in unsecured notes.  ECF No. 201 at 4.  Wesco also entered into the Notes Security Agreement (ECF No. 204-41), which granted liens on Wesco's collateral securing the 2024 and 2026 notes.

In March 2022, Wesco and some existing noteholders executed a transaction amending the Indentures (the "2022 Transaction"). Although there were multiple other noteholders, only Platinum, Carlyle, Senator, and Wolverine participated in the 2022 Transaction (the "Participating Noteholders").  The 2022 Transaction consisted of several steps: (1) amending the Indentures to allow for the issuance of additional notes, (2) issuing the additional notes, (3) amending the Indentures a second time to exchange the notes of the Participating Noteholders for notes with higher-priority liens, and (4) stripping the liens from the non-participating 2024/2026 Noteholders to effectuate the transaction.  Langur Maize and the 2024/2026 Noteholders claim these steps constituted a single transaction, which the Indentures prohibited.

On March 28, 2022, the non-participating noteholders of the 2024 and 2026 Indentures sued Wesco and others for fraudulent transfer,

preferential transfer, breach of contract, breach of the implied covenant of good faith and fair dealing, and related tort claims. ECF No. 201 at 55–56. On March 27, 2023, Langur Maize, the non-participating majority holder of the unsecured 2027 Notes, sued Wesco and others for fraudulent transfer, preferential transfer, breach of contract, breach of the implied covenant of good faith and fair dealing, and related tort claims. ECF No. 201 at 58–59. The lawsuits were filed in New York state court.

Wesco Aircraft Holdings, Inc. and certain affiliates, filed for bankruptcy on June 1, 2023. Wesco filed this adversary proceeding to stay the New York state court lawsuits and seek declaratory judgment on the New York claims. The 2024/2026 Noteholders and Langur Maize brought counterclaims against Wesco and the Participating Noteholders. The parties have moved for summary judgment on their claims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). It is the movant's burden to establish that no genuine issue of material fact exists. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)). A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). If the movant establishes "the absence of evidence supporting an essential element of the non-

movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. Of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## JURISDICTION

28 U.S.C. § 1334 lists four types of matters over which the district court has subject matter jurisdiction in a bankruptcy proceeding: cases under title 11, proceedings arising under title 11, proceedings arising under a case under title 11, and proceedings related to a case under title 11. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987) (quoting 28 U.S.C. § 1334). "Because section 1334(b) defines jurisdiction conjunctively, a district court has jurisdiction over the subject matter if it is at least related to the underlying bankruptcy. *Querner v. Querner (In re Querner)*, 7 F.3d 1199, 1201 (5th Cir. 1993) (citing *Fed. Deposit Ins. Corp. v. Majestic Energy Corp. (In re Majestic Energy Corp.)*, 835 F.2d 87, 90 (5th Cir. 1988)). "As the United States Supreme Court has noted, 'related to' bankruptcy proceedings include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on

the bankruptcy estate." *Arnold v. Garlock*, 278 F.3d 426, 434 (5th Cir. 2001) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.5 (1995)).

"The Act does not define 'related' matters." *Wood*, 825 F.2d at 93. The Fifth Circuit has adopted the Third Circuit's test for "related to" jurisdiction. *Majestic Energy Corp.*, 835 F.2d at 90. Under this test, a proceeding is related to a case under title 11 if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Wood*, 825 F.2d at 93. "'Related to' jurisdiction includes any litigation where the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263, 267 (5th Cir. 2015) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 386 (5th Cir. 2010)).

It is apparent that the Court has jurisdiction over the 2024/2026 Noteholders' and Langur Maize's claims asserted against Wesco. At issue are the claims asserted against the non-debtor entities. A debtor's duty to contractually indemnify a non-debtor defendant gives rise to "related to" jurisdiction. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. CIV. A. H-01-3624, 2005 WL 6220721, at *4 (S.D. Tex. July 25, 2005) ("[W]here the debtor has an obligation to indemnify a non-debtor defendant, a plaintiff's claim against that non-debtor defendant is "related to" the bankruptcy because it could have a conceivable effect on the debtor's estate.").

The 2024, 2026, and 2027 Indentures provide Wesco the obligation to

> indemnify on a joint and several basis the Trustee . . . against any and all losses, liabilities or expenses . . . incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, the Security Documents and the Intercreditor Agreements . . . .

ECF No. 204-2 at 124; ECF No. 204-3 at 122; ECF No. 204-4 at 111–12. The 1L and 1.25L Notes contain substantially similar obligations. ECF No. 204-34 at 136; ECF No. 204-35 at 138. These contractual indemnification provisions are sufficient to give rise to "related to" jurisdiction with respect to claims against WSFS.

The Note Purchase Agreement and Exchange Agreement provide Wesco the obligation to

> indemnify and hold harmless each Purchaser (and any Related Funds of each Purchaser), its Affiliates, its manager and the directors, representatives, officers, employees and agents of such Purchaser . . . against any and all losses, claims, damages, liabilities . . . (collectively, "Losses") to the extent that any such Loss results from any actual, threatened or expected actions, litigations, investigations or proceedings . . . that (i) arise out of or are based upon any breach by any Issuer or Guarantor of any representation or warranty or failure to comply with any of the agreements set forth in any of the Transaction Documents, or (ii) are otherwise related to or

> arise out of or in connection with, in each case,
> the Transactions, including modifications or
> future additions to the Transaction
> Documents . . . .

ECF No. 204-26 at 23; ECF No. 204-33 at 37. The Participating Noteholders are parties to these agreements. Wesco's indemnification obligation under these agreements is sufficient to give rise to "related to" jurisdiction with respect to the claims against the Participating Noteholders.

The district court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1334(a). The dispute has been referred to the bankruptcy court under General Order 2012-6.

## DISCUSSION

### I.   THE CONTRACT AND TORT CLAIMS ASSERTED BY THE 2024/2026 NOTEHOLDERS ARE NOT ESTATE PROPERTY. THE EQUITABLE CLAIMS ARE IMPERMISSIBLE DISGUISED AVOIDANCE ACTIONS

Wesco Aircraft Holdings, Inc. and the Participating Noteholders allege certain claims asserted by the 2024/2026 Noteholders are property of Wesco's bankruptcy estates. Wesco and the Participating Noteholders argue the 2024/2026 Noteholders do not have standing to assert these claims.

The filing of a bankruptcy petition creates an estate comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008) (quoting 11 U.S.C. § 541(a)(1)). The legal and equitable interests comprising a debtor's estate have been construed to include "rights of action," including claims based on state and federal law. *Id.* The trustee has exclusive standing to assert claims belonging to the estate. *Id.* But the trustee does not have standing to bring claims that belong to the estate's creditors. *Id.*; *see also Caplin v. Marine*

*Midland Grace Tr. Co. of New York*, 406 U.S. 416, 428 (1972) (trustee has no authority to "collect money not owed to the estate").

Courts in this Circuit engage in an injury-focused analysis when determining whether a creditor's claim belongs to the bankruptcy estate. *See Seven Seas*, 522 F.3d at 584; *Schertz-Cibolo-Universal City, Indep. Sch. Dist. V. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994); *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res.), L.L.C.*, 912 F.3d 291, 293–94 (5th Cir. 2019). This inquiry focuses on whether the debtor could have raised the claim as of the commencement of the case. *Seven Seas*, 522 F.3d at 584. In making this determination, courts look to "the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury." *Id.* "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." *Id.* (quoting *Educators Grp. Health Tr.*, 25 F.3d at 1284). "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Id.* (quoting *Educators Grp. Health Tr.*, 25 F.3d at 1284).

A claim does not belong to the estate merely because the debtor has also been harmed by the same series of events. *See Buccaneer Res., L.L.C.*, 912 F.3d at 293. Even when conduct harms the debtor, "the creditor may also have a claim if its asserted injury does not flow from injury to the debtor." *Id.* The estate and the creditor "may have separate claims against a third party arising out of the same events." *Id.*; *Seven Seas*, 522 F.3d at 585 ("[I]t is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct."). A claim also does not belong to the estate merely because it could be brought by several creditors. *Seven Seas*, 522 F.3d at 589. Rather, "it is '[a]ctions by individual creditors asserting a generalized

injury to the debtor's estate, which ultimately affects all creditors[,]' that can be said to raise a 'generalized grievance,' not actions by creditors that are merely common to a number of them." *Id.* (alterations in original) (quoting *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 360 (5th Cir. 1999)).

"Whether a specific cause of action belongs to a bankruptcy estate is a matter of law that the court decides by reference to the facial allegations in the plaintiff's complaint." *Don Hanvey Oil Tr., Inc. v. Unit Tex. Drilling, LLC*, No. C-10-202, 2011 WL 606264, at *5 (S.D. Tex. Feb. 16, 2011) (citing *Educators Grp. Health Tr.*, 25 F.3d at 1285), *aff'd sub nom. In re Reichmann Petroleum Corp.*, 453 F.App'x 466 (5th Cir. 2011).

### A.     Claims Asserted Against Wesco

Wesco and the Counterclaim Defendants do not contest that the 2024/2026 Noteholders' contract and tort claims asserted against Wesco are not property of Wesco's estate.  The 2024/2026 Noteholders have standing to assert these claims.

### B.     Claims Asserted Against Non-Debtor Entities

The 2024/2026 Noteholders have asserted various claims against non-debtor entities.  These claims are not property of the bankruptcy estate.  Each claim asserts a direct harm to the 2024/2026 Noteholders resulting from alleged contractual and tortious breaches of duties owed the Noteholders.  In analyzing these claims, the Court must assume the reasonable factual assertions in the complaint are true.  *See Don Hanvey Oil Tr., Inc.*, 2011 WL 606264, at *5.  This opinion does not address the merits of the assertions.

The 2024/2026 Noteholders' first cause of action asserts against the Counterclaim Defendants a claim for declaratory relief of the 2024/2026 Noteholders' direct standing to bring their claims. ECF No. 144 at 58.  A cause of action brought by a creditor seeking a declaration of standing does not belong to the bankruptcy estate.

The 2024/2026 Noteholders' second cause of action asserts against Wesco, certain of Wesco's guarantor affiliates, and Wilmington Savings Fund Society, FSB (WSFS) a claim for declaratory relief for breach of contract.  ECF No. 144 at 59.  The 2024/2026 Noteholders claim these entities entered into agreements that were unauthorized by the governing indentures to modify the 2024/2026 Noteholders' rights by stripping them of their contracted-for liens and subordinating their payment priority to new notes provided to certain Participating Noteholders.  ECF No. 144 at 34–36, 41–42.  The claim alleges the 2024/2026 Noteholders' interest in their lien rights and rights to payment under their notes were impermissibly modified, which is a facial assertion of a direct injury to the 2024/2026 Noteholders.  *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.  So here if the surety at the time of adjudication was . . . either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.").

The 2024/2026 Noteholders' alleged injury is the result of a breach of a contractual relation to which the 2024/2026 Noteholders claim to be a party, or in the alternative, a third-party beneficiary.  Even as third-party beneficiaries, the 2024/2026 Noteholders may nevertheless have a claim for a direct injury.  The Fifth Circuit follows state law in determining third-party beneficiary claims.  *See Tawes v. Barnes (In re Moose Oil & Gas Co.)*, 613 F.3d 521, 527 (5th Cir. 2010), *certified question accepted* (Aug. 6, 2010), *certified question answered sub now. Tawes v. Barnes*, 340 S.W.3d 419 (Tex. 2011).  Both Texas and New York courts have recognized parties to a contract can owe duties to third-party beneficiaries, and those beneficiaries may sue for the harm they directly suffered because of a breach of those duties.  *See Stine v. Stewart*, 80 S.W.3d 586, 589–91 (Tex. 2002) (internal citations omitted) ("A third party may recover on a contract made between other parties

only if the parties intended to secure a benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit. . . .   [T]he focus is on whether the contracting parties intended, at least in part, to discharge an obligation owed to the third party."); *Logan-Baldwin v. L.S.M. Gen. Contractors, Inc.*, 94 A.D.3d 1466, 1468 (N.Y. App. Div. 4th Dep't 2012) (internal quotation marks and citations omitted) ("[A] beneficiary will be considered an intended beneficiary . . . when the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance[.]").

