**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **WESCO AIRCRAFT HOLDINGS, INC., *et al.*,** [1] | ) | **Case No. 23-90611 (MI)** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE AMENDED DISCLOSURE STATEMENT, (II) APPROVING RE-SOLICITATION OF CLASSES 4 AND 6 AND RELATED VOTING PROCEDURES, (III) APPROVING FORMS OF MODIFIED BALLOTS, (IV) SCHEDULING A CONFIRMATION HEARING, (V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES, AND (VI) SHORTENING THE NOTICE AND OBJECTION PERIODS IN <u>CONNECTION WITH THE FOREGOING</u>**

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for Region 7 (the "<u>U.S. Trustee</u>"), files this

Limited Objection to the *Debtors' Emergency Motion for Entry of an Order (i) Approving the Amended*

*Disclosure Statement, (ii) Approving Re-Solicitation of Classes 4 and 6 and Related Voting Procedures,*

*(iii) Approving Forms of Modified Ballots, (iv) Scheduling a Confirmation Hearing, and (vi) Shortening*

*the Notice and Objection Periods in Connection With the Foregoing* (the "<u>Solicitation Motion</u>")[2] [ECF

No. 2030], and represents as follows:

---

[1]  The Debtors operate under the trade name Incora and have previously used the trade names Wesco, Pattonair, Haas, and Adams Aviation. A complete list of the Debtors in these chapter 11 cases, with each one's federal tax identification number and the address of its principal office, is available on the website of the Debtors' noticing agent at http://www.kccllc.net/incora/. The service address for each of the Debtors in these cases is 2601 Meacham Blvd., Ste. 400, Fort Worth, TX 76137.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Solicitation Motion.

---

## SUMMARY

The Solicitation Motion in part seeks approval of procedures, forms of ballots, and notices related to the *Modified Second Amended Joint Plan of Wesco Aircraft Holdings, Inc. et al.* (the "Second Amended Plan") [ECF No. 2027].   The United States Trustee objects to the Solicitation Motion for the following reasons:

   i.   The proposed nonconsensual releases of non-debtor third parties by non-debtor third parties contained in the Second Amended Plan sought to be solicited are not authorized under the United States Bankruptcy Code;

   ii.   The proposed opt-out provisions in the ballots and the non-voting status notice proposed by the Solicitation Motion are ineffective to confer consent to the Third-Party Release;

   iii.   To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Second Amended Plan's exculpation provision is overly broad temporally and in scope of parties sought to be exculpated in violation of Fifth Circuit precedent; and

   iv.   The Second Amended Plan should not improperly limit the police or regulatory powers of governmental agencies.


## FACTUAL ALLEGATIONS

**Procedural History**

1.     Debtors originally pursued confirmation of their *Modified First Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* (the "Prior Plan") [ECF No. 1223].

2.     On May 3, 2024, the U.S. Trustee filed his *Limited Objection of the U.S. Trustee to the Modified First Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* (the "Prior Plan Objection") [ECF No. 1719], which raised objections to the Prior Plan's exculpation provisions extending to the Reorganized Debtors, any independent director of a Debtor, and Debtors' Retained Professionals in violation of Fifth Circuit case law set forth in *NexPoint Advisors, L.P. v. Highland Capital Management L.P. (In re Highland Capital Management, L.P.),* 48 F.4th 419, 437-38 (5th Cir. 2022).

3.      On August 23, 2024, Debtors filed their Second Amended Plan, which still includes the Reorganized Debtors and any independent director of a Debtor in its definition of Exculpated Parties. Second Amended Plan Article I.A.109.

4.      On August 23, 2024, Debtors filed their *Disclosure Statement for Modified Second Amended Joint Plan of Wesco Aircraft Holdings, Inc. et al.* (the "Amended DS") [ECF No. 2029].

5.      On August 23, 2024, the Debtors filed their Solicitation Motion seeking in part (i) approval of the Amended DS, (ii) authority to re-solicit Classes 4 and 6 along with procedures for such solicitation, and (iii) approval of the forms of ballots to be used.

