IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90611-11 |
| | § | HOUSTON, TEXAS |
| WESCO AIRCRAFT HOLDINGS, INC., | § | THURSDAY, |
| ET AL, | § | SEPTEMBER 5, 2024 |
| DEBTORS. | § | 9:00 A.M. TO 10:09 A.M. |

**DISCLOSURE STATEMENT HEARING**

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

(RECORDED VIA COURTSPEAK; NO LOG NOTES PROVIDED)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**<u>APPEARANCES</u>:**


FOR INCORA:                          MILBANK
                                     Dennis Dunne, Esq.
                                     55 Hudson Yards
                                     New York, NY  10001
                                     212-530-5000


FOR THE US TRUSTEE:                  OFFICE OF THE US TRUSTEE
                                     Jayson Ruff, Esq.
                                     515 Rusk, Ste. 3516
                                     Houston, TX  77002


(Please also see Electronic Appearances.)

## <u>INDEX</u>

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
| --- | --- | --- | --- | --- |
| BRIAN CEJKA | | | | |
| By Proffer | 47 | . | . | . |
| By the Court | 48 | . | . | . |

| EXHIBITS: | <u>Admitted</u> |
| --- | --- |
| ECF 2074-1 through -13 | 47 |

***

1        **HOUSTON, TEXAS; THURSDAY, SEPTEMBER 5, 2024; 9:00 A.M.**

2             THE COURT:  All right.  Good morning.  We're here in

3    the Wesco Aircraft Holdings case, 23-90611.

4             We should have electronic appearances have already

5    been made.  Let me ask Debtors' counsel to take the lead today

6    and tell me where you think we're going to be going.  If I can

7    get you to press five-star once now on your phone.

8             Mr. Dunne, good morning.

9             MR. DUNNE:  Good morning.  Can you hear me?

10            THE COURT:  I can.  Good morning.

11            MR. DUNNE:  All right.  So, for the Record, Your

12   Honor, Dennis Dunne of Milbank on behalf of Incora.

13            The Agenda today relates to one item, it's approving

14   the Amended Disclosure Statement and a form of re-solicitation

15   for two classes, per our motion, which is on the docket at

16   ECF 2030.

17            And I'd like to provide a kind of brief overview of

18   the changes, and then Mr. Leblanc will present some evidence

19   and then I can deal with the objection, if that's acceptable

20   to the Court.

21            THE COURT:  Yeah, that's just fine.

22            I need to tell you that I don't understand what it

23   says; and so, at some point in the hearing -- I'm either

24   misreading the text or misreading a table and I need to

25   understand it before I can approve it.  And however you want

1    to go through that, probably we'll need -- I know you've

2    listed one of your FAs as a witness or something.  And

3    seriously, I -- I'll tell you where the problem is, in terms

4    of just me understanding it.

5         The -- as I understood the allocations, it is pro

6    rata of a proration.  And the pro rata of the proration uses

7    as the denominator the sum of all of the 1L notes plus the sum

8    of the 2026 notes.  And then it uses as a numerator for the

9    allocation, obviously, the 2026 notes for the allocation to

10   the 2026s and the 1Ls to the 1Ls.

11        But then, when there's a table that shows the

12   expected distributions, the relative ratios change as more

13   money is distributed.  And I couldn't understand how a

14   proration of a numerator and a denominator -- and I've done a

15   bunch of math on this, which I'm happy to show you -- could

16   result then in different relative outcomes.  So I need that --

17   I need to really understand the math in the table that gives

18   the high/low ranges because they don't make sense to me with

19   the plan.

20        It -- this may mean -- and the difficulty of this is

21   I don't know if I'm misreading the text or misreading the

22   numbers, and so it's hard for me to define where I'm

23   misreading it, but I can't reconcile the two.  So I don't know

24   what you want to do with that as my introduction, but it's

25   something we --

1          MR. DUNNE:  All right.

2          THE COURT:  -- that has to be --

3          MR. DUNNE:  All right.

4          THE COURT:  -- addressed, so --

5          MR. DUNNE:  Your Honor, I attended law school

6    because I am an innumerate and not good with numbers.  But

7    Mr. Leblanc was an electrical engineer, and so I think -- why

8    don't I go forward with the presentation and let Andy prepare

9    a kind of response to Your Honor's questions.  And you may be

10   right because, as you were going through it, I -- looking at

11   some of it, it may relate to the text, as well, so -- but

12   let's do that at the end and then give us some time to

13   hopefully fully address Your Honor's concerns.

14         THE COURT:  Yeah.  And I'm also -- I've got a

15   reasonably open day today.  And so, if you want to take a

16   break to be sure that you can get through my thick skull on

17   that explanation, it's not that I need to rush through this or

18   figure it out. I have other problems, as well, but that's the

19   one that's going to take the time.

20         MR. DUNNE:  Okay.  So why don't I go through it?

21   And we -- Mr. Leblanc can let us know whether we should take a

22   break and come back to you on that or whether we're ready to

23   address it.  But let me jump into the presentation.

24         Your Honor, as you've heard from us at every

25   hearing, the company needs to exit Chapter 11 as soon as

1     possible.  I think Your Honor has been quite clear that the

2     Court supports that objective, and the company greatly

3     appreciate the Court's efforts in that regard to date.

4           We've spent the past few weeks revising the plan to

5     effectuate the Court's July ruling and trying to negotiate

6     with the parties to achieve broad consensus.  On that latter

7     front, we've made progress, which I'll describe in a couple of

8     minutes.  But we do not, today, have a fully consensual plan.

9     We, obviously, hope to achieve that by the confirmation

10    hearing.  But I -- we all think it's important, if we can get

11    there today, to keep us moving towards confirmation and then

12    exit from Chapter 11 in October.

13          Turning to the Agenda item for today, since we filed

14    the amended plan and revised solicitation materials, we

15    received some informal comments, most of which we were able to

16    address in advance of the hearing.  We've also resolved the

17    limited objection by the '26 noteholder group.  The '26

18    noteholder group now supports moving forward today.

19          One objection remains.  The U.S. Trustee filed an

20    objection to the opt-out releases.  I'll address that pleading

21    at the conclusion of my remarks, Your Honor.  I think what

22    might be most helpful is to describe the plan changes that are

23    in the redline, most of which were necessitated by the Court's

24    ruling.

25          One housekeeping note, Your Honor.  We do have a few

1     slides to share.  If you could delegate screen authority to

2     Mr. Dan Porat of Milbank, we could get them up on the screen.

3          THE COURT:  All right.  Hold on.  Let me find him.

4     Mr. Porat, could I get you to press five-star one time?  There

5     we go.  Mr. Porat, you should have control of the monitor at

6     this point.

7          MR. DUNNE:  There we go.  Great.  Let's flip to

8     Slide 2.  I'm going to talk about the salient revised plan

9     terms.

10         Okay.  As with the most recent version before this

11    one of the plan, this amended plan reflects the outcome of the

12    Court's July 10th ruling.  But as Your Honor will recall, we

13    had a status conference on August 13th, Your Honor clarified

14    the treatment of the new money notes, so that has now been

15    reflected in the revised plan.

16         The -- what I guess is the important point here is,

17    even though we have unsecured status of the new money notes,

18    secured status for '26 notes, which has caused the

19    denominators for both the secured and unsecured claims pools

20    to change, as compared with what we previously solicited,

21    crucially, the treatment remains unchanged for other classes,

22    including other classes of unsecured creditors, which will

23    receive the same economic treatment contemplated under the

24    prior solicited version of the plan.  So, as a result, Your

25    Honor, we're seeking only to re-solicit the two classes of

1    affected bondholders, the 1Ls and the '26 noteholders.

2             THE COURT:  Can -- and it's my understanding,

3    Mr. Dunne -- and maybe others can join in or you can just give

4    me the overview -- that no one is objecting to the concept

5    that we only need to re-solicit those two classes, that -- at

6    least --

7             MR. DUNNE:  Correct.

8             THE COURT:  -- I'm not seeing that.  People are

9    generally reserving their rights.  But I do want to know if

10   anybody thinks it's a mistake to limit the solicitation in the

11   manner that you've proposed, which is a pretty small number of

12   people that are being solicited, given what we now know

13   occurred with the debt consolidation and just a few holders.

