# IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

|  |  |
|---|---|
| *In re* <br><br> **WESCO AIRCRAFT HOLDINGS, INC.,** *et al.*,[1] <br><br> Debtors. | Case No. 23-90611 (MI) <br><br> Chapter 11 <br><br> (Jointly Administered) |

# DEBTORS' MEMORANDUM OF LAW (I) IN SUPPORT OF CONFIRMATION OF THE MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF WESCO AIRCRAFT HOLDINGS, INC. *ET AL.* AND (II) IN RESPONSE TO OBJECTIONS

# (RELATED TO DKT. NOS. 1719, 2408, & 2437)

---

[1] The Debtors operate under the trade name Incora and have previously used the trade names Wesco, Pattonair, Haas, and Adams Aviation. A complete list of the Debtors in these chapter 11 cases, with each one's federal tax identification number and the address of its principal office, is available on the website of the Debtors' noticing agent at http://www.veritaglobal.net/incora/. The service address for each of the Debtors in these cases is 2601 Meacham Blvd., Ste. 400, Fort Worth, TX 76137.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

I.      Development of the Plan ........................................................................................... 2

II.     Solicitation and Voting .............................................................................................. 5

ARGUMENT .......................................................................................................................... 9

III.    The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation. ..................... 9

        a.      The Plan Satisfies the Requirements of Section 1129 .................................... 9

        b.      The Solicitation of Votes Complied with Section 1125. ........................... 28

        c.      The Solicitation and Tabulation of Votes Complied with Section 1126. .................... 28

IV.     The Settlements, Releases, Exculpations, and Injunctions in the Plan Are
        Appropriate. ............................................................................................................. 30

        a.      The Debtor Release Should Be Approved. ................................................ 30

        b.      The Consensual Third-Party Release Should Be Approved. .................................. 32

        c.      The Exculpation Provision Should Be Approved. ....................................... 34

        d.      The Plan Injunction Is Appropriate. .......................................................... 34

        e.      The Committee Settlement is Fair and Equitable. .................................... 35

V.      The Court Should Overrule the Sole Objection. ......................................................... 45

        a.      The Third-Party Release Is Consensual ...................................................... 46

        b.      The Revised Exculpation Provision Is Appropriate and Permissible. ..................... 51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ...........................22

*In re AGE Refining, Inc.*,
  801 F.3d 530 (5th Cir. 2015) ........................................................................36, 37

*In re Alpha Nat. Res., Inc.*,
  556 B.R. 249 (Bankr. E.D. Va. 2016) ...................................................................54

*In re Altera Infrastructure L.P.*,
  No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Dkt. No. 533].....................53

*In re Apex Oil Co.*,
  118 B.R. 683 (Bankr. E.D. Mo. 1990)...................................................................17

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006)........................................................................18, 27

*In re Avaya Inc.*,
  No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Dkt. No. 350).................35

*Ameriforge Grp., Inc.*
  No. 17-32660 (Bankr. S.D. Tex. May 22, 2017) ...................................................34

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A.* (*In re B.D. Int'l Disc. Corp.*),
  701 F.2d 1071 (2d Cir. 1983).............................................................................15

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)............................................................................................19

*Bank of New York Trust Co. v. Official Unsecured Creditors' Comm.* (*In re Pacific Lumber Co.*),
  584 F.3d 229 (5th Cir. 2009) ........................................................................10, 48

*In re Beyond.com Corp.*,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) .................................................................17

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) .................................................................31

*In re Block Shim Dev. Co.-Irving*,
  939 F.2d 289 (5th Cir. 1991) ..............................................................................19

*Brief of the American College of Bankruptcy as Amicus Curiae in Support of Neither Party*, *Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 44 (2023)............................................................................................54

*In re Briscoe*,
  994 F.2d at 1165–66 ..........................................................................................24

*In re Cajun Ele. Power Coop., Inc.*,
  119 F.3d 349 (5th Cir. 1997) ..............................................................................36

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986) .................................................................16

*In re CJ Holding Co.*,
    No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) ......................................34

*In re Clear the Air, LLC*,
    631 B.R. 286 (Bankr. S.D. Tex. 2021) ...............................................................46

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985) ............................................................................................53

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) .....................................................9, 15, 27

*In re Derosa-Grund*,
    567 B.R. 773 (Bankr. S.D. Tex. 2017) ...............................................31, 36, 37

*In re Dewey & LeBouef LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) .................................................................36

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991) ...............................................................10

*In re Fabricators, Inc.*,
    926 F.2d 1458 (5th Cir. 1991) .............................................................................43

*Feld v. Zale Corp. (In re Zale Corp.)*,
    62 F.3d 746 (5th Cir. 1995) .................................................................................48

*Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*,
    116 F.3d 790 (5th Cir. 1997) .................................................................15, 24, 52

*FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*,
    255 F. App'x 909 (5th Cir. 2007) ........................................................................33

*In re General Homes Corp.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ...............................................................31

*In re GenOn Energy, Inc.*,
    No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) ......................................34

*In re Goodman Networks, Inc.*,
    No. 22-31641-MVL7, 2024 WL 460478 (Bankr. N.D. Tex. Feb. 6, 2024) ..........37

*Harrington v. Purdue Pharma L.P.*,
    144 S. Ct. 2071 (2024) ................................................................................. *passim*

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters (In re Briscoe Enters)*,
    994 F.2d 1160 (5th Cir. 1993) ..................................................................9, 19, 25

*In re Heritage Org., LLC*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)................................................................31

*Hernandez v. Larry Miller Roofing, Inc.*,
    628 F. App'x 281 (5th Cir. 2016) ........................................................................33

*In re Hibbard Brown & Co.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998)...................................................................37

*In re Highland Cap.*,
    48 F.4th 419 (5th Cir. 2024) ...................................................................35, 52, 53

*Hinojosa Eng'g, Inc. v. Lopez* (*In re Treyson Dev., Inc.*),
    No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) ......................33

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) ...........................................................................51

*In re Houston Reg'l Sports Network, L.P.*,
    505 B.R. 468 (Bankr. S.D. Tex. 2014) ................................................................52

*In re Instant Brands Acquisition Holdings Inc.*,
    Case No. 23-90716 (MI) (Bankr. S.D. Tex. Feb. 21, 2024) ....................................52

*In re J T Thorpe Co.*,
    308 B.R. 782 (Bankr. S.D. Tex. 2003) ..................................................................9

*In re Jackson Brewing Co.*,
    624 F.2d 599 (5th Cir. 1980) ...........................................................................31

*La. World Expo. v. Fed. Ins. Co.*,
    858 F.2d 233 (5th Cir. 1988) ...........................................................................46

*In re Lakeside Global II Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) ................................................................24

*In re Landing Assocs.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ..........................................................17, 24

*In re Lapworth*,
    Case No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...................15

*In re Life Partners Holdings, Inc.*,
    926 F.3d 103 (5th Cir. 2019) ...........................................................................42

*In re Light Tower Rentals, Inc.*,
    No. 16-34284 (DRJ) (Bankr. S.D. Tex. Sept. 30, 2016).........................................34

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.)*,
    150 F.3d at 518 ...............................................................................................16

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) ...................................................................49

*In re MCorp Fin., Inc.*,
    160 B.R. 941 (S.D. Tex. 1993) ..........................................................................21

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006).................................................................31

*In re Mobile Steel Co.*,
    563 F.2d 692 (5th Cir. 1977) ...........................................................................42

*In re Moore*,
    608 F.3d 253 (5th Cir. 2010) ...........................................................................37

*In re Nautical Solutions, L.L.C.*,
    No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 16, 2023) [Dkt. No. 204]........................54

*In re Neff*,
    60 B.R. 448 (Bankr. N.D. Tex. 1985) *aff'd, SBA v. Neff,* 785 F.2d 1033 (5th
    Cir. 1986) .................................................................................................................19

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) .......................................................................15

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ..................................................................................................15

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture* (*In re Greystone III
    Joint Venture*),
    995 F.2d 1274 (5th Cir. 1991) .................................................................................10

*In re Pipeline Health Sys., LLC*,
    No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Dkt. No. 1041] ...................54

*In re Pisces Energy LLC*,
    No. 09-36591, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009).........10, 19, 22

*In re Robertshaw US Holding Corp.* (*Robertshaw*),
    662 B.R. 300 (Bankr. S.D. Tex. 2024) ...............................................................48, 49

*In re Roqumore*,
    393 B.R. 474 (Bankr. S.D. Tex. 2008) ....................................................................37

*In re Rusty Jones, Inc.*,
    110 B.R. 362 (Bankr. N.D. Ill. 1990) ......................................................................17

*In re S & W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ..........................................................................9

*Save Our Springs Alliance, Inc. v. WSI (II)-COS, LLC*,
    632 F.3d 168 (5th Cir. 2011) ..............................................................................10, 24

*In re Sherwood Square Assoc.*,
    107 B.R. 872 (Bankr. D. Md. 1989) .........................................................................17

*In re SI Restructuring, Inc.*,
    532 F.3d 355 (5th Cir. 2008) ....................................................................................42

*In re Smyth*,
    207 F.3d at 761 ........................................................................................................54

*In re Southcross Holdings LP*,
    No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) .............................................34

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ........................................................................17

*In re Sun Country Dev. Inc.*,
    764 F.2d 406 (5th Cir. 1985) ....................................................................................15

*In re Talen Energy Supply, LLC*,
    No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Dkt. No. 1760) .............35, 53

*In re Texas Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. 1988) ..................................................................................19

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) .......................................................................17

*In re Ultra Petrol. Corp.*,
No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) ..........................................34

*In re Vitro Asset Corp.*,
2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013) ............................................9

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007)...................................................................33

*In re Worldcom, Inc.*,
Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
2003) ......................................................................................................................15

**Statutes**

11 U.S.C. § 101(31) ...........................................................................................................17

11 U.S.C. § 328 ..................................................................................................................16

11 U.S.C. §§ 328(a), 330(a)(1)(A) .....................................................................................16

11 U.S.C. § 507(a)(2)....................................................................................................23, 25

11 U.S.C. § 546(e) .......................................................................................................39, 41

11 U.S.C. § 726(B) .............................................................................................................20

11 U.S.C. § 1114 .................................................................................................................25

11 U.S.C. §§ 1122 and 1123 ................................................................................................9

11 U.S.C. § 1122(a) ..................................................................................................9, 10, 11

11 U.S.C. § 1123(a) .............................................................................................................11

11 U.S.C. § 1123(a)(1)........................................................................................................11

11 U.S.C. § 1123(a)(2)........................................................................................................11

11 U.S.C. § 1123(a)(3)........................................................................................................11

11 U.S.C. § 1123(a)(4)........................................................................................................12

11 U.S.C. § 1123(a)(5)........................................................................................................12

11 U.S.C. § 1123(a)(6)........................................................................................................12

11 U.S.C. § 1123(a)(7)...................................................................................................12, 13

11 U.S.C. § 1123(b) ......................................................................................................13, 14

11 U.S.C. § 1123(b)(1)-(3), (6) chapter 11 ................................................................ passim

11 U.S.C. § 1123(b)(3)(A)....................................................................................14, 31, 36

11 U.S.C. § 1123(d) ............................................................................................................14

11 U.S.C. §1125..........................................................................................................5, 15, 28

11 U.S.C. §§  1125 and 1126 ..............................................................................................15

11 U.S.C. § 1125(b) ............................................................................................................28

11 U.S.C. § 1126 ...........................................................................................................29, 30

11 U.S.C. § 1126(a), (f), (g)...............................................................................................29

11 U.S.C. § 1126(c) ............................................................................................................30

11 U.S.C. § 1126(g) ...........................................................................................22

11 U.S.C. § 1129(a)(1) .........................................................................................9

11 U.S.C. § 1129(a)(2) ...................................................................................14, 15

11 U.S.C. § 1129(a)(3) ...................................................................................15, 16

11 U.S.C. § 1129(a)(4) .......................................................................................16

11 U.S.C. § 1129(a)(5) ...................................................................................17, 18

11 U.S.C. § 1129(a)(5)(A)(i) ................................................................................17

11 U.S.C. § 1129(a)(5)(A)(ii) .........................................................................17, 18

11 U.S.C. § 1129(a)(7) ...................................................................................19, 22

11 U.S.C. § 1129(a)(8) ...................................................................................22, 25

11 U.S.C. § 1129(a)(9) .......................................................................................23

11 U.S.C. § 1129(a)(10) .....................................................................................24

11 U.S.C. § 1129(a)(11) .................................................................................24, 25

11 U.S.C. § 1129(a)(12) .....................................................................................25

11 U.S.C. § 1129(a)(13) .....................................................................................25

11 U.S.C. § 1129(b) .............................................................................23, 25, 30

11 U.S.C. § 1129(b)(1) .......................................................................................25

11 U.S.C. § 1129(b)(2)(B) .................................................................................26

11 U.S.C. § 1129(c) ...........................................................................................27

11 U.S.C. § 1129(d) .....................................................................................27, 28

Internal Revenue Code Section 382(g)(4)(D) ......................................................35

Securities Act of 1933 section 5 ....................................................................27, 28, 31, 34

**Other Authorities**

Am. Bankr. Inst. L. Rev. 1, 273 (2015) .............................................................54

*American Bankruptcy Institute Commission to Study the Reform of Chapter 11:*
   *2012-2014 Final Report and Recommendations*, 23 ...........................................54

Fed. R. Bankr. P. 3018 ......................................................................................30

Fed. R. Bankr. P. 3020(e) ..................................................................................54

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ...................9

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978) .......................9

The above-captioned debtors and debtors in possession (the "***Debtors***" and, together with their non-Debtor subsidiaries, "***Incora***") submit this memorandum of law in support of confirmation of the *Further Modified Second Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* [Dkt. No. 2408] (as modified, amended or supplemented from time to time, the "***Plan***"),[1] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.     The Plan is the result of extensive good-faith negotiations and represents a comprehensive and value-maximizing restructuring of Incora. Throughout their chapter 11 process, the Debtors have used the bankruptcy tools to cast away burdens ranging from off-market long-term customer contracts to excess overhead expenses. And now, as the culmination of the Debtors' and stakeholders' efforts, the Debtors have proposed a plan of reorganization that will eliminate approximately $2.3 billion of net funded debt from Incora's balance sheet, improve its long-term creditworthiness, and secure a revolving credit facility on market terms. The Debtors' chapter 11 process has poised Incora for success, but it is imperative that the Debtors emerge from bankruptcy as soon as possible to capitalize on this progress.

