```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                     .
IN RE:                               .  Case No. 23-90611
                                     .  Chapter 11
WESCO AIRCRAFT HOLDINGS,             .
INC., et al.,                        .  515 Rusk Street
                                     .  Houston, TX 77002
                Debtors.             .
                                     .  Monday, December 16, 2024
. . . . . . . . . . . . . . . .      .  7:59 a.m.


                  TRANSCRIPT OF CONFIRMATION HEARING
                 BEFORE THE HONORABLE MARVIN ISGUR
                 UNITED STATES BANKRUPTCY COURT JUDGE
```

For the Debtors:              Milbank LLP
                              By:  DENNIS DUNNE, ESQ.
                                   BENJAMIN SCHAK, ESQ.
                                   SAMIR VORA, ESQ.
                                   ANDREW LEBLANC, ESQ.
                              1850 K Street Northwest
                              Washington, DC 20006
                              (202) 835-7574


For the U.S. Trustee:         Office of the United States Trustee
                              By:  ANDREW JIMENEZ, ESQ.
                              515 Rusk Street, Suite 3516
                              Houston, TX  77002
                              (713) 718-4668


APPEARANCES CONTINUED.

Audio Operator:               Courtroom ECRO Personnel

Transcription Company:        Access Transcripts, LLC
                              10110 Youngwood Lane
                              Fishers, IN 46048
                              (855) 873-2223
                              www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES:   (Continued)


For the Ad Hoc              Kobre & Kim LLP
2024/2026 Noteholder        By:  ZACHARY D. ROSENBAUM, ESQ.
Group:                      800 Third Avenue
                            New York, NY 10022
                            (212) 488-1279



For the Pimco and           DavisPolk
Silver Point                By:  DAMIAN S. SCHAIBLE, ESQ.
Noteholders Group:          450 Lexington Avenue
                            New York, NY  10017
                            (212) 450-4000



For the Committee:          Morrison & Foerster LLP
                            By:  LORENZO MARINUZZI, ESQ.
                            250 West 55th Street
                            New York, NY  10019-9601
                            (212) 468-8000
```

I N D E X
12/16/24

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR: | | | | |
| Patrick Bartels | Declaration | -- | -- | -- |
| Brian Cejka | Declaration | -- | -- | -- |
| Kevin Martin | Declaration | 44 | -- | -- |
| FOR THE COMMITTEE: | | | | |
| Joseph Denham | Declaration | -- | -- | -- |

| EXHIBIT | PAGE |
|---|---|
| ECF 2478 | 38 |
| ECF 2477 | 39 |
| ECF 2472 | 42 |
| ECF 2083-4 | 49 |
| ECF 2480-1 | 51 |

```
 1        (Proceedings commenced at 7:59 a.m.)

 2        THE COURT:  All right.  Good morning.  We are here in

 3   the Wesco Aircraft Holdings case for confirmation of the plan.

 4   Case number is 23-90611.  Everyone should have made an

 5   electronic appearance, so we're not going to take appearances

 6   this morning.  If you wish to speak to the Court and you're on

 7   the phone, you can press "five star."  I have one person who

 8   has done that so far.  If you're in court, please come forward.

 9        Good morning.

10        MR. DUNNE:  Good morning, Your Honor.  Dennis Dunne

11   of Milbank, LLP, on behalf of Incora.  I'm joined in the

12   courtroom this morning with my colleagues, Andy Leblanc, Samir

13   Vora, and Benjamin Schak.  Just by way of quick introductions,

14   we also have in the courtroom Dawn Landry, the general Counsel

15   of Incora, and Brian Cejka of Alvarez & Marsal.  On the line,

16   we have Kevin Martin of Verita, our claims agent, as well as

17   Patrick Bartels is directing one of our witnesses today, and

18   David Coleal, the CEO of Incora.

19        Your Honor, at the outset, we're very pleased to be

20   in front of the Court today to at least commence the

21   confirmation hearing.  We'll talk about that in a minute, but

22   we wouldn't be here today without this steadfast attention of

23   the Court.  The order to show cause that Your Honor entered a

24   few weeks ago helped to catalyze the filing of the revised

25   plan, and the tireless efforts of Judge Shannon.  Judge Shannon
```

1   adopts a truly refuse-to-lose attitude that kept the parties

2   engaged and constantly closing issues.  And so on behalf of the

3   company, I'm sure I'm speaking for all the parties of the case,

4   we're immensely grateful to both the Court and the mediator for

5   your combined efforts.

6         And the plan before the Court today embodies those

7   hours of ceaseless effort and ultimate agreement, but we don't

8   yet have complete agreement among the parties.  The principal

9   area of ongoing negotiations revolves around corporate

10  governance terms between the majority group and the minority

11  group, and Judge Shannon has been helpful there to close those

12  off.  So we need a little more time for that.

13        I'd like to turn the podium over to Mr. Leblanc soon

14  because he has more powers than I do.  He can try to convince

15  the Court how it's possible to proceed with a confirmation

16  hearing today on a consensual plan that we don't yet have full

17  consensus for, but there's lots of areas where we do, and it

18  may be helpful today to present the evidence to the Court and

19  use the hours that we have as efficiently as possible.

20        THE COURT:  I think you -- before we do that, let me

21  just see if we have a couple of people on the phone who tried

22  to buzz in.  I want to be sure they have the chance to speak or

23  make any objection.  I'd just want to join -- Judge Shannon is

24  in hearing right now so he can't hear us, but he has just been

25  amazing.  So I want to extend my appreciation to him very much.

1    Thank you.

2         So on the phone, we do have a couple of people.

3    Mr. Jimenez, good morning.

4         MR. JIMENEZ:  Good morning, Your Honor.  Andrew

5    Jimenez from the United States Trustees.

6         THE COURT:  Thank you.  And from 929-284-1464?  If

7    you're on the phone from 929-284-1464, you may have your own

8    line muted, but I have you unmuted in the courtroom.

9         All right.  I don't know who that is.  I'm going to

10   go ahead and re-mute the line.  If you need to speak later, you

11   can press "five star."  That person is not speaking up.

12        All right.  Mr. Leblanc?

13        MR. LEBLANC:  Good morning, Your Honor.  Andrew

14   Leblanc of Milbank on behalf of Incora.  Your Honor, as

15   Mr. Dunne said, we think this is a very good day for the

16   company and for this bankruptcy process.  Let me begin by just

17   dealing with what Mr. Dunne just had laid out, which is, we

18   have -- we are prepared to go forward to present our evidence

19   with respect to our plan and to deal with objections that have

20   been lodged with respect to the plan today.  We do not have the

21   full consensus from the parties that need to consent to this

22   plan for it to go effective.  And so what we'd like to do,

23   subject to Your Honor's views -- and this is what we talked

24   about with Judge Shannon in his capacity as mediator is,

25   commence the confirmation hearing today, strive to get -- reach

1    the consensus that we need for this plan to be confirmed among

2    the two parties that are negotiating with respect to the issues

3    that Mr. Dunne said, which is primarily regarding the LLC

4    agreement, but there are a couple of other issues.  I -- not

5    with respect to the plan, but all things that would be

6    considered plan supplement documents, and then ask the Court to

7    see if there's some time later in the week, if we can reach

8    that consensus, to come back, to put everybody on notice of

9    what the terms of those things are, which -- none of which I

10   think affect any other party in the case.  But everyone's

11   rights, of course, would be reserved with respect to those

12   issues.

13           And assuming we do, in fact, have that -- the

14   consensus that we understand we will with respect to the plan,

15   then move forward at that later date to try to do -- and I

16   think this would be a very quick telephonic hearing.  We would

17   introduce the new voting statistics based upon that -- reaching

18   -- having reached that consensus.

19           THE COURT:  Yeah, the old ones didn't look too good.

20           MR. LEBLANC:  They -- they're -- the old ones would

21   not allow us to commence a confirmation hearing.  And let me

22   just say at the outset -- I want to be crystal clear about

23   this, and I'm sure everyone's going to say this as well.  We

24   understand that we do not have a plan that would be confirmable

25   in the absence of the consensus, of both the 2026 noteholders

```
 1   and the 1L group.  I don't want to -- I'm not --

 2             THE COURT:  No, I got it.  I got it.  I got it.

 3             MR. LEBLANC:  -- it would only be -- and Your Honor

 4   said that in July, that you put us in a position where we need

 5   the consent to both of them and we understand that.  So --

 6             THE COURT:  I didn't do that on purpose.

 7             MR. LEBLANC:  I also understand that, Your Honor, but

 8   you did and that is what has led us to what, I think, is a

 9   little bit unusual procedural posture, but one that I think

10   makes sense because everyone agrees on the fundamentals of the

11   plan itself.  And I'll walk through that in a moment, if Your

12   Honor permits, I'll walk through what the plan does and what it

13   achieves.  They just need to come to ground.  And everyone has

14   the right -- everyone, meaning those two parties, the 2026

15   noteholders and the 1L group represented by Kobre and Kim and

16   Davis Polk in this court, they each have the right to consent

17   or not consent to the full suite of documents, including the

18   governance agreements.

19             And so until those are done and dusted, we don't have

20   a consensual plan, but we are very confident that we can get

21   those done.  I -- we had discussions with Judge Shannon

22   yesterday.  I spoke with the parties yesterday.  Everyone

23   appears -- everyone is of a belief that, if we had the original

24   date of Friday, the confirmation hearing that we -- that

25   would've been achievable.  And I think if we can find a little
```

1  bit of time with the Court on Friday, I think that is

2  achievable.

3          THE COURT:  So there's no time on Friday.  I have

4  Wednesday afternoon.  That's it for the week, and then next

5  week.  But --

6          MR. LEBLANC:  And would Your Honor be amenable to

7  doing this remotely?

8          THE COURT:  Sure.

9          MR. LEBLANC:  Okay.  What -- why don't we -- I'll

10 defer to the other parties.  We're -- we are -- the debtors are

11 not directly -- we are involved in these negotiations, but

12 they're really -- they -- they're negotiations that are

13 happening between the business people on those sides.  And I --

14 I'm not in the best position to tell the Court whether it's

15 feasible to expect this can happen by Wednesday so that we

16 could have a short catch-up hearing, or by Monday.  What -- I

17 -- I'm assuming Monday -- I think Tuesday is actually a court

18 holiday, if I -- if I understand it correctly.

19          THE COURT:  I don't know if it is, but I would like

20 to give my staff time off on Christmas Eve.

21          MR. LEBLANC:  Yes.

22          THE COURT:  But on Monday, we could do it if we had

23 to, but that would, frankly -- you know, I think, assuming that

24 everybody agrees that we should bifurcate the confirmation

25 hearing in the manner that you've described, we'll come back

1    Wednesday and people need to reach a deal by Wednesday.  So let

2    me -- let's see if anybody objects to your bifurcation concept

3    before we move ahead --

4            MR. LEBLANC:  Sure.  Understood.

5            THE COURT:  -- down that road, but I do want you to

6    know my availability.  And so I am available on Monday.  I

7    think that's a bad idea because if we just do it on Monday,

8    then we won't have a decision on Wednesday.  But if we do it on

9    Wednesday, we'll have a decision on Wednesday.  So -- maybe,

10   anyway.

11           MR. LEBLANC:  I will -- Your Honor, we -- we're not

12   the ones who have to resolve the few -- the very few remaining

13   issues.  And I'll also say, to Mr. Dunne's point, not only has

14   Judge Shannon put in tireless efforts to date; he also, in a

15   discussion I had with him yesterday, said he will make himself

16   available over the course of these next two days to try to

17   resolve any of these remaining issues.  They're just -- they've

18   obviously proven to be very difficult to resolve, but he's made

19   himself available.  So I'll stand back, Your Honor, and let

20   people see if there's consensus with respect to what we propose

21   as a process.  And then we'll go forward from there.

22           THE COURT:  All right.  From 929-284-1464.

23           MR. ROSENBAUM:  Good morning, Your Honor.  I've now

24   figured out that (indiscernible).  Mr. Rosenbaum.

25           THE COURT:  Good morning.

```
 1              MR. ROSENBAUM:  (Indiscernible).

 2              THE COURT:  Mr. -- Mr. Rosenbaum, your are -- your

 3    voice is very muffled.

 4              MR. ROSENBAUM:  Okay.  Any better now?  Let me -- let

 5    me move the -- is this better?

 6              THE COURT:  A little bit.

 7              MR. ROSENBAUM:  Well, let me give it a shot and I can

 8    dial in with a different phone if the Court can't hear me.

 9              Well, good morning.  Zachary Rosenbaum, Kobre and

10    Kim, for the 2024/2026 Noteholders.  We don't have an objection

11    to proceeding in this bifurcated path.  I expect that the Davis

12    Polk group will agree, you know, that there is a full

13    reservation of rights because the exit notes (indiscernible)

14    venture still under negotiation, as is the LLC brief, and that

15    that is subject to those ancillary documents.  We do not have a

16    firm plan unless --

17              THE COURT:  Okay.  So the phone isn't working.

18              MR. ROSENBAUM:  It isn't?  All right.  I will dial in

19    on a different phone with apologies.

20              THE COURT:  No, that's fine.  We'll come back to you

21    when you get there.  I've got one -- no, that's it on the

22    phone.  Go ahead, please.  Good morning.