The 2024/2026 Noteholders claim a breach of contract resulted in the impairment of their secured claim on Wesco's assets, not a harm to those assets themselves or the impairment of a general claim on assets held by all of Wesco's creditors.  This is the alleged injury regardless of whether they are parties or third-party beneficiaries of the Indentures. Wesco could not have asserted a claim for the 2024/2026 Noteholders' direct injury as of the commencement of the case.

The 2024/2026 Noteholders' third cause of action asserts a claim for declaratory relief for breach of the implied covenant of good faith and fair dealing against Wesco, certain of Wesco's guarantor affiliates, WSFS, Silver Point Noteholders (one of the Participating Noteholders), PIMCO Noteholders (one of the Participating Noteholders), the Senator Noteholder (one of the Participating Noteholders), and the Citadel Noteholder (one of the Participating Noteholders).  ECF No. 144 at 60. This cause of action asserts the governing indentures provided various protections to Wesco's secured noteholders in exchange for the provision of financing.  ECF No. 144 at 61.  The 2024/2026 Noteholders claim they "were justified in understanding" the governing indentures contained explicit and implicit undertakings by Wesco, the guarantor affiliates, WSFS, and the other secured noteholders to not:

> (1) abuse (or otherwise encourage, aid, abet or
> endorse the abuse of) the Company's ability to
> issue   new   notes   with   simple   majority

> approval for the purpose of discharging
> 2024/2026 Holders' Liens and creating new
> Unpermitted Liens; (2) dilute consent rights
> and create artificial supermajority for the
> purpose of circumventing the supermajority
> consent requirements; (3) use the votes of that
> artificial supermajority to strip the nonvoting
> holders of their Liens; (4) hand those Liens to
> a group of Favored Noteholders (which
> included insiders, i.e. the Platinum
> Creditors); and (5) impose upon those
> nonvoting holders various impediments to
> challenge the loss of their Liens through legal
> action.

ECF No. 144 at 61–62.

The 2024/2026 Noteholders claim the named parties breached the implied covenant because the 2024/2026 Noteholders "reasonably and justifiably expected a simple majority of holders of the Notes could not purport to transform itself into a supermajority to circumvent the strictures of the Governing Indentures." ECF No. 144 at 62. They claim that the named parties' "bad faith actions" (i.e., their acts of obtaining a "feigned supermajority" to consent to the 2022 Transaction) set out to "destroy the reasonable expectations of the 2024/2026 Holders and to strip the fundamental benefit of their bargain, namely their Liens in the Collateral." ECF No. 144 at 62. This cause of action asserts a direct harm to the 2024/2026 Noteholders' security interests caused by an alleged breach of a contractual duty owed to them. Wesco could not have asserted this claim as of the commencement of the case.

The 2024/2026 Noteholders' sixth cause of action asserts against Platinum Equity Advisors, LLC, and as an alternative claim against Silver Point, PIMCO, Senator, and Citadel, a claim for declaratory relief for tortious interference with contract. ECF No. 144 at 69. The 2024/2026 Noteholders allege Platinum procured a breach of the

Secured Indentures by "conspiring or coordinating with the Company and its Board, both of which the Platinum Sponsor controlled, and WSFS" to complete the 2022 Transaction, which resulted in breaches of the Secured Indentures. ECF No. 144 at 69. The 2024/2026 Noteholders argue these actions tortiously interfered with their contractual rights and caused an unauthorized "transfer of value from 2024/2026 Holders to Platinum." ECF No. 144 at 69. The 2024/2026 Noteholders also allege if Silver Point, PIMCO, Senator, and Citadel are to be found to lack a sufficient contractual relationship to the governing indentures, they should instead be found liable for tortiously interfering with the Indentures. ECF No. 144 at 70–71. This cause of action asserts a direct harm to the 2024/2026 Noteholders' security interests resulting from the alleged procurement of breaches of the 2024/2026 Noteholders' rights under the indentures. Wesco could not have asserted this claim as of the commencement of the case.

The 2024/2026 Noteholders' seventh cause of action asserts against Platinum, Wolverine, and the Participating Noteholders a claim for declaratory relief for conversion. ECF No. 144 at 71. The 2024/2026 Noteholders allege they owned liens in specifically identified assets of Wesco, and through the 2022 Transaction, the Participating Noteholders caused the release of the liens and then transferred the liens to themselves. ECF No. 144 at 72. The 2024/2026 Noteholders allege that, because of the transfer, the Participating Noteholders are in unauthorized possession of the 2024/2026 Noteholders' property and have interfered with their property rights. ECF No. 144 at 72. This cause of action asserts a direct harm to the 2024/2026 Noteholders' alleged property rights in their liens resulting from the conversion of those liens. As with other portions of the transaction, Wesco was not injured. Wesco had liens on its property to secure its debts. Wesco should be indifferent as to the identity of the holders of the debt. Wesco could not have asserted this claim as of the commencement of the case.

The 2024/2026 Noteholders' claims against non-debtors are not property of the estate.

### C.   The Equitable Claims Are Disguised Avoidance Actions

The 2024/2026 Noteholders assert a claim for an equitable lien against Wesco, the Guarantor Defendants, Platinum, Wolverine, and other Participating Noteholders and a claim for equitable subordination against Platinum, Wolverine, and certain Participating Noteholders. ECF No. 144 at 64, 66.

Wesco and the various noteholders claim that causes of action for equitable subordination and equitable lien are "nothing more than repackaged avoidance actions and impede directly on the Debtors' exclusive strong-arm powers."  ECF No. 199 at 86.  They argue the 2024/2026 Noteholders' equitable causes of action are predicated on the same factual bases, and seek the same relief, as their state-court fraudulent transfer claims.  ECF No. 199 at 86–87, 91–93.  And instead of asserting those claims in this Court, the 2024/2026 Noteholders pled around a trustee's exclusive standing to bring avoidance actions by asserting their equitable claims.  ECF No. 199 at 91.  They further assert that, as of the commencement of the case, Wesco could have asserted an avoidance action to unwind the 2022 Transaction, the obligations incurred in furtherance of the transaction, and any liens granted pursuant to the transaction.  ECF No. 199 at 87.

Although the 2024/2026 Noteholders' equitable claims are artfully pled, they are founded on a fraudulent conveyance theory.  The Court has carefully reviewed the pleadings.  These claims cannot exist outside of the fraudulent conveyance context.  Consequently, the claims are deemed to be disguised avoidance actions belonging to Wesco's estate.  *See Don Hanvey Oil Tr., Inc.*, 2011 WL at *8–10.

We must determine whether the creditor has asserted a direct and particularized injury, rather than a harm that is derivative of the debtor's injury or equally felt by the general class of creditors.  *See id.*; *Seven Seas*, 522 F.3d at 585–89; *Buccaneer Res., L.L.C.*, 912 F.3d at 293–94.  "[C]reditors 'lack standing to bring causes of action [that] are . . .

similar in object and purpose to claims that the trustee could bring in bankruptcy regardless of whether such claims are technically part of the estate of the bankrupt.'" *In re Revlon, Inc.*, No. 22-10760, 2023 WL 2229352, at *15 (Bankr. S.D.N.Y. Feb. 24, 2023) (quoting *In re Hatu*, 19-05428-5, 2022 WL 1436051, at *10 (Bankr. E.D.N.C. May 5, 2022)).

11 U.S.C. § 544(b) provides: "[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." Under § 544(b), "[i]f an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and 'avoid' the debtor's transfer." *In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010). "The trustee may recover the full extent of the fraudulently transferred property on the basis of one creditor's claim." *Id.* (citing *Moore v. Bay*, 284 U.S. 4 (1931)).

The 2024/2026 Noteholders' state court complaint asserted claims for fraudulent transfer and preferential transfer. ECF No. 210-36 at 63–68. These claims assert the same factual basis for recovery as the 2024/2026 Noteholders' equitable claims—the invalidity of the 2022 Transaction. ECF No. 210-36 at 63–68; ECF No. 144 at 65–68. Both the state court and equitable causes of action allege injury in the form of the stripping of contracted-for liens on Wesco's collateral and the apparent subordination of the 2024 and 2026 notes in payment priority to newly issued "1L" and "1.25L" notes. ECF No. 201-36 at 65, 67.

The relief sought by the 2024/2026 Noteholders in state court is fundamentally the same that they now seek in this Court through their equitable claims. The state court claims seek to avoid the entirety of the 2022 Transaction. ECF No. 201-36 at 66, 68. This avoidance would result in, amongst other things, a full restoration of the 2024/2026 Noteholders of their liens and elimination of the new 1L and 1.25L notes. If an avoidance action is asserted in this Court, 11 U.S.C. § 510(c) provides the Court with the power to provide further relief:

[A]fter notice and a hearing, the court may—

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

The 2024/2026 Noteholders' equitable lien claim seeks equitable liens on Wesco's collateral with priority over any liens purportedly held by the Platinum Creditors and the other Favored Noteholders . . . ." ECF No. 144 at 73. Their equitable subordination claim requests an order "equitably subordinating the claims of the Platinum Creditors and the other Favored Noteholders to the claims of the 2024/2026 Holders . . . ." ECF No. 144 at 73. If Wesco asserts an avoidance action to unwind the 2022 Transaction, the 2024/2026 Noteholders would obtain the same relief for the same injury as in their equitable claims.

The 2024/2026 Noteholders claims for equitable lien and equitable subordination are artfully pled disguised avoidance claims belong to Wesco's estate. The claims are dismissed.

## II.   LANGUR MAIZE'S STANDING

Langur Maize seeks summary judgment confirming that it has Article III standing to assert its claims. ECF No. 211 at 37. Wesco and several of its secured noteholders have alleged (1) Langur Maize has no Article III standing to sue non-debtor entities, and (2) Langur Maize's claims are property of the bankruptcy estate. Although a genuine issue of material fact remains as to whether Langur Maize has suffered an

injury sufficient for Article III standing, Langur Maize's claims are not property of the bankruptcy estate.

To meet the Constitution's Article III case and controversy requirement, a plaintiff must establish its standing as the proper party to bring suit. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). "[T]he gist of the question of standing" is whether the litigants have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]" *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Article III standing consists of three elements:

> (1) *injury-in-fact*, which is a "concrete and particularized" harm to a "legally protected interest"; (2) *causation* in the form of a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief.

*W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 106–07. The party invoking federal jurisdiction bears the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The injury-in-fact requirement "means that a plaintiff must have personally suffered an injury." *W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 107. A party may generally seek redress only for injuries done to them, not for injuries done to others. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972). However, "[c]ourts may permit a party with standing to assign its claims to a third party, who will stand in the place of the injured party and satisfy the constitutional requirement of an 'injury-in-fact.'" *W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 107. "[T]he minimum requirement for an injury-in-fact is that the plaintiff

have legal title to, or a proprietary interest in, the claim." *Id.* at 108 (citing *Sprint Commc'ns Co., L.P. v. APCC Servs, Inc.*, 554 U.S. 269, 289 (2008)).