6.      The Solicitation Motion is set for hearing on September 5, 2024, at 9:00 a.m. Central Time.

**Solicitation and the Second Amended Plan**

7.      The Solicitation Motion does not seek to authority to re-solicit votes from Classes 7a *General Unsecured Claims*, 7b *General Unsecured Convenience Claims*, and 7c 2024 *Unsecured Notes Claims* (collectively the "Prior Voting Classes") on the assertion by Debtors that the treatment of the Prior Voting Classes under the Second Amended Plan remains either unchanged or potentially improved.

8.      The Solicitation Motion does seek authority to re-solicit Classes 4 and 6 (the "Current Voting Classes").

**Third-Party Releases**

9.      Article I.A.199. of the Second Amended Plan defines "Releasing Parties" as follows:

"*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each non-Debtor affiliate; (d) each of the Consenting 1L Noteholders, the Consenting 1.25L Noteholders and the Consenting Equity Holders; (e) the Committee and its members; (f) the DIP Purchasers; (g) Wilmington Savings Fund Society, FSB, in its capacity as current and/or former indenture trustee, notes agent and collateral agent, as applicable, under the DIP Notes Purchase Agreement, the 1L Indenture, the 1.25L Indenture,

the Unsecured Notes Indentures, the 2026 Indenture, and the PIK Notes Indenture; (h) BOKF, in its capacity as current and/or former indenture trustee under the Unsecured Notes Indentures and the 2026 Indenture; (i) the ABL Agent and the ABL Lenders; (j) the New Revolver Facility Agent and the New Revolver Facility Lenders; (k) the New Notes Indenture Trustees; (*l*) each holder of Claims or Interests that does not elect to opt out of the Third-Party Release; (m) with respect to each of the Entities in the foregoing clauses (a) through (*l*), each such Entity's current and former Related Parties; *provided* that, if any holder of a Claim or Interest does not elect to opt out of the Third-Party Release in any of its capacities, such holder and each of its Related Parties that is also a holder of a Claim or Interest shall be deemed to have not opted out of the Third-Party Release in all capacities; *provided, further*, that no Excluded Party shall be a Releasing Party. Notwithstanding any of the foregoing, Langur Maize shall be deemed to have opted out of the Third-Party Release and shall not be Releasing Parties or Released Parties. For the avoidance of doubt, in accordance with Dkt. No. 1727, no member of the 2024/2026 Noteholder Group (or any Related Party thereof) shall be a Releasing Party or a Released Party.

Second Amended Plan, Art. I.A.199.

10.     Article I.A.197. of the Second Amended Plan defines "Released Party" as follows:

"*Released Parties*" means, collectively, the Releasing Parties; *provided* that no Excluded Party shall be a Released Party.

Second Amended Plan, Art. I.A.197

11.     Article VIII.E. of the Second Amended Plan contains a third-party release provision that imposes on Releasing Parties broad mutual releases with the Released Parties (the "Third-Party Release") unless such Releasing Parties opt-out of said Third-Party Release, directing them to the Amended DS for further information. Second Amended Plan Art. VIII.E.

12.     The Amended DS states that:

You may opt out of granting the Third-Party Release by checking the opt-out box on your Ballot or Non-Voting Status Notice. You must then submit your Ballot or Non-Voting Status Notice to the Solicitation Agent so that it is ***actually received*** on or before the Voting Deadline. If you opt out of consenting to the Third-Party Release as a "Releasing Party," you will also not be a "Released Party" and will not benefit as a releasee under the Third-Party Release.

Amended DS p 102 ¶ d. (emphasis original)

Article VIII.E. of the Second Amended Plan also provides that the third-party release provision will be enforceable through the injunction provisions in Article VIII.G.  Article VIII.G provides for a broad injunction imposed on the Releasing Parties as to the Released Parties.  Second Amended Plan Art. VIII.G.

**Exculpation**

13.     The Second Amended Plan proposes to exculpate the Exculpated Parties (definition below) for any claims or causes of action arising out of certain transactions, agreements, events, or occurrences relating to the Debtors and the Chapter 11 Cases from occurring during the period following the Petition Date. *See* Second Amended Plan, Art. VIII.F.

14.     Article I.A.109 of the Second Amended Plan defines "Exculpated Parties" as follows:

> "*Exculpated Parties*" means, collectively, and in each case in their capacities as such and, in each case, to the maximum extent permitted by law: (a) the Debtors, (b) the **Reorganized Debtors**, (c) the Committee and its members, and (d) **any independent director of a Debtor (including Patrick Bartels as independent director of Wolverine Intermediate Holding)**.