14            MR. DUNNE:  You are right, Your Honor.  We have

15   received no formal or informal objections to soliciting just

16   those two classes.

17            THE COURT:  Hold on.  I've got -- from 212-530-5840,

18   who do we have here?

19       (No verbal response)

20            THE COURT:  212-538-5840?

21            MR. PORAT:  Oh, that might be me, Your Honor.

22            THE COURT:  Who is that?

23            MR. PORAT:  This is Dan.  I was requesting access to

24   share the screen.

25            THE COURT:  Ah.  Oh, that's fine.  I will go ahead

1    and --

2            MR. PORAT:  Thank you.

3            THE COURT:  Yeah, I'll re-mute your line.  No

4    problem.

5            And I've also got someone from the U.S. Trustee's

6    office.  Mr. Ruff, good morning to you.

7            MR. RUFF:  Good morning, Your Honor.  Jayson Ruff

8    with the United States Trustee.

9            Your Honor, I did not -- our objection was not

10   specifically to who the Debtors were intending to solicit.  I

11   will just say that, depending on where we go with our

12   objection and what the Court does today, if we are successful

13   on our objection, then it may mean that, instead of an opt-

14   out, that there would be an opt-in.  That would only affect,

15   of course, the parties who are seeking -- the nonDebtor

16   parties who are seeking the third-party releases.  So there

17   may be some sort of notice that needs to go out to parties, as

18   well, to -- if -- again, if our objection is sustained.  So I

19   just --

20           THE COURT:  I think --

21           MR. RUFF:  -- wanted to mentioned that.

22           THE COURT:  I think there's a -- just in -- I know

23   this is a bit of a side question to what I was asking.  I

24   appreciate your comment.  There's another alternative, which

25   is, if it turns out that opt-out doesn't work, then maybe

1      there isn't a release at all.  And I just -- that's another

2      option.  That would mean that, at confirmation, you would

3      determine there wasn't a release.

4              I think there's something -- I will tell you sort of

5      in advance of getting to your objection -- and it -- the

6      bottom line of this is I'm probably going to want to put off

7      dealing with your objection today because I don't -- I have

8      not reconciled in my mind how the Supreme Court opinions in

9      class action matters that hold that opt-out is superior to

10     opt-in can be reconciled with your argument because it's

11     pretty clear from the Supreme Court opinions that we don't

12     have a due process problem there.  We may have a non due

13     process problem, which I recognize.

14             But I'm -- I don't think you address in your

15     pleading, and I haven't seen anyone address in a pleading why

16     we would do the inverse in bankruptcy versus class action

17     suits with respect to opt-in or opt-out or why one is always

18     good and why one is always bad because I think that the

19     Supreme Court, in the class action concept, has basically

20     said, usually -- and this is, you know, paraphrasing -- you

21     know, usually, opt-out is the superior mechanism, but a court,

22     in its discretion, can do opt-in.

23             So I don't know if you're prepared to argue with --

24     on that issue today, and I don't want to do it, if you will,

25     ad hoc, where I throw out an argument that you haven't --

1      you're not fully prepared to address.  If you're fully
2      prepared to address that, we can do more.
3              But it's clear to me that Purdue did not alter the
4      landscape here.  It said you can't do non-consensual third-
5      party releases.  And as you know, the fifth -- and as you put
6      in your brief, the Fifth Circuit hasn't ever allowed non-
7      consensual third-party releases, so I've never done a non-
8      consensual third-party release.  The question that you're
9      asking, I think, is whether we're doing it the right way, and
10     I think that invokes this class action question.
11             I'll let you ponder all that.  When we get to the
12     end of the hearing, I want you to think through that question.
13             MR. RUFF:  Your Honor, I'd be happy to address it
14     now or I can just wait my turn, that's fine.
15             MR. DUNNE:  Okay.  And Your Honor, I will -- on the
16     opt-out, I do have comments on what you just said, but I'll do
17     that at the end, too.
18             The -- but back to the regularly scheduled
19     programming.  On Slide 2, there are a few other points to note
20     with respect to changes in the plan.
21             You will see a lot of references in the redline to a
22     term called "appellate adjustment mechanism."  The amended
23     plan, as we've discussed at prior hearings, preserves all
24     parties' appellate rights with respect to the Court's July
25     ruling.

1       We file a document at ECF 2031 that contains the

2   terms of an appellate adjustment mechanism, which I am not

3   going to get into.  I'm just going to say it's there for

4   people to read.  And the point of it is to govern a world

5   where the appeal results in a different outcome and a

6   different balance sheet for Reorganized Incora.

7       Prior to filing that proposed appellate adjustment

8   mechanism, we shared drafts with both the 1Ls and the 2026

9   noteholders.  The filed version of that mechanism reflects

10  some informal comments from the 1L notes.  So we understand

11  that that group hasn't fully signed off on it and is still

12  reviewing it.

13      The '26 noteholders did not send us comments on it.

14  I think they referenced in their pleading filed yesterday

15  they'll have some issues with it.  And they did send us a

16  counterproposal, Your Honor, shortly before the hearing today.

17  I have not had time to review it in detail, I'll have to do

18  that after the hearing concludes.

19      But it shows, again, what Your Honor has mentioned

20  at prior hearings.  Having these hearings kind of galvanizes

21  action and it kind of demonstrates why we should keep to the

22  proposed confirmation schedule, if possible, so we can kind of

23  maintain the focus and pressure necessary to resolve the

24  remaining issues.

25      Three other points to note on the redline:

1          The other relates to corporate governance and

2     minority protections.  We've received a governance proposal

3     from the 1L noteholders that's been filed with the Court at

4     ECF Number 2030.  I'm assuming the '26 holders addressed

5     governance in their proposal this morning.  But we intend the

6     time leading up to confirmation to facilitate a resolution on

7     governance and any minority protections that make sense.

8          The third point, Your Honor, is the amended plan

9     contains a new proposal on how to resolve the open issue of

10     payment of advisor fees to the 2026 noteholder group, who are

11     now secured.  The amended plan entitles them to argue at

12     confirmation for cash payment of their fees as a form of

13     adequate protection; as well as, in the alternative, allowance

14     of their fees and expenses as an incremental component of

15     their secured claim.  And everybody will have their right to

16     object to that and to present the arguments for an against to

17     Your Honor.  As I'm sure the court is aware, the '26

18     noteholders filed a motion for fee coverage as adequate

19     protection.  We believe we should resolve all of that, either

20     before negotiations, or at confirmation.

21          The last point in this slide, Your Honor -- and it

22     goes to changes to the plan -- the revised ballot for the 2026

23     noteholders expressly provides for the option for the '26

24     noteholders to elect treatment under Section 1111(b) of the

25     Code.  And as the Court might imagine, that request came

1    directly from the '26 noteholder group and we accommodated it.

2         Let me turn to Slide 3, which is a time line of

3    various deadlines.

4         If the Court were inclined to grant the motion

5    today, we'll remain on course for a confirmation hearing on

6    October 7th.  I think all stakeholders have expressed on the

7    record that they're eager to confirm these cases and emerge

8    from Chapter 11.  But in order to meet and October 7th date,

9    we will need to shorten the default notice with respect to

10   voting and objection deadlines, specifically.

11        Under our proposed schedule, Your Honor, the voting

12   period is shortened to 17 days, as opposed to the 21 days.

13   And the time to object to confirmation is shortened to 21

14   days, as opposed to 28.

15        THE COURT:  Yeah.

16        MR. DUNNE:  The Court has the power to reduce those

17   periods for cause --

18        THE COURT:  Right.

19        MR. DUNNE:  -- under --

20        THE COURT:  How many people are you going to be

21   soliciting --

22        MR. DUNNE:  Not --

23        THE COURT:  -- like a physical number?  Isn't it

24   like 25 or something?