2.     Virtually every stakeholder constituency overall supports the Plan: Following extensive mediation and intense negotiations, the First Lien Noteholder Group and the 2024/2026 Noteholder Group reached agreement on numerous fundamental issues and both groups now support the Plan, subject to final agreement on a very small handful of issues (including relating to the New LLC Agreement), which the Debtors expect may happen after the scheduled confirmation hearing. The Plan is also supported by the 1.25L Noteholders, and 2027 Unsecured Noteholders, as well as the prepetition equity Sponsor. The Committee has also agreed to support the Plan, including its settlement of the causes of action that it had sought standing to prosecute.

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan. A detailed description of the Debtors and their businesses is set forth in the *Declaration of Raymond Carney in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***") [Dkt. No. 13], filed on June 1, 2023 (the "***Petition Date***").

3. The Plan is worthy of this widespread support that it has garnered and deserves to be confirmed. This Memorandum (i) further demonstrates that the Plan should be confirmed because it complies with all applicable provisions of the Bankruptcy Code and (ii) addresses the sole remaining objection to confirmation:[2] a limited objection filed by the Office of the U.S. Trustee.[3] For the reasons set forth in this Memorandum and based on the record of the Chapter 11 Cases and the evidence to be presented at the Confirmation Hearing, the Debtors respectfully submit that the Plan should be confirmed.

## Background

### I. Development of the Plan

4. Throughout the Chapter 11 Cases, the Debtors have engaged in negotiations with key creditor groups over the terms of a chapter 11 plan. Those negotiations first bore fruit last November, when the Debtors, with the support of the First Lien Noteholder Group, filed their *Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* [Dkt. No. 962]. The following month, the Debtors executed the Restructuring Support Agreement, ensuring support of leading holders of

---

[2] The Debtors have accepted language in the filed or to-be-filed revised Plan and/or Confirmation Order to resolve the objections of the Tennessee Department of Revenue (Dkt. No. 1389), the objection of the Chubb Companies (Dkt. No. 1500), the objection of UMB Bank n.a. (Dkt. No. 1726), the objection of the Committee (Dkt. No. 2446), the reservation of rights of the ABL Agent (Dkt. No. 1723), the reservation of rights of Langur Maize (Dkt. No. 1725), and the reservation of rights of the Committee (Dkt. No. 1728), as well as various informal comments. Although the 2024/2026 Noteholder Group's objection (Dkt. No. 1727) and reservation of rights (Dkt. No. 2445) remain outstanding, the Debtors understand that both filings will be resolved if the First Lien Noteholder Group and the 2024/2026 Noteholder Group reach resolution on the few remaining open Plan issues. Various counterparties have lodged cure objections. *See* Dkt. Nos. 1586 (GKN Aerospace Services Ltd. and certain related entities), 1605 (Comcast Cable Communications Management, LLC and Masergy Cloud Communications, Inc.), 1606 (Laird R and F Products, Inc.), 1608 (Oracle Credit Corporation and Oracle America, Inc., withdrawn by Dkt. No. 2433), 1654 (Parker-Hannifin Corporation and certain related entities), 1683 (Microsoft Corporation), 1722 (the Precision Entities), 1724 (Price for Profit LLC), 1741 (the Precision Entities), 1744 (Akzo Nobel Coatings Inc. and certain related entities), and 2408 (Microsoft Corporation). To the extent these have not been resolved or made moot, all such cure objections have been adjourned pursuant to Article V.B.2 of the Plan.

[3] *See Ltd. Obj. of U.S. Trustee to the Modified First Am. Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* [Dkt. No. 1719] (the "**First UST Objection**"); *U.S. Trustee's Obj. to the Further Mod. Second Am. Joint Plan of Wesco Aircraft Holdings, Inc. et al.* [Dkt. No. 2437] (the "**Second UST Objection**"), which incorporates objections raised in the U.S. Trustee's *Emergency Motion for Entry of an Order (i) Approving the Amended Disclosure Statement, (ii) Approving Re-Solicitation of Classes 4 and 6 and Related Voting Procedures, (iii) Approving Forms of Modified Ballots, (iv) Scheduling a Confirmation Hearing, and (vi) Shortening the Notice and Objection Periods in Connection with the Foregoing* [Dkt. No. 2061] (the "**UST DS Objection**", and together with the First UST Objection and the Second UST Objection, the "**UST Objection**").

1.25L Notes Claims and 2027 Unsecured Notes Claims for the *First Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* [Dkt. No. 1133] filed on December 27, 2023. Next, through the Committee Stipulation, the Debtors resolved the Committee's standing motion and secured the Committee's support for the Plan (the "***Committee Settlement***"). As a result of these hard-fought settlements, the 1.25L Noteholders have agreed to forgo all distributions under the Plan.

5.      Then, following certain rulings in the 2022 Financing Adversary Proceeding that reconstituted the Debtors' capital structure,[4] the Debtors filed and solicited a proposed compromise plan that drove negotiations among key creditor constituencies.[5] The Debtors, the First Lien Noteholder Group, and the 2024/2026 Noteholder Group (together, the "***Mediation Parties***") subsequently agreed to participate in a mediation process to consensually resolve open issues regarding the revised plan. On September 30, 2024, Judge Brendan L. Shannon was appointed as mediator pursuant to the *Agreed Order Appointing Mediator and Governing Mediation Procedure* [Dkt. No. 2176]. Months of intense negotiations and in-person mediation sessions among the Mediation Parties and other parties in interest ultimately culminated in the revised Plan filed on December 5, 2024 [Dkt. No. 2408], which reflected settlement on the mediation issues consistent with the court's ruling in the 2022 Financing Adversary Proceeding.

6.      The Plan promises to right-size Incora's balance sheet, provide long-term liquidity, and create a sustainable capital structure to position Incora's business for growth and success. In place of the $3.14 billion in funded debt that burdened Incora as of the Petition Date, Incora's operating entities will emerge with just approximately $845 million of debt, consisting of $421 million under the New Revolver Facility and $424 million of New Exit Notes, including $100

---

[4]   Memorialized in the January 14, 2024 *Memorandum Opinion* [Adv. Pro. Dkt. No. 508] and accompanying *Order on Motions for Summary Judgment* [Adv. Pro. Dkt. No. 509] and the January 23, 2024 *Supplement to Memorandum Opinion* [Adv. Pro. Dkt. No. 553] and accompanying *Amended Order on Motions for Summary Judgment* [Adv. Pro. Dkt. No. 554]. Citations to the Adversary Proceeding Docket refer to the docket in *Wesco Aircraft Holdings, Inc., et al. v. SSD Investments Ltd. et al.*, Adv. Pro. No. 23-03091 (MI).

[5]   *See Certificate of Service* [Dkt. No. 1344].

million of New Exit Notes purchased as a new money investment by members of the First Lien Noteholder Group and the 2024/2026 Noteholder Group. (In addition, $420 million of New Takeback Notes will be issued at the holding company level. Although characterized as debt under the Plan, the New Takeback Notes will not be guaranteed or secured by Incora's top-level operating entity and will not require cash principal or interest payments at any point.)

7.    In addition to creating a new capital structure, as discussed, the Plan effectuates a global resolution of numerous disputes among Incora's stakeholders, including the wide-ranging matters set forth in the Committee's Standing Motion, all remaining claims by or against the Debtors stemming from the 2022 Financing Transactions, the valuation of collateral supporting prepetition funded debt, and various issues among holders of the Debtors' prepetition secured notes, including appellate rights in respect of the 2022 Financing Adversary Proceedings, the payment of advisor fees, and governance terms for Reorganized Incora. Under the Committee Stipulation, as implemented through the Plan, general unsecured creditors will receive approximately 1.6% of the New Common Equity,[6] up to $7,500,000 in cash, a waiver of preference claims against trade creditors, payment of the reasonable fees and expenses of the 2027 Unsecured Indenture Trustee, and additional critical vendor payments, while the holders of 1.25L Notes Claims (some of which were targets of the causes of action asserted in the Committee's Standing Motion) will receive no distribution under the Plan. The members of the First Lien Noteholder Group and the 2024/2026 Noteholder Group have agreed to waive any diminution-in-value, deficiency, and make-whole claims in respect of their 1L Notes Claims and 2026 Notes Claims, respectively. Under the settlements reached among the First Lien Noteholder Group and the 2024/2026 Noteholder Group, (i) all of such parties' rights regarding appeals of the 2022 Financing Adversary Proceeding are preserved and no such parties are permitted to argue equitable mootness on appeal, (ii) the 2024/2026 Noteholder Group's standing motion is resolved and withdrawn

---

[6]    While the Committee Stipulation had provided that general unsecured creditors would receive 3.5% of New Common Equity, that amount had been agreed on the basis that the 2026 Notes Claims were entirely unsecured. Following the Court's ruling that the 2026 Notes are secured, the allocation of New Common Equity to unsecured creditors has been reduced in proportion to the reduction in the unsecured claims pool.

(subject to certain limited appellate outcomes), (iii) the advisor fees for the 2024/2026 Noteholder Group will be paid by the Debtors on the Effective Date, and (iv) the creditor constituency represented by the First Lien Noteholder Group will forgo part of its distribution to fund the settlement consideration under the RSA and the Committee Stipulation. We also expect the First Lien Noteholder Group and the 2024/2026 Noteholder Group to reach agreement on the governance terms of Reorganized Incora after the confirmation hearing. Furthermore, the members of the First Lien Noteholder Group have agreed to convert their DIP Financing Claims into New Exit Notes rather than require a cash payment at maturity. In consideration of these heavily negotiated terms, the Debtors will release the Released Parties from the Causes of Action held by the Estates, including "equitable lien" claims against the holders of 1L Notes Claims.[7]

## II.    SOLICITATION AND VOTING

8.      On January 12, 2024, the Court entered the *Order (I) Approving the Disclosure Statement, (II) Approving Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Scheduling a Confirmation Hearing, and (V) Establishing Notice and Objection Procedures* [Dkt. No. 1228] (the "***Initial Disclosure Statement Order***"), which, among other things, (i) approved the Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, (ii) established the Solicitation Procedures, (iii) approved the form of Ballots, and (iv) approved the form and manner of service of certain related notices. On September 5, 2024, the Court entered the *Order (I) Approving the Amended Disclosure Statement, (II) Approving Re-Solicitation of Classes 4 and 6 and Related Voting Procedures, (III) Approving Forms of Modified Ballots, (IV) Scheduling a Confirmation Hearing, (V) Establishing Notice and Objection Procedures, and (VI) Shortening the Notice and Objection Periods in Connection with the Foregoing* [Dkt. No. 2086] (the "***Amended Disclosure Statement Order***" and, together with the Initial Disclosure Statement Order, the "***Disclosure Statement Order***"), which, among other things, provided relief similar to that provided in the Initial Disclosure Statement Order and

---

[7]    *See Mem. Op.* at 14-16 (Jan. 14, 2024) [Adv. Pro. Dkt. No. 508].

authorized the Debtors to re-solicit two groups of prepetition bondholders, *viz.*, holders of 1L Notes and 2026 Notes, made up nearly entirely by the members of the 1L Noteholder Group and the 2024/2026 Noteholder Group.

9.       The voting deadline for such re-solicitation was subsequently extended indefinitely pending mediation of critical Plan issues. Following substantial progress in mediation, the Debtors filed a revised version of the Plan and on December 5, 2024, the Debtors filed a notice indicating that the confirmation hearing had been set for December 16, 2024 (the "***Confirmation Hearing Notice***"),[8] after which the Debtors extended the voting deadline for the re-solicited classes to December 20, 2024.[9] While the voting deadline is set for a time later than the confirmation hearing, the Debtors intend to go forward with Plan confirmation on December 16, 2024, given the expectation that consensus will be achieved regarding the terms of the Plan and ancillary documents and sufficient creditors entitled to vote will submit ballots in support of the Plan. The Debtors expect that custodians for the re-solicited noteholders will deliver definitive master ballots by the December 20 voting deadline, after which the Debtors will file a final voting report.

10.      Pursuant to and in accordance with the Disclosure Statement Order, the Debtors commenced the solicitation of votes on the Plan. The Debtors' solicitation agent, Verita Global, LLC ("***Verita***"), f/k/a Kurtzman Carson Consultants, distributed Ballots to each creditor entitled to vote on the Plan, along with copies of the Plan, the Disclosure Statement, and other solicitation materials.[10]

11.      In addition to soliciting votes on the plan, the solicitation materials provided creditors with a clear and unambiguous opportunity to opt out of the Third-Party Release. *First*, the Ballots clearly and conspicuously explained that a failure to opt out constitutes consent to the Third-Party Release:[11]

---

[8]    *See* Dkt. No. 2415.

[9]    *See* Dkt. No. 2442.

[10]   *See* Certificate of Service [Dkt. No. 1344]; Supplemental Certificate of Service [Dkt. No. 1364].

[11]   *See* Initial Disc. Stmt. Order, Ex. 2B at 10, Ex. 2C at 10, Ex. 2D at 9.

> **If you decline to check the opt-out box in this Item 2, you will be deemed to have consented to the Third-Party Release quoted above and you will be deemed to have unconditionally, irrevocably, and permanently released and discharged the Released Parties from, among other things, any and all claims that relate to the Debtors.**

12.     *Second*, the Ballots explained, in plain terms, how voting creditors could opt out of granting the Third-Party Release:[12]

> **WHAT IS THE THIRD-PARTY RELEASE?**
>
> The provisions of the Plan setting forth the Third-Party Release are quoted in full on this Beneficial Holder Ballot. **If you do not check the opt-out box in Item 2 of your Beneficial Holder Ballot, you will be deemed to have consented to the Third-Party Release and will be deemed to have unconditionally, irrevocably, and permanently released and discharged the Released Parties (as defined in the Plan) from, among other things, any and all claims that relate to the Debtors.**
>
> **AM I REQUIRED TO ACCEPT THE THIRD-PARTY RELEASE? HOW CAN I OPT OUT?**
>
> You are not required to accept the Third-Party Release. You may opt out of the Third-Party Release by checking the opt-out box in Item 2 of your Ballot. The treatment of your Claim under the Plan will not be affected in any way if you opt out of the Third-Party Release.