23              MR. SCHAIBLE:  Your Honor, good morning.  Damian

24    Schaible with Davis Polk on behalf of the Pimco and Silver

25    Point Noteholder Group.  I'm almost certain, because we spent
```

1  24 hours a day with Mr. Rosenbaum and his clients for the past

2  number of weeks, that what Mr. Rosenbaum is going to say is

3  that there's no objection by either us or them to proceeding

4  this way.  All rights are reserved.  There's very real issues

5  that remain open with respect to -- luckily, less about the

6  economic issues in the plan.  Luckily, not about what the plan

7  is supposed to do in preserving appellate rights and preserving

8  parties' rights in various ways and the way the plan is

9  supposed to work.  Luckily, Mr. -- sorry, Judge Shannon has

10  gotten us through all of that Herculeanly and has done an

11  amazing job with all of that.  Really, it's down to governance

12  and the exit indenture, and we're working through it as quickly

13  as we can.

14        And so Your Honor, it's, you know, it's trading

15  drafts, principals on the phone almost around the clock trying

16  to do it.  I agree with what Mr. Leblanc said that if Friday

17  had worked, we almost certainly would've been done.  We could

18  potentially get it done by Wednesday, and I do support

19  proceeding, reserving everyone's rights.  We're putting

20  everything on the record, but we're not asking Your Honor to

21  rule.  And then hopefully, we're able to come back to Your

22  Honor through a virtual hearing and just thumbs up and have

23  Your Honor consider it at that point.

24        But I do think -- there's a lot of people here and

25  there's a lot that everyone has gotten ready for for today.  So

1   I would propose that we do proceed.

2           THE COURT:  Thanks.

3           MR. SCHAIBLE:  Thanks.

4           THE COURT:  Mr. Rosenbaum, welcome back.

5           MR. ROSENBAUM:  Thank you, Your Honor.  Good morning

6   again.  Can you hear me better now?

7           THE COURT:  I can.  Yes.  Thank you.

8           MR. ROSENBAUM:  Okay.  So did -- I did hear what

9   Mr. Schaible said, and I certainly heard what Mr. Leblanc said.

10  We do not have an objection to this bifurcated path, so long as

11  it's clear, which I think it is, that confirmation -- the

12  (indiscernible) plan (indiscernible) subject to the

13  (indiscernible) convertible indenture, and the LLC agreement,

14  which are under active negotiation, but are not yet agreed

15  upon.  I personally think that Wednesday is ambitious, but I

16  don't want to stand in the way of progress either, and I

17  certainly don't want to interfere with anyone's holidays.  So I

18  -- we don't have an objection to putting another time on the

19  calendar for Wednesday, and hopefully we can meet that.

20          THE COURT:  Thank you.

21          All right.  I find that all parties' rights are

22  reserved, not only the two people that spoke up, but anyone

23  else, on matters that we don't rule on today.  I think that it

24  may make some sense, as we proceed during the day, if there are

25  discrete issues that are not related to the reserved issues,

 1  that we would make interlocutory rulings.  And to the extent

 2  that these are issues on matters not reserved, I intend to do

 3  that, because we do have a number of objections out there.  I

 4  think some of them may be resolvable much more easily than

 5  others, but I want to go through those.  I don't think that any

 6  of them have to do with the issues that are being reserved, and

 7  I want to rule on those so that we don't have to come back on

 8  Wednesday and then pick back up stuff that was already

 9  litigated today.

10        So that -- that'll be the way we proceed,

11  Mr. Leblanc.

12        MR. LEBLANC:  Thank you, Your Honor.  Again, Andrew

13  Leblanc on behalf of Incora.  Your Honor, I do think, just at

14  the outset, I believe that the only remaining unresolved

15  objection is that of the U.S. -- the Office of the United

16  States Trustee.  My colleague, Mr. Schak, is going to address

17  that at the end, but what I propose for the sort of quick run

18  of show, Your Honor, would be I will walk through the plan.  I

19  -- we've got a small deck.  I'll explain to the Court what

20  we've done in bankruptcy, what the plan entails.  We'll

21  introduce our evidence, give other parties the opportunity to

22  speak.  I know Mr. Schaible wanted to say a few words.  And

23  then we would turn to addressing those objections.  And

24  Mr. Schak will address at least the Office of the United States

25  Trustee.

1            THE COURT:  So given that, and given parties believe

2     that we might not be ready by Wednesday, why don't we set the

3     Wednesday -- but the Wednesday hearing literally is going to be

4     a half an hour hearing, right?  It -- it's either yea or nay on

5     Wednesday?

6            MR. LEBLANC:  Correct, Your Honor.

7            THE COURT:  Why don't we do it at five o'clock

8     Wednesday?  So to where -- really, that's the same thing as

9     doing it Thursday morning, which is what you've requested.  So

10    I'll try and give you just as much time as I can to get it done

11    on Wednesday, and I am not going to be averse if the parties

12    have reached an understanding as to what the deal will be that

13    they can announce in court.  I don't know that I need to review

14    the precise two documents that are at issue, as opposed to

15    understanding that the parties have agreed, and these will be

16    the essential terms of those documents.  If the parties are

17    uncomfortable with that, that's fine.  But if they're in a

18    position where they've reached a handshake, the parties can

19    announce a deal that I'm then empowered to enforce the

20    announced deal if the parties can't agree on final language, to

21    me, that shouldn't stop confirmation.  I'll hear others if --

22    maybe that just doesn't work, you know, but --

23            MR. LEBLANC:  Unfortunately, we -- it certainly would

24    work from the company's perspective, Your Honor.  I think -- I

25    think you may hear from the two parties that they want -- given

1  the nature of these negotiations, they want the final

2  documents.

3           THE COURT:  That's fine with me, but that -- just at

4  5 -- at five o'clock on Wednesday, we can either proceed or not

5  proceed.  I'm just telling people, if they choose, you know,

6  perhaps there is a memorandum that's in writing that says what

7  happens and the revisions that need to take place.  If they

8  don't choose, I'm not making people do that.  I do understand,

9  probably not the intensity of the negotiations, but the issues.

10          MR. LEBLANC:  Yeah.  And Your Honor, I mean, we --

11  we've expressed a similar view.  Like, we -- we've expressed

12  the view that we'll -- we're happy to proceed on the term

13  sheets.  The view has been expressed that we're not going to do

14  it on term sheets, and our response to that is, I think, the

15  one Your Honor just said, which is, I don't care.  If you want

16  to do it on full documents, that's fine.  Just get it done.

17          THE COURT:  Yeah.

18          MR. LEBLANC:  That's our perspective on it.

19          THE COURT:  So anyway, Wednesday at 5, will --

20          MR. LEBLANC:  Wednesday at 5.

21          THE COURT:  -- be the hearing.

22          MR. LEBLANC:  We'll be here, hopefully with --

23          THE COURT:  And it'll be a virtual hearing where

24  parties are free to appear here in court, but I don't

25  anticipate people appearing in court and would prefer they not.

1   But it's a public courtroom, so I'll be -- I'll be here, and

2   you can be here if you want to be.

3          MR. LEBLANC:  We appreciate that, Your Honor.  So if

4   -- with the Court's indulgence, I'll do probably 15 minutes, 10

5   minutes, just walk through where we are and what the plan

6   entails, and then we'll proceed with producing -- introducing

7   the evidence and then give parties a chance to -- but, Your

8   Honor, we have a slide deck.  If Your Honor could give

9   broadcast authority to my colleague Dan Porat, P-O-R-A-T.

10         THE COURT:  All right, Mr. Porat, you should be able

11  to accept the presenter role at this point.

12         MR. LEBLANC:  And Your Honor, we have copies

13  available in the courtroom for any parties, but I've got a

14  couple here if you -- if Your Honor would like a hard copy.

15         THE COURT:  Sure.

16         MR. LEBLANC:  May I approach, Your Honor?

17         THE COURT:  Please.  Thank you.

18         MR. LEBLANC:  So Your Honor, when you were first --

19  when you first took over this case in October, Mr. Dunne walked

20  you through what the goals of the company are.  And if you look

21  at Slide 1, or Slide 2, I guess it is, Your Honor, we talked

22  about -- most of the time spent in this courtroom has been with

23  respect to the adversary proceeding and with respect to

24  resolving what the debtor's capital structure is in light of

25  the 2022 transactions.  But in point of fact, the

1    reorganization here was really focused, from the company's

2    perspective, on the first two issues:  normalizing their

3    commercial relationships, stabilizing operations, and then

4    renegotiating their contracts.

5            And the company, in that regard, has been wildly

6    successful and has positioned itself for success to come out of

7    this bankruptcy as a much leaner, much more efficient company

8    with contracts that really are right sized for the supply chain

9    issues that occurred and the inflationary environment that we

10   face.  Again, we've spent an enormous amount of time on the

11   capital structure, but fortunately, even with the resolution of

12   that, there's been no contest between the parties about what

13   the ultimate capital structure of this company is going to be

14   on emergence, and that has been critical.

15           And so if we turn the page, Your Honor, just with

16   respect to that first issue, the company has renegotiated the

17   vast majority of its customer contracts and mitigated those

18   inflationary effects, but also, where necessary -- and Your

19   Honor may remember the Gulf Stream contract where we had to

20   reject the contract because we couldn't get to a renegotiated

21   outcome.  We used the power of the bankruptcy court and the

22   Code to effectuate changes where we needed to.

23           We -- we've -- these two -- the company, Wesco and

24   Incora, that was obviously the product of a merger in 2020,

25   where we hadn't fully realized the synergies that were expected

1   because of the interruption of COVID and the need to respond to

2   that.  But the company's now been able to right-size its

3   capital structure, its organizational structure, and reduce its

4   expenses going forward by more than $20 million, and we've been

5   able to negotiate the overwhelming majority of our contracts.

6   And if we turn to the next page, we've got a short slide that

7   shows that.

8           We renegotiated over 100 contracts, almost all of

9   which now have inflationary protection built into them, whether

10  they're variable or that they have inflation clauses built into

11  them.  That reflects $500 million worth of revenue that

12  contracts have been renewed for, and a gross profit built into

13  those, we expect, of approximately $150 million.  Those are the

14  operational outcomes from the reorganization that we've been

15  able to achieve that are built into the plan, and that is what

16  everybody's betting on when they come to the consensual plan

17  agreement that we think we have here, is to realize the value

18  that comes from the use of the Bankruptcy Code in the way that

19  we have.  And that's been a great success.  Now --

20          THE COURT:  On the inflationary side, are we talking

21  that you've negotiated that your revenues will increase with

22  inflation or that your supply costs will not increase with

23  inflation?  I don't know which --

24          MR. LEBLANC:  It's -- I think it is more the former

25  than the latter.  But Your Honor, if you look at the right, the

1    inflation protection status, in the pie chart, you can see that

2    some of them have variable pass-through pricing.  So that means

3    our margins would remain fixed, and as prices increase, as our

4    costs go up, we would pass through those increased costs to our

5    customers.  Others have an inflation clause in place so that

6    the cost would just go up without -- regardless of what our

7    supply costs would happen.

8            And then the third category in the hardware side is

9    you have an annual repricing where you -- the parties just

10   renegotiate what those prices are on an annual basis, whereas

11   many of these contracts are long-term, five years, where prices

12   were fixed under the previous iteration of these contracts,

13   which really put a damper on the company when you had the

14   double effect during COVID of both an inflationary environment

15   and the supply chain issue, where our costs and our margins

16   were being squeezed because we had to pay extra for -- to get

17   the supply.

18           THE COURT:  Right.

19           MR. LEBLANC:  And we were paying more for the goods

20   and not being able to pass those costs on to our customers.

21   And so the company has done what it can do.  On the chemical

22   side, it's a little bit more straightforward because you just

23   do have the pass-through in the annual repricing.  So that --

24   that's the general nature of what the company's been able to

25   achieve on the operational side with respect to it and just to

1  position itself better for whatever the market is.  If

2  inflation stays where it is today at, you know, 2.4 percent on

3  a quarterly basis, then these changes aren't going to be

4  necessary.  But if it increases again, where it was, you know,

5  6, 8, almost 10 percent, then the company will be in a better

6  position than it was three years ago to deal with those

7  inflationary changes.

8         Now, that takes us through the -- really what the

9  company has been focused on.  Now, there's obviously been this

10  battle going on between the two groups of creditors with

11  respect to what our capital structure's going to look like, but

12  we've now achieved -- we're now at the point, if we can turn

13  the slide, where the plan that is before the Court has brought

14  support among all of the creditor groups.  And again, I don't

15  -- I'm not taking away from the reservation of everyone's

16  rights because it is not done.  It won't be done until it's

17  done.  The two yellow parties, they -- they're still

18  negotiating the terms, and until those are done, no one is

19  consenting.  But we anticipate that we will, by the end of

20  this, the consensus of all five groups of these leading

21  creditor groups.

22         We -- we've had, for almost a year now, a settlement

23  with the UCC that is baked into the plan, and we've been very

24  successful with all the parties, ensuring that there -- when

25  parties have been negotiating over the term -- when the

```
1   parties, meaning the 2026 group and the 1L group, have been

2   negotiating over how to resolve their disputes with respect to

3   the capital structure, they're not changing the terms of the

4   plan and the RSA that we've negotiated with the other three

5   groups.  And I think we've been successful.

6        We've dealt with some comments from some people to

7   make sure that they're not adversely affected by what has

8   changed in the plan, and I think we've been successful.  And

9   we'll continue to deal with those.  To the extent that anybody

10  believes that a change that has been made in the governing

11  documents or the exit facilities adversely affects the

12  negotiated settlement, they have, we will talk with them, deal

13  with them.  And we've been successful in resolving all of those

14  issues to date.  And so we do believe that when we are back

15  before the Court on Wednesday, we will have a consensual plan

16  that has the broad support of all of our leading creditors.

17       Now, the voting record may not show that, and I'll --

18  I want to explain that.  And the reason for that, Your Honor,

19  is we solicited -- we have not re-solicited the general

20  unsecured class.  That class is primarily made up of

21  noteholders, the 2024 noteholders, the 2027 noteholders.  We're

22  not bothering to re-solicit them, even though they're part of

23  the Kobre group, because it frankly doesn't matter if we have

24  the consent of the secured class of creditors, and we can still

25  confirm.  But even though the voting record will not show the
```

1   general unsecured class as a supporting class, it really is,

2   because we will have the support of that Kobre group.  But

3   again, we're not going to waste the time to re-solicit that

4   class.

5           THE COURT:  So just so I understand the numbers, if

6   the Kobre group joins on Wednesday, their votes in favor of the

7   plan will then result in an accepting class?

8           MR. LEBLANC:  Correct.

9           THE COURT:  Okay.  That's what I thought you were

10  saying.  I just wanted to be sure.

11          MR. LEBLANC:  That is -- yes, that is correct, Your

12  Honor.

13          So let me talk about what the structure of the plan

14  does for the company going forward.  And if we turn the slide

15  -- and I think this is critical.  As important as those

16  operational achievements are to the outcome that we hope to

17  have here, the de-leveraging that we're achieving under this

18  plan is quite remarkable.  So Your Honor can see on the

19  left-hand -- in the chart in the middle, when we filed for

20  bankruptcy, we had a capital structure that had $3.4 billion or

21  almost $3.5 billion of debt, secured, unsecured, one and a

22  half, one and a quarter, all different types of debt.

23          When we emerge, Your Honor, we're going to have a

24  capital structure -- the illustrative post-emergence has a

25  capital structure that has $1.247 billion worth of debt, and I

1  want to actually walk through that a little bit more, because

2  even that doesn't really correctly articulate just how much

3  de-leveraging occurs.  And the reason for that is -- so at the

4  top of that, we have an ABL facility.  That ABL facility, Bank

5  of America is our current agent.  They're -- they've agreed to

6  the terms of the plan.  And Bank of America is contemplated to

7  be the ABL facility agent coming out of bankruptcy.  We have

8  not syndicated that ABL facility yet.  We have every confidence

9  and the market seems to be champing at the bit to get an

10 opportunity to make that investment.  We haven't done it

11 because Your Honor may be aware that we've been a little

12 uncertain as to when we might get to consensus and emerge.  And

13 so we have not done that solicitation process yet, but that

14 will start in earnest as soon as we can.

15         The next piece of the debt structure is going to be

16 the new exit notes.  That's 324 million from -- that

17 constitutes -- that's always been in our plan.  That has been

18 the rollover into the exit facility of the existing debt

19 facility.  So that part has always been contemplated.  In

20 addition, the plan contemplates an incremental hundred million

21 dollars being funded.  Because of the delays and the additional

22 costs associated with the negotiations, will -- the lenders

23 will fund an additional hundred million dollars.  One of the

24 issues that is -- remains open is how that hundred million

25 dollars is allocated among the lenders, and I won't say any

1   more about that, but that -- so that will form --

2          THE COURT:  But that's some subset of the existing

3   DIP lenders?

4          MR. LEBLANC:  Correct, Your Honor.  It -- the --

5   well, the DIP lenders and the Kobre group.

6          THE COURT:  Okay.

7          MR. LEBLANC:  So collectively, they will.  So anyone

8   who is currently under Your Honor's decision, a 1L holder, will

9   have the opportunity to fund that.  And the question is, how do

10  you allocate that among them with over and under subscription

11  opportunities?  That -- that's really the issue.  But that will

12  be part of the capital structure as well.

13         And then the last piece is those new tech take-back

14  notes of $420 million.  Again, Your Honor, this has always been

15  part of the plan.  And those take-back notes, while they are

16  structured and they show up here as part of the capital

17  structure, they are fully convertible, no cash pay, and the

18  company will treat them as equity on its books and records.

19  And so the right way, we think, to think about this is that

20  this company will emerge having come into bankruptcy with

21  almost three and a half billion dollars of debt.  It will

22  emerge with just over $800 million of debt.  And with all the

23  cost savings and the improvements in the contracts, we think

24  the company is very well positioned for success coming out of

25  this bankruptcy.

1          Now, Your Honor, in the bottom left corner of this

2    chart, the pro forma equity ownership, Your Honor has seen

3    numbers quite similar to this before, but this is the company's

4    -- this is the agreement of the parties to effectuate the

5    decision that Your Honor rendered in July.  And so under that

6    decision, the 1L notes have an ownership interest at

7    74.4 percent and the 2026 notes collectively, the Kobre group

8    has an ownership interest of 24 percent of the equity.  Now

9    there's an incremental 1.6 percent of that.  That 1.6 percent,

10   which is being shared by the 2024 notes and the 2027 notes,

11   those are the Langur Maize notes, that is pursuant to the

12   agreement with the Unsecured Creditors Committee.

13          Now, when we reached that agreement in January, the

14   allocated amount of equity going to the unsecured pool was

15   3.5 percent.  But what had happened subsequent to that is Your

16   Honor made your decision and took out of the unsecured pool all

17   of the 2026 notes, which then became secured and are sharing

18   the primary equity.  And so that three and a half percent was

19   reduced to 1.6 percent.

20          One wrinkle, just so Your Honor is aware, is in the

21   mediation, the 1L notes and the 2026 notes agreed that the cost

22   of this -- the Committee settlement, the 1.6 percent, that's

23   coming only out of the 1L notes side of the balance sheet, not

24   out of the 2026 notes.  That's just how they agreed to do it.

25   It's a small difference, but they were able to reach that

1   agreement because that settlement had already been negotiated

2   prior to the 2026 notes being secured.

3           And so, Your Honor, that -- that's the nature of the

4   plan and how the allocated distributions are going to go.  Now,

5   there's obviously one other feature of the plan that must be

6   mentioned, and that is -- well, this is the capital structure

7   that will exist on emergence.  The parties have negotiated and

8   this is really -- we -- we're not aware of another situation.

9   You could look at Sanchez maybe, where there continue to be

10  disputes over the capital structure post-emergence, but this is

11  one where the parties have actually negotiated to preserve all

12  parties' appellate rights with respect to Your Honor's

13  decision.  And so the appeals that have not yet commenced will

14  commence with respect to Your Honor's decision, and the plan

15  and all of the organizational documents are built with the

16  understanding that that appeal will go forward, and built with

17  the understanding that the capital structure, and in particular

18  these equity ownership interests and the take-back note

19  interests could change depending on a decision of an appellate

20  court in that -- in those decisions, and then to the extent

21  necessary, decision on remand that changes the capital

22  structure.  And that -- I mean, I -- I've said it in a couple

23  of sentences, but that concept is what has taken months and

24  months and months to negotiate, that complicated structure.  So

25  obviously --

1          THE COURT:  Only if you beg the District Court not to
2     ever remand this case to me again.

3          MR. LEBLANC:  We could until after Your Honor retires
4     if you want.  But Your Honor -- and so the appeal, which hasn't
5     yet been filed because there -- we don't have a final order,
6     there will be an appeal.  That will proceed, and the parties
7     will argue their case, continue to argue their case before
8     whatever court they choose to.  The debtors are only a nominal
9     party to that.  So as part of the mediation and the
10    negotiations, the debtors agree that we would not take part.
11    We're not going to take a side in that, we're not going to
12    litigate on behalf of either side.  We will appear as necessary
13    to preserve everyone's appellate rights, so we may be a nominal
14    party.  We may file a me-too brief to the extent that that is
15    necessary, but we are not taking a side in those appeals.

16          THE COURT:  So on the oral opinion that we gave, do
17    the parties want that at this point converted to a written
18    opinion?

19          MR. LEBLANC:  They -- the parties do, Your Honor.  I
20    think I mentioned that a couple of weeks ago, but one of the
21    things that will be necessary will be that there is an oral --
22    that Your Honor's oral decision be reduced to writing so they
23    can appeal, not only with respect to the July ruling, but also
24    with respect to the tortious interference disputes that are
25    live.  Because those appeals can continue as well.  And so an

1  appeal of that by either side and/or by both, frankly, can

2  continue.  So I think with respect to both of those, the

3  parties would be looking for a decision from the Court.  Yes.

4          THE COURT:  Okay.  Those are being worked on.  I just

5  want to be sure, when they're ready, nobody -- it's not going

6  to cause heartburn to go ahead and issue them, right?

7          MR. LEBLANC:  I would ask you not to do it before

8  Wednesday, but -- so as to not disrupt anything, but other than

9  that, Your Honor, yes.  I think the parties are hoping and

10 anticipating and look -- and anticipating --

11         THE COURT:  Well, with respect to the oral ruling,

12 this literally is going to be a cleaned-up version of the oral

13 ruling.  We're -- I'm not changing a thing from the oral ruling

14 substantively, so -- but it needs cleaning up, and that's

15 basically what the written part will be.

16         MR. LEBLANC:  Yep.  And the parties do anticipate

17 that.

18         Your Honor, the one other thing I'll say with respect

19 to the appellate preservation concept is, it was very important

20 to the company that, on emergence we -- we'd be out of this,

21 not only substantively, not only as a litigating party, but

22 also as a funding source.  So the parties have agreed that,

23 going forward, that the company, the reorganized debtor, is not

24 going to be funding either side's litigation costs.  They --

25 obviously, to the extent the company may file a brief, that

1   it --

2           THE COURT:  Right.

3           MR. LEBLANC:  -- would pay its own lawyers, but the

4   company is not going to be funding either side's litigation

5   costs on a go-forward basis.  They're bearing their own

6   expenses with respect to that.

7           THE COURT:  Do we have an appellate judge in this

8   case yet or we don't have one yet?

9           MR. LEBLANC:  No appeal has been taken at this point,

10  Your Honor.

11          THE COURT:  All right.  Okay.

12          MR. LEBLANC:  So Your Honor, that is where things

13  stand with respect to the plan.

14          Let me just turn to Page 7, Your Honor.  And this is

15  where I believe we are with respect to the status of any

16  objections.  The U.S. Trustee objected -- filed two objections,

17  one in May and one more recently.  Partly -- that has been

18  partly resolved, but the two primary issues that remain there

19  are to deal with the exculpation question, and I think the oft-

20  made consensual release issue.  It -- it's actually funny.  I'm

21  -- we -- I have a confirmation hearing this morning, I have one

22  this afternoon in front of Judge Lopez, same issue, same U.S.

23  Trustee, arguing the same point.  So we'll be arguing this this

24  afternoon in front of Judge Lopez in the interim case.  But

25  Mr. Schak is going to handle that.  I think every other

1   objection that has been made, Your Honor, has been resolved.

2   And you can see them there on Page 7 and Page 8.

3          And so Your Honor, with that, we -- the next page in

4   the slide deck, Your Honor, has -- it is just the summary of

5   our response to the U.S. Trustee's objection, but I'll leave

6   that from Mr. Schak.  What I propose to do is obviously first

7   answer any questions the Court may have of me, and then proceed

8   to introduce our evidence.

9          THE COURT:  Thank you.  Well, let me see if anyone

10  disagrees with your presentation before we go any further.  And

11  I appreciate the thoroughness of it.  Is there anyone that

12  wishes to speak in response in any way to what Mr. Leblanc

13  said?  Yes?

14         MR. MARINUZZI:  Good morning, Your Honor.  Lorenzo

15  Marinuzzi on behalf the Committee.  The only thing I would add,

16  Your Honor, is while it's true the LLC agreement that's still

17  being negotiated is largely between the 1Ls and the 26

18  noteholders, there's equity being distributed to the unsecured

19  creditors, including the Langur Maize Group, and I'm sure they

20  want to see the LLC agreement before it's approved by the

21  Court.  So we would urge the parties to get it on file as

22  quickly as possible.  Thank you.

23         THE COURT:  Either on file or bring you into the loop

24  maybe.

25         MR. MARINUZZI:  Thank you.

1          THE COURT:  Yeah, I think getting it on file is

2   probably hard.

3          MR. MARINUZZI:  Or bringing us into the loop as well,

4   Your Honor.  Yes.

5          THE COURT:  Yeah.  Thank you.  Anyone else wish to

6   address any issues, dispute anything Mr. Leblanc said?  No one

7   else?  All right.

8          MR. LEBLANC:  So with that, Your Honor -- and I'll

9   just for Mr. Marinuzzi's benefit, Mr. Bennett and I have been

10  talking frequently about it, although he may not have seen a

11  draft of it.  I think we -- he understands where we are, but we

12  -- we'll certainly communicate with Mr. Bennett on behalf of

13  his client, Langur Maize.  But with that, Your Honor, I'll

14  yield the podium to my partner, Samir Vora, to introduce our

15  declarations.

16         THE COURT:  Thank you.

17         Mr. Vora.  Good morning.

18         MR. VORA:  Good morning, Your Honor.  Samir Vora,

19  Milbank LLP, on behalf of Incora.  I'll be introducing the

20  evidence today, which will consist of three declarations from

21  witnesses, one of whom is here in the courtroom, two of whom

22  who are appearing virtually.  And then --

23         THE COURT:  If I can get the two virtual witnesses to

24  go ahead and turn on their cameras.

25         MR. VORA:  That'd be fine.  That would be --