The parties disagree as to whether Langur Maize has suffered an injury-in-fact. The crux of the issue is whether Langur Maize, either directly or through assignment of the Depository Trust Company's claim, suffered an injury because of the 2022 Transaction. The parties have not presented arguments as to whether the causation and redressability elements of standing are met. However, if Langur Maize has suffered an injury sufficient to meet the constitutional standing requirement, the injury is allegedly a particularized harm traceable to the 2022 Transaction. This injury, if proved, can be remedied by the Court. Accordingly, the determination as to whether Langur Maize has standing to assert its claims turns on this injury-in-fact requirement.

### A. Langur Maize's Non-Debtor Claims Are Treated as Claims for Declaratory Relief

The parties filed a stipulated comprehensive order for this adversary proceeding on August 23, 2023. ECF No. 193. The order specifically limits non-debtor claims by the 2024/2026 Noteholders, Langur Maize, or the Counterclaim Defendants to claims for declaratory relief with regard to liability. ECF No. 193 at 6. The order permits subsequent litigation for a determination of remedies upon a finding of liability. ECF No. 193 at 7.

Langur Maize's complaint requests substantive relief on account of its claims against non-debtor parties. The Court will treat these as claims for a declaration of liability. Langur Maize's claims for remedies are fully preserved and may be determined subsequently pursuant to the terms of the stipulated comprehensive scheduling order.

### B. Langur Maize Has Article III Standing to Assert Claims Against Wesco, WSFS, and Guarantor Defendants

N.Y. G.O.L. § 13-107 provides:

> [A] transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.

Section 13-107 automatically assigns a transferor's bond-related claims against an obligor, indenture trustee or depositary, or guarantor without the need for a formal assignment of claims. *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 181 (S.D.N.Y. 2011). "The wording of General Obligations Law § 13-107 makes it eminently clear that the buyer of a bond receives exactly the same 'claims or demands' as the seller held before the transfer." *Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 97 N.Y.2d 456, 461 (2002). A transferee need not "demonstrate its own injury in order to bring a claim for damages." *Id.* at 460. Thus, § 13-107 "expressly permits a bondholder to sue . . . for breaches of duty that occur prior to his purchase of the bond, regardless of the bondholder's knowledge of these breaches." *Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 181 (quoting *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 462 (2d Cir. 1999)).

Section 13-107 applies to Langur Maize's claims against Wesco, WSFS (the indenture trustee), and all counterclaim defendants that

guaranteed Wesco's obligations under the 2027 Notes. To the extent Langur Maize asserts claims against these entities, for which it or its transferrer suffered a direct injury, Langur Maize has Article III standing to assert these claims.

With respect to those defendants, § 13-107 makes a great deal of sense. If the law did not transfer the direct bond-related claims to the purchaser, they would either disappear on transfer (rewarding a potential wrong-doer) or be split between the buyer and the seller. Rational buyers and sellers can price the sales transaction in the context of the statute. The Court has no difficulty determining that these claims are held by Langur Maize.

## C. Section 13-107 Does Not Apply to Claims Against Other Parties

Section 13-107 does not provide for the automatic assignment of claims against entities not explicitly mentioned in the statute. "By its terms, § 13-107 is plainly limited to claims against the obligor, the indenture trustee or depositary, or the guarantor of the obligation." *Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 183. If § 13-107 does not apply, a plaintiff must establish its standing through the conventional means permitted by Article III. *See id.* ("[I]t is clear that SPS and the SPS Affiliates are not obligors, depositaries, or guarantors and thus § 13-107 does not confer standing on Plaintiffs to advance Conti's accrued claims. Plaintiff's other argument, that they have standing as successor beneficiaries of a trust pursuant to common law trust principles, is unavailing."); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 531 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014) ("Since LNR is not an obligor, indenture trustee, depositary, or guarantor, Section 13–107 does not invalidate the contemporaneous ownership rule or act as a safety value to confer standing on plaintiff."); *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 609 F. Supp. 434, 444 (S.D.N.Y. 1984) ("The Banque is also precluded from relying upon § 13–107 because it is neither an "obligor" nor a debtor, nor a trustee or depository.").

Section 13-107 does not apply to Langur Maize's claims against entities other than Wesco, WSFS, and the guarantors of the 2027 Notes. To have standing to bring these claims, Langur Maize must establish that it has either been assigned its claims by an entity with standing or has personally suffered an injury-in-fact.

Although the Court recognizes the inconsistency that § 13-107 creates, that determination was unambiguously made by the State of New York. With respect to claim ownership, the Court is bound to follow state law. ECF No. 204-2 at 147 (New York law governs the 2026 Indenture); ECF No. 204-3 at 171 (New York law governs the 2024 Indenture); ECF No. 204-4 at 166 (New York Law governs the Unsecured Indenture).

### D.    There Are No Factual Allegations That Other Claims Were Properly Assigned to Langur Maize

Langur Maize may establish standing if it has been properly assigned a claim by an entity with standing. *Moose Lodge No. 107*, 407 U.S. at 166. Langur Maize has not introduced any evidence of assignment of claims by the beneficial holders of the 2027 Notes. DTC, the record holder of the 2027 Notes, provided Langur Maize authorization to bring its claims in New York state court and this Court. ECF No. 216-30 at 2, 5; ECF No. 216-31 at 6. Langur Maize argues this authorization acts as an assignment of claims sufficient to provide Langur Maize with Article III standing. ECF No. 211 at 37–39.

The DTC did not have a claim assignable to Langur Maize for purposes of Langur Maize's standing. Simply put, Langur Maize's injury is an alleged injury experienced by the beneficial holders of the 2027 Notes, not one suffered by the record holder. DTC, as the record holder, "has no actual interest in the Notes beyond just holding them in the form of a Global Security for others." *Diverse Partners, LP v. AgriBank, FCB*, No. 16-CV 9526, 2017 WL 4119649, at *5 (S.D.N.Y. Sept. 14, 2017). The beneficial owners of the 2027 Notes are the holders to which any harm would occur as a result of a change in the priority

scheme. They are the party injured from any breach of the indentures, and as a result, are the real party in interest. *See Park Royal I LLC v. HSBC Bank USA, N.A.*, No. 650933/2019, 2022 WL 8199545, at *3 (N.Y. Sup. Ct. Oct. 13, 2022) (citation omitted) ("Cede & Co., as a street name, has only book entry interest but no actual interest in those RMBS, while plaintiffs are the real party in interest as beneficial owners . . . ."); *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 399 (S.D.N.Y. 2018) ("The Court is not persuaded that these claims accrue to any entity besides the beneficial owners.").

Langur Maize argues DTC has standing to assert Langur Maize's claims under the legal rights created by N.Y. U.C.C. § 3-301, which Langur Maize claims "gives the holder of a note the right to enforce the note 'whether or not he is the owner.'" ECF No. 324 at 42. Langur Maize misconstrues § 3-301. Section 3-301 provides that "[t]he holder of an instrument whether or not he is the owner may transfer or negotiate it and . . . discharge it or enforce payment in his own name." Among other things, § 3-301 allows the record owner of a note to sue for payment under a debt. *See id.* This has typically been applied in the context of nonpayment actions, such as foreclosures. *See, e.g., HSBC Bank USA, N.A. v. Carchi*, 177 A.D.3d 710 (N.Y. App. Div. 2d Dep't 2019). Section 3-301 does not apply to a suit for a breach of an indenture agreement and related tort claims.

Langur Maize's alleged harm caused by a change in the priority scheme is not a harm suffered by DTC acting as a record holder of the 2027 Notes. The Unsecured Indenture allows DTC, acting as the record owner, to assert claims for harms suffered by beneficial owners. But since DTC did not experience these harms itself, it cannot assign these claims to an entity that did not suffer an injury. For Langur Maize to have standing to bring its suit, it must have suffered an injury-in-fact.

E.    **A Genuine Issue of Material Fact Remains as to Whether Langur Maize Has Suffered an Injury-in-Fact**

Since Langur Maize was not assigned claims other than by operation of § 13-107, it has standing to bring its claims against entities other than Wesco, WSFS, and guarantors of the 2027 Notes only if it has personally suffered an injury-in-fact.

"For purposes of Article III standing, an 'injury in fact' is 'an invasion of a legally protected interest which is (a) concrete and particularized[] and (b) actual or imminent, not conjectural or hypothetical." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (alteration in original) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992)); *accord Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015). "Any monetary loss suffered by the plaintiff satisfies this element[.]" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). "Further, a liability, including a contingent liability, may be a cognizable legal injury." *Id.* "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Lacewell*, 999 F.3d 130 at 141 (internal quotation marks omitted) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Platinum argues Langur Maize has not been injured by the 2022 Transaction because it "did not purchase any Original Unsecured Notes until February 2023, more than ten months after the 2022 Transaction, and it continued to purchase additional notes through July 2023." ECF No. 280 at 11. Platinum argues Langur Maize purchased its notes at a "roughly 90 percent discount" and "plainly was not itself injured by the 2022 Transaction." ECF No. 280 at 11.

The 2027 Noteholders are a group of unsecured noteholders. Langur Maize's complaint alleges the challenged transaction "changed the ranking of the 2027 Notes' right of payment relative to Wesco's other debt by placing their payment priority behind all other debt, either

temporally or on account of their relative claim on the company's assets." ECF No. 142 at 17.   Langur Maize claims that, after the 2022 Transaction, upon maturity "the 2027 Notes would receive nothing because the entire $2.28 billion of other debt obligations (representing the $1.27 billion in New 1L Notes, the $473 million in New 1.25L Notes, and the newly unsecured [2024 and 2026 Notes]) ranks above the 2027 Notes in right of payment . . . ." ECF No. 142 at 18.   Platinum's argument implies Langur Maize's purchase of the 2027 notes at a reduced value must have been priced in a manner that reflected the changed payment priority scheme.   Accordingly, since Langur Maize purchased the notes at a price that accounted for this changed payment scheme, it was not injured by the transaction.   Although Platinum's argument does not state this explicitly, this is the logical conclusion reached by its line of reasoning.

Substantial factual questions remain precluding a determination of whether Langur Maize has suffered an injury-in-fact.   Platinum's line of reasoning would establish that Langur Maize suffered no injury if Langur Maize purchased the 2027 Notes with knowledge of the 2022 Transaction.   Langur Maize argues that, as a result of contractual and tortious breaches stemming from the 2022 Transaction, a change in payment priority scheme occurred such that its 2027 notes would receive very little to nothing upon maturity.   This is a harm that already existed at the time Langur Maize purchased its 2027 Notes.   If Langur Maize purchased its notes with knowledge of the alleged changed priority scheme, then it may have purchased its notes with knowledge that it would receive very little to nothing upon maturity.   In that case, Langur Maize would not have suffered a concrete and particularized injury. There are not enough undisputed facts in the record to make this determination.

Of course, Langur Maize may have purchased its notes at a discount for a variety of other reasons with an assumption that, upon maturity, it would receive payment in accordance with the terms of the

notes and governing indentures.  In that case, Langur Maize might have suffered a potential injury because of the changed priority scheme.

There are no factual allegations as to whether Langur Maize purchased its 2027 Notes with actual knowledge of the 2022 Transaction.  Knowledge may potentially be imputed through the standards of inquiry notice.  *See Cupersmith v. Piaker & Lyons P.C.*, No. 3:14-cv-01303, 2016 WL 5394712, at *7 (N.D.N.Y. Sept. 27, 2016), *aff'd sub nom. Ayers v. Piaker & Lyons, P.C.*, 748 F. App'x 368 (2d Cir. 2018). This standard "saddles the investor with responsibilities like reading prospectuses, reports, and other information related to the investments, and additionally, assumes knowledge of publicly available news articles and analyst's reports."  *Id.* (quoting *Cetel v. Kirwan Fin. Grp. Inc.*, 460 F.3d 494, 507, 512–13 (3d Cir. 2006)) (internal citations omitted).