Second Amended Plan, Art. I.A.109 (emphasis added).  Moreover, Article VIII.F provides that these exculpation provisions will be enforceable through the injunction provision at Art. VIII.G.

## OBJECTIONS

**Statutory Standards**

15.     Pursuant to Section 1125(b) of the Bankruptcy Code, the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing adequate information." 11 U.S.C. § 1125(b).  Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed.

16.    Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirming a chapter 11 plan, when each impaired class of claims votes to approve the plan.  Among other things, a plan must comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).

17.    The Debtors bear the burden of establishing that the Plan complies with all elements of section 1129.  *In re Cypresswood Land Partners, I,* 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009) ("The Debtor, as the proponent of the [plan], has the burden of proving that all elements of 11 U.S.C. § 1129(a) are satisfied.").

18.    Consistent with the requirements set forth in section 1129(a), the U.S. Trustee objects to approval of the Amended DS and to confirmation of the Second Amended Plan as set forth below.

## Objection No. 1 - The Third-Party Release is Non-Consensual

### *Nonconsensual plan releases of non-debtor third parties by non-debtor third parties are not authorized under the United States Bankruptcy Code and opt-out provisions are insufficient to confer consent to a third-party release.*

19.    Nonconsensual third-party releases are not authorized under the United States Bankruptcy Code.  *Harrington v. Purdue Pharma, L. P.*, 144 S. Ct. 2071, 2082–88 (2024).

20.    This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").[3]

21.    No Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a nondebtor to have consented to an agreement to release claims against other nondebtors

---

[3]    The third-party release is particularly odd here in a liquidating, rather than reorganizing, plan.  *See also In re Midway Gold US., Inc.*, 575 B.R. 475, 503 (Bankr. D. Colo. 2017) ("[T]he justification for granting [third-party] releases in a liquidation is far less compelling than in a reorganization."); *In re City Homes III, LLC*, 564 B.R. 827, 870-71 (Bankr. D. Md. 2017) (recognizing that the need for third-party releases, if any, does not apply in liquidations); *In re Berwick Black Cattle Co.*, 394 B.R. 448, 461 (Bankr. C.D. Ill. 2008) ("The rationale for granting third-party releases is far less compelling, if it exists at all, in a liquidation than in a reorganization.").

where consent would not exist under state law. Nor does 11 U.S.C. § 105(a) confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue Pharma, L.P.*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law" nor do they possess a "roving commission to do equity." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (*In re Dairy Mart Convenience Stores, Inc.*), 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Thus, the state-law definition of consent is not diluted or transformed by the Code. Instead, state law contract principles govern whether a release is consensual. *See In re SunEdison, Inc.*, 576 B.R. 453, 458 (S.D.N.Y. Bankr. 2017). The "general rule of contracts is that silence cannot manifest consent." *Patterson et al. v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 686 (E.D. Va. 2022).

22.     While the Second Amended Plan provides that the construction and enforcement of the Second Amended Plan is governed by the laws of the State of New York[4], that does not necessarily require that issues arising in connection to underlying Third-Party Claims and Third-Party Releases are to be governed by the laws of any particular state. The law of the state in which such claims arise between the non-debtors would govern the contracts between those non-debtors. Debtors cannot unilaterally change choice of law principles for nonparties.

23.     Nevertheless, a review of New York law finds that, under New York contract law, silence does not equal consent except under limited circumstances not applicable in this case. New York General Obligations Law provides:

> An agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any ... obligation ... shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such ... obligation ... shall be in writing and signed by

---

[4]  *See* Amended Plan, Art. XII.L.

the party against whom it is sought to enforce the change, modification or discharge, or by his agent.

N.Y. GEN. OBLIG. LAW§ 5-1103 (McKinney 2022).

24.     Under this standard, because there is no consideration for the Third-Party Release, the creditor must affirmatively sign a writing under which it expressly agrees to discharge the non-debtor parties. *See also Matter of Tanenbaum Textile* Co. *v. Schlanger,* 287 N.Y. 400 (1942). Without such a writing from each affected creditor, the release becomes a mere proposal that no one can enforce.