25        MR. DUNNE:  It's not a ton, Your Honor, it's not

1    many.  I -- it -- I think it's fewer than 50, but yes, it's

2    not a lot.

3            THE COURT:  And they're -- every -- literally every

4    one is represented at today's hearing?

5            MR. DUNNE:  Correct.  Ah, I'm not -- Mr. Schak is

6    with me.  And do you think that's right?

7        (Participants confer)

8            MR. DUNNE:  He's going to say 90 plus percent.

9            THE COURT:  Yeah.  I mean, I guess I don't

10   understand --

11           MR. DUNNE:  But --

12           THE COURT:  I don't understand why I would have any

13   problem with that.  We -- I think everybody does want to move

14   ahead, I want to move ahead.  The economics of the situation

15   require moving ahead as quickly as we can and shortening

16   notices for people that are sophisticated and not objecting to

17   that shortening when what we have are some pretty discrete

18   issues causes me really no heartburn and I think is good cause

19   for the shortening them.  I'll listen to people who want to

20   object to that, but this is pretty much a nonissue for me.

21           MR. DUNNE:  Thank you, Your Honor.  I will not go

22   through why I agree with you.  But if people object, I'll come

23   back and add some points to it.

24           But to the -- with respect to the time line, which

25   is set out on Slide 3, the '26 noteholders are now onboard.

1    We had conversations with them over the last day or so to get

2    to consensus on it; and, as a result of those discussions, we

3    moved the proposed plan objection deadline back to September

4    20th and added a deadline of September 17th to file a plan

5    supplement containing definitive documents for the new debt,

6    the new governance terms, and the appellate adjustment

7    mechanism.  And that will be reflected in the revised proposed

8    order that we would ask you to sign.

9         And Your Honor, that concludes my presentation.  If

10   you're so inclined, I would like to address the U.S. Trustee's

11   objection briefly here and, really, your comments, and then

12   I'll conclude and we can see where Mr. Leblanc is on Your

13   Honor's question at the outset.

14        THE COURT:  When I was --

15        MR. DUNNE:  My point on --

16        THE COURT:  When I --

17        MR. DUNNE:  -- the U.S. Trustee's --

18        THE COURT:  When I was --

19        MR. DUNNE:  -- (indiscernible) --

20        THE COURT:  -- about five years old, my ten-year-old

21   brother taught me heads, I win; tails, you lose.  I don't know

22   how old you are when your somebody taught you heads, I win;

23   tails, I [sic] lose.

24        (Laughter)

25        THE COURT:  When I read the plan, it's a heads, I

1    win; tails, you lose plan.  I don't think it should have been

2    filed the way that it got filed.  I'm glad that the parties

3    are working through matters.  But I don't want anyone to have

4    even a slight inkling that I think that the plan, as filed, is

5    confirmable, that I think it was filed in good faith.  It's so

6    objectionable the way that it is structured, for me.

7              And I'm sort of willing to swallow that hard and

8    just say, like with my big brother, you all are all adults

9    fighting in the room and you know what you're doing and I'll

10   stay out of that, for now.  But if this is the plan that gets

11   presented for confirmation, we won't even commence the

12   hearing, I'll just deny it.  It is a non-confirmable plan.  So

13   I just --

14             MR. DUNNE:  Your Honor --

15             THE COURT:  -- want you to --

16             MR. DUNNE:  -- let me --

17             THE COURT:  -- know that.

18             MR. DUNNE:  Let me just share my thoughts with you.

19   I have viewed what we're doing today as a mechanism to get a

20   schedule and work --

21             THE COURT:  And --

22             MR. DUNNE:  -- towards October 7th --

23             THE COURT:  And Mr. Dunne --

24             MR. DUNNE:  -- and then --

25             THE COURT:  -- I very much --

1          MR. DUNNE:  -- we expect --

2          THE COURT:  I very much appreciate that that was the

3    beginning of your comment and all of that stuff.  But I just

4    -- I had to tell you what a visceral, bad reaction I had to

5    the way that this was done.

6          But I'm trying to also recognizing in telling you

7    that I want to move ahead quickly, I want to get to

8    confirmation, I understand you're negotiating, I'm happy

9    you're negotiating.  But I don't want people to read any

10   approval I might do today as, in any way, thinking that this

11   is close to anything that I believe is confirmable under 1129,

12   and I think it's not.

13         That -- I got it that you're going to change it.  I

14   don't know what else to tell you about that.  But I am not

15   questioning your motives here, I know that you're trying to

16   get to a plan.  I wish that I hadn't seen something quite so

17   one-sided, but that's what I got.

18         And I just want you to know that, as you move ahead

19   in the mediation, my determination to move ahead, subject to

20   what we hear from others about slowing things down and

21   especially Mr. Ruff's objection, is not any indication that I

22   think that what I have is a confirmable plan.  I thought about

23   coming out and just not even doing this.  But I think you've

24   made the case that you're negotiating.

25         And frankly, the document filed by Mr. Rosenbaum, I

1    believe overnight -- I'm not sure, but I read it this morning

2    -- that his clients agree that there is negotiations in good

3    faith going on, very, very important to me.  And your comments

4    and the whole tenor of your comments that you're going to

5    negotiate something are extraordinarily important to me, and

6    so I'm going to lay back for a little bit, but I don't want

7    people misreading that.

8         MR. DUNNE:  And Your Honor, it's been our intent to

9    get to an agreement between the '26 noteholders and the 1Ls

10   before confirmation.  But your position is most helpful, as

11   always, to have and will obviously inform positions were we

12   not to reach agreement there, so it's very helpful.

13        THE COURT:  Thank you.

14        MR. DUNNE:  On the U.S. Trustee objection, I just

15   wanted to raise one procedural point --

16        THE COURT:  Okay.

17        MR. DUNNE:  -- and -- which is Your Honor may

18   remember that we actually had an objection deadline to file

19   confirmation objections in May.  And the U.S. Trustee did not

20   raise in their objection to confirmation the opt-out release.

21        You could -- you know, we -- I can argue this at

22   confirmation because you're preserving everything.  But one of

23   the arguments that we will make is that they should be barred

24   from raising it now.  They'll argue some intervening change in

25   law, but I think that might have been true in the Second

1    Circuit, but it's not true in the Fifth Circuit.  The Supreme

2    Court basically landed on the issue where the Fifth Circuit

3    always resided, that non-consensual third-party releases are

4    not permitted.

5         So we're -- Your Honor, I just wanted to put that

6    procedural point out there, as well.  But I'm also fine to

7    deal with this at confirmation and to brief the issue that

8    Your Honor raised, which, you know, we think actually is the

9    right one, which is that this has been deemed by the Supreme

10   Court in another context to be a consensual act, not a non-

11   consensual one.

12        THE COURT:  Mr. Ruff, how do you want to proceed

13   today?  I know I've given you a few minutes to think about it,

14   where you're not taken by surprise.  Certainly, I'll let you

15   proceed today, if you want, but I'll also let you reserve all

16   your rights, subject to his objections to confirmation, so

17   that you can be more prepared, if you're not already prepared

18   on the class action issue.

19        MR. RUFF:  You know, Your Honor, I think -- on the

20   class action, I think -- I believe I am prepared.  I thought

21   about the issue previously.  We didn't brief it for Your Honor

22   because I think class actions are distinct -- factually

23   distinctual [sic] -- distinguishable from what we have here.

24        THE COURT:  No, and --

25        MR. RUFF:  You know --

1          THE COURT:  And so that --

2          MR. RUFF:  -- class actions --

3          THE COURT:  -- you know, Mr. Ruff, I do, too.  But I

4    don't think they are --

5          MR. DUNNE:  Yeah.

6          THE COURT:  I don't think that they are

7    distinguishable under the due process clause.  They're -- and

8    that plays an important role in any decision.  And if you

9    think that they are distinguishable from a due process point

10   of view, I want to hear that argument.  I understand that they

11   are distinguished -- distinguishable in other non due process

12   ways, but not due process.