13.     The Ballots also included, in conspicuous bold typeface, the full text of the Third-Party Release and key embedded defined terms.[13]

14.     The holders of Claims and Interests who were not entitled to vote on the Plan received (a) the Confirmation Hearing Notice and (b) a notice informing them of their non-voting status (the "***Notice of Non-Voting Status***"), which contained similar material regarding the Third-Party Release as the Ballots.[14]

---

[12]   *See id.*, Ex. 2B at 4, Ex. 2C at 3, Ex. 2D at 3.

[13]   *See id.*, Ex. 2B at 7-10, Ex. 2C at 7-10, Ex. 2D at 6-9.

[14]   *See id.*, Ex. 3A at 3, 6-9, Ex. 3B at 3, 6-9, Ex. 3D at 4, 7-10, Ex. 3E at 4, 7-10.

15.     The original voting deadline of February 15, 2024, was extended several times for certain holders of Claims, ultimately to December 20, 2024, as discussed above.

16.     Holders of Claims in Class 4 (1L Notes Claims), Class 7a (General Unsecured Claims), and Class 7b (General Unsecured Convenience Claims) (each, a "***Voting Class***") were entitled to vote to accept or reject the Plan. The voting results, as reflected in the Voting Report, are as follows:[15, 16]

| Class | Class Description | Voted | Accepted | Rejected |
|-------|-------------------|-------|----------|----------|
| 4a | Secured 1L Notes Claims | *To be provided in final voting report* | | |
| 6a | Secured 2026 Notes Claims | *To be provided in final voting report* | | |
| 7a | General Unsecured Claims | Number: 31<br>Amount: $52,412,707.57 | Number: 3<br>Amount: $4,903,000.00 | Number: 28<br>Amount: $47,509,707.57 |
| 7b | General Unsecured Convenience Claims | Number: 438<br>Amount: $16,138,254.74 | Number: 393<br>Amount: $14,983,861.25 | Number: 45<br>Amount: $1,154,393.49 |
| 7c | 2024 Unsecured Notes Claims | Number: 69<br>Amount: $123,544,457 | Number: 8<br>Amount: $7,253,045 | Number: 61<br>Amount $116,291,412 |

17.     The Plan should be confirmed for the reasons set forth in this Memorandum.

---

[15]  *See Decl. of Kevin Martin with Respect to the Tabulation of Votes on the Further Mod. Second Am. Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al.* [Dkt. No. 2472] (the "***Voting Report***").

[16]  As discussed above, the Debtors intend to move forward will plan confirmation on December 16, 2024, in advance of the voting deadline for Classes 4a and 6a on December 20, 2024. While, as a result, final votes for those classes will not be available at the time of the confirmation hearing, the Debtors understand that the First Lien Noteholder Group and 2024/2026 Noteholder Group, which constitute supermajorities of Classes 4a and 6a (with respect to both number and dollar amount of claims held), are approaching resolution of certain issues that would cause them vote to accept the plan by their voting deadline. Final voting results will be reflected in a final voting report to be filed after the confirmation hearing.

# ARGUMENT

## III. THE PLAN SATISFIES THE BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION.

### a. The Plan Satisfies the Requirements of Section 1129.

#### 1. *The Plan Satisfies the Requirements of Section 1129(a)(1).*

18. Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]," and must do so by a preponderance of the evidence.[17] The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code.[18]

### c. The Plan Satisfies the Classification Requirements of Section 1122.

19. Section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

20. For a classification structure to satisfy section 1122, claims or interests placed in a particular class must be substantially similar to each other.[19] Plan proponents have significant

---

[17] *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters* (*In re Briscoe Enters*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[18] S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

[19] *In re Vitro Asset Corp.*, 2013 WL 6044453, at *15 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class").

flexibility in placing similar claims into different classes, provided there is a rational basis for doing so.[20]

21.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122. The Plan places Claims and Interests into sixteen separate Classes,[21] with Claims and Interests in each Class differing from the Claims and Interests in other Classes in their legal or factual nature or based on other relevant criteria.[22]   Specifically, the Plan contains the following Classes:

    a. <u>Class 1</u>:  Priority Non-Tax Claims
    b. <u>Class 2</u>:  Other Secured Claims
    c. <u>Class 3</u>:  ABL Facility Claims
    d. <u>Class 4</u>:  Secured 1L Notes Claims
    e. <u>Class 4b</u>: 1L Notes Deficiency Claims
    f. <u>Class 4c</u>: New Money Claims
    g. <u>Class 5</u>: 1.25L Notes Claims
    h. <u>Class 6</u>: Secured 2026 Notes Clams
    i. <u>Class 6b</u>: 2026 Notes Deficiency Claims
    j. <u>Class 7a</u>:  General Unsecured Claims
    k. <u>Class 7b</u>:  General Unsecured Convenience Claims
    l. <u>Class 7c</u>: 2024 Unsecured Notes Claims
    m. <u>Class 8</u>:  PIK Notes Claims
    n. <u>Class 9</u>:  Intercompany Claims
    o. <u>Class 10</u>:  Existing Equity Interests
    p. <u>Class 11</u>:   Intercompany Interests

---

[20]   *See Bank of New York Trust Co. v. Official Unsecured Creditors' Comm.* (*In re Pacific Lumber Co.*), 584 F.3d 229, 251 (5th Cir. 2009) (noting that the rationale supporting different classifications will vary with the circumstances); *Save Our Springs Alliance, Inc. v. WSI (II)-COS, LLC*, 632 F.3d 168, 174 (5th Cir. 2011); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture* (*In re Greystone III Joint Venture*), 995 F.2d 1274, 1279 (5th Cir. 1991); *In re Pisces Energy LLC*, No. 09-36591, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar.").

[21]   Because the Plan constitutes a separate chapter 11 plan for each Debtor, Article III of the Plan also provides that, while the Claims or Interests in a particular Class have been placed in one Class for the purposes of nomenclature, the Claims and Interests against each applicable Debtors are treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

[22]   *See* Plan Art. III.

22.     Section 1122(b) permits the Debtors to establish Class 7b (General Unsecured Convenience Claims) consisting of "claim[s] that [are] less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." The Plan's classification scheme generally tracks the Debtors' prepetition capital structure and divides Claims and Interests into Classes based on the underlying instruments giving rise to those Claims and Interests. In addition, Claims (rights to payment) are classified separately from Interests (representing ownership in the business). Accordingly, the Plan satisfies the requirements of section 1122(a).

   b.   The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a).

23.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements that every chapter 11 plan of a business entity must satisfy.[23] The Plan satisfies each of these requirements, and no party has suggested otherwise.

   i.   Designation of Classes of Claims and Interests (§ 1123(a)(1))

24.     Section 1123(a)(1) of the Bankruptcy Code requires that the plan "designate . . . classes of claims . . . and classes of interests."

25.     As set forth above in Section 22.b., Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies the requirement of section 1123(a)(1).

   ii.   Specification of Unimpaired Classes (§ 1123(a)(2))

26.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement by identifying Classes 1, 2, 3, 9, and 11 as Unimpaired or potentially Unimpaired:

   iii.   Treatment of Impaired Classes (§ 1123(a)(3))

27.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this

---

[23]   An eighth requirement, set forth in § 1123(a)(8), applies only to a debtor that is an individual and therefore is not discussed in this Memorandum.

requirement by specifying the treatment of Classes 4a, 4b, 4c, 5, 6a, 6b, 7a, 7b, 7c, 8, 9, and 10, which are Impaired or potentially Impaired:

### iv.   Equal Treatment within Classes (§ 1123(a)(4))

28.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan meets this requirement because holders of Allowed Claims or Interests, as applicable, within each Class will receive the same treatment as all other holders of Allowed Claims or Interests within such Class. All Allowed Claims in the Voting Classes (Classes 4a, 6a, 7a, and 7b)—even those whose holders vote to reject the Plan—will receive the same distributions on account of their Claims.

### v.   Means for Implementation (§ 1123(a)(5))

29.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions, sets forth the means by which the Plan will be implemented. Among other things, Article IV of the Plan: (a) effectuates the global settlement and (b) authorizes the Debtors to (i) issue new securities and (ii) engage in a series of restructuring transactions, to be described more precisely in the Plan Supplement, that will implement the economic terms of the Plan in a tax-efficient manner. Accordingly, the Plan satisfies section 1123(a)(5).

### vi.   Issuance of Non-Voting Securities (§ 1123(a)(6))

30.     Section 1123(a)(6) of the Bankruptcy Code requires that a reorganized debtor's constituent documents prohibit the issuance of non-voting equity securities. Article IV of the Plan provides that the New Organizational Documents will prohibit the issuance of any non-voting equity securities to the extent required by section 1123(a)(6), and the LLC agreement for Reorganized Incora (to be filed in the Plan Supplement) will expressly prohibit the issuance of such securities to the extent required by section 1123(a)(6). Accordingly, the Plan satisfies section 1123(a)(6).

vii.   Directors and Officers (§ 1123(a)(7))

31.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." Article IV of the Plan outlines the manner of selecting the officers, directors, and/or managers of the Reorganized Debtors and of the ultimate parent company, which accords with applicable state law, the Bankruptcy Code, the interests of creditors and equity security holders, and public policy. Additionally, the New Organizational Documents, to be filed in the Plan Supplement, will disclose the process by which the Reorganized Company Board and the officers of the Reorganized Debtors will be determined and selected, and their identities will be disclosed, to the extent known, in the Plan Supplement. Accordingly, the Plan satisfies section 1123(a)(7).

c.   The Plan Incorporates Certain Provisions That Are Permitted under Section 1123(b).

32.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) provides that a plan may: (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[24]

33.     The Plan is consistent with Bankruptcy Code section 1123(b). Specifically, under Article III of the Plan, (a) Classes 1, 2, 3, and 11 (as well as Class 9, to the extent reinstated) are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the holders of Claims and Interests in those Classes and (b) Classes 4a, 4b, 4c, 6a, 6b, 7a, 7b, 7c, 8, and 10 (as well as Class 9, to the extent extinguished) are Impaired since the Plan modifies the rights of the holders of Claims and Interests in those Classes.

---

[24]   11 U.S.C. § 1123(b)(1)-(3), (6).

34.     In addition, Article V.A of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases other than those expressly specified.

d.    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b).

35.     The Plan also includes certain releases and an exculpation provision, which are addressed comprehensively in Sections IV and V.a below. These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were a material inducement for parties to enter into the global settlement and to extend the DIP and exit financing, and are supported by the key constituencies of the Chapter 11 Cases. Notably, section 1123(b)(3)(A) expressly permits a chapter 11 plan to settle "any claim or interest belonging to the debtor or to the estate."

e.    The Plan Complies with Section 1123(d).

36.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

37.     The Plan complies with Bankruptcy Code section 1123(d). Article V.B provides that all Executory Contracts and Unexpired Leases are assumed with $0.00 cure amounts unless otherwise specified. The Debtors have since filed and served a Schedule of Assumed Executory Contracts and Unexpired Leases, which sets forth non-zero cure amounts for certain Executory Contracts and Unexpired Leases, and the Debtors continue to discuss with counterparties to resolve any cure disputes. The objections with respect to the cure amounts will be adjourned beyond the Confirmation Hearing as permitted under Article V.B.2 of the Plan, and the Debtors are committed to resolving these disputes expeditiously.

**2.     *The Debtors Satisfy the Requirements of Section 1129(a)(2).***

38.     The Plan satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code. The legislative history of section 1129(a)(2) reflects that this provision is

intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[25] As discussed below, the Debtors have complied with those sections.

### 3. *The Plan Satisfies the Requirements of Section 1129(a)(3).*

39. Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement is satisfied.[26] To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[27]

40. The Plan satisfies section 1129(a)(3). The Debtors' reasons for commencing the Chapter 11 Cases and proposing the Plan are consistent the purposes of the Bankruptcy Code. The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[28] Here, the Plan will enable Incora to deflate its balance sheet, improve liquidity,

---

[25] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under 11 U.S.C.S. § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of 11 U.S.C.S. § 1125."); *In re Lapworth*, Case No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, Case No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[26] *See In re Sun Country Dev. Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) (concluding that 1129(a)(3) is satisfied when "the Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the Debtors and maximizing the returns available to creditors of the Debtors.").

[27] *In re Sun Country Dev., Inc.*, 764 F.2d at 408; *Century Glove*, 1993 WL 239489, at *4.

[28] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *Fin. Sec. Assurance Inc. v. T-H New Orleans L.P.* (*In re T-H New Orleans L.P.*), 116 F.3d 790, 802 (5th Cir. 1997) ("[G]ood faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."); *In re Sun Country Dev., Inc.*, 764 F.2d at 408 ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." (citation omitted)); *accord B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A.* (*In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir.

and strengthen its operations—positioning Incora's business for long-term success. Moreover, the Plan is the product of extensive arm's-length negotiations among the Debtors and many of their leading creditors.[29] Finally, as set forth herein, the Plan complies with bankruptcy and applicable nonbankruptcy laws. For all these reasons, the good faith requirement of section 1129(a)(3) has been met.

#### 4. *The Plan Satisfies the Requirements of Section 1129(a)(4)).*

41.   Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[30] Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[31]

42.   The Plan satisfies this requirement. The Debtors submit that the payment of the Retained Professional Fees is the only category of payments that falls within the ambit of section 1129(a)(4) in the Chapter 11 Cases, and the Plan prohibits payment of the Retained Professional Fees without Court approval. All Retained Professional Fees are subject to prior Court approval and the reasonableness requirements under Bankruptcy Code sections 328 and/or 330.[32] Article II.C of the Plan provides that Retained Professionals must file their final requests for payment of Retained Professional Fees no later than 60 days after the Effective Date, thereby

---

1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

[29]   *See generally Declaration of Brian Cejka in Support of Confirmation of the Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. and its Affiliated Debtors and Debtors in Possession* (the "**Cejka Declaration**") (to be filed substantially concurrently).