```
 1                THE COURT:  And to press "five star" on their phone.
 2                MR. VORA:  Yeah, Mr. Bartels and then Mr. Martin.
 3                THE COURT:  Thank you.
 4                MR. VORA:  I see Mr. Bartels.
 5                THE COURT:  Okay.  I've got two people that are
 6     buzzing in.
 7                MR. VORA:  Okay.
 8                THE COURT:  Mr. Bartels, good morning.  Mr. Bartels,
 9     I have your line unmuted from my end.  You should be able to
10     speak at this point.
11                MR. BARTELS:  Can you hear me, Your Honor?
12                THE COURT:  I can.  Good morning.
13                MR. BARTELS:  Good morning, sir.  How are you?
14                THE COURT:  Good.  Thank you.
15                From 310-708-6851, who do we have?  310-708-6851,
16     please be sure your own line isn't muted from your end.
17                MR. MARTIN:  Your Honor, Kevin Martin from Verita.
18                THE COURT:  I'm sorry, could you repeat that?
19                MR. MARTIN:  Kevin Martin from Verita.
20                THE COURT:  Good morning, Mr. Martin.
21                MR. MARTIN:  Morning, Your Honor.
22                MR. VORA:  Thanks, Your Honor.  That's Kevin Martin
23     of Verita Global, the claims noticing solicitation.
24                THE COURT:  All right.  So --
25                MR. VORA:  Okay, so --
```

1              THE COURT:  -- however you wish to proceed.

2              MR. VORA:  Yeah.  Thank you, Your Honor.  So first

3    I'll seek to admit the declaration of Patrick Bartels, Director

4    of Wolverine Intermediate Holding Corporation, which can be

5    found, Your Honor, at doctor -- at Docket 2478.  Mr. Bartels is

6    attending by video and is available for examination.

7              THE COURT:  Thank you.  Is there any party that

8    objects to the admission of 2478 as substantive evidence

9    subject to cross-examination that should be admitted today?

10             MR. ROSENBAUM:  Good morning, Your Honor.  Zachary

11   Rosenbaum for the 2024/2026 holders.  We do not object to the

12   admission of Mr. Bartels's declaration, but with a reservation

13   of rights.  For the record, Article 4, Section 2, Outline of

14   the Plan, outlined in more detail that reservation.  But to the

15   extent of an appeal that Your Honor's declaration is served in

16   any matter of course, the (indiscernible) case is on an

17   argument that the company, not the 2026 or 2024 holders,

18   possess the remedy that Your Honor proposed, this proceeding

19   would be reopened de novo.

20             And as agreed among the parties at this portion of

21   the proceeding, this is the -- what we're calling the UCC

22   settlement will be re-reviewed, and there will be a

23   supplementation of the record.  I'm summarizing the plan.  I'm

24   not intending to receive the plan, but I just want to make sure

25   that that statement is on the record in the event of this

1    provision actually becoming activated.

2          THE COURT:  So --

3          MR. ROSENBAUM:  And I'm sorry.  Your Honor, you just

4    pointed out to me, so that we're clear on the record, is

5    Article 4 (indiscernible) of the plan on file.

6          THE COURT:  So if -- I just want to repeat back to

7    you what you're asking me to do.  You are not objecting to the

8    admission of this for today's hearing, but if the case comes

9    back on remand, then you're reserving your rights to object to

10   its consideration at the remand hearing.  Is that what you're

11   telling me?

12         MR. ROSENBAUM:  I am, Your Honor, and reserving our

13   rights to supplement the record based on certain potential

14   circumstances on that remand.  And that has been agreed upon

15   subject to everyone's overarching reservation of rights

16   (indiscernible) the plan as we have voted on.  But that is the

17   principal agreement that's reflected in Article 4 --

18         THE COURT:  Right.

19         MR. ROSENBAUM:  -- and 2.

20         THE COURT:  But in terms of any decision that we

21   might be making in the next 72 hours, you do not have any

22   cross-examination or any objection to the admission of

23   Mr. Bartels's declaration for those purposes.  Is that correct?

24         MR. ROSENBAUM:  That is correct.

25         THE COURT:  Thank you.

1            Does the debtor have any problem with that

2   reservation?

3            MR. SCHAK:  No problem, Your Honor.

4            THE COURT:  All right.

5            MR. SCHAK:  Thank you.  Is that --

6            THE COURT:  Wait a second.  You got a problem right

7   behind you.

8            MR. SCHAK:  The debtor does not, but perhaps somebody

9   else does.

10           MR. DUNNE:  Nor do I, Your Honor.  I -- and I agree

11  with increasingly many things that Mr. Rosenbaum says.  But I

12  agree that no one is looking to overwrite or rewrite what is --

13  was painfully crafted in the plan.  Suffice it to say, Your

14  Honor, from our perspective, and I believe Mr. Rosenbaum would

15  agree with this, the plan doesn't work unless the debtors have

16  made a determination -- the debtors have made a determination

17  to settle certain estate causes of action.

18           Today, Your Honor is going to hear evidence,

19  including the testimony by Mr. Bartels and other evidence, of

20  the sufficiency of the consideration provided for the debtor's

21  release of the debtor's causes of action against certain

22  parties, including my clients.  Mr. Rosenbaum does not need to

23  challenge that settlement at this point.  However, we have

24  baked into the plan a very complicated set of provisions that

25  permit, in certain limited circumstances, Mr. Rosenbaum to come

1   back and have a de novo review by Your Honor of the 9019

2   settlement that is approved today.

3           So his rights are reserved to add evidence, to

4   contest evidence, to argue for the insufficiency of

5   consideration provided.  Our rights are reserved, again in

6   those limited circumstances, to add evidence and convince Your

7   Honor that the -- that under Rule -- under 9019, the standard

8   was met for release of, again, just the estate causes of

9   action.  So it's limited, yet complicated.

10          THE COURT:  I got it.  But for the purpose of any

11  ruling we might make in the next 72 hours, I can ignore the

12  reservation.

13          MR. DUNNE:  Correct.

14          THE COURT:  That reservation will neither expand nor

15  restrict what is contained in the plan about what could happen

16  on remand.  And so we don't need to deal with it now.

17          MR. DUNNE:  Correct.

18          THE COURT:  We need to deal with it in the highly

19  unlikely event that you guys don't keep your word and get this

20  remanded, right?

21          MR. DUNNE:  Correct.  Everything except the last

22  thing you said.  Thank you, Your Honor.

23          THE COURT:  No, you can appeal it all you want.  Just

24  don't get it remanded.

25          MR. DUNNE:  Thank you, Your Honor.

```
 1                THE COURT:  All right.

 2                MR. SCHAK:  Thank you, Your Honor.

 3                THE COURT:  So with --

 4                MR. SCHAK:  I think --

 5                THE COURT:  -- with that --

 6                MR. SCHAK:  -- limited but complicated --

 7                THE COURT:  Right.

 8                MR. SCHAK:  -- is an appropriate description of what

 9   we're doing.

10                THE COURT:  I'm admitting the declaration on -- filed

11   by the debtor of Mr. Bartels at 2478 for the purpose of the

12   hearing that we are conducting this week and perhaps next week

13   only.  And after that, its application will be determined by a

14   confirmed plan if a plan is confirmed.

15           (Exhibit 2478 admitted into evidence)

16                THE COURT:  Mr. Bartels, would you raise your right

17   hand, please, sir?

18                 PATRICK BARTELS, DEBTOR'S WITNESS, SWORN

19                THE COURT:  Thank you.

20                Is there any cross-examination of Mr. Bartels?

21   Right.  Then we --

22                MR. ROSENBAUM:  No, Your Honor, on the basis that we

23   just described.

24                THE COURT:  Thank you.  All right.  All right.  It is

25   admitted for all purposes without cross-examination.  Thank
```

1   you.

2         MR. SCHAK:  Thank you, Your Honor.

3         THE COURT:  Thank you, Mr. Bartels.

4         MR. BARTELS:  Thank you, Your Honor.

5     (Witness excused)

6         MR. SCHAK:  Next, I'll seek -- I'll seek to admit the

7   declaration of Brian Cejka of Alvarez & Marsal, one of the

8   debtor's restructuring advisors, which attaches as Exhibit A

9   certain consolidated financial projections of the debtors.  The

10   Cejka declaration and the accompanying exhibit can be found in

11   Docket Number 2477.  Mr. Cejka, as I noted, is here in the

12   courtroom and is available for examination to the extent

13   necessary.

14         THE COURT:  All right.  Mr. Cejka, would you come

15   forward, please?  Good morning, Mr. Cejka.

16         MR. CEJKA:  Good morning.

17         THE COURT:  Is there any party that has any objection

18   to the admission of Mr. Cejka's declaration that was filed at

19   ECF 2477?

20         MR. ROSENBAUM:  Your Honor, no objection, based on

21   the same reservation that was just articulated and accepted

22   both by the Court and the parties.

23         THE COURT:  Thank you.  All right.  I'm admitting the

24   declaration.

25     (Exhibit 2477 admitted into evidence)

```
 1              THE COURT:  Mr. Cejka, would you raise your hand
 2   please, sir?
 3                   BRIAN CEJKA, DEBTOR'S WITNESS, SWORN
 4              THE COURT:  Thank you.
 5              Is there any cross-examination of Mr. Cejka by any
 6   party?
 7              MR. ROSENBAUM:  No, with the same reservation, Your
 8   Honor.
 9              THE COURT:  Thank you.
10              Mr.  Jimenez, only -- I'm just calling on you just
11   because this does address certain of the issues that you're
12   involved in to be sure you're okay without any
13   cross-examination, Mr. Cejka.
14              MR. JIMENEZ:  Thanks, Your Honor.  Andrew Jimenez for
15   the United States Trustee.  I was waiting my turn to
16   cross-examine Mr. Martin on the balloting issues.
17              THE COURT:  All right.  No, that's fine.  I just
18   wanted to be sure we're good.  And then I'm going to admit
19   Mr. Cejka's declaration for all purposes.
20              Thank you, Mr. Cejka.  All right.
21         (Witness excused)
22              MR. SCHAK:  Thank you, Your Honor.  Finally, I'll
23   introduce the declaration of Kevin Martin of Verita Global, the
24   debtor's claims noticing and solicitation agent, which is --
25   which attaches this Exhibit A and B, certain tabulation summary
```

```
 1   issues.  Mr. Martin, I believe, is available at least by phone,

 2   and his declaration together with the exhibits, Your Honor, can

 3   be found at Docket Number 2472.

 4           THE COURT:  So I just -- I want some clarification of

 5   why we're doing that.  It's critically important, but right now

 6   unavailing.  And so since it has to be refiled for you to

 7   confirm, why are we introducing this at this stage?

 8           MR. SCHAK:  Well, there's certain aspects of his

 9   declaration that I think are sort of faked at this point.

10   You're right, Your Honor.  The classes 4A and 6A are still

11   subject to the termination of the voting period, which is

12   December 20th.  But I think there are certain aspects of the

13   evidence that I --

14           THE COURT:  Okay.  Fair enough.  Yeah.  I just wanted

15   to know what we're doing there.  So you're going to change the

16   attachment, but leave the narrative the same basic --

17           MR. SCHAK:  Yes.

18           THE COURT:  -- or maybe add a paragraph.

19           MR. SCHAK:  That's correct, Your Honor.

20           THE COURT:  All right.  Is there any objection to the

21   admission of Mr. Martin's declaration that was filed at ECF

22   2472, subject to cross-examination?

23           MR. JIMENEZ:  Andrew Jimenez for the United States

24   Trustee.

25       (Simultaneous speaking)
```

1          THE COURT:  Hold on.  Mr. Jimenez, go ahead.  I'm

2   going to let you go first.

3          MR. JIMENEZ:  Thank you, Your Honor.  Andrew Jimenez

4   for the United States Trustee.  No objection.  I just would

5   like the opportunity to cross-examine Mr. Martin.

6          THE COURT:  Of course.

7          Mr.  Rosenbaum?

8          MR. ROSENBAUM:  No objection, Your Honor, with the

9   (indiscernible) clarification that we have not voted that

10   (indiscernible) declaration or testimony.

11          THE COURT:  Thank you.

12          All right.  Mr. Martin, would you raise your right

13   hand please, sir, and tell me when you have it raised?

14          MR. MARTIN:  Sure, sir.

15          KEVIN MARTIN, DEBTOR'S WITNESS, SWORN

16          THE COURT:  All right.  The Martin's declaration --

17   Mr. Martin's declaration filed at 2472 is admitted.  It is

18   admitted for all purposes subject to the reservations.

19      (Exhibit 2472 admitted into evidence)

20          THE COURT:  And we are now going to have Mr. Jimenez

21   and then anyone else that wishes to cross-examine Mr. Martin.

22   So we'll take all the cross-examination.  Please press "five

23   star" if you do want to cross-examine him, but Mr. Jimenez can

24   proceed at this point.

25          Go ahead, Mr. Jimenez.

1            MR. JIMENEZ:  Thanks, Your Honor.  Andrew Jimenez for

2   the U.S. Trustee.  And just before we start, I don't see

3   Mr. Martin on the camera.  I just want to make sure or confirm

4   whether we have him available on camera or not.

5            THE COURT:  Mr. Martin, are you available on camera?

6            THE WITNESS:  I am, Your Honor.  I have the camera

7   turned on on my GoTo.

8            THE COURT:  It's not showing up.  That's interesting.

9   Hold on.

10           THE WITNESS:  I can see my own image on my camera

11  preview.

12           THE COURT:  Interesting.  Hold on.  Can you see

13  everyone else's image as well?

14           THE WITNESS:  I cannot.

15           THE COURT:  Because I don't see that you're connected

16  into this GoTo Meeting.  Let me get you to, if you don't mind,

17  disconnect your --

18           MR. ROSENBAUM:  Your Honor?

19           THE COURT:  Yes?

20           MR. ROSENBAUM:  I believe that it might have been

21  (indiscernible) session only.

22           THE COURT:  There we go.  There we go.

23           MR. DUNNE:  I think --

24           THE COURT:  There.  You're here now.  Thank you.  I

25  don't know what happened, but you're here now.  So welcome.  Go

```
 1   ahead, Mr. Jimenez.

 2            MR. JIMENEZ:  Thank you, Your Honor.

 3                      CROSS-EXAMINATION

 4   BY MR. JIMENEZ:

 5   Q    Once again, Andrew Jimenez with the United States Trustee.

 6   Good morning, Mr. Martin.  I am an attorney for the United

 7   States Trustee.  Before I begin, can you confirm that you can

 8   hear me?

 9   A    I can, Mr. Jimenez.

10   Q    Thank you.  Mr. Martin, did Verita, as claims agent,

11   receive ballots in which claimant opted out to the third-party

12   releases?

13   A    We did.

14   Q    Did Verita receive opt-out forms from non-voting

15   claimants?