Although the parties have presented evidence that the existence of the 2022 Transaction was publicly available through news reports when Langur Maize purchased its notes, the inquiry notice standard requires a fact-intensive inquiry to be determined on a case-by-case basis.  *See, e.g.*, ECF No. 216-16 at 2–6; *In re Bernard L. Madoff Inv. Sec. LLC*, No. 20-CV-02586, 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) (quoting *Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 195 (2d Cir. 2021)).  The parties have not argued whether inquiry notice applies to Langur Maize's knowledge of the transaction in the context of Article III standing, and if so, whether the factual circumstances are sufficient to impute knowledge of the transaction to Langur Maize.

To be clear, the issue of Langur Maize's discounted purchase of the 2027 notes is relevant only to the question of whether Langur Maize suffered an injury sufficient for Article III standing.  The Court does not now decide what effect the discounted price may have on any damages award.

There remains a genuine issue of material fact as to whether Langur Maize has suffered an injury-in-fact sufficient for Article III standing.

### (1)   *If Langur Maize Was Injured, It Was Properly Authorized to Bring Suit*

Even if Langur Maize suffered an injury-in-fact, the Unsecured Indentures require authorization by DTC to bring suit. Under § 2.03 of the Unsecured Indenture, DTC is the depositary, i.e., the record holder, of the 2027 Global Note. ECF No. 209-1 at 52. Pursuant to § 2.08 of the indenture, "[t]he rights of Beneficial Owners in the Global Note shall be exercised only through the Depositary subject to the Applicable Procedures." ECF No. 209-1 at 62. Section 2.08 does not give the beneficial owners of the 2027 Notes, including Langur Maize, the authority to exercise their rights under the notes, such as by bringing the current proceeding to challenge the 2022 Transaction, without authorization from DTC. ECF No. 209-1 at 62 ("Notwithstanding the foregoing, with respect to any Global Note, nothing herein shall prevent the Issuer, the Trustee, or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by any Depositary (or its nominee), as a Holder, with respect to such Global Note or shall impair, as between such Depositary and owners of beneficial interests in such Global Note, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Holder of such Global Note.").

New York courts have held, when standing to sue on an indenture is reserved to registered holders, a beneficial holder does not have standing absent authorization to sue from the registered holder. *MacKay Shields LLC v. Sea Containers, Ltd.*, 300 A.D.2d 165, 166 (N.Y. App. Div. 1st Dep't 2002) (internal citations omitted) ("Standing to sue upon the indentures which plaintiffs seek to enforce is, pursuant to the indentures, expressly reserved to 'holders.' . . . Inasmuch as it is undisputed that plaintiffs are not registered holders, they are without standing to sue, regardless of whether they are beneficial holders . . . ."); *Springwell Navigation Corp. v. Sanluis Corporacion, S.A.*, 81 A.D.3d 557, 561 (N.Y. App. Div. 1st Dep't 2011) (internal citation omitted) ("As the indenture expressly permits the registered holder to assign its right

to institute any legal action to an appointed proxy, and plaintiff has obtained the registered holder's authorization to sue in its stead, plaintiff's status has changed, and its prior lack of capacity has been cured . . . ."); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2016 WL 439020, at *3 (S.D.N.Y. Feb. 3, 2016) (second alteration in original) ("'[A] beneficial owner who lacks standing [to enforce a PSA] may receive authorization to sue from the registered Holder,' even if the PSA does not specifically provide for such authorization." (quoting *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 607 (S.D.N.Y. 2015))).

Langur Maize received authorization to bring its suit in New York state court (and this Court) through a two-step authorization process. First, DTC, acting through its nominee, Cede & Co., authorized Bank of New York Mellon to take "any and all actions and exercise any and all rights and remedies that Cede & Co., as the holder of the Subject Notes on the Subject Date, is entitled to take . . . under the terms of the Notes, the related guarantees, the related indenture, and any other controlling documents." ECF No. 216-31 at 6. Bank of New York Mellon acts as custodian of Langur Maize's notes. ECF No. 216-30 at 5. In turn, Bank of New York Mellon then authorized Langur Maize, as beneficial owner of the notes, "to take any and all Actions." ECF No. 216-30 at 2.

New York courts have found substantially similar authorizations sufficient to confer on the beneficial holder of notes standing to bring suit under the notes. *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, No. 22CV5199, 2023 WL 2632199, at *1, 3 (S.D.N.Y. Mar. 24, 2023) ("In a letter dated September 23, 2022, Cede authorized plaintiff 'to take any and all actions and exercise any and all rights and remedies that Cede & Co. as the holder of record' is 'entitled to take' . . . . The language of the authorization closely tracks Cede authorizations regularly accepted in this District."); *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 244 (2d Cir. 2005) ("DTC and its nominee Cede authorized Lehman Brothers Inc., the participant through which Applestein owned the beneficial

interest, 'to pursue any and all of the rights that DTC has under Section 508 of the Indenture.'  In turn, Lehman Brothers gave Applestein the same authorization."); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394, 2016 WL 439020, at *2 (S.D.N.Y. Feb. 3, 2016) (alternations in original) ("CEDE & Co. . . . hereby authorizes . . . [Plaintiff] to take any and all actions and exercise any and all rights . . . that CEDE & Co. . . . is entitled to take.").

DTC's authorization is sufficient.

### F.     The Claims Asserted by Langur Maize Are Not Property of the Estate

#### (1)     *Claims Asserted Against Wesco*

The parties do not contest that Langur Maize's claims against Wesco are not property of Wesco's estate.  Langur Maize has standing to assert these claims.

#### (2)     *Claims Asserted Against Non-Debtor Entities*

Because the Court is denying summary judgment on standing as to claims outside the realm of § 13-107, standing remains on open issue.  But, standing alone will not allow the claims to be brought.  They must also not be estate property.  For the reasons set forth in this section, the Court holds that the claims are not estate property.  If Langur Maize has standing, the claims will be adjudicated.  If it does not have standing, then the claims will be dismissed.

Langur Maize's claims against non-debtor entities are not property of the bankruptcy estate.  Each claim asserts a particularized harm allegedly suffered by Langur Maize and the group of 2027 Noteholders.

Langur Maize's first through third claims for relief assert a breach of §§ 3.02, 6.05, and 9.02(10) of the Unsecured Indenture and § 4 of the 2027 Notes.  ECF No. 142 at 31–32, 34.  These claims are asserted against  Platinum  Advisors,  Platinum  Funds,  Wolverine,  Carlyle

Management, Carlyle Funds, Senator, and WSFS.  ECF No. 142 at 31–32, 34.

The first claim for relief argues that WSFS breached § 3.02, which allegedly requires a pro rata redemption or purchase of unsecured notes if less than all of the unsecured notes are to be redeemed pursuant to § 3.07 of the governing indenture.  ECF No. 142 at 31.  Langur Maize argues WSFS breached § 3.02 by selecting Platinum's and Wolverine's 2027 notes for exchange in the 2022 Transaction instead of a pro rata apportionment amongst the 2027 Noteholders, which Langur Maize claims was "designed to put Platinum Group in a better position in the event of a bankruptcy filing or otherwise."  ECF No. 142 at 31–32.  Langur Maize argues the other named entities breached the indenture by directing or allowing a breach of § 3.02.  ECF No. 142 at 32.

The second claim for relief argues Carlyle and Senator "held a majority of the 2027 Notes that were not held by Platinum," and directed WSFS to retire only those 2027 Notes that were held by the Platinum Group for purchase in the Insider Exchange."  ECF No. 142 at 33 (footnote omitted).  Langur Maize also alleges "WSFS did not have any trust or power conferred on it to select 2027 Notes for purchase in any method other than as expressly set forth in Section 3.02 of the Indenture."  ECF No. 142 at 33.  Langur Maize argues "Carlyle's and Senator's direction to WSFS to exercise a power that was not conferred on it, and WSFS's compliance with such direction, violated Section 6.05," which allows holders of a majority of unsecured notes to direct the "time, method and place of conducting any proceeding for exercising any remedy to the Trustee or exercising any trust or power conferred on it."  ECF No. 142 at 32–33.  Langur Maize also claims "Platinum's direction and orchestration of only those 2027 Notes that were held by the Platinum Group for purchase" violates § 6.05.  ECF No. 142 at 33.

The third claim for relief argues the named entities breached § 9.02 of the Unsecured Indenture, which requires the consent of each affected holder if any supplement or waiver makes "any change to, or modif[ies], the ranking of the Unsecured Notes in respect of right o

payment that would adversely affect the Holders of the Unsecured Notes." ECF No. 142 at 34–35. Langur Maize alleges that, because of the 2022 Transaction, their unsecured notes were subordinated in ranking with respect to both claims on Wesco's assets and right of payment. ECF No. 142 at 34–35. Langur Maize claims the named entities made these changes without Langur Maize's consent as required by § 9.02. ECF No. 142 at 34–35.

Langur Maize's breach of contract claims assert harm to Langur Maize and other 2027 Noteholders through the reduction in value of their unsecured notes because of their apparent subordination in payment priority and claim on assets following the 2022 Transaction. This apparent subordination is alleged to be the result of a breach of contractual duties owed the 2027 Noteholders. On its face, this is a harm directly experienced by Langur Maize as a holder of the 2027 notes. The breach of contract claims are not property of the bankruptcy estate.

Langur Maize's fourth claim for relief alleges that, in the alternative to the breach of contract claims, Platinum, Wolverine, Carlyle, and Senator tortiously interfered with Langur Maize's contractual relations. ECF No. 142 at 36. This claim for relief alleges the same harm as Langur Maize's breach of contract claims. For the same reason as Langur Maize's breach of contract claims, Langur Maize's tortious interference claim is not property of the estate.

Langur Maize's fifth claim for relief alleges unjust enrichment against all Crossclaim and Third-Party Defendants. ECF No. 142 at 36. Langur Maize claims the named entities were unjustly enriched at Langur Maize's expense because of the 2022 Transaction. ECF No. 142 at 36–37. The claim alleges harm stemming from "illegal and inequitable" activity by the non-debtor entities directed toward Langur Maize. ECF No. 142 at 37. Langur Maize's 2027 notes, and its right to payment under those notes, are not estate assets. The claim does not belong to the bankruptcy estate.

Langur Maize's sixth claim for relief alleges against all Crossclaim and Third-Party Defendants a breach of the implied covenant of good faith and fair dealing. ECF No. 142 at 37. Langur Maize argues the Defendants violated the implied covenant by "selecting, or directing WSFS to select, 2027 Notes for exchange in a process that WSFS could not have reasonably deemed 'fair and appropriate' under § 3.02 of the Indenture," directing WSFS to "exercise a 'power' or 'remedy' that could not reasonably have expected to be available to WSFS, *i.e.*, selecting 2027 Notes for purchase in a fashion that was neither *pro rata*, nor by lot, nor fair and appropriate," and "causing the remaining $104 million in 2027 Notes to be paid after all the company's other debt." ECF No. 142 at 37–38. Langur Maize alleges the Defendants breached contractual duties owed to Langur Maize and the other 2027 Noteholders, resulting in a subordination in payment priority of the 2027 Notes to all other debt. Langur Maize alleges a violation that caused direct injury to itself and the group of 2027 Noteholders. Langur Maize's implied covenant claim is not property of the estate.