25.     In applying New York contract law, a court recently refused to approve a disclosure statement for a plan that would bind creditors to a third-party release unless the creditors opted out. *In re Tonawanda Coke Corp.,* Decision and Order on Disclosure Statement, Bankr. W.D.N.Y. Aug. 27, 2024 (Case No. 18-12156) (Bucki, C.J.) at *4. The court stated, "[a]bsent a writing expressly agreeing to a release of non-debtors, creditors have not given consent as required by the Supreme Court in *Harrington v. Purdue Pharma*." *Id* at *5.

26.     The same holds true under general rules of contract construction:

> Acceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance. See Comment b to § 53. The usual requirement of notification is stated in § 54 on acceptance by performance and § 56 on acceptance by promise. **The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak**. The exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds. See Chapter 5.

*See* Restatement (Second) of Contracts § 69 (1981).  (emphasis added)

27.     Likewise, under Texas law, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v.*

---

*Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas

stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

28.     Silence and inaction, however, will generally not be deemed assent to an offer because,

with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2

Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally

informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could

not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr.

N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d

443, 445–46 (Tex. 1982)). "[A] meeting of the minds is an essential element of an implied in fact

contract." *Id*. (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental

Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted). 2008)); *see also Beverick v.

Koch Power, Inc., 186 S.W.3d 145, 152* (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence

cannot satisfy the basic requirements of contract creation.").

29.     Just like it is legal error to define consent in a manner inconsistent with state law, it is

error to presume it exists.  As discussed above, consent arises when two parties affirmatively assent to

something.  A party seeking to include non-debtor releases in a bankruptcy plan must show that they

are consensual.  To do so, state law requires that mutually agreeing third parties must come forward, state their consent affirmatively, and ask the court to memorialize their consent in a plan.  Nothing in the Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law.

30.     Applying the hornbook law on contracts cited above to the Third-Party Releases, affirmative consent—and the limited circumstances in which silence can be consent under state law— are absent here.  Here, the opt-out provisions in the ballots and the non-voting status notice are ineffective to confer consent under non-bankruptcy law to the Third-Party Release.

31.     As an initial matter, merely voting in favor of a Plan does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting on a chapter 11 plan is governed by the Bankruptcy Code and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.  Those voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. *Id*.  Nor are they "silently tak[ing] offered benefits" from the released non-debtors, *id*., such that consent may be inferred.  The only benefits received are through distributions from the debtor's chapter 11 plan—there are no benefits provided from the released non-debtor to the releasing claimant.  Further, because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions.  Voting for a plan does not reflect the unambiguous assent that should be required to find consent to a release between non-debtors.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual releases are premised on the party's agreement to the

release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

32.     Nor can consent be imputed from the failure to make an opt-out election on a Plan ballot that is voted in favor of the Plan.  Courts have held that affirmative agreement—something more than the failure to opt out—is required to support a consensual third-party release.  *See In re* Decision and Order on Disclosure Statement, *Tonawanda Coke Corp.,* Case No. 18-12156, Dkt. 790 at 5 (Bankr. W.D.N.Y. Aug. 27, 2024); *Patterson*, 636 B.R. at 686.  The *Patterson* court, in applying black letter contract principles to opt-out releases in a chapter 11 plan in *Mahwah*, found that contract law does not support consent by failure to opt-out. *Mahwah*, 636 B.R. at 686.  "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688.

33.     Beyond those who vote in favor of the Plan and fail to opt out of the releases, the releases will also be imposed on those who either reject the Plan or do not vote on the Plan at all and opt out. But conspicuous warnings in the disclosure statement, the plan ballots, or an opt-out form that silence or inaction will constitute consent to a release are not sufficient to convert a party's silence into consent to the release. *SunEdison*, 576 B.R. at 458–61. In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id*. at 460–61. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id*. at 460.

34.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015). Moreover, the court in *SunEdison* observed that parties who are solicited, but do not vote, may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. As the *Emerge Energy Services, LP* court noted, "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).