13         So you tell me how you want to go.  Do you want to

14   go today or do you want to brief it?  Or if you can make a

15   distinction today on due process, I'd love to hear that

16   because I have not figured out that, any distinction from a

17   due process point of view.

18         MR. RUFF:  So, on due process, Your Honor, I think

19   what we're talking about here are there specific rules in

20   place.  I think we have somewhat similar situations in

21   bankruptcy.  There are some situations in bankruptcy where

22   negative notice is appropriate under the Code and under the

23   rules, to get certain relief.

24         And I think, in class action, you have the same

25   thing.  You have specific laws and rules that govern.  You

1      know, if there's an affected class that has been certified,

2      that has the benefit of counsel repping that class, that

3      specific class and the members of that class, that -- you

4      know, that parties can be bound if they don't choose to opt

5      out.  But again, there are specific law and rules on point for

6      that.

7           And I think that's where this is distinguishable

8      here, in that we're talking about there are not similar

9      bankruptcy law or rules or non-bankruptcy law or rules that

10     govern what essentially here is a contractual agreement

11     between nonDebtor third parties.

12           THE COURT:  But I found --

13           MR. RUFF:  And this might --

14           THE COURT:  I found that the --

15           MR. RUFF:  -- delve into a little bit --

16           THE COURT:  I understand those distinctions, but I

17     don't think they go to the due process question.  Do you think

18     they address the due process issue?  Because in -- here's --

19     to me, the due process question -- maybe I should word it and

20     tell you why I think that they are the same.

21           In a class action, someone that chooses not to vote

22     and not to participate can be bound by a court action without

23     violating the due process clause and they can be forced to

24     give up a claim.  I think that's exactly what we're doing

25     here, if someone takes no action.  It may be the wrong choice

1      in this case, which is a factual issue that has to be

2      explored, but I don't know how it could violate the due

3      process clause because it seems like the identical question.

4              So, focusing only on due process -- and the other

5      distinctions may carry the day for you and I got that.  But

6      due process --

7              MR. RUFF:  Uh-huh.

8              THE COURT:  -- is the most important question that

9      I'm trying to confront in my own mind as a threshold to

10     whether this can occur because, you know, once it occurs, it

11     becomes a confirmation objection, as I indicated before.  If

12     it turns out that that didn't get a release, it didn't get a

13     release.  But if it's a due process --

14             MR. RUFF:  I understand.

15             THE COURT:  -- problem, I shouldn't set us off down

16     a due process problem that is incurable.  And that's the

17     distinction I'm trying --

18             MR. RUFF:  Well --

19             THE COURT:  -- to get made.

20             MR. RUFF:  Your Honor, I think one of the things

21     that we have here, if you look at the plan -- I think there is

22     a due process issue if you look at the -- even the definitions

23     in the plan and "related parties."  I don't know how on earth

24     the Debtors can make any sort of representation or provide any

25     sort of evidence to the Court that all the related parties are

1    receiving any sort of notice of the third-party releases that

2    are being proposed, so I do think there's a due process issue.

3         THE COURT:  I -- that was -- and you put that in

4    your brief and I want to hear Mr. Dunne's answer to that.  But

5    it's very clear to me -- and so maybe this will just sustain

6    part of your objection -- that we aren't doing third-party

7    releases by people that don't have notice consistent with the

8    due process clause.

9         I didn't know the answer that the Debtor had to

10   that, of course, because your objection I just recently read.

11   And if they want to answer it now, that's fine.  But that's

12   pretty -- that's a pretty narrow group.  I don't know if

13   they're getting some sort of notice.  But if they're not, then

14   I don't know how we would do it.

15        MR. RUFF:  I will say, Your Honor -- and I'm sorry,

16   I didn't mean to cut you off there.

17        THE COURT:  No, no.

18        MR. RUFF:  So -- but I will say the heart of our

19   argument -- and I -- is certainly that, just with the releases

20   themselves, the proposed releases themselves are not

21   authorized by the Code and the rules.

22        And you know, this may be going to what Mr. Dunne

23   was raising earlier, you know, why now, why raise the

24   argument, you didn't raise it before.  The Supreme Court

25   specifically stated it was not going to address, you know, the

1 issue of what constitutes consent.  And while it didn't answer

2 that question, you know, it didn't answer that question

3 because that was not the question before the Court.

4    And also, the answer to my very simple -- you know,

5 depending on which non-bankruptcy law applies, which state

6 you're in or what the better the case may be.  But you know,

7 what the Supreme Court did tell us is that the non-Debtor

8 third-party releases, one, they have to be consensual; and it

9 also told us that the 1123(b)(6) catchall cannot be used in

10 dealing with nonDebtor third-party releases.  And I'll just

11 quote one brief section of the Purdue decision.  It says, when

12 Congress authorized, quote:

13    "-- appropriate plan provisions in Paragraph 6, it

14 did so only after enumerating five specific sorts of

15 provisions, all of which concern the Debtor, its rights and

16 responsibilities and its relationship with creditors."

17    And that's the Purdue decision at 124 S. Ct. 2071,

18 at 2083.

19    So, Your Honor, the reason we're raising it now is,

20 you know, we didn't have the benefit of Purdue before.  The

21 plan has not been confirmed.  And we have the Debtors filed a

22 new proposed plan that was amended, it did not address what

23 Purdue had raised previously, and so we're raising it now.

24    And I already said this, but I'll just bear -- I

25 think it bears repeating.  The nonDebtor third-party releases

1    are not covered by the Bankruptcy Code, so we have to look to

2    non-bankruptcy law.  And in order to be effective, third-party

3    releases need to be affirmatively consented to when you look

4    at non-bankruptcy and we've briefed that obviously before Your

5    Honor, and so I won't get into all those details.

6           But I think, when you have an opt-out, at best, you

7    have an offer to enter into an agreement for a mutual release.

8    And one of the big problems with the proposed opt-out is it

9    improperly shifts to the offeree that they do not legally

10   have, specifically to ask for (indiscernible) and I think Your

11   Honor sort of touched on this a little bit when talking about

12   the due process issue.

13          You know, with respect to creditors and their

14   ability to be bound by a plan's provision, creditors don't

15   even have a duty to vote on a plan.  Now they can be impacted

16   by a plan, for sure, but they're not duty bound to vote on a

17   plan.  And likewise, there's nothing in the Bankruptcy Code or

18   Rules that requires creditors to opt out when there's an

19   offered release presented to them.

20          And I think, lastly, Your Honor, I think one of the

21   fatal flaws of an opt-out, again, when you're looking at it

22   under non-bankruptcy law, is that there's no evidence -- and I

23   don't know how you could even, you know, provide this evidence

24   -- that there is a meeting of the minds for parties that

25   simply don't respond to the opt-out.

1          And so that's basically, in a nutshell, what our

2     argument is.  Obviously, we've laid out in our brief and --

3     why we think, instead of an opt-out mechanism, there needs to

4     be some sort of an opt-in mechanisms where people -- where

5     parties are affirmatively giving their -- you know, evidence

6     of their consent to what is -- what they're being asked to

7     release.

8               THE COURT:  Thank you, Mr. Ruff.

9               Mr. Dunne, would you respond to the issue of no

10    notice to certain parties that might be bound by the release?

11    I was not aware of that until I read Mr. Ruff's objection and

12    have no idea if you agree or disagree about the notice to

13    those parties.

14         (No verbal response)

15               THE COURT:  You're muted.

16               MR. DUNNE:  Yeah.  Your Honor, you're talking about

17    the related party to the releasor, correct?

18               THE COURT:  I'm not sure.  I'll let Mr. Ruff clarify

19    who he thinks isn't getting notice, so ...

20               MR. RUFF:  It is the related parties, Your Honor.

21               THE COURT:  To who, though, to the -- let's say to

22    a --

23               MR. RUFF:  The released --

24               THE COURT:  -- creditor?

25               MR. RUFF:  Yeah, to the released parties.

1          MR. DUNNE:  We're fine to fix that with language,

2     Your Honor, to make sure that the contours of that don't go

3     beyond parties that receive notice.  There may be related

4     parties that actually receive notice, which will be bound.