[30]   *See* 11 U.S.C. § 1129(a)(4); *see also In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[31]   *See Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.),* 150 F.3d at 518 ("Section 1129(a)(4) by its terms requires court approval of '[a]ny payment made… the proponent . . . for services or for costs and expenses in or in connection with the case.'") (internal citations omitted); *see also In re Chapel Gate Apartments,* 64 B.R. at 573 (noting "there must be a provision [in the plan] for review by the Court of any professional compensation").

[32]   11 U.S.C. §§ 328(a), 330(a)(1)(A).

providing an adequate period of time for the U.S. Trustee and all parties in interest to review such fees before a final fee hearing.

**5.    *The Plan Satisfies the Requirements of Section 1129(a)(5).***

43.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors. Section 1129(a)(5)(B) further requires the plan proponent to disclose the identity of any "insider" (as defined by Bankruptcy Code section 101(31)) who will be employed or retained by the reorganized debtor and the nature of compensation for any such insider. Additionally, section 1129(a)(5)(A)(ii) provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, directing the court to ensure that the governance of the reorganized debtors is in "good hands."[33] Courts have interpreted this to mean that (a) the appointees have experience in the reorganized debtors' business and industry[34] and in financial and management matters,[35] (b) that their appointment does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor,"[36] and (c) that the debtors and creditors believe control of the reorganized debtor by the proposed individuals will be beneficial.[37] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[38]

---

[33]    *See In re Landing Assocs.,* 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.").

[34]    *See In re Rusty Jones, Inc.,* 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)); *Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 760 (citing *Toy & Sports*, 37 B.R. at 149–50).

[35]    *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[36]    *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[37]    *In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[38]    7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2012).

44.     The Debtors have satisfied or will satisfy the requirements of Bankruptcy Code section 1129(a)(5). *First*, in accordance with Article V.I of the Plan, as of the Effective Date, the board of directors of Reorganized Incora (the "***Board***") will be constituted of the chief executive officer and other designees of the members of the First Lien Noteholder Group and the 2024/2026 Noteholder Group, as will be set forth in the New LLCA Agreement to be filed with the Plan Supplement. In the Plan Supplement, the Debtors will disclose any known identities of the persons proposed to serve on the Board.[39] In addition, the current officers, who have successfully guided the Debtors through the tumult of bankruptcy while increasing Incora's revenue, are expected to retain their positions and will continue to serve at the discretion of the Board.

45.     *Second*, the appointment or continuance of officers, directors, and managers is "consistent with the interests of creditors and equity security holders and with public policy."[40] The proposed directors, managers, and officers of the Reorganized Debtors have significant knowledge and solid business and industry experience, are competent, and will give the Reorganized Debtors both continuity and fresh insights into running the business. The Debtors and their creditors believe control of the Reorganized Debtors by the proposed individuals will be beneficial, and no party in interest has objected to the Plan on the ground that it is not so. Therefore, the requirements of section 1129(a)(5)(A)(ii) are satisfied.

46.     *Finally*, the Debtors have satisfied section 1129(a)(5)(B) because they will publicly disclose in the Plan Supplement the identity of all insiders that the Reorganized Debtors will employ or retain in compliance with the Bankruptcy Code.

**6.      *The Plan Satisfies the Requirements of Section 1129(a)(7).***

47.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

---

[39]   *See Armstrong World Indus.*, 348 B.R. at 165 (finding disclosure of identities and nature of compensation of persons to serve as directors and officers on the effective date sufficient for Bankruptcy Code section 1129(a)(5)).

[40]   11 U.S.C. § 1129(a)(5)(A)(ii).

18

With respect to each impaired class of claims or interests—

(A)    each holder of a claim or interest of such class—

(i)    has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[41]

48.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries by such dissenting stakeholders in a hypothetical chapter 7 liquidation of the debtor's estate against the estimated recoveries under the proposed plan.[42] The value of distributions is measured "in present value terms."[43] A creditor's "speculation" that it "would have fared better if the assets had been liquidated under chapter 7" is not probative.[44]

49.    Here, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis attached as Exhibit C to the Disclosure Statement included in the Disclosure Statement Supplement Order (as updated below to conform to the Plan's revised classification, the "***Liquidation Analysis***")[45] that compares projected recoveries for creditors in various classes under the Plan to their respective recoveries in a hypothetical chapter 7 liquidation. The projected recoveries for these creditors under the Plan are equal to, or in excess of, the recoveries estimated

---

[41]    *Id.* § 1129(a)(7)(A).

[42]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court is "required to determine whether [impaired claims] would receive no less under [a reorganization] than through a liquidation of the company's assets"); *In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) *aff'd, SBA v. Neff,* 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan.").

[43]    *In re Briscoe*, 994 F.2d at 1165; *In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *12 (Bankr. S.D. Tex. Dec. 21, 2009).

[44]    *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

[45]    *See* Cejka Declaration at ¶ 28.

in a hypothetical chapter 7 liquidation. Specifically, the projected recoveries under the Plan and under the Liquidation Analysis are as follows:[46]

| Class and Designation | Plan Recoveries | Liquidation Recoveries | |
|---|---|---|---|
| | | Low | High |
| Carveout Reserve Claims[47] | 100.0% | 100.0% | 100.0% |
| DIP Claims | 100.0% | 77.3% | 100.0% |
| Administrative Claims | 100.0% | 0.0% | 0.4%[48] |
| Priority Tax Claims | 100.0% | 0.0% | 0.8% |
| 1<br>Priority Non-Tax Claims | N/A | N/A | N/A |
| 2<br>Other Secured Claims | 100.0% | 100.0% | 100.0% |
| 3<br>ABL Facility Claims | 100.0% | 100.0% | 100.0% |
| 4<br>1L Notes Claims[49] | 40.0%-67.0% | 0.0% | 4.1% |
| 5<br>1.25L Notes Claims | 0.0% | 0.0% | 0.0% |
| 6<br>2026 Notes Claims[50] | 50.0%-83.0% | 0.0% | 5.1% |
| 7a<br>General Unsecured Claims | 2.0%-4.0% | 0.0% | 0.0% |
| 7b<br>General Unsecured Convenience Claims | 10.0% | 0.0% | 0.0% |

[46]  Although classification under the Plan has changed since completion of the liquidation analysis, the resulting Plan recoveries vis-à-vis a chapter 7 liquidation have not. Furthermore, although there is no standalone analysis for Classes 4b, 4c, 6a, or 6b, the Debtors expect the holders of such claims to vote overwhelmingly to accept the Plan, including all members of the First Lien Noteholder Group and the 2024/2026 Noteholder Group.

[47]  Carve-out reserve claims, defined as the "Carve-Out" in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Dkt. No. 396], include any outstanding Professional Fees, fees required to be paid to the Claims Register and the U.S. Trustee, and fees and expenses up to $100,000 incurred by a trustee under section 726(B) of the Bankruptcy Code that have not been paid prior to the Conversion Date, as well as an aggregate amount not to exceed $6.0 million for the Post-Trigger Fee Cap.

[48]  Recovery of individual Administrative Expenses range from 0.0%-5.0% depending on the Debtor and range from 0.0% - 0.4% on a consolidated basis.

[49]  The 1L Notes Claims includes those in Class 4a (Secured 1L Notes Claims), Class 4b (1L Notes Deficiency Claims), and Class 4c (New Money Claims).

[50]  The 2024 Notes Claims includes those in Class 6a (Secured 2026 Notes Claims) and Class 6b (2026 Notes Deficiency Claims).

| Class and Designation | Plan Recoveries | Liquidation Recoveries | |
|---|---|---|---|
| | | Low | High |
| 7c<br>2024 Unsecured Notes Claims | 2.0%-4.0% | 0.0% | 0.0% |
| 8<br>PIK Notes Claims | 0.0% | 0.0% | 0.0% |
| 9<br>Intercompany Claims | 0.0% or 100.0% | 0.0% | N/A[51] |
| 10<br>Existing Equity Interests | N/A | 0.0% | 0.0% |
| 11<br>Intercompany Interests | N/A | 0.0% | 0.0%[52] |

50.     These projections are based on reasonable and fair assumptions regarding a chapter 7 trustee's ability to liquidate the Debtors' assets and the values that such sales would be likely to produce.[53] As the United States District Court for the Southern District of Texas has reasoned:

> The additional costs of three chapter 7 trustees, the short time allowed a plain liquidation, the potential for more claims to be filed against the estates, and the loss of knowledge and momentum . . . about the management of these assets would combine to reduce significantly the cash to be realized by the estates from these assets. The lower prices from the liquidation are reasonable.[54]

Further, as this Court has explained:

> [A] chapter 7 liquidation would increase the administrative costs of the Bankruptcy Cases and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Bankruptcy Cases and the Debtors' [post-effective] date operations. Moreover, the increased costs associated with a liquidation under chapter 7 would further reduce the proceeds available for distribution. These costs would include, among other things, administrative fees and costs payable to a trustee in bankruptcy and professional advisors to such trustee.

---

[51]   Recovery on Intercompany Claims is estimated to range from 0 - 100% depending on the Debtor.

[52]   Recovery on Intercompany Interests is estimated to range from 0 - 100% depending on the Debtor.

[53]   See Cejka Declaration at ¶¶ 26-29.

[54]   *In re MCorp Fin., Inc.*, 160 B.R. 941, 961 (S.D. Tex. 1993) (reversing denial of confirmation of chapter 11 plan).

. . . The Bankruptcy Court here considers, inter alia: (1) the problems associated with the quick sale of assets as contemplated in chapter 7; (2) the limitations of section 721 of the Bankruptcy Code; and (3) loss of value through passage of time.[55]

51.    As the evidence will show, the assumptions made in the Liquidation Analysis are appropriate and consistent with Mr. Cejka's extensive experience as a financial advisor to distressed companies, and tailored to the Debtors' specific business and assets. Because each holder of a Claim or Interest in all Impaired Classes will receive a distribution under the Plan greater than or equal to what such holder would receive in a hypothetical chapter 7 liquidation, the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**7.    *While the Plan Does Not Satisfy the Requirements of Section 1129(a)(8), It May Still Be Confirmed.***

52.    Section 1129(a)(8) of the Bankruptcy Code requires that each impaired class of claims or interests must accept the plan. Class 7a has voted to reject the Plan. In addition, Classes 4b, 4c, 5, 6b, 8, 9, and 10 are Impaired and their holders are not receiving or retaining any property on account of their Claims or Interests and, thus, these Classes are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, the Plan does not satisfy Section 1129(a)(8) of the Bankruptcy Code. However, the Plan is nonetheless confirmable because, as discussed more fully below, it satisfies the "cram down" requirements of section 1129(b) with respect to these Classes.[56]

**8.    *The Plan Satisfies the Requirements of Section 1129(a)(9).***

53.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive specified deferred cash payments. In particular, pursuant to section 1129(a)(9)(A), holders

---

[55]    *Pisces Energy*, 2009 WL 7227880, at *12, n.7 (holding that plan satisfied best interests test); *accord In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252–258 (Bankr. S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) (considering, among other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would adopt settlements embodied in plan).

[56]    *See* Section III.a.13.

of claims of a kind specified in section 507(a)(2)—administrative claims allowed under section 503(b)—must receive, on the effective date, cash equal to the allowed amount of such claims.[57] Section 1129(a)(9)(B) requires that each holder of a claim of a kind specified in section 507(a)(1), (4)–(7)—generally, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that the holders of claims of a kind specified in section 507(a)(8)— i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of their claims.

54.    The Plan satisfies Bankruptcy Code section 1129(a)(9). *First*, Article II.A of the Plan provides that each holder of an Allowed General Administrative Expense will receive Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, then in the applicable Reorganized Debtor's ordinary course of business). *Second*, Article II.F of the Plan states that holders of Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C). The Plan thus satisfies each of the requirements of section 1129(a)(9).

### 9.    *The Plan Satisfies the Requirements of Section 1129(a)(10).*

55.    Section 1129(a)(10) of the Bankruptcy Code provides that at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider."

56.    As set forth above, Classes 4a, 6a, and 7b, which are Impaired, voted or are expected to vote overwhelmingly to accept the Plan independent of any insiders' votes. The Plan thus satisfies the requirements of section 1129(a)(10).

---

[57]    The same rule applies to claims specified in section 507(a)(3), which arise only in an involuntary case.

### 10. *The Plan Satisfies the Requirements of Section 1129(a)(11).*

57.     Bankruptcy Code section 1129(a)(11) requires that the plan must be feasible as a condition precedent to confirmation. Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[58]

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[59] Rather, a debtor must provide only a "reasonable assurance" of success.[60] There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[61] As discussed in greater detail below, the Plan is feasible within the meaning of section 1129(a)(11) because it "provide[s] a reasonable assurance of commercial viability by a preponderance of the evidence."[62]

### 11. *The Plan Satisfies the Requirements of Section 1129(a)(12).*

58.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the U.S. Code], as determined by the court at the hearing on confirmation of the plan." Section 507(a)(2) of the Bankruptcy Code provides that "any fees

---

[58]   11 U.S.C. § 1129(a)(11).

[59]   *Fin. Sec. Assurance. Inc. v. T–H New Orleans L.P.* (*In re T–H New Orleans L.P.*), 116 F.3d at 801 ("[T]he [bankruptcy] court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required." (citations omitted)); *In re Lakeside Global II Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (noting that the feasibility standard "has been slightly broadened and contemplates whether the debtor can realistically carry out its plan.")

[60]   *In re T-H New Orleans L.P.*, 116 F.3d at 801; *In re Briscoe*, 994 F.2d at 1165–66; *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115.