16   A    We did.

17   Q    Did Verita tabulated the opt-outs?

18   A    We did.

19   Q    Okay.  What was the result of such tabulation?

20   A    Give me a moment, Mr. Jimenez.

21   Q    Yes.

22   A    Those results were actually reported in our May 2024

23   deposition results.  So I could pull --

24   Q    And they are not filed in the declaration and exhibit

25   filed at Docket Number 20 -- 2472?
```

1  A    Correct.  Which, we can't include them in the final

2  declaration we filed after the 20 --

3  Q    Okay.  Okay.

4  A    -- December 20th deadline.

5  Q    Okay.  Because we're dealing here today with the exhibit

6  file of 2472, and it's not showing here.  Do you have a

7  recollection of what was the tabulation of the opt-outs?

8  A    I know out of the Class 8s, there are only two opt-outs

9  out of the GUC class.  I would have to go back and look at my

10 -- at the original declaration from May 2024.

11          THE COURT:  So I'm going to open ECF 1740, which is

12 Mr. Martin's prior declaration.  And if -- unless there is some

13 objection, I'm going to put it on the screen so that

14 Mr. Jimenez and Mr. Martin can communicate about what got

15 filed.

16          Will that be helpful, Mr. Jimenez?

17          MR. JIMENEZ:  Certainly, Your Honor.  We're trying to

18 get as much information as possible.  I was just restricting my

19 question to 2472 because that's what has been presented for the

20 Court's consideration today.

21          THE COURT:  Yeah.  Do you want to look at 1740 or

22 not?  I -- I'm just -- I'm making that available if you wish

23 but not if you don't wish.

24          MR. JIMENEZ:  So Your Honor, I will say yes.  We can

25 look at that today, but I think it will be important -- I think

1  it was stated earlier that the declaration is going to be

2  supplemented or amended.  I think it would be important that,

3  when that happens, information regarding the opt-outs be

4  included in that amended declaration.

5          THE COURT:  Fair enough.  For the purpose of today's

6  hearing, is there any objection by any party for the admission

7  of 1740 solely for the question of opt-outs and not for any

8  other purpose?

9          Okay.  Given that there are no objections, I am going

10 to admit 1740 solely for the purpose of determining the

11 opt-outs.

12     (Exhibit 1740 admitted into evidence for limited purpose)

13         THE COURT:  Let me get this shown up on the screen,

14 except that that means you all can't see it in the courtroom.

15 Well, yes, you can.  Hold on.  All right.

16         Is that helpful?

17     (Pause)

18         THE WITNESS:  I believe that is it, Your Honor.

19         THE COURT:  All right.  Go ahead, please.

20         MR. JIMENEZ:  Thanks, Your Honor.

21 BY MR. JIMENEZ:

22 Q   Mr. Martin, so in Docket Number 1740, we see an Exhibit C

23 that purports to contain a summary of the claimants that opted

24 out.  Is that correct?

25 A   That's correct.

1   Q    Okay.  Have the opt-outs or the valuation of the opt-outs

2   -- so this document was filed with the Court on May 7, 2024.

3   So my question is, has this opt-out tabulation changed since

4   May 7 of 2024?

5   A    It has not.

6   Q    I couldn't hear your answer.  I'm sorry?

7   A    No, sir.  It has -- it has not.

8   Q    Okay.  You have not -- Verita has not received any

9   additional opt-outs after May 7, 2024?

10  A    We have not, since we only re-solicited the classes of

11  Class 4A and 6A.  So the new opt-outs will be reflected on the

12  final tabulation declaration filed at a later date.

13  Q    Is there in -- either in this summary on Docket 1740 or

14  the one at Docket 2472, have you tabulated any returned ballots

15  or non-voting -- non-voting forms?

16  A    I'm sorry.  Mr. Jimenez, you (indiscernible).

17  Q    Yes.  And what I mean -- have you received any returned

18  ballots or non-voting forms?  And what I mean, "returned," that

19  they were not deliverable and, you know, they were not received

20  by that claimant, and they were returned to you?

21  A    Yes.  There were undeliverables, sir.

22  Q    Where can we find those?

23  A    We would have to run an undeliverable report to indicate

24  -- there are certain opt-out forms that were not delivered as

25  -- returned undelivered by the USPS.

1    Q     Okay.

2    A     The undeliverables were not included in our declaration.

3    Q     Okay.  So those are not -- those have not been tabulated

4    yet or accounted for?

5    A     Well, if the -- it's -- if the mail was not deliverable,

6    they could not have submitted an opt-out.  So no, they were not

7    tabulated.

8    Q     And let me clarify my question.  My question is, if you

9    have, in any way or form, counted those forms that you know for

10   a fact were not deliverable --

11   A     I'm not sure how -- how to count --

12   Q     -- that were returned to you as undeliverable?

13   A     How can we count a form that was -- that was sent out

14   undeliverable?

15   Q     If they were returned to you as undeliverable?

16   A     Right.  So then we would not have an address for that

17   creditor.  How -- how would we have an opt-out form?

18   Q     So my question is, have you counted those forms or ballots

19   that were returned as undeliverable?

20   A     No.  We -- we do not tabulate them.  We can run a report

21   of undeliverable mail for classes that are eligible for

22   opt-out.

23   Q     Okay.  And that report was not included in your

24   declaration?

25   A     No, it was not.

1          MR. JIMENEZ:  That is all the questions I have, Your

2    Honor.  Thank you.

3          THE COURT:  Thank you.

4          Does any other party have any cross-examination for

5    Mr. Martin?  Is there any redirect by the debtor of Mr. Martin?

6          Mr.  Martin, thank you, sir.

7          THE WITNESS:  Thank you, Your Honor.

8       (Witness excused)

9          THE COURT:  All right.

10         MR. SCHAK:  The last piece of evidence, Your Honor, I

11   should have introduced either in connection with Mr. Cejka's

12   declaration.  It is the liquidation analysis that is attached

13   as Exhibit C to the Disclosure Statement and can be found at

14   Docket Number 2083.

15         THE COURT:  Is there any objection to the admission

16   of the liquidation analysis filed as Exhibit C to 4 -- to 2083?

17         MR. ROSENBAUM:  No objection, Your Honor, but with

18   the reservation of rights that I engaged in, the Court

19   attested, and the parties accepted earlier in these

20   proceedings.

21         THE COURT:  Thank you.  Any other objections?  So

22   subject to the procedures of the plan, if the plan is

23   confirmed, for what might happen on a remand, we're admitting

24   2083-4, which is Exhibit C to the Disclosure Statement.

25      (Exhibit 2083-4 admitted into evidence)

1          MR. SCHAK:  Thank you, Your Honor.  That concludes

2    our presentation of the evidence.

3          THE COURT:  Thank you.

4          MR. SCHAK:  There may be other parties, including the

5    UCC, who may have evidence, and I'll cede the podium.

6          THE COURT:  All right.  Mr. Marinuzzi?

7          MR. MARINUZZI:  Good morning again, Your Honor.

8          THE COURT:  Morning.

9          MR. MARINUZZI:  We do have some evidence we'd like to

10   put in in connection with the Committee's settlement, and that

11   would be the Declaration of Joseph Denham of Piper Sandler, who

12   I believe is available online.

13         THE COURT:  Mr. Denham, would you press "five star"

14   for me one time on your phone?

15         MR. MARINUZZI:  Your Honor, early this morning, we

16   filed a statement in support of the plan settlement, and that

17   was Docket 2480.  And next to that, as 2480-1, is the

18   Declaration of Joe Denham, which we would like to offer in

19   support of the settlement.

20         THE COURT:  Mr. Denham, good morning.

21         MR. DENHAM:  Good morning, Your Honor.

22         THE COURT:  Mr. Denham, would you raise your right

23   hand, please?

24          JOSEPH DENHAM, COMMITTEE'S WITNESS, SWORN

25         THE COURT:  Thank you.  So give me just a minute,

1    Mr. Denham.

2            Is there any objection to the admission of 2480-1,

3    which is the Declaration of Joseph Denham filed by the

4    Committee?

5            MR. ROSENBAUM:  Your Honor, no objection, but again,

6    subject to the reservation of rights that the Court accepted

7    and the parties agreed upon as reflected in the plan and the

8    record today.

9            THE COURT:  Thank you, sir.  I hadn't read this, so

10   give me just a minute to read it.

11       (Pause)

12           THE COURT:  All right.  Given the absence of any

13   objections on the reservation of rights, we're admitting

14   Mr. Denham's Declaration that was filed at 2480-1, subject to

15   cross-examination.

16       (Exhibit 2480-1 admitted into evidence)

17           THE COURT:  Is there any party that has any

18   cross-examination for Mr. Denham?

19           MR. ROSENBAUM:  No cross-examination, but again, Your

20   Honor, subject to reservation of rights.

21           THE COURT:  Thank you.  All right.

22           Mr.  Denham, thank you for coming this morning.  Your

23   declaration has been admitted, and there is no

24   cross-examination.  Thank you, sir.

25           MR. DENHAM:  Thank you, Your Honor.

1         (Witness excused)

2              MR. MARINUZZI:  Thank you, Your Honor.  That

3    concludes the evidence in this case.

4              THE COURT:  Thank you.  Any other evidence in support

5    of confirmation of the plan?  Subject to the reservation

6    contained in the plan with respect to what would occur if we

7    confirm and the case is later remanded, is there any party that

8    wishes to introduce any evidence in opposition to confirmation

9    of the plan?

10             All right.  I find the evidentiary record is closed.

11   So I want to now go to deal with the matters to which an

12   objection has been filed that the debtor believes has been

13   resolved, and then we'll go to unresolved matters.

14             MR. DUNNE:  I think, actually, Mr. Schaible had

15   mentioned that he wanted to say a few words in support of the

16   plan.  I told him that I thought the best time would be right

17   after evidence, but it's Your Honor's courtroom, so whatever

18   you'd like to do.

19             THE COURT:  It is my courtroom, but I'll let

20   Mr. Schaible do whatever he wants to do.

21             Mr.  Schaible?

22             MR. DUNNE:  Your Honor, I'm glad we got that on the

23   record.

24             MR. SCHAIBLE:  Your Honor, again, for the record,

25   Damian Schaible, Davis Polk, on behalf of the Pimco and Silver

1   Point noteholders.  I'll be brief.  I just wanted to clarify a

2   couple of things in the complicated plan that we've put

3   together.  But let me start by thanking Your Honor and thanking

4   this Court and thanking Judge Shannon for the incredible work

5   that everyone has put together.

6        Your Honor's status conferences were scary when they

7   were noticed on the docket, but they helped people come

8   together, and so we greatly appreciate all of that and the time

9   you gave us.  We also appreciate the unbelievable amounts of

10  time Judge Shannon gave us, including literally typing emails

11  from the campfire on a Boy Scout camping trip on a Friday

12  night.  So we greatly appreciate everything that he did.

13       Your Honor, I -- Mr. Leblanc walked through the plan

14  construct, and I'm not going to I'm not going to belabor those

15  points, but to state the obvious, the construct that we've

16  painstakingly put together over the past many, many months is

17  bespoke, at the very least.  The concept of a debtor coming out

18  of bankruptcy and giving effect to a series of complicated

19  rulings after a year-long litigation, but making sure that

20  those rulings and the effect of those rulings and the capital

21  structure the debtors are emerging with are all effectively

22  subject to appellate rights, is not something that people do

23  every day.

24       And so it was a complicated road, but we believe

25  we've reached a careful balance where all parties understand

1  what we're all agreeing to and parties' rights are preserved to

2  the extent they need to be.  And so frankly I'm, I don't know

3  if you can call it proud, but of having been part of working

4  together with the Kobre and Kim and the Fried Frank groups and

5  the '24 and '26 noteholders incredibly well, and all the

6  parties, including the debtors, to be able to get to something

7  that can get this company out of bankruptcy, which is first and

8  foremost of importance so that the employees can continue to do

9  their job and the business cannot -- no longer be impacted by

10  the shadow of this bankruptcy.  So we're gratified for that.

11         Your Honor, two points, just to make sure that we --

12  that Your Honor is kind of, you know, focused on and aware of.

13  And so Your Honor, you'll remember that I filed a motion

14  seeking to compel mediation a number of months ago, maybe the

15  first of those in history that wasn't immediately overruled.

16  Your Honor was kind enough to take it under advisement and let

17  me continue to fight another day.  I think it's still pending,

18  which is great.  I take great comfort in that.

19         But when we did that, Your Honor, what we said was we

20  wanted to mediate two things.  We wanted to mediate global

21  resolution if it could be reached.  Unfortunately, based on the

22  many, many, many months of conversations prior to that, I was

23  not sure that global resolution was going to be able to be

24  reached.  And in the absence of that, we were focused on having

25  the parties mediate on what we called Plan B, which was what we

1   ended up with today through quite a lot of work.

2        And that Plan B, from our client's perspective, there

3   is a lot that they gave for that plan.  But what they were

4   getting for that plan was to have their appellate rights

5   preserved, and not just preserved in name but preserved in

6   substance, in reality, that no party -- none of the parties

7   here today, none of the parties that may be buying debt or

8   buying equity going forward, no subsequent transferees -- no

9   one could argue that our appellate rights were not fully

10  preserved or that somehow this plan, in coming out of

11  bankruptcy, had mooted any anyone's appellate rights, either

12  technically under the law or in substance by not having an

13  available remedy.

14       And so Your Honor, if you -- as you read through the

15  plan, I'm sure you saw quite a lot of mechanics.  The idea

16  there was to make clear that there was at least one effective

17  remedy that Your Honor or an appellate court -- and we'll beg

18  the appellate court to do it and not send it back to Your Honor

19  -- could use to the extent that any portion of your decision

20  was addressed differently and that the capital structure should

21  look different.  And that is on both sides.  It's both ways.

22  It's not a one-way ratchet.

23       But if, in fact, Your Honor's ruling is adjusted on

24  appeal or by settlement, effectively, then all parties would

25  know that there is at least one available remedy that would be

1   available to this Court or an appellate court, and that remedy

2   is turnover.  The securities that are going to be issued are

3   going to be labeled.  The party is going to be -- the debtors

4   are going to be maintaining records and maintaining, you know,

5   situations.  Purchasers have to sign on to agreements that

6   they, you know, agree to take the security subject to turnover.

7           Mr. Rosenbaum will tell you, and we don't disagree,

8   that there may be other remedies and all rights are preserved

9   for arguing that there may be other remedies that could be used

10  in lieu of turnover.  And we would have rights, and everyone

11  would have rights, to figure out what the right remedy is, but

12  no one would argue that turnover is not available, and no one

13  would argue that turnover could not be done.

14          And so the whole idea of the plan was to set up a

15  construct where a turnover would be both technically and

16  substantively available.  And so subsequent purchasers will be

17  well on notice that any equity, any securities, any debt that

18  they might buy, would -- for -- on all sides, may be subject to

19  being adjusted or subject to turnover to the extent that we

20  need to adjust the capital structure subsequent to appeal or

21  settlement.

22          The second point, we -- we've really already covered,

23  Your Honor, but that is debtors' releases in the plan.  Your

24  Honor has now introduced -- evidence has been introduced of the

25  -- what we view as rather significant contributions that our

1    debtor -- that our clients have made in connection with the

2    plan as part of a finely negotiated settlement with the debtors

3    and with the UCC for estate cause of action and for release of

4    estate cause of action against our clients.

5              I won't belabor it, and it's all in the record, but,

6    you know, recoveries to general unsecured creditors that are

7    coming only out of our clients' distributions is part of the

8    consideration that has been paid.  Waivers of various rights,

9    deficiency claims, make-whole claims, indemnification claims,

10   507(b) claims, all of those things, again, are consideration

11   that our clients are providing as part of this settlement.  The

12   financing of the cases through the DIP notes, the -- Your Honor

13   -- as Your Honor well knows, continued extension of the

14   deadlines and the maturities of the DIP notes throughout the

15   case is, again, consideration provided.

16             Exit financing for the debtors by not requiring that

17   the debtors -- the DIP be paid in full but instead be rolled

18   into exit financing, again, consideration being provided.  And

19   very importantly, agreements to pay a number of different

20   parties' fees and expenses effectively out of the estate, an

21   agreement to do that and to not challenge that was, again,

22   value that was provided.  And then funding additional amounts,

23   as Your Honor heard today, in the exit notes that are being

24   funded upon bankruptcy.

25             There's other things that are all in the record.  But

1   today, Mr. Rosenbaum's clients have preserved limited rights,

2   as you heard, on potential remand to argue anew that, under

3   9019, those amounts were not sufficient to -- or were not

4   sufficient to meet the 9019 standard for release of claims in

5   cause of action.  Again, just relating to my clients, that

6   those are preserved in a limited way as set forth in the plan.

7          But today, Your Honor is considering whether, based

8   on the record, those settlements and those payments are

9   sufficient to release those causes of action because,

10  obviously, without release of those causes of action, we

11  effectively don't have a client.  So with that, Your Honor, I

12  won't go into the other aspects, but it's just, again, a

13  bank's --

14         THE COURT:  So let me just be clear that I don't

15  believe that any party other than Mr. Rosenbaum's client has an

16  objection to those releases.  The evidentiary record is now

17  closed.  And in my view, the evidentiary record, which does not

18  include the record of why it's not a good deal because

19  Mr. Rosenbaum is reserving that right for a later day, so I

20  have to rule on the evidentiary record before me.  The

21  evidentiary record before me supports the releases.

22         MR. SCHAIBLE:  All right.  Thank you, Your Honor.

23  Appreciate it.

24         THE COURT:  Thank you.  Anyone else wish to make a --

25         MR. ROSENBAUM:  Your Honor --

```
 1            THE COURT:  -- a statement in support of or an
 2   opposition to confirmation, other than Mr. Jimenez, where we're
 3   going to hear full argument about that unresolved matter.
 4            Mr.  Rosenbaum?
 5            MR. ROSENBAUM:  Good morning, again, Your Honor.  I
 6   was hoping to get through today without having to disagree with
 7   Mr. Schaible, but I do have to disagree with him in some
 8   respects.  But I do not disagree with him on the pleasure that
 9   I think everyone has in being this close to the -- to
10   confirmation, subject to everything that we discussed.  But
11   neither of us can or should attempt to summarize or restate
12   what is in the plan for (indiscernible) negotiation.  But there
13   are a couple of points that I just want to make.
14            First of all, we are highly confident that there will
15   be no remand and there will be no reversal.  The idea of a
16   remedy that is reserved for in the plan of -- likely, again, in
17   our view, will never come to pass.  But if it were to come to
18   pass, the plan itself is what a potential (indiscernible) order
19   may or may not look like.  And I don't disagree that turnover
20   is mentioned, but I won't comment further other than agreeing
21   with Mr. -- one of Mr. Schaible's statements that we otherwise
22   do not agree to any such remedies by virtue of (indiscernible).
23            THE COURT:  So I'm going to make this easier.
24   Nothing that you say today about what occurs on remand and
25   nothing that he says today about what occurs on remand is
```

1   evidence.  I won't consider it.  I'm going to ignore you all.

2          MR. ROSENBAUM:  I -- then I have nothing further

3   other than I do feel compelled to just say one thing, Your

4   Honor, just to make sure -- we appreciate (indiscernible) the

5   Court what this preservation of rights is in Article 4 that I

6   mentioned earlier, and this 9019 issue.

7          This plan reflects the (indiscernible) group

8   receiving 24 percent of the equity, which is predicated on Your

9   Honor's ruling and the declarations that were the results of

10  the adversarial proceeding.  If -- and I'll just

11  (indiscernible).  If there were ever an event that a court

12  found that there was a breach of the agreement as Your Honor

13  found (indiscernible), but somehow our client didn't possess

14  that direct remedy to obtain that 24 percent of the equity.

15  But somehow, that revenue was property of the state, it is in

16  that circumstance that we would be on remand and dealing with

17  this de novo issue.

18          As I said, I don't expect to come -- it to come to

19  pass.  Your Honor has already said that nothing that is

20  (indiscernible) there -- nothing that was said is evidence.

21  But I just want to make sure I made that statement on the

22  record, (indiscernible).

23          THE COURT:  Thank you.  I'll ignore you.  All right.

24          Mr.  Leblanc?  Or -- I'm sorry.  Mr. Schak?

25          MR. SCHAK:  Thank you, Your Honor.  Benjamin Schak,

```
 1  for the record.  I think that brings us to the one contentious

 2  objection that we do not expect to be resolved in relation to

 3  mediation, with the exception, I'll say, of -- there are quite

 4  a few objections to particular contract assumptions and cures,

 5  which are on the docket, which we're not planning to treat

 6  today.  We're planning to take the time between confirmation or

 7  emergence to resolve those consensually and, if necessary, to

 8  come back to the Court.  But we think all those are going to be

 9  resolvable, and the plan contemplates that they can be

10  adjourned.

11            THE COURT:  And the parties that have filed those

12  objections, have they consented to a confirmation that reserves

13  the amount of the cures and appropriateness of the cures until

14  later?

15            MR. SCHAK:  Well, we have sent messages to them.  We

16  haven't received response in all instances.  If anyone has an

17  objection to this, we're happy to work with them sooner rather

18  than later.