Langur Maize's seventh claim for relief alleges civil conspiracy against all Crossclaim and Third-Party Defendants. ECF No. 142 at 39. The claim argues that "Platinum Advisors, the Platinum Fund, Wolverine, Carlyle Management, the Carlyle Funds, Senator and WSFS agreed among themselves to" breach the Indentures. ECF No. 142 at 39. In the alternative, Langur Maize argues that "Platinum Advisors, Platinum Fund, Wolverine, Carlyle Management, the Carlyle Funds, and Senator agreed among themselves to tortiously interfere with the Indenture[s]." ECF No. 142 at 39. Langur Maize argues these actions constituted a civil conspiracy. ECF No. 142 at 39. For the same reasons that the allegations of wrongs underlying the civil conspiracy are not property of the bankruptcy estate, the civil conspiracy claim is also not property of the bankruptcy estate.

Langur Maize's eighth claim for relief asserts against all Counterclaim Defendants declaratory relief that "(a) the Insider

Exchange violated the terms of the Indenture; and (b) Langur Maize has standing to sue parties other than Wesco, WSFS and the Guarantor Defendants for amounts due under the 2027 Notes." ECF No. 142 at 40. With respect to the breach claim, for the same reasons set forth in Langur Maize's breach of contract claims for relief, this claim is not property of the bankruptcy estate. With respect to the standing claim, a claim brought by a creditor seeking a declaration of standing does not belong to the bankruptcy estate.

Langur Maize's claims are not property of the bankruptcy estate.

## III.   THE CONTRACT AND TORT CLAIMS IN THIS ADVERSARY PROCEEDING ARE NOT CORE

The parties dispute whether the claims in this adversary proceeding are "core" claims within the meaning of 28 U.S.C. § 157(b). Other than the 2024/2026 Noteholders' equitable claims and the parties' standing claims, the claims in this adversary proceeding are not core.

The United States District Court has "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). In addition, district courts have "original but not exclusive jurisdiction [over] all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). District courts may refer to bankruptcy courts "all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 157(a).

Matters referred to a bankruptcy court are bifurcated into two categories: "core" and "non-core." 11 U.S.C. § 157(b). The bankruptcy court determines whether matters before it are core or non-core. *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33 (2014). If a matter is core, the statute authorizes a bankruptcy judge to hear, determine, and enter final judgment on the claim. *Id.* at 33–34. If a matter is non-core, and the parties have not consented to final adjudication by the bankruptcy court, the bankruptcy judge may only propose findings of fact and conclusions of law to the district court. *Id.*

A matter is core under § 157 "if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987). The fact that a claim arises under state law is not dispositive, as "many truly bankruptcy issues, like the determination of the basis for creditors' claims, turn on state law." *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999). Nevertheless, *Wood* cautioned against interpreting § 157(b) in a way that causes "the entire range of proceedings under bankruptcy jurisdiction [t]o fall within the scope of core proceedings." 825 F.2d at 95. A claim based on state created rights, which could have proceeded in state court had there been no bankruptcy, is likely not core. *Id.* at 97.

In determining the nature of a proceeding for purposes of determining core status, the court must look to both the form and substance of the proceeding. *Id.*

### A. The Parties Consent to the Court's Entry of Final Judgment with Respect to the 2024/2026 Noteholders' Equitable Claims

Although the parties concede that the 2024/2026 Noteholders' claims for equitable lien and equitable subordination are core, these claims are dismissed by this opinion. ECF No. 144 at 23; ECF No. 199 at 113.

### B. The 2024/2026 Noteholders' and Langur Maize's Standing Claims Are Core

The 2024/2026 Noteholders' first cause of action seeks a declaration of their direct standing to bring their remaining claims. ECF No. 144 at 58. Langur Maize's eighth claim for relief seeks a declaration of its standing to "sue parties other than Wesco, WSFS and the Guarantor Defendants for amounts due under the 2027 Notes." ECF No. 142 at 40.

A determination as to standing is a "threshold inquiry to adjudication." *Orix Cap. Mkts. v. Rafizadeh (In re Cyrus II P'ship)*, 358 B.R. 311, 315 (Bankr. S.D. Tex. 2007). Federal courts, including the bankruptcy court, make determinations as to a party's standing. *See id.* The 2024/2026 Noteholders' and Langur Maize's standing claims are also necessarily contingent on whether their claims are property of the bankruptcy estates, an issue that "invokes a substantive right provided by title 11." *See Wood*, 825 F.2d at 97. This Court has held that "[p]roceedings to determine whether something is estate property or somehow stopped being estate property is a core proceeding under Section 157(b)(2)(A)." *In re Royce Homes, LP*, 652 B.R. 488, 495 (Bankr. S.D. Tex. 2023).

The 2024/2026 Noteholders' and Langur Maize's standing claims are core. The Court may enter final judgment with respect to these claims.

## C.   The 2024/2026 Noteholders' and Langur Maize's Contract and Tort Claims Are Not Core

The 2024/2026 Noteholders and Langur Maize have asserted various contract- and tort-based causes of action. Count four of Wesco's complaint seeks a declaratory judgment confirming the validity of the 2022 Transaction. ECF No. 63 at 70–71. This will involve a determination of the same issues asserted by the 2024/2026 Noteholders and Langur Maize. These causes of action are not core within the meaning of § 157(b).

The Fifth Circuit has held that claims similar to those filed by Langur Maize and the 2024/2026 Noteholders are non-core. The reasoning in *Wood* is illustrative. There, the plaintiffs' complaint argued that certain directors of a medical clinic wrongfully issued stock to one of the clinic's shareholders. *Wood*, 825 F.2d at 91. The complaint stated that "in the Spring of 1985, Dr. James Wood received a disproportionate distribution from the clinic as a result of the wrongful stock issuance in violation of the agreement between Dr. James Wood

and Dr. Arthur Wood that they were to be equal partners in the clinic." In finding the plaintiffs' claim to be non-core, the court reasoned:

> The plaintiff's suit is not based on any right created by the federal bankruptcy law.  It is based on state created rights.  Moreover, this suit is not a proceeding that could arise only in the context of bankruptcy.  It is simply a state contract action that, had there been no bankruptcy, could have proceeded in state court.

*Id.* at 97.

This reasoning is equally applicable in this case.  Langur Maize's and the 2024/2026 Noteholders' contract and tort claims are state law-based claims that could have been adjudicated in state court irrespective of Wesco's bankruptcy filing.  The suit is not based on any right created by the Bankruptcy Code and is not one that could arise only in the context of a bankruptcy case.  It is irrelevant whether a determination of the claims may in some way lead to the determination of other issues concerning the administration of the estate.  This does not convert otherwise state-law based tort and contract claims, that could be decided outside the bankruptcy court, into core proceedings.  *See id.* at 98 ("Conceivably, a final judgment in this proceeding in the plaintiff's favor may lead to proceedings to allow the claim or to discharge the debt.  At this juncture, however, these concerns are speculative and insubstantial in the proceeding.  The plaintiff's suit is not a core proceeding."); *see also WRT Creditors Liquidation Tr. v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 609–10 (S.D. Tex. 1999) ("In this case, all of the alleged tortious conduct and breaches of contract occurred pre-petition.  The only post-petition element of the WRT Trust's state court lawsuit is one element of the damages claimed to result from pre-petition conduct and contracts, a claim for reorganization costs.  Defendants' assertion that the claim for the $11 million in reorganization costs is a core matter, or makes the entire case a core proceeding, fails."); *Stern v. Marshall*, 564

U.S. 462, 499 (2011) ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").

Langur Maize's and the 2024/2026 Noteholders' tort and contract claims are not core. Similarly, Wesco's claim for a declaratory judgment as to the validity of the 2022 transaction is not core.

## IV. SUMMARY JUDGMENT IS DENIED IN PART AND GRANTED IN PART FOR BREACH OF CONTRACT ISSUES

There is no choice of law dispute as to contract interpretation. New York law governs the contract issues. The 2026 indenture provides:

> THE LAWS OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE 2026 SECURED NOTES AND THE 2026 SECURED NOTE GUARANTEES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

ECF No. 204-2 at 147; *see also* ECF No. 204-3 at 171 (New York law governs the 2024 Indenture); ECF No. 204-4 at 166 (New York Law governs the Unsecured Indenture).

The determination of whether a contract is ambiguous is a question of law. *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (contract ambiguity is a question of law). A contract is ambiguous if "the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and

terminology as generally understood in the particular trade or business.'" *Id.* at 466 (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  A contract is unambiguous if there "is no reasonable basis for a difference of opinion." *Id.* (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)); *see also In re GenOn Mid-Atl. Dev., LLC*, No. 17-33703, 2021 WL 4691452, at *5 (Bankr. S.D. Tex. June 17, 2021).

When interpreting an unambiguous contract, the court should use the plain meaning of the text.  *Mid-State Industries, LTD v. State of New York*, 117 A.D.3d 1255, 1256 (N.Y. App. Div. 3d Dep't 2014).  A court should consider extrinsic proof of the meaning of the contract only if the contract is ambiguous.  *Id.*

Parts of the Indentures are ambiguous and require extrinsic evidence at trial.  Other parts of the Indentures are not ambiguous and are appropriate for summary judgment.

## A.    The Integrated Transaction Doctrine

The 2024/2026 Noteholders and Langur Maize assert the 2022 Transaction should be treated as one transaction.  They allege the 2022 Transaction was evidenced by a series of documents that accomplished a single purpose.  When agreements are "executed at the same time, by the same parties, and for the same purpose[, they are], in the eye of the law, one instrument." *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 72 Misc. 3d 1218(A), at *8 (N.Y. Sup. Ct. 2021) (quoting *Fernandez v. Cohen*, 110 A.D.3d 557, 558 (N.Y. Sup. Ct. 2013)); *In re Waterford Wedgwood*, 500 B.R. 371, 379 (Bankr. S.D.N.Y. 2013) (applying the collapsing doctrine, also known as the integrated transaction doctrine or step-transaction doctrine, to a fraudulent conveyance question).

The 2024/2026 Noteholders allege the 2022 Transaction (viewed in the whole) was a debt restructuring transaction that stripped secured noteholders of their liens on Wesco's collateral and changed the payment priority scheme.   The 2024/2026 Noteholders allege the 2022

Transaction swapped the notes of the Participating Noteholders for higher, super priority notes and stripped the liens from the notes of the 2024/2026 Noteholders.  The 2024/2026 Noteholders also allege they were formerly secured, and the 2022 Transaction stripped their notes of this security in violation of the Secured Indentures.  Langur Maize alleges the 2022 Transaction altered the payment priority scheme.

The 2022 Transaction was accomplished by the execution of multiple documents:

- Amendment 3 for the 2027 Unsecured Indenture.  ECF No. 204-24.
- Amendment 3 for the 2024 Indenture.  ECF No. 204-22.
- Amendment 3 for the 2026 Indenture.  ECF No. 204-20.
- A Note Purchase Agreement.  ECF No. 204-26.
- Amendment 4 for the 2027 Unsecured Indenture.  ECF No. 204-31.
- Amendment 4 for the 2024 Indenture.  ECF No. 204-29.
- Amendment 4 for the 2026 Indenture.  ECF No. 204-27.
- An Exchange Agreement.  ECF No. 204-33.

Amendment 3 to each Indenture allowed the issuance of additional notes.  The Participating Noteholders purchased the additional notes through the Note Purchase agreement.  Amendment 4 to each Indenture amended the Indentures to allow an exchange of the Participating Noteholders' notes for higher-priority notes.  And the Exchange agreement effectuated the exchange of the notes.

The Amendments were executed in substantially the same form for each of the Indentures.  The same parties executed each of the Amendments, the Note Purchase Agreement and the Exchange Agreement. ECF No. 204-20 at 5-14; ECF No. 204-22 at 5–14; ECF No. 204-24 at 5–14; ECF No. 204-27 at 9–18; ECF No. 204-29 at 9–18; ECF No. 204-31 at 7–16; ECF No. 303-79 at 7.  All were executed on March 28, 2022.