35.     Although opt-out mechanisms have been approved in some cases in the Southern District of Texas, the U.S. Trustee respectfully submits that whether the release is consensual must be determined based on state law, which does not recognize silence as consent.[5]

36.     Some courts in both Delaware and New York have held that merely having an opt out mechanism is not enough.[6]  *See In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011); *see also SunEdison*, 576 B.R. at 458–61 (holding that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when

---

[5] At the confirmation hearing in *Chassix Holdings Inc.*, Judge Wiles explained why courts should be wary of deeming consent based on a party's inaction:

> [I]t's a legal fiction.  It's not consent in any real sense.  It's consent by inaction, knowing perfectly well, that the legal fiction that people have read it and decided, well, I'm just going to abide by this consequence is nonsense.  People throw these things away.  They pay no attention whatsoever, and so the question is, what business do the Courts have basically helping to expand the number of parties who are deemed to consent to these releases.

*In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW), ECF No. 654 (Bankr. S.D.N.Y. Jul. 21, 2015), Tr. 158:1-9.

[6]      *But see In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-05 (Bankr. D. Del. 2013); *U.S. Bank N.A. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del 2010) (limited to unimpaired classes that were "being paid in full.")

the disclosure statement made it clear that such a consequence would result); *Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third-party release." *Wash. Mut.*, 442 B.R. at 355.

37.     Importantly in this case, those receiving Non-Voting Notices did not receive the full solicitation package.  While information concerning how to obtain a copy of the Amended DS, the Second Amended Plan, and the Plan Supplement was provided on the Non-Voting Status Notices, it is not disputed that parties receiving such notices electronically were not provided full notice in the form of the underlying documents which would have more fully disclosed the parameters of the plan provisions and releases from which they were expected to "opt out".  Any party receiving a Non-Voting Status Notice electronically would have to take affirmative action to obtain those documents in order to review and understand fully what was being asked of them.  Accordingly, the parties who received a Non-Voting Notice electronically may not fully comprehend the extent of the third-party release due to a lack of notice.

38.     The failure of a party to opt out of the Third-Party Release is not consent to the Third-Party Release.  As the *SunEdison* and *Chassix* courts observed, there may be myriad reasons that a party is inactive in a bankruptcy case.  Construing a failure to return an opt-out form as affirmative consent—including where a claimant is deemed to reject the plan and thus has no reason to vote— is not authorized by the Bankruptcy Code and cuts against state contract law principles.

39.     Like in *SunEdison* (applying the contract laws of New York, which are similar to Texas's contract laws), none of the three exceptions to silence as consent apply here.  There is no course of conduct between the Debtors and its creditors that would imply consent to the Third-Party Release.

---

And while the creditors may accept payments under the Amended Plan, should it be confirmed, they would receive those payments whether or not they opted out of the Third-Party Release. Accordingly, mere acceptance of payments under a plan is not the silent acceptance of the benefit of the "bargain" of the Third-Party Release sufficient to confer consent.

40.     With regard to misleading conduct, the *SunEdison* debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the nonvoting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *SunEdison*, 576 B.R. at 460. The *SunEdison* court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id.*

41.     It is equally implausible to suggest that a party returning a ballot rejecting the Plan but neglecting to opt out of the Third-Party Release is evidencing consent to the Third-Party Release. Not only is there no "mutual agreement" as to the Plan, much less the Third-Party Release, the creditor has actually expressly stated its rejection of the Plan.

### *The Debtors Are Not Providing Notice to Procure Affirmative Consent from All Parties Affected by the "Consensual" Third-Party Releases*

42.     Even if the Court finds that the third-party releases are consensual as to certain creditors by virtue of the opportunity to opt-out, here the Debtors have not provided notice to all affected parties, including without limitation the "Related Parties" as defined in the Second Amended Plan. These parties will have not received notice or an opportunity to object or opt-out, and certainly never expressly consented to the broad releases in the Second Amended Plan. There is no evidence that the Second Amended Plan or the solicitation of materials proposed by the Solicitation Motion will give notice to the breadth of parties included in the definition of "Releasing Parties" including "Related Parties" of

the Releasing Parties, which are listed below and set forth in Article I.A.195 of the Second Amended

Plan:

> "*Related Parties*" means, with respect to a specified Entity, (x) such specified
> Entity's predecessors, successors, assigns, current or former shareholders,
> subsidiaries, affiliates, affiliated investment funds or investment vehicles,
> managed or advised accounts, funds, or other entities, and investment advisors,
> sub-advisors, managers, direct and indirect equity holders, portfolio companies,
> and management companies, (y) with respect to such specified Entity and each of
> the other Entities in the foregoing clause (x), such Entity's current and former
> directors, officers, principals, managers, members, partners (including limited
> partners), employees, trustees, independent contractors, managed accounts or
> funds, fund advisors, investment advisors, advisory board members, management
> companies, investment bankers, financial advisors, restructuring advisors,
> accountants, actuaries, agents, consultants, representatives, attorneys, and other
> consultants and professional advisors; and (z) with respect to such specified
> Entity and each of the other Entities in each of the foregoing clauses (x) and (y),
> each such Entity's respective heirs, executors, estates, and nominees.

Second Amended Plan, Art. I.A 195.

43.     Indeed, the record is devoid of any evidence showing that the Debtors have made or will

make efforts to (1) identify the parties referenced above that are affected by the third party releases; (2)

provide notice to the parties referenced above of the third-party releases and an opportunity to object

or opt out; and (3) show a manifestation of their affirmative consent to the third-party releases in the

Plan. Here, the Plan's third-party releases adversely affect many individuals and entities (of whom few

are even identified) who were provided no notice and thus, could not consent. Approval of the third-

party release provisions that include these affected parties would be akin to approval of a nonconsensual

third-party release and violates the Supreme Court's recent ruling in *Purdue.*

44.     Under the Supreme Court's holding in *Purdue* and the holdings of *Pacific Lumber*,

*Emerge Energy*, *Washington Mutual*, and the other cases cited above, because the Releases by Holders

of Claims include releases of claims against non-debtors held by parties without their affirmative

consent—and, in the case of the Related Parties, without their receiving notice—the Second Amended Plan is unconfirmable.

**Objection No. 2 - The Exculpation provision is too broad in violation of Fifth Circuit authority.**

45.     To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan improperly provides overly broad exculpation coverage to Reorganized Debtors and any independent director of any of the Debtors in violation of Fifth Circuit case law.  *NexPoint Advisors, L.P. v. Highland Capital Management L.P. (In re Highland Capital Management, L.P.),* 48 F.4th 419, 437-38 (5th Cir. 2022, cert denied).  This controlling decision is unequivocal.  Fifth Circuit precedent, including *Bank of New York Trust Company, NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)* 584 F.3d 229 (5th Cir. 2009), and section 524(e) of the Bankruptcy Code, "require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ."  *In re Highland Cap. Mgmt., L.P.,* 48 F.4th at 437 (5th Cir. 2022, cert denied).

46.     Specifically, the Fifth Circuit in *Highland Capital* analyzed whether the independent directors who were specifically appointed by the Official Committee of Unsecured Creditors in the Highland Capital bankruptcy case pursuant to an order entered by the bankruptcy court to act together as the bankruptcy trustee could be exculpated and concluded:

> That leaves one remaining question:  whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*.  We answer in the affirmative.  As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital.  Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee.  *See* 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01.  It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence.  *See In re Hilal,* 534 F.3d at 501.  Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

*In re Highland Cap. Mgmt., L.P.,* 48 F.4th at 437.   Unlike the "Independent Directors" at issue in *Highland Capital*, there is nothing unique about the appointment of the independent directors in these Chapter 11 Cases.   More specifically, during the pendency of these Chapter 11 Cases, the bankruptcy court has not issued any order allowing for the Official Committee of Unsecured Creditors to appoint the Debtors' independent directors to act as a bankruptcy trustee for the Debtors.   Thus, to be consistent with *Pacific Lumber* and *Highland Capital*, the definition of "Exculpated Party" in the Amended Plan must exclude Debtors' independent directors.

47.     Exculpations must also be temporally limited to the period from the Petition Date to the Effective Date.   Extending exculpations outside those parameters is impermissible and contrary to *Pacific Lumber* and *Highland Capital*.   "[O]ur precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ."   *In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437 (emphasis added).