5     But it's a due process that I think the Court is focused on,

6     which I think we can fix with language.

7          THE COURT:  All right.  I'm -- with that statement,

8     unless I hear an objection from any other party, I'm going to

9     sustain the U.S. Trustee's objection today to the extent that

10     any release -- any third-party release would purport to bind a

11     party without notice of the right to opt out.

12          And I'm going to reserve for confirmation the

13     balance of the U.S. Trustee's argument, which I find to be a

14     confirmation question, not a Disclosure Statement question.

15     It's very clear what the deal is, the Disclosure Statement

16     makes it really clear people can opt out.  If it turns out

17     that opt-out doesn't work to generate the releases, that goes

18     towards confirmation, not towards procedural approval of the

19     Disclosure Statement, and that argument is preserved for

20     confirmation.

21          I, as you know, have repeatedly, over a large number

22     of years, believed that it was fine to do non-consensual

23     third-party releases.  Taking another look at that, in light

24     of Purdue, I have no problem taking a look, I'll look at it in

25     a fresh light.

1          I think that, with respect to the waiver objection,

2     any argument that is now raised that is dependent on the

3     Purdue decision I find is fair game.  A new argument, not

4     dependent on the Purdue decision, I think would be waived.

5          And so, for example, the 1123 argument that Mr. Ruff

6     just made, I don't think that he waives that when we then have

7     a Supreme Court, a new, intervening Supreme Court opinion.

8     Some of the other arguments he may waive or may have waived,

9     and so we'll wait and see the contours of that when we get

10    there, but we'll argue it at confirmation.

11         Where do you want to go next, Mr. Dunne?

12         MR. DUNNE:  I think it's to Mr. Leblanc to deal with

13    evidence and Your Honor's initial question at the outset of

14    the hearing.

15         THE COURT:  Mr. Leblanc.  Let me get your line

16    active.  Good morning, Mr. Leblanc.

17         MR. LEBLANC:  Thank you, Your Honor.  Andrew Leblanc

18    of Milbank on behalf of Incora.

19         Your Honor, I want to -- I want to try to address

20    the question that I think Your Honor had with respect to the

21    math.  Let me try to -- if that's all right with Your Honor.

22    And then I can do the admission of the evidence.  And if I

23    can't satisfy you with respect to the math, we may have to

24    take a recess for -- we might even have to have a different

25    witness to testify to that.

1          But let me -- I think I can explain it, Your Honor,

2     and let me just start by correcting Mr. Dunne.  My

3     undergraduate degree is in aeronautical engineering, not

4     electrical engineering, but it's engineering, Your Honor, so I

5     generally am comfortable doing math, which is something that a

6     lot of lawyers don't like to do.

7          THE COURT:  So, before we go any further, can you

8     tell me why the Starliner can't come home?

9          MR. LEBLANC:  That one I don't know, Your Honor.

10    That's a question for Boeing, I guess.

11         So, Your Honor, the reason -- I think Your Honor is

12    referring to the summary of recoveries table, which is on Page

13    4 of the Disclosure Statement.

14         THE COURT:  Yeah.  Why don't we --

15         MR. LEBLANC:  Is that correct?

16         THE COURT:  Why don't we -- let's open it up just

17    for a minute.  I can --

18         MR. LEBLANC:  Sure.

19         THE COURT:  I can take back over the screen or you

20    can have somebody put it up, whichever way that you want to do

21    that.

22         MR. LEBLANC:  If you have it right there, Your

23    Honor; otherwise, I'll ask Mr. Porat to put it up, but if Your

24    Honor has it, that --

25         THE COURT:  No.

1          MR. LEBLANC:  -- may be --

2          THE COURT:  I've got it.

3          MR. LEBLANC:  -- easier.

4          THE COURT:  So I'll put up 2029.  I know there's a

5     revised one, but I've gone through the revised one a little

6     bit, but not for this purpose.  And I'm going to now take back

7     the screen.

8          (Pause in proceedings)

9          THE COURT:  So the table that I think is

10    inconsistent with the text, if you do the math, is the one

11    that I'm showing you on Pages 4 and 5.  And what I don't

12    understand is why these ratios -- in other words, it's a 50

13    percent expected return versus a 40 percent expected return --

14         MR. LEBLANC:  Yep.

15         THE COURT:  -- why the ratio here could move to 83

16    to 67 versus 50 to 40, if everything is done on a pure pro

17    rata basis.  And I just could never math that worked like

18    that, so that's the question.

19         MR. LEBLANC:  Sure.  Yeah, and let me try to explain

20    it, Your Honor.

21         So, first of all -- and I think Your Honor probably

22    appreciates the reason there's a difference between the

23    numbers is Class 4, the 1L notes claim, includes not only the

24    notes that Your Honor found were secured, meaning the exchange

25    notes, but it also includes the new money notes, so the $250

1       million.  Those are treated under the plan as unsecured notes

2       and do not get a recovery consistent with the notes that --

3       the 2026 notes, which are pure secured notes at this point.

4                    So the recovery for the portion of Class 4 that is

5       secured and the portion of Class 6 that -- 6A that is secured

6       is identical -- or it's pro rata, fully pro rata.  So --

7                    THE COURT:  Then are you telling me the Class 4 is

8       comprised of both secured and unsecured claims in the same

9       class?

10                   MR. LEBLANC:  It is -- it -- Your Honor, it's

11      comprised of the 1L notes in full.  But Your Honor has found

12      that 250 million of those at issue, so whatever that PIKs to,

13      are not secured.  So, yes, those are included.  When -- and

14      the total amount is allowed, but the secured recovery is

15      limited to the portion of that that is still secured after

16      Your Honor's decision.  And that --

17                   THE COURT:  But if --

18                   MR. LEBLANC:  That's the reason that there's a

19      difference.  1.3 -- roughly 1.39 billion is the total amount

20      of that 1L of the Class 4 claims, but the 250 million of it,

21      plus incurred interest, is not treated as secured under the

22      plan.

23                   THE COURT:  Right.

24                   MR. LEBLANC:  It's treated as --

25                   THE COURT:  So I used --

1          MR. LEBLANC:  -- unsecured.

2          THE COURT:  I think I used 1.1 billion ish, is what

3     you were using.  I'm not sure that -- well, I'm quite certain

4     I don't agree with what you're doing here, substantively.

5     It's this inconsistency that I'm trying to get to, though.

6          So, if -- are these recoveries based on the 1.1

7     billion or are they based on the 1.3 billion?

8          MR. LEBLANC:  It's based on the full amount of the

9     claim and it's made up of three different components, Your

10    Honor.  It's just -- so it's made up of the take-back notes

11    that they get in their capacity as secured creditors --

12         THE COURT:  Correct.

13         MR. LEBLANC:  -- which is -- which -- and to be

14    clear, the reason there's a difference between the high and

15    the low as the move is because the take-back notes is a

16    consistent amount.  So the ratio of that is 319 million of the

17    take-back notes go to the secured portion of the 1L claim and

18    101 million of the take-back notes go to the 2026 claim.  And

19    that's true in the low, middle, and high case, that ratio.

20         THE COURT:  Okay.

21         MR. LEBLANC:  Those numbers are consistent.

22         With respect to the sharing of the equity, it's an

23    equal percentage of that equity, but that equity value changes

24    over whether it's the low, middle, or high case.

25         And in addition -- so then each of the secured

1    portion of the 1L claim and the 2026 notes claim share pro

2    rata in the equity based on their secured -- the secured

3    portion of their claim, and that the equity values assumed for

4    the low, middle, and high case are 325 million at the low and

5    825 million at the high.  And so that -- those numbers change,

6    what the actual dollar value of the equity is changes.

7         In addition to that, for the 1L notes claims,

8    because they have 250 million of those notes that are

9    unsecured, they also share in the recovery for the -- out of

10    the general unsecured pool of the 1.5 million.  So they get a

11    portion of the one -- their pro rata portion of the 1.5, so

12    there's that additional component to it.  That doesn't exist

13    for the 2026 notes.