[61]   *In re T-H New Orleans L.P.*, 116 F.3d at 802 (citing *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 508 n.20 (Bankr. S.D. Tex. 1989) and *In re Western Real Estate Fund, Inc.*, 75 B.R. 580, 585 (Bankr. E.D. Okla. 1987)); *see also Save Our Springs*, 632 F.3d at 172 ("To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by . . . liquidation, or the need for further financial reorganization.'" (quoting 11 U.S.C. § 1129(a)(11))); *In re Landing Assocs.*, 157 B.R. at 820 (stating that section 1129(a)(11) only requires a finding that a plan offers "a reasonable probability of success"); *Lakeside*, 116 B.R. at 507 ("The purpose of the feasibility requirement is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." (internal quotation marks and citation omitted)).

[62]   *In re Briscoe*, 994 F.2d at 1166.

and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

59.     The Plan satisfies section 1129(a)(12) because Article II.D provides that all such fees and charges, to the extent not previously paid, must be paid for each quarter until the Chapter 11 Cases are closed, dismissed, or converted to cases under chapter 7.

### 12.     *The Plan Satisfies the Requirements of Section 1129(a)(13).*

60.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at the levels established in accordance with section 1114 of the Bankruptcy Code. The Plan satisfies this requirement because Article V provides that all employment agreements will continue.

### 13.     *The Plan Satisfies Cram-Down Requirements of Section 1129(b) with Respect to Rejecting Classes.*

61.     Section 1129(b)(1) of the Bankruptcy Code excuses compliance with section 1129(a)(8) so long as all other requirements of section 1129(a) are satisfied, and the Plan is "fair and equitable" and "does not discriminate unfairly" with respect to rejecting classes. The Plan is "fair and equitable" and "does not discriminate unfairly" with respect to all rejecting classes— Class 4b (1L Notes Deficiency Claims), Class 4c (New Money Claims), Class 5 (1.25L Notes Claims), Class 6b (2026 Notes Deficiency Claims), Class 7a (General Unsecured Claims), Class 7c (2024 Unsecured Notes Claims), Class 8 (PIK Notes Claims), and Class 10 (Existing Equity Interests)—and, as such, these classes may be "crammed-down".

### a.   The Plan is "Fair and Equitable" with Respect to All Applicable Classes.

62.     The statutory requirements for a Plan to be "fair and equitable" in respect of a particular class depend on the type of claims or interests in the class. Section 1129(b)(2) provides that to be fair and equitable with respect to a rejecting class of impaired unsecured claims, a plan must provide that either (a) each holder of such claims receives or retains property having a value, as of the plan effective date, equal to the allowed amount of such claim, or (b) no holders of claims or interests that are junior to the claims in the dissenting class will receive or retain any property

under the plan on account of such junior claim or interest.[63]  Classes 4b, 4c, 5, 6b, 7a, 7c, and 8 consist of unsecured claims. The only class of claims or interests that is junior to such claims is Class 10, which consists of Existing Equity Interests. Because holders of interests in Class 10 will not receive or retain any property under the Plan on account of their interests, the Plan is "fair and equitable" in respect of the classes of unsecured claims.

63.      Section 1129(b)(2) provides that to be "fair and equitable" with respect to a dissenting class of impaired equity interests, a plan must provide that either (a) each holder of such interests receives or retains property having a value, as of consummation of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest, or (b) no holders of interests that are junior to the interests in the dissenting class will receive or retain any property under the plan on account of its junior claim or interest. At the Debtor where the Existing Equity Interests are held, there are no interests junior to the Existing Equity Interests such that the Plan is "fair and equitable" in respect of the Existing Equity Interests.

> b.  The Plan Does Not Unfairly Discriminate with Respect to Any Applicable Class.

64.      A plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.[64] Classes 4b, 4c, 5, 6b, 7a, and 7c consist of similarly situated unsecured claims. While holders of claims in Classes 4b, 4c, 5, and 6b will not receive any distributions on account of their claims, whereas holders of claims in Classes 7a and 7c will, there is no unfair discrimination in respect of Classes 4b, 4c, 5, and 6b because holders of claims in such classes have agreed to waive such distributions in connection with voluntary settlements reached for other valuable consideration. Classes 7a and 7c will receive proportionate distributions such that the Plan does not unfairly discriminate among those classes.

---

[63]  *See* 11 U.S.C. § 1129(b)(2)(B). That latter requirement is known as the "absolute priority" rule.

[64]  *In re Cypresswood Land Partners, I*, 409 B.R. 396, 434 (Bankr. S.D. Tex. 2009); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006).

65.     Furthermore, there are no Classes that are substantially similar to either Class 8 (PIK Notes, which are structurally junior to the Debtors' other unsecured claims) or Class 10 (Existing Equity Interests). The Plan therefore does not unfairly discriminate in respect of those Classes.[65]

### 14.     *The Plan Satisfies the Requirements of Section 1129(c).*

66.     Section 1129(c) of the Bankruptcy Code provides that the court may only approve one plan. The Plan is the only plan being proposed.

### 15.     *The Plan Satisfies the Requirements of Section 1129(d).*

67.     Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."

68.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.[66] Accordingly, the Plan satisfies the requirements of section 1129(d). Moreover, no governmental unit has requested that the Court decline to confirm the Plan on such grounds.

### 16.     *Other Requirements of Section 1129 Are Not Applicable to the Plan.*

69.     Section 1129(a)(6) is inapplicable to the Plan because the Debtors are not subject to the jurisdiction of any governmental regulatory commission. Sections 1129(a)(14) and 1129(a)(15) are inapplicable because no Debtor is an individual. Section 1129(a)(16) is inapplicable because each of the Debtors that is a corporation is a moneyed, business, or commercial corporation. Section 1129(e) is inapplicable because none of the Chapter 11 Cases is a small business case.

---

[65]   None of the secured classes are rejecting classes and, as such, it is not necessary to demonstrate that the Plan is "fair and equitable" and "does not discriminate unfairly" with respect to the secured classes. Furthermore, the cram-down requirements should not be applied to Class 9 (Intercompany Claims), which have no economic substance and will be impaired only to preserve, improve, or simplify the accounting or tax position of the Reorganized Debtors' enterprise. In any event, each holder of an Intercompany Claim is a proponent of the Plan and has therefore waived any objection to its treatment under the Plan.

[66]   *See generally* Cejka Declaration.

**b.    The Solicitation of Votes Complied with Section 1125.**

70.    Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

71.    In the Disclosure Statement Order, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b) of the Bankruptcy Code. As set forth in the Voting Report, the Debtors solicited votes from the members of the Voting Classes in a manner consistent with the provisions of the Disclosure Statement Order. In compliance with section 1125(b) of the Bankruptcy Code, the Debtors did not solicit votes on the Plan from any holder of a Claim or Interest prior to the entry of the Disclosure Statement Order.

**c.    The Solicitation and Tabulation of Votes Complied with Section 1126.**

72.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization. Specifically, under section 1126, only holders of claims and interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests (to the extent such claims or interests are allowed) may vote to accept or reject such plan. Section 1126 provides, in pertinent part, that:

> (a) The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .
>
> . . .
>
> (f) Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.
>
> (g) Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such

28

> claims or interests to receive or retain any property under the plan
> on account of such claims or interests.[67]

In accordance with these provisions, the Debtors solicited acceptances or rejections of the Plan

from the holders of Claims and Interests in Classes 4a, 6a, 7a, 7b, and 7c—the only classes entitled

to vote—but did not solicit votes from holders of Claims and Interests in Classes 1, 2, 3, 4b, 4c,

6b, 8, 10, or 11 (as well as Class 9, to the extent extinguished)—the unimpaired and impaired

classes whose members, pursuant to section 1126(f) and 1126(g), are conclusively presumed to

have accepted or rejected the Plan, as applicable.

73.    As referenced above, all holders of claims in voting classes, including Classes 7a,

7b, and 7c, were solicited and voted pursuant to the earlier Initial Disclosure Statement Order,

entered on January 12, 2024, in respect of a prior version of the Plan filed January 12, 2024 (the

"*January Plan*"). Holders of claims in Classes 4a and 6a were then re-solicited and are voting

pursuant to the Amended Disclosure Statement Order, entered on September 5, 2024, in respect of

the revised Plan. While substantial changes have been made to the Plan since the January Plan, the

changes do not adversely impact the treatment of Classes 7a, 7b, or 7c and, as such, those classes

did not need to be re-solicited.

74.    Sections 1126(c) of the Bankruptcy Code specifies the requirements for acceptance

of a plan by classes of claims and interests:

> A class of claims has accepted a plan if such plan has been accepted
> by creditors, other than any entity designated under subsection (e)
> of this section, that hold at least two-thirds in amount and more than
> one-half in number of the allowed claims of such class held by
> creditors, other than any entity designated under subsection (e) of
> this section, that have accepted or rejected such plan.[68]

75.    As set forth in the Voting Report, Verita has tabulated and certified the votes of

eligible holders in a manner consistent with section 1126. Classes 4a, 6a, 7b, and 7c voted or are

---

[67]    11 U.S.C. § 1126(a), (f), (g).

[68]    11 U.S.C. § 1126(c); *see also* Fed. R. Bankr. P. 3018.

expected to vote to accept the Plan[69] while Class 7a voted to reject it. As discussed above, however, the Plan may be confirmed despite the rejection by Class 7a as it satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Class, as well as the Classes deemed to reject the Plan.

76.     The Debtors submit that the requirements of section 1126(c) of the Bankruptcy Code have been satisfied or will be satisfied at the time of the confirmation hearing.

## IV.    THE SETTLEMENTS, RELEASES, EXCULPATIONS, AND INJUNCTIONS IN THE PLAN ARE APPROPRIATE.

77.     The Plan includes certain settlements, releases, exculpations, and injunctions. The Debtor Release releases the Estates' own causes of action, including the causes of action identified by the Committee (which has consented to the release as part of the global settlement). The consensual Third-Party Release releases direct causes of action that certain parties in interest have against certain other parties, including other creditors, the Sponsor, and the Debtors' directors and officers. The exculpation provision serves to limit claims against estate fiduciaries. Finally, the injunction enforces each of the foregoing provisions. These interconnected provisions are necessary and appropriate under the circumstances.

### a.     The Debtor Release Should Be Approved.

78.     Article VIII.D of the Plan provides for the release by the Debtors, as of the Effective Date, of certain claims, rights, and Causes of Action that the Debtors and the Reorganized Debtors may have against the Released Parties.

79.     Section 1123(b)(3)(A) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." This

---

[69]   As discussed above, while final votes for those classes may not be available at the time of the confirmation hearing, the Debtors understand that the First Lien Noteholder Group and 2024/2026 Noteholder Group, which constitute supermajorities of Classes 4a and 6a (with respect to both number and dollar amount of claims held), are approaching resolution of certain issues that would cause them vote to accept the plan by their voting deadline.

provision allows the Debtors to release estate claims and causes of action as consideration for concessions made by stakeholders pursuant to the Plan.[70]

80.     The standard for such releases is discussed in more detail below, *see infra* Section V. Broadly speaking, however, courts in the Fifth Circuit generally consider whether the release is "'fair and equitable' and 'in the best interest of the estate.'"[71] In accordance with Fifth Circuit precedent, the Debtor Release and the settlements contained in the Plan are "fair and equitable" because they do not result in any stakeholders to receive or retain any property on account of junior Claims or Interests.

81.     In addition to being fair and equitable, the Debtor Release is in the best interests of the Estates. *First*, prosecution of the claims and Causes of Action released by the Debtor Release would be time consuming and expensive, it could mire these cases in prolonged litigation instead of allowing the Debtors to effectuate a prompt, consensual, and value-maximizing restructuring. The Debtors do not believe that they possess material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.

82.     *Second*, the Committee, as the other statutory fiduciary in the Chapter 11 Cases, conducted a thorough investigation of the released claims and Causes of Action and has accepted the proposed settlement, including the release of those Causes of Actions that the Committee previously sought standing to pursue.

83.     *Third*, the Plan, including the Debtor Release, was vigorously negotiated by sophisticated entities that were represented by able counsel and financial advisors. The result is a

---

[70]    *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re General Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[71]    *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)); *see Mirant*, 348 B.R. at 738; *see also Heritage*, 375 B.R. at 259; *In re Derosa-Grund*, 567 B.R. 773, 784 (Bankr. S.D. Tex. 2017).

compromise that reflects the give-and-take of a true arm's-length negotiation process. The Debtor Release provides the Released Parties with a substantial level of finality that allows the Debtors to emerge successfully from bankruptcy protection without the burden of value destructive litigation. Moreover, the Debtor Release is a central component of the Restructuring and was key to bringing the core parties to the deal that will eliminate billions of dollars of debt. This result would be impossible without the contributions and concessions of the Released Parties. Accordingly, the Debtor Release is fair, equitable, and in the best interest of the Debtors and their Estates, is justified under the controlling Fifth Circuit standard, and should be approved.

### b.     The Consensual Third-Party Release Should Be Approved.

84.     Article VIII.E of the Plan contains the Third-Party Release, whereby each Releasing Party releases any and all claims and Causes of Action such party could assert against the Released Parties.[72] The Third-Party Release satisfies the criteria used by the courts in the Fifth Circuit as articulated in *In re Wool Growers Central Storage Co.*,[73] *i.e.*, "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration" may be approved.[74]

85.     *First*, the Third-Party Release is consensual. As shown above, the Plan, the Disclosure Statement, and the Disclosure Statement Order (each transmitted to all members of the Voting Classes and otherwise publicly available) expressly state—in capitalized, bold-faced,

---

[72]   Certain of the Releasing Parties are defined as such in multiple capacities. To the extent there is any conflict between the foregoing summary and the definition of "Releasing Party" contained in the Plan, the Plan definition controls.

[73]   *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768 (Bankr. N.D. Tex. 2007) (*citing FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, No. 05-CV-00333-R, 2006 WL 228982, at *4 (N.D. Tex. 2006) and *Republic Supply*, 815 F.2d at 1050); *see also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286–88 (5th Cir. 2016) (discussing the specificity requirement for third-party releases in Fifth Circuit); *FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a non-debtor release where "the release of claims was an integral part of the bankruptcy order … [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself"); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez* (*In re Treyson Dev., Inc.*), No. 14-70256, 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (observing that "[t]he Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient." (citations omitted)).