19            THE COURT:  So let me understand.  Right now, is

20  there anyone here at the hearing with respect to any objection

21  other than one filed by the United States Trustee that wishes

22  to be certain it is resolved pre-confirmation as opposed to

23  placing into the confirmation order a reservation that the

24  matters will be resolved post-confirmation?  If so, please

25  press "five star" on your phone.  No one is doing that.
```

```
 1              Are there any of the parties who are active in the
 2    case who believe it's inappropriate to postpone the cure issues
 3    until later?  All right.  We will postpone with respect to all
 4    of the cure objections in the confirmation order.  If we
 5    confirm to a later date -- and I will ask you to propose a
 6    date.  When do you want to do it in?  Maybe I'll give you a
 7    date right now, so you can put it in the order.  Do you want to
 8    do it in January?
 9              MR. SCHAK:  I'd rather do it in January than
10    December, Your Honor.
11              THE COURT:  By when in January do you anticipate
12    having all of the cure matters either resolved or teed up for
13    hearing, or do you want to start with a status conference in
14    January for the ones that are resolved and then set evidentiary
15    for later?  You tell me what you want to do and I'll get you
16    some dates.
17              MR. SCHAK:  I think, Your Honor, a mid-January status
18    conference would make a lot of sense.  I would not anticipate
19    that we would be emerging before then.  So if we could do a
20    mid-January status conference and then see where we are from
21    there --
22              THE COURT:  Any party have any problem with having a
23    status conference on all reserved cure objections on January
24    14th at 10:00 in the morning, Central?
25              All right.  Mr. Jackson, if you would go ahead and
```

1  reserve from ten o'clock until noon for a status conference in

2  Wesco on the 14th, and we will do that.  There is no objection

3  to doing it that way.

4           So how do you want to proceed, then, on the remaining

5  objection, the one by the U.S. Trustee?

6           MR. SCHAK:  Your Honor, these are purely legal

7  issues.  I would be happy to deliver a brief argument

8  restatement and then perhaps hear it from Mr. Jimenez.

9           THE COURT:  Mr. Jimenez, do you want to go first or

10  second?  What do you want to do?

11          MR. JIMENEZ:  I -- I'll go second, Your Honor.  Thank

12  you.  And I apologize, I think you have to lock the video

13  connection.  I don't know if you can see me.

14          THE COURT:  You're frozen on my screen, maybe

15  forever.  So if you want me to disconnect you and let you

16  reconnect, we can do that.  But I definitely want to have that

17  working before we take this up.  So why don't I disconnect you

18  and then you can connect right back?

19          MR. JIMENEZ:  Yeah.  I will disconnect.

20          THE COURT:  Okay.  You're disconnected.  Let's wait

21  until he's on so that --

22          MR. SCHAK:  Yes, sir.

23          THE COURT:  I'm going to just close a few of the

24  lines of people that are on, but aren't intending to speak

25  right now.

```
 1            Mr.  Jimenez, does it look like it's working, or do
 2   you want me to take a short break?  Oh, wait.  You just got
 3   back into -- there we are.
 4            MR. JIMENEZ:  Okay.  Can you hear me, Your Honor?
 5            THE COURT:  I can.  And you're not frozen.  So
 6   welcome back.
 7            MR. JIMENEZ:  Okay.  Thank you, Your Honor.
 8            THE COURT:  All right.
 9            Mr.  Schak?
10            MR. SCHAK:  Thank you, Your Honor.  Again, Benjamin
11   Schak, for the record.  Your Honor, we have been working
12   through the U.S. Trustee's Office, filed two different
13   objections on the record, and we -- glad to say that we've been
14   able to resolve most of those consensually.  Very much
15   appreciate the efforts of Mr. Jimenez and his colleague,
16   Mr. Ruff, to do that.
17            As always, those include their objection regarding
18   the temporal limitation of the exculpation provision.  They are
19   -- have accepted the language that's in the plan now, and
20   regarding the waiver of the case, they stated a confirmation
21   order.
22            As I just indicated a minute ago, Your Honor, there's
23   no way we're going to be emerging within 14 days of
24   confirmation.  So that's one -- I don't think we could have
25   advocated for a waiver of that state, and we were happy to give
```

1  that up.

2          There are, however, Your Honor, two issues that

3  remain unresolved where we simply don't see eye to eye with the

4  Office of the United States Trustee.  And I think we will need

5  a resolution from the Court.  One of those, Your Honor, is the

6  issue of exculpation of the independent director in this case,

7  an issue that I know Your Honor is familiar with the Instant

8  Brands case, which is currently under advisement.  And the

9  other issue is the objection just filed last week from U.S.

10 Trustee regarding the opt-out process for the consensual third-

11 party notices under the claim.

12         Your Honor, I'm not going to say a whole lot about

13 the exculpation issue, because I know it's been fully briefed

14 and argued very recently, Your Honor, in the Instant Brands

15 case.  And candidly, I don't think there's much I can say that

16 would distinguish this case from that case, or that would add

17 to the arguments that have been canvased in that case.

18         I'll just say we agree with the debtors in that case,

19 that the reasoning of the 5th Circuit in Highland does not

20 hinge on any sort of special mechanism that was put in place in

21 Judge Jernigan's governance order in Highland.  We think their

22 reasoning refers to Section 11078 for the point that a debtor

23 in possession always has substantially the same duties as a

24 Chapter 11 Trustee.  And therefore, it makes sense to extend

25 the circuit's precedent regarding exculpations of a Chapter 11

1    Trustee to the board.  In particular, to the independent board

2    of direct --

3              THE COURT:  So let me see the language.  And I want

4    to understand, in this case, what is the difference between

5    the -- I always forget which section it is, but is it the

6    exculpation that is built into the Code for the direction and

7    planning and all of that concerning the plan?  Let me just find

8    that, or you can quote it to me.

9              MR. SCHAK:  Yeah.

10             MR. JIMENEZ:  Are you referring to 1125(e), Your

11   Honor?

12             THE COURT:  I am.  So I want to know, what is the

13   difference between 1125(e), which I don't think is subject to

14   reasonable dispute, that that would include the independent

15   director?

16             And then I want to compare that to the exculpation

17   that you're seeking.  And I want to understand, substantively,

18   what issues are covered by your exculpation that aren't already

19   covered by 1126(e)?  So can I see your exculpation provision?

20             MR. SCHAK:  Yes, Your Honor.  I'll pull it up.

21             THE COURT:  It's currently modified.  I know you may

22   have modified it with the U.S. Trustee a little bit.

23             MR. SCHAK:  Yes, Your Honor.  It's filed at Article

24   8F of the plan.  The -- finding it here in my binder.

25             THE COURT:  Is this part of 2473, which is the plan

1    you filed yesterday?

2            MR. SCHAK:  Yes, Your Honor.  Article 8, F as in

3    Frank.

4            THE COURT:  Okay.  So I am looking at 8F.

5            MR. SCHAK:  Your Honor, 1125(e), as I read that

6    section, Your Honor, is limited to the post-petition disclosure

7    and solicitation of the Chapter 11 plan.  So it's the things

8    that go into the disclosure statement, of what gets told to

9    creditors about the plan, perhaps even the formulation of the

10   plan.

11           What I don't think it covers is some of the other

12   activities in the bankruptcy case, such as the operational

13   restructuring that the debtors have done here.  I think, Your

14   Honor, a typical exculpation plan provision in this district,

15   including ours, does go beyond the solicitation-oriented text

16   of 1125(e), and goes to other activities during the course of

17   the bankruptcy case.

18           It is limited, Your Honor, to the temporal period

19   after the petition date.  So this is not an exculpation that

20   tries to reach back to pre-petition activities.  It certainly

21   doesn't cover anything whatsoever having to do with the 2022

22   up-tier transactions, but it does go beyond the --

23           THE COURT:  I mean, Mr. Bartels, as I recall, was

24   retained three to four weeks before those transactions, right?

25           MR. SCHAK:  I --

```
 1            THE COURT:  For the 2022 transactions.

 2            MR. SCHAK:  I think it was more than that, Your

 3   Honor, but it was before those transactions.

 4            THE COURT:  Okay.  So under 1129(e), and I want

 5   Mr. Jimenez to participate in this conversation, I think it's

 6   certainly broader than the issuance of the security.  Someone

 7   that works in good faith on the formulation of the plan that is

 8   later solicited, for example, would also be covered, I think,

 9   by 1126(e).

10            But you're telling me that there are some operational

11   kinds of decisions during -- at post-petition operational

12   decisions that you want exculpation for -- well, what petition

13   operational decisions did Mr. Bartels participate in post-

14   petition?

15            MR. SCHAK:  Your Honor, I'll give one example.  When

16   the board approves a key employer incentive program, for

17   instance, for the management team of the company and for the

18   lower-level employees, that's the sort of operational decision,

19   or when the debtors decide to reject a contract or to approve a

20   -- an amendment to a contract, those are the sort of

21   operational --

22            THE COURT:  So let me divide this up a little bit,

23   and I want to see if Mr. Jimenez agrees or disagrees with this.

24   I think that an individual that serves as a director within an

25   office, whether independent or not, that takes action that is
```

1  approved by the Court, so they submit something for court

2  approval, and we approve it, cannot be sued for that, because

3  we have approved it.

4         If we didn't approve it, there can't be any damage

5  from it, because we didn't approve it.  So I -- if there's a

6  disagreement about that, that's fine.  But I think I'm

7  interested in operational decisions that we didn't approve that

8  we want to protect somebody for, because I can't imagine that

9  -- I do want to hear from Mr. Jimenez, because maybe I'm just

10  imagining it wrong, that if a 9019 is submitted, and we approve

11  it on notice, if a key employee retention program is submitted,

12  and we approve it on notice that anyone thinks that anybody is

13  liable for that.

14         Am I misstating anything, Mr. Jimenez?  Because there

15  are other things that aren't included in that kind of a list.

16  I got it.  You know, maybe some other operational decisions,

17  but in terms of ones that get court approval, which are what

18  Mr. Schak is identifying, is there a dispute that people are

19  protected by getting the Court order?

20         MR. JIMENEZ:  So I agree with the Court's statement

21  about the effect that a court order will have, Your Honor.

22         THE COURT:  So I want to hear, then, assuming he

23  agrees with that, because we can fix the exculpation to include

24  you're exculpated from anything that was approved by the Court,

25  which -- for which there is no dispute, because I don't want a

1    frivolous lawsuit brought.  Mr. Jimenez doesn't normally bring

2    frivolous lawsuits.  In this case, he's saying upfront, he

3    agrees with my statement.  That may cover everything you need.

4    Is there something else that we're worried about?

5            MR. SCHAK:  I think it comes close, Your Honor.  But

6    the board does do things during a bankruptcy case that do not

7    rise to the surface of the Court.  So one example I can think

8    of is, we touched on in the initial presentation today that

9    there's been an internal organizational restructuring, which

10   has saved the company a bundle of money.  There are different

11   people now at the executive level with different lines of

12   responsibility that we think is a vast improvement on what the

13   company had during -- coming into the case.

14           THE COURT:  But aren't we approving all of that at

15   confirmation?

16           MR. SCHAK:  I --

17           THE COURT:  We're approving the whole reorganization,

18   which includes all the new people and all the new structure,

19   right?

20           MR. SCHAK:  I don't think there is anything black and

21   white in the confirmation order that says, for instance, the

22   decision of the Board to divide hardware and chemicals up into

23   separate business lines was a good decision.  I think it was a

24   good decision.

25           THE COURT:  Well, I think we ought to put into the

1  confirmation order -- I mean, it was an essential part of the

2  opening presentation, which came in without objection -- that

3  the reorganization of the business as described in the opening

4  statement is ratified by the Court.  And then it'll be covered

5  under the things that are covered.  I really want -- I -- what

6  I'm -- if I were Mr. Jimenez, let me tell you what I'd be

7  worried about.  And I think that this is what he probably is

8  worried about from listening to him -- something he doesn't

9  know about.

10      So there is some secret decision that got made, not

11  part of the plan, not part of the public restructuring of the

12  company, not something we've approved, but something that

13  occurred that hasn't been disclosed.  Him giving exculpation of

14  that would make him nervous, I think.  And if we can find a way

15  to get this done, I don't know that we're going to have a

16  problem because I don't know there's a principal disagreement.

17      I'm assuming that you agree that, if there is some --

18  and maybe you don't agree with this.  Let -- let's assume that

19  Mr. Bartels has secretly approved something and didn't disclose

20  it to you or to the Court, but it nevertheless resulted in an

21  outflow of $1 million of company funds because he, as a

22  director, approved it and didn't tell you about it.  I don't

23  think Mr. Bartels would've done that, but let's -- I -- because

24  I'm not -- I -- I'm just saying that is the kind of thing

25  Mr. Jimenez is worried about.

1           Do you need protection for those secret kind of

2    activities?

3           MR. SCHAK:  I don't think we're trying to get

4    protection for, you know, gross negligence or willful

5    misconduct.  And those are the --

6           THE COURT:  Well, let's assume that, you know, he

7    thought it was a good business decision to pay somebody $1

8    million and didn't disclose it, and it should have been

9    disclosed.

10          MR. SCHAK:  I think, if it violated the Bankruptcy

11   Code and violated 363(b) in the sense that it should have come

12   before the Court, I don't think our exculpation provision, as

13   drafted, would protect him whatsoever.

14          THE COURT:  Show me where it would not protect him.

15   Because this only carves out gross negligence, willful

16   misconduct, or actual fraud.  Not talking about that.  I --

17   Mr. Bartels would not have done any of those three things.  He

18   is not going to have any problem that carve-out.  What if he

19   approved something that, like you said, ordinarily should get

20   363 approval but didn't?  Why is he being exculpated for that

21   is, I think -- this is a very narrow range of stuff we're

22   talking about, right?

23          MR. SCHAK:  It is a very narrow range.  And I admit I

24   don't think I've ever thought before of the hypo that a

25   director would do such a thing.  I do think it would be

1  reasonable to carve out matters undertaken in violation of the

2  Bankruptcy Code or in -- you know, in violation of prevailing

3  law.  Anything that's flatly unlawful I don't think we're --

4          THE COURT:  Would you include in that something for

5  which Court approval would ordinarily be required but wasn't

6  sought?

7          MR. SCHAK:  That makes sense to me, Your Honor.

8          THE COURT:  Mr. Jimenez, if we change the exculpation

9  and deal with the fact that, if we've approved something by an

10 order, there is no liability, but if something should have had

11 an order but wasn't presented to the Court, it gets added to

12 the list of exclusions from the exculpation, is there anything

13 else that you're worried about other than that?

14         MR. JIMENEZ:  So Your Honor, I think what -- the

15 language that the Court has suggested will be very helpful in

16 providing guidance and clarification of what is exculpated or

17 not.  I think the only remaining matter is -- it goes directly

18 to the definition of "exculpated parties."  The definition of

19 "exculpated parties" as drafted in this plan includes the

20 debtor, the Committee and its members, and the -- and any

21 independent director of any of the debtors.  That, Your Honor,

22 is what I submit that -- it is not allowed under the Fifth

23 Circuit precedent of Highland Capital.

24         I have a different view, from Highland Capital, from

25 what has been suggested by the debtors.  Highland Capital

1    presented extreme circumstances under which the Court was

2    forced to session a relief to take care of governance issues

3    that occurred post-petition.  And in that case, you had

4    circumstances that justified appointing independent directors

5    by the Court that would serve as bankruptcy trustees.

6           That is not the situation we have here, Your Honor.

7    Here, we have a debtor in possession that is fulfilling its

8    fiduciary duties as debtor in possession.  We don't have any

9    governance issues, any governance problems.  Therefore, there

10   is no legal or factual justification to provide a -- an

11   exculpation to independent directors that is separate from the

12   exculpation that a debtor in possession is entitled to receive.

13   And --

14          THE COURT:  So let me ask you this because I -- look,

15   I -- this is a repetitive problem, and I would -- really would

16   like to explore a good solution to it.  If we were to eliminate

17   the independent director and the other directors, if they're

18   included, from the exculpation provision, but add a provision

19   that says protection of parties for court-approved matters --

20   that says what we've said, which is parties are protected for

21   any matter -- from any lawsuit by any person, from any matter

22   for which Court approval was required and sought, but are not

23   protected from matters for which Court approval was required

24   and not sought, and are also protected under applicable non-

25   bankruptcy law from their actions taken as decision-makers so

1   long as such actions were not the result of gross negligence,

2   willful misconduct, or actual fraud because they're all

3   protected for that, anyway, under state law.  Does that solve

4   everybody's problem?

5            MR. JIMENEZ:  So as to, first, the striking out

6   independent directors?  Yes.  And to the other part of the

7   Court's suggestion, I think that sounds very reasonable, Your

8   Honor.  However, I would like the opportunity to consult with

9   my client before giving the Court an answer.  I just don't want

10  to -- make sure that I don't get ahead of myself.

11           THE COURT:  I also don't want Mr. Schak to get ahead

12  of himself.

13           MR. SCHAK:  I don't want to get ahead of myself,

14  either, Your Honor, but what Your Honor laid out sounds very

15  constructive and very sensible.

16           THE COURT:  But I'm not sure it should be different

17  for an independent director than a regular director, right?

18           MR. SCHAK:  I -- I'm not sure either.  And I know we

19  only put in the plan a request to exculpate the independent

20  director.  But --

21           THE COURT:  So this is not going to be an exculpation

22  in the traditional sense that the Fifth Circuit was addressing.

23  It's going to just be a new thing that really is a declaration

24  of the law.

25           MR. SCHAK:  Yeah.

1          THE COURT:  So that people can feel protected by that

2   because it's important that people be able -- it's very

3   important that both directors and independent directors and

4   officers know that they have a duty to go to court.  And if

5   they go to court and they get approval for something, they

6   don't get sued for it later because people are making hard

7   decisions in bankruptcy cases, whether they're independent or

8   not independent.

9          And I think this may be something for you to think

10  about, and I would like for you, and I'd like for Mr. Jimenez,

11  to think about it, and maybe we'll come back this afternoon and

12  hear whether or not that kind of thing works.  Does that -- I'm

13  looking over at a couple partners of yours over there.

14         Does -- is there any heartburn from thinking about it

15  at this time?

16         UNIDENTIFIED:  No.  No heartburn, Your Honor.  But

17  what I might suggest is why -- could we use Wednesday's hearing

18  to tack this on at the end?  That way, Mr. Jimenez has time to

19  consult with his client, and we can --

20         THE COURT:  Well, I'm hoping he can consult with him

21  today because if -- let's assume there is not an agreement

22  about this.  Then, we can't proceed to -- in the manner that

23  everybody is expecting on Wednesday.  I'd like to get it

24  resolved today, if -- can you all decide today?

25         UNIDENTIFIED:  We can, Your Honor.  Unless there's --

 1          THE COURT:  Mr. Jimenez, can you decide by sometime
 2   later this afternoon?
 3          MR. JIMENEZ:  I think so, Your Honor.  As soon as
 4   we're done with this hearing, I will consult with my client and
 5   do my best to have an answer today.
 6          THE COURT:  So why don't we come back for this
 7   question at four o'clock today, unless that causes calendaring
 8   problems for people?
 9          MR. SCHAK:  That is fine for me, at least, Your
10   Honor.  I'm just looking at the rest of the people.
11          UNIDENTIFIED:  You may be by yourself.
12          MR. SCHAK:  Okay.
13          THE COURT:  All right.  So and again, if you all
14   can't -- if you can't get to your clients by then and can't
15   make a decision by then, I got it.  And we may have to come
16   back another time, but I don't want to crowd Wednesday with
17   stuff when, Wednesday, I really want to try and see if we can
18   reach the ultimate conclusion.
19          So let's move to the second half, then, of the
20   consensual or non-consensual releases, I think, is what is
21   remaining, if that concept works for everybody.
22          MR. SCHAK:  Thank you, Your Honor.  That makes sense.
23   So the second open objection of the U.S. Trustee, Your Honor,
24   has to do with opt-outs as a means to obtain consent to the
25   third-party releases under the Chapter 11 plan.  And this

1     issue, Your Honor, was filed by the U.S. Trustee in its

2     Supplemental Objection last Thursday, Docket 2437.

3               And the threshold issue that I want to raise, Your

4     Honor, is that we do think this objection is late and simply

5     should not be considered a threshold.  This is a point that

6     Mr. Dunne raised at the disclosure statement re-solicitation

7     hearing a few months ago.  And the point here, Your Honor, is

8     that this op-out mechanic has actually been in our plan ever

9     since the very first rendition of the plan was filed 13 months

10    ago, and nothing has changed since the original objection

11    deadline for that original plan way back in May.

12              The plan hasn't changed.  It has had an opt-out

13    mechanic all the -- along.  And I think, most importantly, the

14    legal doctrine surrounding this issue has not, in fact,

15    changed.  The U.S. Trustee mentions <u>Purdue</u> as an intervening

16    case, but I don't think that holds water, Your Honor, because

17    <u>Purdue</u>, in fact, sided with the Fifth Circuit doctrine that

18    pre-existed <u>Harrington v. Purdue</u>.  And the U.S. Trustee's new

19    objection even -- it seems to concede that <u>Purdue</u> did not

20    address the issue of what constitutes a consensual release.

21              So perhaps, Your Honor, in a different circuit, it

22    would be appropriate to revisit this issue in light of <u>Purdue</u>.

23    But here, Your Honor, we think that if it was fair game for the

24    U.S. Trustee to file this objection before <u>Purdue</u> in the -- in

25    this circuit, they should have presented in that case.  And if

1  they would like the bankruptcy judges in this district to

2  revisit local practice, I think it's more appropriate for them

3  to do so in the first instance with a plan that is being filed

4  afresh, particularly in this case where we have not gone out

5  and re-solicited the general unsecured creditors.

6          THE COURT:  Yeah.  I -- I'm going to -- I'll cut you

7  short.  I have an independent mandatory duty to be certain that

8  the plan is confirmable.  This is a hot issue.  It's not a

9  surprise to anybody.  It may be late.  I don't care.  I'm going

10 to meet my independent duty and hear the argument.

11         They may have forfeited the argument for appeal.  I'm

12 not dealing with that.  I'm dealing with my independent duty

13 only, but I want to hear the parties' arguments about my

14 independent duty and whether to approve this.  And I don't need

15 to cross the bridge of timeliness or untimeliness because I'm

16 going to cover it on the same basis with respect to my

17 independent duty.

18         MR. SCHAK:  I think, Your Honor, it's -- it remains a

19 pretty clear question on the merits.  And Judge Lopez got it

20 right, I think, very recently, in the Robert Shaw opinion.  He

21 pointed out that there have been hundreds of cases approving

22 consents on an opt-out basis under the Pacific Lumber regime,

23 which was a Fifth Circuit case holding that third-party

24 releases must be consensual.  He then went on to say Purdue did

25 not change the law of this circuit.

1              So Your Honor, if opt-outs worked under Pacific

2    Lumber and Purdue did not change Pacific Lumber, then it

3    logically follows that the opt-out custom in this district

4    still satisfies the consent requirement.  And I think, Your

5    Honor, that is consistent with ordinary principles of

6    jurisprudence that, you know, the law abounds with waiver and

7    forfeiture doctrines.  The Supreme Court, for instance, has

8    squarely held, and Your Honor touched on this at the disclosure

9    statement hearing, that opt-out procedures are permissible

10   under the due process clause.  That is the Phillips v. Shutts

11   case from 1985.  That what is -- what is required is clear

12   notice and then an opportunity to be heard.

13             THE COURT:  So I -- I've read the U.S. Trustees'

14   brief on that question.  They address not the due process

15   question in their brief, which is what we had talked about, but

16   really that there are differences between class actions and

17   bankruptcy cases.  And they're right about that.  But I do want

18   to focus solely on the due process question for a moment.

19             If your client, by way of example, failed to send

20   notice to a known creditor of this opt-out right in violation

21   of the due process clause, you're not looking for me to ratify

22   violations of the due process clause, right?  So we could

23   include in the confirmation order that the opt-outs are

24   effective subject to compliance with the due process clause,

25   right?  If there -- it could just be a mistake by your client.

1    I'm certainly not talking about something intentional.  That is

2    not what I -- that didn't happen.

3           But let's say that you had a known creditor and they

4    didn't make the list, and so they didn't get an opt-out notice.

5    I think, under the due process clause, known creditors have to

6    get mail, not publication notice.  So if you -- if there is

7    that kind of an error, that gets visited on you, not on the

8    non-opt-out party, right?

9           MR. SCHAK:  I agree with that, Your Honor.  Known

10   creditors have to get actual notice sent to the correct

11   address.  We can't send it to the wrong address if we know the

12   right address.

13          THE COURT:  So if, in five years, someone comes in

14   and says, I'm not bound by this because of the due process

15   clause, that is just something that has to be dealt with.  And

16   we can put an exception into the confirmation order that deals

17   with that?

18          MR. SCHAK:  That is right, Your Honor.  And we would

19   have to, at that point, dig up what we knew about their address

20   way back when.  And hopefully, the statute of limitations

21   simply deals with a lot of those issues because that can be a

22   difficult exercise.

23          THE COURT:  It might.  I've got three of those cases

24   right now, and they're not fun, but we might have to be there,

25   right?