Certain statements contained within the documents lend support to the assertion that 2022 Transaction was a single, integrated transaction. The Exchange Agreement references "other Transaction Documents." ECF No. 303-79 at 41. "Transaction Documents" is defined as "the Exchange Documentation and the Note Purchase Documents." ECF No. 303-79 at 16–17. The Note Purchase Agreement also references other documents involved in the transaction. ECF No. 303-76 at 7, 9 (including Third Amendment as one of the Note Purchase Documents). The Third Supplemental Indenture also mentions the Note Purchase Agreement. ECF No. 204-20 at 2; ECF No. 202-22 at 2; ECF No. 204-24 at 2.

But beyond these cross-references within the 2022 Transaction documents, there are disputes as to the circumstances surrounding the transaction. The principal factual disputes are: (i) whether the Amendments were conditioned upon the execution of the other documents related to the 2022 Transaction (including the Note Purchase Agreement and the Exchange Agreement); and (ii) whether the parties intended the 2022 Transaction to be one single transaction. The 2024/2026 Noteholders allege "the Insider Transaction must be viewed as a singular whole under established principles of law." ECF No. 200 at 26. The 2024/2026 Noteholders argue "courts look to substance over form to evaluate a single, contemporaneous agreement even if it is executed through multiple, interrelated writings." ECF No. 200 at 26. Wesco asserts the steps of the 2022 Transaction should be viewed separately, not as one single transaction. ECF No. 199 at 60. Wesco argues "melding the 2022 Transaction into a single agreement would merge separate agreements (and types of agreements governing different things) between distinct groups of parties . . . ." ECF No. 199 at 60. Most of these issues will be based on the parties' intentions. Summary judgment will not be granted.

### B. Summary Judgment as to § 3.02 Is Denied

A court "should not find the contract ambiguous where the interpretation urged by one party would 'strain [] the contract language

beyond its reasonable and ordinary meaning.'" *Law Debenture Trust*, 595 F.3d at 467 (quoting *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459 (1957)).

Langur Maize asserts Platinum, Wolverine, Carlyle, Senator, and WSFS breached § 3.02 of the indentures.  Section 3.02 of the Indentures states:

> If less than all of the [] Secured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select [] Secured Notes for redemption or purchase *pro rata*, by lot or by such method as it shall deem fair and appropriate (subject to applicable DTC procedures with respect to the Global Notes, including the Applicable Procedures).

ECF No. 204-2 at 67; ECF No. 204-3 at 66; ECF No. 204-4 at 64 ("If less than all of the Unsecured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select Unsecured Notes for redemption or purchase *pro rata*, by lot or by such method as it shall deem fair and appropriate (subject to applicable DTC procedures with respect to the Global Notes, including the Applicable Procedures).").

Wesco and the Participating Noteholders allege the 2022 Transaction was not a redemption.  The term "redemption" is not defined in any of the documents.  The Court will rely on an evidentiary record to determine if the transaction was a redemption within the parties' intent.  WSFS argues "no redemption took place; rather, the [2022] Transaction was expressly permitted by Section 3.07(h) and, as such, cannot constitute a breach of the Indentures."  ECF No. 196 at 22. WSFS asserts the 2022 Transaction was an exchange under § 3.07(h) of the Indentures, not a redemption, which is treated differently under §§ 3.07(a)–(g). ECF No. 196 at 22–24.  The parties do not clearly distinguish why the 2022 Transaction is covered by § 3.07(h) as opposed

to §§ 3.07(a)–(g).  There is not enough factual support surrounding the circumstances of the transaction to understand whether the 2022 Transaction could be a redemption, such as a redemption under § 3.07(b).

Wesco asserts "[a]t bottom, in compliance with Section 3.07(h), the Exchange was an 'open market or privately negotiated transaction,' and the furthest thing from a unilateral redemption by the Company pursuant to any of the specified redemption options."  ECF No. 199 at 73.  Wesco does not clearly point to undisputed facts surrounding the circumstances themselves that demonstrate the transaction was under § 3.07(h) instead under §§ 3.07(a)–(g).  Wesco argues Langur Maize and the 2024/2026 Noteholders did not assert why the transaction was a redemption.  ECF No. 199 at 72–73.  Wesco, WSFS, and the Participating Noteholders repeatedly assert the 2022 Transaction is not a redemption, without defining a redemption under the indentures.  ECF No. 314 at 13 ("The undisputed documentary evidence definitively establishes []that no redemption took place . . . ."); ECF No. 264 at 22–27 (stating "the Unsecured Indenture plainly contemplated for and provided the Issuer with a right to engage in 'privately negotiated transactions' which it described as 'purchases' and which it distinguished from 'redemptions' pursuant to Sections 3.07(a), (b), (f), or (e)" without undisputed facts demonstrating why the 2022 Transaction was not any type of redemption sufficient to grant summary judgment on the issue); ECF No. 279 at 7 (referencing Wesco and other Participating Noteholders' explanations of the transaction); ECF No. 206 at 19 ("Here, because the 2022 Transaction effected by the Exchange Agreement is precisely a transaction permitted by Section 3.07(h), there can be no violation of Section 3.02, entitling Senator to summary judgment as a matter of law."); ECF No. 213 at 19 ("Moreover, the 2022 Transaction involved a 'privately negotiated transaction,' *expressly permitted* by the Original Unsecured Indenture, *see* Ex. 4 § 3.07(h), not a 'redemption' governed by section 3.02 of that indenture.").

Langur Maize asserts the 2022 Transaction may not be a redemption. ECF No. 281 at 13 ("Langur Maize has never asserted that the Selective Exchange should be recharacterized as a 'redemption.' Langur Maize has consistently referred to the Selective Exchange as a 'purchase' (and, as explained above, Section 3.02 applies to purchases)."); ECF NO. 281 at 18 n.16 ("Notably, this paragraph applies only to 'redemption events,' and thus would not even apply to a purchase of 2027 Notes."). Langur Maize alleges regardless, the 2022 Transaction might be covered under the term "redemption" because repurchases are also redemptions. ECF No. 202 at 15 n.14.

There is ambiguity as to what qualifies as a redemption under the Indentures. The parties do not explain which form of redemption the provision applies to (if at all)—whether mandatory or voluntary under any sub-section of § 3.07. Langur Maize is unclear whether it is even advancing the redemption argument. Even if the 2022 Transaction was not a redemption, there is a dispute as to whether § 3.07 (h) authorized the transaction because there are not enough undisputed facts surrounding the circumstances of the 2022 Transaction.

Langur Maize asserts § 3.02 applies even if the 2022 Transaction was not a redemption because § 3.02 also applies to purchases. Section 3.02 begins with "[i]f less than all the [Notes] are to be redeemed . . . ." ECF No. 204-4 at 64. Langur Maize alleges that "redeemed" in § 3.02 should be read to include a purchase, so § 3.02 should apply even if the 2022 Transaction was a purchase instead of a redemption. "[T]he expression of one thing implies the exclusion of the other." *Mastrocovo v. Capizzi*, 87 A.D.3d 1296, 1298 (N.Y. Sup. Ct. 2011) (quoting *Matter of New York City Asbestos Litig.*, 41 A.D.3d 299, 302 (N.Y. App. Div. 1st Dep't 2007)). Section 3.02 of the Indentures applies when "less than all of the [Notes] are redeemed." ECF No. 204-2 at 67; ECF No. 204-3 at 66; ECF No. 204-4 at 64. It does not refer to when less than all the notes are "redeemed or purchased." ECF No. 204-2 at 67; ECF No. 204-3 at 66; ECF No. 204-4 at 64. Other sections of the Indentures refer to both redemption and purchase. *E.g.,* ECF No. 201-2 at 68 ("on the

redemption or purchase date"); ECF No. 204-3 at 67 (same); ECF No. 204-4 at 65 (same); ECF No. 204-2 at 69 ("[u]pon surrender of [a note] that is redeemed or purchased"); ECF No. 204-3 at 67 (same); ECF No. 204-4 at 66 (same).

Because § 3.02 does not specifically reference both redemption and purchase, under the canon of expression *unjus est exclusion alterius*, § 3.02 may apply only in cases of redemptions, not purchases.[1]

Langur Maize also asserts § 3.02 applies to non-redemption transactions, such as exchanges and purchases because the phrase "less than all" includes "none."  ECF No. 372 at 213.  Langur Maize asserts even if the 2022 Transaction was not a redemption, § 3.02 still applies because "none" of the notes were redeemed.  ECF No. 372 at 213.  This logic would strain the language of the Indentures.  Section 3.02 is not ambiguous.  The quoted portion of § 3.02 does not apply to exchanges that involved no redemptions.  It applies only when a redemption occurs involving less than all of the notes under the Indentures.  In this context, "less than all" does not include "none."

If the 2022 Transaction was not a redemption, § 3.02 does not apply to the 2022 Transaction.  There is genuine dispute as to whether the 2022 Transaction was a redemption.  Summary judgment is denied.

## C.    Summary Judgment as to § 9.02 Is Denied

Langur Maize and the 2024/2026 Noteholders also assert breach of contract claims under § 9.02 of the Indentures.  The 2024/2026 Noteholders and Langur Maize assert the Counterclaim Defendants did not obtain the required consents for the 2022 Transaction.

Langur Maize asserts Platinum, Wolverine, Carlyle, Senator, and WSFS breached § 9.02 when the 2022 Transaction "[modified] the

---

[1] Langur maize also cites a Northern District of Georgia case, *Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.*, No. Civ.A. 1:04-CV-1350-, 2006 WL 358270 (N.D. Ga. Feb. 15, 2006).  In *Whitebox Convertible*, the court found the exchanges in question were "essentially . . . two partial redemptions."  *Id.* at *3.  Such is not the case here.

ranking of the Unsecured Notes in respect of rights of payment that would adversely affect the Holders of the Unsecured Notes" without the consent of all noteholders.  ECF No. 142 at 34.  The 2024/2026 Noteholders assert the same.  ECF No. 291 at 60.  Wesco argues that "ranking . . . in respect of right of payment" is different than the ranking of liens.  ECF No. 199 at 67.  The 2024/2026 Noteholders allege that § 9.02's "right of payment" includes the change to the liens that the 2022 Transaction caused.  ECF No. 291 at 61.

The 2024/2026 Noteholders also assert Wesco, the Guarantor Defendants, and WSFS breached § 9.02 by failing to get required consents.  ECF No. 144 at 59–60.  The 2024/2026 Noteholders also assert the 2022 Transaction breached § 9.02 when it either modified documents "dealing with Collateral in [a] manner adverse to the Holders of the 2026 Secured Notes" and/or "[had] the effect of releasing all or substantially all of the Collateral from the Liens."  ECF No. 291 at 43.

A genuine issue of material fact exists as to whether the 2022 Transaction modified the ranking of the notes in a way that adversely affected the 2024/2026 Noteholders and Langur Maize.  The term "right of payment" is ambiguous.  Does it mean the priorities listed in a promissory note, or the practical legal rights that allow secured creditors to be paid out of the proceeds of a lien interest before an allocation to an unsecured holder?  It is unclear whether right of payment applies to changes in rankings of, or stripping of, liens.

The issue of whether the 2022 Transaction violated § 9.02 when it modified documents "dealing with Collateral in [a] manner adverse to the Holders of the 2026 Secured Notes" or "[had] the effect of releasing all or substantially all of the Collateral from the Liens" cannot be determined on summary judgment.  The answer largely depends on whether this should be considered an integrated transaction.   If the 2022 Transaction was a singular transaction, Wesco may have needed a two-thirds vote.  Summary judgment on this issue will not be granted.