48.     The exculpation clause in the Second Amended Plan also contravenes Fifth Circuit precedent because it expands exculpation to transactions, agreements, events, or other occurrences taking place after the Effective Date.   *See* Second Amended Plan, Art. VIII.F. Examples include "the administration and implementation of the Plan or the property to be distributed under the Plan; the issuance or distribution of securities under or in connection with the Plan; the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized

Debtors under or in connection with the Plan[.]" *Id.* Without a temporal limitation, the exculpation clause is inconsistent with Fifth Circuit precedent.[7]

49.     Accordingly, exculpation of the Reorganized Debtors is not permissible because they do not come into being until the Effective Date of the Second Amended Plan.  Exculpation for conduct before the Petition Date or after the Effective Date also fails to comport with the Fifth Circuit's direction in *Highland*.

**Objection No. 3 The Application of the <u>Injunction to Enforce the Third-Party Release and the Exculpation Also Violates *Purdue and the Bankruptcy Code*</u>.**

50.     Although a plan injunction may be appropriate in the context of claims against a debtor that are discharged by the Code, this Court may not approve the injunction enforcing the non-debtor releases and exculpation provisions because (1) non-consensual third-party releases and injunctions are not permitted by the Bankruptcy Code, *see Purdue Pharma,* 144 S. Ct. at 2088; (2) the exculpation violates Fifth Circuit precedent as discussed above, and (3) even if the court did deem the non-debtor releases consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them.

51.     First, as the *Purdue* Court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context:  asbestos-related bankruptcies, and these cases are not asbestos-related.  *See Purdue Pharma*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(g)).

52.     Second, even if the release is deemed consensual, no Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to enjoin non-debtors from suing other non-debtors.

---

[7] This revision could easily be accomplished by adding the phrase "from the Petition Date to the Effective Date" to Article VIII.F. of the Amended Plan.

53.     Further, such an injunction is not warranted by the traditional factors that support injunctive relief because, if the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent "immediate and irreparable harm" to either the estate or the released parties. *See Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (stating elements movant must establish to obtain injunctive relief). A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors. But there is no reason for this Court to be involved with the post-effective date enforcement of consensual releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

**Objection No. 4 - The Amended Plan should clarify whether claims of governmental entities are released.**

54.     The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015).

55.     The Debtors should modify the Amended Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters. The United States Trustee requests that the Debtors be required to include the following language in the Second Amended Plan or order confirming the same:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order

---

**UNITED STATES TRUSTEE'S OBJECTION TO APPROVAL OF AMENDED DS**                    **Page 19**

or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## <u>CONCLUSION</u>

56.     The Court should not approve a disclosure statement for the Second Amended Plan that impermissibly imposes third-party releases on parties who have not affirmatively and unambiguously consented to grant such broad releases. The Debtors' use of the opt-out provisions in the solicitation materials and Second Amended Plan are insufficient to confer consent to third-party releases. Further, the list of individuals and entities included as Releasing Parties is enormously broad and includes affected parties that have not been identified or provided notice of the third-party releases. Absent the Debtors' showing affirmative consent from all parties affected by the third-party release in the Second Amended Plan, the Court should not approve the Second Amended Plan.

57.     Additionally, the definition of "Exculpated Party" in the Second Amended Plan must exclude the Reorganized Debtors and Debtors' independent directors to be consistent with Fifth Circuit precedent.  Unless the Debtors conform the Amended Plan's exculpation provision to this mandate, the Plan violates section 1129(a)(1) and the plan is patently unconfirmable as proposed.

58.     For the reasons above, this Court should deny approval of the Amended DS absent the modifications detailed herein to the Second Amended Plan and its related solicitation materials and grant such other and further relief as it may deem just and proper.

DATED: September 4, 2024                     Respectfully submitted,

                                             KEVIN M. EPSTEIN
                                             UNITED STATES TRUSTEE

                                             */s/ Jayson B. Ruff*
                                             Jayson B. Ruff
                                             Trial Attorney
                                             Michigan State Bar No. P69893
                                             Office of the United States Trustee
                                             515 Rusk Avenue, Suite 3516
                                             Houston, Texas  77002
                                             (713) 718-4662
                                             jayson.b.ruff@usdoj.gov


### **Certificate of Service**

I certify that, on September 4, 2024, a true and correct copy of foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

                                             */s/ Jayson B. Ruff*
                                             Jayson B. Ruff