14         THE COURT:  So --

15         MR. LEBLANC:  For the 2026 notes --

16         THE COURT:  So you're telling --

17         MR. LEBLANC:  -- their --

18         THE COURT:  -- me that --

19         MR. LEBLANC:  -- treatment is --

20         THE COURT:  -- that money is going to flow down,

21    even though there's not enough value to pay the secured claims

22    in full under the plan?

23         MR. LEBLANC:  That is correct, Your Honor.  There's

24    money that's being provided to -- and the 2026 notes -- I'm

25    sorry.  The 2024 notes are sharing in that, as well.  That's

1    pursuant to the settlement that we've struck with the UCC that

2    provides value to the UCC, to unsecured creditors.

3              THE COURT:  Well --

4              MR. LEBLANC:  But the secured lenders' deficiency

5    claims don't share in that, but the unsecured notes claims,

6    including the 250 million of new money financing, that shares

7    in that unsecured creditor pool recovery in the same way that

8    the 2024 notes, which are Class 7C, they share in that

9    unsecured recovery, pool recovery.

10             THE COURT:  Yeah.  Take me to the definition of

11   "Class 4."  Where will I find that?

12             MR. LEBLANC:  I think, Your Honor, it's in the plan.

13             THE COURT:  Wait.  Let me open that then.  Hold on

14   just a second.

15             Because you're -- by the way, you're directly

16   addressing the question that I asked and I very much

17   appreciate it, so -- I don't know that I understand it yet,

18   but you're clearly doing what I'm asking you to do here, so

19   ...

20             So I've got the plan up.

21             MR. LEBLANC:  Okay.  So, if you turn, Your Honor, to

22   internal Page 36, which is the first place to go, and then

23   we'll go -- we'll have to go back to a definition.

24        (Pause in proceedings)

25             MR. LEBLANC:  So right -- actually, yeah, on that --

1   you're -- I've got a different version in front of me, but

2   yes, this is what I was looking for, Your Honor.  Class 4 is

3   all 1L notes claims.

4           And then, if you -- and I apologize for making you

5   do this.  But if you go back to Page 2 of the plan, that's the

6   definition.

7           (Pause in proceedings)

8           MR. LEBLANC:  Right.  Okay.  And the Definition

9   Number 7, Your Honor, is the "1L notes" means the 10.5 senior

10  secured first lien PIK notes due November 2026 under the 1L

11  indenture, including the new money notes.

12          And then "1L notes claim" any -- means any claim

13  arising on account of the obligations under the note document,

14  as each defined -- as each defined in the 1L of indenture.

15  For the avoidance of doubt, the 1L notes claim includes --

16  include all claims on account of the new money notes.

17          But then you see Definition Number 9.  The "1L

18  secured notes claim" means a 1L note claim other than a 1L

19  notes claim on account of the new money unsecured notes, if

20  any.

21          And so that's where we separate the portion of that

22  that is secured and the portion that is unsecured.  And the

23  issue is, Your Honor, they're issued under the same indenture.

24          THE COURT:  Okay.

25          MR. LEBLANC:  And then Your Honor -- based on Your

1    Honor's decision, one portion of that is now unsecured.

2         And so I don't think there's any dispute among the

3    parties that this is how the math works with respect to this.

4    And that's the reason that there is a difference, is because -

5    -

6         THE COURT:  So --

7         MR. LEBLANC:  -- their recovery -- we're comparing

8    their recovery to the full amount of their claim, which is the

9    1.39 billion, and that means it's a lower recovery percentage.

10        THE COURT:  I think I'm understanding the math

11   issue.

12        I wonder if -- I'm not requiring this, this is a

13   question I want to ask, to see if it can help others read it.

14   The way that we ruled on the adversary proceeding is that the

15   entirety of the 2026 issue remained as the 2026 claims, both

16   the part held by Silver Point/PIMCO and the part held by

17   Mr. Rosenbaum's clients.

18        You've broken that out and left Mr. Rosenbaum's

19   clients with the only 2026 note claims, I think, and then you

20   --

21        MR. LEBLANC:  Right.

22        THE COURT:  -- stripped away, in a manner -- and I'm

23   going to say this and I don't mean it negatively.  You

24   stripped it away in a manner that is inconsistent with our

25   ruling and taken those roughly $600 million worth of Silver

1    Point and PIMCO 2026 claims and you're treating them as 1L

2    notes claims.

3          And the reason why I don't mean that negatively is I

4    always was hoping that you would take the ruling and turn it

5    into something that was a saleable business deal, so I don't

6    think it's negative that that's the kind of proposal that

7    you're doing, as long as it results in a reasonable outcome.

8    So the fact that it's inconsistent with the ruling is not

9    negative to me; it may even be a positive to me because you

10   all are thinking outside the box about how to do this.

11         But I think, without telling people in the

12   Disclosure Statement that here was the ruling and that, in an

13   effort to get to an agreement, you have stripped out those and

14   you're now taking them and putting them over in the 1L -- it

15   would have clarified it to me, I think.  And I wonder if we

16   shouldn't just have that simple statement in there to do that.

17         MR. LEBLANC:  Yeah, Your Honor, I think that -- we

18   tried to do fidelity to Your Honor's decision, in terms of

19   treatment.  And I can assure you -- and I don't think anybody

20   is suggesting that we're not treating the secured portion of

21   the 1L notes in the -- you know, exactly the same terms.

22   They're getting the same percentage recovery, pro rata

23   recovery, as the legacy 2026 notes that are owned by

24   Mr. Rosenbaum's clients.  I don't think anybody believes

25   that's the case.

1          We can put in whatever language -- the way that we

2     had thought to do it is, because they actually continue to --

3     they hold 1L notes, those consistent of a number of different

4     things that have rolled into that and it's one unitary

5     indenture.  That's the reason we put it in as we did.

6          But we treated this, the portion of it that Your

7     Honor has ruled to be unsecured, as a different -- it doesn't

8     get the same treatment that --

9               THE COURT:  Well, I mean --

10              MR. LEBLANC:  -- was --

11              THE COURT:  -- for that part --

12              MR. LEBLANC:  Yeah.

13              THE COURT:  -- you did.  The big change that you

14    made in what I did was you -- and again, this is a major

15    inconsistency.  It is not that you can't do this because, you

16    know, the effect of my ruling is I gave you blocking of

17    virtually anything that you tried to do and you're going to

18    have to reach a consensus and I understand that.

19         But you didn't leave the 1Ls as 1Ls.  You took the

20    1Ls and you gave other people equal priority with the 1Ls,

21    which was not what I had ruled, and again, that's okay.  And

22    that, I think, is explained in the Disclosure Statement.  But

23    I don't think that it's fair to say that you're giving, nor

24    should you be giving mathematical equivalence to the effect of

25    the ruling because that will never get you a confirmed plan

1    and I got that.

2           That -- I'm just thinking that we ought to have an

3    explanation that I think you can write in just a few sentences

4    that says that, under the ruling, all 2026 notes and their

5    liens were preserved, for purposes of the plan, we are

6    separating those out and it is our position that you've giving

7    them equal treatment, just in different classes.  And I just

8    think that would be a helpful statement, so that people can

9    figure out what's going on.

10           It took me a -- I did figure that part out.  What I

11   didn't figure out was that 1L wasn't just secured, that it was

12   -- I noticed the difference between the 1.1 and the 1.3, and I

13   couldn't figure out what that was.  And I just think a

14   narrative might be helpful for the explanation.

15           MR. LEBLANC:  Of course.  We -- Your Honor, we're

16   happy to add that to try to make it as clear as we can.

17           And I -- but I do want to make sure that we're being

18   consistent with Your Honor's decision in the main.  And I --

19   we believe we are, in the sense that we are treating

20   everything but the 250 million that was owned by the 1Ls, by

21   Mr. Schaible's group, as secured, and treating the 250 million

22   and its --

23           THE COURT:  Well, but you're --

24           MR. LEBLANC:  -- accrued interest --

25           THE COURT:  You're treating --

1          MR. LEBLANC:  -- as unsecured.

2          THE COURT:  You're treating Mr. Schaible's group,

3     though -- and again, it's okay in a plan.  But in terms of, if

4     there's an existing first lien and somebody files a new thing

5     they call a "first lien," it's still second to the existing

6     first lien, and you're treating them as equal.  That was the

7     deal that you had made with Mr. Schaible's client and I'm not

8     objecting to it on that basis.