[74]   *Wool Growers Cent. Storage Co.*, 371 B.R. at 775-76.

underlined text—that the holders of impaired Claims and Interests that do not opt out of the Third-Party Releases will be bound thereby.[75] *Second*, the language of the Third-Party Release is specific as it identifies the potential claims and Causes of Action proposed to be released, so as to put the Releasing Parties on sufficient notice.[76] *Third*, the Third-Party Release is integral to the Plan and a condition of the Global Settlement. The Plan, including the Third-Party Release, was heavily negotiated by sophisticated parties, each of whom was represented by competent counsel and financial advisors. The consensual Third-Party Release is a key component of the Debtors' restructuring and was a critical inducement to bringing various stakeholder groups to the bargaining table. *Finally*, the Third-Party Release was given for consideration as each Releasing Party has made a substantial contribution to the Chapter 11 Cases.

86.     The U.S. Trustee has recently objected to the Third-Party Release, but, as discussed below in Section III, the U.S. Trustee's objection is not well-founded. Courts in this and other districts have confirmed chapter 11 plans containing releases similar to the Third-Party Release in comparable circumstances.[77] Accordingly, the Third-Party Release complies with Fifth Circuit precedent and is fully justified.[78]

---

[75]   Disclosure Statement Order at 44.

[76]   *See, e.g.*, *FOM Puerto-Rico S.E. v. Dr. Barnes Eyecenter*, 255 F. App'x at 910, 912 (finding release language that provided for release of any and all claims "based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to [the debtor], its Bankruptcy Case, or the Plan" sufficiently specific to meet the *Republic Supply* standard).

[77]   *See, e.g., In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (overruling U.S. Trustee objection and confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (confirming chapter 11 plan where general unsecured creditors were impaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Light Tower Rentals, Inc.*, No. 16-34284 (DRJ) (Bankr. S.D. Tex. Sept. 30, 2016) (confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (same).

[78]   Hence, as discussed in Section III, the U.S. Trustee did not even raise an objection to the Third-Party Releases in its First UST Objection. It only raised an objection following the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024), but that decision did not alter Fifth Circuit law.

### c.     The Exculpation Provision Should Be Approved.

87.     Article VIII.F of the Plan provides exculpation to the Exculpated Parties from claims and Causes of Action arising out of or in connection with the administration of the Chapter 11 Cases and certain related transactions, except for acts or omissions that constitute a criminal act, intentional fraud, or willful misconduct as determined by a Final Order. The Exculpated Parties are: (a) the Debtors, (b) the Reorganized Debtors, (c) the Committee and its members, (d) any independent director of a Debtor (including Patrick Bartels as independent director of Wolverine Intermediate Holding), and (e) the Retained Professionals and other professional advisors of the foregoing, in each case, solely in their respective capacities as such. As discussed below in connection with the United States Trustees' objections, *see infra* Section V, the Exculpation Provision conforms to existing precedent, is appropriate, and should be approved.

### d.     The Plan Injunction Is Appropriate.

88.     The injunction provision set forth in Article VIII.G of the Plan implements the Plan's release and exculpation provisions by permanently enjoining all persons and entities from commencing any actions and seeking any form of relief released or exculpated by the Plan or the Confirmation Order. The Injunction Provision is a key Plan provision because it enforces the releases and exculpations that are central to the Plan, provides certainty to the Reorganized Debtors that the Plan will be enforced in accordance with its terms, and notifies all parties in interest that they may be subject to sanctions if they act in violation of the Plan. As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision is also appropriate.

89.     The injunction provision also serves a "gatekeeper" function because it provides that, before any claim or Cause of Action is brought against a Released Party or Exculpated Party, the Court must (a) determine, after notice and a hearing, that such claim or Cause of Action is colorable, and (b) specifically authorize such person or entity to bring such claim or Cause of

Action. The gatekeeper provision is consistent with that approved by the Fifth Circuit in *Highland Capital* and by this Court in *Avaya* and *Talen*.[79]

90.     The Plan also includes an injunction barring "50-percent shareholder" (within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code) from taking stock deductions in a manner that would adversely affect the Reorganized Debtors. This serves to extend the Sponsor's current commitment to the same into the period following confirmation of the Plan, which is in the best interests of the Reorganized Debtors. This injunction is functionally similar to injunctions that bankruptcy courts routinely grant at the outset of bankruptcy cases to prevent large shareholders (in this case, the Sponsor) from taking actions that would impair the Debtors' tax attributes.

### e.     The Committee Settlement is Fair and Equitable.

91.     The Committee Settlement represents a fair and equitable resolution of estate causes of action, is in the best interests of creditors, and is the result of arm's-length negotiations among the two fiduciaries—the Debtors and the Committee—and other various stakeholders. The settlement provides releases of estate causes of action that would be very costly, disruptive, and risky to litigate in exchange for a package of valuable consideration that comfortably exceeds the risk adjusted value of all potential estate causes of action. The Debtors are unaware of any economic stakeholder (or any other party) that objects to its approval.

92.     Settlements are favored in bankruptcy cases. "[C]ompromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly."[80] It follows that the settlement

---

[79]     *In re Highland Cap.*, 48 F.4th at 439 ("Courts have long recognized bankruptcy courts can perform a gatekeeping function. . . . [W]e . . . affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Dkt. No. 350) (confirming chapter 11 plan that included an injunction and gatekeeper provisions); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Dkt. No. 1760) (same).

[80]     *In re Cajun Ele. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (internal quotation marks and citation omitted); *see also In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) ("As a general matter, 'settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.'") (citations omitted).

proponent's "burden is not high,"[81] and the Court's role in approving a settlement under Rule 9019 is limited—it must only "apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision."[82]

93.      Further, a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[83] The court may approve a settlement when it is "fair and equitable."[84] In particular, courts in the Fifth Circuit apply a multi-factor test for considering whether to approve a settlement under Rule 9019, weighing: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise," which include "(i) the best interests of the creditors, with proper deference to their reasonable views; and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."[85] Courts have discretion to assign different weight to each of the factors under the facts and circumstances of the particular case.[86]

94.      The Debtors' burden "is not high" in establishing that a settlement is fair and equitable based on the balance of the above factors.[87] In evaluating a Rule 9019 settlement, a bankruptcy court "need not 'conduct a mini-trial to determine the probable outcome of any claims waived in the settlement.'"[88] Instead, while Rule 9019 requires that settlements be fair and equitable, settlements need only fall above "the lowest point in the range of reasonableness" to be

---

[81]   *In re DeRosa-Grund*, 567 B.R. 773, 785 (Bankr. S.D. Tex. 2017).

[82]   *In re AGE Refining, Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation marks and citations omitted).

[83]   11 U.S.C. § 1123(b)(3)(A).

[84]   *In re AGE Refining, Inc.*, 801 F.3d at 540.

[85]   *Id.* at 540 (internal quotation marks and citation omitted); *see also In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010).

[86]   *See In re DeRosa-Grund*, 567 B.R. at 801 (citation omitted).

[87]   *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

[88]   *Id.* (quoting *In re Cajun Elec. Power Coop.*, 119 F.3d at 355).

approved.[89] Additionally, courts should exercise their discretion in deciding whether to grant or deny a settlement under Rule 9019 "in light of the general public policy favoring settlements."[90]

**Factor 1: Probability of Success**

95.     The first factor is "[t]he probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law."[91] Here, the Committee Settlement clearly falls above the lowest point in the range of reasonableness. The Debtors have thoroughly analyzed and considered the claims asserted and their probability of success in litigation and have concluded, in their informed business judgment, that each of the claims is highly uncertain to succeed and would cause extensive delay, cost, and uncertainty in these chapter 11 cases and otherwise.

96.     The *Corrected Omnibus (I) Motion of the Official Committee of Unsecured Creditors for Exclusive Leave, Standing, and Authority to Prosecute and Settle Certain Claims, Causes of Action, and Claim Objections on behalf of the Debtors' Estates and (II) Claim Objection* and accompanying proposed complaint [Dkt. No. 1020] (the "***Committee Standing Motion***")[92] sets forth causes of action primarily targeting restructuring transactions completed in January 2020 and March 2022. The causes of action alleged generally fall into five categories:

- Claims under state and federal law challenging certain transactions and decisions relating to the January 2020 leveraged buyout which merged Wesco and Pattonair into one combined company—Incora (the "***LBO-Related Claims***").

- Claims under state and federal law challenging payments of advisory fees to Platinum (the "***Advisory Fee-Related Claims***").

- Claims under state and federal law challenging Amendment No. 6 to the Revolving Credit Agreement dated as of January 9, 2020 (the "***ABL Credit Agreement***") that governs

---

[89]   *In re Goodman Networks, Inc.*, No. 22-31641-MVL7, 2024 WL 460478, at *8 (Bankr. N.D. Tex. Feb. 6, 2024) (quoting *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983)).

[90]   *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

[91]   *In re AGE Refining, Inc.*, 801 F.3d at 540.

[92]   As part of the Committee Settlement, the parties agreed to hold the Committee Standing Motion in abeyance until the occurrence of the effective date of an acceptable plan, upon which it will be withdrawn.

the Debtors' ABL Facility, and related decisions (the "***Amendment No. 6-Related Claims***").

• Claims under state and federal law seeking to avoid the liens on certain of the Debtors' bank accounts, director and officer insurance policies, and commercial tort claims (the "***Lien Avoidance Claims***").

• Claims under state and federal law challenging certain transactions and decisions relating to the 2022 Transaction ("***2022 Transaction Claims***"), some of which have been heavily briefed and litigated in the adversary proceeding.

These claims and causes of action all face significant factual and legal hurdles.

97.     Each of the proposed LBO-Related Claims faces hefty challenges which jeopardize the likelihood of any successful litigation. The Committee Standing Motion alleges that (i) certain transaction fees, payments, and financings in connection with the close of the LBO should be avoided as constructive fraudulent transfers; (ii) Platinum, as controlling shareholder, and one officer and director of certain entities, breached fiduciary duties in connection with the LBO; and (iii) Platinum's claims should be equitably subordinated on account of its LBO-related conduct. If litigated, the Debtors believe expert testimony would establish that the Debtors: were solvent when the LBO closed; received significant value from the transaction; and had hundreds of millions of dollars in liquidity to run their business. Further, the Debtors believe Platinum would seek dismissal of the LBO-Related fraudulent transfer claims on the basis that they are barred by the safe harbor provisions of section 546(e) of the Bankruptcy Code, and that the LBO-Related fiduciary duty claims are time-barred under the applicable statute of limitations periods for such claims.

98.     The Advisory Fee-Related Claims face similar headwinds. The Committee Standing Motion alleges that the $7 million annual fees paid to Platinum under a corporate advisory services agreement (the "***Advising Agreement***") should be avoided as constructive fraudulent transfers. If litigated, discovery would show that the Debtors received value well above the $7 million annual fees, in the form of advisory services rendered to the Debtors. For example, during the relevant time period, the advisors under the Advising Agreement (i) counseled the Debtors extensively and negotiated on behalf of the Debtors concerning *all* of the Debtors' major

financing operations, including material acquisitions, dispositions, debt financings, recapitalizations, capital markets or similar; (ii) advised the Debtors on identifying, structuring, negotiating, and obtaining sources of financing with respect to transactions; (iii) advised the Debtors on utilization of assets, coordination of short-term and long-term financing requirements, and general corporate stewardship; and (iv) offered general business advice. Moreover, the Debtors believe expert testimony would establish that the Debtors were solvent, able to pay their debts, and adequately capitalized at the time they paid the fees.

99.     The Amendment No. 6-Related Claims are also of dubious merit. The Committee Standing Motion alleges that certain modifications[93] effectuated by Amendment No. 6 to the ABL Credit Agreement constitute constructive fraudulent transfers, and that Platinum and Mary Ann Sigler breached fiduciary duties in connection with Amendment No. 6. If litigated, however, discovery would show that in connection with the Guarantees and Reallocation, reasonably equivalent value was exchanged, and the Debtors (including the Foreign Guarantors) were solvent, able to pay their debts, and adequately capitalized. Moreover, the Board and relevant officers involved in the decision-making concerning Amendment No. 6 conducted significant diligence, were well informed, and made reasonable business determinations on behalf of each relevant entity.

100.     The thin assertions in the Committee Standing Motion that certain bank account balances, commercial tort claims, and director and officer insurance policies have not been properly perfected (and thus should be avoided) are factually and legally deficient—and indeed

---

[93]   A key modification effectuated by Amendment No. 6 was the inclusion of new secured guarantees (the "**Guarantees**") provided by (i) Wesco Aircraft Canada Inc.; (ii) Haas Group Canada Inc.; and (iii) Haas TCM de Mexico, S. de R.L. de C.V. (together, the "**Foreign Guarantors**").

Another key modification effectuated by Amendment No. 6 was the reallocation of $55 million of commitments under the U.S. Primary Subfacility to the UK Primary Subfacility (the "**Reallocation**"), such that after giving effect to the Reallocation, the aggregate amount of revolving commitments under the U.S. Primary Subfacility was $325 million and UK Primary Subfacility was $150 million, in each case, less the outstanding amount of commitments under a first-in-last-out facility (the "**FILO**").

ignore relevant facts, including the existence of control agreements over security deposit accounts and transition agreements as to the trustees thereof—and are thus unlikely to succeed.

101.    With respect to the 2022 Transaction Claims, the Committee sought through the Committee Standing Motion to bring a host of claims arising from the 2022 Transaction, including for example actual or constructive fraudulent transfer, preferential transfer, breach of fiduciary duties, and equitable subordination, against various Participating Noteholders, Platinum, the Debtors' directors, and others.[94] The Debtors believe that the 2022 Transaction was properly conducted and complied with the Original Indentures,[95] but recognize that the Court disagreed in its adversary proceeding ruling that the 2022 Transaction did not comply with the 2026 Indenture or the 2027 Unsecured Indenture. Even assuming, however, that the 2022 Transaction breached the 2026 Indenture and 2027 Unsecured Indenture, the proposed 2022 Transaction Claims are separate and distinct, and would face substantial (indeed, fatal) hurdles. The Committee participated fully in the 2022 Transaction Adversary Proceeding discovery process—including issuing numerous discovery requests in addition to the discovery conducted in the main bankruptcy case—and received the full discovery record, attended 26 depositions, and was permitted to attend and participate in the adversary proceeding trial including cross-examining witnesses. The Committee's decision to enter into the Committee Settlement reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand.