```
 1              MR. SCHAK:  That is right.

 2              THE COURT:  Okay.  I -- I'm going to -- Mr. Jimenez,

 3   you may or may not agree with all that.  I'm -- I'll go to you

 4   separately on this.  I just wanted to explore with the debtor

 5   what they're seeking.  So an exception for the due process

 6   problem is acceptable to the debtors?

 7              MR. SCHAK:  We are not trying to override Amendment 5

 8   of the Constitution, Your Honor.

 9              THE COURT:  Or 14?

10              MR. SCHAK:  Or 14, although this is federal court.

11              THE COURT:  I guess that is right, but these may be

12   state law rights.

13              MR. SCHAK:  That is true.

14              THE COURT:  All right.  Go ahead.

15              MR. SCHAK:  So Your Honor mentioned class action, and

16   the U.S. Trustee's objection does discuss how this is not a

17   class action.  Rule 23 does not apply.  And I -- I'm not going

18   to stand here and argue that we are trying to do something

19   under Rule 23.  What I think, though, is correct is that the

20   bankruptcy situation is much closer in flavor to a federal

21   class action or a state class action than it is to the U.S.

22   Trustee's analog of an ordinary contractual transaction between

23   private individuals.

24              And the reason I say that, Your Honor, is -- there

25   are several.  One is that the class action, like the
```

1  bankruptcy, is a proceeding where a mass of creditors has been

2  brought under the jurisdiction of a single court and under the

3  purview of a single case.  The U.S. Trustee points out that

4  class actions have lots of auxiliary protections built around

5  them, and that is absolutely true.  But I also think, Your

6  Honor, that the bankruptcy process in the United States is one

7  of the quintessential examples of another process where there

8  are lots of protections for creditors.

9          There are statutory fiduciaries that work here at

10 these two tables, just like there are through the class action

11 representative in a -- in a Rule 23 case.  There is a court-

12 supervised noticing process that we undertook here at the

13 disclosure statement hearing.  And perhaps most importantly,

14 and special to bankruptcy, is that the third-party releases

15 under a plan could not get off the ground if we didn't have the

16 sufficient votes from the creditor base to confirm the plan.

17 I -- in other words, Your Honor, I don't think you could come

18 into bankruptcy court --

19          THE COURT:  I'm not sure I agree with that one

20 because it would be possible.  I mean, it doesn't happen in

21 this case, but it would be possible, for example, that you have

22 a cram down of the unsecured class of creditors where they all

23 vote "no" but they still are bound by the releases.  And so I'm

24 not sure that I agree that the voting matters to it.

25          I think that the other protections you're talking

1   about have analogs.  But the voting -- you can correct me if

2   I'm wrong, but I think that, if we're going to establish this

3   as sort of a follow-up, I don't want to then run into a case

4   where, you know, all the unsecureds voted "no" but they still

5   have an opt-out.  And somebody says, "well, yeah, but that

6   means they voted no."

7            MR. SCHAK:  I won't belabor the point.  Your Honor, I

8   do think that, at least in bankruptcy, you need some threshold

9   level of creditor group, maybe not within one particular class

10  or another, and that is one collective protection for the

11  creditor base.  And I think the key difference here, between

12  bankruptcy or class actions on one side and contract on another

13  side, is the very practical difference between receiving a

14  piece of junk mail in the mail and receiving a legal notice.

15            If someone sends me a letter on some company's

16  letterhead saying, check this box and return it or you will

17  hereby have bought a bunch of wheelbarrows from me, I'm just

18  going to throw that in the trash because I throw junk mail in

19  the trash each day.  But here, Your Honor, we have legal

20  notices that point out, are recognizable to anyone who gets it

21  as a legal notice.  And just like in a class action, Your

22  Honor, they can choose to throw that out at their own peril, or

23  they can choose to actually look at what the legal notice said.

24            And I think that is the major, major difference, or

25  one of them, between class actions and bankruptcies and other

1   legal proceedings on one side and the contract example on the

2   other side.  The U.S. Trustee also picks up on this hypo from

3   Judge Goldblatt's decision in <u>Smallhold</u>, which is a recent

4   case.  And I think those are worth looking at.  They -- there

5   are two hypos.  One is one litigant sends a letter to the

6   other, saying, object within 10 days or I am hereby released.

7   Another is that Chapter 11 says, check this box or else you owe

8   $100 to the CEO's child.

9            And Judge Goldblatt, I think, is correct that those

10  are absurd.  Those would never work legally.  I -- but I think

11  he is incorrect, though, and it pains me to say that because I

12  have such admiration for Judge Goldblatt, is that those are

13  distinguishable, in fact, from the ordinary third-party

14  releases with an opt-out that you see in Chapter 11 plans.  And

15  I think the statutory basis, Your Honor, for that distinction

16  is 1123(b)(6), which specifically says, "Under a plan, a debtor

17  or a plan proponent can include any other appropriate provision

18  not inconsistent with the applicable provisions of this title."

19           That provision, Your Honor, it sometimes portrayed as

20  the last refuge of a scoundrel, what a debtor will look to when

21  they can't find any other statutory hook.  But I think it

22  actually does a lot of work here to answer Judge Goldblatt's

23  hypothetical.  I think that, if a debtor proposed to say, check

24  this box or you owe the CEO $100, a court would immediately

25  recognize that that is not an appropriate provision to put in a

1 | plan.  I think any bankruptcy court, going back to the days of

2 | British bankruptcy commissioners, would recognize that you

3 | can't force someone to pay money into a bankruptcy case.

4 |         So that is why I think this is very distinguishable

5 | from Judge Goldblatt's hypos because this is a third-party

6 | release that serves the bankruptcy purpose.

7 |         THE COURT:  So really, then, when you read Purdue,

8 | Purdue is -- the foundation of Purdue is that (a)(6) doesn't

9 | allow provisions inconsistent with the Code.  And when, for

10 | example, they look at the asbestos provisions, it makes no

11 | sense to say that the bankruptcy courts, when Congress limited

12 | this to asbestos, could then expand it into some other -- the

13 | drug field, to have releases imposed on people that are

14 | objecting to them and that that would be, then, inconsistent

15 | with what the drafters wrote.

16 |         Is what you're proposing consistent or inconsistent

17 | with what the drafters wrote?

18 |         MR. SCHAK:  I think it is consistent, Your Honor,

19 | because the asbestos provisions specifically spoke to non-

20 | consensual releases.  Those are releases that can channel in

21 | formulas that apply to all creditors, whether they like it or

22 | not.  I just think consensual releases, Your Honor, are

23 | categorically different.  And the question that faces the Court

24 | in examining the appropriate of a -- appropriateness of a

25 | consensual release is, one, does this have anything whatsoever

1  to do with the case?  And I think that is easily satisfied

2  here.

3          And two, does this give people a fair shot, if they

4  want to excuse themselves from the releases, to do that?  And I

5  think, Your Honor, that we, in fact -- I would even say set the

6  gold standard here for the quality of notice.  We don't just

7  put it in a very conspicuous box.  It was in the ballot with a

8  plain English FAQ.  Anyone who wanted to opt-out could have.

9  And on the voting report from May that we put on the screen

10 earlier, I think it was clear that dozens, if not hundreds, of

11 creditors had --

12         THE COURT:  $418 million of opt-outs.  Yeah.  That is

13 a lot of opt-outs.

14         MR. SCHAK:  That is correct, Your Honor.  And -- but

15 even small creditors, Your Honor, opted out.  There were at

16 least a couple of individuals on that list who, you know, were

17 former employees of the company.  Maybe they have a bone to

18 pick.  Maybe they just want to preserve their rights.  And they

19 figured it out very easily, how to opt-out of the consensual

20 release.

21         THE COURT:  All right.  Mr. Jimenez, what is your

22 response to that?

23         MR. JIMENEZ:  Thank you.  Thank you, Your Honor.

24 Andrew Jimenez for the United States Trustee.  First, Your

25 Honor, I think I want to start by conveying to the Court that I

1  think what we are asking the Court is to make a determination

2  on whether the opt-out procedures, applied to the facts of this

3  case, are enough to provide consent, affirmative consent, and

4  therefore to create a consensual release.

5          I don't think it is -- that the right way to

6  interpret opt-outs is to treat them as a magic formula that

7  will apply in each and every case.  I don't think that is the

8  case, and I don't think that is what applicable law supports.

9  I think that the question of whether a particular opt-out

10 mechanism applied to the circumstances of a particular case --

11 that has never been answered in the Fifth Circuit.

12         We have Fifth Circuit cases where -- have been

13 ratified that included opt-outs.  But the question of whether

14 the opt-out mechanism used in those cases was not a question

15 before the Court.  So I don't think that particular question

16 was addressed even though they contained that mechanism.

17         THE COURT:  So I think, largely, I agree with you

18 that there is a case or two, and I can't cite it to you right

19 now, where there were opt-out releases.  Someone violated the

20 opt-out release, and the Court enforced the opt-out release.

21 Now, that is after the fact, so it's after the confirmation

22 order has been entered and it potentially can't be amended.

23 But the Fifth Circuit doesn't raise any questions about the

24 opt-out, so that is a little bit different.

25         Can I, though, set maybe a different framework than

1  I've seen argued in these cases, because I think I may not have

2  approached all of these entirely correctly and others may not

3  have, which is -- I want to start where I think I have to

4  start, which is 1129.

5         If all of the requirements of 1129 are satisfied,

6  then confirmation is mandatory, I think.  I believe the term of

7  art is "shall," right?

8         MR. SCHAK:  Yes, Your Honor.  And I see "shall" at

9  1129.  Right.

10        THE COURT:  So the issue for me has to start with, on

11 confirmation, have all the requirements of 1129 been satisfied

12 because, if they have, I have to confirm.  And if I'm wrong

13 about that, I want people to correct me.  And if I'm right

14 about that, I want to have sort of question one, which

15 provision of 1129 is not being satisfied by the plan.  And then

16 we will look potentially to 1320 -- I'm sorry to 1122.  But I

17 don't even get to 1122 until I figure out where does this fit

18 under 1129, which is mandatory.  And I want to know if anybody

19 disagrees with that.

20        MR. JIMENEZ:  So your --

21        THE COURT:  I'm sorry, go ahead, Mr. Jimenez.

22        MR. JIMENEZ:  So Your Honor, I appreciate the

23 question.  And I -- and I would submit to the Court that the

24 issue of the opt-out will fall within 1120 -- 29(a)(1).  The

25 plan -- the plan complies with applicable provisions of the

1   Bankruptcy Code and then 1129(3), the plan has been proposed in

2   good faith and not by any means forbidden by law.  And I think

3   in this particular instance at the upsell, Your Honor, and we

4   as we have brief state law, I don't think allows for silence on

5   opt-out form to constitute affirmative consent.  So in those

6   cases I --

7            THE COURT:  So let's -- no, let's -- I want to deal

8   with that though, because I think that's really critical.  So

9   under 1129(a)(1), let me assume you're right that under state

10  law, this wouldn't work.  How does that not comply with the

11  provisions of the Bankruptcy Code?  I don't think it doesn't.

12  So really, I think your argument is really 1129(a)(3), but if

13  you have a separate argument under one, I'm missing it.

14           MR. JIMENEZ:  You -- Your Honor, because there is no

15  bankruptcy provision that allows for a consensual release or

16  that the consensual release be authorized under the Bankruptcy

17  Code, you have to look into state law to find what constitutes

18  consent.  So there is independent of the state law

19  requirements, there is no bankruptcy provision that allows for

20  this type of mechanism --

21           THE COURT:  So hold on.

22           MR. JIMENEZ:  -- for a (indiscernible) release.

23           THE COURT:  I want to start with (a)(1), you told me

24  they don't comply with (a)(1).  How does that statement show

25  non-compliance with (a)(1)?

1          MR. JIMENEZ:  Because there is no provision that

2    authorizes specifically what the debtors are attempting to do

3    with that mechanism.

4          THE COURT:  So it's a --

5          MR. JIMENEZ:  And I'll make the comparison with --

6          THE COURT:  I'm sorry.  Go ahead.

7          MR. JIMENEZ:  And I think I want to make the

8    comparison with the asbestos provision.  So the Bankruptcy Code

9    gives you a specific statute or section of the Code for the

10   special permission.  You don't have anything similar to that

11   for this type of release.

12         THE COURT:  Yeah, but I want to back up for a second.

13   You said that we have to look at this case by case to see

14   whether the non-consensual releases fit into this case and are

15   appropriate.  I'm sorry, the consensual releases.  Well, that

16   implies that there are some consensual releases that are

17   appropriate.  So which provision of the Bankruptcy Code allows

18   for any consensual releases?  I think that has to be an

19   1122(a)(6), if you're correct.  But you tell me, what were you

20   referring to when you said there's sometimes it works and

21   sometimes it doesn't work.  When does it work ever?  If your

22   argument is that you can't do them in a plan.

23         MR. JIMENEZ:  When you have affirmative consent, and

24   an example of that --

25         THE COURT:  And where is that -- where is that

1   written into the Bankruptcy Code?  You're telling me it needs

2   to affirmatively be in the Bankruptcy Code.  Where does the

3   Bankruptcy Code says if there's affirmative consent, you can

4   have mutual releases?

5          MR. JIMENEZ:  So it doesn't, Your Honor.  It -- so

6   my --

7          THE COURT:  So it's an 1122(a)(6) that allows you to

8   include some form of consensual releases.  You just don't like

9   this form, right?

10         MR. JIMENEZ:  I -- I'm saying that this one does not

11  satisfy the question of consent.  And then -- and then that --

12         THE COURT:  Yeah.  But let's assume that what we have

13  is the one that's perfect in your mind, which is the debtor has

14  signed a release and the creditor has signed a release and

15  they're both there and they both say, this is subject to

16  confirmation of the plan.  And the plan says, the release is

17  signed by the debtor and the creditor will be enforced under

18  the plan.  So sort of your, as I understand it, ideal

19  situation, what under the Code allows me to approve that.

20         MR. JIMENEZ:  So I -- I'm not concerned about those,

21  Your Honor, because those are releases with the debtor.

22         THE COURT:  No.

23         MR. JIMENEZ:  Our concern is with the third-party

24  releases --

25         THE COURT:  I -- I'm sorry.  So third party -- so --

1   a third-party release, the debtor release includes a release of

2   all of its officers, directors, et cetera.  The creditors

3   agreed to that.  So everybody gets released under these signed

4   mutual releases subject to Court approval.  How can I approve

5   those under your theory?  What provision of the Code allows me

6   to do that?

7            MR. JIMENEZ:  So Your Honor, I -- again, I think my

8   argument was that we need to look at 1129(a)(1) and (a)(3), and

9   (a)(3) specifically deals with the state law components of what

10  constitutes consent. (Indiscernible) --

11           THE COURT:  I want to -- but I want to go to (a)(1)s

12  first.  What about (a)(1) isn't complied with if what we have

13  is both parties sign these releases that release third parties,

14  everybody signs them.  Is there an (a)(1) violation?

15           MR. JIMENEZ:  I would say no, Your Honor, because

16  both parties are -- if you have an affirmative consent of all

17  the parties, I think that the question is that it's clear and

18  you have --

19           THE COURT:  So -- no, so -- no, so what --

20           MR. JIMENEZ:  -- you have --

21           THE COURT:  -- no, no, no, I want to stick with this.

22  What under the law lets me approve the example of where

23  everybody has signed and is agreeing to it?  What provision

24  under the law?  I understand you don't object to those, but we

25  have to find a legal basis that is different between one that

1   has acquiescence consent versus signature consent.  And you're

2   telling me (a)(1) is violated.  That means under (a)(1), the

3   ones with signature consent complies and the ones with

4   acquiescence consent doesn't apply.  I don't understand how

5   (a)(1) applies at all if you're telling me you can only do it

6   sometime.  I do understand your (a)(3) argument, but I want to

7   focus on (a)(1).

8           MR. JIMENEZ:  Yes, Your Honor.  So Your Honor, I

9   think you -- you're trying to identify a Code provision that

10  would allow under that circumstance?

11          THE COURT:  Yeah, because I think -- I think that's

12  1120 -- that is why we have in that circumstance it seems to

13  me, it's one of the reasons why we have 1123(a)(6).  So

14  1123(a)(6) can work.  It may not work, but it can work to allow

15  these mutual releases.  And I appreciate your focus on, we got

16  to worry about this case, but to do that, we have to agree that

17  1123(a)(6) could authorize this.

18          But let's move to (a)(3).  Tell me what is -- you --

19  you've talked about what is -- what works under state law.

20  That is not what (a)(3) says.  It says it's been proposed in

21  good faith and not by any means forbidden by law.  What is

22  forbidden by law with respect to a consent by acquiescence as

23  opposed to approved by law?  Those are different statements.

24  What is forbidden by law?

25          MR. JIMENEZ:  Well, I don't think the -- the sentence

1   that is contemplated in this opt-out is -- which is that

2   silent, you know, not returning an opt-out form, not checking

3   the opt-out box on the ballot that will -- that will be

4   interpreted as an acceptance.

5           THE COURT:  Yes.  And where's the --

6           MR. JIMENEZ:  I think that has --

7           THE COURT:  -- where does the -- where does the

8   law -- where does the law forbid that?  Your argument is it's