### D.   WSFS Is Partially Protected from Liability Under § 9.06

WSFS asserts it is protected from liability under the Indentures. Section 9.06 provides:

> In executing any amendment or supplement, the Trustee will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Sections 13.02 and 13.03 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amendment or supplement is authorized or permitted by this Indenture or the Escrow Agreement, as applicable, and, in the case of an Opinion of Counsel, that such amendment or supplement constitutes the legally valid and binding obligation of the Issuer and the Guarantors, subject to customary exceptions.

ECF No. 204-4 at 119; ECF No. 204-2 at 133 ("In executing any amendment or supplement, the Trustee and Notes Collateral Agent, if applicable, will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Sections 13.02 and 13.03 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amendment or supplement is authorized or permitted by this Indenture, the Escrow Agreement, the Security Documents or the Intercreditor Agreements, as applicable, and, in the case of an Opinion of Counsel, that such amendment or supplement constitutes the legally valid and binding obligation of the Issuer and the Guarantors, subject to customary exceptions."); ECF No. 204-3 at 131 (same).

WSFS executed two amendments for each of the Original Indentures, Amendments 3 and 4. ECF 204-20 at 14; ECF 204-22 at 14; 204-24 at 14; 204-27 at 18; 204-29 at 18; 204-31 at 16. The Officer's Certificate and Opinion of Counsel for each Amendment were put in the record for the summary judgment motions and the hearing on the motions. ECF No. 198-9; ECF No. 198-10; ECF No. 198-12; ECF No. 198-13; ECF No. 198-15; ECF No. 198-16; ECF No. 198-18; ECF No. 198-19; ECF No. 198-23; ECF No. 198-24; ECF No. 198-26; ECF No. 198-27. Because WSFS was protected from liability under § 9.06 in its execution of the Amendments, the contract claims against WSFS under § 9.02 relating to the Amendments are dismissed.

### E.   Summary Judgment as to §§ 2.01, 4.09, and 4.12 Is Denied

The 2024/2026 Noteholders also assert Wesco breached §§ 2.01, 4.09, and 4.12 of the Secured Indentures.

Section 2.01(e) provides:

> Additional Secured Notes ranking *pari passu* with the Initial Secured Notes may be issued from time to time by the Issuer . . . *provided, further*, that the Issuer's ability to issue Additional Secured Notes shall be subject to the Issuer's compliance with Sections 4.09 and 4.12 hereof.

ECF No. 204-2 at 55; 204-3 at 54.

Section 4.09(a) provides "[t]he Issuer will not . . . directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness . . . ." ECF No. 204-2 at 88; ECF No. 204-3 at 87. Section 4.09(b)(3) originally said § 4.09(a) does not apply when the debt incurred is permitted debt. ECF No. 204-2 at 89; ECF No. 204-3 at 87–88. Permitted debt includes "Indebtedness

represented by (a) the Secured Notes issued on the Issue Date and the Secured Note Guarantees and (b) the Unsecured Notes issued on the Issue Date and the related Guarantees thereof." ECF No. 204-2 at 89; ECF No. 204-3 at 88. The Third Amendment to the Secured Indentures changed § 4.09(b)'s definition of permitted debt to include "Indebtedness represented by (a) the Secured Notes issued on the Issue Date, the Additional 2026 Secured Notes and the Secured Note Guarantees and (b) the Unsecured Notes issued on the Issue Date and the related Guarantees thereof." ECF No. 204-20 at 3; ECF No. 204-22 at 3.

Section 4.09(h) provides the 2026 Secured Notes were not to be "exchanged, converted or otherwise redeemed, repaid or refinanced with Indebtedness secured by any Collateral . . . unless the same Collateral or guarantee has been offered to all Holders of the 2026 Secured Notes." ECF No. 204-2 at 96 (original 2026 indenture); ECF No. 204-3 at 94 ("Notwithstanding the foregoing, in no event shall any 2024 Secured Notes held by the Sponsor be exchanged, converted or otherwise redeemed, repaid or refinanced with Indebtedness secured by any Collateral or guaranteed by any entities not otherwise securing or guaranteeing the 2024 Secured Notes (or with greater priority than any Collateral securing the 2024 Secured Notes or Guarantees guaranteeing the 2024 Secured Notes) unless the same Collateral or guarantee has been offered to all Holders of the 2024 Secured Notes.").

Section 4.12(a) provides "[t]he Issuer will not, and will not permit any Subsidiary Guarantor, if any, to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (other than Permitted Liens) . . . ." ECF No. 204-2 at 101; ECF No. 204-3 at 100.

Whether Wesco breached §§ 2.01, 4.09, and 4.12 of the Secured Indentures depends on whether the 2022 Transaction should be considered a single transaction. If the 2022 Transaction was one transaction, Wesco appears to have violated the Indentures when Wesco amended the Secured Indentures without a two-thirds vote of the outstanding notes. If each transaction should be viewed separately,

then there was no apparent violation.  Summary judgment is denied as to this issue.

### F.    Summary Judgment Is Denied as to § 6.05

Langur Maize asserts Platinum, Wolverine, Carlyle, and WSFS breached § 6.05 of the Unsecured Indenture.   Under § 6.05 of the Unsecured Indenture

> Holders of a majority in aggregate principal amount of the then outstanding Unsecured Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that the Trustee determines may be unduly prejudicial to the rights of other Holders of Unsecured Notes or that may involve the Trustee in personal liability.

ECF No. 204-4 at 106.   Langur Maize asserts the 2022 Transaction violated § 6.05 because the Noteholder Defendants directed WSFS to take action in violation of the Unsecured Indenture.   Factual disputes exist as to whether Platinum's, Wolverine's, and Carlyle's actions were allowed under the Unsecured Indenture.

Langur Maize also alleges WSFS' "compliance with such direction" to "retire only those 2027 Notes that were held by the Platinum Group for purchase in the Insider Exchange" went beyond the scope of WSFS' power.   ECF No. 142 at 33.   Section 6.05 uses "may" twice.  Section 6.05 states WSFS "may" refuse to follow the directions of noteholders.  Section 6.05 also states noteholders "may direct the time, method, and place of conducting any proceeding for exercising any remedy available to" WSFS.  ECF No. 204-4 at 106.   The two different uses of may have two different meanings. "Although the word 'may' is

generally permissive, it can also be read as mandatory where the context suggests the parties so intended . . . .   Whether a permissive or mandatory construction is applicable depends on the apparent intention as gathered from the context, considering the whole instrument in which it is used." *RLS Assocs., LLC v. United Bank of Kuwait PLC*, *380 F.3d 704, 710* (2d Cir. 2004).  Reading "may" in the first sentence of § 6.05 to obligate the noteholders would be an unreasonable interpretation of the contract.  But, considering the context of § 6.05, "may" in the second sentence regarding WSFS' duties has a different meaning.  In the second sentence "may" obligates WSFS to use its reasonable discretion to refuse to take action in violation of law and the Indentures.  This obligation is subject to WSFS' reasonable discretion.   There are not enough undisputed facts to determine whether WSFS acted within their reasonable discretion in not refusing to retire certain 2027 notes.  Summary judgment cannot be granted as to § 6.05.

### G.   All Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Are Dismissed

#### (1)   *WSFS Was Not Subject to an Implied Covenant of Good Faith and Fair Dealing*

In New York, courts imply a covenant of good faith and fair dealing into all contracts.  *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 751 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57 (2d Cir. 2017).  "The covenant incorporates 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included[.]'"  *Id.* at 751–52 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)).

Courts will not imply the covenant to include "any obligation that would be inconsistent with the express terms of the contract."  *Id.* at 752; *Emigrant Bank v. SunTrust*, No. 20 Civ. 2391, 2023 WL 2647648, at *17 (S.D.N.Y. Mar. 27, 2023).  If a contract disclaims the implied covenant, a court will not imply it in the contract.  *See Edmar Financial Company, LLC v. Currenex, Inc.*, No. 21-cv-6598, 2023 WL 3570017, at *18

(S.D.N.Y. May 18, 2023) (dismissing claim for breach of implied covenant and fair dealing when the contract disclaimed the implied covenant); *Commerzbank AG v. U.S. Bank Nat'l Ass'n.*, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017) (dismissing claims under the implied covenant when the agreement contained a disclaimer stating "[n]o implied covenants or obligations shall be read into this Agreement against the Trustee").[2]

The parties disclaimed the implied covenant of good faith and fair dealing as to WSFS § 7.01(b) of the Indentures. Section 7.01(b)(1) of the Indentures states

> the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee . . . .

ECF No. 204-2 at 121; ECF No. 204-3 at 119; ECF No. 204-4 at 109. As to WSFS, the indenture trustee, the claim for breach of the implied covenant of good faith and fair dealing is dismissed.

### *(2)*   *Some of the Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Are Duplicative of the Breach of Contract Claims*

New York courts routinely dismiss breach of implied covenant of good faith and fair dealing claims when they are duplicative of a party's breach of contract claim. *Alter v. Bogoricin*, No. 97 CIV. 0662 (MBM), 1997 WL 691332, at *7–8 (S.D.N.Y. Nov. 6, 1997). A breach of implied

---

[2] Langur Maize cites authority from the New York Court of Appeals in asserting that every contract has an implied covenant of good faith and fair dealing. ECF No. 281 at 41 (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)). This case stands for the proposition that all contracts have an implied covenant. *See id. Kirke* does not address whether the implied covenant can be disclaimed.

covenant claim is duplicative of a contract claim if it "arise[s] from the same facts and seek[s] the identical damages" as the contract claim. *Emigrant Bank v. Sun Trust*, No. 20 CIV. 2391, 2023 WL 2647648, at *18 (S.D.N.Y. Mar. 27, 2023); *Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, No. 22-CV-1105, 2023 WL 2751049, at *37 (S.D.N.Y. Mar. 31, 2023) (quoting *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 365 F. Supp. 3d 379, 400 (S.D.N.Y. 2019)) (an implied covenant claim is duplicative when the "conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."); *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). A party may assert claims under both breach of contract and the implied covenant "only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract." *Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, No. 22-CV-1105, 2023 WL 2751049, at *37 (S.D.N.Y. Mar. 31, 2023) (quoting *Commerzbank AG*, 377 F. Supp. 3d at 498) (dismissing an implied covenant claim as duplicative of the breach of contract claim because the plaintiffs did not "allege[] a breach of the implied covenant that is not tied to their damages resulting from the breach of contract").

"To warrant dismissal, '[t]he conduct alleged in the two causes of action need not be identical in every respect. It is enough that they arise from the same operative facts.'" *Audax Credit*, 72 Misc.3d 1218(A), at *10 (alteration in original) (quoting *Mill Fin., LLC v. Gillett*, 122 A.D.3d 98, 104–05 (1st Dep't 2014)) ("[A]n implied covenant claim 'may not be used as a substitute for a nonviable claim of breach of contract.'" (internal citations omitted)).

Both Langur Maize and the 2024/2026 Noteholders assert claims for breach of the implied covenant and breach of contract.

The damages sought by Langur Maize for the breach of contract and implied covenant claims are intrinsically tied. Langur Maize asserts breach of implied covenant against all crossclaim and third-

party defendants based on the implied covenant in relation to §§ 3.02 and 9.02(10) of the Indentures.  ECF No. 142 at 37–39.

The 2024/2026 Noteholders bring a breach of contract claim against Wesco, the Guarantor Defendants, and WSFS.  ECF No. 144 at 59.  The 2024/2026 Noteholders bring their implied covenant claim against Wesco, the Guarantor Defendants, WSFS, Silver Point, PIMCO, Senator, and Citadel.  ECF No. 144 at 60.  The breach of covenant claim can only be duplicative as to Wesco, the Guarantor Defendants, and WSFS.