9          But our ruling preserved the first lien status of

10     all 2026 claims.  You are doing violence to that, but not in a

11     way that I am complaining about, if that makes sense.  I mean,

12     I -- you have to do something different than what I ruled or

13     you're not going to get the votes.

14          MR. LEBLANC:  And Your Honor, we're not trying to

15     gerry -- we're really -- we really are trying to do -- to

16     respect the Court's decision and to reflect the Court's

17     decision.  And even if that means that -- as I think Your

18     Honor suggested to me when I was before you last at the status

19     conference, even if that means that we have to get everyone's

20     consent, we're trying to do -- to reflect what Your Honor

21     decided.

22          Now, admittedly, all we have -- we have a transfer,

23     so we're all working from it.  But I --

24          THE COURT:  Right.

25          MR. LEBLANC:  I didn't believe, until just now, that

1     we had not done that.  And I don't think anyone -- I don't

2     think Mr. Rosenbaum has suggested to us that we've been --

3     that what we've presented is not consistent with their

4     understanding.  I don't think Mr. Schaible has said that it's

5     not consistent with his understanding.

6           And I just want to make sure that we are -- and

7     again, I understand what Your Honor is saying, that, with

8     calling them -- reverting them to 2026 is putting them in one

9     class.  But the economic outcome, I don't think anybody has

10    disagreed with the way that we're presenting it.  And

11    Mr. Rosenbaum and his colleagues have not objected to the way

12    that we've classified it.  But we're not trying to gerrymander

13    and I'm not trying to create a class here.  We're trying to --

14          THE COURT:  No, I --

15          MR. LEBLANC:  -- reflect the --

16          THE COURT:  I --

17          MR. LEBLANC:  -- decision.

18          THE COURT:  I really -- my reaction on that was

19    almost the opposite.  You not only weren't gerrymandering, you

20    left a class out there that you said is going to reject the

21    plan, right?  And so the issue -- the way you did it was anti-

22    gerrymandering.  You created a class you knew --

23          MR. LEBLANC:  Correct.

24          THE COURT:  -- was going to reject, so I -- my

25    comments are not intended to be critical of that.  It's just I

1    do think it's different.  And so now you -- but by creating

2    those claims the way that you did or perhaps the way that I

3    did, you now have an 1129(b) problem that's difficult to

4    confront.  And we don't need to go into the merits of that

5    because you all are going to negotiate this thing and get to

6    something.

7         But I think I understand the math now.  And my real

8    -- the reason I started off the hearing is I hadn't understood

9    it; I now do.  And I think, if you can just add that

10   clarifying comment -- this also goes to the fact, frankly,

11   that the 25 votes all now already under -- or 50 voters

12   already understood it before we started this hearing, and so I

13   may be the only one that doesn't.  And so, if the voters

14   already understood it, this may be relatively unimportant.

15        I think it's important because, if we confirm, I

16   want clarity as to why things occurred.  So I would ask that

17   you add that paragraph, but that's it.

18        MR. LEBLANC:  We will do so, Your Honor.  And

19   frankly, with all due respect to all the constituents here,

20   it's more important to me that you understand it than they do.

21   So we'll make sure -- but you know, we're happy to clarify it

22   and try to answer any questions.

23        But that was the -- that's what I was trying to do

24   is to try to explain --

25        THE COURT:  You --

1          MR. LEBLANC:  -- the differences --

2          THE COURT:  And you fully --

3          MR. LEBLANC:  -- in those numbers.

4          THE COURT:  You fully did.  I now understand it.  I

5     understand that I misunderstood the narrative -- excuse me --

6     the definitions of what all was in the 1L class.  And that was

7     just I started off with kind of an assumption that that was a

8     secured class, and I probably read it and made the words fit

9     into my assumption, rather than a class that was split between

10    the secured and unsecured.  But I'm good with your

11    explanation.  I don't need more on that.

12         MR. LEBLANC:  Okay.

13         THE COURT:  So wherever you want to --

14         MR. LEBLANC:  Your Honor, I'm --

15         THE COURT:  -- go next is fine.  Let me ask if --

16         MR. LEBLANC:  The only --

17         THE COURT:  -- if anyone else has any questions

18    about that issue or does anybody object to including the

19    clarifying paragraph.

20         (No verbal response)

21         THE COURT:  Okay.  Good.

22         So how do you want to proceed then?

23         MR. LEBLANC:  Your Honor, we have -- Mr. Cejka on

24    our witness list, and we've previously proffered Mr. Cejka on

25    the Disclosure Statement; and, frankly, I don't think anything

1        has changed with respect to that.  But I'm happy to re-proffer

2        him and offer our exhibits at this time.

3                THE COURT:  All right.  Why don't you go ahead and

4        do that?

5                MR. LEBLANC:  And I don't see Mr. Cejka on the

6        screen.  I would just ask that -- oh, he has his hand up, I

7        see.

8                THE COURT:  He's just raised his hand.

9                MR. LEBLANC:  He may -- I don't know --

10       THE COURT:  He --

11       MR. LEBLANC:  -- if he has --

12       THE COURT:  Hold on.

13       MR. LEBLANC:  -- to hit five-star.

14       THE COURT:  I think he's here.

15       MR. LEBLANC:  Okay.  Great.  Perfect.

16       THE COURT:  Mr. Cejka --

17       MR. LEBLANC:  Thank you, Your Honor.

18       THE COURT:  Mr. Cejka, good afternoon -- or good

19       morning.

20       MR. CEJKA:  Good morning to you, as well.  Can you

21       hear me okay?

22       THE COURT:  I can.  Thank you.

23       MR. CEJKA:  Thank you.

24       MR. LEBLANC:  First, Your Honor, I'll offer our

25       exhibits.  We filed an exhibit list at Docket Number 2074.

1          THE COURT:  Is there anyone that objects to the

2    admission of 2074-1 through 13?

3          (No verbal response)

4          THE COURT:  All right.  2074-1 through 13 are

5    admitted.

6          (Debtors' Exhibits at ECF 2074-1 through 2074-13 received

7    in evidence)

8          MR. LEBLANC:  Thank you, Your Honor.

9          And Your Honor, I'd proffer the testimony of

10    Mr. Cejka of Alvarez & Marsal, Incora's restructuring advisor.

11          Your Honor, I'm going to skip the preliminary -- the

12    -- Mr. Cejka's background because Your Honor has heard it

13    previously.

14          DIRECT EXAMINATION OF BRIAN CEJKA BY PROFFER

15          BY MR. LEBLANC:  Mr. Cejka would testify that he's

16    familiar with the current Disclosure Statement that was filed

17    at ECF Number 2030 and was just admitted as Exhibit Number 2

18    in this matter.  I -- I'm sorry, Your Honor, 2029, exhibit

19    number -- Docket Number 2029, entered as Exhibit Number 2;

20    that he's reviewed it in its entirety and, to the best of his

21    knowledge, everything in that Disclosure Statement is true and

22    correct.

23          Your Honor, that would conclude my proffer of

24    Mr. Cejka's testimony.  He's available if Your Honor has any

25    questions or for cross-examination.

1          THE COURT:  Mr. Cejka, would you raise your hand,

2     please, sir?

3               BRIAN CEJKA, WITNESS FOR THE DEBTORS, SWORN

4                    EXAMINATION BY THE COURT

5          BY THE COURT:  Was the proffer of your testimony

6     true and correct in all respects?

7          THE WITNESS:  Yes.

8          THE COURT:  Does anyone have any cross-examination

9     for Mr. Cejka?