102.    For example, the Committee sought standing to bring intentional fraudulent transfer and preference claims arising from the 2022 Transaction. But the evidence adduced in discovery, as shown at trial, makes clear that the Debtors were not harmed by the 2022 Transaction. In fact,

---

[94]    The Debtors incorporate herein their prior briefing on the substance and merits of the 2022 Transaction Claims. *See* Debtors' Memorandum of Law In Opposition to the 2024/2026 Holders' Amended and Supplemental Standing Motion [Dkt. No. 1126]; Counterclaim Defendants' Amended Joint Post-Trial Brief [Dkt. No. 1398].

[95]    *See* Debtors' Motion for Summary Judgment at 82 [Adv. Pr. No. 23-03091, Dkt. No. 199] (seeking declaratory relief that "the 2022 Transaction was permitted under the unambiguous terms of the Original Indentures").

the Court repeatedly recognized that the 2022 Transaction was essential to the Debtors because it provided critical capital at an important time.[96] Moreover, among other hurdles to the fraudulent transfer claims, such as the safe harbor of section 546(e) of the Bankruptcy Code, the 2022 Transaction bore none of the badges of fraud that would suggest an intentional fraudulent transfer.[97] For example, as the Court expressed, the Debtors were not insolvent at the time of the transaction.[98] And the expert testimony presented at trial demonstrated that the transaction more likely than not provided reasonably equivalent value to the Debtors.[99] Further, the record and the Court's ruling show that the Debtors, through their advisors, engaged with the Debtors' outside creditors in an arm's-length negotiation for the benefit of the Debtors.[100] Thus, the fraudulent transfer and preference claims faced considerable challenges even if there was a breach of any of the Original Indentures.

103.    Likewise, the Committee's claim to equitably subordinate the Participating Noteholders and others also faced considerable hurdles. Equitable subordination is "an extraordinary remedy, to be sparingly employed."[101] The Fifth Circuit has "largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the

---

[96]    *See, e.g.*, 7/10 Hr'g Tr. at 8:4-9:18 (finding that "Wesco needed to raise approximately $250 million in new capital to remain viable" and "[t]he record does not show the existence of any better alternative to the 2022 transaction").

[97]    *See* Debtors' Memorandum of Law In Opposition to the 2024/2026 Holders' Amended and Supplemental Standing Motion at 70-83 [Dkt. No. 1126].

[98]    *See* 6/25 Hr'g Tr. at 39:16-22 ("If you were insolvent, it's a preference. But I don't think – [the Debtor was] insolvent on the date of the transaction.").

[99]    *See, e.g.,* Dkt. No. 1351 (Rule) at 54:8-19 ("Q. And what is the total dollar number of the value received by Incora? A. Approximately $1.7 billion. . . . And what is the total dollar amount of the value provided by Incora? A. Approximately $1.75 billion."); Dkt. No. 1352 (Steffen) at 89:7-20 (THE COURT: "And if we want to think about market value, we then can't question the market's reasons. Right? We have to simply accept it. And so the market must have reasoned, if we buy into your theory, that the transaction produced benefits, and if it's an efficient market, it produced benefits precisely equal to the delta.").

[100]    *See, e.g.*, Dkt. No. 536-24 at 4-18; Dkt. No. 738 (O'Connell) at 11:23-12:17, 13:22-14:10, 15:5-8, 31:1-37:69, 112:9-113:6 (describing negotiations and Debtors' considerations); 7/10 Hr'g Tr. at 9:6-18 (finding that "Wesco and Platinum believed, in good faith, that the 2022 transaction was the best available alternative to stop the bankruptcy filing"); Dkt. No. 536-24 at 4-18; Dkt. No. 738 (O'Connell) at 31:1-9.

[101]    *In re SI Restructuring, Inc.*, 532 F.3d 355, 359, n.2 (5th Cir. 2008).

disadvantage of other creditors; and (3) when a third party actually defrauds other creditors."[102] Breach of contract—which is the basis alleged for equitable subordination here—is not one of those circumstances. Far from engaging in egregious misconduct, certain of the Debtors' creditors, after an arms-length negotiation, injected considerable working capital into the company with no obligation to do so, a circumstance that the Fifth Circuit has warned should not be discouraged.[103] In addition, the Participating Noteholders, including the First Lien Noteholder Group, were not fiduciaries; the Participating Noteholders, other than potentially the Platinum Noteholders (who have agreed to give up any distribution on account of their notes), exercised no control over the Debtors; and proving fraud is an extraordinarily high bar, which in light of the evidence at trial, would have been exceptionally difficult, if not impossible to meet.

104.     Finally, the Committee's breach of fiduciary duty claims is also susceptible to significant obstacles. Those claims could only be established if a creditor "actually use[s] its power to control to its own advantage or to the other creditors' detriment."[104] The record does not support that Platinum took any formal action as a shareholder to compel any aspect of the 2022 Transaction, or improperly direct or influence negotiations.[105] Ultimately, the fiduciary duty claims would have to overcome the evidentiary record, which, as noted above, shows that the 2022 Transaction was the product of good-faith, arms-length negotiations.

105.     In short, each of the 2022 Transaction Claims face considerable challenges and are unlikely to succeed.

### Factor 2: Complexity, Delay, and Expense

106.     While the Debtors believe the claims alleged in the Committee Standing Motion have little merit or likelihood of success, any litigation over those claims will be vigorous,

---

[102]   *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 122 (5th Cir. 2019).

[103]   *See In re Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir. 1977) (emphasizing "a desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of capital").

[104]   *In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir. 1991).

[105]   *See* Counterclaim Defendants' Amended Joint Post-Trial Brief at 70-71 [Dkt. No. 1398].

complex, expensive, and delay the Debtors' emergence from these Chapter 11 Cases. Prosecuting claims arising from the aforementioned causes of action would involve (among other things) collection, review, and production of thousands of documents from numerous current and former employees of the Debtors, attendant depositions and additional discovery, as well as costly expert testimony concerning a host of issues, including the value of the Debtors' assets and equity at the time of the LBO and the monetary value of the numerous services provided by the advisors under the Advising Agreement.

107.    Additionally, as the Court is well aware, the Debtors desperately need to emerge from these proceedings to avoid continued disruption of their business. In addition to the direct value provided by the settlement, by clearing the path toward emergence, the settlement provides extensive indirect benefits to the estate by removing the cloud of bankruptcy that continues to encumber the Debtors' business. Remaining in bankruptcy for the purpose of litigating the estate claims would almost certainly destroy more value than could be obtained, even assuming that the claims were all successful (which is very unlikely).[106]

108.    Ultimately, the Committee Settlement eliminates the need for any such expensive and protracted litigation and appeals without millions of dollars in expenses and potential years of delay. In light of the foregoing, the Debtors have reasonably determined that the Committee Settlement is a fair and efficient resolution of the Committee's claims. The alternative—yet more litigation, and the uncertainty, delay, and harm to the Debtors' business that comes with it—is simply not tenable.

### Factor 3: Best Interests of Creditors and the Product of Arm's-Length Bargaining

109.    Finally, the Committee Settlement was negotiated at arm's length among the Debtors, the Committee, and numerous creditors and other third parties, each of which was

---

[106]    *See* Debtors' Memorandum of Law in Opposition to the 2024/2026 Holders' Amended and Supplemental Standing Motion at 87 [Dkt. No. 1126] ("Rather than opt for costly, uncertain, and ultimately meritless litigation for no clear benefit, the Debtors have instead focused their efforts on negotiating and developing a confirmable plan of reorganization so that the Debtors can successfully reorganize.").

represented by sophisticated counsel and advisors. The Committee Settlement enjoys wide-ranging support of the Debtors' creditors (as indicated through the Committee Stipulation, the RSA, and the votes to accept the Plan).

110. The Committee Settlement, in addition to the substantial benefits to the Debtors' business conferred by emerging from bankruptcy without the need to spend significant amounts of money on further litigation, provided extensive value to the estate. Specifically, the value of the settlement includes:

    a. General unsecured creditor recoveries in the form of cash for General Unsecured Convenience Claims and equity for General Unsecured Claims;

    b. A waiver of recoveries on account of unsecured deficiency claims, make-whole claims, certain indemnification claims and section 507(b) adequate protection claims;

    c. A waiver by holders of 1.25L Notes Claims of any distribution under the Plan;

    d. The financing of these Chapter 11 Cases through the DIP Notes, including multiple maturity extensions thereof;

    e. Exit financing for the Reorganized Debtors through the rolling of the DIP Notes into the New Exit Notes, and the waiver of the DIP Purchasers' right to receive payment in full in cash at emergence;

    f. Release of preference claims against vendors and other parties doing business with the Debtors;

    g. Payment of certain critical vendor claims and professional fees; and

    h. Appointment of and funding for a General Unsecured Claims Observer.

111. After due consideration of the potential estate claims as compared to the value to the estate of the settlement, the Committee Settlement was approved by the Committee and a director without the involvement of potentially conflicted Board members, as a critical part of the

Debtors' reorganization efforts and as the best means of resolving potential claims without the need for costly litigation. Each of the components of the settlement provides significant value to the estate and avoids value-destroying continued litigation. And, taken as a whole, the value created by the Committee settlement far exceeds the costs associated with forgoing the estate causes of action.

112.    Resolution of the claims alleged in the Committee Standing Motion through the Plan, which contemplates an efficient and fair restructuring of the Debtors' enterprise, does ***not*** leave the interests of the creditors unprotected.[107] Here, the Committee, the Court-appointed representative of and fiduciary for unsecured creditors, as well as nearly all major case constituents are in favor of the Committee Settlement as a reasonable resolution of claims in place of expensive and protracted litigation and appeals, evidencing that it in the best interests of the Debtors' stakeholders.

113.    In sum, the Debtors and the Committee spent more than a year investigating and conducting diligence on the potential estate claims and causes of action, and have spent numerous months negotiating at arm's length concerning the Plan. The Committee Settlement is a result of those investigations and negotiations and demonstrates the overwhelming support and commitment of the Debtors' creditors. The Court should approve the Committee Settlement.

## V.    THE COURT SHOULD OVERRULE THE SOLE OBJECTION.

114.    The Debtors are pleased to report that the UST Objection is the only remaining objection to confirmation of the Plan.[108] The UST Objection lacks merit and should be overruled.

---

[107]   *See La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 253, n.20 (5th Cir. 1988) ("[T]he interests of creditors are imperilled [sic] where valid and profitable state law causes of action are neglected by the debtor-in-possession[.]"); *In re Clear the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. 2021) (stating same).

[108]   Other than certain objections to the Debtors proposed contract cure amounts under the Plan, which have been adjourned pursuant to Article V.B.2 of the Plan. Additionally, although the 2024/2026 Noteholder Group's objection (Dkt. No. 1727) and reservation of rights (Dkt. No. 2445) remain outstanding, the Debtors understand that both filings will be resolved if the First Lien Noteholder Group and the 2024/2026 Noteholder Group reach resolution on the few remaining open Plan issues.

### a.        The Third-Party Release Is Consensual

115.    The U.S. Trustee asserts that the opt-out mechanism with respect to the Third-Party Release proposed by the Debtors results in non-consensual releases and injunction and thus violates the Bankruptcy Code in light of the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*[109] This is incorrect.

### a.        The U.S. Trustee Waived Any Objection to the Third-Party Release When It Failed to Raise an Objection to the Debtors' Earlier Plan.

116.    When the Debtors sought approval to solicit the January Plan, which occurred prior to the Supreme Court issuing its *Purdue* decision, the U.S. Trustee did not raise any objection to the nearly identical opt-out release proposed to be included in the January Plan. Even more critically, when the Debtors sought confirmation of the January Plan (again, prior to the *Purdue* decision) the U.S. Trustee similarly did not raise any issue with the opt-out release, consistent with its standard practice in the Fifth Circuit where opt-out releases have long been understood to be consensual. Now, in a post-*Purdue* world, the U.S. Trustee seeks to exploit the passage of time to lob in an objection to the Third-Party Release. But as the Court has aptly observed, the U.S. Trustee should not be permitted to make a late objection to the Third-Party Release absent the emergence of a legitimate new basis:

> I think that, with respect to the waiver objection, any argument that is now raised that is dependent on the Purdue decision is fair game. A new argument, not dependent on the Purdue decision, I think would be waived."[110]

117.    The Second UST Objection suggests that the Supreme Court's *Purdue* decision constitutes this new basis, but that is plainly wrong. In *Purdue*, the Supreme Court resolved a circuit split regarding non-consensual third-party releases in chapter 11 plans, aligning with the Fifth Circuit to hold that the Bankruptcy Code does not "authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a

---

[109]   144 S. Ct. 2071 (2024).

[110]   Disc. Stmt. Hr'g Tr. (September 5, 2024) at 30:1-4.

nondebtor without the consent of affected claimants."[111] But the Supreme Court stopped there, indicating that nothing in its decision "should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan"[112] and expressly declining "to express a view on what qualifies as a consensual release."[113] As such, the Fifth Circuit's long-standing acceptance of opt-out releases as consensual has been entirely unaltered—*Purdue* simply confirmed what has always been the law in the Fifth Circuit.[114] Accordingly, since *Purdue*, several courts have recognized that *Purdue* did not impact what constitutes a consensual release,[115] including one court in this district that has expressly said that "*Purdue* did not change the law in this Circuit."[116] The U.S. Trustee even acknowledges the same in its brief.[117]

118.    Thus, the U.S. Trustee has no basis to raise an objection to the Plan's Third-Party Release that it did not have at the time it filed its First UST Objection. Since the January Plan was filed, Fifth Circuit law has not changed, and none of the points raised in the Second UST Objection suggest that it has—indeed, nearly all sources cited in the First UST Objection date from before the *Purdue* decision came down. The Court should not permit the U.S. Trustee to try to further delay confirmation with its far too late objection.

---

[111]  144 S. Ct. at 2088.

[112]  144 S. Ct. at 2087.