9   ineffective.

10          MR. JIMENEZ:  What's that?

11          THE COURT:  That's different than saying it's

12  forbidden by law.  What forbids it?

13          MR. JIMENEZ:  Well, Your Honor, if it doesn't comply

14  with the law, I think that's -- I think that's falls under the

15  forbidden by law.

16          THE COURT:  Why?

17          MR. JIMENEZ:  And you cannot -- you cannot --

18  because, you know, the law states out the rules of what can

19  constitute affirmative consent and state law provides us the

20  rules of how you provide affirmative consent.  So if you don't

21  have affirmative consent under state law, you cannot get this

22  type of consensual release, because it would not be consensual.

23          THE COURT:  This -- I mean, I -- in what state is it

24  forbidden for someone to seek approval by acquiescence?  I

25  understand there's states that say that will not suffice, but

1  in what state is it forbidden to seek it?

2         MR. JIMENEZ:  So Your Honor, I think in our brief we

3  addressed that, and we address it under Texas law.  I think

4  that question is -- the answer is similar under New York law as

5  well.

6         THE COURT:  So show me under Texas Law or New York

7  law, where it is forbidden to seek consent by acquiescence?

8         MR. JIMENEZ:  When you say for -- well, Your Honor,

9  if you're asking me if there's a statute that says you shall

10  not do this specifically --

11         THE COURT:  That's what forbidden means.

12         MR. JIMENEZ:  -- I don't think I can provide --

13         THE COURT:  That's what forbidden means to me, right.

14         MR. JIMENEZ:  I don't think --

15         THE COURT:  Forbidden means there's a statute that

16  says it's for forbade, right?

17         MR. JIMENEZ:  I don't think I can provide you with

18  that, but there is clear law of what constitutes acceptance in

19  a contract and what does not.  And I think that's what gives us

20  the legal basis of what the debtors can do under state law and

21  what they cannot do.

22         THE COURT:  Yeah.  So look, I want to make the

23  distinction with Purdue and then I know I've been questioning

24  you and I'm going to be quiet and let you just argue to me for

25  a minute.  Purdue holds that a mandatory release without more

1 is forbidden under the Bankruptcy Code, because the Bankruptcy

2 Code limits that asbestos cases.  That's the whole thing.

3          So it relies on forbidden conduct under the

4 Bankruptcy Code.  I don't know why this is forbidden conduct as

5 opposed to conduct that -- your argument is there could be

6 better conduct.  There could be more fulsome things.  There

7 could be more enforceable things.  There could be more

8 effective things, more permitted things.  I don't think that

9 puts them into the forbidden category.  And that's why I sort

10 of started with the premise that if 1129(a) is satisfied, I

11 don't have a choice, but to confirm.  So that's the concern

12 I've got.  I'll be quiet and I'll let you deal with that or any

13 other issue that you want to deal with.

14          MR. JIMENEZ:  Yes.  So Your Honor, thank you.  And

15 let me go back for a moment to the due process, which is

16 something that the Court touched upon earlier.  And the due

17 process, it's fundamental for a plan and the content of the

18 plan to have -- to bind creditors.  And when we talk about due

19 process, Your Honor, I just want to make the distinction that

20 the one thing is when you send a legal notice in a bankruptcy

21 proceeding and you trying to have legal effect or define what

22 are going to be the legal relationships between debtor and its

23 creditors.  That's one thing.  I think in those -- in that

24 scenario, the legal notice can be sufficient to have an effect,

25 but it's not the same when you're sending a legal notice that

1  it's going to have effect on non-debtor third parties.

2          And that's what we have here, Your Honor.  We have

3  non-debtor third parties that are going to be releases.  And

4  you know, the -- I think in small hold that it's discuss what

5  is, you know, the theories of default.  Whether sending a legal

6  motive that if you don't take action or do this within certain

7  -- with a -- within a certain specified sign, you can have

8  these legal consequences and that that theory of default should

9  not -- really just should not apply in the scenario of third-

10  party releases, because the bankruptcy, the Chapter 11 plan and

11  the bankruptcy is designed to settle plans between debtors and

12  its creditors, not between non-debtor third parties.  And I

13  think that's an important distinction for due process.

14          And the way to address that, Your Honor, I think

15  under these circumstances is to have a simple opt-in.  That way

16  I think that covers the due process concerns and there can be

17  no question as to whether that party is agreeing to the

18  releases.  I think we don't have a clear evidentiary record for

19  the third-party releases, Your Honor.  We don't have a report

20  of the undeliverable ballots and non-voting notices that were

21  that were sent out.  We have some information, some partial

22  information of the opt-outs ballots that were actually

23  received, but we don't have a complete picture of the number of

24  creditors out there and the number of claimants that were sent

25  out this notices and ballots with opt-outs.  And how many of

1   them were received and how many of those were returned.

2           THE COURT:  Right.  So let's assume for a minute

3   because I just want you to define what your argument is, that

4   the debtor sent a notice to the last known address of an

5   employee.  And at that address, the employee had cashed a

6   paycheck two weeks ago, but then that notice to that employee

7   got returned to the debtor.  Take that as my hypothetical.

8   Does that meet the due process clause?

9           MR. JIMENEZ:  I'm sorry, can you repeat the question,

10  Your Honor?

11          THE COURT:  Does that notice which got returned, but

12  it was sent to the last known address, valid address, meet the

13  due process clause?

14          MR. JIMENEZ:  It does not, Your Honor.

15          THE COURT:  Why not?

16          MR. JIMENEZ:  Because there was no actual notice to

17  the person that is going to be affected by the plan.

18          THE COURT:  But it meets the due process clause in a

19  class action case.  How can it -- how can that exact same

20  notice meet the due process in a class action case, but not

21  meet the due process notice in a bankruptcy case?

22          MR. JIMENEZ:  And as we explained in our objection

23  that the class action, I think, is very different from the

24  bankruptcy process and has all the kinds of safeguards that are

25  simply not present here.

1          THE COURT:  Yeah.  I'm just -- they are different,

2  but why is one meeting -- it's -- we're talking about the due

3  process cause of the constitution.  Sending a notice that

4  someone doesn't get.  And how can that meet the due process

5  clause in class action, but not meet the due process clause in

6  bankruptcy?

7          MR. JIMENEZ:  Your Honor, I think a distinction in

8  class action is that the members of a class in a class action

9  are the parties that are affected by that litigation.  And

10  specifically, by the -- by what is being addressed in that

11  litigation.  In a bankruptcy, what's being addressed is the

12  relationship between debtors and creditors.  It is not

13  relationship between third-party non-debtors.  And people don't

14  have a legal obligation to reply to those type of notices that

15  are just dealing with third-party -- with releases of third

16  parties, not between the debtor and the creditor.

17          THE COURT:  Thank you.  But go ahead with your

18  argument.

19          MR. JIMENEZ:  Your Honor, I think to summarize with

20  respect to the opt of our position is that silence should not

21  be interpreted as acceptance of third-party releases.  I think

22  the appropriate way to meet the due process concerns is to have

23  an opt-in form.  And again, I don't think that the full

24  theories are proper in these particular -- our circumstances,

25  because what is being addressed in those releases is not a

1  claims between debtors and creditors, but between third-party

2  non-debtor parties.

3           And finally, Your Honor, as I said, I don't think we

4  have a complete evidentiary record as to all the ballots and

5  funds that were sent.  We just have a partial picture of some

6  of the ballots that were returned without ballots.  Under those

7  basis, Your Honor, I don't think this opt-out mechanism is

8  confirmable under 1129(a)(3) and 1129(a)(1).

9           THE COURT:  Mr. Jimenez, thank you.  All right.  I am

10  going to approve with the one limitation that we have talked

11  about, the third-party opt-out releases in this case.  The one

12  limitation being I'm going to require confirmation order make

13  clear that we're not overriding the due process clause with

14  respect to the notice requirements of what occurred.  Here are

15  the reasons why I am making that.  We have jurisdiction,

16  obviously under 28 U.S.C. Section 1334.  Confirmation of a plan

17  of which this is an essential part in this case is a core

18  matter under 28 U.S.C. Section 157.  As I read 1129 and as I

19  believe the overwhelming case law supports, if a plan meets the

20  requirements of 1129, confirmation is mandatory, not

21  discretionary by the Court.  The most recent pronouncement of

22  this concept, I think by the Fifth Circuit was actually in a

23  Chapter 13 case, which has the same language, and the Fifth

24  Circuit, In re Diaz, 972 F.3d 713 (2020), said that the term

25  shall with respect to confirmation leaves no discretion on the

1    part of the Court.

2         And in that particular case, they were overriding a

3    decision that respected a Chapter 13 trustee's objection, which

4    might have made for a better plan for the creditors, but was

5    not required by the Code.  And they said, no, once you meet the

6    Code requirements, the Court must confirm.  That means that the

7    issue is not whether opt-in or opt-out is best.  They each have

8    their advantages and disadvantages.  But whether the process,

9    and I agree with Mr. Jimenez, the process in this case was

10   sufficient to allow people to opt out.  And I'll note that $418

11   million worth of creditors have opted out.  This is not an

12   unnoticed provision that sort of went out and was hidden under

13   the radar screen.  Nevertheless, even if the Code requires or

14   allows this -- and we're going to go through whether it allows

15   it -- the due process clause must be satisfied.

16        Under class action lawsuits, the due process clause

17   is satisfied as the Supreme Court has held when you send notice

18   to people that is consistent with the due process notice

19   requirements.  I disagree with the United States Trustee

20   arguments that the identical notice one sent of class action

21   suit and the other sent in a bankruptcy case would be treated

22   differently under the due process clause.  They are treated

23   differently because of statutory issues and those statutory

24   issues differ, which may make one enforceable and the other not

25   enforceable, which is a separate question that we're going to

1   answer.  But those do not arise under the due process clause.

2   They arise under what's the Court's authority.  You'll recall

3   in the Purdue case, for example, the Supreme Court even said

4   that the bankruptcy court could be given authority for non-

5   consensual third-party releases.

6        They just hadn't been given authority for non-

7   consensual third-party releases.  I don't think it's a due

8   process question.  I am going to require due process

9   protections and that'll be in the confirmation order.  So I'm

10  to go through for a moment, what Purdue counsels.  The issue in

11  Purdue is whether it was permissible under Section 1123 to

12  include a release provision that released parties that did not

13  wish to grant a release from the ability to -- or the enjoin

14  parties in effect from being able to sue third parties, the

15  Sackler family, by virtue of the plan and which was imposed on

16  them, not withstanding their objections.  That is a very far

17  cry from what we have here, what the Supreme Court found was

18  that under Section 1123, that the imposition of a non-

19  consensual release on an objecting party could not occur

20  because it was inconsistent with other provisions of the Code.

21       And in particular, one of the most important

22  findings, I think in the Supreme Court opinion was that by

23  including asbestos third-party release provisions under the

24  Code that would allow for mandatory third-party releases with

25  the proper vote.  That the bankruptcy court could not write

1   around those provisions and make the same things apply,

2   frankly, with even a lesser vote in non-asbestos cases.  The

3   Court held that duty of expanding non-consensual release

4   provisions was left to Congress to amend.

5              All parties here, including the United States Trustee

6   agree that a consensual release of claims is not inconsistent

7   with other provisions of the Code.  And that's the hypothetical

8   example of, everybody signs this release, you're releasing

9   third parties, can that be incorporated into the plan?  And the

10  conclusion is yes.  So it isn't that there is anything in the

11  Code that prohibits consensual releases.  The issue is whether

12  those consensual releases are being sought in the correct

13  manner by having an opt-out or an opt-in provision.

14             The issue is whether this consensual, what I'll call

15  release by acquiescence, somebody that doesn't check a box and

16  return it, but a lot of people did, after full notice and a

17  hearing works.  And there is nothing in the Code that forbids

18  it.  And that is the language of 1129(a)(3).  It has to not be

19  any means by forbidden by law.  Consensual releases.

20  Consensual releases in a bankruptcy case are not forbidden by

21  law, nor are they forbidden by state law.  No one has cited to

22  me any case that says that parties cannot do consensual

23  releases.  The sole issue here isn't whether you can do a

24  consensual release or a non-consensual release, but whether

25  this one is being done the right way.  As counsel argues, there

1   are all sorts of times in the law where a Court requires people

2   to respond.  And if you don't respond, there is then a

3   consequence of the non-response.

4          I mean, the easiest example is a lawsuit.  A sues B.

5   B gets served.  B doesn't respond.  B is ordered to pay money

6   to A.  That's what courts do.  Here the obligation to opt out

7   was sent out.  It was sent out to everybody.  Those that it

8   didn't get sent to appropriately will be excluded because the

9   due process clause.  There's simply nothing forbidden or

10  inconsistent about that.  Do we need to comply with state law?

11  There's no requirement we comply with state law.  Federal law

12  can allow for consequences as a result of default.  And I don't

13  know why we look to state law at all to try and resolve this

14  question.  I'm not convinced we should look to state law to

15  resolve that question, because there is a consequence of not

16  responding.  Even if you do look to state law, some states

17  might permit it, some states might not permit it.  Where does

18  that leave the bankruptcy court?  I don't know.  But we go back

19  to 1129(a).  I frankly am not persuaded at all by the argument,

20  if 1129(a)(1) would be a bar towards confirmation of something

21  that has opt-out provisions.

22          There is nothing non-compliant with the applicable

23  provisions of the title.  Purdue may have been non-compliant by

24  including a consensual -- I'm sorry, a non-consensual release

25  of a third-party claim.  And I think it is, now that you can

1    review the Supreme Court's opinion.  It simply doesn't apply to

2    consensual.

3          And then the only other argument is 1129(a)(3),

4    whether the plan has been proposed in good faith and not by any

5    means forbidden by law.  There's not really a challenge to good

6    faith.  There's a question as to whether this has been

7    forbidden by law.

8          The argument is not -- that has been made, is not

9    that it is forbidden by law, but rather that it is being done

10   in any manner that wouldn't be enforceable if it were solely

11   done under state law.

12         It's not being solely done under state law.  And that

13   is not something that is forbidden by state law.  It's

14   something that might not be enforceable under state law.

15   Congress wrote, it has to have been forbidden, to mean that you

16   couldn't include it in 1123.

17         There is no argument that this is forbidden.  And I

18   decline to expand the word forbidden to mean there might be

19   something better or there might be an alternative or some state

20   might have held something differently.  These are non-forbidden

21   by law, assuming that the rest of confirmation is satisfied,

22   which we'll learn on Wednesday.  I am overruling this objection

23   and find that it does not bar confirmation.  And I will approve

24   the plan with the non-consensual release provisions.

25         What else do we need to cover today -- this morning,

1  other than coming back at four o'clock on the issue with

2  respect to exculpation?

3            MR. SCHAK:  Thank you, Your Honor.

4            THE COURT:  Thank you.

5            MR. LEBLANC:  Good afternoon, Your Honor.  Good

6  morning still, I guess.  Andrew Leblanc, Milbank, on behalf of

7  Incora.  Your Honor, I think that's all we have to do today.

8  We will obviously come back.  We'll be back at least some

9  subset of us, Mr. Doug, and I have a hearing --

10           THE COURT:  You can do it virtually.

11           MR. LEBLANC:  Yeah, we just have a hearing next door.

12  So we won't be here, but Mr. Schak and others may be --

13           THE COURT:  Oh, you're just going to be down the

14  hall?

15           MR. LEBLANC:  Correct.

16           THE COURT:  Yeah.  Just tell him that I've been here

17  longer than he has.  And that he can take a break.

18           MR. LEBLANC:  Well, I'm -- I will tell him you ruled

19  on the very same issue this morning that it's going to be one

20  of the issues we'll be hearing.  So no transcript yet

21  available, but you can listen to the audio this evening, I

22  think.

23           But, Your Honor, so -- we -- some of us will be here

24  at 4.  We'll be back Wednesday at 5 p.m. virtually.  And with

25  every hope that that brings us to a point where we can walk the

1    Court through the steps to get to a confirmation.

2          I do want to express our thanks, Your Honor, for Your

3    Honor taking this somewhat unusual procedural step and I'll

4    echo Mr. Dunne's comments at the beginning, thanking

5    Judge Shannon for all his efforts, not only in the past, but

6    what I'm sure he is about to do for the next 36 or so hours.

7          THE COURT:  All right.  Thank you.  Does anybody else

8    have anything you need to say before we conclude this morning's

9    portion of the hearing?

10          MR. JIMENEZ:  We've done one additional note, as

11   Mr. Leblanc mentioned, it's clearly in the proceeding, the 24