Langur Maize and the 2024/2026 Noteholders' entitlement to relief under their breach of the implied covenant claim is based on a breach of the Indentures.  If the Counterclaim Defendants complied with the contract, then Langur Maize and the 2024/2026 Noteholders cannot successfully bring a breach of implied covenant claim.  *Audax Credit*, 72 Misc.3d 1218(A), at *10 ("[T]he implied covenant cannot be used to impose obligations or restrictions going beyond what is set forth in the contract . . . ." (internal citations omitted)).  If the Counterclaim Defendants did breach the Indentures, Langur Maize and the 2024/2026 Noteholders may recover under their breach of contract claim.  *Audax Credit*, 72 Misc.3d 1218(A), at *10.  The two types of claims are based in the same facts and seek the same relief.  Langur Maize and the 2024/2026 Noteholders' breach of contract and breach of implied covenant claims are so intrinsically tied that it would be duplicative to continue asserting both claims.  Langur Maize's breach of implied covenant claim is dismissed.  The 2024/2026 Noteholders' breach of implied covenant claim is dismissed as to Wesco, WSFS, and the Guarantor Defendants.

### (3)   The Remaining Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Are Dismissed

The 2024/2026 Noteholders allege "[t]he Silver Point Noteholders, the PIMCO Noteholders, the Senator Noteholder, and the Citadel

Noteholder who hold the Original Secured Notes are parties to the Governing Indentures by virtue of having purchased the Notes."  ECF No. 144 at 60.  But the Secured Indentures were "among Wolverine Escrow, LLC[,] . . . the Guarantors[,] . . . the 'Trustee[,]' . . . the 'Notes Collateral Agent" and Wesco Aircraft Holdings Inc.  ECF No. 204-3 at 7; ECF No. 204-2 at 6–7.  Wolverine Intermediate Holding II Corporation and any subsidiaries of Wesco are the Guarantors.  ECF No. 204-3 at 27; ECF No. 204-3 at 28.   The Silver Point Noteholders, the PIMCO Noteholders, the Senator Noteholder, and the Citadel Noteholder are not parties to the agreement.  *See Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 124 N.Y.S.3d 346, 356 (2020); *iHeart Commc'ns, Inc. v. Benefit St. Partners LLC*, No. SA-17-CV-00009, 2017 WL 1032510, at *2 (W.D. Tex. Mar. 16, 2017) (investor noteholders were not parties or signatories to the indenture).

"As a general rule, in order for someone to be liable for a breach of contract, that person must be a party to the contract." *A & V 425 LLC Contracting Co. v. RFD 55th St. LLC*, 830 N.Y.S.2d 637, 643 (Sup. Ct. 2007); *Pac. Carlton Dev. Corp. v. 752 Pac., LLC*, 851 N.Y.S.2d 59 (Sup. Ct. 2007) (citing *A&V 425 LLC Contracting Co. v. RFD 55th St. LLC*, 830 N.Y.S.2d 637, 643 (Sup. Ct. 2007)), aff'd as modified, 62 A.D.3d 677, 878 N.Y.S.2d 421 (2009).  "Contractual obligations cannot be imposed on an intended beneficiary absent a showing that the third party manifested acceptance to be bound or the existence of an agency relationship with one of the contracting parties." *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 374 (S.D.N.Y. 2015); *Saray Turizm A.S. v. MTS Logistics, Inc.*, No. 17 CIV. 7495, 2021 WL 1199470, at *9 (S.D.N.Y. Mar. 30, 2021).

Because the Silver Point Noteholders, the PIMCO Noteholders, the Senator Noteholder, and the Citadel Noteholder are not parties to the Secured Indentures, they cannot be obligated under the Secured Indentures.   And there is no evidence the third-party beneficiaries manifested any intent to be bound.  Because there is no underlying contract for the covenant of good faith and fair dealing to be implied in,

the 2024/2026 Noteholders for breach of the implied covenant is dismissed as to the Silver Point Noteholders, the PIMCO Noteholders, and the Senator Noteholder.

## V.   THE TORT CLAIMS

### A.   Summary Judgment as to Tortious Interference Claims Are Denied

Under New York Law, the elements of tortious interference are "(1) the existence of a valid contract between itself and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract; and (4) damages." *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 82 (S.D.N.Y. 2012). The contract must have been actually breached in order to meet the third element. *Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN 120950, LRNNN 122950, LRNN 123580, MSLNV 254064*, 485 F. Supp. 2d 187, 202 (E.D.N.Y. 2007).

There are factual disputes surrounding the third element. Because the Court has not reached a conclusion on the breach of contract issue, the tortious interference claim is not appropriate for summary judgment. Summary judgment as to tortious interference is denied.

### B.   Conversion

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (alteration in original) (quoting *Vigilant Ins. Co. of Am. V. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)). Conversion requires the property be tangible property. 23 N.Y. Jur. 2d Conversion, and Action for Recovery of a Chattel § 4 (footnotes omitted).

Conversion does not apply to property that is "indefinite, intangible, [or] incorporeal." *Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 864 (N.Y. App. Div. 4th Dep't 1987). New York courts have allowed

certain intangible property interests to be converted if they are "represented by something that is subject to conversion—e.g., physical or electronic documents." *Nelly de Vuyst, USA, Inc. v. Eur. Cosmetiques, Inc.*, No. 11 CV 1491, 2012 WL 246673, at \*8 (S.D.N.Y. Jan. 6, 2012).

Conversion might apply when "an intangible property right can be united with a tangible object for conversion purposes." *In re CIL Ltd.*, 582 B.R. 46, 113 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 289 (2007)). For instance, stocks, while intangible, are evidenced in stock certificates and are subject to conversion. *Id.* Conversion only applies to intangible items to the extent that they "bear a substantial similarity to tangible property." *Id.* at 114114(quoting *Yankowitz Law Firm v. Tashlitsky (In re Tashlitsky)*, 492 B.R. 640, 649 (Bankr. E.D.N.Y. 2013));*Iglesias v. United States*, 848 F.2d 362, 364 (2d Cir. 1988) (New York law requires a right in tangible property or documents that embody an intangible right).[3] For instance, business opportunities, marketing rights under an agreement, and patentable ideas that were not a tangible expression of the ideas are not tangible property. *CIL*, 582 B.R. at 114–15.

"[T]he mere right to payment cannot be the basis for a cause of action alleging conversion since the essence of a conversion cause of action is the 'unauthorized dominion over the thing in question.'" *Daub v. Future Tech Enter., Inc.*, 65 A.D.3d 1004, 1006 (N.Y. App. Div. 2d Dep't 2009) (quoting *Fiorenti v. Central Emergency Physicians*, 305 A.D.2d 453, 454–55 (N.Y. App. Div. 2d Dep't N.Y. 2003)). "A right to the benefits under a contract is not the type of intangible property interest"

---

[3] The Plaintiffs also assert the conversion claim is duplicative of the breach of contract claims. Courts have dismissed claims for conversion as being duplicative of breach of contract claims. *E.g.*, *AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04-CV-8832 , 2007 WL 2962591, at \*7 (S.D.N.Y. Oct. 10, 2007). In those cases, the claims were based on the same underlying facts and did not have a distinct basis for the conversion claims. *Id.* Here, the Defendants' bases for their breach of contract claims lie in the failure to get the requisite consent to make changes to debt structure. The conversion claim relates to the stripping of the liens themselves, which is independent from the contract claims.

that is subject to conversion.  *Nelly de Vuyst, USA, Inc. v. Europe Cosmetiques, Inc.*, No. 11 CV 1491, 2012 WL 246673, at *8 (S.D.N.Y. Jan. 6, 2012) (holding marketing rights under a contract are not a convertible property interest); *cf. Sun Gold, Corp. v. Stillman*, 95 A.D.3d 668, 669–70 (N.Y. App. Div. 1st Dep't  2012) (holding leasehold and future business interests are not tangible property subject to conversion); *Austin v. Gould*, 168 A.D.3d 626, 627 (N.Y. App. Div. 1st Dep't  2019) (holding an interest in an LLC is not tangible property subject to conversion).  Case law does not squarely address whether a lien on a mixture of personal property and real estate can be tangible property for purposes of conversion.  The 2024/2026 Noteholders bring claims for conversion of their liens under the Indentures.  The 2024/2026 Noteholders allege the 2022 Transaction "caused the release of the 2024/2026 Holders' property rights—i.e., their interests in the Liens on the Collateral—and the simultaneous transfer of such property to the [Participating Noteholders].  By reason of such release and transfer, the [Participating Noteholders] are in possession of the 2024/2026 Noteholders valuable property."   ECF No. 144 at 72.  The Secured Indentures define Collateral as

> any and all assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Obligations under the Secured Notes Indentures (including proceeds and products thereof), other than, other than the U.S. Excluded Assets or the U.K. Excluded Assets (save to the extent covered by any floating charge), as applicable.

ECF No. 204-2 at 15; ECF No. 204-3 at 14–15.  The Counterclaim Defendants assert the 2024/2026 Noteholders cannot bring a claim for conversion because the liens are not tangible property.

The 2024/2026 Noteholders' security interest in the Collateral is not tangible and is far more removed than the electronic records and stocks referenced in *Thyroff*. The Court should avoid expanding the *Thyroff* exception so much that it swallows the general requirement that property be tangible to be convertible. *See Field v. Mans*, 516 U.S. 59, 69 (1995) (avoiding a reading that would allow the exception to swallow the broader rule). The liens are more akin to the right to payment in *CSI* because they are not evidenced by anything tangible that is comparable to a stock certificate. A security interest in a right to payment is intangible like the right to payment itself. Finding otherwise would allow the narrow *Thyroff* exception to swallow the broader requirement that property be tangible to be convertible.

Because the Liens are not tangible property rights that could be converted, the 2024/2026 Noteholder's conversion claim is dismissed.

### C.   Langur Maize's Unjust Enrichment Claim Is Dismissed

Under New York Law, the elements of unjust enrichment are "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 419 (N.D.N.Y. 2020) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)). Parties may bring a claim for unjust enrichment only when there is no affirmative agreement. *Id.* "[T]he existence of an enforceable, written contract will typically preclude a recovery for a quasi-contractual claim, including for unjust enrichment . . . ." *Id.* ("[A]n unjust enrichment claim is 'not available where it simply duplicates, or replaces, a conventional contract or tort claim.'" (quoting *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014))). But "if the subject-matter of an unjust enrichment claim 'is not covered by a valid, enforceable contractual obligation,' that claim is not duplicative and need not be dismissed based solely on the existence of a breach of contract claim." *Id.* (quoting *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 296, 305 (E.D.N.Y. 2010)).

This principle also applies to non-signatories. A non-signatory to a contract may not be held liable under unjust enrichment where a valid contract exists that governs the subject matter. *Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*, 60 F. Supp. 3d 365, 375 (E.D.N.Y. 2014).

The Indentures are valid contracts that govern this dispute. The Indentures cover the subject matter alleged in the unjust enrichment claim. Langur Maize's claim for unjust enrichment is dismissed.

### D.   Summary Judgment as to Langur Maize's Civil Conspiracy Claim Is Denied

Under New York Law, "to establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort . . . , plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a common purpose or plan; and, (4) resulting damage or injury." *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 659 (S.D.N.Y. 2015) (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 386 (S.D.N.Y. 2010)). When a court does not resolve the underlying tort claim on summary judgment, the civil conspiracy claim also goes to trial. *See Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 567 (Bankr. D. Del. 2022).

The underlying tortious interference claim is not resolved on summary judgment. Summary judgment is denied as to Langur Maize's claim for civil conspiracy.

### CONCLUSION

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED 01/14/2024

_____

Marvin Isgur

United States Bankruptcy Judge