10         (No verbal response)

11         THE COURT:  All right.

12         (Witness excused)

13         THE COURT:  So, before I pass, Mr. Leblanc, to allow

14    others to raise objections or make statements, a number of

15    parties have filed what I will call "protective objections"

16    with respect to the Disclosure Statement, to be certain that

17    they have reserved all of their confirmation objections until

18    the confirmation hearing.  I recognize and respect all of

19    those reservations.  All confirmation objections are reserved

20    to confirmation and no confirmation objections are being

21    waived by a failure to produce them today or to argue them

22    today.

23         And with that, I want to now take parties that wish

24    to introduce any evidence in opposition to approval of the

25    Disclosure Statement.

49

1          Mr. Ruff, I'll start with you because I want to be

2     sure that you get to do what you want to do today.  I made

3     preliminary rulings already.  But if you wanted to introduce

4     evidence or anything of that nature today to preserve a

5     record, as opposed to waiting until the confirmation hearing,

6     just let me know.  I have already, of course, sustained one of

7     your objections.

8          MR. RUFF:  I have no additional evidence to offer

9     today, Your Honor.  Thank you.

10          THE COURT:  Thank you.

11          Does anyone else have any evidence they wish to

12     offer, either in support of or in opposition to approval of

13     the Disclosure Statement?

14       (No verbal response)

15          THE COURT:  All right.  I'm going to show the Record

16     is closed.

17          I approve the Disclosure Statement.  I think, with

18     the amendment that we have required, once I review that, that

19     the Disclosure Statement does contain adequate information to

20     allow for solicitation.

21          I'm approving the shortening of deadlines, as I

22     already indicated to Mr. Dunne that I would.  It's a case

23     where -- and I have the distinction that we might have one or

24     two smaller holders who aren't here.  But virtually everyone

25     that is now going to be in the re-vote is represented by a

1    world-class bankruptcy lawyer.  They already understand what I

2    didn't understand.  And so the idea that we're going to

3    shorten the voting deadline and the objection deadline is

4    completely appropriate.  This case has been here forever.

5    People have followed it, they know what's going on.  So the

6    deadlines are shortened.

7              What else on the Disclosure Statement issue do we

8    need to cover today?  Anything?

9              MR. LEBLANC:  I think that's it, Your Honor.

10             THE COURT:  Okay.  So, if you will upload -- and I

11   -- and contact Ms. Thomas when you do, upload the -- I'm

12   trying to figure -- I guess file a final Disclosure Statement

13   that includes that paragraph, and then notify her that that

14   has been filed.  I'll find that paragraph.  Assuming that I

15   approve it, and I'm confident that I will, I'll then sign your

16   Disclosure Statement approval order.  I have not looked at

17   your draft that you just re-filed overnight, but I'm assuming

18   that I'll be able to go through that order without any real

19   problems.

20             MR. LEBLANC:  That's fine, Your Honor.  We'll do so.

21             THE COURT:  Okay.  And hopefully, I will get the

22   order signed today and out today.

23             I assume that -- Mr. Leblanc, that that paragraph

24   that you're going to add, is that going to occur by 2:00

25   o'clock this afternoon, probably?

1          MR. LEBLANC:  I think, given Your Honor's direction,

2     we can -- meaning Your Honor's telling us the words to put in,

3     I think we can be set up and add it in by 2:00 o'clock today,

4     yes.

5          THE COURT:  Thank you.

6          All right.  Let's go to the motion to extend time

7     under 345.  I'm not sure how you all want to proceed on that.

8     I know that we have it scheduled for today.

9          Mr. Ruff, I couldn't tell if this is somewhat of a

10    prophylactic hearing or more of a substantive hearing that you

11    think we ought to be having from the motion that got filed.

12    But as I understood it, it was that you want -- from what, I

13    think, the Debtors are saying, this shouldn't be rubber-

14    stamped, this ought to be a thoughtful decision, is your

15    position.  I agree with that.

16         Tell me how you want the Debtors and how you want

17    you to proceed.  We can take it up with evidence today, we can

18    continue it to the soon, upcoming now confirmation hearing.

19    What does the U.S. Trustee want to do?

20         MR. RUFF:  Your Honor, I -- we -- so we do not have

21    any opposition to what the Debtors are requesting in their

22    motion to extend, given the time lines and actually that Your

23    Honor is approving the Disclosure Statement today and the re-

24    solicitation of certain classes.

25         So, recognizing that, just as a matter of policy,

1       though, we just don't want to be in the position where we're

2       stipulating to the extension.  And so that's why you see the

3       Debtors making the request from the Court because it is the

4       Debtors' obligation under 345(b).  But in light of the

5       circumstances, Your Honor, we don't have any specific

6       opposition to the relief being requested.

7              THE COURT:  All right.  Mr. Leblanc, Mr. Dunne, tell

8       me how you want me to proceed on this matter with respect to

9       whatever proof you think you're required to have.

10              MR. DUNNE:  Your Honor, Mr. Schak is going to handle

11      this motion.

12              THE COURT:  Mr. Schak, if you would press five-star,

13      please.

14              MR. DUNNE:  He's actually, Your Honor -- well, why

15      don't you come up.

16              MR. SCHAK:  Okay.

17              MR. DUNNE:  He's in my office, Your Honor.

18              THE COURT:  Okay.

19              MR. SCHAK:  Thank you, Your Honor.  Benjamin Schak

20      of Milbank for the Debtors and Debtors-in-possession.

21              Your Honor, Mr. Ruff is correct that we've requested

22      another extension of the 345(b) extension period.  We had done

23      this on the first day of the case, Your Honor, and for much of

24      the case had received consensual extensions from the U.S.

25      Trustee's Office, which is what the case management order

1     entered by Judge Jones originally contemplated.

2             I do understand there's been a policy in the U.S.

3     Trustee's Office to take -- to no longer consensually agree to

4     that.  But you know, we think this is, you know, justified on

5     the same basis it was justified on the first day of the case

6     because there are some relatively small accounts that the

7     Debtors need to use for things like Argentinian payroll that,

8     just as a practical matter, are never going to be able to get

9     into compliance with 345(b).  As a whole, Your Honor, the cash

10    management system is in compliance with 345(b), and we expect

11    it to remain so.

12            THE COURT:  So is there any additional evidence you

13    want to introduce today or do you want to just carry forward

14    the evidence from prior hearings?  And really, I think

15    probably I have more familiarity with this case than any other

16    case before me, so it's not like I don't know what the case is

17    about.  But I also want to be sure that everybody gets their

18    record the way that they need it to have, including you and

19    Mr. Ruff.

20            MR. SCHAK:  Your Honor, I think we can just carry

21    forward the evidence from the first-day hearing, which was

22    nothing more than the first-day declaration put forward by the

23    company's CFO.

24            THE COURT:  I'm also going to take note that your

25    motion has not drawn any opposition.  I think the allegations

1     in the motion are deemed admitted by the absence of those.

2              Does anyone wish to introduce any other evidence

3     with respect to the 345 motion?

4          (No verbal response)

5              THE COURT:  Okay.  The Debtor is running an

6     international organization and cannot, with any reasonable

7     capability, implement 345 of the Bankruptcy Code fully.  345

8     deadlines can be extended by the Court.  I'm going to extend

9     it just until the end of October, as was requested, because,

10    by that point, I expect to have an effective date of a plan.

11             MR. SCHAK:  From your lips to God's ears, Your

12    Honor.

13             THE COURT:  I don't know that god has been listening

14    so far, but maybe.  I've had trouble getting here.

15             I've signed the order and we will get that docketed

16    right now.

17             MR. SCHAK:  Thank you, Your Honor.

18             THE COURT:  I've sent it to docketing.

19             What else can we do today?

20             MR. DUNNE:  I think that's it, Your Honor.

21             THE COURT:  All right.  We are in recess.  Thank

22    you.

23             MR. DUNNE:  Thank you.

24             MR. RUFF:  Thank you, Your Honor.

25          (Proceedings concluded at 10:10 a.m.)

* * * * *

      *I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

    */S/  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69101*

*DATE FILED:  SEPTEMBER 7, 2024*