[113]  144 S. Ct. at 2088.

[114]  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995); *In re Pac. Lumber Co.*, 584 F.3d at 299.

[115]  *In re Robertshaw US Holding Corp.* (*Robertshaw*), 662 B.R. 300, 322 (Bankr. S.D. Tex. 2024) ("The Plan does not include non-consensual third-party releases like the ones addressed in *Purdue* [and instead] contains consensual ones[,] . . . the *Purdue* decision does not apply."); *see also In re Diamond Sports Group, LLC*, Case No. 23-90116 (Bankr. S.D.T.X. Nov. 14, 2024) [Dkt. No. 2671]; *In re FTX Trading Ltd.*, Case No. 22-11068 (Bankr. D. Del. Oct. 8, 2024) [Dkt. No. 26404]; *In re DRF Logistics, LLC*, Case No. 24-90447 (CML) (Bankr. S.D. Tex. Sept. 24, 2024) [Dkt. No. 276]; *In re Eiger BioPharmaceuticals, Inc.*, Case No. 24-80040-SGJ11 (N.D. Tex. Sept. 5, 2024) [Dkt. No. 639]; *In re Gigamonster Networks, LLC*, Case No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) [Dkt. No. 889]; *In re Bowflex Inc.*, Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) [Dkt. No. 614]; *In re Invitae Corp.*, Case No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 9, 2024) [Dkt. No. 932].

[116]  *Robertshaw*, 662 B.R. at 322 (citing *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995)).

[117]  Second UST Objection at 3 ("The Supreme Court in Purdue did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.")

b.   Even if the U.S. Trustee is Permitted to Object, the Third-Party Releases Are Consensual and Permitted Under Supreme Court and Fifth Circuit Precedent.

119.   As discussed, Purdue expressly allowed for bankruptcy court approval of consensual third-party releases. The Third-Party Release in the Plan is consensual, and the U.S. Trustee's assertion that the proposed opt-out mechanism makes such release non-consensual is incorrect. The Debtors specifically and deliberately crafted the opt-out mechanism to conform to settled law in this Circuit prohibiting non-consensual releases but treating opt-outs as consensual.[118]

120.   Countless plans in this district have been approved with opt-out third-party releases in accordance with Fifth Circuit law.[119] To take one post-*Purdue* example, when faced with an identical objection and argument in *Robertshaw*, this Court declined to depart from such long-standing precedent. There, the Court held that "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan"[120] and the U.S. Trustee does not identify any meaningful distinction between the Court-approved solicitation materials in this case and those in *Robertshaw,* compelling the same conclusion. In both cases:

> Parties in interest were provided detailed notice about the Plan, the deadline to object to plan confirmation, the voting deadline, and the opportunity to opt out of the third-party releases. The Disclosure Statement included a detailed description about the third-party releases and the opt-out. . . . All ballots provided claimants an opportunity to opt out. Non-voting parties . . . received a Notice of Non-Voting Status that offered a chance to opt out too. The ballots and the Notice of Non-Voting Status allowed parties to carefully review and consider the terms of the third-party release and the consequences of electing not to opt-out.[121]

---

[118]   *In re Pac. Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) (prohibiting non-consensual releases); *see also Robertshaw*, 662 B.R. at 332 (noting that "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out").

[119]   *See supra* n. 119.

[120]   *Robertshaw*, 662 B.R. at 323.

[121]   *Id.* at *18.

121.     Ultimately, the U.S. Trustee hangs its argument on far-flung and non-binding precedent that suggests an "opt out" does not accord with traditional contract principles and therefore is "non-consensual". However, the application of contract principles is inapposite. As recognized both before and after the Supreme Court's *Purdue* decision, deemed consent is accepted throughout the judicial system, including the bankruptcy system:

> The notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system. When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them. Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim. Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed. There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization.[122]

122.     Indeed, here, the noticing process associated with the Third-Party Release was developed based on best-practices to ensure sufficient due process for all affected parties. The opportunity to opt out of the Third-Party Release appears in clear and conspicuous language throughout the solicitation materials using bold typeface and encircled for maximum recognition. For example, the Disclosure Statement states:[123]

---

[122]  *In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022).

[123]  Dkt. No. 2083 at iii.

> The Modified Second Amended Plan provides that certain Entities and Persons will be deemed to have granted the Third-Party Release contained in Article VIII.E of the Modified Second Amended Plan. You will be bound by the Third-Party Release if you do not validly and timely opt out of the Third-Party Release. For more information about the Third-Party Release, please refer to Section IV.K.4.f of this Disclosure Statement.
>
> For the avoidance of doubt, parties that validly and timely opted out of the Third-Party Release contained in the Modified First Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. et al. [Dkt. No. 1223] (the "Modified First Amended Plan") are deemed to opt out of the Third-Party Release contained in Article VIII.E of the Modified Second Amended Plan.

Further:[124]

> Regardless of whether you vote on acceptance or rejection of the Modified Second Amended Plan, you must return your Ballot at or before the Voting Deadline in compliance with the instructions in order to opt out of the Third-Party Release.

123.    The Ballots use similar call-out boxes, bold typeface, and clear instructions, making the opt-out mechanism clear and comprehensive:

> If you decline to check the opt-out box in this Item 2, you will be deemed to have consented to the Third-Party Release quoted above and you will be deemed to have unconditionally, irrevocably, and permanently released and discharged the Released Parties from, among other things, any and all claims that relate to the Debtors.

Check the following box **only** if you wish to opt out of the Third-Party Release provisions of the Modified Second Amended Plan:

☐    **Opt out** of the Third-Party Release

---

[124]   *Id.* at 120.

124.    As the Court observed: "It's very clear what the deal is, the Disclosure Statement makes it really clear people can opt out."[125]

125.    The U.S. Trustee's contract law arguments are a red herring. While silence alone may not, in some instances, be enough to bind private parties to a contract, there is a fundamental difference between taking silence to imply consent to *private contract* and implying consent through the failure to act *in a judicial proceeding*. There is a long history under U.S. law, including at the Supreme Court, where a failure to act can be deemed consent, including to a settlement such as the one embodied by the Third-Party Release. [126] There is no reason the U.S. Trustee's arguments should upset the rationales underpinning these long-standing legal principles.[127]

### b.    The Revised Exculpation Provision Is Appropriate and Permissible.

126.    The U.S. Trustee is also incorrect in its assertion that the exculpation of the Debtors' independent directors exceeds the permitted scope of exculpation provisions in chapter 11 plans.[128] This Court is considering the validity of a similar exculpation provision in *Instant Brands*, and the Debtors here agree with the debtors in that case.[129]

---

[125]   Disc. Stmt. Hr'g Tr. (September 5, 2024) at 29:15-16.

[126]   The Supreme Court held in *Phillips Petroleum Co. v. Shutts* that opt out mechanisms, when they are accompanied by sufficient notice, procure consent of plaintiffs to be joined to a class settlement. 472 U.S. 797, 813-14 (1985). There is no principled argument why an opt-out mechanism can procure consent in the class action context but not in appropriate analogous circumstances in the bankruptcy context.

[127]   Among other issues, if courts were to accept the U.S. Trustee's argument, it would mean that courts have to analyze each state contract law to determine what is consensual in a particular state. That would result in inconsistent enforceability of releases granted under a plan from state to state, undermining the all-important federal bankruptcy system's goal of uniformity. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985).

[128]   The First UST Objection and Second UST Objection also objected to the time period covered by the Plan's exculpation provision. The Plan currently provides that the period covered by the exculpation provisions runs from the Petition Date to the Effective Date, except for, following the Effective Date, any issuance or distribution of securities, the distribution of any property, or the implementation of the Restructuring, each pursuant to and in accordance with the Plan. The U.S. Trustee has informed the Debtors that it no longer objects to the exculpation provision on this basis based on the current exculpation provision.

[129]   *See Debtor's Reply and Memorandum of Law in Support of Final Approval and Confirmation of the Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates, In re Instant Brands Acquisition Holdings Inc.*, Case No. 23-90716 (MI) (Bankr. S.D. Tex. Feb. 21, 2024).

127.     Fifth Circuit precedent allows for the exculpation of non-debtors so long as there is a separate basis for justifying such exculpation. In *Nexpoint Advisors, L.P. v. Highland Capital Management., L.P. (In re Highland Capital Management, L.P.)*, the Fifth Circuit held that exculpatory provisions may apply to bankruptcy trustees acting within the scope of their fiduciary duties to the bankruptcy estate and, accordingly, they may also encompass a debtor's independent directors because "the Independent Directors are entitled to all the rights and powers of a trustee."[130] As a sister court in this Circuit explained, "[i]n a chapter 11 case in which no trustee is appointed, the fiduciary duties to the [e]state rest with a debtor-in-possession's directors," who "bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."[131] Indeed, the Supreme Court similarly acknowledged, "the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"[132]

128.     Like the independent directors in *Highland*, the Debtors' independent directors owed fiduciary duties to the Debtors and their Estates in accordance with section 1107(a). The record shows that the Debtors' independent directors exercised their fiduciary duties to the Debtors and their Estates with the utmost level of care, loyalty, good faith, and diligence. Moreover, the exculpation provision in the Plan is narrowly tailored to protect the Exculpated Parties from inappropriate litigation solely "in connection with or arising out of the administration of the Chapter 11 Cases" and does not apply to "any act or omission" that "constitute[s] gross negligence, willful misconduct, or actual fraud."[133]

---

[130]   *Highland*, 48 F.4th at 437; *see id.* at 437-38.

[131]   *In re Houston Reg'l Sports Network, L.P.*, 505 B.R. 468, 481 (Bankr. S.D. Tex. 2014) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985)).

[132]   *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355 (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).

[133]   Plan, Art. VIII.F.

129.     The U.S. Trustee does not contest any of these facts, however, it argues—without any support—that the protection of exculpation is only appropriate for directors appointed post-petition pursuant to an order of the bankruptcy court establishing a unique corporate governance structure.[134] But that is not the law—nor should it be.

130.     *First*, the limitation the U.S. Trustee seeks is not found in *Highland*. To the contrary, the Fifth Circuit could have—but did not—require that only the independent directors appointed by the bankruptcy court could be exculpated; rather, the Fifth Circuit relied on the rights and duties the independent directors perform. Given the rights and duties of the Independent Directors in these cases, the same reasoning should apply and entitle them to analogous protections. Indeed, since the Fifth Circuit's *Highland* decision, courts in this District have repeatedly approved exculpation provisions similar to that contained in the Plan.[135]

131.     *Second*, the limitation proposed by the U.S. Trustee would substantially harm the bankruptcy system. Should courts refuse to permit exculpation of independent directors, individuals will (understandably) be reluctant to serve in such positions, which would severely disadvantage the very businesses that most badly need the expertise and judgment of an independent director.[136] The Fifth Circuit has acknowledged a similar concern when deciding the appropriate extent of protection for a bankruptcy trustee in a chapter 11 case, finding that "too little

---

[134]   UST Obj., ¶ 13.

[135]   *See e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) [Dkt. No. 1760] (overruling U.S. Trustee and confirming a plan that exculpated independent directors, explicitly stating that the provision was appropriate under applicable law, including *Highland*); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Dkt. No. 533] (same); *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Dkt. No. 1041] (same); *In re Nautical Solutions, L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 16, 2023) [Dkt. No. 204] (overruling U.S. Trustee and finding same).

[136]   *See In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 260-61 (Bankr. E.D. Va. 2016) ("As a policy matter, exculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in chapter 11 cases."); *American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012-2014 Final Report and Recommendations*, 23 Am. Bankr. Inst. L. Rev. 1, 273 (2015) (the public policy underlying exculpation provisions includes "encouraging parties to engage in the process and assist the debtor in achieving a confirmable plan—actions that committees, committee members, other estate representatives and their professionals, and certain parties (such as key lenders) may not be willing to undertake in the face of litigation risk"); *Brief of the American College of Bankruptcy as Amicus Curiae in Support of Neither Party*, *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44 (2023) (No. 23-124).

protection might expose a trustee to excessive personal liability and dissuade capable people from becoming trustees."[137] The same consideration applies here and militates strongly towards permitting exculpation of independent directors.

132. Even if the Court sustains the U.S. Trustee's objection to the exculpation of independent directors, the Plan's exculpation provision would still be appropriate because the Plan exculpation provision is already limited such that it only applies "to the fullest extent permitted by applicable law."[138]

133. For all the foregoing reasons, the Debtors respectfully request that the Court overrule the UST Objection.[139]

*[Remainder of page intentionally blank]*

---

[137] *In re Smyth*, 207 F.3d at 761.

[138] Plan, Art. VIII.F.

[139] The UST Objection also requests that in the event the Court overrules the UST Objection, the U.S. Trustee further objects to any waiver of the fourteen-day stay period pursuant to Fed. R. Bankr. P. 3020(e). The Debtors will file a revised Plan that removes such waiver such that the request is now moot.

Upon the foregoing Memorandum, together with evidence and argument to be presented at the Confirmation Hearing, the Debtors respectfully request that the Court enter an order (a) confirming the Plan and (b) grant such other relief as is just and proper.

Dated: December 15, 2024

Respectfully submitted,

*/s/ Charles A. Beckham, Jr.*

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Patrick L. Hughes (TX Bar No. 10227300)
Martha Wyrick (TX Bar No. 24101606)
Re'Necia Sherald (TX Bar No. 24121543)
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 4000
Houston, TX  77010
Telephone: 1 (713) 547-2000
Email:     Charles.Beckham@HaynesBoone.com
           Patrick.Hughes@HaynesBoone.com
           Martha.Wyrick@HaynesBoone.com
           ReNecia.Sherald@HaynesBoone.com

- and -

Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
Benjamin M. Schak (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Telephone: 1 (212) 530-5000
Email:     DDunne@Milbank.com
           SKhalil@Milbank.com
           BSchak@Milbank.com

*Counsel to the Debtors and*
*Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that, on December 15, 2024, a true and correct copy of the foregoing document was served through the Electronic Case Filing system of the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed noticing agent.

Dated: December 15, 2024

*/s/ Charles A. Beckham, Jr.*

Charles A. Beckham, Jr.