12   holders have not been re-solicited so they are in that tally of

13   opt-out.  But between now and Wednesday, if Wednesday holds,

14   they may opt in.  And the point will be the -- or -- they may

15   change their opt-out status.  So I just wanted that to be clear

16   on the record since this was part of dialogue today.

17          THE COURT:  Yeah, I think up until we confirm, any

18   party can change and can opt in and opt out.  If somebody shows

19   up Wednesday at 5 and says, I've thought about this, and I want

20   to opt out, I'm going to let them opt out.  These are

21   consensual.  So until we sign the order, people can go either

22   way.

23          All right.  We are in a recess till 4.  Four o'clock

24   hearing will be virtual, but parties will clearly be able to

25   come into Court and participate if that's what they prefer to

1    do.  I'm hoping that between now and then that the principle of

2    this, which can then be included in the final confirmation

3    order can be agreed to by both the U.S. Trustee and by the

4    debtor.

5            I sort of like this solution.  I think it's really

6    more consistent with the Code than doing exculpations.  And I

7    would really hope people could think about this as a solution

8    to sort of this nagging problem that keeps hitting us.  But I

9    think what we're talking about is probably the right thing to

10   do.  So I -- we'll leave it up to y'all as to whether you can

11   agree to it.  And if not, then we -- we'll deal with it.

12           We're in recess until this afternoon when we'll take

13   up a different case.  But we're in recess in this case until

14   four o'clock.  Thank you.

15           MR. JIMENEZ:  Thank you, Your Honor.

16           THE COURT:  Thank you.

17       (Recess taken at 10:38 a.m.)

18       (Proceedings resumed at 4:00 p.m.)

19           THE COURT:  All right.  We're going back on the

20   record for the Wesco confirmation hearing 23-90611.  I've

21   activated Mr. Jimenez's line on the phone.  If anyone else

22   wishes to speak at this afternoon's hearing, you'll need to

23   press 5 Star.  Let's go ahead and remake though your

24   appearances, if we could.

25           MR. SCHAK:  Thank you, Your Honor.  Benjamin Schak of

1    Milbank, LLP, for the debtors, for the record.

2            THE COURT:  And Mr. Jimenez, let's go ahead and get

3    your appearance as well.

4            MR. JIMENEZ:  Good afternoon, Your Honor.  Andrew

5    Jimenez for the United States Trustee.

6            THE COURT:  Thank you.  So have you all been -- had a

7    chance to talk with one another and with your clients?

8            MR. SCHAK:  We have, Your Honor, and Your Honor, the

9    courtroom's a little less crowded than it was before, hopefully

10   that means everyone's resolving the governance matters over the

11   next hour or so.  I'm pleased to report on this issue that we

12   have some progress but not total resolution.

13           On the due process point, Your Honor, we do have a

14   brief language that I'd like to just read into the record that

15   would go into the confirmation, where the language is, "For the

16   avoidance of doubt, the third-party release shall not be

17   binding against any releasing party that has not received

18   notice consistent with the United States Constitution and

19   applicable law."

20           THE COURT:  All right.  Mr. Jimenez, that works for

21   the U.S. Trustee?

22           MR. JIMENEZ:  That language is acceptable, Your

23   Honor.

24           THE COURT:  Thank you, sir.  Okay.

25           MR. SCHAK:  On the points about exculpation, Your

1    Honor, we're not quite there.  And there are two separate

2    points, I think, to mention.  One is the temporal scope of the

3    exculpation.

4            Your Honor, we walked into the hearing this morning

5    with the understanding we have a deal.  We discussed a little

6    more and we do think we have a deal now.  It is the language

7    that the debtor has filed in the exculpation proceeding at 8F.

8            And also the debtors are agreeing to remove the

9    phrase "reorganized debtors" from the definition of exculpated

10   party.  And that's, as I understand it, acceptable to both

11   sides regarding the issue of the temporal scope of the

12   exculpation provision.

13           Separately, Your Honor, there's an issue that we

14   dwelled on this morning about what kinds of protections are

15   available to the individuals who were responsible for managing

16   the debtor's business during the course of the Chapter 11

17   cases.

18           And on that issue, Your Honor, I think there does

19   remain just a little bit of a disconnect about the outcome of,

20   and the direction that we got at this morning's hearing.  We

21   had understood, Your Honor, that there was a suggestion that we

22   would go off and draft some language that would recognize that

23   those individual directors benefit from protections to the

24   extent that they're effectuating something that the Court has

25   blessed.

 1          So they're conducting some sort of transaction or act

 2   that it -- has been approved or authorized by an order of this

 3   Court.  And also, that they would -- that they would have the

 4   usual protections available to them under state law, such as

 5   Delaware corporate law.

 6          We, as the debtor drafted language that we thought

 7   addressed those points.  I think the U.S. Trustee's Office just

 8   had a different takeaway from the hearing.  And, you know, I --

 9   I'll let Mr. Jimenez present his understanding, but I think it

10   would be helpful, Your Honor, just to better understand the

11   direction --

12          THE COURT:  I think that would be helpful.  For what

13   it's worth, I asked whether parties would agree to something, I

14   didn't direct them to do anything.  And so -- but -- so I

15   didn't declare this is the outcome this morning, but let me

16   hear Mr. Jimenez's views on that.

17          MR. JIMENEZ:  Thank you, Your Honor.  So Your Honor,

18   when we started the hearing this morning and we discussed the

19   issue of exculpation, I am not sure if we neglected to update

20   the Court on the progress that we had previously made regarding

21   that objection.

22          Because prior to the hearing, the U.S. Trustee had

23   agreed to the exculpated provision language that was included

24   in the Second Amendment plan.  The only remaining issue was

25   what parties are included in the definition of exculpated

1    parties.

2            So it was part of our objection that "the reorganized

3    debtor" and "the independent director" should be removed from

4    the definition.  That was the only last issue regarding this

5    objection.

6            We have no objection regarding the language of the

7    exculpation provision.  It was just about refining who are the

8    parties in the exculpated parties definition.  That's it.  I

9    think that's all -- that's the only thing we brought for the

10   Court's consideration this morning.

11           And I think that the only thing that needs to be

12   resolved is the parties -- the definition of exculpated

13   parties.  I think the debtor is suggesting here that they would

14   agree to remove "the reorganized debtor".  It is -- it seems

15   that they're not agreeing to remove "the independent director".

16   From what I actually heard, though I thought they were going to

17   agree to that.

18           The language that was proposed by the debtors, Your

19   Honor, I -- they were not acceptable to my client.  I think

20   it -- that language was over broad.  It includes many things

21   that are really verbally not discussed.  And I think goes

22   around the limitations of Highland Capital.

23           I don't think that we have -- that -- the issue that

24   we have here is very limited, Your Honor, it is just -- it has

25   nothing to do with the exculpation provision language that we

1  agreed prior to the hearing.

2          It is only about the parties included in the

3  definition of exculpated parties.  And as we stated earlier,

4  Highland Capital is clear about that.  And that "independent

5  director" and the "reorganized debtors" shouldn't have been

6  included in that definition.

7          THE COURT:  All right.  I do think you all have a

8  difference of opinion.  I'm going to issue a ruling on this and

9  put some language down which I haven't drafted yet.  So we're

10  going to do this sort of on the spot.

11          MR. SCHAK:  If it would be helpful, Your Honor, I can

12  send Your Honor the language we drafted?

13          THE COURT:  I don't want to see that.

14          MR. SCHAK:  Okay.

15          THE COURT:  That's the opposite of what I want.

16          MR. SCHAK:  I thought Your Honor might say that.

17          MR. JIMENEZ:  And that's the language we have

18  objections on, Your Honor.

19          THE COURT:  Right.  I -- let me at least start by

20  seeing if I can draft something that makes sense here.  Why

21  don't you have a seat, this is going to take me a while and I'm

22  just going to make you all wait.

23          MR. JIMENEZ:  Thank you, Your Honor.

24      (Pause)

25          THE COURT:  I think we're all in somewhat of an

1   urgent situation to get this done one way or the other and try

2   and just deal with it.

3           MR. SCHAK:  Your Honor, begging pardon.  I can see

4   what Your Honor is doing on the screen here, but not through

5   the GoTo Meeting.

6           THE COURT:  Oh, I -- I'll --

7           MR. SCHAK:  I don't know if that was intentional.

8           THE COURT:  Yep.  It was not intentional.  Let me fix

9   that.  Thank you.

10          MR. SCHAK:  Okay.

11          THE COURT:  I haven't typed very much yet,

12  Mr. Jimenez, but I -- I'll show it to you right away.

13  Apologies for this.

14      (Pause)

15          THE COURT:  I would like your comment on the

16  language.  What I have done is found that the United States

17  Trustee has objected to the inclusion of both the independent

18  director, Mr. Bartels, as well as the reorganized debtors

19  themselves, as exculpated parties.  Under the facts of this

20  case, I find that neither Mr. Bartels nor the reorganized

21  debtors qualify as exculpated parties under the laws of --

22  under the law of the Fifth Circuit.  I find that Mr. Bartels

23  was appointed to serve as an independent director, but because

24  his conduct did not reflect that level of independence that

25  would be expected of an independent director, that he may not

1    serve as an exculpated party under Highland Capital.

2           But the argument that has been made and that was made

3    this morning deals with, well, then, what should happen to

4    somebody that acted in accordance with a court order and what

5    should the liabilities be?  And I think it is appropriate for

6    the Court, sua sponte, to clarify what those liabilities are so

7    that everybody knows where they stand.

8           So first of all, with respect to the language of

9    1126(e), that provides a broad level of protection written into

10   the Bankruptcy Code having nothing to do with exculpation,

11   other than it may cover some of the same ground as exculpation.

12   But it was never addressed by Highland Capital, and I don't

13   think anyone is trying to override 1126(e).

14          And then I find that, if someone complies with one of

15   our court orders, it's -- they are simply protected by

16   operation of the law for acting in conformance with a court

17   order.  And if they don't comply with a court order but do

18   something for which a court order is required, they shouldn't

19   be protected from liability.  And finally, there's nothing

20   about the Bankruptcy Code that should make someone lose their

21   state law limitations on what liability is imposed for.  We're

22   not making people more liable because they're in bankruptcy

23   court for things that are, for example, simple negligence for

24   which a director, under most state laws, would be protected.

25          And so I'm finding that exculpation should not apply

1  but that we then lack as to what should happen in the future,

2  and I'm going to insist on clarity, and that is the language

3  that I am trying to draft.  I want to know what the parties

4  think of Paragraphs 1 and 2, and I want to hear that.  And then

5  I may think about this more, too.  But I wanted to put out

6  there what I'm thinking of doing.

7          So go ahead.  Do you want to start, and then we'll go

8  to Mr. Jimenez?

9          MR. SCHAK:  Thank you, Your Honor.  Again, Benjamin

10  Schak, for the record.  Your Honor, no issues in concept with

11  the language that Your Honor has drafted.  I think it makes a

12  lot of sense.  Just a few minor drafting comments.  So if you

13  could describe them as -- that -- we were discussing, at

14  counsel's table, one is that some of the debtors are organized

15  outside the United States.  So it may make sense to refer to

16  "state" or "jurisdiction" of organization.

17          THE COURT:  I am not sure this language captures it

18  perfectly, but you're right.  I shouldn't say "state of

19  incorporation," but I also shouldn't limit it to fraud, gross

20  negligence, or willful misconduct.  It ought to be whatever the

21  applicable non-bankruptcy law providing those restrictions or

22  expansions would be there.

23          What else do you have?

24          MR. SCHAK:  I think that is fair, Your Honor.  I

25  think you may need a -- an end parenthesis right where the

1  cursor is right now.

2            THE COURT:  All right.

3            MR. SCHAK:  The citation, Your Honor, to 1126(e) -- I

4  think those should be 1125(e).

5            THE COURT:  You're right.  Sorry.  Thank you.

6            MR. SCHAK:  And if, Your Honor, the order refers to a

7  confirmation order, I think we would probably want to put this

8  into the plan itself since, at some point, we'll be filing a --

9  likely to be filing another go-round of the plan.

10           THE COURT:  That is up to you.  I wouldn't --

11           MR. SCHAK:  I -- I'm happy to just do that on our own

12  without that going in here.

13           THE COURT:  Yeah.  I think you could do that on your

14  own.  Yeah.  I don't want to order what you ought to put in a

15  plan.  I will order what goes in my proposed order.

16           MR. SCHAK:  That is fair.  We're the plan proponents,

17  and you're the judge, Your Honor.  The last comment, Your

18  Honor, is that Mr. Bartels' name has one L.  That is it.

19           THE COURT:  Thank you.

20           Mr. Jimenez, what are your thoughts about this?

21           MR. JIMENEZ:  Thank you, Your Honor.  So I have a

22  comment for Paragraph 1.  The definition of "exculpated

23  parties" refers to -- with respect to the independent

24  directors, it refers to "any independent director of a debtor,"

25  and then, in parentheses, "including Patrick Bartels as

1  independent director of Wolverine Intermediate Holding."  I

2  would suggest that it be clarified that "any independent

3  director of a debtor" should be removed from the definition.

4          THE COURT:  Let's just see if you -- if this works

5  better.  I agree with you that I need to fix that.  Is that

6  better?

7          MR. JIMENEZ:  Yes, Your Honor.

8          MR. SCHAK:  Your Honor, that works for the debtors.

9  In point of fact, Mr. Bartels is the only independent director.

10         THE COURT:  I think, from a factual point of view,

11  that is right.  But given the language that we have in the

12  plan, we're better off using the language from Mr. Jimenez, so.

13         MR. SCHAK:  Agreed, Your Honor.

14         THE COURT:  What do you have next, Mr. Jimenez?

15         MR. JIMENEZ:  So my other observation has already

16  been pointed out -- was about the correct citation for 1125(e).

17  And I think those are all the comments I have.

18         THE COURT:  Are you okay with Paragraph 2 here?  Is

19  it properly reflecting what the law to be?

20         MR. JIMENEZ:  I am, Your Honor.  I think that is the

21  right resolution to this issue.

22         THE COURT:  Okay.  I have a comment that you all are

23  all afraid to make, which is I think my language in this long

24  paragraph, in Paragraph 2, is very awkward.  And so I want a

25  chance to fix it.  Or maybe you all want to talk about how to

1   fix it.  But I would like to get it better written than what
2   I'm able to do sitting out here on the bench.
3           So I think I'm going to just kind of save this.  Do
4   you -- I -- I'll just ask the two of you all.  Do you all want
5   to work jointly on language, or do you want me to just clean
6   this up and revise it?  I have the concept down, I think, at
7   this stage, so maybe I can do it, or probably my law clerks can
8   do it better.  Or if you all want to take a stab, that is fine.
9   But I'm not going to sign this order because it's just -- we
10  all pieced it together in 10 minutes on something very
11  important, and it's awkward.  And I want to get a better draft.
12          MR. JIMENEZ:  Your Honor.  I --
13          THE COURT:  Mr. Jimenez?
14          MR. JIMENEZ:  I think that you got the concept right.
15  And I will be confident in letting the Court fix it to the
16  standard that you think it is appropriate.  But I think it
17  would be better if it comes from the Court.
18          THE COURT:  You okay with -- if I just take some
19  time, I'll redraft it, and sort of, before I go to bed tonight,
20  I'll have this entered on the docket so you can see what it
21  says?
22          MR. SCHAK:  Yes, Your Honor.
23          THE COURT:  You're still going to get to object to
24  it, but I think you would agree that I didn't do a great job
25  here, right?

1          MR. SCHAK:  Your Honor, I think the language is just

2     fine.  And given that we took a stab at it between the two of

3     us earlier today and weren't able to resolve it, I think this

4     is the clearest path to finishing this issue up.

5          THE COURT:  Okay.  I'll get it fixed.  Thanks for

6     putting up with me.  I just -- I have a feeling this may be

7     important to do not only here but elsewhere, in other cases,

8     and I want to be sure I get the language fine-tuned a bit.

9          MR. SCHAK:  Yes, Your Honor.  And I'm sure debtors'

10    counsel, in future cases, will transform this into several more

11    paragraphs of legalese.

12         THE COURT:  Please don't do that.  No.  Let me get it

13    down to one shorter paragraph and see if I can get this done.

14    All right.  I think that is it for this afternoon.  I believe

15    that the only confirmation issue that is now outstanding is the

16    issue of governance, and that is to be resolved, one hopes, and

17    then announced at five o'clock on Wednesday.

18         MR. SCHAK:  Knock on wood, Your Honor.

19         THE COURT:  All right.  We'll see you all then.

20         MR. SCHAK:  Thank you, Your Honor.

21         THE COURT:  Thank you.  Thank you all for dialing in.

22         MR. JIMENEZ:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24      (Proceedings concluded at 4:34 p.m.)

25                              * * * * *

1                  **C E R T I F I C A T I O N**

2

3        I, Lisa Luciano, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   _____

10  LISA LUCIANO, AAERT NO. 327   DATE:  December 18, 2024

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25